**CARNEY BATES & PULLIAM, PLLC**
Joseph Henry ("Hank") Bates (CA #167688)
hbates@cbplaw.com
Randall K. Pulliam
rpulliam@cbplaw.com
11311 Arcade Drive, Suite 200
Little Rock, AR  72212
Telephone:  (501)  312-8500
Facsimile:  (501) 312-8505

Attorneys for Plaintiffs
Napoleon Ebarle and Jeanne Stamm

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAPOLEON EBARLE and JEANNE STAMM, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>LIFELOCK, INC.,<br><br>        Defendant. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>1.  VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1522(A))<br><br>2.  DECLARATORY JUDGMENT |

Carney Bates & Pulliam, PLLC
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212

COMES NOW, Plaintiffs Napoleon Ebarle and Jeanne Stamm ("Plaintiffs"), who bring this Complaint against Defendant LifeLock, Inc. ("Defendant" or "LifeLock"), and allege as follows:

## **INTRODUCTION**

1.      This is a consumer class action arising out of LifeLock's false, misleading and fraudulent representations and material omissions regarding its ability to protect consumers from identity theft.

2.      LifeLock markets itself as the "leading provider of proactive identity theft protection services for consumers and identity risk and credit worthiness assessment for enterprise." Upon this self-proclaimed title, LifeLock offers the following fee-based membership plans to consumers (collectively referred to as the "Membership Plans"): LifeLock Standard, LifeLock Advantage, and LifeLock Ultimate Plus (described more fully below). Each of LifeLock's Membership Plans is governed by LifeLock's Service Terms and Conditions, which specifically provides that

> The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

3.      LifeLock markets, offers, and sells its Membership Plans as providing (1) the "most comprehensive identity theft protection in the industry," and (2) service 24 hours a day, 7 days a week, 365 days a year. LifeLock further represents or creates the impression that its present technology is adequate to safeguard its customers' personal information and maintain necessary security standards. In addition, LifeLock represents or creates the impression that it is compliant with the terms of a settlement LifeLock entered into with the Federal Trade Commission ("FTC") in 2010 (referred to herein as the "FTC Settlement").

4.      Despite its representations, Defendant has (a) failed to adequately disclose that its

service is subject to frequent delays and/or freezes; (b) failed to implement and maintain technology to deliver and maintain security standards as promised; (c) failed to maintain compliance with the FTC Settlement; and (d) inadequately handled cancellation requests to the detriment of its consumers.

5.     As such, Defendant has engaged in deceptive marketing and sales practices in connection with its Membership Plans in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 (A).

6.     Upon information and belief, as a result of their unfair, deceptive, and unconscionable practices, Defendant has amassed substantial sums of money from the monthly fees paid by consumers, including Plaintiffs, for these Membership Plans.

## PARTIES

7.     Plaintiff Napoleon Ebarle is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

8.     Plaintiff Jeanne Stamm is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

9.     Defendant LifeLock is a Delaware corporation with its principal executive offices at 60 East Rio Salado Parkway, Suite 400, Tempe, Arizona 85281.   LifeLock conducts business throughout California and the United States.   It is currently estimated that LifeLock provides identity theft services to over 3 million subscribers.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, which, inter alia, amends 28 U.S.C. § 1332 to add subsection (d), which confers jurisdiction over class actions where, as here, "any member of a class is a citizen of a State

different from any other Defendant," and the aggregated amount in controversy exceeds five million dollars. *See* 28 U.S.C. § 1332(d)(2) and (6).

11.     This Court has jurisdiction over Defendant because it does business in California and upon information and belief Defendant's conduct that gives rise to this complaint, as further described below, occurred within and/or was implemented, authorized, or ratified in California.

12.     In accordance with 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the conduct complained of herein occurred in this District.

## COMMON FACTUAL ALLEGATIONS

**I.     Background, Prior Litigation, and the FTC Settlement**

13.     LifeLock was founded in 2005 by Richard Todd Davis ("Davis") and Robert J. Maynard, Jr. ("Maynard").

14.     From the outset, LifeLock's business model was premised on placing and renewing "fraud alerts" on its customers' credit files.  A "fraud alert" is a 90-day alert credit reporting agencies place on a consumer's credit file when requested to do so by the consumer or an authorized representative.  To request a "fraud alert," a consumer must have a good faith belief that he or she or it is, or is about to be, the victim of a fraud or related crime, including identity theft.  The "fraud alert" gives notice to creditors accessing the consumer's credit report that the consumers do not authorize the establishment of new credit, the issuance of additional cards on existing accounts, or an increase in the credit limit on an existing account.

15.     In 2006, LifeLock began an aggressive advertising campaign wherein Davis, Chief Executive Officer ("CEO") of LifeLock, put his social security number on the side of a truck and claimed LifeLock made his personal data useless to criminals.

16.     The following year, 2007, it was exposed that Davis had become the victim of

4

identity theft.  Upon information and belief, Davis has had his identity stolen no less than 13 times since 2006, despite being a LifeLock subscriber.  As such, Davis' claim that LifeLock made his personal data useless to criminals was proven to be a falsehood.

17.  Notwithstanding, upon information and belief, LifeLock continued to market and sell its products using the same and/or substantially similar marketing ploys.

18.  In 2008, Experian Information Solutions, Inc. ("Experian"), a credit reporting agency, filed suit against LifeLock alleging that LifeLock's practice of placing and renewing "fraud alerts" under consumers' names violated the federal Fair Credit Reporting Act ("FCRA") because the statutory language excludes corporations such as LifeLock from placing "fraud alerts".  According to court documents, LifeLock called Experian's fraud hotline up to 15,000 times a day to request "fraud alerts."

19.  In an order granting partial Summary Judgment in favor of Experian, the Honorable Andrew J. Guilford agreed with Experian, finding that under the language of the statute and its legislative history, "the FCRA embodies an established public policy against companies like LifeLock placing fraud alerts on behalf of consumers."  *See Experian Information Solutions, Inc. v. LifeLock Inc.* (Case No. SACV08-00165 AG), Order Granting Motion for Partial Summary Judgment, attached hereto as Ex. 1.  Accordingly, the very premise of LifeLock's promised protections, *i.e.* the Company setting fraud alerts on behalf of its consumers, was declared unlawful.

20.  That same year, the FTC filed suit against LifeLock alleging that the Company's services did not prevent identity theft, as represented, and did not provide many of the protections claimed by LifeLock.  The FTC alleged that LifeLock made material misrepresentations and/or omissions of material fact in violation of Section 5(a) of the FTC Act by representing and/or creating the impression, among others, that (a) LifeLock stops identity theft before it happens, (b) LifeLock

offers a proven solution to identity theft, and (c) LifeLock guarantees identity-theft from ever happening. Thirty-five State Attorney Generals (referred to as the "State AGs") joined the FTC's action.

21.    In resolution of the claims brought by the FTC, LifeLock and the FTC entered into a Final Stipulated Judgment and Order for Permanent Injunction and Other Equitable Relief as to Defendants LifeLock and Davis (the "FTC Order"), wherein LifeLock and Davis and "their officers, agents, servants, and employees and all persons in active concert of participation with any of them . . ." were "permanently restrained and enjoined" from the following:

A.    in connection with the advertising, distributing, promoting, offering for sale, or sale of any product, service, or program designed for the purpose of preventing, mitigating, or recovering from any form of identity theft as defined in 18 U.S.C. § 1028, misrepresenting in any manner, expressly or by implication:

1.  that such product, service, or program provides complete protection against all forms of identity theft by making customers' personal information useless to identity thieves;

2.  that such product, service, or program prevents unauthorized changes to customers' address information;

3.  that such product, service, or program constantly monitors activity on each of its customers' consumer reports;

4.  that such product, service, or program ensures that a customer will always receive a phone call from a potential creditor before a new credit account is opened in the customer's name;

5.  the means, methods, procedures, effects, effectiveness, coverage, or scope of such product, service, or program;

6.  the risk of identity theft to consumers;

7.  whether a particular consumer has become or is likely to become a victim of identity theft; and/or

8. the opinions, beliefs, findings, or experiences of an individual or group of consumers related in any way to any such product, service, or program.

Such products, services, or programs include, but are not limited to, the placement of fraud alerts on behalf of consumers, searching the internet for consumers' personal data, monitoring commercial transactions for consumers' personal data, identity theft protection for minors, and guarantees of any such product, services, or programs.

B. misrepresenting in any manner, expressly or by implication, the manner or extent to which they maintain and protect the privacy, confidentiality, or security of any personal information collected from or about consumers.

22. The FTC Order further ordered that LifeLock (as well as any business entity controlled by Davis that collects, maintains, or stores personal information from or about consumers) "establish and implement, and thereafter maintain, a comprehensive information security program that is designed to protect the security, confidentiality, and integrity of personal information collected from or about consumers. Such program, the content and implementation of which must be fully documented in writing, shall contain administrative, technical, and physical safeguards appropriate to the entity's size and complexity, the nature and scope of the entity's activities, and the sensitivity of the personal information collected from or about consumers . . . ."

23. In this same vein, the FTC order required LifeLock to make an initial assessment and biennial assessments for twenty years on the effectiveness of its safeguards.

24. The FTC Order also obligated LifeLock to pay $11 million to the FTC, to be used for equitable relief to injured consumers, and $1 million to the State AGs.

## II. LifeLock's Relationship With Its Subscribers

25. As previously noted, LifeLock markets, offers, and sells the following fee-based Membership Plans: LifeLock Standard, LifeLock Advantage, and LifeLock Ultimate Plus.

26. LifeLock Standard offers identity theft detection and alerts within its network, lost

7

wallet protection, address change verification, black market website surveillance and reduced pre-approved credit card offers for $9.99/mo.

27.    LifeLock Advantage offers LifeLock Standard services plus fictitious identity monitoring, court records scanning, data breach notifications, credit reports and scores, and financial account activity alerts for $19.99/mo.

28.    LifeLock Ultimate Plus protection provides LifeLock Advantage services plus bank account takeover alerts, enhanced credit application alerts, file-sharing network searches, sex offender registry reports, credit reports and scores, and monthly credit score tracking for $29.99.

29.    As an add-on service, a subscriber of one of these three Membership Plans can enroll in LifeLock Junior, which is marketed and sold as providing monitoring services for the member's children's personal information.  LifeLock Junior protection purportedly provides identity theft detection and alert notifications, credit file detection, black market website surveillance, file-sharing network searches, and a $1 million total service guarantee.  According to LifeLock, "LifeLock Junior – it's relentless protection for your kids and peace of mind for you."

30.    Each of LifeLock's Membership Plans is governed by LifeLock's Service Terms and Conditions, which specifically provide that

> These LifeLock Service Terms and Conditions (the "Service Terms") are a legally binding agreement between LifeLock, Inc. ("LifeLock," "we" "our" or "us") and you ("you," "your" or "yours"), and describe the terms under which you agree to use the LifeLock identity programs, including any applicable Stolen Identity Insurance (the "Protection Programs""), credit monitoring service (the "Credit Monitoring Service") and any other service or product which may be made available to you by us for which you have registered or enrolled or have been registered or enrolled by an authorized third party (collectively the 'Services" and individually a "Service").

31.    In addition, the Service Terms and Conditions provide as follows:

> The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the

United States.

**III.    Defendant's Products Are Marketed, Offered, and Sold to Consumers in an Unfair, Misleading, and Deceptive Manner.**

32.    LifeLock advertises heavily on the television, internet, and radio.  It claims, via its website, to provide "comprehensive identity theft protection" that "helps safeguard your finances, credit and good name," and promises to guarantee its services up to $1,000,000.

33.    More particularly, LifeLock markets, offers, and sells each of its Membership Plans as providing the following: (a) protection from fraud or unauthorized account charges; (b) a solution to financial security; (c) live member support 24/7/365 and up-to-the-minute "alerts" of any threat of identity theft; and (d) a $1 million total service guarantee.

34.    LifeLock advertises and sells its Membership Plans on the representation that "LifeLock's patented alert technology gives you the opportunity to confirm your identity before a new account such as a retail card, auto loan or new wireless phone is opened with your information."

35.    LifeLock further represents that it will keep its customers timely informed through use of its "Identity Alert System".  According to its website, LifeLock promises the following:

**Alerts When You Need Them**

With our patented LifeLock Identity Alert system, as soon as we detect a threat to your identity, you'll be notified by text, phone, or email, to help stop thieves before they do damage.  So while you're out there connecting to the world, we'll be here helping to keep your personal information safe.

36.    Defendant represents that it provides continuous "alert" services, maintaining that its team works 24 hours a-day, 7 days a week, 365 days a year.  Specifically, Defendant touts:

**Need Help?  We're Here all the Time.**

Our award-winning Member Services agents are on the job every minute of every day, including holidays.  Call or contact us online whenever you need help or have questions.  If you do become a victim, our Certified Resolution Specialists know exactly what to [do].  That's why millions trust LifeLock with their identity theft

protection.

**A.      A LifeLock Insider Reveals that LifeLock Misrepresents the Scope and Effectiveness of Its Alert Services.**

37.      In a complaint filed on July 8, 2013 for wrongful termination (*see Burke v. LifeLock, Inc.*, No. 13-CV-1355 (D. Ariz.)), Stephen P. Burke ("Burke"), a Senior Financial Analyst with LifeLock from February 1, 2010 to March 2013, revealed that during the period of his employment, LifeLock

> had and continues to have widespread system problems in processing [ ] alerts and sending them out to the customers as promised in its national marketing campaigns. The problem of timely informing customers that their credit information was accessed is so widespread that Defendant instituted a code freeze.  In essence, Defendant is deliberately 'stepping on the brakes' with regard to sending this critical information to customers on a timely basis, and worse, often choosing not to send these alerts out at all.  This practice has been referred to as "throttling."

*See* Ex. 2:  Burke Compl., ¶ 13.

38.      Burke alleged that he "first learned of an issue with LifeLock's alert notification services to customers through an e-mail chain forwarded to him in late November 2012 by John Lenstohm ("Lenstrohm"), [LifeLock's] Director, Direct Response."  *Id.* at ¶ 15.

39.      Burke further recounted that he reported the problems of delayed alerts, diminished alert notification service, and "throttling" of alerts with the following LifeLock officers and employees, among others:  Lenstrohm, Director, Direct Response; Erick Dickens, Vice President of Marketing; Amanda Mellon, Senior Manager; Brent Hazel, Manager; Melinda Keels, Finance; and Gregory Lim, Burke's immediate supervisor.

40.      Burke further averred that he raised concerns to the officers and employees identified in the preceding paragraph about the effects of not sending out alerts, specifically addressing that "throttling" might violate the FTC Order.  Burke also recommended that LifeLock "adjust its marketing messaging to reflect this diminished service."  *Id.* at ¶¶ 16, 19.

41.     In February 2014, LifeLock settled Burke's wrongful termination suit for an undisclosed amount.

**B.     A Second LifeLock Insider Confirms Delays and Shut-Downs of LifeLock's Alert Notification Services and Further Reveals that LifeLock's Technology Is Inadequate to Provide the Protections Promised.**

42.     On the heels of the Burke settlement, Michael D. Peters ("Peters"), LifeLock's Chief Information Security Officer from approximately May 24, 2013 through July 29, 2013, filed a complaint against LifeLock for wrongful termination and violation of whistleblower protection laws, a suit that remains ongoing.

43.     In his complaint against LifeLock, Peters alleges that upon commencing work at LifeLock, he immediately began an initial risk assessment of the Company.  Peters states that prior to his risk assessment, the Company had never conducted a bona fide risk assessment.  Ex. 3:  Peters Compl. ¶ 17.

44.     Peters recounts that the findings of his assessment included discovery of multiple examples of LifeLock engaging in misleading, unfair, and/or deceptive practices, including, among others, the following:

- LifeLock's manager of database administration, Jacqueline Hufford-Jensen, signed a Sarbanes-Oxley audit verifying that the information contained in that audit was true and correct even though the time period she was attesting to predated her hiring date at LifeLock.

- LifeLock's director of internal audits, Tony Valentine, had collected evidence from the information security team that existed prior to Peters's arrival related to access logging, audit logging, audit log reviews, network security controls, and data leakage controls that either (1) did not truly exist because the technology was still in

boxes; or (2) LifeLock lacked the staff to keep track of everything; or (3) such reviews were not actually conducted.

- LifeLock employee Dave Bridgman reported that LifeLock's current practice was to manipulate the customer alerts sent to its elderly customers. LifeLock would turn off or reduce the services alerting elderly customers to reduce the call volume received by LifeLock's customer support center.

- LifeLock was in the process of finalizing a new product offering called PassLock. This system was designed to allow customers to include their passwords for up to ten accounts. PassLock would then crawl through hundreds of internet sites to check the username and password supplied by the customer and report back to the customer. The problem was that the database was not being protected with industry-grade encryption. The database was predicted to contain millions of customer credentials that would be devastating to consumers if a breach occurred. Moreover, the system was going to utilize third-party cloud hosting business without that third party's knowledge or consent. Technically, the PassLock crawling would be identified by most service providers as intrusive, illegal, illegitimate, and then blacklist the source address.

*Id.*

45.    Peters further alleges that the risk assessment uncovered that LifeLock's technology and security were ineffective to deliver the protections LifeLock promised. Specifically, Peters determined that

- "LifeLock's internal capacity for governance implemented (policies, audit plan, change controls, architecture review, etc.) was at 47% of the minimum to protect

LifeLock's customers and their sensitive information." (*Id*. at ¶ 18);

- "LifeLock's technological security readiness (intrusion prevention, data leakage, data encryption, access controls, physical security, etc.) was only at 27% of the minimum to protect LifeLock's customers and their sensitive information." (*Id*. at ¶ 19); and

- "LifeLock's security vigilance (vulnerability testing, auditing, monitoring, awareness education, event logging, incident management, etc.) was at 0% of the minimum to protect LifeLock's customers and their sensitive information." (*Id*. at ¶ 20).

46.     According to Peters, these deficiencies were due, in large part, to deficient staffing. LifeLock only had two people responsible for security.  One individual lacked technical skill and only had minimal security experience. While the other had technical skills, he was newly out of college and lacked experience.  Peters determined that millions of consumers were at risk, which led Peters to advise LifeLock Chief Financial Officer, Chris Power, and LifeLock Chief Information Officer, Rich Stebbins, that LifeLock should immediately hire 12 information security professionals. Peters reports that in response, LifeLock fired Peters, resulting in Peters filing suit.  (*Id*. at ¶¶ 20-25.)

**C.     LifeLock Fails to Inform Customers that It Cannot Lawfully Place "Fraud Alerts" With Credit Reporting Agencies**

47.     Despite the court's ruling in *Experian* (*see* ¶¶ 20-21 above), LifeLock's business model and services have remained substantially unchanged since 2005.  *See* http://consumerproductadvisor.com/lifelock-review/.          Indeed,  on  the  website www.lifelockblog.com/why-lifelock/, which has a 2015 copyright and was last visited by Plaintiffs' counsel on January 14, 2015, LifeLock continues to represent that "LifeLock will request on your behalf that fraud alerts be placed on your accounts – By doing these, creditors will use extra care to identify who you are to investigate the validity of any transaction."

48.     On this same website, LifeLock further represents that "If a child has a credit report, LifeLock will request that fraud alerts be placed on the child's accounts."   *See* www.lifelockblog.com/why-lifelock/.

49.     However, at no time does LifeLock inform consumers that under the statutory language of the FCRA, only an individual is allowed to place a "fraud alert," either for themselves, or acting on behalf of or as a personal representative to another individual.

50.     Likewise, LifeLock fails to inform consumers that a federal court has previously ruled that placement of fraud alerts by LifeLock with any credit reporting agency violates public policy.

**D.      LifeLock Fails to Disclose the True Nature of Its Service, and Then Inadequately and/or Unfairly Handles Cancellation Requests**

51.     The Consumer Product Advisor reports that LifeLock's products and services are marketed in a confusing and convoluted way, masking their limitations, exclusions, and restrictions, and making it impossible for consumers to knowingly determine what these products cover and whether they provide a worthwhile benefit.

52.     For example, LifeLock's marketing proclaims that membership in one of LifeLock's Membership Plans provides "peace of mind."   However, Defendant's "peace of mind" tagline misrepresents the true nature of the Membership Plans; specifically, that a majority of the services provided are available for free; that Defendant's services have many hidden, variable, and narrow restrictions; that Defendant's alert notification services are substantially diminished because of the Company's practice of "throttling" alerts; and that Defendant's monitoring services  were not equipped to handle and protect a customer's personal information as represented by LifeLock.

CLASS ACTION COMPLAINT

53.     In addition, upon information and belief, LifeLock fails to adequately inform its members that the Company only runs a credit report once a year and that the Sex Offender list maintained by LifeLock is not updated on a daily or weekly basis.

54.     Upon further information and belief, Defendant's customer service representatives employ an array of deceptive tactics to thwart members' ability to cancel their Membership Plans.

55.     According to various customer complaints posted on www.consumeraffairs.com/privacy/lifelock.html, LifeLock does not timely respond to cancellation requests and/or uses scare tactics to bully or mislead customers into believing that they are unsafe without LifeLock.  Moreover, customers report that even after canceling their accounts, or at least a portion thereof, they continued to be billed by LifeLock for the canceled services.

## IV.     Defendant's Policies, Procedures, and Practices Are in Violation of the FTC Order.

56.     As set forth above in ¶¶ 23 through 26, the FTC Order enjoins LifeLock from misrepresenting, expressly or by implication, "the means, methods, procedures, effects, effectiveness, coverage, or scope" of LifeLock's services.

57.     Notwithstanding, throughout the Class Period, Defendant has made, and continues to make, material misrepresentations and omissions.  For example, LifeLock has failed on an ongoing basis to disclose that its consumer alert notification services were subject to regular delays and were actively disabled by the Company.  Thus, Defendant's representations that LifeLock offers "24x7x365" service support and up-to-the-minute "alerts" are misleading, at best.

58.     Moreover, LifeLock has represented, on a continuous basis, and/or actively created the impression, and continues to create the impression, that its technology and safety protocols were and are sufficient to adequately protect is members private and confidential information as promised. However, as previously described herein, LifeLock's technology and personnel were deficient and

incapable of protecting the security, confidentiality, and integrity of personal information collected from or about consumers as promised.

## V. The FTC's Renewed Investigation of LifeLock

59. Around the same time Peters filed his wrongful termination suit against LifeLock in federal court, Peters filed a whistleblower complaint with the FTC. As a result, in or about August 2013, the FTC opened an investigation into LifeLock's current policies, procedures, and practices. Upon information and belief, the FTC investigation remains ongoing.

## FACTUAL ALLEGATIONS SPECIFIC TO NAMED PLAINTIFFS

60. Plaintiff Napoleon Ebarle has been a member of LifeLock since at least 2012. In addition, Plaintiff Ebarle enrolled his wife and two minor children. Since his enrollment and based on LifeLock's representations and promises, Plaintiff Ebarle has paid LifeLock a fee of approximately $40 a month for LifeLock's services.

61. Based on LifeLock's advertisements and representations, Plaintiff Ebarle understood and/or had the impression that LifeLock would protect against any attempt to steal his identity or fraudulently procure credit under his name, would contact him in the event of suspicious activity, and send him "up-to-the-minute" alerts. In accord with Plaintiff Ebarle's understanding, he submitted his, his wife's, and his children's personal information to LifeLock.

62. However, during his subscription, Plaintiff Ebarle experienced an incident with suspicious activity to his family's personal information. However, Plaintiff Ebarle did not receive the services and/or support promised by LifeLock.

63. Additionally, upon contacting LifeLock, Plaintiff Ebarle learned that despite paying for services for himself, his wife, and two children, LifeLock was not servicing the accounts for his wife and two children.

64.     Plaintiff Jeanne Stamm subscribed to LifeLock in 2008.   Since that time, Plaintiff Stamm has paid LifeLock a fee of approximately $100 a year, or $9 per month.

65.     Based on LifeLock's advertisements and representations, Plaintiff Stamm understood and/or had the impression that LifeLock would protect against any attempt to steal her identity or fraudulently procure credit under her name and send her timely alert notification.   Based on her understanding, Plaintiff Stamm submitted her personal information to LifeLock.

66.     At no time relevant hereto was Plaintiff Stamm aware that LifeLock was not permitted to submit fraud alerts on her behalf; that LifeLock's consumer alert notification services were subject to regular delays and were actively disabled by the Company; or that LifeLock's technology and personnel were deficient and incapable of protecting the security, confidentiality, and integrity of personal information collected from or about consumers as promised.

67.     As such, Plaintiffs were charged and paid fees for services that were not as represented, were illegal for the Company to perform, were non-existent, and/or virtually worthless.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action against LifeLock as a class action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3).

69.     Plaintiffs seek certification of this action on behalf of the following class (the "Class"):   all persons in the United State who are or were, during January 19, 2014 through the resolution of this matter (the "Class Period") subscribers of LifeLock's fee-based theft protection services. Excluded from the Class are Defendant, any parent, subsidiary, affiliate, or controlled person of Defendant, as well as the officers, directors, agents, servants or employees of Defendant and the immediate family members of any such person.   Also excluded is any judge who may preside over this cause of action.

70.     The exact number of the Class, as herein identified and described, is not known, but it is estimated to number in the thousands.  The Class is so numerous that joinder of individual members herein is impracticable.

71.     There are common questions of law and fact in the action that relate to and affect the rights of each member of the Class and the relief sought is common to the entire Class.  In particular, the common questions of fact and law include:

(A)     Whether Defendant's alert notification services were subject to regular delays and/or shut-downs;

(B)     Whether Defendant failed to maintain compliance with the FTC Order;

(C)     Whether Defendant's technology and safeguards were deficient to deliver the protections as promised;

(D)     Whether Arizona law applies to the putative Class; and

(E)     Whether members of the Class have sustained damages, and, if so, in what amount.

72.     The claims of the Plaintiffs, who are representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiffs, depend on a showing of the acts of Defendant giving rise to the right of Plaintiffs to the relief sought herein.  There is no conflict between the individually named Plaintiffs and other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

73.     The named Plaintiffs are the representative parties for the Class, and are able to, and will fairly and adequately protect the interests of the Class.  The attorneys for Plaintiffs and the Class are experienced and capable in complex civil litigation, consumer fraud litigation and class actions.

74.     The class action procedure is superior to all other available methods for the fair and efficient adjudication of this controversy.  This action would permit a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence and effort.  Class treatment also would permit the adjudication of claims by class members whose claims are too small and complex to individually litigate against a large corporate defendant.

## COUNT I
## VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT

75.     Plaintiffs repeat and reallege all preceding paragraphs contained herein.

76.     LifeLock's advertising and marketing made use of material misrepresentations and omissions, false promises, and deception in connection with the sale and advertisement of its services in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A).

77.     Specifically, LifeLock used false, deceptive and misleading statements, and omitted material facts, concerning the scope and effectiveness of its services; LifeLock's ability to place fraud alerts under the FCRA; and the limitations, exclusions, and restrictions on LifeLock's services.  For example, LifeLock omits from its advertising the fact that its consumer alerts are subject to regular delays and are actively disabled.  In addition, LifeLock also fails to disclose the effects of not sending out alerts.

78.     Likewise, LifeLock's advertisements and website were misleading, false, and/or deceptive regarding the efficacy of LifeLock's technology and safeguards.

79.     LifeLock's advertisements, marketing, and customer service representatives purposely used inconsistent and confusing terms and/or high pressure sales tactics so as to confuse customers and prevent them from bringing legitimate claims and/or canceling their services.

80.     Upon information and belief, LifeLock knowingly violated the terms of the FTC

19

Order and used false, misleading, and deceptive representations and/or omissions in the advertising, marketing, and sales of its services.

81.    As a result of LifeLock's misrepresentations and omissions, LifeLock's members paid substantial fees, were injured and sustained damages in an amount to be proven at trial.  These damages include, at a minimum, payments of monthly charges for services that were not as represented and payments for a service that is illegal for a company such as LifeLock to perform.

## COUNT II
### DECLARATORY JUDGMENT

82.    Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

83.    An actual case and controversy within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, which may be adjudicated by this Court exists between Plaintiffs and proposed class members, and the Defendant.

84.    Plaintiffs and all members of the proposed class have, had, or were subscribers of one of Defendant's fee-based Membership Plans.  Defendant's Terms and Conditions provide that its insureds are treated consistent with the requirements of the laws and regulations of Arizona.  Thus, per the governing contract, Arizona law controls how the Defendant's customers must be treated by Defendant.

85.    At the same time, the relationship between Defendant and its customers was subject to the FTC Order entered between Defendant and the FTC in 2010, which specifically enjoins LifeLock from misrepresenting, expressly or by implication, "the means, methods, procedures, effects, effectiveness, coverage, or scope" of LifeLock's services.

86.    Defendant, as a general policy and business practice, represented or created the impression that LifeLock's Membership Plans provide: (a) protection from fraud or unauthorized account charges or "peace of mind"; (b) a solution to financial security; (c) live member support

20

1    24/7/365 and up-to-the-minute "alerts" of any threat of identity theft; and (d) a $1 million total

2    service guarantee.

3        87.    Accordingly, Defendant has violated, and continues to violate, Arizona law and the

4    FTC Order and Plaintiffs are entitled to declaratory relief.

5                                           *RELIEF*

6        WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

7    respectfully request that this Court:

8        a)    determine that this action may be maintained as a class action under Rule 23 of the

9              Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives, and

10             approve Plaintiffs' Counsel as counsel for the Class;

11       b)    enter an order demanding that Defendant pay monetary damages to the Plaintiffs, and

12             all proposed Class members;

13       c)    enter an order declaring that Defendant's actions are unlawful; and

14       d)    grant such other legal and equitable relief as the Court may deem appropriate,

15             including costs and attorneys' fees.

## V.    **JURY DEMAND.**

Plaintiffs and the Class members hereby request a trial by jury.

Dated: January 19, 2015                    Respectfully submitted,

                                By:    */s/ Joseph H. Bates*
                                       CARNEY BATES & PULLIAM, PLLC
                                       Joseph Henry ("Hank") Bates (CA #167688)
                                       Randall K. Pulliam
                                       11311 Arcade Drive, Suite 200
                                       Little Rock, AR 72212
                                       Telephone: (501) 312-8500
                                       Fax: (501) 312-8505

                                       *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT