CARNEY BATES & PULLIAM, PLLC
Joseph Henry ("Hank") Bates (CA #167688)
hbates@cbplaw.com
Randall K. Pulliam
rpulliam@cbplaw.com
One Cantrell Building
2800 Cantrell, Suite 510
Little Rock, AR  72212
Telephone:  (501) 312-8500
Facsimile:  (501) 312-8505

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Michael W. Sobol (CA #194857)
msobol@lchb.com
Nicole D. Sugnet (CA #246255)
nsugnet@lchb.com
RoseMarie Maliekel (CA #276036)
rmaliekel@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Attorneys for Plaintiffs Napoleon Ebarle, Jeanne
Stamm, Brian Litton, and Reiner Jerome Ebarle

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAPOLEON EBARLE, JEANNE STAMM, BRIAN LITTON, and REINER JEROME EBARLE on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LIFELOCK, INC.,<br><br>Defendant. | Case No.  3:15-cv-00258<br><br>**JOINT DECLARATION OF HANK BATES AND MICHAEL W. SOBOL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: December 17, 2015<br>Time: 2:00 p.m.<br>Courtroom: 15, 18th Floor<br>Judge: Hon. Haywood S. Gilliam, Jr. |

Hank Bates and Michael W. Sobol, under penalty of perjury, submit this Joint Declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Joint Declaration"), and declare as follows:

## I.   <u>INTRODUCTION</u>.

1.   Hank Bates is a partner at Carney Bates & Pulliam, PLLC, and Michael W. Sobol is a partner at Lieff, Cabraser, Heimann & Bernstein, LLP  (collectively, "Class Counsel").

2.   We are counsel to plaintiffs Napoleon Ebarle, Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle ("Plaintiffs" or "Plaintiff Class Representatives") and the Class in the above-captioned case (the "Action").

3.   We submit this Joint Declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, and have personal knowledge of the matters set forth below based on our active participation in all aspects of the prosecution and settlement of this litigation.

4.   The proposed settlement (the "Settlement") in this Action will establish a non-reversionary, cash settlement fund of $68,000,000 ("Settlement Fund"), the entirety of which will be used to pay benefits to Class Members.  The costs of administering the Settlement, as well as any attorneys' fees and expenses, and Service Awards to the Class Representatives that may be awarded by the Court, will be paid separately by LifeLock, Inc.  *See* Exhibit A at p. 4.  Class Counsel believe this is an excellent recovery for the Class and endorse the Settlement as fair, reasonable, and adequate.

## II.   <u>SUMMARY OF THE LITIGATION</u>.

5.   This Action was commenced on January 19, 2015, when Plaintiffs Napoleon Ebarle and Jeanne Stamm, on behalf of themselves and a putative class, filed a complaint (the "Complaint") (ECF No. 1) against LifeLock, alleging that LifeLock's advertisements regarding its identity theft protection services violated Arizona's Consumer Fraud Act, Ariz. Rev. Stat. §

44-1522(A) ("ACFA").

6.      On March 6, 2015, LifeLock filed a Motion to Dismiss (ECF No. 24) the Complaint.  In response, Plaintiffs filed an Amended Class Action Complaint (the "Amended Complaint") (ECF No. 31), which added Brian Litton as a Plaintiff and expanded upon the allegations and causes of action in the original Complaint.  In their Amended Complaint, Plaintiffs allege that LifeLock made numerous misrepresentations that generally fall into the following four categories:  (1) LifeLock's promise to provide "comprehensive" services in detecting fraud; (2) LifeLock's promise to provide timely and continuous alerts of potential fraud twenty four hours a day, seven days a week, three hundred sixty five days a year; (3) LifeLock's promise to keep customers' sensitive personal data—including credit card, social security, and/or bank account numbers which all Class members were required to and did provide to LifeLock— secure; and (4) LifeLock's promise to provide a "$1 Million Total Service Guarantee," which, as the promise suggests purports to provide insurance in an amount up to $1,000,000 against identity theft.  Plaintiffs' Amended Complaint seeks declaratory judgment, compensatory damages, equitable relief, attorneys' fees, and costs.

7.      In an effort to facilitate discussions regarding potential mediation and to maximize the efficient use of judicial resources, on April 9, 2015, the parties filed a Joint Stipulation Regarding Amended Complaint (ECF No. 34), requesting the Court to extend LifeLock's time to answer Plaintiffs' Amended Complaint, which the Court granted (ECF No. 35).  Thereafter, on April 22, 2015, the parties participated in an in-person meeting regarding a possible mediation and exchanging informal discovery prior to any such mediation.  While the parties were unable to reach an agreement on the parameters of informal discovery and whether mediation would be fruitful, they agreed to continue their discussions.  Accordingly, on April 24, 2015, the parties filed a second Joint Stipulation Regarding Amended Complaint (ECF No. 37), which the Court

granted on May 4, 2015 (ECF No. 38), giving Defendant until May 27, 2015 to answer or otherwise respond to Plaintiffs' Amended Complaint.

8.      On May 13, 2015, the parties filed a third Joint Stipulation Regarding Amended Complaint (ECF No. 39), informing the Court that the parties had agreed to proceed with mediation on July 1, 2015 and advising the Court that the parties would provide a status update thereafter.  On May 22, 2015, the Court granted the parties' Joint Stipulation, staying the matter pending the parties' mediation and giving the parties until July 10, 2015 to provide the Court with a status update (ECF No. 40).

9.      In accord with the parties' agreement to mediate this Action, the parties exchanged informal discovery requests, which led to the production and review of thousands of pages of documents.  The parties also exchanged confidential mediation statements addressing Plaintiffs' allegations and LifeLock's potential defenses thereto.

10.      On July 1, 2015, the parties participated in mediation before the highly respected mediator, Justice Howard Wiener (Ret.).  While the parties made good progress, they were unable to reach a mutually agreeable resolution to the Action.  However, the parties agreed to schedule a second mediation session, and accordingly filed a fourth Joint Stipulation Regarding Amended Complaint (ECF No. 41) requesting a further extension until after the parties' August 18, 2015 mediation, which the Court granted on July 8, 2015 (ECF No. 42).

11.      Leading up to the parties' second mediation session, the parties continued to engage in informal discovery.  Ultimately, LifeLock produced, and Class Counsel reviewed, over 10,000 pages of documents, which included, but was not limited to: (i) exemplars of 416 print advertisements disseminated between April 2010 and December 2012; (ii) exemplars of 75 aired television commercials; (iii) account histories for the individual Plaintiffs; (iv) the Settlement Agreement in the Multi District Litigation entitled *In Re LifeLock, Inc. Marketing and Sales*

*Practices Litigation*, MDL Docket No. 08-1977-MHM in the United States District Court for the District of Arizona; (v) certain documents in the matter entitled *Federal Trade Commission v. LifeLock, Inc.*, Case No. 10-CV-00530-PHX-MHM (D. Ariz.); (vi) transcripts of depositions taken in other litigation involving LifeLock; (vii) an affidavit signed by Stephen Burke, a former LifeLock employee; (viii) consumer surveys LifeLock conducted concerning certain of its advertisements; (ix) "white papers" that LifeLock provided to the FTC in connection with its 18-month investigation; (x) contracts between LifeLock and its vendors; (xi) LifeLock call-center scripts; (xii) LifeLock's terms of service during the alleged Class Period; (xiii) insurance policies underlying LifeLock's $1 million guarantee; (xiv) information regarding LifeLock subscribers; (xv) alert histories including times when alerts may not have been delivered immediately; (xvi) product pricing; (xvii) identity theft protection plan cancellations; (xviii) financial institutions within LifeLock's monitoring network; and (xix) LifeLock's responses to numerous of the FTC's requests for information.  The parties also exchanged supplemental mediation briefs.

12.     On August 18, 2015, the parties participated in a second, all-day mediation session.  At the conclusion of this session, Justice Wiener made a mediator's proposal.  As a result, the parties entered into an agreement in principle to resolve this Action.  The parties memorialized the principle terms of their agreement in a non-binding Memorandum of Understanding ("MOU").

13.     As part of the settlement framework and in furtherance of Class Counsel's due diligence, Class Counsel took Rule 30(b)(6) depositions on various topics, including LifeLock's policies and practices in delivering alerts to customers and how those policies and practices changed over time.  LifeLock produced two key employees for these depositions:  (1) Gregory Lim, Vice President Enterprise Risk & Strategic Operations, who was deposed on September 24, 2015; and (2) Sharma Upadhyayula, Sr. Director, Product Management, who was deposed on

September 25, 2015.

14.     Thereafter, Class Counsel and LifeLock's counsel engaged in further negotiations regarding the remaining terms of the Settlement, and worked together to develop a comprehensive set of settlement papers, including the Class Action Settlement Agreement, the proposed Notices, the Claim Form, and the proposed orders.  A copy of the executed Settlement Agreement, along with all exhibits, is attached hereto as Exhibit A.

III.     **THE SETTLEMENT TERMS AND THE FTC ACTION.**

15.     The Settlement requires Defendant to establish a non-reversionary Settlement Fund of $68,000,000 to provide redress to consumers in the form of benefits to eligible Settlement Class Members, which includes a Class and Subclass. Ex. A at ¶¶ 40, 57.

16.     The Settlement defines the Class as "all members of a LifeLock identity theft protection plan in the United States at any time between September 1, 2010, and the date of the Preliminary Approval Order". Ex. A at ¶ 9.  It is estimated there are approximately 6.8 million Class Members.[1]

17.     The Settlement defines the Subclass as "all individuals who enrolled in (i.e., became a member of) a LifeLock identify theft protection plan in the United States at any time between January 1, 2012, and April 30, 2015."  *Id*. at ¶ 43.  It is estimated there are approximately 3.4 million Subclass Members.

18.     The Subclass accounts for differing potential damages sustained by those Class Members who purchased LifeLock's products and/or services during the timeframe between January 1, 2012 and April 30, 2015.

19.     Specifically, while all members of the Class were subject to the core allegations of

---

[1] Excluded from the Class are LifeLock, any parent, subsidiary, affiliate, or controlled person of LifeLock, as well as the officers, directors, agents, servants or employees of LifeLock and the immediate family members of any such persons.  Also excluded is any judge who may preside over the lawsuit.

misrepresentations in this Action,[2] LifeLock's advertising and practices during the timeframe between January 1, 2012 and April 30, 2015 were particularly problematic in that LifeLock advertised and marketed that it would provide "continuous, uninterrupted" alerts of potential credit or identity fraud to customers 24 hours a day, seven days a week, 365 days a year. However, during that timeframe, we believe LifeLock failed to deliver on that promise for various reasons, including its inability to provide alerts during multiple planned maintenance and unplanned system outages and its decision to not deliver certain alerts during 42 different weekends.

20.     However, since April 30, 2015, LifeLock no longer makes such claims regarding alerts in its advertising, and it has also made multiple technical improvements to its systems to ensure that customers will receive timely alerts.  For example, LifeLock is now able to deliver alerts during planned maintenance and unplanned system outages through the use of "parallel tracks" that allow maintenance of the system on one track while alerts continue to be delivered to customers on another track.  In addition, LifeLock now has emergency backup systems through which alerts may be processed and delivered.

21.     Based on the foregoing, the Settlement Fund of $68 million shall be allocated into a fund for the Subclass (the "Subclass Fund") and a fund for the Class (the "Class Fund").  *See* Ex. A at ¶¶ 12 and 44.

22.     The Subclass Fund shall be created based on the percentage of the Class that the Subclass comprises.  For instance, if the Subclass comprises 50% of the Class, then 50% of the Settlement Fund shall be allocated to the Subclass Fund.  *Id.* at ¶ 44.  Each Subclass Member will

---

[2] These include LifeLock's promise to provide "comprehensive" services in detecting fraud; LifeLock's promise to provide timely and continuous alerts of potential fraud twenty four hours a day, seven days a week, three hundred sixty five days a year; LifeLock's promise to keep customers' sensitive personal data—including credit card, social security, and/or bank account numbers which all Class members were required to and did provide to LifeLock—secure; and LifeLock's promise to provide a "$1 Million Total Service Guarantee."

receive an automatic *pro rata* distribution from the Subclass Fund.  *Id*. at ¶ 58.

23.     The Class Fund shall be the Settlement Fund less the Subclass Fund.  Each Class Member (including those who are members of the Subclass) may submit a claim for Twenty Dollars ($20.00) from the Class Fund.  *Id*. at ¶¶ 12 and 58.

24.     In the event that claims submitted by Valid Claimants, *i.e.* Class Members that have submitted a timely and valid claim, exceed the total amount of the Class Fund, each Valid Claimant shall have a right to receive a *pro rata* distribution from the Class Fund.  *Id*. at ¶ 69.

25.     In addition, should any money remain from uncashed checks 120 days after the Payment Dates, a second *pro rata* distribution shall be made to Valid Claimants who cashed their initial payment checks.  *Id*. at ¶ 63.

26.     In the event that money remains from uncashed checks 120 days after the second distribution, the money shall be deposited into the Court Registry in a related action entitled *Federal Trade Commission v. LifeLock, Inc.*, Case No. CV-10-00530-PHX-JJT, pending in the United States District Court for the District of Arizona (the "FTC Action").  *Id*.

27.     The allegations underlying the FTC Action overlap with the allegations that form the basis of the claims asserted on behalf of the Class in this action.   After the principle Settlement terms in this Action were memorialized in the MOU, LifeLock negotiated a separate proposed agreement with the staff of the FTC that, if approved by the Commission and the court, would settle the FTC Action by entry of a judgment for $100,000,000 in favor of the FTC for the purpose of consumer redress. The proposed settlement would require LifeLock to satisfy the $100,000,000 judgment by depositing the judgment amount into the registry of the United States District Court for the District of Arizona. LifeLock would be authorized to use up to $68,000,000 from that Court registry to provide redress to consumers by funding the Settlement Fund in this Action, provided that the Settlement Fund complies with the conditions of the ultimate order

entered in the FTC Action.  However, pursuant to paragraph 57 of the Agreement in this Action, if for any reason, all or part of the $68,000,000 has not been distributed from the Court's Registry to the Settlement Administrator by the date of entry of the Final Approval Order, then LifeLock must pay within three business days following entry of the Final Approval Order sufficient amounts to fully fund the $68,000,000 Settlement Fund.

## IV.    RECOMMENDATION OF CLASS COUNSEL

28.    As exemplified in each firm's respective firm resume, Class Counsel have extensive experience litigating and settling consumer class actions and other complex matters. *See* Exhibits B and C, attached hereto.  Indeed, each firm has held significant leadership roles in prominent class actions throughout the United States.  Moreover, collectively, Class Counsel have assisted putative class members in recovering billions of dollars.  *Id.*

29.    In addition, as set forth in Section II above, Class Counsel have conducted an extensive investigation into the factual and legal issues raised in this Action.   To briefly summarize, Class Counsel have researched and analyzed pertinent law, reviewed and analyzed over 10,000 pages of documents, and deposed key personnel in this Action.  Accordingly, Class Counsel had a wealth of information at their disposal before entering into settlement negotiations, which allowed Class Counsel to adequately assess the strengths and weaknesses of Plaintiffs' case and balance the benefits of settlement against the risks of further litigation.

30.   Against this backdrop, Class Counsel have weighed the benefits of the Settlement against the inherent risks and expense of continued litigation, and they strongly believe that the proposed Settlement is fair, reasonable, adequate, and in the best interest of the Class.

31.    In particular, LifeLock vigorously denies the alleged wrongdoing in this Action.  LifeLock denies that it engaged in any intentional "throttling" (*i.e.* systemic delays) of alerts, and also maintains that it provides the most comprehensive identity theft protection services available

on the market.  LifeLock additionally asserts that any inadvertent delays in sending alerts to customers affected only a small number of its customers, and that such delays in any event did not result in any harm in the form of actual credit fraud or identity theft such that LifeLock claims that none of the Class Members have suffered any injury.  Moreover, LifeLock believes that variances in the representations that Class Members saw, whether Class Members' alerts were delayed, and whether Class Members suffered any harm make class certification unlikely.

32.     Hence, in the absence of settlement, LifeLock would defend this Action aggressively at multiple, procedural steps prior to trial, undoubtedly including a motion to dismiss, motion for summary judgment and opposition to class certification.

33.     Against this backdrop, the outcome of continued litigation, including trial and likely appeals, is far from certain, could add years to this litigation, and would entail significant expense.

34.     In contrast, the Settlement provides significant, immediate benefits to the Class.  While Plaintiffs have calculated the maximum value of their claims to be a figure larger than the settlement amount, when this amount is discounted by the risks identified herein, the combined experience of Class Counsel dictates that the interests of the Class are better served by the proposed Settlement.

## V.     CONCLUSION

35.     In sum, the settlement negotiations in this Action were conducted at arm's length by informed and experienced counsel for both parties, spanned seven months, and included two, full-day mediation sessions before a reputable mediator who had an integral part in the settlement negotiations.  Further, the Settlement provides a significant benefit to the Class now, without the inherent risk, expense, delay, and uncertainty of continued litigation.

36.     Consequently, Class Counsel believe the proposed Settlement is fair, reasonable,

and adequate, and should be preliminarily approved by the Court.

We declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this 4th day of November, 2015.

San Francisco, California    */s/ Michael W. Sobol*
                             Michael W. Sobol, Esq.
                             Lieff Cabraser Heimann & Bernstein, LLP

Little Rock, Arkansas        */s/ Hank Bates*
                             Hank Bates, Esq.
                             Carney Bates & Pulliam, PLLC

## ATTESTATION

I, Michael W. Sobol, am the ECF user whose identification and password are being used to file this Joint Declaration.  I hereby attest that Hank Bates has concurred in this filing.

                             */s/ Michael W. Sobol*
                             Michael W. Sobol, Esq.

# EXHIBIT A

**CLASS ACTION SETTLEMENT AGREEMENT**

**TABLE OF CONTENTS**

I.        INTRODUCTION .................................................................................................. 1

II.       DEFINITIONS ...................................................................................................... 4

III.      CONVENTIONS ................................................................................................ 10

IV.       SECOND AMENDED COMPLAINT ............................................................... 11

V.        CERTIFICATION OF THE CLASS AND SETTLEMENT CLASS ........................ 12

VI.       SETTLEMENT RELIEF .................................................................................... 13

VII.      NOTICE TO THE CLASS ................................................................................. 17

VIII.     CLASS CLAIMS PROCESS ............................................................................. 22

IX.       REQUESTS FOR EXCLUSION ....................................................................... 22

X.        OBJECTIONS TO SETTLEMENT ................................................................... 24

XI.       SETTLEMENT ADMINISTRATOR ................................................................ 25

XII.      RELEASE AND WAIVER ................................................................................ 27

XIII.     ATTORNEYS' FEES AND EXPENSES AND PLAINTIFF SERVICE
          AWARDS .......................................................................................................... 30

XIV.      PRELIMINARY APPROVAL ORDER, FINAL APPROVAL ORDER, FINAL
          JUDGMENT, AND RELATED ORDERS .......................................................... 32

XV.       MODIFICATION OF THIS SETTLEMENT AGREEMENT ............................ 33

XVI.      CONDITIONS IMPACTING FINALITY OF SETTLEMENT ....................... 34

XVII.     SCHEDULE OF EVENTS ................................................................................ 38

XVIII.    NONDISPARAGEMENT ................................................................................. 39

XIX.      CONFIDENTIALITY ........................................................................................ 40

XX.       AGREEMENT TO COOPERATE .................................................................... 41

XXI.      WARRANTIES .................................................................................................. 42

XXII.     NO ADMISSIONS ............................................................................................. 43

XXIII.    GENERAL MATTERS AND RESERVATIONS .............................................. 45

## CLASS ACTION SETTLEMENT AGREEMENT

**IT IS HEREBY STIPULATED AND AGREED** by, between, and among Plaintiffs

Napoleon Ebarle, Jeanne Stamm, Brian Litton, and Renier Jerome Ebarle (collectively,

"Plaintiffs") and Defendant LifeLock, Inc. ("LifeLock"), with all terms as defined below,

through their counsel, that the action entitled *Ebarle, et al. v. LifeLock, Inc.*, Case No. 3:15-CV-

00258 HSG (N.D. Cal.) (the "Action") is settled and judgment shall be entered on the terms and

conditions set forth in this Settlement Agreement, subject to the Court's approval.

## I.  INTRODUCTION

A.      On January 22, 2015, LifeLock was served with a Class Action Complaint filed

by Plaintiffs Napoleon Ebarle and Jeanne Stamm alleging that LifeLock's advertisements

regarding its identity theft protection services violated Arizona's Consumer Fraud Act, Ariz.

Rev. Stat. § 44-1522(A) ("ACFA"), for which they sought declaratory judgment, compensatory

damages, attorneys' fees, and costs.  LifeLock responded by filing a Motion to Dismiss the

Complaint on March 6, 2015.  In lieu of responding to LifeLock's Motion to Dismiss, Plaintiffs

amended their Complaint on March 27, 2015, to add Brian Litton as a Plaintiff and to expand

upon their allegations and causes of action.  In their First Amended Complaint ("FAC"),

Plaintiffs generally allege that LifeLock makes numerous representations which it does not

deliver upon.  Plaintiffs allege these misrepresentations fall into four categories: (1) LifeLock's

promise to provide "comprehensive" services in detecting fraud; (2) LifeLock's promise to

provide timely and continuous alerts of potential fraud twenty-four hours a day, seven days a

week, three hundred sixty-five days a year; (3) LifeLock's promise regarding its information

security program; and (4) LifeLock's promise to provide a "$1 Million Total Service

Guarantee," which, as the promise suggests, purports to provide insurance in an amount up to

$1,000,000 against identity theft.  Plaintiffs' FAC seeks declaratory judgment, compensatory damages, equitable relief, attorneys' fees, and costs.

B.      LifeLock expressly denies any wrongdoing and does not admit or concede any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been alleged against it in this Action.  Nevertheless, LifeLock considers it desirable to resolve the Action on the terms stated herein in order to avoid further expense, inconvenience, and interference with its business operations and to dispose of burdensome litigation. Therefore, LifeLock has determined that the settlement of the Action on the terms set forth herein is in its best interests.

C.      This Settlement Agreement reflects a compromise between the Parties and shall in no event be construed as or deemed an admission or concession by any Party of the truth of any of the pleadings in the Action or of any fault on the part of LifeLock and all such allegations or the validity of any purported claim or defense asserted are expressly denied. Nothing in this Settlement Agreement shall constitute an admission of liability or may be used as evidence of liability by or against any Party hereto.

D.      LifeLock has informally produced approximately 10,000 pages of relevant documents in the Action to Class Counsel, which Class Counsel has thoroughly reviewed.  In particular, LifeLock's production included, but was not limited to: (i) 416 exemplars of print advertisements, comprising approximately 1,279 pages, which were disseminated between April 2010 and December 2012; (ii) 75 exemplars of aired television commercials; (iii) account histories for the individual Plaintiffs; (iv) the Settlement Agreement in the Multi District Litigation entitled *In Re LifeLock, Inc. Marketing and Sales Practices Litigation*, MDL Docket No. 08-1977-MHM in the United States District Court for the District of Arizona; (v) certain

documents filed in *Federal Trade Commission v. LifeLock, Inc.*, Case No. 10-CV-00530-PHX-MHM (D. Ariz.); (vi) transcripts of depositions taken in other litigation involving LifeLock; (vii) an affidavit signed by Stephen Burke, a former LifeLock employee; (viii) consumer surveys LifeLock conducted concerning certain of its advertisements; (ix) "white papers" that LifeLock provided to the FTC in connection with its 18-month investigation; (x) contracts between LifeLock and its vendors; (xi) LifeLock call-center scripts; (xii) LifeLock's terms of service during the alleged Class Period; (xiii) insurance policies underlying LifeLock's $1 million guarantee; (xiv) information regarding LifeLock subscribers; (xv) alert histories including times when alerts may not have been delivered immediately; (xvi) product pricing; (xvii) identity theft protection plan cancellations; (xviii) monitored financial institutions; and (xix) LifeLock's responses to numerous of the FTC's requests for information.  LifeLock also designated and produced two witness for deposition in response to Plaintiffs' Rule 30(b)(6) Deposition Notice: (1) Gregory Lim, Vice President Enterprise Risk & Strategic Operations; and (2) Sharma Upadhyayula, Sr. Director, Product Management.  Class Counsel deposed Mr. Lim on September 24, 2015, and Mr. Upadhyayula on September 25, 2015.

E.     Based upon their review, investigation, and evaluation of the facts and law relating to the matters alleged in the Action, Plaintiffs and Class Counsel, on behalf of the putative Class, have agreed to settle the Action pursuant to the provisions of this Settlement Agreement, after considering, among other things: (1) the substantial benefits to the Class Members under the terms of this Settlement Agreement; (2) the risks, costs, and uncertainty of protracted litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation; and (3) the desirability of consummating this Settlement Agreement promptly in order to provide expeditious and effective relief to the Class Members.

F.      The Parties have therefore agreed to a Settlement in which LifeLock will pay Sixty-Eight Million Dollars ($68,000,000) (the "Settlement Amount") for use as compensation for Settlement Class Members and Settlement Subclass Members.  LifeLock will separately pay the reasonable costs of administering the Settlement, any Class Counsel fees and expenses awarded, and any Service Awards to the named Plaintiffs.

G.      This Settlement was reached over the course of seven months of settlement negotiations among and between Class Counsel, LifeLock, and LifeLock's Counsel including an in-person meeting on April 22, 2015, and two mediation sessions, one on July 1, 2015, and a second on August 18, 2015, before Justice Howard W. Wiener.  The Settlement was reached only after the mediator made a mediator's proposal at the August 18, 2015 mediation, which resulted in the execution of a Non-Binding Confidential Memorandum of Understanding that day and further negotiations concerning the terms of the definitive settlement reflected in this Settlement Agreement over the course of over two months.

## II.    <u>DEFINITIONS</u>

As used in this Settlement Agreement, including the exhibits attached hereto (which are an integral part of this Settlement Agreement and are incorporated in their entirety by reference), the following terms have the following meanings, unless this Settlement Agreement specifically provides otherwise:

1.      "Action" means the putative class action complaint, including all amended complaints, filed in the matter entitled *Ebarle, et al. v. LifeLock, Inc*., Case No. 3:15-CV-00258 HSG currently pending in the Northern District of California.

2.      "Administrative Costs" means and includes: the reasonable costs and expenses of the Settlement Administrator (and any persons or entities they retain to assist them consistent

with the terms of this Settlement Agreement) associated with disseminating notice to the Class, implementing the Claim Process, and carrying out any other responsibility consistent with the terms of this Settlement Agreement.  Administrative Costs do not include other fees, costs, or expenses, including Attorneys' Fees and Expenses, court costs, or Service Awards to Plaintiffs.

3.      "Attorneys' Fees and Expenses" means such funds as may be awarded by the Court to Class Counsel to compensate all Plaintiffs' Counsel for their fees and expenses in connection with the Action and the Settlement, as described in Section XIII of this Settlement Agreement, not to exceed $10,200,000.

4.      "Claim" means the claim of a Class Member or his or her legal representative submitted in compliance with the procedure provided in this Settlement Agreement as described in Section VIII.

5.      "Claimant" means a Class Member or his or her legal representative who submits a Claim.

6.      "Claim Deadline" means sixty (60) days following the Notice Date.

7.      "Claim Form" means the document substantially in the form attached as **Exhibit 1** to this Settlement Agreement.

8.      "Claim Process" means the process for submitting and reviewing Claims as described in Section VIII of this Settlement Agreement.

9.      "Class" means all members of a LifeLock identity theft protection plan in the United States at any time between September 1, 2010, and the date of the Preliminary Approval Order.  LifeLock estimates there will be approximately 6.8 million Class Members.

10.      "Class Counsel" means: Joseph Henry ("Hank") Bates and Randall K. Pulliam of Carney Bates & Pulliam, PLLC, 2800 Cantrell Rd., Suite 510, Little Rock, Arkansas 72202,

and Michael W. Sobol of Lieff, Cabraser, Heimann & Bernstein, LLP, 275 Battery Street 29th Floor, San Francisco, California 94111.

11.    "Class Data" means the data and information available to LifeLock, after a reasonable review to ascertain the accuracy of that data and information, to be provided by LifeLock to the Settlement Administrator for the Settlement Administrator's use in disseminating Notice, processing Claims, and making Settlement payments, including information in LifeLock's possession identifying each Class Member's name, last known address and/or last known email address, and date of enrollment in a LifeLock identity theft protection plan.

12.    "Class Fund" means the amount available to pay claims submitted by Valid Claimants after deduction from the Settlement Fund of the Subclass Fund.

13.    "Class Member" means any individual falling within the Class definition.

14.    "Class Notice" means all types of notice that will be provided to the Class Members pursuant to Federal Rules of Civil Procedure 23(c)(2) and 23(e)(1), the Preliminary Approval Order, and this Settlement Agreement, including email notice, first class mail notice, website notice, publication notice, and any additional notice that may be ordered by the Court.

15.    "Court" means the United States District Court for the Northern District of California.

16.    "Defendant" refers to LifeLock, Inc.

17.    "Fairness Hearing" means the hearing at or after which the Court shall make a final decision regarding whether to finally approve this Settlement Agreement as fair, reasonable, and adequate.

18.    "Final Approval Order" means the Court's order, substantially in the form attached to this Settlement Agreement as **Exhibit 2**, finally approving the Settlement and this Settlement Agreement, as described in Section XIV of this Settlement Agreement.

19.    "Final Judgment" means the Court's order finally disposing of the Action, substantially in the form attached to this Settlement Agreement as **Exhibit 3**.

20.    "Final Settlement Date" means the next business day after both of the following have occurred:

        (1)    This Settlement Agreement is fully executed by all signatories; and

        (2)    The Court enters the Final Approval Order.

21.    "FTC Action" means the action currently pending in the United States District Court for the District of Arizona entitled *Federal Trade Commission v. LifeLock, Inc*., Case No. 10-CV-00530-PHX-MHM.

22.    "LifeLock" means Defendant LifeLock, Inc.

23.    "LifeLock's Counsel" means: Luanne Sacks of Sacks, Ricketts & Case LLP, 177 Post Street, Suite 650, San Francisco, California 94108, and Cynthia Ricketts of Sacks, Ricketts & Case LLP, 2800 N. Central Avenue, Suite 1230, Phoenix, Arizona 85004.

24.    "Long Form Class Notice" means a notice substantially in the form attached as **Exhibit 4** to this Settlement Agreement and approved by the Court, which the Settlement Administrator shall make available on the Settlement Website pursuant to the terms of this Settlement Agreement.

25.    "Notice Date" means thirty (30) days following the entry of the Preliminary Approval Order.

26.    "Objection Deadline" means forty-five (45) days following the Notice Date.

27.   "Opt-out Deadline" means forty-five (45) days following the Notice Date.

28.   "Parties" means Plaintiffs and LifeLock, collectively, as each of those terms is defined in this Settlement Agreement.

29.   "Payment Date" means the date by which (i) the Settlement Fund (not including any re-mailed or re-issued payments) will be distributed to the Valid Claimants and Settlement Subclass Members pursuant to paragraphs 58 and 68-70 of this Settlement Agreement; (ii) any funds otherwise due to Class Counsel and the class representatives pursuant to paragraphs 97-105 of this Settlement Agreement will be distributed; and (iii) any funds due to the Settlement Administrator pursuant to paragraph 64 of this Settlement Agreement will be distributed.  The Payment Date shall be twenty (20) days following the Final Settlement Date.

30.   "Plaintiffs" means and includes Napoleon Ebarle, Jeanne Stamm, Brian Litton, and Renier Jerome Ebarle.

31.   "Preliminary Approval Order" means the order to be entered by the Court preliminarily approving the Settlement as outlined in Section XIV of this Settlement Agreement and that is substantially in the form attached as **Exhibit 5** to this Settlement Agreement.

32.   "Release" means the release and waiver set forth in Section XII of this Settlement Agreement.

33.   "Released Parties" means LifeLock and each of its respective present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, assigns, and insurers, including all of their insurers' affiliates, predecessors, successors, assigns, and reinsurers, and the respective agents, servants, attorneys, employees, officers, directors, shareholders, and representatives of the foregoing, and each of them, and all of the present and former directors, officers, employees, agents, attorneys, and shareholders of LifeLock and each of their present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, and assigns.

34.     "Releasing Parties" means Plaintiffs and the Settlement Class Members, including, only to the extent they may have a right to a claim on behalf of a Plaintiff or a Settlement Class Member, each of their respective spouses, executors, representatives, heirs, predecessors, successors, bankruptcy trustees, guardians, wards, joint tenants, tenants in common, tenants by the entirety, co-borrowers, agents, attorneys, and assigns, and all others of those who claim through them or who assert claims on their behalf.

35.     "Service Award" means an award authorized by the Court to be paid to each Plaintiff in recognition of his/her efforts in prosecuting the Action and obtaining the benefits of the Settlement for the Class Members, such award not to exceed Two Thousand Dollars ($2,000) for each of the Plaintiffs.

36.     "Settlement" or "Settlement Agreement" means this Settlement Agreement, including the exhibits attached hereto.

37.     "Settlement Administrator" means Garden City Group, LLC, subject to Court approval.

38.     "Settlement Class" means all Class Members who do not timely and validly exclude themselves from the Class pursuant to the procedure set forth in Section IX of this Settlement Agreement.

39.     "Settlement Class Member" means any member of the Settlement Class.

40.     "Settlement Fund" means Sixty-Eight Million Dollars ($68,000,000), which LifeLock has agreed to pay pursuant to the terms and conditions set forth in this Settlement Agreement.

41.     "Settlement Subclass" means all Subclass Members who do not timely and validly exclude themselves from the Class pursuant to the procedure set forth in Section IX of

this Settlement Agreement.

42. "Settlement Subclass Member" means all individuals who are members of the Settlement Subclass.

43. "Subclass" means all individuals who enrolled in (i.e., became a member of) a LifeLock identity theft protection plan in the United States at any time between January 1, 2012, and April 30, 2015. LifeLock estimates there are approximately 3.4 million Subclass Members.

44. "Subclass Fund" means the amount of the Settlement Fund that shall be available for direct automatic distribution to Settlement Subclass Members and shall be determined by the percentage of the Class that the Subclass comprises. For instance, if the Subclass comprises fifty percent (50%) of the Class, then fifty percent (50%) of the Settlement Fund shall be allocated to the Subclass Fund for use in making direct automatic payments to the Settlement Subclass.

45. "Subclass Member" means any individual falling within the Subclass definition.

46. "Summary Notice" means the notice substantially in the form attached as **Exhibit 6** to this Settlement Agreement and approved by the Court that the Settlement Administrator shall email or mail to Class Members.

47. "Valid Claimant(s)" means and includes all Class Members who have not opted-out and who the Settlement Administrator determines have submitted a timely and valid Claim.

## III.   CONVENTIONS

48. Other capitalized terms used in this Settlement Agreement but not defined in the Definitions Section (Section II) of this Settlement Agreement shall have the meanings ascribed to them elsewhere in this Settlement Agreement.

49.     All personal pronouns used in this Settlement Agreement, whether used in masculine, feminine, or neuter gender, shall include all other genders and the singular shall include the plural and vice versa except where expressly provided to the contrary.

50.     All references herein to sections, paragraphs, and exhibits refer to sections, paragraphs, and exhibits of and to this Settlement Agreement, unless otherwise expressly stated in the reference.

51.     The headings and captions contained in this Settlement Agreement are included only as a matter of convenience and in no way define, limit, extend, or describe the scope of this Settlement Agreement or the intent of any provision herein.

## IV.   SECOND AMENDED COMPLAINT

52.     As a material part of this Settlement, at the time of seeking preliminary approval, Plaintiffs shall seek leave to file a Second Amended Complaint ("SAC") naming Renier Jerome Ebarle as a Plaintiff.  The proposed SAC is attached hereto as **Exhibit 7**.

53.     As a material part of this Settlement, LifeLock stipulates to and does not oppose the filing of the SAC provided that a Preliminary Approval Order, a Final Approval Order, and Final Judgment each is entered and this Settlement Agreement becomes effective on the Final Settlement Date.

54.     If a Preliminary Approval Order is not entered or a Final Approval Order and Final Judgment is not entered, this Settlement Agreement and the Settlement proposed herein does not become effective for any reason, or if this Settlement Agreement and the Settlement proposed herein is terminated, canceled, or fails to become effective for any reason whatsoever, and subject to paragraphs 112 and 114, the Plaintiffs shall withdraw the SAC within five (5) days of the denial of Preliminary Approval, the denial of Final Approval, the termination or

cancellation of this Settlement Agreement, or when the Parties agree in writing this Settlement Agreement shall not become effective for any reason, and that if the Court does not allow withdrawal of the SAC, then the Parties agree that LifeLock reserves all rights to challenge the validity of the SAC.

## V.   CERTIFICATION OF THE CLASS AND SETTLEMENT CLASS

55.    LifeLock, while reserving all defenses if this Settlement Agreement is not finally approved, hereby consents, solely for purposes of and in consideration of the Settlement set forth herein, to the certification for settlement purposes only of the Class and Subclass upon entry of the Preliminary Approval Order, to the certification of the Settlement Class and Settlement Subclass upon entry of the Final Approval Order, to the appointment of Class Counsel, and to the approval of the Plaintiffs as suitable representatives of the Settlement Class.

56.    The conditional certification of the Class and Subclass upon entry of the Preliminary Approval Order, the certification of the Settlement Class and Settlement Subclass upon entry of the Final Approval Order, the appointment of the Plaintiffs as class representatives, and the appointment of Class Counsel shall be binding only with respect to this Settlement and this Settlement Agreement.  If the Court fails to enter a Preliminary Approval Order or a Final Approval Order, this Settlement Agreement and the Settlement proposed herein does not become effective for any reason, or if this Settlement Agreement and the Settlement proposed herein is terminated, canceled, or fails to become effective for any reason whatsoever, the class certification, to which the Parties have stipulated solely for the purposes, and in consideration, of the Settlement set forth herein, this Settlement Agreement and all the provisions of any Preliminary Approval Order or any Final Approval Order shall be vacated by their own terms and the Action shall revert to its status as existed prior to the date of this

Settlement Agreement with respect to class certification, appointment of Plaintiffs as class

representatives, and appointment of Class Counsel.  In that event, LifeLock shall retain all

rights it had immediately preceding the execution of this Settlement Agreement to object to the

maintenance of the Action as a class action, the appointment of Plaintiffs as class

representatives, and the appointment of Class Counsel as class counsel and, in that event,

nothing in this Settlement Agreement or other papers or proceedings related to the Settlement

shall be used as evidence or argument by any of the Parties concerning whether the Action may

properly be maintained as a class action under applicable law, whether any of the Plaintiffs are

adequate or typical class representatives, or whether Class Counsel is adequate class counsel.

## VI.   <u>SETTLEMENT RELIEF</u>

57.      No later than ten (10) days after entry of the Preliminary Approval Order,

LifeLock shall either (i) pay to the Settlement Administrator the sum of Sixty-Eight Million

Dollars ($68,000,000.00) to create the Settlement Fund; or (ii) move for an Order directing

distribution from the Court's Registry in the FTC Action the sum of Sixty-Eight Million

Dollars ($68,000,000.00) for use by the Settlement Administrator to create the Settlement Fund.

If LifeLock elects to move for an Order directing distribution of Sixty-Eight Million Dollars

($68,000,000.00) from the Court's Registry in the FTC Action and all or part of the Sixty-Eight

Million Dollars ($68,000,000.00) has not been distributed from the Court's Registry in the FTC

Action to the Settlement Administrator by the date of entry of the Final Approval Order, then

LifeLock agrees to pay within three (3) business days following entry of the Final Approval

Order sufficient funds to enable the Settlement Administrator to create the Settlement Fund in

the amount of Sixty-Eight Million Dollars ($68,000,000.00).The Settlement Fund must be

distributed to Settlement Subclass Members and Valid Claimants pursuant to the terms of

Paragraph 62 of this Agreement, and such distribution must be completed by the deadlines set forth in paragraphs 62-63. If LifeLock elects to move for an Order directing distribution from the Court's Registry in the FTC Action, any funds that remain after eighteen months from the date on which the Court in the FTC Action enters the Stipulated Consent Order must be returned by the Settlement Administrator, including interest accrued thereon, to the Court's Registry in the FTC Action, and LifeLock shall concurrently pay an equal amount to the Settlement Administrator to restore the Settlement Fund. The Settlement Fund will be maintained by the Settlement Administrator as a Court-approved Qualified Settlement Fund pursuant to Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended. Provided that this Settlement Agreement is finally approved by the Court without material change, amendment, or modification, the Settlement Fund is to be used solely to provide compensation to all Valid Claimants and all Settlement Subclass Members. Any and all interest earned by the Qualified Settlement Fund prior to the Payment Date shall be distributed to Valid Claimants and Settlement Subclass Members pursuant to the terms of this Settlement Agreement (i.e., as part of the Settlement Fund), or distributed to the Court's Registry in the FTC Action as otherwise provided in this Paragraph, and shall not be used for any other purpose.

58.     As set forth in paragraph 62 of this Settlement Agreement, each Settlement Subclass Member will receive an automatic *pro rata* distribution from the Subclass Fund.  All Class Members (including those who are also members of the Subclass) may submit a claim for Twenty Dollars ($20.00) substantially in the form of **Exhibit 1** before the Claim Deadline, which claims will be paid solely from the Class Fund.  Any sum due to a Settlement Subclass Member who is also a Valid Claimant shall be paid by the Settlement Administrator in a single

check from the Settlement Fund.  No amount of the Settlement Fund shall be refunded or revert to LifeLock.

59.     Beginning no later than fourteen (14) days after the entry of the Preliminary Approval Order and continuing until the processing of Claims is completed, the Settlement Administrator shall provide weekly updates to Class Counsel and LifeLock's Counsel regarding Claims submissions and regarding its review and processing of Claims.

60.     The Settlement Administrator shall conduct reasonable audit(s) to ensure the integrity of the Claims Process, including that appropriate controls are in place to prevent fraud.

61.     By no later than fourteen (14) days after the Claims Deadline, the Settlement Administrator, using the Class Data and the information submitted by Valid Claimants, shall create and provide to Class Counsel and LifeLock's Counsel a complete and final list of Valid Claimants and Settlement Subclass Members, including for each the member's name and total payment amount as calculated pursuant to Section VIII of the Settlement Agreement. LifeLock's Counsel, LifeLock, and Class Counsel shall take appropriate steps to safeguard the list and shall not use it for any purpose other than the administration and implementation of this Settlement Agreement.  Class Counsel agrees to return this list to the Settlement Administrator sixty (60) days after the Final Settlement Date.

62.     By no later than the Payment Date, the Settlement Administrator shall mail checks via First Class U.S. Mail, proper postage prepaid, to the Valid Claimants and Settlement Subclass Members, drawn from the Settlement Fund as set forth in paragraph 58 of this Settlement Agreement.  Payment checks to Valid Claimants shall be sent to the mailing address indicated in each Class Member's Claim Form.  For Settlement Subclass Members who are not also Valid Claimants, their payment checks shall be mailed to the addresses indicated in the

Class Data, as updated by the Settlement Administrator through the National Change of Address Database and as otherwise stated in Section VII of this Settlement Agreement. Checks to Valid Claimants and Settlement Subclass Members shall be valid for a period of one hundred and twenty (120) days from the date appearing on the payment check. For any payment check that is returned undeliverable with forwarding address information, the Settlement Administrator shall re-mail the check to the new address indicated. For any payment check that is returned undeliverable without forwarding address information, the Settlement Administrator shall make reasonable efforts to identify updated address information and re-mail the check to the extent an updated address is identified.

63.     If payment checks from the Settlement Fund are returned undeliverable or have not been cashed one hundred and twenty (120) days after the date appearing on the payment check, the Parties agree that the Settlement Administrator shall, within ten (10) days of expiration of that one hundred and twenty (120) day period, distribute the uncashed funds on a *pro rata* basis to each Valid Claimant who cashed an initial payment check. If these second payment checks are returned undeliverable or have not been cashed one hundred and twenty (120) days after the date appearing on the second payment check, the Parties agree that the Settlement Administrator shall deposit the amount of the uncashed Settlement Fund into the Court Registry in the FTC Action without delay upon the expiration of that second one hundred and twenty (120) day period, and in no case more than nine (9) days after such expiration. Funding the FTC facilitates the purposes of the Plaintiffs' lawsuit by furthering the FTC's mission of protecting consumers.

64.     Any and all reasonable Administrative Costs incurred by the Settlement Administrator associated with the administration of this Settlement, distribution of Class

Notice, the publication and Internet/Media Notice Program, launching and maintaining the

Settlement Website, distribution of the Settlement Fund, and any and all other tasks assigned to

the Settlement Administrator by this Agreement or by the Court shall be paid by LifeLock,

subject to approval by LifeLock's Counsel.  The Settlement Administrator shall provide a copy

of invoices to LifeLock's Counsel on a monthly basis.

## VII.   NOTICE TO THE CLASS

65.   **Class Notice**.  Plaintiffs, Class Counsel, and LifeLock agree to the following

Class Notice procedures which the Parties agree is the best notice practicable.

### A.   **Dissemination of the Summary Notice.**

(1)   By no later than three (3) business days following the entry of the

Preliminary Approval Order, LifeLock shall provide the Settlement Administrator with the

Class Data.  The Class Data shall include two separate data sets: (1) a list of all Class Members

and (2) a list of all Subclass Members.  Each list shall include the Member's (i) first and last

name; (ii) last known mailing address, if available; and (iii) last known email address, if

available.  The Class Data shall not be provided to Plaintiffs, Class Counsel, or anyone other

than the Settlement Administrator.

(2)   By no later than the Notice Date, the Settlement Administrator

shall send the Summary Class Notice, in the form approved by the Court, to Class Members via

email for those Class Members for whom an email address is available and via First Class U.S.

Mail, proper postage prepaid, for those Class Members for whom an email address is not

available.  The subject line for all emails covered by this paragraph shall be:  Notice of Class

Action Settlement.

(3)   The Settlement Administrator shall update the mailing addresses

in the Class Data through the National Change of Address Database prior to sending any Summary Notice via First Class U.S. Mail, proper postage prepaid.

(4)     The Settlement Administrator shall perform a single Skip Trace using information identifying the Class Members, as necessary, to conduct an address update with respect to any Summary Notice sent via First Class U.S. Mail and returned to the Settlement Administrator as undeliverable not bearing a forwarding address using an industry accepted source such as Accurint and shall send the Summary Notice to the mailing address identified by the Skip Tracing.  The Settlement Administrator shall resend via First Class U.S. Mail, proper postage prepaid, the Summary Notice to the new address for each such Class Member within three (3) business days of obtaining each such new address.

(5)     Any mailed Summary Notice returned to the Settlement Administrator as undelivered and bearing a forwarding address shall be re-mailed by the Settlement Administrator within three (3) business days following receipt of the returned mail.

(6)     Any emailed Summary Notice that bounces back or is returned to the Settlement Administrator as undeliverable after three (3) unsuccessful delivery attempts shall be mailed by the Settlement Administrator if a mailing address is also provided in the Class Data.  If no mailing address is provided in the Class Data, the Settlement Administrator shall perform a single Skip Trace using information identifying the Class Member, as necessary, to conduct an address update to allow the Summary Notice to be sent via U.S. Mail, proper postage prepaid.  The Settlement Administrator shall send the Summary Notice to any mailing or physical address identified by the Skip Tracing within seven (7) business days following receipt of the bounced back or returned as undeliverable email enclosing the Summary Notice.

B.     **Dissemination of the Long Form Notice**:  By no later than the Notice Date, the Settlement Administrator shall post the Long Form Notice on the Settlement Website.

C.     **Publication and Internet/Media Notice**:   The Settlement Administrator shall cause the Summary Notice to be published in publication and media outlets as agreed upon by the Parties.  Notice shall also be provided via an Internet-based notice program.  The publication and Internet/Media Notice Program described in this paragraph shall commence as soon as practicable following the entry of the Preliminary Approval Order and, in all events, shall commence not later than the Notice Date.

D.     **Contents of the Summary Notice and the Long Form Notice**:  The Summary Notice shall be substantially in the form attached as **Exhibit 6,** and the Long Form Notice shall be substantially in the form attached as **Exhibit 4** as approved by the Court.  Both the Summary Notice and the Long Form Notice shall include the following information:

(1)     **General Terms**: The notices shall contain a plain, neutral, objective, and concise description of the nature of the Action and the proposed Settlement, include an estimate of the anticipated amount of the Class Fund and Subclass Fund, and a brief description of the FTC Action and the status of that action.

(2)     **Opt-Out Rights**: The notices shall inform Class Members that they have the right to opt-out of the Class and the Settlement and shall provide the deadline and procedures for exercising this right.

(3)     **Objection to Settlement**: The notices shall inform Class Members of their right to object to the proposed Settlement, Class Counsel's fee application, and/or the requested Service Awards for Plaintiffs and of their right to appear at the Fairness Hearing and shall also provide the deadlines and procedures for exercising these rights.

(4)     **Fees and Expenses**: The Long Form Notice shall inform Class Members about the amounts being sought by Class Counsel as Attorneys' Fees and Expenses and the amounts of the Service Awards being sought for the Plaintiffs and shall explain that any Attorneys' Fees or Expenses and Service Awards for the Plaintiffs that are awarded by the Court will not be paid from the Settlement Fund but instead will be paid separately by LifeLock.

(5)     **Claim Form for Class Members**: The notices shall advise the Class Members that a Claim Form is available on the Settlement Website or may be obtained from the Settlement Administrator and that a Claim Form may be submitted online or emailed or mailed to the Settlement Administrator.  The Claim Form shall be in the form approved by the Court and the notices shall remind Class Members that only Subclass Members are eligible to receive an automatic cash payment.  The notices shall also inform Class Members who are not also Subclass Members that they must submit a timely and valid Claim Form to secure a cash payment.  The notices shall further inform Subclass Members that they are eligible to submit a Claim Form to receive a payment in addition to the automatic payments they will receive from the Subclass Fund. The notices shall also provide the deadline and procedures for submitting a Claim Form.

E.     **Settlement Website**: The Settlement Administrator shall establish and maintain an Internet website, at the web address www.ebarleclasssettlement.com ("Settlement Website") where Class Members can obtain further information about the terms of this Settlement, their rights, important dates and deadlines, and related information.  Class Members shall also be able to submit a Claim Form electronically via the Settlement Website.  The Settlement Website shall include, in PDF format, the SAC, this Settlement Agreement, the

Motion for Preliminary Approval, the Preliminary Approval Order, the Class Notice, any papers filed in support of final approval of the Settlement, Class Counsel's application for attorneys' fees and costs (after it is filed), the Final Approval Order (after it is entered), and other case documents as agreed upon by the Parties and/or required by the Court and shall be operational and live by no later than thirty (30) days following entry of the Preliminary Approval Order.  The Settlement Website shall be optimized for display on mobile phones. The Settlement Administrator shall maintain the Settlement Website as operational and shall not take it down until thirty (30) days after the Payment Date.  Within five (5) business days after the Settlement Website is taken down, the Settlement Administrator shall transfer ownership of the URL for the Settlement Website to LifeLock.

       F.     **Toll-Free Telephone Number**: The Settlement Administrator shall establish and maintain a toll-free telephone number ("Toll-Free Number") where Class Members can obtain further information about the Settlement and their rights and request that a hard copy Claim Form or Long Form Notice be mailed to them.  The Toll-Free Number shall be operational and live by no later than thirty (30) days following entry of the Preliminary Approval Order.

     66.    **CAFA Notice.** Within the time prescribed by 28 U.S.C. § 1715, the Settlement Administrator shall serve notice of this Settlement to the appropriate federal and state officials in compliance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715.  The Settlement Administrator shall be responsible for drafting and preparing the CAFA notice in conformity with 28 U.S.C. § 1715 and for identifying the appropriate federal and state officials to be notified.  LifeLock agrees to pay the cost of drafting, preparing, and distributing the CAFA notice and that such costs shall not be paid from the Settlement Fund.

67.     **Best Notice Practicable.**  Plaintiffs and Class Counsel agree that the Parties are providing the best notice practicable and will not of their own initiative advocate for content or methods of Class Notice beyond that to which the Parties have agreed in this Section VII of the Settlement Agreement.

## VIII.   CLASS CLAIMS PROCESS

68.     Each Class Member may make a claim for Twenty Dollars ($20.00) from the Class Fund by submitting a completed Claim Form to the Settlement Administrator via email, via the Settlement Website, or via U.S. Mail at the address specified on the Claim Form, the Long Form Notice, and the Settlement Website on or before the Claims Deadline.  To be valid, a completed Claim Form must include the name and mailing address of the person submitting a Claim Form.  If the Claimant has an email address, the email address should also be included on the Claim Form; however, failure to include an email address on the Claim Form does not invalidate a Claim.

69.     In the event that Claims submitted by Class Members who the Settlement Administrator determines are Valid Claimants exceed the total amount of the Class Fund, each Valid Claimant shall have a right to receive a *pro rata* distribution from the Class Fund.

70.     To the extent that Claims submitted by Valid Claimants do not exhaust the Class Fund, the remainder of the Class Fund shall be distributed by the Settlement Administrator to each member of the Settlement Subclass on a *pro rata* basis.

## IX.     REQUESTS FOR EXCLUSION

71.     Any Class Member or person legally entitled to act on his or her behalf who wishes to be excluded from the Class must email or mail a written request for exclusion to the Settlement Administrator at the email address or mailing address provided in the Class Notice,

postmarked no later than the Opt-out Deadline and specifying that he or she wants to be excluded from the Class.  Such written request for exclusion (i) must contain the name and address of the person to be excluded; (ii) if applicable, must contain the name and address of any person claiming to be legally entitled to submit an exclusion request on behalf of the Class Member and the basis for such legal entitlement; (iii) must be made via email or mailed by First Class U.S. Mail, proper postage prepaid, to the Settlement Administrator at the specified mailing address or email address; (iv) must be submitted or postmarked on or before the Opt-out Deadline; and (v) must clearly indicate that he/she wants to be excluded from the Class.

72.     Any Class Member who does not submit a timely and valid written request for exclusion as provided in paragraph 71 shall be bound by all subsequent proceedings, orders, and judgments in the Action, including, but not limited to, the Release, even if he or she has litigation pending or subsequently initiates litigation against LifeLock relating to the Released Claims.

73.     Any Class Member who timely submits a request for exclusion as provided in paragraph 71 shall waive and forfeit any and all rights (s)he may have to benefits of the Settlement if it is approved and becomes final, including monetary relief, and shall waive and forfeit any and all rights to object to the fairness, reasonableness, or adequacy of the Settlement, Class Counsel's request for Attorneys' Fees and Costs, and/or the requested Service Awards to Plaintiffs.

74.     Not later than ten (10) days after the Opt-out Deadline, the Settlement Administrator shall provide to Class Counsel and LifeLock's Counsel a complete and final list of Class Members who submitted timely and valid requests to exclude themselves from the Class.

## X.    OBJECTIONS TO SETTLEMENT

75.    Any Class Member or person legally entitled to act on his or her behalf may object to the fairness, reasonableness, or adequacy of the Settlement, Class Counsel's request for Attorneys' Fees and Costs, and/or the requested Service Awards to Plaintiffs.  To be valid, any objection must be made in writing and mailed to the Settlement Administrator at the address provided in the Class Notice, postmarked no later than the Objection Deadline.  In addition, any objection must include the following: (i) the name of this Action; (ii) the objector's full name, address, and telephone number; (iii) if applicable, the name and address of any person claiming to be legally entitled to object on behalf of a Class Member and the basis of such legal entitlement; (iv) all grounds for the objection; (v) whether the objector is represented by counsel and, if so, the identity of such counsel; and (vi) the objector's signature.

76.    Not later than ten (10) days after the Objection Deadline, the Settlement Administrator shall provide to Class Counsel and LifeLock's Counsel all objections submitted by Class Members.

77.    Any Class Member who submits a timely written objection as described in paragraph 75 may appear at the Fairness Hearing, either in person or through personal counsel hired at the Class Member's own personal expense.

78.    Any Class Member who fails to make a timely objection shall waive and forfeit any and all rights (s)he may have to object and shall be bound by all the terms of this Settlement Agreement and by all proceedings, orders, and judgments in the Action including the Final Approval Order and Final Judgment.

79.     Any Class Member who objects to the Settlement shall nevertheless be entitled to all benefits of the Settlement if it is approved and becomes final, including monetary relief if (s)he is a Valid Claimant or a Settlement Subclass Member.

80.     Not later than twenty (20) days after the Objection Deadline, Class Counsel shall file with the Court any and all objections to the Settlement Agreement and/or to Class Counsel's Application for Attorneys' Fees and Expenses and Request for Service Awards.

## XI.     <u>SETTLEMENT ADMINISTRATOR</u>

81.     The Settlement Administrator shall be responsible for, without limitation, dissemination of the Class Notice by mail and email, launching and maintaining the Settlement Website, and implementing the terms of the Claim Process and related administrative activities that include communications with Class Members concerning the Settlement, Claim Process, and their options thereunder.  In particular, the Settlement Administrator shall be responsible for: (a) printing, mailing, or arranging for the mailing of the Class Notice; (b) emailing or arranging for the emailing of the Class Notice; (c) handling returned mail not delivered to Class Members; (d) attempting to obtain updated address information for any mailed Class Notice returned without a forwarding address; (e) attempting to obtain updated address information for any emailed Class Notice returned as undeliverable or that bounces back; (f) making any additional mailings or emailings required under the terms of this Settlement Agreement; (g) establishing a Settlement Website that contains the Settlement Agreement, Preliminary Approval Order, Class Notice, the Claim Form, a mechanism by which the Claim Form may be completed and submitted online, any papers filed in support of final approval of the Settlement, Class Counsel's Application for an award of Attorneys' Fees and Expenses and other relevant documents related to the Action and this Settlement; (h) publication and Internet/Media Notice

Program; (i) establishing a Toll-Free Number at which Class Members may seek information about the Action and the Settlement; (j) receiving and maintaining on behalf of the Court and the Parties any Class Member correspondence regarding requests for exclusion and objections to the Settlement, Application for Attorneys' Fees and Costs, or the Claim Process; (k) forwarding inquiries from Class Members to Class Counsel for a response, if warranted; (l) establishing a post office box for the receipt of Claim Forms, exclusion requests, objections, and any other correspondence related to this Settlement; (m) reviewing and verifying Claim Forms; (n) calculating payment amounts for Valid Claimants and Settlement Subclass Members pursuant to the terms of this Settlement Agreement; (o) mailing and re-mailing payments to Valid Claimants and Settlement Subclass Members pursuant to the terms of this Settlement Agreement; (p) otherwise implementing and/or assisting with the claim review and payment process; (q) paying to the Court's Registry in the FTC Action any sums remaining in the Qualified Settlement Fund after all payments have been made from the Settlement Fund; and (r) as otherwise ordered by the Court or jointly requested and agreed upon by the Parties.

82.     If the number of Class Members who submit requests to be excluded from the Settlement exceeds two percent (2%) of all Class Members to whom Summary Notice was mailed or emailed, the Settlement Administrator shall notify the Parties, in writing, immediately and in no event later than three (3) days after this fact is known.  If more than two percent (2%) of the total number of Class Members ask to be excluded from the Settlement, LifeLock shall have the right to withdraw from this Settlement Agreement as set forth in Paragraph 113 of this Settlement Agreement.

83.     Not later than fifteen (15) days after the Claims Deadline, the Settlement Administrator shall provide to Class Counsel and LifeLock's Counsel and Class Counsel shall

file with the Court a declaration(s) detailing the scope, methods, and status of the Class Notice program and the Claim Process.

84.     The Settlement Administrator shall provide weekly reports to Class Counsel and LifeLock's Counsel including, but not limited to, the number of Claims received and the number of requests for exclusion received.

85.     The Parties each represent that he, she, or it will not have any financial interest in the Settlement Administrator ultimately appointed by the Court and otherwise will not have a relationship with the Settlement Administrator ultimately appointed that could create a conflict of interest.

86.     The Parties acknowledge and agree that the Settlement Administrator is not an agent of the Plaintiffs, Class Counsel, LifeLock, or LifeLock's Counsel and that the Settlement Administrator is not authorized by this Settlement Agreement or otherwise to act on behalf of the Plaintiffs, Class Counsel, LifeLock, or LifeLock's Counsel.

87.     Subject to Section XIX of this Settlement Agreement, the Parties agree that within one (1) year plus thirty (30) days of the Payment Date, the Settlement Administrator shall destroy all Class Members' personal identifying information received from LifeLock and otherwise in connection with the implementation and administration of this Settlement.

88.     Upon completion of the implementation and administration of the Settlement, the Settlement Administration shall provide written certification of such completion to Class Counsel and LifeLock's Counsel.

## XII.   RELEASE AND WAIVER

89.     The Parties agree to the following release and waiver, which shall take effect upon the Final Settlement Date.

90.     In consideration for the Settlement benefits described in this Settlement

Agreement, Releasing Parties will fully, finally, and forever release, relinquish, acquit, and

discharge the Released Parties from, and shall not now or hereafter institute, maintain, or assert

on their own behalf, on behalf of the Settlement Class, or on behalf of any other person or

entity, any and all manner of claims, actions, causes of action, suits, rights, debts, sums of

money, payments, obligations, reckonings, contracts, agreements, executions, promises,

damages, liens, judgments, and demands of whatever kind, type, or nature whatsoever, both at

law and in equity, whether past, present, mature or not yet mature, known or unknown,

suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or

local law, statute, ordinance, regulation, code, contract, common law, or any other source, or

any claim that Plaintiffs or Settlement Class Members ever had, now have, may have, or

hereafter can, shall, or may ever have against the Released Parties that were or reasonably could

have been alleged in the Action or in any other court, tribunal, arbitration panel, commission,

agency, or before any governmental and/or administrative body, or any other adjudicatory

body, on the basis of, connected with, arising from, or relating to the subject matter or

allegations of the Action, including, without limitation, any such claims: (1) alleged in the

Action; (2) for rescission, restitution, or unjust enrichment for all damages of any kind related

in any way to their enrollment or re-enrollment in or renewal of a LifeLock identity theft

protection plan; (3) for violations of any state's deceptive, unlawful, and/or unfair business

and/or trade practices, false, misleading, or fraudulent advertising, consumer fraud, and/or

consumer protection statutes; (4) for failure to make any consumer disclosures required under

any state or federal law or statute; (5) for engaging in unfair or deceptive acts or practices in or

affecting commerce; or (6) for damages, costs, expenses, extra-contractual damages,

compensatory damages, exemplary damages, special damages, consumer redress, penalties, punitive damages, and/or damage multipliers, disgorgement, declaratory relief, equitable relief, injunctive relief, expenses, interest, and/or attorneys' fees and costs.

91.     Notwithstanding the language in this Section and/or this Settlement Agreement, the Settlement Class Members, other than Plaintiffs, are not releasing any claims of or relating to personal injury.

92.     Plaintiffs, and, by application of law, all Settlement Class Members represent and warrant that they are the sole and exclusive owner of all claims that they personally are releasing under this Settlement Agreement.  Plaintiffs and all Settlement Class Members further acknowledge that they have not assigned, pledged, or in any manner whatsoever, sold, transferred, assigned, or encumbered any right, title, interest, or claim arising out of or in any way whatsoever pertaining to the Action, and that they are not aware of anyone other than themselves claiming any interest, in whole or in part, in the Action, or in any benefits, proceeds, or values under the Action on their behalf.

93.     Plaintiffs expressly understand and acknowledge that they and all Settlement Class Members will be deemed by the Final Approval Order and Final Judgment to acknowledge that certain principles of law, including, but not limited to, **Section 1542 of the Civil Code of the State of California, provide that "a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor"** do not apply to this Settlement.  To the extent that anyone might argue that these principles of law are applicable, Plaintiffs hereby agree that the provisions of all such principles of law or similar federal or state laws, rights, rules, or legal

principles, to the extent they are found to be applicable herein, are hereby knowingly and voluntarily waived, relinquished, and released by Plaintiffs and, by application of law, all Settlement Class Members

94.     The Parties shall be deemed to have agreed that the Release set forth herein may be raised as a complete defense to and would preclude any action or proceeding based on the claims released by and through this Settlement Agreement.

95.     Nothing in this Release shall preclude any action to enforce the terms of this Settlement Agreement.

96.     Plaintiffs and LifeLock hereby agree and acknowledge that the provisions of this Release together constitute an essential and material term of this Settlement Agreement and shall be included by reference in any Final Approval Order and Final Judgment entered by the Court.

## XIII.   ATTORNEYS' FEES AND EXPENSES AND PLAINTIFF SERVICE AWARDS

97.     Subject to the provisions of this Section, Class Counsel will make, and LifeLock agrees not to oppose, an application for an award of Attorneys' Fees and Expenses in an amount not to exceed Ten Million Two Hundred Thousand Dollars ($10,200,000).  Class Counsel shall file their application for Attorneys' Fees and Expenses and their request for Service Awards for the Plaintiffs no later than thirty (30) days after the Notice Date.  The Settlement Administrator shall post on the Settlement Website such application promptly after it is filed.

98.     Any Attorneys' Fees and Expenses awarded by the Court shall not be paid out of the Settlement Fund but, instead, shall be paid separately by LifeLock.  Class Counsel, in their

sole discretion, shall allocate and distribute any Attorneys' Fees and Expenses that are awarded by the Court.

99.     In the event the Court declines to approve, in whole or in part, the payment of Attorneys' Fees and Expenses in the amounts requested, the remaining provisions of this Settlement Agreement shall remain in full force and effect.

100.     Payment by LifeLock of the amounts awarded by the Court in Attorneys' Fees and Expenses shall be the sole aggregate compensation paid by LifeLock to Class Counsel and Plaintiffs' counsel in connection with the Action and shall constitute full satisfaction by LifeLock of any obligation to pay any amounts to any person, attorney, or law firm for attorneys' fees, expenses, or costs in the Action incurred by any attorney on behalf of the Plaintiffs, the Class Members, or the Settlement Class and shall relieve LifeLock, LifeLock's Counsel, and the Released Parties of any other claims or liability to any other attorney or law firm for any attorneys' fees, expenses, and/or costs in which any of them may claim to be entitled on behalf of the Plaintiffs, the Class Members, and/or the Settlement Class Members, any Released Claim, or the Action.

101.     Any Service Awards awarded by the Court shall not be paid out of the Settlement Fund but instead paid separately by LifeLock. Class Counsel will make, and LifeLock agrees not to oppose, an application for Service Awards, in an amount not to exceed Two Thousand Dollars ($2,000.00) for each of the Plaintiffs to compensate them for their efforts and commitment on behalf of the Class.  Neither Class Counsel's application for, nor any Plaintiff's entitlement to, a Service Award shall be conditioned in any way upon the Plaintiffs' support for this Settlement Agreement.

102.     In the event the Court declines to approve, in whole or in part, the payment of Service Awards in the amounts requested, the remaining provisions of this Settlement Agreement shall remain in full force and effect.

103.     In accordance with instructions for payment provided by Class Counsel to LifeLock, the Attorneys' Fees and Expenses and Service Awards awarded by the Court shall be paid within twenty (20) days following the later of entry of the Final Approval Order or entry of any separate order awarding Attorneys' Fees and Expenses and Service Awards.  In the event the order approving Attorneys' Fees and Expenses and Service Awards is reversed on appeal or the Settlement Agreement is voided, rescinded, or terminated for any other reason provided under the terms of this Agreement ("Repayment Event"), then Class Counsel shall, within ten (10) business days after the Repayment Event, return to LifeLock all Attorneys' Fees and Expenses and Service Awards consistent with the relevant court ruling.

104.     Any Service Award paid to any of the Plaintiffs shall be reported on an IRS form 1099 (i.e., as "Other Income") and provided to each Plaintiff and applicable governmental authorities.

105.     Contemporaneous with executing this Settlement Agreement, each of the Plaintiffs will execute the General Release substantially in the form attached hereto as **Exhibits 8, 9, 10, and 11.**  If this Settlement Agreement is terminated or does not become final for any reason set forth in Section XVI of this Settlement Agreement, each General Release will be rendered null, void and non-binding.

## XIV.   PRELIMINARY APPROVAL ORDER, FINAL APPROVAL ORDER, FINAL JUDGMENT, AND RELATED ORDERS

106.     On or before November 16, 2015, or any subsequent mutually agreed upon date, Plaintiffs shall file with the Court a motion seeking preliminary approval of the Settlement and

asking the Court to enter a Preliminary Approval Order substantially in the form attached as **Exhibit 5** to this Settlement Agreement.

107.     In connection with the motion for preliminary approval, the Parties shall ask the Court to set a date for the Fairness Hearing as soon as practicable, but in no event no earlier than the Claim Deadline and a date that ensures compliance with the requirements of 28 U.S.C. § 1715(d).

108.     Not later than thirty (30) days following the Claims Deadline, the Parties shall file motion(s) seeking final approval of the Settlement and asking the Court to enter the Final Approval Order and Final Judgment substantially in the form attached to this Settlement Agreement as **Exhibits 2 and 3**.

109.     After entry of the Final Approval Order, the Parties agree that the Court shall retain jurisdiction to enforce the terms of this Settlement Agreement and the Final Approval Order and the Final Judgment.

## XV.   MODIFICATION OF THIS SETTLEMENT AGREEMENT

110.     This Settlement Agreement may not be amended or modified in any respect except by a written document executed by all of the Parties to this Settlement Agreement or their counsel who are authorized to make such amendment or modification.

111.     The Parties agree that any mutually approved nonmaterial amendments, modifications, or expansions to this Settlement Agreement may be made in writing after the Preliminary Approval Order or the Final Approval Order without the need to seek the Court's approval.  Specifically, the Parties may by written agreement effect such amendments, modifications, reasonable extensions of time, or expansions of this Settlement Agreement and its implementing documents (including all exhibits hereto) without further notice to the Class or

approval by the Court if such changes are consistent with the Court's Preliminary Approval Order or its Final Approval Order and Final Judgment and do not limit or adversely affect the rights of Class Members under this Settlement Agreement.

112.    If the Court indicates, prior to Preliminary Approval or Final Approval, that the Settlement will not be approved unless certain changes are made, the Parties will attempt in good faith to reach an agreement as to any such changes prior to withdrawing from this Settlement Agreement.  However, if no such agreement can be reached within thirty (30) days after the Court indicates that the Settlement will not be approved unless certain changes are made, then the Plaintiffs or LifeLock may terminate and withdraw from this Settlement Agreement.  If this Settlement Agreement is terminated under such circumstances, the Plaintiffs, LifeLock, and the Class Members shall be deemed to be in the same position as existed prior to its execution, with the same *status quo ante* rights and interests as they may have had absent the execution of this Settlement Agreement and any and all understandings and agreements between the Parties and their respective counsel relating to the Settlement shall be deemed to be null and void and of no force and effect.  Upon termination under this paragraph of this Settlement Agreement, the Parties shall jointly notify the Court of the need to set a schedule for LifeLock's anticipated motion to dismiss the FAC and Plaintiffs shall notify the Court of the withdrawal of the SAC consistent with paragraph 54 of this Settlement Agreement.

## XVI.  CONDITIONS IMPACTING FINALITY OF SETTLEMENT

113.    If more than two percent (2%) of the total number of Class Members to whom Summary Notice was mailed or emailed request to exclude themselves from the Settlement, LifeLock shall have the option, at its sole discretion, of terminating and withdrawing from the Settlement in its entirety; provided, however, that LifeLock must notify Class Counsel and the

Court in writing that it is exercising such option within ten (10) days after being notified in writing by the Settlement Administrator that the number of Class Members who have timely requested exclusion exceeds two percent (2%) of the total number of Class Members to whom the Summary Notice was sent via email or mail.

114.　The Parties expressly agree that in the event of any of the following conditions:

A.　the Court does not grant the Plaintiffs' motion for leave to file the SAC;

B.　The Court does not preliminarily approve the Settlement:

C.　The Court does not enter the Final Approval Order;

D.　Either Party exercises its right to withdraw from and terminate the Settlement pursuant to paragraph 112;

E.　LifeLock withdraws from and terminates the Settlement pursuant to paragraph 113 of this Settlement Agreement; or

F.　This Settlement does not become final for any reason including on subsequent review by any appellate court(s) in the Action, the Court ultimately rejects, modifies, or denies approval of any portion of this Settlement Agreement that either Plaintiffs or LifeLock reasonably determines is material, including, without limitation, the terms of relief, the provisions relating to notice, the definition of the Class, and/or the terms of the Release;

then Plaintiffs and LifeLock each has the right to withdraw from and terminate this Agreement.  Notwithstanding the foregoing, neither the denial of, an appeal of, a modification of, nor a reversal on appeal of any Attorneys' Fees and Expenses Award or any Service Award shall constitute grounds for cancellation or termination of this Settlement Agreement.

115.    Any Party exercising its right to terminate and withdraw must exercise this option as provided under paragraph 114 above by a signed writing served on the other Parties no later than twenty-one (21) days after receiving notice of the event prompting the termination.

116.    The Parties recognize that the Payment Date may occur prior to the resolution of any potential appeal and agree that, in the event that an appeal occurs, then upon the completion of an appeal with no impact on the finality of this Settlement Agreement, the Release shall apply nunc pro tunc.  Nothing herein shall limit Lifelock's rights to assert any legal or equitable defense to any claim by a Class Member if this Settlement does not become final for any reason related to a subsequent review by any appellate court(s) in the Action, as set forth in paragraph 114.

117.    In the event that a terminating party exercises its option to withdraw from and terminate this Settlement Agreement pursuant to paragraph 114:

A.    This Settlement Agreement and the Settlement proposed herein shall be null and void and shall have no force or effect and no party to this Settlement Agreement shall be bound by any of its terms, except for the terms of paragraph 54, 56, and this paragraph 117 of the Settlement Agreement or as otherwise specifically provided for herein;

B.    The Parties will petition to have any stay orders that are entered pursuant to this Settlement Agreement lifted;

C.    This Settlement Agreement and all of its provisions, and all negotiations, statements, and proceedings relating to it, shall be without prejudice to the rights of LifeLock, Plaintiffs, or any Class Member, all of whom shall be restored to their respective positions existing immediately before the execution of this Settlement Agreement, except that the Parties

36

shall cooperate in requesting that the Court set a new scheduling order such that neither Party's substantive or procedural rights is prejudiced by the attempted Settlement;

       D.     The Released Parties, as defined herein, expressly and affirmatively reserve all defenses, arguments, and motions as to all claims that have been or might later be asserted in the Action, including, without limitation, LifeLock's argument that the Action may not be litigated as a class action;

       E.     Plaintiffs and all other Class Members, on behalf of themselves and their heirs, assigns, executors, administrators, predecessors, and successors, expressly and affirmatively reserve and do not waive any motions as to, and arguments in support of, all claims, causes of actions, or remedies that have been or might later be asserted in the Action including, without limitation, any argument concerning class certification, consumer fraud, and damages;

       F.     This Settlement Agreement, the fact of its having been made, the negotiations leading to it, any informal discovery or action taken by a Party or Class Member pursuant to or in connection with this Settlement Agreement, or any documents or communications pertaining to this Settlement Agreement shall not be admissible or entered into evidence for any purpose whatsoever in the Action or in any other proceeding between the Parties, other than to enforce the terms of this Settlement Agreement; provided, however, that LifeLock may rely on such evidence to defend itself in any other action not brought on behalf of the Class and relating to the subject matter of this Action

       G.     All reasonable Administrative Costs incurred and approved but not yet paid will be paid by LifeLock.  Plaintiffs, Class Counsel, and LifeLock's Counsel shall not be responsible for any of these costs or any other Settlement-related costs;

H.      Notwithstanding the terms of this Section, if the Settlement is not consummated, Class Counsel may include any time spent in settlement efforts as part of any fee petition filed at the conclusion of the case and LifeLock reserves the right to object to such requested fees.

I.      Notwithstanding the terms of this Section, in the event of the denial of Preliminary Approval or Final Approval, Plaintiffs and/or LifeLock may seek appellate review through a writ or pursue any other available appellate remedy in support of the Settlement or this Settlement Agreement.  The Parties agree that nothing herein is intended to restrict or limit the rights of either LifeLock or the Plaintiffs to appeal any order of this Court in the event the Settlement is not finally approved for any reason.  During the pendency of any appeal of the denial of Preliminary Approval or Final Approval, this Settlement Agreement shall remain valid and binding.

## XVII.  SCHEDULE OF EVENTS

118.    Based upon the terms of this Settlement Agreement, the Parties anticipate the following schedule related to Preliminary Approval and Final Approval of this Settlement Agreement and performance of this Agreement, which is subject to the Court's approval:

| Date | Event |
|---|---|
| November 16, 2015 | Deadline for Preliminary Approval Motion |
| Three (3) business days after entry of Preliminary Approval Order | Deadline for LifeLock to provide Class Data to Settlement Administrator |
| Ten (10) days after filing of Preliminary Approval Motion | Deadline for Settlement Administrator to provide notice to federal or state officials per U.S.C. § 1715 |
| Ten (10) days after entry of Preliminary Approval Order (or within three (3) calendar days after entry of Final Approval Order if money not released from Court's Registry in the FTC Action) | LifeLock shall pay the sum to the Settlement Administrator of Sixty-Eight Million Dollars ($68,000,000.00) to create the Settlement Fund |
| Thirty (30) days after entry of Preliminary Approval Order | Notice Date and deadline for the Settlement Website and Toll-Free Number to go live |

| Date | Event |
|---|---|
| Thirty (30) days after Notice Date | Deadline for Class Counsel to file application for Attorneys' Fees and Expenses and request for Service Awards |
| Forty-five (45) days after Notice Date | Objection, Opt-Out Deadline |
| Sixty (60) days after Notice Date | Claim Deadline |
| Ten (10) days after notification from Settlement Administrator that more than two percent (2%) of the Class has requested exclusion | Deadline for LifeLock to notify Class Counsel and the Court that it is cancelling the settlement |
| Fifty-five (55) days after Notice Date | Settlement Administrator to provide to Class Counsel and LifeLock's Counsel a final list of Class Members who requested exclusion or objected |
| Seventy-five (75) days after Notice Date | Settlement Administrator to provide and Class Counsel to file a declaration detailing the scope, method, and status of the Class Notice program and the Claim process. |
| Seventy-five (75) days after Notice Date | Deadline for Final Approval Motion; and for the parties to provide any responses to Settlement Objections |
| One business day after entry of the Final Approval Order | Final Settlement Date |
| Twenty (20) days after the Final Settlement Date, or earlier if agreed upon by parties. | Payment Date (i.e., Deadline for Settlement Administrator to Disburse Settlement Fund) |
| Thirty (30) days after Payment Date | Settlement Website taken down |
| Thirty-five (35) days after Payment Date | Settlement Administrator to transfer Settlement Website URL to LifeLock |
| One hundred and twenty (120) days after Payment Date | Settlement checks expire |
| One hundred and eighty (180) days after Final Settlement Date | Deadline for Class Counsel to return documents produced by LifeLock |
| One (1) year plus thirty (30) days after Payment Date | Deadline for Settlement Administrator to return documents received from Class Counsel or LifeLock's Counsel |

## XVIII. **NONDISPARAGEMENT**

119.    Each of the Plaintiffs and Class Counsel agrees that he, she, and/or they will not

disparage LifeLock or any of the Released Parties in any manner potentially harmful to them or

their business, business reputation, or personal reputation related to the Released Claims.  This

agreement not to disparage includes, but is not limited to, publishing disparaging statements

(whether anonymously or for ascription) on the web, in blogs, in chat rooms, in emails, or in other electronic means of transmitting information.

## XIX.   <u>CONFIDENTIALITY</u>

120.    Plaintiffs and Class Counsel agree that the confidential information made available to them, including but not limited to attorneys' eyes only information made available to Class Counsel, solely through the mediation and settlement process was made available, as agreed to, on the condition that neither Plaintiffs nor Class Counsel disclose it to third parties; that it not be the subject of public comment; that it not be used by Plaintiffs or Class Counsel in any way in the Action should Settlement not be achieved; and that it is to be returned or destroyed; provided, however, that nothing contained herein shall prohibit Plaintiffs from seeking such information through formal discovery or from referring to the existence of such information in connection with this Settlement and the Preliminary Approval and Final Approval of this Settlement.

121.    Plaintiffs and Class Counsel agree that they will not make any statements or comments, written or oral, about this Settlement or Settlement Agreement to any person other than to Class Members in any way other than as provided in this Settlement Agreement, the Class Notice, on the Settlement Website, or as otherwise agreed upon by LifeLock in writing in each instance.  Notwithstanding the terms of this provision, Class Counsel may display a link to the Settlement Website on their respective firms' websites and reference this Settlement as evidence of Class Counsel's professional qualifications in resumes, curriculum vitae, and motions for appointment as class counsel pursuant to Fed. R. Civ. P. 23 and similar state rules of procedure, but only to state that (i) it was a nationwide consumer class; (ii) the general

allegations involved in the action; and (iii) the general terms of the Settlement, including the Settlement Fund of Sixty-eight Million Dollars ($68,000,000.00).

122.     Within one hundred and eighty (180) days after the Final Settlement Date (unless the time is extended by written agreement of the Parties), Class Counsel, any Plaintiffs' Counsel, and any expert or other consultant employed by them in such capacity or any other individual with access to documents provided by LifeLock to Class Counsel, shall either: (i) return to LifeLock's Counsel all such documents and materials (and all copies of which documents in whatever form made or maintained) informally produced by LifeLock in the Action and any and all handwritten notes summarizing, describing, or referring to such documents; or (ii) certify to LifeLock's Counsel that all such documents and materials (and all copies of such documents in whatever form made or maintained) informally produced by LifeLock in the Action and any and all handwritten and/or electronically recorded notes summarizing, describing, or referring to such documents have been destroyed; provided, however, that this Section shall not apply to any documents made part of the record in connection with a Claim, nor to any documents made part of a Court filing, nor to Class Counsel's work product.  LifeLock's Counsel agrees to hold all documents returned by Class Counsel and any expert or other consultant or any other individual employed by Class Counsel in such capacity with access to documents provided by LifeLock until two years after the Payment Date.

## XX.   <u>AGREEMENT TO COOPERATE</u>

123.     The Parties, their successors and assigns, and their counsel agree to use reasonable efforts with one another in seeking Court approval of this Settlement Agreement and to implement the terms of this Settlement and to use reasonable efforts to resolve any disputes

that may arise in the implementation of this Settlement Agreement, the Preliminary Approval Order, and/or the Final Approval Order.

124.     The Parties, their successors and assigns, and their counsel further agree to cooperate in the Settlement administration process and implementation of the Settlement and to make all reasonable efforts to control and minimize the costs and expenses incurred in the administration and implementation of the Settlement.

## XXI.  **WARRANTIES**

125.     Class Counsel represents that: (1) they are authorized to enter into this Settlement Agreement on behalf of their respective law firms; and (2) they are seeking to protect the interests of the Class.

126.     Plaintiffs represent and certify that: (1) they have agreed to serve as representatives of the Class; (2) they are willing, able, and ready to perform all of the duties and obligations of representatives of the Class; (3) they have read the operative Complaint or have had the contents of such pleadings described to them; (4) they are generally familiar with the results of the fact-finding undertaken by Class Counsel; (5) they have read this Settlement Agreement or have received a detailed description of it from Class Counsel and they have agreed to its terms; (6) they have consulted with Class Counsel about the Action and this Settlement Agreement and the obligations imposed on them as representatives of the Class; and (7) they shall remain and serve as representatives of the Class until the terms of the Settlement Agreement are effectuated, this Settlement Agreement is terminated in accordance with its terms, or the Court at any time determines that said Plaintiffs cannot represent the Class.

127.     Plaintiffs each further warrant and represent that (s)he is the sole and lawful owner of all rights, title, and interest in and to all of their respective Released Claims and that

(s)he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other person or entity any of the Released Claims or any part or portion thereof.

128.    LifeLock represents and warrants that the individual executing this Settlement Agreement is authorized to enter into this Settlement Agreement on behalf of LifeLock.

## XXII.  <u>NO ADMISSIONS</u>

129.    This Settlement Agreement reflects, among other things, the compromise and settlement of disputed claims among the Parties hereto and neither this Settlement Agreement nor the releases given herein, nor any consideration therefor, nor any actions taken to carry out this Settlement Agreement are intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or the validity of any claim or defense, or of any point of fact or law (including but not limited to matters respecting class certification) on the part of any of the Parties.

130.    LifeLock expressly denies Plaintiffs' allegations in the Action, the original Complaint, the FAC, and the SAC.  Neither this Settlement Agreement, nor the fact of settlement, nor the settlement proceedings, nor settlement negotiations, nor any related document shall be used as an admission of any fault or omission by LifeLock or be offered or received in evidence as an admission, concession, presumption, or inference of any wrongdoing by LifeLock in any proceeding, other than such proceedings as may be necessary to consummate, interpret, or enforce this Settlement Agreement.

131.    Nothing in this Settlement Agreement may be construed as, or may be used as an admission by Plaintiffs that any of their claims are without any merit.  Plaintiffs expressly affirm that the allegations contained in the original complaint, the FAC, and the SAC were

made in good faith and have a basis in fact, but consider it desirable for the Action to be settled and dismissed because of the substantial benefits that the proposed Settlement will provide to Class Members.

132.    The Parties expressly acknowledge and agree that this Settlement Agreement and its exhibits, along with all related drafts, motions, pleadings, conversations, negotiations, and correspondence, constitute an offer of compromise and a compromise within the meaning of Federal Rule of Evidence 408 and any equivalent rule of evidence in any state.  In no event shall this Settlement Agreement, any of its provisions, or any negotiations, statements, or court proceedings relating to its provisions in any way be construed as, offered as, received as, used as, or deemed to be evidence of any kind in the Action, any other action, or in any judicial, administrative, regulatory, or other proceeding, except in a proceeding to enforce this Settlement Agreement or the rights of the Parties or their counsel.  Without limiting the foregoing, neither this Settlement Agreement nor any related negotiations, statements, or court proceedings shall be construed as, offered as, received as, used as, or deemed to be evidence or an admission or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Released Parties, Plaintiffs, the Class, or the Settlement Class or as a waiver by the Released Parties, Plaintiffs, or the Class of any applicable privileges, claims, or defenses.

133.    If this Settlement Agreement does not become effective or is cancelled, withdrawn, or terminated for any reason, it shall be deemed negotiation for settlement purposes only and will not be admissible in evidence or usable for any purpose whatsoever in the Action, any proceeding between the Parties, or in any action related to the Released Claims or

otherwise involving the Parties, the Federal Trade Commission, any State Attorney General, or any Released Party.

134.    LifeLock's execution of this Settlement Agreement shall not be construed to release—and LifeLock expressly does not intend to release—any claim LifeLock may have or make against any insurer for any cost or expense incurred in connection with this Settlement including, without limitation, for attorneys' fees and costs.

## XXIII. GENERAL MATTERS AND RESERVATIONS

135.    This Settlement Agreement, complete with its exhibits, sets forth the sole and entire agreement among the Parties with respect to its subject matter and it may not be altered, amended, or modified except by written instrument executed by Class Counsel and LifeLock's Counsel.  The Parties expressly acknowledge that no other agreements, arrangements, or understandings not expressed in this Settlement Agreement exist among or between them and that in deciding to enter into this Settlement Agreement, they are relying solely upon their own judgment and knowledge.  This Settlement Agreement supersedes any prior agreements, understandings, or undertakings (written or oral) by and between the Parties regarding the subject matter of this Settlement Agreement.

136.    This Settlement Agreement and any amendments thereto shall be governed by and interpreted according to the law of the State of Arizona, notwithstanding its conflict of laws provisions.

137.    Any disagreement and/or action to enforce this Settlement Agreement shall be commenced and maintained only in the Court in which the Action is pending.

138.    Whenever this Settlement Agreement requires or contemplates that one of the Parties shall or may give notice to the other, notice shall be provided by email and next-day (excluding Saturdays, Sundays, and Legal Holidays) express delivery service as follows:

A.    If to LifeLock, then to:

Luanne Sacks
Sacks, Ricketts & Case LLP
177 Post Street, Suite 650
San Francisco, CA 94108
lsacks@srclaw.com

B.    If to Plaintiffs, then to:

Michael W. Sobol
Lieff, Cabraser, Heimann & Bernstein, LLP
275 Battery Street 29th Floor
San Francisco, CA 94111
msobol@lchb.com

139.    All time periods set forth herein shall be computed in calendar days unless otherwise expressly provided.  In computing any period of time prescribed or allowed by this Settlement Agreement or by order of the Court, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a Legal Holiday (as defined in Fed. R. Civ. P. 6(a)(6)), or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the office of the clerk of the court inaccessible, in which event the period shall run until the end of the next day that is not one of the aforementioned days.

140.    The Class, the Settlement Class, Plaintiffs, Class Counsel, LifeLock, or LifeLock's Counsel shall not be deemed to be the drafter of this Settlement Agreement or of any particular provision, nor shall they argue that any particular provision should be construed

against its drafter or otherwise resort to the *contra proferentem* canon of construction. All Parties agree that this Settlement Agreement was drafted by counsel for the Parties during extensive arm's length negotiations. No parol or other evidence may be offered to explain, construe, contradict, or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which this Settlement Agreement was made or executed.

141. In the event of a conflict between this Settlement Agreement and any other document prepared pursuant to the Settlement or in connection with the implementation of this Settlement Agreement, the terms of this Settlement Agreement supersede and control.

142. The waiver by one party of any breach of this Settlement Agreement by another party shall not be deemed a waiver of any prior or subsequent breach of this Settlement Agreement.

143. If one party to this Settlement Agreement considers another party to be in breach of its obligations under this Settlement Agreement, that party must provide the breaching party with written notice of the alleged breach and provide a reasonable opportunity to cure the breach before taking any action to enforce any rights under this Settlement Agreement.

144. This Settlement Agreement may be signed with a facsimile signature or .pdf scanned signature and in counterparts, each of which shall constitute a duplicate original. This Settlement Agreement is not effective until all Parties have executed a counterpart of this Settlement Agreement.

Agreed to on the date indicated below.

DATED: 10/28/15

Napoleon Ebarle

DATED: 10/28/15 _____     _____
                            Jeanne Stamm

DATED: _____      _____
                            Brian Litton

DATED: _____      _____
                            Renier Jerome Ebarle

DATED: _____      LIFELOCK, INC.

                            By_____
                            Its Chief Legal Strategist

48

DATED: _____

DATED: Oct 28, 2015

DATED: _____

DATED: _____

_____
Jeanne Stamm

_____
Brian Litton

_____
Renier Jerome Ebarle

LIFELOCK, INC.

By_____
Its Chief Legal Strategist

48

DATED: _____

Jeanne Stamm

DATED: _____                    _____

                                          Brian Litton

DATED: Oct 28, 2015                       _____

                                          Reiner Jerome Ebarle

DATED: _____                    LIFELOCK, INC.

                                          By_____
                                          Its Chief Legal Strategist

48

DATED: _____

_____
Brian Litton

DATED: _____

_____
Renier Jerome Ebarle

DATED: 11/3/2015 _____

LIFELOCK, INC.

By _____
Its Chief Legal Strategist

**Exhibit List**

Exhibit 1: Claim Form

Exhibit 2: [Proposed] Final Approval Order

Exhibit 3: [Proposed] Final Judgment

Exhibit 4: Long Form Class Notice

Exhibit 5: [Proposed] Preliminary Approval Order

Exhibit 6: Summary Notice

Exhibit 7: Second Amended Complaint

Exhibit 8: General Release – Ebarle

Exhibit 9: General Release – Stamm

Exhibit 10: General Release – Litton

Exhibit 11: General Release – R. Ebarle

# EXHIBIT 1

**MUST BE POSTMARKED ON OR BEFORE XXXXX XX, 2015**

*Ebarle v. Lifelock, Inc.*
c/o GCG
P.O. Box 10248
Dublin, OH 43017-5748
Toll-Free: 1 (855) 907-3140

LL2

Control No: 1234567890
Claim No: LL2011111111

LL21234567890



JANE CLAIMANT
123 4TH AVE
APT 5
SEATTLE, WA  67890

## CLAIM FORM

**TO RECEIVE BENEFITS FROM THIS SETTLEMENT, YOU MUST PROVIDE
THE INFORMATION BELOW AND YOU MUST <u>SIGN</u> THIS CLAIM FORM.**

**YOUR CLAIM FORM MUST BE <u>POSTMARKED</u> BY _____.**

**CLAIMANT INFORMATION:**

Name (First, Middle, Last):

Mailing Address:

City:                                                              State:          ZIP:

Email (optional):

**I certify that the foregoing is true and correct:**

Signature:

Name (please print):

Date:         /         /

To view GCG's Privacy Notice, please visit http://www.gcginc.com/pages/privacy-policy.php

**QUESTIONS? VISIT WWW.EBARLECLASSSETTLEMENT.COM OR CALL TOLL-FREE 1 (855) 907-3140**

# EXHIBIT 2

1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| NAPOLEON EBARLE, JEANNE STAMM, BRIAN LITTON, and REINER JEROME EBARLE on behalf of themselves and all other similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>LIFELOCK, INC.,<br><br>        Defendant. | Case No.  3:15-cv-258-HSG<br><br>**[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>Date:<br>Time:<br>Location: Courtroom 15, 18th Floor<br>Judge: Hon. Haywood S. Gilliam |

This matter came before the Court for hearing pursuant to the Court's Preliminary Approval Order dated _____, 2015 (Docket No. __), and on the motion for final approval of the Class Settlement Agreement, dated _____ __, 2015 (the "Settlement"), entered into by the Parties to settle and finally resolve the above captioned class action law suit (the "Action" or the "Class Action Lawsuit"), as well as Class Counsel's motion for an award of attorneys' fees and costs and for service awards for the Plaintiffs.  Due and adequate notice having been given to the Class of the proposed Settlement and the pending motions, as required by the Preliminary Approval Order, and upon consideration of all papers filed and proceedings had herein, IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.      Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Settlement.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and has personal jurisdiction over the Parties.  Venue is proper in this District.

3.      The "Class" for purposes of this Order, shall mean:

All members of a LifeLock identity theft protection plan in the United States at any time between September 1, 2014 and the date of the Preliminary Approval Order.

In addition, the Subclass, which is part of the Class, is defined as follows:

All individuals who enrolled in a LifeLock identity theft protection plan in the United States at any time between January 1, 2012, and April 30, 2015.

4.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court hereby certifies for settlement purposes only the Class and Subclass, which it previously provisionally certified.  The Court further certifies for settlement purposes only the Settlement Class, which is defined as (and comprised of) all Class Members except those individuals, identified on Exhibit 1 hereto, who excluded themselves by submitting a timely request for exclusion in accordance with the requirements set forth in the Settlement and Notice. Also excluded from the Class are Defendant, any parent, subsidiary, affiliate, or controlled person of Defendant, as well as the officers, directors, agents, servants or employees of Defendant and the immediate family

1275525.3

members of any such person.  Also excluded is any judge who may preside over this cause of action.

5.     The Court finds that the notice provisions set forth under the Class Action Fairness Act, 28 U.S.C. § 1715, were complied with in this Action.

6.     The Court finds that the program for disseminating notice to the Class provided for in the Settlement, and previously approved and directed by the Court (the "Notice Program"), has been implemented by the Settlement Administrator and the Parties, and that such Notice Program, including the approved forms of notice, constitutes the best notice practicable under the circumstances and fully satisfied due process, the requirements of Rule 23 of the Federal Rules of Civil Procedure and all other applicable laws.

7.     The Court reaffirms that this Action is properly maintained as a class action, for settlement purposes only, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(3), and 23(e), and that Class Counsel and the Plaintiffs, as class representatives, fairly and adequately represent the interests of the Class.  In support of its conclusion that this action is properly maintained as a class action, for settlement purposes, the Court finds as follows:

(a) the Settlement Class members are so numerous that joinder of all members is impracticable;

(b) there are questions of law and fact common to the Settlement Class members, and these questions predominate over any questions affecting individual Settlement Class members;

(c) the named Class Representatives' claims are typical of the claims of the Settlement Class members;

(d) the named Class Representatives and Class Counsel have adequately represented and will continue to adequately represent and protect the interests of the Settlement Class;

(e) class-wide treatment of the disputes raised in this action is superior to other available methods for adjudicating the controversy before this Court; and

(f) manageability issues do not prevent certification for settlement purposes because there will be no trial.

[PROPOSED] ORDER GRANTING FINAL APPROVAL
OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

8.      The Court hereby finds there were very few timely written objections and requests for exclusion from the Settlement.  The small number of opt-outs and objections indicates that the vast majority of the Settlement Class Members found the Settlement to be fair and reasonable.  Furthermore, the Parties demonstrated that any and all objections to the Settlement are without merit and are hereby overruled.

9.      The Court further finds that a full and fair opportunity has been afforded to the Class Members to opt out, to object and to participate in the hearing convened to determine whether the Settlement should be given final approval.  Accordingly, the Court hereby determines that all members of the Settlement Class are bound by this Final Approval Order.

10.      The Court finds that the Settlement, including the exhibits thereto, is fair, reasonable and adequate to the Settlement Class Members, is in the best interests of the Settlement Class Members, has been entered into in good faith and should be and hereby is fully and finally approved pursuant to Federal Rule of Civil Procedure 23.  The Settlement represents a fair resolution of all claims asserted on behalf of Plaintiffs, as Class Representatives, and the Settlement Class Members in this Action, and fully and finally resolves all such claims.  LifeLock and each Settlement Class Member shall be bound by the Settlement, including the Release set forth in Section XII of the Settlement, and by this Order and the Final Judgment entered in connection with this Order.

11.      After considering (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement, the Court hereby finds that the Settlement is in all respects fair, reasonable, and adequate and in the best interests of the Settlement Class.  In addition, the Court finds that there was no collusion in connection with the Settlement, that the Settlement was the product of informed and arm's-length negotiations among competent counsel, and that the record is sufficiently developed to have enabled the Class Representatives and LifeLock to adequately evaluate and consider their respective positions.  Accordingly, the Court hereby finally and unconditionally approves the

[PROPOSED] ORDER GRANTING FINAL APPROVAL
OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

Settlement.

12.     Class Counsel are hereby awarded attorneys' fees in the amount of $_____, and reimbursement of their out-of-pocket litigation costs in the amount of $_____. LifeLock shall pay such amounts to Class Counsel pursuant to the terms of the Settlement, separate from and in addition to the Settlement Fund, which may be used solely to provide compensation to Valid Claimants and Settlement Subclass Members.  The Court finds these amounts to be fair and reasonable and fairly compensates Class Counsel for their contributions to the prosecution of this Action and the Settlement.

13.     The Court hereby awards service awards in the amount of $2,000 each, to each of the Plaintiffs as Class Representatives, to compensate them for their commitments and efforts on behalf of the Class in this Action.  LifeLock shall pay such amounts to Plaintiffs, pursuant to the terms of the Settlement Agreement, separate from and in addition to the Settlement Fund, which may be used solely to provide compensation to Valid Claimants and Settlement Subclass Members.

14.     The Parties are to bear their own costs, except as awarded by this Court in this Final Order.

15.     In its Preliminary Approval Order [Dkt. _____], the Court appointed and designated The Garden City Group, Inc. to act as the Settlement Administrator.  The Garden City Group, Inc. shall continue to act as the Settlement Administrator to perform those duties and responsibilities that remain under the Settlement and this Final Order.

16.     The Parties and Settlement Administrator are hereby directed to implement this Final Order and the Settlement in accordance with the terms and provisions thereof, including the processing and payment of Claims.

17.     As of the Final Settlement Date, the Releasing Parties shall be deemed to have, and by operation of this Order and the Final Judgment entered in connection with this Order shall have, fully and irrevocably released and forever discharged the Released Parties from all Released Claims, as more fully set forth in Section XII of the Settlement including that the Releasing Parties shall be deemed to have fully, finally, and forever released, relinquished, acquitted, and discharged the Released Parties from, and shall not now or hereafter institute,

maintain, or assert on their own behalf, or on behalf of any other person or entity, any and all manner of claims, actions, causes of action, suits, rights, debts, sums of money, payments, obligations, reckonings, contracts, agreements, executions, promises, damages, liens, judgments, and demands of whatever kind, type, or nature whatsoever, both at law and in equity, whether past, present, mature or not yet mature, known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, or any claim that Plaintiffs or Settlement Class Members ever had, now have, may have, or hereafter can, shall, or may ever have against the Released Parties that were or reasonably could have been alleged in the Action or in any other court, tribunal, arbitration panel, commission, agency, or before any governmental and/or administrative body, or any other adjudicatory body, on the basis of, connected with, arising from, or relating to the subject matter or allegations of the Action, including, without limitation, any such claims: (1) alleged in the Action; (2) for rescission, restitution, or unjust enrichment for all damages of any kind related in any way to their enrollment or re-enrollment in or renewal of a LifeLock identity theft protection plan; (3) for violations of any state's deceptive, unlawful, and/or unfair business and/or trade practices, false, misleading, or fraudulent advertising, consumer fraud, and/or consumer protection statutes; (4) for failure to make any consumer disclosures required under any state or federal law or statute; (5) for engaging in unfair or deceptive acts or practices in or affecting commerce; or (6) for damages, costs, expenses, extra-contractual damages, compensatory damages, exemplary damages, special damages, consumer redress, penalties, punitive damages, and/or damage multipliers, disgorgement, declaratory relief, equitable relief, injunctive relief, expenses, interest, and/or attorneys' fees and costs.

18.     As of the Final Settlement Date, Plaintiffs and, by operation of law, each Settlement Class Member shall further be deemed to have waived and released any and all provisions, rights and benefits conferred by Section 1542 of the California Civil Code or similar laws of any other state or jurisdiction.

19.     The Court orders that, upon the Final Settlement Date, the Settlement shall be the exclusive remedy for any and all Released Claims of the Releasing Parties.

20.     The Court hereby dismisses this Action with prejudice, and without fees or costs except as provided in the Settlement and this Order.  Plaintiffs and all Settlement Class Members are hereby permanently barred and enjoined from commencing, pursuing, maintaining, enforcing or prosecuting, either directly or indirectly, any Released Claims in any judicial, administrative, arbitral or other forum, against any of the Released Parties, provided that this injunction shall not apply to the claims of any Class Members who have timely and validly requested to be excluded from the Class.  This permanent bar and injunction is necessary to protect and effectuate the Settlement, this Order and this Court's authority to effectuate the Settlement, and is ordered in aid of this Court's jurisdiction and to protect its judgments.

21.     The Released Parties may file this Final Order in any other action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

22.     Nothing in this Order or in the Final Judgment entered in connection with this Order shall preclude any action to enforce the terms of the Settlement.

23.     Without affecting the finality of this Order in any way, the Court hereby retains continuing jurisdiction over: (a) all matters relating to the modification, interpretation, administration, implementation, effectuation and enforcement of the Settlement; (b) further proceedings, if necessary, on Class Counsel's Fee Application and/or the request for service awards for Plaintiffs; and (c) the Parties, Class Counsel and Settlement Class Members for the purpose of administering, supervising, construing and enforcing this Order and the Settlement in accordance with its terms.

24.     Neither this Order, the Final Judgment entered in connection with this Order, nor the Settlement (nor any other document referred to herein, nor any action taken to carry out this Order or the accompanying Final Judgment) shall be construed as or used as an admission or concession by or against LifeLock or Released Parties of the validity of any claim or defense or any actual or potential fault, wrongdoing, or liability whatsoever.  The Settlement and this resulting Final Order simply represent a compromise of disputed allegations.

25.     Without further order of the Court, the Parties may agree to reasonably necessary

extensions of time to carry out any of the provisions of the Settlement and to make other non-material modifications, in implementing the Settlement, that are not inconsistent with this Order.

26.     The Clerk shall enter Final Judgment, consistent with this Order, forthwith.

27.     Class Counsel shall serve a copy of this Final Order on all named parties or their counsel and the Settlement Administrator immediately upon receipt and the Settlement Administrator shall post a copy of this Final Order on the Settlement Website immediately upon receipt.

IT IS SO ORDERED.

Dated:  _____          _____

HAYWOOD S. GILLIAM JR.

United States District Judge

[PROPOSED] ORDER GRANTING FINAL APPROVAL
OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

# EXHIBIT 3

1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                          NORTHERN DISTRICT OF CALIFORNIA

10                              SAN FRANCISCO DIVISION

11

12  NAPOLEON EBARLE, JEANNE              Case No.  Case No. 3:15-CV-258-HSG

13  STAMM, BRIAN LITTON, and REINER
    JEROME EBARLE on behalf of          **[PROPOSED] FINAL JUDGMENT**
14  themselves and all other similarly situated,

15                  Plaintiffs,

16  v.

17  LIFELOCK, INC.,

18                  Defendant.

19

20          Judgment is hereby entered consistent with the Court's Order Granting Final Approval to

21  Class Settlement dated _____, 20__.  This document constitutes a judgment and a separate

22  document for purposes of Federal Rule of Civil Procedure 58(a).

23

24  JUDGMENT APPROVED AS TO FORM BY:

25  Dated: _____           _____

26                                              HAYWOOD S. GILLIAM
                                                United States District Judge
27

28

JUDGMENT ENTERED: _____, 201_

By: CLERK OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

# EXHIBIT 4

## If you were a member of a LifeLock identity theft protection plan at any time between September 1, 2010 and [preliminary approval], you are eligible for a <u>cash payment</u> from a class action settlement.

A federal court authorized this notice.  This isn't a solicitation from a lawyer and you aren't being sued.

- A proposed settlement has been reached in a class action lawsuit that challenges representations LifeLock made regarding its identity theft protection plans and information security programs.  LifeLock denies the allegations or that it did anything wrong.  The court has not decided who is right in the lawsuit.

- If you were a member of a LifeLock identity theft protection plan at any time between September 1, 2010, and [Preliminary Approval Date], such that you could have asserted a claim arising from the types of violations alleged in the lawsuit, you are a Class Member and are eligible to submit a claim to receive a cash payment. If you enrolled in a LifeLock identity theft protection plan between January 1, 2012, and April 30, 2015, you are also a Subclass Member.

- As a result of the settlement, LifeLock has agreed to pay $68 million to a settlement fund.  All Class Members will be able to file claims for cash payments of up to $20.  Subclass Members who do not exclude themselves from the settlement will receive automatic payments under the settlement, but will also receive an additional payment if they submit a valid claim.

- Your legal rights are affected whether you act or do not act.  Read this notice and the information on this Settlement Website carefully.

| SUMMARY OF YOUR OPTIONS AND LEGAL RIGHTS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM** | If you are a Class Member, you can submit a Claim Form online at www.EbarleClassSettlement.com, or mail the Claim Form found at www. EbarleClassSettlement.com to the address provided below.  The deadline to submit a Claim Form is **[DATE]**.  **See Question 10 below for more details.** |
| **AUTOMATIC PAYMENT TO SUBCLASS MEMBERS** | If you are a Subclass Member, and do not exclude yourself from the settlement, you will automatically receive a cash payment if the settlement is approved. This automatic cash payment will be in ***addition*** to the amount you will receive if you submit a Claim Form.  **See Question 9 below for more details.** |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT** | You <u>won't</u> receive a cash payment from the settlement.  This is the only option that allows you to retain your right to bring another lawsuit against LifeLock about the claims in this lawsuit. The postmark deadline to exclude yourself is **[DATE]**. **See Question 16 below for more details.** |
| **DO NOTHING** | If the settlement is approved and you do nothing, you will be bound by the settlement terms and judgment and will not be able to later sue LifeLock about the claims in this lawsuit.  If you are a Subclass Member and do nothing, you will still receive an automatic cash payment. If you are <u>not</u> a Subclass Member and do nothing, you will <u>not</u> receive a cash payment. **See Question 20 below for more details.** |
| **OBJECT TO THE SETTLEMENT** | Write to the Court if you don't like the settlement. You may object to the settlement and also submit a claim for a payment under the settlement. The postmark deadline to send an objection is **[DATE]**.  **See Question 18 below for more details.** |
| **ATTEND THE HEARING** | The Court has set a hearing on [DATE] regarding the fairness of the settlement. You may appear at the hearing, but you don't have to. You may hire your own attorney to appear for you.  **See Questions 23-25 below for more details.** |

- These rights and options, and the deadlines to exercise them, are explained in this notice.

- The Court will decide whether to approve the settlement. Proposed payments to Class Members and Subclass Members who do not exclude themselves from the settlement will be made if the Court approves the settlement. Please be patient and check back to this website to find out when the cash payments may be available.

QUESTIONS? CALL TOLL-FREE 1 (855) 907-3140 OR VISIT WWW.EBARLECLASSSETTLEMENT.COM

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** .......................................................................................................................**PAGE**   **3**
  1. Why is there a notice? ..........................................................................................................Page   3
  2. What is the lawsuit about?....................................................................................................Page   3
  3. How does LifeLock respond to the allegations? .................................................................Page   3
  4. Has the Court decided who is right? ....................................................................................Page   3
  5. Why is this a class action?....................................................................................................Page   3
  6. Why is there a settlement?....................................................................................................Page   3

**WHO IS IN THE SETTLEMENT?** .......................................................................................................**PAGE**   **4**
  7. Who is included in the settlement?.......................................................................................Page   4

**THE SETTLEMENT'S BENEFITS** .......................................................................................................**PAGE**   **4**
  8. What benefits does the settlement provide? ........................................................................Page   4
  9. How do I get a cash payment?..............................................................................................Page   4
  10. How do I submit a Claim Form and what is the deadline? .................................................Page   4
  11. What happens after a Claim Form is submitted?................................................................Page   5
  12. How will payment amounts be calculated?.........................................................................Page   5
  13. Can I file more than one claim?..........................................................................................Page   5
  14. When will I receive a cash payment?..................................................................................Page   5
  15. What am I giving up if I do not exclude myself from the Settlement? ...............................Page   5

**EXCLUDING YOURSELF FROM THE PROPOSED SETTLEMENT** ........................................................**PAGE**   **5**
  16. How do I exclude myself from the Class? ..........................................................................Page   5
  17. If I don't exclude myself, can I sue LifeLock for the same thing later? ............................Page   6

**OBJECTING TO THE PROPOSED SETTLEMENT**.................................................................................**PAGE**   **6**
  18. How do I tell the Court if I don't like the settlement?.......................................................Page   6
  19. What's the difference between objecting to the settlement and excluding myself from the Class?.............Page   7

**IF YOU DO NOTHING** .......................................................................................................................**PAGE**   **7**
  20. What happens if I do nothing at all?...................................................................................Page   7

**THE LAWYERS REPRESENTING YOU** ...............................................................................................**PAGE**   **7**
  21. Do I have a lawyer representing me in the lawsuit?............................................................Page   7
  22. How will the Class Counsel be paid? .................................................................................Page   7

**THE COURT'S FAIRNESS HEARING** .................................................................................................**PAGE**   **7**
  23. When and where will the Court decide whether to approve the settlement? .......................Page   8
  24. Do I have to attend the hearing?.........................................................................................Page   8
  25. May I speak at the hearing?.................................................................................................Page   8

**GETTING MORE INFORMATION**.......................................................................................................**PAGE**   **8**
  26. How do I get more information? ..........................................................................................Page   8

## BASIC INFORMATION

### 1.   WHY IS THERE A NOTICE?

A Court authorized this notice because you have a right to know about the proposed settlement of this class action lawsuit and about all of your options before the Court decides whether to give final approval to the settlement. This Settlement Website provides notice of and explains the lawsuit, the proposed settlement, your legal rights, what settlement benefits are available, who is eligible for them, and how to get them. If the Court approves the proposed settlement, cash payments will be made consistent with the settlement terms and the Court's orders. You will be informed of the progress of the settlement on this Settlement Website

The United States District Court for the Northern District of California is overseeing this lawsuit.  The case is *Ebarle et al. v. LifeLock, Inc.*, Case No. 3:15-CV-258-HSG (the "Lawsuit").

The consumers who filed the Lawsuit are called Plaintiffs and Class Representatives and the company they sued, LifeLock, Inc. ("LifeLock"), is called the Defendant.

### 2.   WHAT IS THE LAWSUIT ABOUT?

The Lawsuit claims that LifeLock made misrepresentations which generally fall into four categories: (1) LifeLock's promise to provide "comprehensive" services in detecting fraud; (2) Lifelock's promise to provide timely and continuous alerts of potential fraud twenty four hours a day, seven days a week, three hundred sixty five days a year; (3) Lifelock's promise regarding its information security program; and (4) LifeLock's promise to provide a "$1 Million Total Service Guarantee," which the Class Representatives allege purports to promise insurance in an amount up to $1,000,000 against identity theft. The Second Amended Complaint filed in the Lawsuit, which is available at www.EbarleClassSettlement.com, contains all of the allegations and claims asserted against LifeLock.

The Federal Trade Commission ("FTC") has made similar allegations against LifeLock in a contempt proceeding related to a February 23, 2010, Consent Decree, which LifeLock agreed to enter ("FTC Contempt Action"). The FTC Contempt Action is currently pending in the Arizona District Court for the District of Arizona, in a matter entitled *Federal Trade Commission v. LifeLock, Inc.*, Case No. 2:10-cv-00530-JJT.

### 3.   HOW DOES LIFELOCK RESPOND TO THE ALLEGATIONS?

LifeLock expressly denies that it did anything wrong and does not admit or concede any actual or potential fault, wrongdoing, or liability in connection with any facts or claims that have been alleged against it in the Lawsuit.

### 4.   HAS THE COURT DECIDED WHO IS RIGHT?

No.  The Court hasn't decided which of the parties, Plaintiffs or LifeLock, is right.

### 5.   WHY IS THIS A CLASS ACTION?

In a class action, one or more people, called "Class Representatives," (in this case, Napolean Ebarle, Jeanne Stamm, Brian Litton, and Renier Jerome Ebarle)  sue on behalf of people who have similar claims.  All of the people who have claims similar to the Class Representatives are members of the "Class" or "Class Members".

### 6.   WHY IS THERE A SETTLEMENT?

The Court hasn't decided in favor of either Plaintiffs or LifeLock.  Instead, both sides agreed to the settlement.  By agreeing to the settlement, the parties avoid the costs and uncertainty of a trial, and Class Members receive the benefits described in

this notice. The Class Representatives and the attorneys appointed to represent the class (called "Class Counsel") believe that the settlement is in the best interest of all Class Members.

## WHO IS IN THE SETTLEMENT?

| 7. | WHO IS INCLUDED IN THE SETTLEMENT? |
|---|---|

You are a "Class Member" if you were a member of a LifeLock identity theft protection plan at any time between September 1, 2010 and [the date of the Preliminary Approval Order] and could have asserted a claim arising from the types of violations alleged in the lawsuit.  You are also a "Subclass Member" if you enrolled in a LifeLock identity theft protection plan between January 1, 2012 and April 30, 2015.

LifeLock is excluded from the Class as well as any parent, subsidiary, affiliate, or controlled person of LifeLock, as well as the officers, directors, agents, servants or employees of LifeLock and the immediate family members of any such persons. Also excluded is any judge who may preside over the Lawsuit.

**IF YOU WERE A MEMBER OF A LIFELOCK IDENTITY THEFT PROTECTION PLAN BETWEEN SEPTEMBER 1, 2010 AND [PRELIMINARY APPROVAL ORDER DATE] BUT ARE UNSURE WHAT BENEFITS YOU ARE ELIGIBLE TO RECEIVE, WHETHER YOU ARE A SUBCLASS MEMBER OR WHAT YOUR OPTIONS ARE, YOU MAY CONTACT THE SETTLEMENT ADMINISTRATOR, AT 1 (855) 907-3140 OR CAN REVIEW THE SETTLEMENT DOCUMENTS ON THIS SETTLEMENT WEBSITE.**

| 8. | WHAT BENEFITS DOES THE SETTLEMENT PROVIDE? |
|---|---|

Approximately 6.8 Million Class Members are eligible for a cash payment. The settlement agreement is available at www. EbarleClassSettlement.com.  If the proposed settlement is approved and becomes final, LifeLock has agreed to pay $68 million to a settlement fund. You are eligible for a cash payment from the settlement fund, if you're a Class Member. ***See* Question 7** to determine if you're a Class Member. The $68 million settlement fund will be used to only to provide cash payments to Class Members.

For details about how to receive a cash payment and about how payments will be determined, see **Questions 9-12** below.

| 9. | HOW DO I GET A CASH PAYMENT? |
|---|---|

All Class Members may submit a <u>Claim Form</u> at www.EbarleClassSettlement.com. Subclass Members who do not exclude themselves from the settlement will automatically receive a cash payment, regardless of whether they submit a Claim Form, but Subclass Members will receive an ***additional*** payment under the settlement if they submit a valid claim. If you are unsure about what benefits you may be eligible to receive, whether you are Class and/or Subclass Member, or what your options are, you may contact the Settlement Administrator, at 1 (855) 907-3140 or can review the settlement documents on this Settlement Website.

*See* **Question 10** below, for instructions on how to submit a Claim Form.

| 10. | HOW DO I SUBMIT A CLAIM FORM AND WHAT IS THE DEADLINE? |
|---|---|

You have two options for submitting a Claim Form:

- <u>Online</u>:  You can submit a Claim Form online at www.EbarleClassSettlement.com using your Claim ID.

- <u>By mail</u>:  You can print and fill out the Claim Form that is available at www.EbarleClassSettlement.com or request that the Settlement Administrator mail you a Claim Form, and then mail your completed Claim Form (with postage) to:

Ebarle v. LifeLock, Inc. Settlement
c/o GCG
PO Box 10248
Dublin, OH 43017-5748

You must follow the instructions and provide all of the required information on the Claim Form.

**Online Claim Forms must be submitted by [DATE].  Claim Forms submitted by mail must be postmarked by [DATE].** If you fail to submit online or postmark a Claim Form by [DATE], your claim will be rejected.

### 11.   WHAT HAPPENS AFTER A CLAIM FORM IS SUBMITTED?

The Settlement Administrator supervising the cash payments will use LifeLock's records and the information you provide on your Claim Form to calculate the amount of your cash payment consistent with the terms of the Settlement Agreement. If the Settlement Administrator needs more information, it may contact you directly.

### 12.   HOW WILL PAYMENT AMOUNTS BE CALCULATED?

Payment amounts will depend on two things:  how many people file valid claims, and the date you enrolled in a LifeLock identity theft protection plan.

The Settlement Administrator will use LifeLock's records and the information you provide on your Claim Form to determine this information.

### 13.   CAN I FILE MORE THAN ONE CLAIM?

If you were enrolled in a LifeLock identity theft protection plan between September 1, 2010, and [Preliminary Approval Date], you are entitled to submit one Claim Form.

### 14.   WHEN WILL I RECEIVE A CASH PAYMENT?

The Court will hold a Fairness Hearing on [date], 2016, to decide whether to approve the proposed settlement. If the Court approves the proposed settlement, the cash payments will be made approximately twenty one (21) days thereafter. This Settlement Website will be updated with current settlement information including if final approval is entered and the date on which cash payments will be made.  Please be patient.

### 15.   WHAT AM I GIVING UP IF I DO NOT EXCLUDE MYSELF FROM THE SETTLEMENT?

If you don't exclude yourself from the proposed settlement by following the process explained in Question 16, you will release (i.e., give up) all of the claims described in the Settlement Agreement, which is available at www.EbarleClassSettlement.com.  That means that you will not be able to sue, continue to sue or be part of any other lawsuit against LifeLock about the Released Claims. It also means that all of the decisions by the Court will apply to you.

## EXCLUDING YOURSELF FROM THE PROPOSED SETTLEMENT

If you want to keep the right to sue LifeLock on your own about the issues in this Lawsuit, then you must take steps to exclude yourself from the proposed settlement. This is sometimes referred to as excluding yourself from or opting out of the settlement.  If you exclude yourself, you are no longer part of the settlement and you won't get a cash payment.

### 16.   HOW DO I EXCLUDE MYSELF FROM THE PROPOSED SETTLEMENT?

If you don't want to be part of the proposed settlement, you may exclude yourself by email or by writing to the Settlement

Administrator. Your request must include the following:

•       Your full name and address;

•       If applicable, the name and address of any person claiming to be legally entitled to submit an exclusion request on your behalf and the basis for such legal entitlement; and

•       A statement that you want to be excluded from the class.

You must email or mail your exclusion request, **postmarked or emailed by [DATE]**, to:

Ebarle v. LifeLock, Inc. Settlement
c/o GCG
PO Box 10248
Dublin, OH 43017-5748
info@EbarleClassSettlement.com

You cannot exclude yourself from the proposed settlement by phone. A sample request for exclusion letter is available at www.EbarleClassSettlement.com.

| | |
|---|---|
| **17.** | **IF I DON'T EXCLUDE MYSELF, CAN I SUE LIFELOCK FOR THE SAME THING LATER?** |

No. Unless you exclude yourself, you give up the right to sue LifeLock about the issues in the Lawsuit.

## OBJECTING TO THE PROPOSED SETTLEMENT

You can tell the Court that you don't agree with the settlement or some part of it, Class Counsel's request for attorneys' fees and expenses and/or the request for service awards for each of the Class Representatives. This is called objecting to the settlement.

| | |
|---|---|
| **18.** | **HOW DO I TELL THE COURT IF I DON'T LIKE THE SETTLEMENT ?** |

If you are a Class Member and don't exclude yourself, you can object to any part of the settlement, the settlement as a whole, Class Counsel's request for attorneys' fees and expenses, and/or the request for service awards for each of the Class Representatives. Any objection must be made in writing and include the following information:

•       The name of this case, which is *Ebarle et al. v. LifeLock, Inc.*, Case No. 3:15-CV-258-HSG;

•       Your full name, address and telephone number;

•       If applicable, the name and address of any person claiming to be legally entitled to object on your behalf and the basis of such legal entitlement;

•       All grounds for your objection;

•       Whether you are represented by counsel, and if so the identity of such counsel;

•       Your signature (an attorney's signature is not sufficient).

To be considered, your objection must be mailed to the Settlement Administrator: Ebarle v. LifeLock, Inc. Settlement, c/o GCG, PO Box 10248 Dublin, OH 43017-5748, **postmarked no later than [DATE]**.

If you don't send a timely or complete objection, you will waive all objections to the settlement, and won't be allowed to object to the settlement at the Fairness Hearing or otherwise.

Even if you object to the settlement you will be eligible for cash payments as set forth above in **Questions 8-14**; however,

you will be bound by all terms of the proposed settlement if it is finally approved by the Court.

| 19. | WHAT'S THE DIFFERENCE BETWEEN OBJECTING TO THE SETTLEMENT AND EXCLUDING MYSELF FROM THE SETTLEMENT? |

You object to the settlement when you wish to remain a Class Member and be subject to the settlement, but disagree with some aspect of the settlement.  An objection allows your views to be heard in Court.

In contrast, excluding yourself from the proposed settlement means that you are no longer part of the proposed settlement and don't want the settlement to apply to you even if the Court finally approves it.  Once excluded from the proposed settlement, you lose any right to receive a cash payment from the settlement or to object to any aspect of the settlement because the case no longer affects you.

## IF YOU DO NOTHING

| 20. | WHAT HAPPENS IF I DO NOTHING AT ALL? |

If you do nothing and the Court grants final approval of the proposed settlement, you will be included in the settlement and be bound by the release of claims in this settlement and will be giving up your rights to be part of any other lawsuit or make any other claim against LifeLock about the issues raised in the Lawsuit as described in **Question 15**. The Settlement Agreement, available at www.EbarleClassSettlement.com, describes all of the claims you will release (give up).   If you do nothing and are a Subclass Member, you will automatically receive a cash payment. If you are <u>not</u> Subclass Member and do nothing, you will <u>not</u> receive a cash payment.

## THE LAWYERS REPRESENTING YOU

| 21. | DO I HAVE A LAWYER REPRESENTING ME IN THE LAWSUIT? |

Yes.  The Court has appointed lawyers to represent the Class Members in the Lawsuit.  They are called "Class Counsel."  You won't be charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.  The lawyers appointed as Class Counsel are:

|  |  |
|---|---|
| Michael W. Sobol | Randy Pulliam |
| Lieff Cabraser Heimann & Bernstein, LLP | Carney Bates & Pulliam, PLLC |
| 275 Battery Street, 29th Floor | 2800 Cantrell, Suite 510 |
| San Francisco, California  94111 | Little Rock, AR 72202 |

| 22. | HOW WILL THE CLASS COUNSEL BE PAID? |

Class Counsel intends to ask the Court to award attorneys' fees and expenses of up to $10,200,000. LifeLock has agreed not to object to any request by Class Counsel provided it does not exceed $10,200,000 in total for attorneys' fees and expenses.

Class Counsel will also ask the Court to award a $2,000 service award to each of the four (4) Class Representatives, to compensate them for their commitment and efforts on behalf of the Class Members in the Lawsuit. LifeLock has agreed not to object to any service award request provided it does not exceed $2,000 for each of the four (4) Class Representatives.

Class Counsel's application for attorneys' fees, expenses, and class representative service awards will be available at www. EbarleClassSettlement.com once filed.

The Court will determine the amount of attorneys' fees, expenses, and service awards to award.  Any attorneys' fees, expenses, and service awards awarded by the Court will be paid by LifeLock and will not come out of the $68 million settlement fund.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing (the "Fairness Hearing") to decide whether to approve the proposed settlement and the request for Class Counsel's attorneys' fees, expenses and the Class Representatives' service awards.  You may attend and you may ask to speak, but you don't have to.

**23.    WHEN AND WHERE WILL THE COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT?**

The Court will hold the Fairness Hearing at __:__ a.m./p.m. on _____, 201_, at the United States District Court for the Northern District of California, 450 Golden Gate Ave, 18th Floor, Courtroom 15, San Francisco, CA 94102.  The hearing may be moved to a different date or time without notice, so check for updates on this website.  At this hearing, the Court will consider whether the proposed settlement is fair, reasonable and adequate.  The Court will also consider Class Counsel's application for attorneys' fees and expenses and for service awards for the Class Representatives.  If there are objections, the Court will consider them at the hearing.  After the hearing, the Court will decide whether to approve the settlement.  We don't know how long the decision will take.

**24.    DO I HAVE TO ATTEND THE HEARING?**

No.  You don't have to attend the Fairness Hearing.  Class Counsel will answer any questions the Court may have.  If you or your personal attorney would like to attend the Fairness Hearing, you are welcome to do so at your expense.  If you send a written objection, you don't have to come to Court to talk about it.  As long as you submit your written objection by [date], to the proper address, and it complies with the requirements set forth above, the Court will consider it.

**25.    MAY I SPEAK AT THE HEARING?**

You may ask the Court for permission to speak at the Fairness Hearing.   If you intend to speak at the Fairness Hearing, you may, but you are not required to, file with the Court and serve by First-Class mail on Class Counsel and LifeLock's Counsel, a Notice of Intention to Appear by [date] at the addresses below:

| CLASS COUNSEL | LIFELOCK'S COUNSEL |
|---|---|
| Michael W. Sobol<br>Lieff, Cabraser, Heimann & Bernstein, LLP<br>275 Battery Street<br>29th Floor<br>San Francisco, CA 94111 | Luanne Sacks<br>Sacks, Ricketts & Case LLP<br>177 Post Street, Suite 650<br>San Francisco, CA 94108 |

## GETTING MORE INFORMATION

**26.    HOW DO I GET MORE INFORMATION?**

This notice summarizes the proposed settlement.  You can find more details in the Settlement Agreement. You can get a copy of the Settlement Agreement, read other key case documents, and get more information on this website.  You can also call 1 (855) 907-3140 for more information. **DO NOT CONTACT THE COURT, LIFELOCK OR LIFELOCK'S COUNSEL.**

# EXHIBIT 5

1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

12

13

14

15

16

17

18

| | |
|---|---|
| NAPOLEON EBARLE, JEANNE STAMM, BRIAN LITTON, and REINER JEROME EBARLE on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LIFELOCK, INC.,<br><br>Defendant. | Case No.  3:15-CV-258-HSG<br><br>**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS SETTLEMENT**<br><br>Date: December 17, 2015<br>Time: 2:00 p.m.<br>Location: Courtroom 15, 18th Floor<br>Judge: Hon. Haywood S. Gilliam |

19

20

21

22

23

24

25

26

27

28

1   This matter comes before the Court upon Plaintiffs' Motion for Preliminary Approval of

2   Class Settlement.  The Parties have entered into a Class Settlement Agreement, dated November

3   3, 2015 (the "Settlement") which, if approved, would resolve the above captioned class action

4   law suit (the "Action" or the "Class Action Lawsuit").  Upon review and consideration of the

5   motion papers and the Settlement and all exhibits thereto, including the proposed forms of notice

6   to the Class and the proposed Claim Form, the Court finds that there is sufficient basis for: (1)

7   granting preliminary approval of the Settlement; (2) provisionally certifying the Class and the

8   Subclass for settlement purposes only; (3) appointing Class Counsel and Plaintiffs to represent

9   the Class; (4) approving the Parties' proposed notice program and forms of notice substantially

10  similar to those forms attached to the Settlement, and directing that notice be disseminated to the

11  Class pursuant to the notice program provided in the Settlement; (5) approving the Parties'

12  proposed Claim Form, and approving the procedures set forth in the Settlement for Class

13  Members to submit claims, exclude themselves from the Class, and object to the Settlement; (6)

14  appointing a Settlement Administrator to conduct the duties assigned to that position in the

15  Settlement; (7) staying all non-Settlement related proceedings in the Action pending final

16  approval of the Settlement; and (8) setting a hearing (the "Fairness Hearing"), at which the Court

17  will consider: (a) whether to grant final approval of the Settlement; (b) Class Counsel's

18  application for attorneys' fees and costs; and (c) any request for service award for the Plaintiffs.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

19      1.      Capitalized terms not otherwise defined herein shall have the same meaning as set

20  forth in the Settlement.

21      2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and has

22  personal jurisdiction over the Parties.  Venue is proper in this District.

23      3.      This Action is provisionally certified as a class action, for the purposes of

24  settlement only, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3) and 23(e).  The

25  Class is defined as follows:

26      All members of a LifeLock identity theft protection plan in the United States at
        any time between September 1, 2010 and the date of the Preliminary Approval
27      Order.

28

- 1 -

[PROPOSED] ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

The Subclass is defined as follows:

> All individuals who enrolled in a LifeLock identity theft protection plan in the United States at any time between January 1, 2012, and April 30, 2015.

Excluded from the Class are Defendant, any parent, subsidiary, affiliate, or controlled person of Defendant, as well as the officers, directors, agents, servants or employees of Defendant and the immediate family members of any such person.  Also excluded is any judge who may preside over this cause of action.

4.      Certification of the Class and Subclass shall be solely for settlement purposes and without prejudice to the Parties in the event the Settlement is not finally approved by this Court or otherwise does not take effect.

5.      Pursuant to Federal Rule of Civil Procedure 15(a)(2), and for purposes of, and solely in connection with, the Settlement, the Court grants the Plaintiffs' unopposed Motion for Leave to Amend their Complaint to file their Second Amended Complaint ("SAC").  The SAC is deemed filed as of the date of this Preliminary Approval Order.

6.      In support of this Preliminary Approval Order, the Court conditionally and preliminarily finds that: (a) the Class Members are so numerous that joinder of all members is impracticable; (b) there are questions of law and fact common to the Class Members, each of whom could have asserted the types of claims raised in the Action, and these questions predominate over any questions affecting individual Class Members; (c) the named Class Representatives' claims are typical of the claims of the Class Members; (d) the named Class Representatives and Class Counsel identified below are able to adequately represent the Class Members; and (e) class-wide treatment of the disputes raised in the SAC is superior to other available methods for adjudicating the controversy.

7.      The Court preliminarily approves the proposed Settlement as fair, reasonable and adequate, entered into in good faith, free of collusion and within the range of possible judicial approval.

[PROPOSED] ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

8.      The Court appoints the following as Class Counsel: Randall K. Pulliam and Hank Bates of Carney Bates & Pulliam, PLLC, and Michael W. Sobol of Lieff, Cabraser, Heimann & Bernstein, LLP.

9.      The Court appoints Plaintiffs Napolean Ebarle, Jeanne Stamm, Brian Litton, and Renier Jerome Ebarle as class representatives for the Class.

10.      The Court appoints Garden City Group, LLC to serve as the Settlement Administrator, and directs them to carry out all duties and responsibilities of the Settlement Administrator specified in the Settlement.

11.      The Court approves the program for disseminating notice to the Class set forth in the Settlement (the "Notice Program").  The Court approves the form and content of the proposed forms of notice, in the forms attached to the Settlement as Exhibits 4 and 6.  The Court finds that the proposed forms of notice are clear and readily understandable by Class Members. The Court finds that the Notice Program, including the proposed forms of notice, constitutes the best notice practicable under the circumstances, constitutes valid, due and sufficient notice to the Class in full compliance with the requirements of applicable law, including Federal Rule of Civil Procedure 23 and the Due Process Clause of the United States Constitution, and is the only notice to the Class of the Settlement that is required.

12.      The Court approves the form and content of the proposed Claim Form, in the form attached to the Settlement as Exhibit 1, and approves the procedures set forth in the Settlement for Class Members to submit Claims.

13.      Pursuant to the terms of the Settlement, to the extent LifeLock has not already done so, three (3) business days after entry of this Order, LifeLock shall provide to the Settlement Administrator the Class Data for the Settlement Administrator's use in disseminating notice and processing Claims.  The Class Data shall identify each Class Member's name, last known address and/or last known email address, and date of enrollment in a LifeLock identity theft protection plan.

14.      The "Notice Date" shall be thirty (30) days following the entry of this Order.

15.      By no later than the Notice Date, the Settlement Administrator shall send the Summary Class Notice, in the form approved by the Court, to Class Members via email for those

- 3 -

[PROPOSED] ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

1  Class Members for whom an email address is available and via First Class U.S. Mail, proper

2  postage prepaid, for those Class Members for whom an email address is not available.  The

3  subject line for all emails covered by this paragraph shall be: Notice of Class Action Settlement.

4        16.     The Settlement Administrator shall update the mailing addresses in the Class Data

5  through the National Change of Address Database prior to sending any Summary Notice via

6  First Class U.S. Mail, proper postage prepaid.  The Settlement Administrator shall perform a

7  single Skip Trace using information identifying the Class Members, as necessary, to conduct an

8  address update with respect to any Summary Notice sent via First Class U.S. Mail and returned

9  to the Settlement Administrator as undeliverable not bearing a forwarding address using an

10  industry accepted source such as Accurint and shall send the Summary Notice to the mailing

11  address identified by the Skip Tracing.  The Settlement Administrator shall resend via First Class

12  U.S. Mail, proper postage prepaid, the Summary Notice to the new address for each such Class

   Member within three (3) business days of obtaining each such new address.

13        17.     Any mailed Summary Notice returned to the Settlement Administrator as

14  undelivered and bearing a forwarding address shall be re-mailed by the Settlement Administrator

15  within three (3) business days following receipt of the returned mail.  Any emailed Summary

16  Notice that bounces back or is returned to the Settlement Administrator as undeliverable after

17  three (3) unsuccessful delivery attempts shall be mailed by the Settlement Administrator if a

18  mailing address is also provided in the Class Data.  If no mailing address is provided in the Class

19  Data, the Settlement Administrator shall perform a single Skip Trace using information

20  identifying the Class Member, as necessary, to conduct an address update to allow the Summary

21  Notice to be sent via U.S. Mail, proper postage prepaid.  The Settlement Administrator shall

22  send the Summary Notice to any mailing or physical address identified by the Skip Tracing

23  within seven (7) business days following receipt of the bounced back or returned as

24  undeliverable email enclosing the Summary Notice.

25        18.     By no later than the Notice Date, the Settlement Administrator shall post the

26  Long Form Notice, in the form approved by the Court, on the Settlement Website.

27        19.     As soon as practicable following the entry of the Preliminary Approval Order

28  and, in all events, by no later than the Notice Date, the Settlement Administrator shall cause the

- 4 -

Summary Notice to be published in publication and media outlets as agreed upon by the Parties.

20.     The Settlement Administrator shall establish and maintain an Internet website, at the web address www.ebarleclasssettlement.com ("Settlement Website") where Class Members can obtain further information about the terms of this Settlement, their rights, important dates and deadlines, and related information.  Class Members shall also be able to submit a Claim Form electronically via the Settlement Website.  The Settlement Website shall include, in PDF format, the SAC, the Settlement, the Motion for Preliminary Approval, the Preliminary Approval Order, the Class Notice, Class Counsel's application for attorneys' fees and costs (after it is filed), the Final Approval Order (after it is entered), and other case documents as agreed upon by the Parties and/or required by the Court and shall be operational and live by no later than thirty (30) days following entry of the Preliminary Approval Order.  The Settlement Website shall be optimized for display on mobile phones.  The Settlement Administrator shall maintain the Settlement Website as operational and shall not take it down until thirty (30) days after the Payment Date.  Within five (5) business days after the Settlement Website is taken down, the Settlement Administrator shall transfer ownership of the URL for the Settlement Website to LifeLock.

21.     The Settlement Administrator shall establish and maintain a toll-free telephone number ("Toll-Free Number") where Class Members can obtain further information about the Settlement and their rights and request that a hard copy Claim Form or Long Form Notice be mailed to them.  The Toll-Free Number shall be operational and live by no later than thirty (30) days following entry of the Preliminary Approval Order.

22.     By no later than seventy five (75) days after the Notice Date, the Settlement Administrator shall file with the Court declaration(s) detailing the scope, methods, and status of the Notice Program.

23.     Class Members who wish to submit a Claim shall have the option of submitting Claim Forms online via the Settlement Website or by mail.  Claim Forms submitted online must be submitted by no later than sixty (60) days following the Notice Date (hereinafter the "Claim Deadline").  Claim Forms submitted by mail must be postmarked no later than the Claim Deadline.

24.    Any Class Member who wishes to be excluded from the Class must email or mail a written request for exclusion to the Settlement Administrator at the address provided in the Class Notice, postmarked no later than forty-five (45) days following the Notice Date, and must include: (a) their full name and address and if applicable the name and address of any person claiming to be legally entitled to submit an exclusion request on behalf of the Class Member and the basis for such legal entitlement; and (b) a statement that clearly indicates that he/she wants to be excluded from the Class.

25.    If the Settlement is finally approved and becomes effective, any Class Member who does not send a timely and valid request for exclusion shall be a Settlement Class Member and shall be bound by all subsequent proceedings, orders, and judgments in the Action, including, but not limited to, the Release, even if he or she has litigation pending or subsequently initiates litigation against LifeLock relating to the claims and transactions released in the Action.

26.    Any Class Member or person legally entitled to act on his or her behalf may object to the Settlement, to Class Counsel's request for attorneys' fees and expenses ("Fee Application"), and/or to any request for service awards for the Plaintiffs.  To be considered, an objection must be made in writing, must be mailed to the Settlement Administrator at the address provided in the Class Notice, postmarked no later than forty-five (45) days following the Notice Date, and must include the following: (a) the name of the Action (*Ebarle v. LifeLock, Inc.,* No. 15-cv-00258-HSG); (b) the objector's full name, address and telephone number; (c) if applicable, the name and address of any person claiming to be legally entitled to object on behalf of a Class Member and the basis of such legal entitlement; (d) all grounds for the objection; (e) whether the objector is represented by counsel and, if so, the identity of such counsel; and (f) the objector's signature.

27.    Any Class Member who submits a timely and valid written objection may appear at the Fairness Hearing, either in person or through personal counsel hired at the Class Member's own expense.  Any Class Member who does not submit a timely and valid objection shall be deemed to have waived all objections and shall forever be foreclosed from making any objection to the fairness, adequacy or reasonableness of the Settlement and any Final Order and Final Judgment entered approving it, Class Counsel's Fee Application, or any request for Service

[PROPOSED] ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

Awards for the Plaintiffs.

28.     The Settlement Administrator shall promptly after receipt provide to Class Counsel and LifeLock's Counsel copies of any requests for exclusion and objections, including any related correspondence.

29.     LifeLock shall pay to the Settlement Administrator all reasonable costs associated with the administration of the Settlement, distribution of Class Notice, and any other tasks assigned to the Settlement Administrator by the Settlement, this Preliminary Approval Order, by LifeLock and the Class Counsel's mutual agreement in writing, or by this Court.  The Settlement Administrator shall not be paid from the Settlement Fund.

30.     The Court directs that the Fairness Hearing be scheduled for _____, 2016, at __o'clock __.m. to assist the Court in determining whether the Settlement should be finally approved as fair, reasonable and adequate to the Settlement Class Members; whether Final Judgment should be entered dismissing the Action with prejudice; whether Class Counsel's Fee Application should be approved; and whether any request for Service Awards for the Plaintiffs should be approved.

31.     The Parties shall file any motions in support of final approval of the Settlement by no later than 75 days following the Notice Date.  Class Counsel shall file their Fee Application and any Request for Plaintiff Service Awards by no later than thirty (30) days following the Notice Date.  After it is filed, Class Counsel's Fee Application and Request for Plaintiff Service Awards shall be posted on the Settlement Website.

32.     The Parties shall file any responses to any Class Member objections, and any reply papers in support of final approval of the Settlement or Class Counsel's Fee Application or request for Plaintiff service awards, by no later than 75 days following the Notice Date.

33.     The Court reserves the right to modify the date of the Fairness Hearing and related deadlines set forth herein.  In the event the Fairness Hearing is moved, the new date and time shall be promptly posted on the Settlement Website by the Settlement Administrator.

34.     This Order shall become null and void and shall be without prejudice to the rights of the Parties, all of whom shall be restored to their respective positions existing immediately before the Court entered this Order, if: (a) the Settlement is not finally approved by the Court, or

does not become final, pursuant to the terms of the Settlement; (b) the Settlement is terminated in accordance with the Settlement; or (c) the Settlement does not become effective pursuant to the terms of the Settlement for any other reason. In any such case, any amounts transferred into the Settlement Fund from the Court's Registry in the FTC Action pursuant to paragraph 57 of the Settlement shall be returned, with any interest accrued thereon, to the Court's Registry in the FTC Action.

35.    If the Settlement does not become final and effective pursuant to the terms of the Settlement, the Class Representatives, the Class Members, and LifeLock shall be returned to their respective statuses as of the date immediately prior to the execution of the Settlement, and this Preliminary Approval Order shall have no force or effect, and neither this Preliminary Approval Order nor the Settlement shall be construed or used as an admission, concession, or declaration by or against LifeLock of any fault, wrongdoing, breach, or liability, or be construed or used as an admission, concession, or declaration by or against any of the Plaintiffs or Class Members that their claims lack merit or that the relief requested is inappropriate, improper, or unavailable, or as a waiver by any party of any defenses or claims he, she, or it may have in this Action or in any other lawsuit, and neither shall be admissible in evidence or usable for any purpose whatsoever in the Action, any proceeding between the Parties, or in any action related to the Released Claims or otherwise involving the Parties, Class Members, the Federal Trade Commission, any State Attorney General, or any Released Party.

36.    Pending the final determination of whether the Settlement should be approved, all proceedings in this Action, except as may be necessary to implement the Settlement or comply with the terms of the Settlement, are hereby stayed.

37.    Pending the final determination of whether the Settlement should be approved, Plaintiffs and each Class Member, and any person purportedly acting on behalf of any Class Member(s), are hereby enjoined from commencing, pursuing, maintaining, enforcing or prosecuting, either directly or indirectly, any Released Claims in any judicial, administrative, arbitral or other forum, against any of the Released Parties, provided that this injunction shall not apply to the claims of any Class Members who have timely and validly requested to be excluded from the Class.  Such injunction shall remain in force until Final Settlement Date or until such

time as the Parties notify the Court that the Settlement has been terminated.  This injunction is

necessary to protect and effectuate the Settlement, this Preliminary Approval Order and this

Court's authority regarding the Settlement, and is ordered in aid of this Court's jurisdiction and

to protect its judgments.

38.     Class Counsel, LifeLock and the Settlement Administrator are directed to carry out

their obligations under the Settlement and this Preliminary Approval Order.

39.     The following chart summarizes the dates and deadlines set by this Order:

| Date | Event |
|---|---|
| Three (3) business days after entry of Preliminary Approval Order | Deadline for LifeLock to provide Class Data to Settlement Administrator |
| Ten (10) days after filing of Preliminary Approval Motion | Deadline for Settlement Administrator to provide notice to federal or state officials per U.S.C. § 1715 |
| Ten (10) days after entry of Preliminary Approval Order (or within three (3) calendar days after entry of Final Approval Order if money not released from Court's Registry in the FTC Action) | LifeLock shall pay to the Settlement Administrator the sum of Sixty-Eight Million Dollars ($68,000,000.00) to create the Settlement Fund |
| Thirty (30) days after entry of Preliminary Approval Order | Notice Date and deadline for the Settlement Website and Toll-Free Number to go live |
| Thirty (30) days after Notice Date | Deadline for Class Counsel to file application for Attorneys' Fees and Expenses and request for Service Awards |
| Forty-five (45) days after Notice Date | Objection, Opt-Out Deadline |
| Sixty (60) days after Notice Date | Claim Deadline |
| Ten (10) days after notification from Settlement Administrator that more than two percent (2%) of the Class has requested exclusion | Deadline for LifeLock to notify Class Counsel and the Court that it is cancelling the settlement |
| Fifty-five (55) days after Notice Date | Settlement Administrator to provide to Class Counsel and LifeLock's Counsel a final list of Class Members who requested exclusion or objected |
| Seventy-five (75) days after Notice Date | Settlement Administrator to provide and Class Counsel to file a declaration detailing the scope, method, and status of the Class Notice program and the Claim process. |
| Seventy-five (75) days after Notice Date | Deadline for Final Approval Motion; and for the parties to provide any responses to Settlement Objections |
| One business day after entry of the Final Approval Order | Final Settlement Date |
| Twenty (20) days after the Final Settlement Date, or earlier if agreed upon by parties. | Payment Date (i.e., Deadline for Settlement Administrator to Disburse Settlement Fund) |
| Thirty (30) days after Payment Date | Settlement Website taken down |
| Thirty-five (35) days after Payment Date | Settlement Administrator to transfer Settlement Website URL to LifeLock |
| One hundred and twenty (120) days after Payment Date | Settlement checks expire |

- 9 -

[PROPOSED] ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

| One hundred and twenty (120) days after the date appearing on second payment checks | Any checks issued as further distribution expire |
| One hundred and eighty (180) days after Final Settlement Date | Deadline for Class Counsel to return documents produced by LifeLock |
| One (1) year plus thirty (30) days after Payment Date | Deadline for Settlement Administrator to return documents received from Class Counsel or LifeLock's Counsel |

IT IS SO ORDERED.

Dated: _____          _____

                                                  HAYWOOD S. GILLIAM

                                                  United States District Judge

[PROPOSED] ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:15-CV-258-HSG

# EXHIBIT 6

| From: | EbarleClassSettlement@tgcginc.com |
|---|---|
| Sent: | Tuesday, November 03, 2015 2:37 PM |
| To: | |
| Subject: | Court Authorized Notice of Settlement |

**If you were a member of a LifeLock identity theft protection plan at any time between September 1, 2010, and [PRELIMINARY APPROVAL DATE], you are eligible to receive a cash payment.**
**The sole purpose of this notice is to inform you of the proposed settlement so that you may decide what to do.**

**WHAT IS THIS CASE ABOUT?** A proposed settlement has been reached in the nationwide class action lawsuit, *Ebarle, et al. v. LifeLock, Inc.,* Case. No. 3:15-CV-00258 (HSG) ("Lawsuit"). This Lawsuit challenges representations LifeLock made regarding its identity theft protection plans and information security program. LifeLock denies all allegations or that it did anything wrong. Under the proposed settlement, Lifelock has agreed to pay $68 million to a settlement fund.

**WHO IS INCLUDED?** If you were a member of a LifeLock identity theft protection plan at any time between September 1, 2010, and [Preliminary Approval Date], such that you could assert a claim arising from the types of violations alleged in the lawsuit, you are a **Class Member**. If you enrolled in a LifeLock identity theft protection plan between January 1, 2012, and April 30, 2015, you are **also** a **Subclass Member**.

**HOW DO I GET A CASH PAYMENT IF THE SETTLEMENT IS APPROVED? All <u>Class</u> members may submit a Claim Form to receive a pro rata share of the allocated net settlement amount of up to $20 by either** (1) Filing a claim online using your Claim ID; or (2) Printing a Claim Form, filling it out and mailing it (with postage) to the address listed on the Claim Form. **<u>Claim Forms must be submitted online or postmarked by [DATE].</u>** Subclass Members who do not exclude themselves from the settlement will receive a cash payment regardless of whether they submit a claim, but will receive an ***additional*** payment under the Settlement if they submit a valid claim. **Your Claim ID is: [Insert Claim ID Here]**.

**YOUR OTHER OPTIONS.** If you don't want to be bound by the settlement and any judgment in the Lawsuit, you can exclude yourself by sending a written request no later than [DATE]. If you exclude yourself, you won't get a cash payment. If you don't exclude yourself and the settlement is approved, you will be bound by its terms and cannot later sue LifeLock about the claims in the Lawsuit. If you don't exclude yourself, you may object to the Settlement or the request for fees by the attorneys appointed by the Court to represent the Class ("Class Counsel") or any service award to any of the four individuals who represent the Class in the Lawsuit ("Class Representatives"). Any objection must be made in writing and postmarked before [DATE]. The Court will hold a hearing on [DATE], 2016, at [TIME], to consider whether to approve: (1) the settlement; (2) up to $10.2 million in attorneys' fees and expenses to Class Counsel; and (3) service awards of $2,000 to each Class Representative. You may appear at the hearing, but you don't have to. You may hire your own attorney to appear for you.

**For more information or to submit a claim, visit <u>www.ebarleclasssettlement.com</u> or call 1 (855) 907-3140.**

*A federal court authorized this notice. This isn't a solicitation from a lawyer. You aren't being sued.*

If you wish to UNSUBSCRIBE from future email messages from the Claims Administrator with regard to this Settlement, please click on this link.

*Ebarle, et al. v. LifeLock, Inc.*
**c/o GCG**
**P.O. Box 10248**
**Dublin, OH 43017-5748**

**Forwarding Service Requested**

1234567890

Claim No: LL2011111111

Control No: 1234567890

JANE CLAIMANT
123 4TH AVE
APT 5
SEATTLE, WA  67890

Class Action Settlement Notice

**If you were a member of a LifeLock identity theft protection plan at any time between September 1, 2010, and [PRELIMINARY APPROVAL DATE], you are eligible to receive a cash payment.**
**The sole purpose of this notice is to inform you of the proposed settlement so that you may decide what to do.**

**WHAT IS THIS CASE ABOUT?** A proposed settlement has been reached in the nationwide class action lawsuit, *Ebarle, et al. v. LifeLock, Inc.*, Case. No. 3:15-CV-00258 (HSG) ("Lawsuit"). This Lawsuit challenges representations LifeLock made regarding its identity theft protection plans and information security program. LifeLock denies all allegations or that it did anything wrong. Under the proposed settlement, Lifelock has agreed to pay $68 million to a settlement fund.

**WHO IS INCLUDED?** If you were a member of a LifeLock identity theft protection plan at any time between September 1, 2010, and [Preliminary Approval Date], such that you could assert a claim arising from the types of violations alleged in the lawsuit, you are a **Class Member**. If you enrolled in a LifeLock identity theft protection plan between January 1, 2012, and April 30, 2015, you are **also a Subclass Member**.

**HOW DO I GET A CASH PAYMENT IF THE SETTLEMENT IS APPROVED?** <u>All</u> **Class members may submit a Claim Form to receive a pro rata share of the allocated net settlement amount of up to $20 by either** (1) Filing a claim online using your Claim ID; or (2) Printing a Claim Form, filling it out and mailing it (with postage) to the address listed on the Claim Form. <u>**Claim Forms must be submitted online or postmarked by [DATE]**</u>. Subclass Members who do not exclude themselves from the settlement will receive a cash payment regardless of whether they submit a claim, but will receive an additional payment under the Settlement if they submit a valid claim. Your Claim ID is: 11111111

**YOUR OTHER OPTIONS.** If you don't want to be bound by the settlement and any judgment in the Lawsuit, you can exclude yourself by sending a written request no later than [DATE]. If you exclude yourself, you won't get a cash payment. If you don't exclude yourself and the settlement is approved, you will be bound by its terms and cannot later sue LifeLock about the claims in the Lawsuit. If you don't exclude yourself, you may object to the Settlement or the request for fees by the attorneys appointed by the Court to represent the Class ("Class Counsel") or any service award to any of the four individuals who represent the Class in the Lawsuit ("Class Representatives"). Any objection must be made in writing and postmarked before [DATE]. The Court will hold a hearing on [DATE], 2016, at [TIME], to consider whether to approve: (1) the settlement; (2) up to $10.2 million in attorneys' fees and expenses to Class Counsel; and (3) service awards of $2,000 to each Class Representative. You may appear at the hearing, but you don't have to. You may hire your own attorney to appear for you.

**For more information or to submit a claim, visit www.ebarleclasssettlement.com or call 1 (855) 907-3140.**

*A federal court authorized this notice. This isn't a solicitation from a lawyer. You aren't being sued.*

# EXHIBIT 7

1  CARNEY BATES & PULLIAM, PLLC
   Joseph Henry ("Hank") Bates (CA #167688)
2  hbates@cbplaw.com
   Randall K. Pulliam
3  rpulliam@cbplaw.com
   One Cantrell Building
4  2800 Cantrell, Suite 510
   Little Rock, AR  72212
5  Telephone:  (501) 312-8500
   Facsimile:  (501) 312-8505
6
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
7  Michael W. Sobol (CA #194857)
   msobol@lchb.com
8  RoseMarie Maliekel (CA #276036)
   rmaliekel@lchb.com
9  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
10 Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008
11
   Attorneys for Plaintiffs
12
                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14

15
   NAPOLEON EBARLE, JEANNE          Case No.  3:15-cv-258
16 STAMM, BRIAN LITTON, and REINER
   JEROME EBARLE on behalf of       **SECOND AMENDED CLASS ACTION**
17 themselves and all other similarly situated,   **COMPLAINT**

18              Plaintiffs,         1.  VIOLATIONS OF THE ARIZONA
                                        CONSUMER FRAUD ACT (ARIZ. REV.
19 v.                                   STAT. § 44-1522(A))

20 LIFELOCK, INC.,                  2.  BREACH OF CONTRACT

21              Defendant.          3.  DECLARATORY JUDGMENT

22                                  4.  UNJUST ENRICHMENT

23

24

25         COMES NOW, Plaintiffs Napoleon Ebarle, Jeanne Stamm, Brian Litton, and Reiner

26 Jerome Ebarle ("Plaintiffs"), who bring this Complaint against Defendant LifeLock, Inc.

27 ("Defendant" or "LifeLock" or the "Company"), and allege as follows:

28

1279432.1                                          AMENDED CLASS ACTION COMPLAINT
                                                          CASE NO. 3:15-CV-258

**<u>INTRODUCTION</u>**

1.      In today's technologically driven and connected world, the fear of identity theft preys on American consumers.  Notably, however, there is a significant divide between an average consumer's sensitivities to this fear and his or her comprehension of the practical tools necessary to combat the threat of identity theft in a realistic manner.  This chasm between phobia and comprehension has created an opportunity for unscrupulous companies to exploit concerned American consumers.

2.      Capitalizing on this disconnect between fear and knowledge, LifeLock falsely represents and/or misleads consumers into believing its subscription based services will thwart criminals from stealing their personal information.  This consumer class action is brought to redress LifeLock's false, misleading and deceptive activities.

3.      In a nutshell, LifeLock's material misrepresentations and omissions fall into two broad categories:  (a) LifeLock's promise to provide services that the Company cannot provide as either a practical or a legal matter, and (b) LifeLock's promise to provide specific services and/or results which it falls short in delivering.  Indeed, far from its claim that the Company provides services that banks and credit card companies cannot, LifeLock does an inferior job of providing redundant services that these entities provide, oftentimes for free.

4.      At its core, LifeLock represents that it is the "leading provider" of "comprehensive" and "proactive identity theft protection services for consumers and identity risk and credit worthiness assessment for enterprise."  The foundation of its purported "comprehensive" and "proactive" services, and its representations to its customers in both marketing and contractual materials, includes 6 pillars.  Yet, each of these 6 pillars is flawed:

   i.     "comprehensive" network, which is in reality miniscule in comparison to the number of banking and financial institutions;

   ii.    timely and continuous 24/7/365 "alert" services, which, in truth, were so fraught with wide-scale problems that the Company instituted a code freeze policy;

   iii.   patented alert technology that purports to "*stop thieves before they do damage*," which, in the simplest terms, overstates the benefits of and the results achieved by LifeLock;

   iv.    protection that "watches out for you in ways banks and credit card companies just

can't;" however, in truth, other banks and credit card companies provide a superior product and they provide it for free;

v.   statistical analyses on the rising trends in identity theft; however, a closer review of current data reveals that the incidence of new account fraud-the mainstay of LifeLock's services- had actually declined in 2013, meaning LifeLock's use of such data amounts to nothing more than a scare tactic;

vi.   $1 Million Total Service Guarantee; which is in actuality a clever marketing ploy that is essentially worthless.

5.   In short, LifeLock purports to provide sweeping and superior identity theft protection services, when, in fact, its services are limited in scope and effectiveness and inferior to services offered by other credit card companies for free.

6.   LifeLock's unsavory and deceptive practices are nothing new.  Indeed, as recent as 2010, the Federal Trade Commission ("FTC") and 35 Attorneys General brought an action (the "FTC Action") alleging that LifeLock made material misrepresentations and/or omissions of material fact in violation of Section 5(a) of the FTC Act by representing and/or creating the impression, among others, that (a) LifeLock stops identity theft before it happens, (b) LifeLock offers a proven solution to identity theft, and (c) LifeLock guarantees identity-theft from ever happening.  As a result of the FTC Action LifeLock was permanently enjoined from "misrepresenting, in any manner, expressly or by implication" that its product prevents misuse of personal data, the effectiveness or scope of its services, and the risk of identity theft to consumers, among other things.  In addition, LifeLock was forced to pay out approximately $12 million. Notwithstanding, LifeLock continues, 5 years later, to engage in the same fundamental, deceptive practices in marketing to new customers and in inducing existing customers to renew the service on a monthly or annual basis.

7.   LifeLock's subscription-based services are governed by, among other things, LifeLock's Service Terms and Conditions ("Service Terms"), which specifically provides that

The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

As such, class-wide application of Arizona law is appropriate.

8.     Generally, this class action alleges that Defendant has engaged, on an ongoing and continuous basis, in deceptive marketing and sales practices in connection with its subscription based membership plans in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 (A), as well as breached its contract with its consumers.  As customers who have paid LifeLock's periodic subscription fees ("Membership Fees") at all relevant times hereto, Plaintiffs bring this action on behalf of a national class of consumers who paid Membership Fees after January 19, 2009.

9.     More particularly, Plaintiffs allege that LifeLock has engaged in a fraudulent and/or misleading course of conduct by making material misrepresentations and/or omissions that LifeLock's services (i) are "comprehensive," (ii) provide timely and continuous "alert" services, (iii) are founded on patented alert technology that purports to "*stop thieves before they do damage*," (iv) provide protection that "watches out for you in ways banks and credit card companies just can't;" and (v) $1 Million Total Service Guarantee.  In addition, LifeLock falsely and/or misleadingly represents the risk of identity theft to consumers.  Contrary to LifeLock's representations and/or omissions, LifeLock's network covers an estimated 3% of reported banking institutions; LifeLock's "alert" services are teeming with wide-scale problems, such that the Company instituted regular code freezes; LifeLock's services cannot as a practical or legal matter fulfill and/or achieve the benefits promised; LifeLock's services provide an inferior product that, in substance, offer little to no value; the risk of new account fraud was less than 1%, meaning LifeLock's principle service is inapplicable to 99% of American consumers; and LifeLock's $1 Million Total Service Guarantee is essentially worthless.

10.     Upon information and belief, as a result of LifeLock's contractual breach and its unfair, deceptive, and unconscionable practices, Defendant has amassed, to the detriment of its customers, substantial sums of money from the monthly fees paid by consumers ("Membership Fees"), including Plaintiffs, for these Membership Plans.  Accordingly, Plaintiffs seek damages, which at a minimum include payments of monthly or annual charges for services that were not as represented and payments for a service that is either illegal or infeasible for a company such as LifeLock to perform.

**PARTIES**

11.     Plaintiff Napoleon Ebarle is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

12.     Plaintiff Jeanne Stamm is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

13.     Plaintiff Brian Litton is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

14.     Plaintiff Reiner Jerome Ebarle is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

15.     Defendant LifeLock is a Delaware corporation with its principal executive offices at 60 East Rio Salado Parkway, Suite 400, Tempe, Arizona 85281.  LifeLock conducts business throughout California and the United States.  It is currently estimated that LifeLock provides identity theft services to over 3 million subscribers.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, which, inter alia, amends 28 U.S.C. § 1332 to add subsection (d), which confers jurisdiction over class actions where, as here, "any member of a class is a citizen of a State different from any other Defendant," and the aggregated amount in controversy exceeds five million dollars. *See* 28 U.S.C. § 1332(d)(2) and (6).

17.     This Court has jurisdiction over Defendant because it does business in California and upon information and belief Defendant's conduct that gives rise to this complaint, as further described below, occurred within and/or was implemented, authorized, or ratified in California.

18.     In accordance with 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the conduct complained of herein occurred in this District.

# COMMON FACTUAL ALLEGATIONS

## I.      LifeLock's Relationship With Its Subscribers

19.     LifeLock markets, offers, and sells the following fee-based membership plans to consumers (collectively referred to as the "Membership Plans"):  LifeLock Standard, LifeLock Advantage, and LifeLock Ultimate Plus.

20.     LifeLock Standard purports to offer identity theft detection and alerts within its network, lost wallet protection, address change verification, black market website surveillance, reduced pre-approved credit card offers, and a $1 million total service guarantee for $9.99/mo.

21.     LifeLock Advantage purports to offer LifeLock Standard services plus fictitious identity monitoring, court records scanning, data breach notifications, credit reports and scores, financial account activity alerts, and a $1 million total service guarantee for $19.99/mo.

22.     LifeLock Ultimate Plus protection purports to provide LifeLock Advantage services plus bank account takeover alerts, enhanced credit application alerts, file-sharing network searches, sex offender registry reports, credit reports and scores, monthly credit score tracking, and a $1 million total service guarantee for $29.99.

23.     As an add-on service, a subscriber of one of these three Membership Plans can enroll in LifeLock Junior, which is marketed and sold as providing monitoring services for the member's children's personal information.  LifeLock Junior protection purportedly provides identity theft detection and alert notifications, credit file detection, black market website surveillance, file-sharing network searches, and a $1 million total service guarantee.  According to LifeLock, "LifeLock Junior – it's relentless protection for your kids and peace of mind for you."

24.     Each of LifeLock's Membership Plans is governed by LifeLock's Service Terms and Conditions, which specifically provide that

> These LifeLock Service Terms and Conditions (the "Service Terms") are a legally binding agreement between LifeLock, Inc. ("LifeLock," "we" "our" or "us") and you ("you," "your" or "yours"), and describe the terms under which you agree to use the LifeLock identity programs, including any applicable Stolen Identity Insurance (the "Protection Programs""), credit monitoring service (the "Credit Monitoring Service") and any other service or product which may be made available to you by us for which you have registered or enrolled or have been

registered or enrolled by an authorized third party (collectively the 'Services' and individually a "Service").

25.     In addition, the Service Terms provide as follows:

The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

26.     In sum, LifeLock customers are charged and pay between $10 and $30 dollars a month in Membership Fees for the Company to monitor their identities, but as discussed, LifeLock falsely and misleadingly advertises and sells its services and does not provide the protections against identity theft as promised.

## II.     Defendant's Products are Marketed, Offered, and Sold to Consumers in an Unfair, Misleading, and Deceptive Manner.

### A.     LifeLock's Claim of "Comprehensive" Services Misrepresents the Scope and Effectiveness of Its Network

27.     As previously noted, in 2008, the FTC filed suit against LifeLock alleging that the Company's services did not prevent identity theft, as represented, and did not provide many of the protections claimed by LifeLock.  Indeed, commenting on the lawsuit, then FTC Chairman Jon Leibowitz had this to say:  "The protection [LifeLock] actually provided left enough holes that you could drive a truck through it."  *See* https://www.truthinadvertising.org/lifelocks-protection-leaves-much-to-be-desired/.

28.     In resolution of the claims brought by the FTC, LifeLock and the FTC entered into a Final Stipulated Judgment and Order for Permanent Injunction and Other Equitable Relief as to Defendants LifeLock and Davis (the "FTC Order"), wherein LifeLock and Davis and "their officers, agents, servants, and employees and all persons in active concert of participation with any of them . . ." were "permanently restrained and enjoined" from the following:

A.     in connection with the advertising, distributing, promoting, offering for sale, or sale of any product, service, or program designed for the purpose of preventing, mitigating, or recovering from any form of identity theft as defined in 18 U.S.C. § 1028, misrepresenting in any manner, expressly or by implication:

1.     that such product, service, or program provides complete protection against all forms of identity theft by making customers' personal information useless to identity thieves;

2.   that such product, service, or program prevents unauthorized changes to customers' address information;

3.   that such product, service, or program constantly monitors activity on each of its customers' consumer reports;

4.   that such product, service, or program ensures that a customer will always receive a phone call from a potential creditor before a new credit account is opened in the customer's name;

5.   the means, methods, procedures, effects, effectiveness, coverage, or scope of such product, service, or program;

6.   the risk of identity theft to consumers;

7.   whether a particular consumer has become or is likely to become a victim of identity theft; and/or

8.   the opinions, beliefs, findings, or experiences of an individual or group of consumers related in any way to any such product, service, or program.

Such products, services, or programs include, but are not limited to, the placement of fraud alerts on behalf of consumers, searching the internet for consumers' personal data, monitoring commercial transactions for consumers' personal data, identity theft protection for minors, and guarantees of any such product, services, or programs.

B.   misrepresenting in any manner, expressly or by implication, the manner or extent to which they maintain and protect the privacy, confidentiality, or security of any personal information collected from or about consumers.

29.   Despite the permanent injunction, LifeLock has continued to market and sell its products using the same and/or substantially similar marketing ploys, promising customers "comprehensive" and "relentless" protection.

30.   Despite promising "comprehensive" protection, LifeLock's network only provides limited protection against only some forms of identity theft.

31.   To begin with, LifeLock makes misleading declarations, via its advertisements and website, that "[e]nrollment takes just minutes and our 24/7 identity theft protection starts immediately."  In truth, however and as buried in the fine print in LifeLock's Service Terms it can take up to four (4) weeks from the date of a customer's acceptance of the Service Terms to complete the enrollment process and for all services to be fully activated.  As such, LifeLock's claims of "immediate" protection do not adequately portray the enrollment process or the scope and effectiveness of LifeLock's services and/or operations.

32.     In addition to its false and/or misleading claims of "immediate" protection, LifeLock falsely and/or misleadingly portrays LifeLock's "comprehensive" service as trolling "a trillion data points."  In reality, LifeLock's services do not cover some of the largest credit card companies and/or businesses, or car loans.  Indeed, upon information and belief, LifeLock's network consists of approximately 250 institutions *collectively*.  By way of comparison, there were 6,891 active banking institutions reported at the end of the third quarter in 2013, meaning LifeLock's network has access to only 3% of these entities, and that is being generous because it does not account for the hundreds of thousands of retail outlets in the United States.

33.     The limitations of LifeLock's network are chronicled on various outlets.  For example, as recounted by one LifeLock customer on a January 4, 2014 post on LifeLock's Facebook page, the customer applied for a credit card at Best Buy but never received an alert that someone was using her personal information to get a credit card.  To the contrary, she received an automatic email from LifeLock stating that they had checked her information and "LifeLock found no fraudulent activity associated with your personal information within our extensive network.  LifeLock monitors over a trillion data points and is relentlessly protecting your identity . . . ."  When the customer contacted LifeLock to question the Company, she was informed that Best Buy was not in LifeLock's network.

34.     Similarly, and further demonstrative of LifeLock's misrepresentations and/or concealments, another customer complaint posted on April 1, 2014 on the Better Business Bureau's website, reveals that despite subscribing to LifeLock the previous year under the impression "that, as advertised, the company would notify me if there was activity using my personal information in order to detect possible identity fraud," LifeLock failed to send her a single alert when she moved, changed her address on her credit card accounts, purchased a vehicle, and had credit approved for a lease on a rental property.  Moreover, when she contacted LifeLock on the matter, she was told that the particular banks she used were not in LifeLock's network and car loans aren't always counted.

35.     Similarly, in a March 2013 special report, KTVU-TV in Oakland reported that LifeLock completely missed not one, but two, identity theft incidents because the two firms

involved, Sprint and USAA, were not part of LifeLock's network.  *See*

http://www.ktvu.com/news/news/special-reports/industry-leader-identity-theft-protection-

recently/nWf9P/.

36.     Thus, LifeLock's proclaimed "comprehensive" network that purportedly trolls "a

trillion data points" is misleading and/or fails to inform customers that LifeLock's services do not

cover some of the largest credit card companies and/or businesses, or car loans.

37.     In addition to falsely and/or misleadingly representing LifeLock's diminished

network, LifeLock misrepresents the value of its services, many of which are available for free.

For example, LifeLock's black market website monitoring is essentially worthless.  With regard

to this service, LifeLock has no authority or power to prevent personal information from being

posted or shared on these websites, and any "threat" is detected after the theft has already

occurred -- not "before it happens."  As such, this service provides limited to zero value to

LifeLock's customers, and it misleads LifeLock's customers about the quality and characteristics

of LifeLock's services.  Indeed, upon information and belief, even if LifeLock sends a "black

market" alert, it does not have the ability to inform customers about the specific information on

the website, how it was obtained, or who obtained it, heightening the potential for incorrect

and/or unreliable information from LifeLock in this context.

38.     LifeLock also fails to adequately inform its customers that it does not provide 3-

bureau credit monitoring to subscribers of its Standard package.  Most consumers understand

LifeLock's representations to include this service in each of its Membership Plans.  However, this

is not the case, and, upon and information and belief, when consumers call LifeLock to inquire

about the disparity between the services advertised and those actually provided by LifeLock, they

are told they must increase their Membership Plan and Membership Fees to be covered, despite

the fact that customers can obtain their own credit data for free.

39.     Thus, LifeLock only provides credit monitoring to subscribers of LifeLock's

Ultimate Plan, those paying the highest monthly premium of $30 a month.  However, credit

monitoring is an antiquated service that is not very effective, and not worth the heightened

premium.  Indeed, a 2013 Department of Justice study found that less than 1% of existing account

1   fraud was discovered from a credit monitoring service or credit report.  Similarly, *Consumer*

2   *Reports* advises that "credit monitoring is a primitive defense against ID theft that can scare you

3   with lots of alerts for day-to-day nonfraudulent changes in your credit report – only 1 in 20 alerts

4   is actual illicit activity – and that can ultimately train you to ignore the alerts."

5   http://www.consumerreports.org/cro/news/2014/02/expect-less-and-pay-more-with-target-credit-

6   monitoring/index.htm.

7        40.     Further, LifeLock fails to inform customers that it does not monitor transactions on

8   existing accounts.  Indeed, as noted below, approximately 90% of current identity theft incidents

9   consist of fraudulent transactions on existing accounts.  However, upon information and belief,

10  LifeLock does not monitor charges on a customer's existing accounts.  Thus, LifeLock provides

11  zero protection against credit card and bank fraud.

12       41.     In this same vein, LifeLock's alleged reduction of pre-approved credit card offers

13  is similarly of limited to no value.  The essence of this so-called service is simply LifeLock

14  entering its members' information at the Consumer Credit Reporting industry at

15  optoutprescreen.com, a process that takes less than five minutes and that the customer can do by

16  himself or herself for free.  Notwithstanding, LifeLock charges its customers approximately $10

17  to $30 month for this service.

18       42.     Upon further information and belief, LifeLock does not have direct access to

19  financial information.  Accordingly, it is dependent on electronic transfers of data from partners

20  and has no ability to monitor paper forms.

21       43.     In sum, LifeLock's network does not cover major financial and business

22  institutions and several of the services offered provide zero value to customers.  As such,

23  LifeLock falsely and/or misleadingly advertises its services, as well as charges customers for

24  services that they are not receiving and/or that are essentially worthless.

25       B.     LifeLock Conceals Wide-Scale Problems of Its "Alert" Services and Regular Code
                Freezes
26

27       44.     LifeLock represents that it will keep its customers timely informed through use of

28  its patented "Identity Alert System".  According to its website, LifeLock promises the following:

**Alerts When You Need Them**

> With our patented LifeLock Identity Alert system, as soon as we detect a threat to your identity, you'll be notified by text, phone, or email, to help **stop thieves before they do damage**.  So while you're out there connecting to the world, we'll be here helping to keep your personal information safe.  (emphasis added)

45.     Defendant represents that it provides continuous "alert" services, maintaining that its team works 24 hours a-day, 7 days a week, 365 days a year.  Specifically, Defendant touts:

> **Need Help?  We're Here all the Time.**
>
> Our award-winning Member Services agents are on the job every minute of every day, including holidays.  Call or contact us online whenever you need help or have questions.  If you do become a victim, our Certified Resolution Specialists know exactly what to [do].  That's why millions trust LifeLock with their identity theft protection.

46.     However, LifeLock's representations falsely and/or misleadingly conveyed the scope and effectiveness of its "alert" services.  Indeed, in a complaint filed on July 8, 2013 for wrongful termination (*see Burke v. LifeLock, Inc.*, No. 13-CV-1355 (D. Ariz.)), insider Stephen P. Burke ("Burke"), a Senior Financial Analyst with LifeLock from February 1, 2010 to March 2013, revealed that during the period of his employment, LifeLock

> had and continues to have widespread system problems in processing [ ] alerts and sending them out to the customers as promised in its national marketing campaigns.  The problem of timely informing customers that their credit information was accessed is so widespread that Defendant instituted a code freeze.  In essence, Defendant is deliberately 'stepping on the brakes' with regard to sending this critical information to customers on a timely basis, and worse, often choosing not to send these alerts out at all.  This practice has been referred to as "throttling."

*See* Ex. 2:  Burke Compl., ¶ 13.

47.     Burke further revealed that he "first learned of an issue with LifeLock's alert notification services to customers through an e-mail chain forwarded to him in late November 2012 by John Lenstrohm ("Lenstrohm"), [LifeLock's] Director, Direct Response.  *Id.* at ¶ 15.

48.     Burke further recounted that he reported the problems of delayed alerts, diminished alert notification service, and "throttling" of alerts with the following LifeLock officers and employees, among others:  Lenstrohm, Director, Direct Response; Erick Dickens,

1    Vice President of Marketing; Amanda Mellon, Senior Manager; Brent Hazel, Manager; Melinda

2    Keels, Finance; and Gregory Lim, Burke's immediate supervisor.  According to Burke, he raised

3    concerns to these officers and employees about the effects of not sending out alerts, specifically

4    addressing that "throttling" might violate the FTC Order.  Burke also recommended that LifeLock

5    "adjust its marketing messaging to reflect this diminished service."  *Id*. at ¶¶ 16, 19.

6         49.    In February 2014, LifeLock settled Burke's wrongful termination suit for an

7    undisclosed amount.

8         50.    To further put all this into perspective, a LifeLock website reports that LifeLock

9    "members receive over 20,000 alerts for potential identity fraud on a weekly basis."  *See*

10   http://www.lifelockbusinesssolutions.com/why-lifelock/trust-lifelock/.  With an estimated three

11   million members, this means that the typical LifeLock member receives one alert every 150

12   weeks.

13        C.     LifeLock Falsely Touts Its Patented Technology to Mislead Customers into
              Believing It Will "Stop Thieves Before They Do Damage"
14

15        51.    In addition to the already described misdeeds, LifeLock falsely and/or

16   misleadingly leads customers to believe that its patented technology will "stop thieves before they

17   do damage."  However, this is a guarantee that LifeLock cannot back, as either a legal or practical

18   matter.

19        52.    Via its website, LifeLock purports to "review each attempt to misuse your identity,

20   and proactively contact you anytime we detect an exposure or threat."  However, LifeLock's

21   representation gives customers a false sense of security because LifeLock's technology, systems,

22   and personnel are inadequate to provide this level of protection.

23        53.    First, and as previously noted, LifeLock's network is far more limited than

24   LifeLock represents and LifeLock's "alert" services were so riddled with problems that the

25   Company instituted a code freeze, meaning that members did not receive notification of potential

26   exposures or threats because LifeLock routinely turned these services off.  Thus, LifeLock's

27   technology cannot, as a practical matter, guarantee to "stop thieves before they do damage."

28

54.     Second, LifeLock's systems and personnel are not equipped to handle the level of administrative, technical, and physical safeguards that is necessary to provide the promised protections.

55.     More specifically, all Lifelock subscribers, including Plaintiffs and all members of the proposed Class, provide Lifelock with sensitive personal data, including credit card, social security and bank account numbers. The FTC Order, in addition to what has previously been listed, ordered LifeLock (as well as any business entity controlled by Davis that collects, maintains, or stores personal information from or about consumers) to "establish and implement, and thereafter maintain, a comprehensive information security program that is designed to protect the security, confidentiality, and integrity of personal information collected from or about consumers.  Such program, the content and implementation of which must be fully documented in writing, shall contain administrative, technical, and physical safeguards appropriate to the entity's size and complexity, the nature and scope of the entity's activities, and the sensitivity of the personal information collected from or about consumers . . . ."  In this same vein, the FTC Order required LifeLock to (1) make an initial assessment and biennial assessments for twenty years on the effectiveness of its safeguards, and (2) distribute a copy of the FTC order to all principals, officers, directors, managers, employees, agents, and representatives for a period of five years, or until February 23, 2015.

56.     Despite the obligations imposed by the FTC Order, LifeLock continued to use ineffective administrative, technical, and physical safeguards, failed to routinely assess and report the adequacy of the effectiveness of its safeguards, and failed to distribute the FTC Order to required personnel.  All the while, however, LifeLock falsely and/or misleadingly represented that it would "stop thieves before they do damage."

57.     The deficiencies in LifeLock's systems and staffing have been documented by a Company insider.  Indeed, on the heels of the Burke settlement, insider Michael D. Peters ("Peters"), LifeLock's Chief Information Security Officer from approximately May 24, 2013 through July 29, 2013, corroborated Burke's allegations of wide-scale problems and himself filed

1  a complaint against LifeLock for wrongful termination and violation of whistleblower protection

2  laws, a suit that remains ongoing.

3        58.     In his complaint against LifeLock, Peters alleges that upon commencing work at

4  LifeLock, he immediately began an initial risk assessment of the Company.  Peters states that

5  prior to his risk assessment, the Company had never conducted a bona fide risk assessment.

6  Ex. 3:  Peters Compl. ¶ 17.

7        59.     Peters further alleges that the risk assessment uncovered that LifeLock's

8  technology and security were ineffective to deliver the protections LifeLock promised.

9  Specifically, Peters determined that

10       • LifeLock's internal capacity for governance implemented (policies, audit plan,

11         change controls, architecture review, etc.) was at 47% of the minimum to protect

12         LifeLock's customers and their sensitive information." (*Id*. at ¶ 18);

13       • "LifeLock's technological security readiness (intrusion prevention, data leakage,

14         data encryption, access controls, physical security, etc.) was only at 27% of the

15         minimum to protect LifeLock's customers and their sensitive information." (*Id*. at

16         ¶ 19); and

17       • "LifeLock's security vigilance (vulnerability testing, auditing, monitoring,

18         awareness education, event logging, incident management, etc.) was at 0% of the

19         minimum to protect LifeLock's customers and their sensitive information."  (*Id*. at

20         ¶ 20).

21        60.     According to Peters, these deficiencies were due, in large part, to deficient

22  staffing.  LifeLock only had two people responsible for security.  One individual lacked technical

23  skill and only had minimal security experience. While the other had technical skills, he was newly

24  out of college and lacked experience.  Peters determined that millions of consumers were at risk,

25  which led Peters to advise LifeLock Chief Financial Officer, Chris Power, and LifeLock Chief

26  Information Officer, Rich Stebbins, that LifeLock should immediately hire 12 information

27  security professionals.  Peters reports that in response, LifeLock fired Peters, resulting in Peters

28  filing suit.  (*Id*. at ¶¶ 20-25.)

61.     Peters further states that the findings of his assessment included discovery of multiple examples of LifeLock's misleading, unfair, and/or deceptive practices, including, among others, the following:

- LifeLock's director of internal audits, Tony Valentine, had collected evidence from the information security team that existed prior to Peters's arrival related to access logging, audit logging, audit log reviews, network security controls, and data leakage controls that either (1) did not truly exist because the technology was still in boxes; or (2) LifeLock lacked the staff to keep track of everything; or (3) such reviews were not actually conducted.

- LifeLock employee Dave Bridgman reported that LifeLock's current practice was to manipulate the customer alerts sent to its elderly customers. LifeLock would turn off or reduce the services alerting elderly customers to reduce the call volume received by LifeLock's customer support center.

- LifeLock was in the process of finalizing a new product offering called PassLock. This system was designed to allow customers to include their passwords for up to ten accounts. PassLock would then crawl through hundreds of internet sites to check the username and password supplied by the customer and report back to the customer. The problem was that the database was not being protected with industry-grade encryption. The database was predicted to contain millions of customer credentials that would be devastating to consumers if a breach occurred. Moreover, the system was going to utilize third-party cloud hosting business without that third party's knowledge or consent. Technically, the PassLock crawling would be identified by most service providers as intrusive, illegal, illegitimate, and then blacklist the source address.

*Id.*

62.     Accordingly, company insiders have confirmed that LifeLock intentionally misled its customers concerning the scope and effectiveness of its services.

63.     Moreover, the Consumer Product Advisor reports that LifeLock's products and services are marketed in a confusing and convoluted way, masking their limitations, exclusions, and restrictions, and making it impossible for consumers to knowingly determine what these products cover and whether they provide a worthwhile benefit.

64.     LifeLock is able to perpetuate its maze-like services through use of its "affiliates." As part of its marketing campaign, LifeLock uses an affiliate program whereby people and/or businesses create websites and blogs that link to LifeLock.com.  The affiliates receive a commission on each enrollment generated from their site or review.  Thus, LifeLock's affiliates are incentivized to perpetuate LifeLock's advertising and marketing scheme and mislead consumers.

65.     Moreover, even though the FTC Order requires LifeLock to distribute a copy of the FTC Order to LifeLock's affiliates, upon information and belief, LifeLock fails to provide its affiliates a copy of the FTC Order.  Failure to do so is itself a violation of the FTC Order.

66.     In addition, upon information and belief, LifeLock fails to adequately inform its members that the Company only runs a credit report once a year and that the Sex Offender list maintained by LifeLock is not updated on a daily or weekly basis.

67.     Upon further information and belief, Defendant's customer service representatives employ an array of deceptive tactics to thwart members' ability to cancel their Membership Plans, such as putting customers on hold for lengthy amounts of time, citing misleading identity theft statistics, and telling consumers that without LifeLock's services their identity will be stolen.

68.     Indeed, various customer complaints posted on www.consumeraffairs.com/privacy/lifelock.html report that LifeLock does not timely respond to cancellation requests and/or uses scare tactics to bully or mislead customers into believing that they are unsafe without LifeLock.  Moreover, customers report that even after canceling their accounts, or at least a portion thereof, they continued to be billed by LifeLock for the canceled services.

69.     In sum, LifeLock's marketing and sales representations misrepresent that Defendant's services have many hidden, variable, and narrow restrictions; that Defendant's alert

1   notification services are substantially diminished because of the Company's practice of

2   "throttling" alerts; and that Defendant's monitoring services were not equipped to handle and

3   protect a customer's personal information as represented by LifeLock.  Consequently, LifeLock's

4   promise to "stop thieves before they do damage" is a falsehood.

5       D.      LifeLock Promises Protection That It Purports Other Banks and Credit Card
                Companies Cannot Provide

6

7       70.     In 2008, Experian Information Solutions, Inc. ("Experian"), a credit reporting

8   agency, filed suit against LifeLock alleging that LifeLock's practice of placing and renewing

9   "fraud alerts" under consumers' names violated the federal Fair Credit Reporting Act ("FCRA")

10  because the statutory language excludes corporations such as LifeLock from placing "fraud

11  alerts".  According to court documents, LifeLock called Experian's fraud hotline up to 15,000

12  times a day to request "fraud alerts."

13      71.     In an order granting partial Summary Judgment in favor of Experian, the

14  Honorable Andrew J. Guilford agreed with Experian, finding that under the language of the

15  statute and its legislative history, "the FCRA embodies an established public policy against

16  companies like LifeLock placing fraud alerts on behalf of consumers."  *See Experian Information*

17  *Solutions, Inc. v. LifeLock Inc.* (Case No. SACV08-00165 AG), Order Granting Motion for

18  Partial Summary Judgment, attached hereto as Ex. 1.  Accordingly, the very premise of

19  LifeLock's promised protections, *i.e.* the Company setting fraud alerts on behalf of its consumers,

20  was declared unlawful.

21      72.     Despite the court's ruling in *Experian*, LifeLock's business model and services

22  have remained substantially unchanged since 2005.  *See*

23  http://consumerproductadvisor.com/lifelock-review/.  Indeed, on the website

24  www.lifelockblog.com/why-lifelock/, which upon information and belief is owned by LifeLock,

25  has a 2015 copyright and was last visited by Plaintiffs' counsel on January 14, 2015, LifeLock

26  continues to represent that "LifeLock will request on your behalf that fraud alerts be placed on

27  your accounts – By doing these, creditors will use extra care to identify who you are to

28  investigate the validity of any transaction."

73.     On this same website, LifeLock further represents that "If a child has a credit report, LifeLock will request that fraud alerts be placed on the child's accounts." *See* www.lifelockblog.com/why-lifelock/.

74.     However, at no time does LifeLock inform consumers that under the statutory language of the FCRA, only an individual is allowed to place a "fraud alert," either for themselves, or acting on behalf of or as a personal representative to another individual.

75.     Likewise, LifeLock fails to inform consumers that a federal court has previously ruled that placement of fraud alerts by LifeLock with any credit reporting agency violates public policy.

76.     As set forth above in ¶27 the FTC Order enjoins LifeLock from misrepresenting, expressly or by implication, "the means, methods, procedures, effects, effectiveness, coverage, or scope" of LifeLock's services.  Thus, LifeLock had an ongoing duty throughout the Class Period to provide accurate and non-misleading information with regard to "the means, methods, procedures, effects, effectiveness, coverage, or scope" of its services. Notwithstanding this duty, throughout the Class Period, Defendant made, and continues to make, material misrepresentations and omissions.

77.     Moreover, as set forth above, LifeLock's technology and personnel were deficient and incapable of protecting the security, confidentiality, and integrity of personal information collected from or about consumers as promised.  Thus, in reality, LifeLock provides an inferior service to that offered by other banks and credit card companies for free.

78.     Notably, at around the same time Peters filed his wrongful termination suit against LifeLock in federal court, Peters filed a whistleblower complaint with the FTC.  As a result, in or about August 2013, the FTC opened an investigation into LifeLock's current policies, procedures, and practices.  Upon information and belief, the FTC investigation remains ongoing.

79.     Thus, Defendant's representations that LifeLock offers protection that other banks and credit companies can't are misleading, at best.

E.     LifeLock Uses Statistical Analyses and Testimonials to Mislead Consumers of the Risk of Identity Theft and the Benefits and Results of LifeLock's Services

80.     Upon information and belief, the foundation of LifeLock's marketing strategy is the use of misleading statistics and testimonials, as well as other scare tactics.

81.     More specifically, on its website, LifeLock proclaims that "according to the Department of Justice, approximately 16.6 million Americans were victims of identity theft in 2012, sustaining more than $24 billion of economic losses." (citing "Victims of Identity Theft, 2012," Department of Justice, 2012).

82.     At the same time, LifeLock assures that "[w]ith approximately 3 million LifeLock members, we're committed to providing our consumers peace of mind amid the growing threat of identity theft."

83.     However, LifeLock's statistics are misleading at best.  In point of fact, in a 2014 report on industry statistics, Javelin Research reported that 88% of all U.S. fraud loss was related to fraud on existing accounts and that new account fraud has fallen to "historic lows."  In this same report, Javelin found that the incidence of new account fraud was only 0.5% in 2013, down from 1.2% in 2012.  Javelin further determined that new account fraud is rapidly declining because financial institutions have made it more difficult for criminals to open fraudulent accounts.

84.     However, LifeLock makes no differentiation in its marketing.  This is undoubtedly because LifeLock does not monitor charges on customers' existing accounts, only on new accounts.  Stated another way, LifeLock does not protect against those instances where someone steals your credit-card number and begins making purchases with that information.  Thus, LifeLock's services only pertain to a fraction of a percent of current identity theft trends.

85.     Notwithstanding the small umbrella of protection actually provided by LifeLock, LifeLock's use of such statistics falsely and misleadingly conveys the message that the scope of LifeLock's network is more expansive than it actually is, as well as falsely and/or misleadingly conveying the characteristics of LifeLock's Membership Plans and its $1 Million Guarantee.  In truth, and as further discussed below, LifeLock's services and purported patented technology

1    regularly fail to notify customers of new account openings, auto loans, and/or wireless account

2    activity.  In reality, it simply does not provide the promised "comprehensive" protection that it

3    purports other banks and credit companies cannot offer.

4           86.     Moreover, LifeLock's use of such statistics fails to inform consumers that

5    LifeLock does not protect against tax and wage-related fraud, which the FTC listed as the most

6    common type of identity theft in 2012.  *See* https://www.truthinadvertising.org/lifelocks-

7    protection-leaves-much-to-be-desired/.

8           87.     LifeLock is able to further perpetuate its commercial deception and mask the true

9    scope of its network through use of false and/or misleading testimonials.  These testimonials are

10   used to aid in the appearance of legitimacy; however, they falsely and misleading present the

11   scope and effectiveness of LifeLock's services.

12          88.     For example, a testimonial from Gene Z. on LifeLock's website states that Gene Z.

13   was contacted by a company that sold large computer equipment and asked if he had purchased a

14   computer, which he had not.  Gene Z. states that while he was in the process of looking up his

15   credit card information, he received a call from LifeLock informing him that someone had tried to

16   use his social security number to open a phone account.  Gene Z. further states that he informed

17   LifeLock of the potential credit card fraud and asked LifeLock what he needed to do.  Gene Z.

18   states that LifeLock told him "Don't worry, we'll take care of everything."  First, this testimonial

19   falsely and/or misleadingly conveys the message that LifeLock protects against any and all credit

20   card fraud, which it does not.  Second, this testimonial falsely and/or misleadingly conveys the

21   message that LifeLock handles every aspect of a customer's ordeal while the customer has zero

22   responsibility to take any action.  In reality, LifeLock mandates a list of exclusions and

23   preconditions that substantially limit the applicability of LifeLock's services and its $1 Million

24   Total Service Guarantee.  Third, this testimonial falsely and/or misleadingly conveys the message

25   that LifeLock's services will prevent identity theft, a representation that LifeLock cannot

26   guarantee.

27          89.     Similarly, a second testimonial from Justin L., also on LifeLock's website,

28   recounts how Justin L. was contacted by several credit card companies to verify credit

1    applications, which he did not in fact apply for.  Justin L. further states that whoever was

2    attempting to open these new accounts in his name, also got into his bank account.  Justin L. then

3    states that he signed up for LifeLock and has had no problems since.  This testimonial falsely

4    and/or misleadingly leads consumers to believe that the result a customer can expect after signing

5    up with LifeLock is a complete reduction in identity theft threats, *i.e.* that LifeLock's services

6    will prevent identity theft.  Further, this testimonial falsely and/or misleadingly conveys the

7    message that LifeLock's services provide complete protection and/or greater protection than

8    credit card companies provide.  Also, this testimonial falsely and/or misleadingly conveys the

9    message that when someone tries to misuse a customer's information LifeLock automatically

10   kicks in.

11          90.     Another testimonial used by LifeLock, and found at

12   http://www.reviewsonlife.com/life-reviews/life-testimonial.html, states, "As the owner of a small

13   business my employees are an extension of my family.  I looked into LifeLock and immediately

14   paid to sign everyone up."  This testimonial is false and/or misleading because it conveys the

15   message that LifeLock provides protection for all business activities, when, in fact, it does not.

16   *See* below.

17          91.     The testimonials described above are unsubstantiated and/or falsely and/or

18   misleadingly overstate the services provided by LifeLock and the benefits and results achieved by

19   utilizing LifeLock's services.  In truth, LifeLock's network is extremely limited and is dependent

20   upon the exchange of electronic information, meaning it does not have the capacity to monitor

21   paper applications.  Moreover, the scope, quality, and characteristics of its services do not provide

22   the protections promised because LifeLock's safety protocols are not sufficient, LifeLock's

23   suffers from lack of adequate personnel, and many of LifeLock's services are available to a

24   consumer for free.

25          92.     In this same vein, celebrity endorsements from Rush Limbaugh, Rudy Guiliani,

26   Montel Williams, and others falsely and misleadingly convey the effectiveness of LifeLock's

27   services.  Indeed, each of these paid advertisers give LifeLock customers a false sense of security

28

1   because, as described herein, LifeLock's services are predicated on illusory, worthless, and/or

2   misleading promises.

3          F.      LifeLock's $1 Million Total Service Guarantee is Nothing More Than a Clever
                   Marketing Ploy That Is Essentially Worthless
4

5          93.     Through its website and advertisements, LifeLock makes the blanket statement

6   "Sign up for any LifeLock membership and you're immediately backed by our $1 Million Total

7   Service Guarantee."

8          94.     LifeLock further proclaims, "If you become a victim of identity theft while a

9   LifeLock member, we'll spend up to $1 million to hire experts, lawyers, investigators, consultants

10  and whomever else it takes to help your recovery.  Benefits under the Service Guarantee are

11  provided under a zero deductible identity theft insurance policy."  Also promising, "Our U.S.

12  based recovery agents work closely with you to evaluate your specific situation and provide the

13  support you need to recover quickly.  When necessary, a Certified Resolution Specialist will

14  handle your case step by step."

15         95.     Broken down, LifeLock's $1 Million Identity Theft Guarantee has two

16  components:  (1) identity theft insurance, and (2) a service guarantee.

17         96.     The first part of LifeLock's $1 Million Guarantee, *i.e.* the identity theft insurance,

18  is described by LifeLock as follows:  "Identity theft insurance included with your LifeLock

19  membership – with zero deductible – reimburses you for certain out-of-pocket expenses."

20         97.     Notably, LifeLock is not an insurance company.  Accordingly, the insurance

21  component of the guarantee is provided by a third-party insurance company called State National

22  Insurance Company ("State National").

23         98.     However, the insurance policy provided by State National contains an exhaustive

24  list of restrictive provisions and exclusions, rendering the policy less than the premiums paid for

25  it.  More specifically, the Master Policy provides the following exclusions:

26              •   Any loss arising from dishonest acts;

27              •   Any loss arising from bodily injury;

28              •   Any loss arising from war or terrorism;

- Any loss arising from pollution;

- Any loss arising from radioactive Contamination;

- Any loss arising from contract frustration business;

- Any loss arising from failure to or delay in delivery or supply of any form of property whatsoever;

- Any loss arising from any form of financial guarantee, surety, or credit indemnity;

- Any loss arising from fraudulent withdrawals by immediate family members;

- Any loss not reported within 90 days;

- Any loss arising from any  business activity;

- Any loss resulting from or arising out of the destruction, confiscation, or seizure by order of any government of public authority; and

- Any loss arising from a voluntary disclosure of any code or other security information.

In addition, the Master Policy has an exhaustive list of conditions precedent.  These limitations and restrictions prevent consumers from being able to decipher what is covered and what is not and/or the true value of the Master Policy.

99.    The second component, the service guarantee, is described by LifeLock as follows: "If you become a victim of identity theft while you are a LifeLock member we will spend up to $1 million to hire experts, lawyers, investigators, consultants, and whoever else it takes to help your recovery."  Thus, the service guarantee is supposed to cover legal costs, remediation, service costs, and case management costs in the event of an identity theft.

100.    However, LifeLock's service guarantee is limited by the Master Policy, which provides as follows:

> Remediation Service Cost.  The amount of reasonable and necessary expenses paid to investigators and other third-party business providers who are retained by LifeLock and provide any services that are reasonably necessary, **viewed in the context of LifeLock's business and Membership Programs**, to restore the good name and identity of the Insured, or to recover Losses of the Insured in accordance with any Membership Program. (emphasis added)

Consequently, because the service guarantee is given in the context of "LifeLock's business and

Membership Programs" and, as described herein, LifeLock's network and services are severely limited and/or restricted, LifeLock's service guarantee does not cover a variety of identity theft instances and/or losses incurred by LifeLock's customers.

101.    Thus, upon information and belief, LifeLock's $1 Million Service Guarantee is illusory.  Demonstrating the illusory nature of LifeLock's guarantee, LifeLock Senior Vice President Mike Prusinski reported that as of September 27, 2011, the largest payout under the service guarantee was approximately $2,500 (a fraction of 1% of the $1 Million Total Service Guarantee).

### III.     LifeLock Breached Its Contractual Obligations

102.    Through its advertising, website, and Service Terms, LifeLock made analogous offers to Plaintiffs and the members of the Class to protect their identity by, among other things, providing "comprehensive" protection that "banks and credit card companies" cannot provide, "up-to-the-minute" alerts, adequate safeguards and personnel, and a $1 Million Total Service Guarantee. *See* Ex. 4 (LifeLock client agreement).

103.    Plaintiffs and the Class accepted LifeLock's offer and provided consideration through payment of Membership Fees.

104.    Upon information and belief, all relevant contracts contain a clause stating:

> …any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

Accordingly, class-wide application of Arizona law is appropriate.

105.    LifeLock breached its contract with Plaintiffs and the members of the Class by making material misrepresentations about the agreement and its services.

106.    Up to 3 million people paid on average between $10.00 and $30.00 for a service LifeLock promised,  but did not – and could not – provide.  In reliance on that promise, those who subscribed to LifeLock's products at worst were left unprotected and suffered further harm, and at best were paying for a service that they were not receiving.

107.    LifeLock's first contractual promise to its subscribers is that it provides "comprehensive" identity theft protection.  Subscribers rely on LifeLock's promise of "comprehensive" monitoring to mean that LifeLock does in fact have the capability of providing such a service.  As stated above, LifeLock's services do not cover some of the largest credit card companies and businesses, nor does it cover car loans.  Instead, LifeLock only monitors 250 institutions in total, less than 3% of entities that would require monitoring.

108.    Failure to monitor the remaining 97% of entities which could be the source of identity theft for subscribers is a clear breach of LifeLock's contractual obligation to provide comprehensive monitoring.

109.    LifeLock's second contractual promise is that it provides timely and continuous 24/7/265 "alert" services.  Subscribers rely on this service to notify them of any suspicious activity related to their identities.  Not only does LifeLock lack the resources and personnel to follow through on this service, but also, LifeLock has actually suspended this service entirely both because of system failures and as a way of deflecting customer service calls.

110.    This is an example not simply of failure to comply with a contractual obligation, but rather a failure to perform the contractual obligation at all.  Subscribers rely on notifications of suspicious activity so that they may proactively take next steps in protecting themselves.  By throttling or shutting down the alert system entirely, LifeLock fails to meet its contractual obligation of keeping its subscribers informed of suspicious activity.

111.    LifeLock's third contractual promise is that it employs a patented alert system which stops identity theft before it does damage.  This was an obligation that LifeLock did not meet, and could not as a practical or legal matter.  Numerous audits and recommendations were presented to LifeLock regarding its products and policy that brought to light deficiencies in LifeLock's ability to deliver on this particular promise.  (See ¶ 45 through 60).  Despite having notice that they did not have the technology, personnel, and expertise to deliver this service, LifeLock nevertheless promised to provide it to subscribers and charged them for it.  Moreover, as described in ¶ 60 above, some of the technology which LifeLock intended to use to sweep the

web first left its subscribers' personally identifiable information entirely unencrypted and second was arguably illegal.

112.   LifeLock's fourth contractual promise is that it provides a monitoring service that banks and credit card companies cannot provide.  Subscribers rely on this promise and pay LifeLock to provide a superior service than their banks or credit card companies. As discussed above, LifeLock's lack of technology, personnel, and expertise has made it impossible for them to deliver even a substandard level of care in credit monitoring, let alone provide a service superior to that provided by banks and credit card companies for free.

113.   Finally, LifeLock's fifth contractual obligation is that it will use statistical analyses on rising trends in identity theft to better protect its subscribers.  Subscribers rely on this promise by trusting that LifeLock will stay up-to-date and adjust its monitoring accordingly.  Data over the past three years has clearly shown that the incidence of new account fraud accounts for the clear minority of fraud, and instead that the vast majority of fraud is related to existing accounts. And yet, LifeLock fails to provide for this exact type of identity theft – if someone steals your credit card number and uses it to make purchases, LifeLock won't help you.

114.   In sum, LifeLock fails to deliver on any of the above contractual obligations it promises to provide.  And in exchange, up to 3 million subscribers pay LifeLock up to $30.00 a month, believing they are protected when in fact they are getting nothing in return.

**FACTUAL ALLEGATIONS SPECIFIC TO NAMED PLAINTIFFS**

115.   Plaintiff Napoleon Ebarle has been a member of LifeLock since at least 2012.  In addition, Plaintiff Napoleon Ebarle enrolled his wife and two minor children.  Since his enrollment and based on LifeLock's representations and promises, Plaintiff Napoleon Ebarle has paid LifeLock a fee of approximately $40 a month for LifeLock's services.

116.   Based on LifeLock's advertisements and representations, as identified herein, Plaintiff Napoleon Ebarle understood and/or had the impression that LifeLock would protect against any attempt to steal his identity or fraudulently procure credit under his name, would contact him in the event his personal data was used, and send him "up-to-the-minute" alerts.  In

1  accord with Plaintiff Ebarle's understanding, he submitted his, his wife's, and his children's

2  personal information to LifeLock.

3      117.    In or around August of 2014, Plaintiff Ebarle opened a Discover account;

4  however, Plaintiff Ebarle did not receive an alert from LifeLock in connection with this new

5  account opening.

6      118.    Similarly, in or around October 2014, Plaintiff Ebarle opened a new account with

7  US bank and Wells Fargo.  Yet again, however, Plaintiff Ebarle did not receive any notifications

8  from LifeLock in connection with these account openings.

9      119.    In comparison to LifeLock's inability and/or failure to detect and report these

10 activities, each of the three (3) instances described above was detected and reported to Plaintiff

11 Ebarle through his alternative account with Protect My ID, a LifeLock competitor.

12     120.    Consequently, it is clear that Plaintiff Ebarle did not receive the services and/or

13 support promised by LifeLock and paid for by Plaintiff Ebarle, and that LifeLock does not

14 provide the superior "comprehensive" services promised.

15     121.    Additionally, during the period from March through December 2014, while

16 Plaintiff Ebarle received approximately six alerts pertaining to his wife's personal information

17 from Protect My ID, he did not receive a single alert from LifeLock.  Upon contacting LifeLock,

18 Plaintiff Ebarle learned that despite paying for services for himself and his wife, LifeLock was

19 not servicing the account for his wife, even though Plaintiff Ebarle had been charged for and paid

20 for these services.

21     122.    Plaintiff Jeanne Stamm subscribed to LifeLock in 2008.  Since that time, Plaintiff

22 Stamm has paid LifeLock a fee of $9 per month, or $108 a year.

23     123.    Based on LifeLock's advertisements and representations, Plaintiff Stamm

24 understood and/or had the impression that LifeLock would protect against any attempt to steal her

25 identity or fraudulently procure credit under her name and send her timely alert notifications.

26 Based on her understanding, Plaintiff Stamm submitted her personal information to LifeLock.

27     124.    At no time relevant hereto was Plaintiff Stamm aware that LifeLock was not

28 permitted to submit fraud alerts on her behalf; that LifeLock's consumer alert notification

1    services were routinely disabled by the Company; or that LifeLock's technology and personnel

2    were deficient and incapable of protecting the security, confidentiality, and integrity of personal

3    information collected from or about consumers as promised.

4         125.    Plaintiff Brian Litton has been a member of LifeLock since 2007.  In addition,

5    Plaintiff Litton enrolled his wife and minor child.  Since his enrollment and based on LifeLock's

6    representations and promises, Plaintiff Litton has paid LifeLock a fee of approximately $30 a

7    month for LifeLock's services.

8         126.    Based on LifeLock's advertisements and representations, Plaintiff Litton

9    understood and/or had the impression that LifeLock would protect against any attempt to steal his

10   identity or fraudulently procure credit under his name, would contact him in the event his

11   personal data was used, and send him timely alerts.  In accord with Plaintiff Litton's

12   understanding, he submitted his, his wife's, and his child's personal information to LifeLock.

13        127.    In or around late February 2015, Mr. Litton received correspondence from a credit

14   company that someone was attempting to open a credit account in his name.  He informed the

15   company that it was not him, and the credit card company closed the account.  Mr. Litton never

16   received an alert from LifeLock.

17        128.    Shortly after this incident, someone did open a Sears account in Mr. Litton's name,

18   charging approximately $750.00.  Mr. Litton called and canceled the credit card.  Again,

19   Mr. Litton never received a notification from LifeLock.  When Mr. Litton called LifeLock to

20   inquire why the Company was not sending him notifications on these account openings, LifeLock

21   instructed him that he needed a different plan for LifeLock to monitor these activities and to assist

22   him in restoring his name.

23        129.    Based on LifeLock's representations, Mr. Litton enrolled in LifeLock's Ultimate

24   Plan and was told that a service representative would contact him within 24 to 72 hours.  In the

25   meantime, through its free service, Citibank assisted Mr. Litton in contacting the credit unions

26   and sending out affidavits to put a lock on his credit.  Mr. Litton was only contacted by LifeLock

27   after he had already handled the problems, meaning he received none of the promised protections

28   and/or assistance that LifeLock represented it would provide.

130.     Plaintiff Reiner Jerome Ebarle subscribed to LifeLock in mid-2012.  Since that time, Plaintiff Reiner Ebarle has paid LifeLock a fee of $9 per month, or $108 a year.

131.     Based on LifeLock's advertisements and representations, Plaintiff Reiner Ebarle understood and/or had the impression that LifeLock would protect against any attempt to steal his identity or fraudulently procure credit under his name and send him timely alert notifications. Based on his understanding, Plaintiff Reiner Ebarle submitted his personal information to LifeLock.

132.     At no time relevant hereto was Plaintiff Reiner Ebarle aware that LifeLock was not permitted to submit fraud alerts on her behalf; that LifeLock's consumer alert notification services were routinely disabled by the Company; or that LifeLock's technology and personnel were deficient and incapable of protecting the security, confidentiality, and integrity of personal information collected from or about consumers as promised.

133.     As such, Plaintiffs were charged and paid fees for services that were not as represented, were illegal for the Company to perform, were non-existent, and/or virtually worthless.

### FRAUDULENT CONCEALMENT AND TOLLING

134.     The applicable statutes of limitations are tolled by virtue of Defendant's knowing and active concealment of the facts alleged above.  Plaintiffs and class members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

135.     At the time this action was filed, Defendant was under a duty to disclose the true, character, quality, and nature of LifeLock's services to Plaintiffs and the Class.  Defendant is therefore estopped to rely on any statute of limitations.

136.     Defendant's fraudulent concealment is common to the Class.

### CLASS ACTION ALLEGATIONS

137.     Plaintiffs bring this action against LifeLock as a class action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3).

138.     Plaintiffs seek certification of this action on behalf of the following class (the "Class"):  all persons in the United State who are or were, during January 19, 2009, through the resolution of this matter (the "Class Period") subscribers of LifeLock's fee-based theft protection services. Excluded from the Class are Defendant, any parent, subsidiary, affiliate, or controlled person of Defendant, as well as the officers, directors, agents, servants or employees of Defendant and the immediate family members of any such person.  Also excluded is any judge who may preside over this cause of action.

139.     The exact number of the Class, as herein identified and described, is not known, but it is estimated to number in the thousands.  The Class is so numerous that joinder of individual members herein is impracticable.

140.     There are common questions of law and fact in the action that relate to and affect the rights of each member of the Class and the relief sought is common to the entire Class.  In particular, the common questions of fact and law include:

> (A)     Whether Defendant's alert notification services were subject to regular delays and/or shut-downs;
>
> (B)     Whether Defendant failed to maintain compliance with the FTC Order;
>
> (C)     Whether Defendant's technology and safeguards were deficient to deliver the protections as promised;
>
> (D)     Whether Arizona law applies to the putative Class; and
>
> (E)     Whether members of the Class have sustained damages, and, if so, in what amount.

141.     The claims of the Plaintiffs, who are representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiffs, depend on a showing of the acts of Defendant giving rise to the right of Plaintiffs to the relief sought herein.  There is no conflict between the individually named Plaintiffs and other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

1    142.    The named Plaintiffs are the representative parties for the Class, and are able to,

2    and will fairly and adequately protect the interests of the Class.  The attorneys for Plaintiffs and

3    the Class are experienced and capable in complex civil litigation, consumer fraud litigation and

4    class actions.

5    143.    The class action procedure is superior to all other available methods for the fair

6    and efficient adjudication of this controversy.  This action would permit a large number of injured

7    persons to prosecute their common claims in a single forum simultaneously, efficiently, and

8    without unnecessary duplication of evidence and effort.  Class treatment also would permit the

9    adjudication of claims by class members whose claims are too small and complex to individually

10   litigate against a large corporate defendant.

11
                                    *COUNT I*
12               *VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT*

13   144.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

14   145.    LifeLock's acts and omissions constitute material misrepresentations and

15   concealments in connection with the sale or advertisement of its services in violation of the

16   Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A).

17   146.    Specifically, LifeLock used false, deceptive and misleading statements, concerning

18   the scope and effectiveness of its services; LifeLock's ability to provide continuous alerts and

19   services; LifeLock's ability to place fraud alerts under the FCRA; and the limitations, exclusions,

20   and restrictions on LifeLock's services.

21   147.    Likewise, LifeLock's advertisements and website were misleading, false, and/or

22   deceptive regarding the efficacy of LifeLock's technology and safeguards.

23   148.    LifeLock further omitted and/or concealed material facts.  For example, LifeLock

24   concealed the fact that the Company was regularly engaged in the practice of throttling, that

25   LifeLock's network and safety protocols were not and/or could not function at the level promised.

26   In addition, LifeLock also failed to disclose the effects of not sending out alerts.

27   149.    LifeLock's advertisements, marketing, and customer service representatives

28   purposely used inconsistent and confusing terms and/or high pressure sales tactics so as to

confuse customers and prevent them from bringing legitimate claims and/or canceling their services.

150.     Upon information and belief, LifeLock knowingly violated the terms of the FTC Order and used false, misleading, and deceptive representations and/or omissions in the advertising, marketing, and sales of its services.

151.     As a result of LifeLock's misrepresentations and omissions, LifeLock's members paid substantial fees, were injured and sustained damages in an amount to be proven at trial. These damages include, at a minimum, payments of monthly charges for services that were not as represented and payments for a service that is illegal for a company such as LifeLock to perform.

## COUNT II
## BREACH OF CONTRACT

152.     Plaintiffs repeat and reallege all preceding paragraphs contained herein.

153.     By contract, LifeLock agreed to provide Plaintiffs and the members of the Class Membership Plans and protections as advertised.

154.     LifeLock breached its contracts with Plaintiffs and the members of the Class by failing to provide the benefits and/or protections as promised.

155.     As a direct and proximate result of Defendant's breach, Plaintiffs and the Class are entitled to all damages arising from the breach of contract.

## COUNT III
## UNJUST ENRICHMENT

156.     Plaintiffs repeat and reallege all preceding paragraphs contained herein.

157.     Plaintiffs and the Class conferred benefits upon the Defendant by paying Membership Fees for the promised identity theft protections and services.

158.     Although LifeLock received earnings and benefits from the sale of its Membership Plans and the collection of Membership Fees, LifeLock retained these revenues under conditions that would constitute an unjust enrichment of those revenues.

159.   As a direct and proximate result of Defendant's actions, Plaintiffs and the Class are entitled to restitution on the full amount by which the Defendant has been unjustly enriched and should be required to disgorge same to Plaintiffs and the Class.

### COUNT IV
### DECLARATORY JUDGMENT

160.   Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

161.   An actual case and controversy within the meaning of the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, which may be adjudicated by this Court exists between Plaintiffs and proposed class members, and the Defendant.

162.   Plaintiffs and all members of the proposed class have, had, or were subscribers of one of Defendant's fee-based Membership Plans.  Defendant's Terms and Conditions provide that its insureds are treated consistent with the requirements of the laws and regulations of Arizona.  Thus, per the governing contract, Arizona law controls how the Defendant's customers must be treated by Defendant.

163.   At the same time, the relationship between Defendant and its customers was subject to the FTC Order entered between Defendant and the FTC in 2010, which specifically enjoins LifeLock from misrepresenting, expressly or by implication, "the means, methods, procedures, effects, effectiveness, coverage, or scope" of LifeLock's services.

164.   Defendant, as a general policy and business practice, represented or created the impression that LifeLock's Membership Plans provide: (a) protection from fraud or unauthorized account charges or "peace of mind"; (b) a solution to financial security; (c) live member support 24/7/365 and up-to-the-minute "alerts" of any threat of identity theft; and (d) a $1 million total service guarantee.

165.   Accordingly, Defendant has violated, and continues to violate, Arizona law and the FTC Order and Plaintiffs are entitled to declaratory relief.

### **RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

1          a)          determine that this action may be maintained as a class action under Rule 23 of the

2                       Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives,

3                       and approve Plaintiffs' Counsel as counsel for the Class;

4          b)          enter an order demanding that Defendant pay monetary damages to the Plaintiffs,

5                       and all proposed Class members;

6          c)          enter an order declaring that Defendant's actions are unlawful; and

7          d)          grant such other legal and equitable relief as the Court may deem appropriate,

8                       including costs and attorneys' fees.

9                                            **JURY DEMAND.**

10         Plaintiffs and the Class members hereby request a trial by jury.

11    Dated: October 15, 2015                         Respectfully submitted,

12                                          By:    _/s/ Joseph H. Bates_
                                                  CARNEY BATES & PULLIAM, PLLC
13                                                Joseph Henry ("Hank") Bates (CA #167688)
                                                  Randall K. Pulliam
14                                                11311 Arcade Drive, Suite 200
                                                  Little Rock, AR 72212
15                                                Telephone: (501) 312-8500
                                                  Fax: (501) 312-8505
16
                                                  LIEFF CABRASER HEIMANN
17                                                  & BERNSTEIN, LLP
                                                  Michael W. Sobol (CA #194857)
18                                                msobol@lchb.com
                                                  RoseMarie Maliekel (CA #276036)
19                                                rmaliekel@lchb.com
                                                  275 Battery Street, 29th Floor
20                                                San Francisco, CA 94111-3339
                                                  Telephone: (415) 956-1000
21                                                Facsimile: (415) 956-1008

22                                                *Attorneys for Plaintiffs*

23

24

25

26

27

28

# EXHIBIT 8

**Exhibit 8**

## GENERAL RELEASE OF ALL CLAIMS BY PLAINTIFF NAPOLEON EBARLE.

1.      In consideration for the settlement benefits described in the Class Action Settlement Agreement ("Settlement Agreement") to which this General Release is an integral and material part, Napoleon Ebarle ("Ebarle"), on his own behalf and on behalf of his administrators, representatives, and assigns, hereby completely fully, finally, and forever releases, relinquishes, acquits, and discharges LifeLock, Inc. ("LifeLock") and each of its respective present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, assigns, and insurers, including all of their insurers' affiliates, predecessors, successors, assigns, and reinsurers, and the respective agents, servants, attorneys, employees, officers, directors, shareholders, and representatives of the foregoing, and each of them, and all of the present and former directors, officers, employees, agents, attorneys, and shareholders of LifeLock and each of their present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, and assigns ("Released Parties"), from any and all manner of claims, actions, causes of action, suits, rights, debts, sums of money, payments, obligations, reckonings, contracts, agreements, executions, promises, damages, liens, judgments, and demands of whatever kind, type, or nature whatsoever, both at law and in equity, whether past, present, known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, which Ebarle has, may now have, or has ever had against any of the Released Parties, or any of them arising from or in any way connected with Ebarle's relationship with LifeLock, as of the date of Ebarle's execution of this General Release including but not limited to claims that were asserted in or arising from or that may have arisen from the same facts alleged in the matter entitled *Ebarle, et al. v. LifeLock, Inc.*, Case No. 3:15-CV-00258 HSG, currently pending in the District Court for the Northern District of California (the "Action"). This General Release covers all statutory, common law, constitutional, and other claims, including but not limited to:

(a) Any and all claims concerning the advertising of LifeLock's identity theft protection services;

(b) Any and all claims concerning the advertising of LifeLock's information security program;

(c) Any and all claims concerning LifeLock's disclosures concerning the nature of its identity theft protection services;

(d) Any and all claims concerning LifeLock's disclosures concerning the nature of its information security program;

(e) Any and all claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*, or any other applicable law or statute related to LifeLock's advertising or disclosures concerning its identity theft protection services or information security program;

(f) Any and all claims that LifeLock's advertising or disclosures regarding LifeLock's identity theft protection services or information security program constituted a fraudulent, unlawful, unfair, or deceptive business practice, were unconscionable, violated consumer protection statutes, and/or constituted a breach of contract and/or breach of the covenant of good faith and fair dealing or unjust enrichment; and/or

(g) Any and all claims concerning any fact or circumstance that relates to LifeLock's advertising or disclosures regarding its identity theft protection services or information security program (collectively, the "Released Claims").

This General Release described herein covers, includes, and is intended to include all remedies that could be sought for the Released Claims including, but not limited to, statutory,

constitutional, contractual, and common law claims for damages, costs, expenses, extra-contractual damages, compensatory damages, exemplary damages, special damages, consumer redress, penalties, punitive damages, and/or damage multipliers, disgorgement, declaratory relief, equitable relief, injunctive relief, expenses, interest, and/or attorneys' fees and costs against LifeLock.

2. **Waiver of Unknown Claims**. Ebarle has read Section 1542 of the Civil Code of the State of California, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
> THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS
> OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,
> WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY
> AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Ebarle hereby voluntarily waives the rights described in Section 1542 and elects to assume all risks for claims that now exist in his favor, whether known or unknown, against the Released Parties. Accordingly, this General Release includes within its effect claims and causes of action which Ebarle does not know or suspect to exist in his favor at the time of his execution hereof and of the facts and circumstances relating in any manner to the Released Claims are hereafter found to be other than or different from the facts now believed to be true, this General Release shall remain effective.

3. Ebarle warrants and represents that he is the sole and lawful owner of all rights, title, and interest in and to all of the claims described above and that he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other person or entity such claims or any part or portion thereof.

4. To the extent required by law, Garden City Group, LLC as the Settlement Administrator of the Settlement shall issue Ebarle a Form 1099 reflecting the payment of any settlement benefits described in the Class Action Settlement Agreement

5. Ebarle agrees that he alone is responsible for any tax consequences, including any penalties or interest, relating to the payment of any settlement benefits described in the Class Action Settlement Agreement

6. Ebarle and the Released Parties expressly agree that any and all force and effectiveness of this General Release is entirely contingent upon final approval of the Settlement, executed in the Action. If the Settlement does not become final for any reason, then this General Release shall be null and void *ab initio*. Neither a modification of nor a reversal on appeal of the Service Award shall constitute grounds for cancellation or termination of this General Release, however.

Dated: _10/28_, 2015

Napoleon Ebarle

_____

# EXHIBIT 9

**Exhibit 9**

## GENERAL RELEASE OF ALL CLAIMS BY PLAINTIFF JEANNE STAMM.

1.      In consideration for the settlement benefits described in the Class Action Settlement Agreement ("Settlement Agreement") to which this General Release is an integral and material part, Jeanne Stamm ("Stamm"), on his own behalf and on behalf of his administrators, representatives, and assigns, hereby completely fully, finally, and forever releases, relinquishes, acquits, and discharges LifeLock, Inc. ("LifeLock") and each of its respective present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, assigns, and insurers, including all of their insurers' affiliates, predecessors, successors, assigns, and reinsurers, and the respective agents, servants, attorneys, employees, officers, directors, shareholders, and representatives of the foregoing, and each of them, and all of the present and former directors, officers, employees, agents, attorneys, and shareholders of LifeLock and each of their present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, and assigns ("Released Parties"), from any and all manner of claims, actions, causes of action, suits, rights, debts, sums of money, payments, obligations, reckonings, contracts, agreements, executions, promises, damages, liens, judgments, and demands of whatever kind, type, or nature whatsoever, both at law and in equity, whether past, present, known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, which Stamm has, may now have, or has ever had against any of the Released Parties, or any of them arising from or in any way connected with Stamm's relationship with LifeLock, as of the date of Stamm's execution of this General Release including but not limited to claims that were asserted in or arising from or that may have arisen from the same facts alleged in the matter entitled *Ebarle, et al. v. LifeLock, Inc.*, Case No. 3:15-CV-00258 HSG, currently pending in the District Court for the Northern District of California (the "Action"). This General Release covers all statutory, common law, constitutional, and other claims, including but not limited to:

(a) Any and all claims concerning the advertising of LifeLock's identity theft protection services;

(b) Any and all claims concerning the advertising of LifeLock's information security program;

(c) Any and all claims concerning LifeLock's disclosures concerning the nature of its identity theft protection services;

(d) Any and all claims concerning LifeLock's disclosures concerning the nature of its information security program;

(e) Any and all claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*, or any other applicable law or statute related to LifeLock's advertising or disclosures concerning its identity theft protection services or information security program;

(f) Any and all claims that LifeLock's advertising or disclosures regarding LifeLock's identity theft protection services or information security program constituted a fraudulent, unlawful, unfair, or deceptive business practice, were unconscionable, violated consumer protection statutes, and/or constituted a breach of contract and/or breach of the covenant of good faith and fair dealing or unjust enrichment; and/or

(g) Any and all claims concerning any fact or circumstance that relates to LifeLock's advertising or disclosures regarding its identity theft protection services or information security program (collectively, the "Released Claims").

This General Release described herein covers, includes, and is intended to include all remedies that could be sought for the Released Claims including, but not limited to, statutory,

constitutional, contractual, and common law claims for damages, costs, expenses, extra-contractual damages, compensatory damages, exemplary damages, special damages, consumer redress, penalties, punitive damages, and/or damage multipliers, disgorgement, declaratory relief, equitable relief, injunctive relief, expenses, interest, and/or attorneys' fees and costs against LifeLock.

2.     **Waiver of Unknown Claims.**  Stamm has read Section 1542 of the Civil Code of the State of California, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
> THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS
> OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,
> WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY
> AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Stamm hereby voluntarily waives the rights described in Section 1542 and elects to assume all risks for claims that now exist in his favor, whether known or unknown, against the Released Parties.  Accordingly, this General Release includes within its effect claims and causes of action which Stamm does not know or suspect to exist in his favor at the time of his execution hereof and of the facts and circumstances relating in any manner to the Released Claims are hereafter found to be other than or different from the facts now believed to be true, this General Release shall remain effective.

3.     Stamm warrants and represents that he is the sole and lawful owner of all rights, title, and interest in and to all of the claims described above and that he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other person or entity such claims or any part or portion thereof.

4.     To the extent required by law, Garden City Group, LLC as the Settlement Administrator of the Settlement shall issue Stamm a Form 1099 reflecting the payment of any settlement benefits described in the Class Action Settlement Agreement

5.     Stamm agrees that he alone is responsible for any tax consequences, including any penalties or interest, relating to the payment of any settlement benefits described in the Class Action Settlement Agreement

6.     Stamm and the Released Parties expressly agree that any and all force and effectiveness of this General Release is entirely contingent upon final approval of the Settlement, executed in the Action. If the Settlement does not become final for any reason, then this General Release shall be null and void *ab initio*.   Neither a modification of nor a reversal on appeal of the Service Award shall constitute grounds for cancellation or termination of this General Release, however.

Dated: _Oct. 28_, 2015

Jeanne Stamm

_Jn St_____

2

# EXHIBIT 10

**Exhibit 10**

## GENERAL RELEASE OF ALL CLAIMS BY PLAINTIFF BRIAN LITTON.

1.      In consideration for the settlement benefits described in the Class Action Settlement Agreement ("Settlement Agreement") to which this General Release is an integral and material part, Brian Litton ("Litton"), on his own behalf and on behalf of his administrators, representatives, and assigns, hereby completely fully, finally, and forever releases, relinquishes, acquits, and discharges LifeLock, Inc. ("LifeLock") and each of its respective present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, assigns, and insurers, including all of their insurers' affiliates, predecessors, successors, assigns, and reinsurers, and the respective agents, servants, attorneys, employees, officers, directors, shareholders, and representatives of the foregoing, and each of them, and all of the present and former directors, officers, employees, agents, attorneys, and shareholders of LifeLock and each of their present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, and assigns ("Released Parties"), from any and all manner of claims, actions, causes of action, suits, rights, debts, sums of money, payments, obligations, reckonings, contracts, agreements, executions, promises, damages, liens, judgments, and demands of whatever kind, type, or nature whatsoever, both at law and in equity, whether past, present, known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, which Litton has, may now have, or has ever had against any of the Released Parties, or any of them arising from or in any way connected with Litton's relationship with LifeLock, as of the date of Litton's execution of this General Release including but not limited to claims that were asserted in or arising from or that may have arisen from the same facts alleged in the matter entitled *Ebarle, et al. v. LifeLock, Inc.*, Case No. 3:15-CV-00258 HSG, currently pending in the District Court for the Northern District of California (the "Action"). This General Release covers all statutory, common law, constitutional, and other claims, including but not limited to:

(a) Any and all claims concerning the advertising of LifeLock's identity theft protection services;

(b) Any and all claims concerning the advertising of LifeLock's information security program;

(c) Any and all claims concerning LifeLock's disclosures concerning the nature of its identity theft protection services;

(d) Any and all claims concerning LifeLock's disclosures concerning the nature of its information security program;

(e) Any and all claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*, or any other applicable law or statute related to LifeLock's advertising or disclosures concerning its identity theft protection services or information security program;

(f) Any and all claims that LifeLock's advertising or disclosures regarding LifeLock's identity theft protection services or information security program constituted a fraudulent, unlawful, unfair, or deceptive business practice, were unconscionable, violated consumer protection statutes, and/or constituted a breach of contract and/or breach of the covenant of good faith and fair dealing or unjust enrichment; and/or

(g) Any and all claims concerning any fact or circumstance that relates to LifeLock's advertising or disclosures regarding its identity theft protection services or information security program (collectively, the "Released Claims").

This General Release described herein covers, includes, and is intended to include all remedies that could be sought for the Released Claims including, but not limited to, statutory,

constitutional, contractual, and common law claims for damages, costs, expenses, extra-contractual damages, compensatory damages, exemplary damages, special damages, consumer redress, penalties, punitive damages, and/or damage multipliers, disgorgement, declaratory relief, equitable relief, injunctive relief, expenses, interest, and/or attorneys' fees and costs against LifeLock.

2.     **Waiver of Unknown Claims**.  Litton has read Section 1542 of the Civil Code of the State of California, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
> THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS
> OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,
> WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY
> AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Litton hereby voluntarily waives the rights described in Section 1542 and elects to assume all risks for claims that now exist in his favor, whether known or unknown, against the Released Parties.  Accordingly, this General Release includes within its effect claims and causes of action which Litton does not know or suspect to exist in his favor at the time of his execution hereof and of the facts and circumstances relating in any manner to the Released Claims are hereafter found to be other than or different from the facts now believed to be true, this General Release shall remain effective.

3.     Litton warrants and represents that he is the sole and lawful owner of all rights, title, and interest in and to all of the claims described above and that he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other person or entity such claims or any part or portion thereof.

4.     To the extent required by law, Garden City Group, LLC as the Settlement Administrator of the Settlement shall issue Litton a Form 1099 reflecting the payment of any settlement benefits described in the Class Action Settlement Agreement

5.     Litton agrees that he alone is responsible for any tax consequences, including any penalties or interest, relating to the payment of any settlement benefits described in the Class Action Settlement Agreement

6.     Litton and the Released Parties expressly agree that any and all force and effectiveness of this General Release is entirely contingent upon final approval of the Settlement, executed in the Action. If the Settlement does not become final for any reason, then this General Release shall be null and void *ab initio*.   Neither a modification of nor a reversal on appeal of the Service Award shall constitute grounds for cancellation or termination of this General Release, however.

Dated: Oct 28, 2015

Brian Litton

_____

2

# EXHIBIT 11

**Exhibit 11**

**GENERAL RELEASE OF ALL CLAIMS BY PLAINTIFF REINER JEROME EBARLE.**

1.     In consideration for the settlement benefits described in the Class Action Settlement Agreement ("Settlement Agreement") to which this General Release is an integral and material part, Reiner Jerome Ebarle ("R.J. Ebarle"), on his own behalf and on behalf of his administrators, representatives, and assigns, hereby completely fully, finally, and forever releases, relinquishes, acquits, and discharges LifeLock, Inc. ("LifeLock") and each of its respective present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, assigns, and insurers, including all of their insurers' affiliates, predecessors, successors, assigns, and reinsurers, and the respective agents, servants, attorneys, employees, officers, directors, shareholders, and representatives of the foregoing, and each of them, and all of the present and former directors, officers, employees, agents, attorneys, and shareholders of LifeLock and each of their present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, and assigns ("Released Parties"), from any and all manner of claims, actions, causes of action, suits, rights, debts, sums of money, payments, obligations, reckonings, contracts, agreements, executions, promises, damages, liens, judgments, and demands of whatever kind, type, or nature whatsoever, both at law and in equity, whether past, present, known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, which R.J. Ebarle has, may now have, or has ever had against any of the Released Parties, or any of them arising from or in any way connected with R.J. Ebarle's relationship with LifeLock, as of the date of R.J. Ebarle's execution of this General Release including but not limited to claims that were asserted in or arising from or that may have arisen from the same facts alleged in the matter entitled *Ebarle, et al. v. LifeLock, Inc.*, Case No. 3:15-CV-00258 HSG, currently pending in the District Court for the Northern District of California (the "Action"). This General Release covers all statutory, common law, constitutional, and other claims, including but not limited to:

(a) Any and all claims concerning the advertising of LifeLock's identity theft protection services;

(b) Any and all claims concerning the advertising of LifeLock's information security program;

(c) Any and all claims concerning LifeLock's disclosures concerning the nature of its identity theft protection services;

(d) Any and all claims concerning LifeLock's disclosures concerning the nature of its information security program;

(e) Any and all claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*, or any other applicable law or statute related to LifeLock's advertising or disclosures concerning its identity theft protection services or information security program;

(f) Any and all claims that LifeLock's advertising or disclosures regarding LifeLock's identity theft protection services or information security program constituted a fraudulent, unlawful, unfair, or deceptive business practice, were unconscionable, violated consumer protection statutes, and/or constituted a breach of contract and/or breach of the covenant of good faith and fair dealing or unjust enrichment; and/or

(g) Any and all claims concerning any fact or circumstance that relates to LifeLock's advertising or disclosures regarding its identity theft protection services or information security program (collectively, the "Released Claims").

This General Release described herein covers, includes, and is intended to include all remedies that could be sought for the Released Claims including, but not limited to, statutory,

constitutional, contractual, and common law claims for damages, costs, expenses, extra-contractual damages, compensatory damages, exemplary damages, special damages, consumer redress, penalties, punitive damages, and/or damage multipliers, disgorgement, declaratory relief, equitable relief, injunctive relief, expenses, interest, and/or attorneys' fees and costs against LifeLock.

2. **Waiver of Unknown Claims**. R.J. Ebarle has read Section 1542 of the Civil Code of the State of California, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH
> THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS
> OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE,
> WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY
> AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

R.J. Ebarle hereby voluntarily waives the rights described in Section 1542 and elects to assume all risks for claims that now exist in his favor, whether known or unknown, against the Released Parties. Accordingly, this General Release includes within its effect claims and causes of action which R.J. Ebarle does not know or suspect to exist in his favor at the time of his execution hereof and of the facts and circumstances relating in any manner to the Released Claims are hereafter found to be other than or different from the facts now believed to be true, this General Release shall remain effective.

3. R.J. Ebarle warrants and represents that he is the sole and lawful owner of all rights, title, and interest in and to all of the claims described above and that he has not heretofore voluntarily, by operation of law or otherwise, sold, assigned, or transferred or purported to sell, assign, or transfer to any other person or entity such claims or any part or portion thereof.

4. To the extent required by law, Garden City Group, LLC as the Settlement Administrator of the Settlement shall issue R.J. Ebarle a Form 1099 reflecting the payment of any settlement benefits described in the Class Action Settlement Agreement

5. R.J. Ebarle agrees that he alone is responsible for any tax consequences, including any penalties or interest, relating to the payment of any settlement benefits described in the Class Action Settlement Agreement

6. R.J. Ebarle and the Released Parties expressly agree that any and all force and effectiveness of this General Release is entirely contingent upon final approval of the Settlement, executed in the Action. If the Settlement does not become final for any reason, then this General Release shall be null and void *ab initio*. Neither a modification of nor a reversal on appeal of the Service Award shall constitute grounds for cancellation or termination of this General Release, however.

Dated: Oct 28, 2015

Reiner Jerome Ebarle

_____

2

# EXHIBIT B

**Lieff
Cabraser
Heimann &
Bernstein**

Attorneys at Law

275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  212.355.9500
Facsimile:  212.355.9592

One Nashville Place
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2415
Telephone:  615.313.9000
Facsimile:  615.313.9965

2101 Fourth Avenue, Suite 1900
Seattle, WA  98121-2315
Telephone:  206.739.9059

Email: mail@lchb.com
Website: www.lieffcabraser.com

### *FIRM PROFILE:*

Lieff Cabraser Heimann & Bernstein, LLP, is a sixty-plus attorney, AV-rated law firm founded in 1972 with offices in San Francisco, New York, Nashville, and Seattle.  We have a diversified practice, successfully representing plaintiffs in the fields of personal injury and mass torts, securities and financial fraud, employment discrimination and unlawful employment practices, product defect, consumer protection, antitrust and intellectual property, environmental and toxic exposures, False Claims Act, digital privacy and data security, and human rights.  Our clients include individuals, classes or groups of persons, businesses, and public and private entities.

Lieff Cabraser has served as Court-appointed Plaintiffs' Lead or Class Counsel in state and federal coordinated, multi-district, and complex litigation throughout the United States. With co-counsel, we have represented clients across the globe in cases filed in American courts.

Lieff Cabraser is among the largest firms in the United States that only represent plaintiffs.  Described by *The American Lawyer* as "one of the nation's premier plaintiffs' firms," Lieff Cabraser enjoys a national reputation for professional integrity and the successful prosecution of our clients' claims.  We possess sophisticated legal skills and the financial resources necessary for the handling of large, complex cases, and for litigating against some of the nation's largest corporations.  We take great pride in the leadership roles our firm plays in

many of this country's major cases, including those resulting in landmark decisions and precedent-setting rulings.

Lieff Cabraser has litigated and resolved thousands of individual lawsuits and hundreds of class and group actions, including some of the most important civil cases in the United States over the past four decades. We have assisted our clients in recovering over $97 billion in verdicts and settlements. Twenty-five cases were resolved for over $1 billion; another 66 cases resulted in verdicts or settlements at or in excess of $100 million.

*The National Law Journal* has recognized Lieff Cabraser **as one of the nation's top plaintiffs' law firms for** twelve years, including for 2015, **and we are a member of its Plaintiffs'** Hot List Hall of Fame. In compiling the list, *The National Law Journal* examines recent verdicts and settlements and looked for firms "representing the best qualities of the plaintiffs' bar and that demonstrated unusual dedication and creativity." In 2014, *The National Law Journal* recognized Lieff Cabraser as one of the 50 Leading Plaintiffs Firms in America and named the firm to its Midsize Hot List.

*U.S. News* and *Best Lawyers* have selected Lieff Cabraser as a national "Law Firm of the Year" each year the publications have given this award to law firms. For 2011, 2012, and 2014, we were recognized in the category of Mass Torts Litigation/Class Actions – Plaintiffs. For 2013, the publications selected our firm as the nation's premier plaintiffs' law firm in the category of Employment Law – Individuals. For 2015, we have again been recognized in the category of Mass Torts Litigation/Class Actions – Plaintiffs. Only one law firm in each practice area receives the "Law Firm of the Year" designation.

***CASE PROFILES:***

**I.      Personal Injury and Products Liability Litigation**

      **A.      Current Cases**

            1.      ***In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation***, MDL No. 2151 (C.D. Cal.). Lieff Cabraser serves as Co-Lead Counsel for the plaintiffs in the Toyota injury cases in federal court representing individuals injured, and families of loved ones who died, in Toyota unintended acceleration accidents. The complaints charge that Toyota took no action despite years of complaints that its vehicles accelerated suddenly and could not be stopped by proper application of the brake pedal. The complaints further allege that Toyota breached its duty to manufacture and sell safe automobiles by failing to incorporate a brake override system and other readily available safeguards that could have prevented unintended acceleration.

In December 2013, Toyota announced its intention to begin to settle the cases. In 2014, Lieff Cabraser played a key role in turning Toyota's intention into a reality through assisting in the creation of an innovative

resolution process that has settled scores of cases in streamlined, individual conferences. The settlements are confidential. Before Toyota agreed to settle the litigation, plaintiffs' counsel overcame significant hurdles in the challenging litigation. In addition to defeating Toyota's motion to dismiss the litigation, Lieff Cabraser and co-counsel demonstrated that the highly-publicized government studies that denied unintended acceleration, or attributed it to mechanical flaws and driver error, were flawed and erroneous.

2.   ***Individual General Motors Ignition Switch Defect Injury Lawsuits***.  Lieff Cabraser represents over 100 persons injured nationwide, and families of loved ones who died, in accidents involving GM vehicles sold with a defective ignition switch.  Without warning, the defect can cause the car's engine and electrical system to shut off, disabling the air bags.  For over a decade GM was aware of this defect and failed to inform government safety regulators and public.  The defect has been has been implicated in the deaths of over 300 people in crashes where the front air bags did not deploy.  On August 15, 2014, U.S. District Court Judge Jesse M. Furman appointed Elizabeth J. Cabraser as Co-Lead Plaintiffs' Counsel in the GM ignition switch litigation in federal court.

3.   ***Injury and Death Lawsuits Involving Wrongful Driver Conduct and Defective Tires, Transmissions, Cars and/or Vehicle Parts (Seat Belts, Roof Crush, Defective seats, and Other Defects).***  Lieff Cabraser has an active practice prosecuting claims for clients injured, or the families of loved ones who have died, by wrongful driver conduct and by unsafe and defective vehicles, tires, restraint systems, seats, and other automotive equipment.  We also represent clients in actions involving fatalities and serious injuries from tire and transmission failures as well as rollover accidents (and defective roofs, belts, seat back and other parts) as well as defective transmissions and/or shifter gates that cause vehicles to self-shift from park or false park into reverse.  Our attorneys have received awards and recognition from California Lawyer magazine (Lawyer of the Year Award), the Consumer Attorneys of California, and the San Francisco Trial Lawyers Association for their dedication to their clients and outstanding success in vehicle injury cases.

4.   ***In re Engle Cases***, No. 3:09-cv-10000-J-32 JBT (M.D. Fl.).  Lieff Cabraser represents over Florida smokers, and the spouses and families of loved ones who died, in litigation against the tobacco companies for their 50-year conspiracy to conceal the hazards of smoking and the addictive nature of cigarettes.  On February 25th, 2015, Lieff Cabraser announced the settlement of more than 400 Florida smoker lawsuits against the major cigarette companies Philip Morris USA Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company.  As a part of the settlement,

the companies will collectively pay $100 million to injured smokers or their families.

Lieff Cabraser attorneys tried over 20 cases in Florida federal court against the tobacco industry on behalf of individual smokers or their estates, and with co-counsel obtained over $105 million in judgments for our clients.  Two of the jury verdicts Lieff Cabraser attorneys obtained in the litigation were ranked by *The National Law Journal* as among the Top 100 Verdicts of 2014.

In September 2013, in *RJR v. Walker*, 728 F.3d 1297 (11th Cir.), the Court of Appeals affirmed two plaintiffs' trial verdicts against defendant's due process challenges.  This was the first federal appellate decision to hold that the trial structure used in the Florida state and federal courts to make individual Engle plaintiffs damages trials feasible meets due process standards.  On June 9, 2014, the U.S. Supreme Court denied RJR's petition for writ of certiorari.

5.    ***In re Takata Airbag Litigation***, MDL No. 2599 (S.D. Fl.).  Lieff Cabraser serve**s on the Plaintiffs' Steering Committee in the national** litigation against Takata Corporation.  Nearly 34 million vehicles, mostly manufactured prior to 2009, have been recalled worldwide due to defective and dangerous airbags manufactured by Japanese-based Takata Corporation.  This is the largest automotive recall in U.S. history.  At least six deaths and more than 100 injuries have been linked to the airbag defect.  The recalled Takata airbags contain a propellant that may cause the airbag to explode upon impact in an accident, shooting out metal debris from the casing towards drivers and passengers.  The complaints charge that the company knew of defects in its airbags a decade ago, after conducting secret tests of the products that showed dangerous flaws.  Rather than alert federal safety regulators to these risks, Takata allegedly ordered its engineers to delete the test data.

6.    ***Stryker Metal Hip Implant Litigation***.  Lieff Cabraser represents over 60 hip replacement patients nationwide who received the recalled Stryker Rejuvenate and ABG II modular hip implant systems.  Wendy **Fleishman serves on the Plaintiffs' Lead Counsel Committee of the** multidistrict litigation cases.  These patients have suffered tissue damage and have high metal particle levels in their blood stream.  For many patients, the Stryker hip implant failed necessitating painful revision surgery to extract and replace the artificial hip.  On November 3, 2014, a settlement was announced in the litigation against Stryker Corporation for the recall of its Rejuvenate and ABG II artificial hip implants. Under the settlement, Stryker will provide a base payment of $300,000 to patients that received the Rejuvenate or ABG II hip systems and underwent revision surgery by November 3, 2014, to remove and replace

the devices.  Stryker's liability is not capped.  It is expected that the total amount of payments under the settlement will far exceed $1 billion dollars.

7.     ***In re Actos (Pioglitazone) Products Liability Litigation***, MDL No. 2299.  Lieff Cabraser represents patients who developed bladder cancer after exposure to the prescription drug pioglitazone, sold as Actos by Japan-based Takeda Pharmaceutical Company and prescribed for patients with Type 2 Diabetes.

In April 2015, Takeda agreed to settle all bladder cancer claims brought by individuals who took Actos at some time prior to December 1, 2011, and who were diagnosed with bladder cancer on or before April 28, 2015, so long as the claimants were represented by counsel by May 1, 2015.  The settlement amount will be increased from $2.37 to $2.4 billion, because the percentage of claimants who decided to participate exceeded 97% before the opt-in deadline of September 11, 2015.  Average payments of about $250,000 per person will be increased for more severe injuries, and reductions will occur where an individual had other likely causes of bladder cancer, such as smoking.

In 2014, Lieff Cabraser attorney Donald C. Arbitblit served as a member of the trial team in the case of Allen v. Takeda, working closely with lead trial counsel Mark Lanier in an Actos trial in federal court in Louisiana.  The jury found Takeda failed to adequately warn about the bladder cancer risks of Actos.  The jury also found that Takeda acted with wanton and reckless disregard for patient safety and awarded $9 billion in punitive damages. The trial judge reduced the punitive damage award but upheld **the jury's findings of misconduct and ruled that a multiplier of 25 to 1 for** punitive damages was justified.  The verdict is currently on appeal..

8.     ***Fen-Phen ("Diet Drugs") Litigation***.  Since the recall was announced in 1997, Lieff Cabraser has represented individuals who suffered injuries from the "Fen-Phen" diet drugs fenfluramine (sold as Pondimin) and/or dexfenfluramine (sold as Redux).  We served as counsel for the plaintiff who filed the first nationwide class action lawsuit against the diet drug manufacturers alleging that they had failed to adequately warn physicians and consumers of the risks associated with the drugs.  In ***In re Diet Drugs (Phentermine / Fenfluramine / Dexfenfluramine) Products Liability Litigation***, MDL No. 1203 (E.D. Pa.), the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Management Committee which organized and directed the Fen-Phen diet drugs litigation in federal court.  In August 2000, the Court approved a $4.75 billion settlement offering both medical monitoring relief for persons exposed to the drug and compensation for persons with qualifying damage.  We represented over 2,000 persons that suffered

valvular heart disease, pulmonary hypertension or other problems (such as needing echocardiogram screening for damage) due to  and/or following exposure to Fen-Phen and obtained more than $350 million in total for clients in individual cases and/or claims.  We continue to represent persons who suffered valvular heart disease due to Fen-Phen and received compensation under the Diet Drugs Settlement who now require heart value surgery.  These persons may be eligible to submit a new claim and receive additional compensation under the settlement.

9.      ***DePuy Metal Hip Implants Litigation***.  Lieff Cabraser represents nearly 200 patients nationwide who received the ASR XL Acetabular and ASR Hip Resurfacing systems manufactured by DePuy Orthopedics, a unit of Johnson & Johnson.  In 2010, DePuy Orthopedics announced the recall of its all-metal ASR hip implants, which were implanted in approximately 40,000 U.S. patients from 2006 through August 2010.  The complaints allege that DePuy Orthopedics was aware its ASR hip implants were failing at a high rate, yet continued to manufacture and sell the device.  In January 2011, in ***In re DePuy Orthopaedics, Inc.*** ASR Hip Implant Products, MDL No. 2197, the Court overseeing all DePuy recall lawsuits in federal court appointed Lieff Cabraser attorney Wendy R. **Fleishman to the Plaintiffs' Steering Committee for the organization and** coordination of the litigation.  In July 2011, in the coordinated proceedings in California state court, the Court appointed Lieff Cabraser attorney **Robert J. Nelson to serve on the Plaintiffs' Steering Committee.** In 2013, Johnson & Johnson announced its agreement to pay at least $2.5 billion to resolve thousands of defective DePuy ASR hip implant lawsuits.  Under the settlement, J&J offers to pay a base award of $250,000 to U.S. citizens and residents who are more than 180 days from their hip replacement surgery, and prior to August 31, 2013, had to undergo revision surgery to remove and replace their faulty DePuy hip ASR XL or ASR resurfacing hip.  The $250,000 base award payment will be adjusted upward or downward depending on medical factors specific to each patient.  We also represent nearly 100 patients whose DePuy Pinnacle artificial hip with the metal insert, called the Ultamet metal liner, has prematurely failed.

10.     ***Mirena Litigation***.  A widely-used, plastic intrauterine device (IUD) that releases a hormone into the uterus to prevent pregnancy, Mirena is manufactured by Bayer Healthcare Pharmaceuticals.  Lieff Cabraser represents patients who have suffered serious injuries linked to the IUD.  These injuries include uterine perforation (the IUD tears through the cervix or the wall of the uterus), ectopic pregnancy (when the embryo implants outside the uterine cavity), pelvic infections and pelvic inflammatory disease, and thrombosis (blood clots).

11.     ***Birth Defects Litigation***.  Lieff Cabraser represents children and their parents who have suffered birth defects as a result of problematic pregnancies and improper medical care, improper prenatal genetic screening, ingestion by the mother of prescription drugs during pregnancy which had devastating effects on their babies.  These birth defects range from heart defects, physical malformations, and severe brain damage associated with complex emotional and developmental delays.  Taking of antidepressants during pregnancy has been linked to multiple types of birth defects, neonatal abstinence syndrome from experiencing withdrawal of the drug, and persistent pulmonary hypertension of the newborn (PPHN).

12.     ***Vaginal Mesh Litigation***.  Vaginal mesh is a polypropylene material implanted as a treatment for pelvic organ prolapse or stress urinary incontinence.  Gynecare Transvaginal products, manufactured and sold by Johnson & Johnson, as well as mesh products made by Boston Scientific, AMS, Bard, Caldera, and Coloplast, have been linked to serious side effects including erosion into the vaginal wall or other organs, infection, internal organ damage, and urinary problems.

13.     ***Xarelto Litigation:***  We represent patients prescribed Xarelto sold in the U.S. by Janssen Pharmaceuticals, a subsidiary of Johnson & Johnson.  The complaints charge that Xarelto, approved to prevent blood clots, is a dangerous and defective drug because it triggers in certain patients uncontrolled bleeding and other life-threatening complications. Unlike Coumadin, an anti-clotting drug approved over 50 years ago, the concentration of Xarelto in a patient's blood cannot be reversed in the case of overdose or other serious complications.  If a Xarelto patient has an emergency bleeding event -- such as from a severe injury or major brain or GI tract bleeding -- the results can be fatal.

14.     ***Benicar Litigation***:  We represent patients prescribed the high blood pressure medication Benicar who have experienced chronic diarrhea with substantial weight loss, severe gastrointestinal problems, and the life-threatening conditions of sprue-like enteropathy and villous atrophy in litigation against Japanese-**based Daiichi Sankyo, Benicar's manufacturer,** and Forest Laboratories, which marketed Benicar in the U.S.  The complaints allege that Benicar was insufficiently tested and not accompanied by adequate instructions and warnings to apprise consumers of the full risks and side effects associated with its use.

15.     ***Risperdal Litigation***:  In 2013, Johnson & Johnson and its subsidiary Janssen Pharmaceuticals, the manufacture of the antipsychotic prescription drugs Risperdal and Invega, entered into a $2.2 billion settlement with the U.S. Department of Justice for over promoting the drugs.  The government alleged that J&J and Janssen knew Risperdal

triggered the production of prolactin, a hormone that stimulates breast development and milk production.  We represent parents whose sons developed abnormally large breasts while prescribed Risperdal and Invega.

16.   ***Power Morcellators Litigation***:  We represent women who underwent a hysterectomy (the removal of the uterus) or myomectomy (the removal of uterine fibroids) in which a laparoscopic power morcellator was used.  In November 2014, the FDA warned surgeons that they should avoid the use of laparoscopic power morcellators for removing uterine tissue in the vast majority of cases due to the risk of the devices spreading unsuspected cancer.  Based on current data, the FDA estimates that 1 in 350 women undergoing hysterectomy or myomectomy for the treatment of fibroids have an unsuspected uterine sarcoma, a type of uterine cancer that includes leiomyosarcoma.

17.   ***Yaz and Yasmin Litigation***.  Lieff Cabraser represents women prescribed Yasmin and Yaz oral contraceptives who suffered blood clots, deep vein thrombosis, strokes, and heart attacks, as well as the families of loved ones who died suddenly while taking these medications.  The complaints allege that Bayer, the manufacturer of Yaz and Yasmin, failed to adequately warn patients and physicians of the increased risk of serious adverse effects from Yasmin and Yaz.  The complaints also charge that these oral contraceptives posed a greater risk of serious side effects than other widely available birth control drugs.

**B.    Successes**

1.    ***Multi-State Tobacco Litigation***.  Lieff Cabraser represented the Attorneys General of Massachusetts, Louisiana and Illinois, several additional states, and 21 cities and counties in California, in litigation against Philip Morris, R.J. Reynolds and other cigarette manufacturers.  The suits were part of the landmark $206 billion settlement announced in November 1998 between the tobacco industry and the states' attorneys general.  The states, cities and counties sought both to recover the public costs of treating smoking-related diseases and require the tobacco industry to undertake extensive modifications of its marketing and promotion activities in order to reduce teenage smoking.  In California alone, Lieff Cabraser's clients were awarded an estimated $12.5 billion to be paid through 2025.

2.    ***In re Vioxx Products Liability Litigation***, MDL No. 1657 (E.D. La.).  Lieff Cabraser represented patients who suffered heart attacks or strokes, and the families of loved ones who died, after having been prescribed the arthritis and pain medication Vioxx. In individual personal injury lawsuits against Merck, the manufacturer of Vioxx, our clients allege that Merck falsely promoted the safety of Vioxx and failed to disclose the full range of

the drug's dangerous side effects.  In April 2005, in the federal multidistrict litigation, the Court appointed Elizabeth J. Cabraser to the Plaintiffs' Steering Committee, which has the responsibility of conducting all pretrial discovery of Vioxx cases in federal court and pursuing all settlement options with Merck.  In August 2006, Lieff Cabraser was co-counsel in *Barnett v. Merck*, which was tried in the federal court in New Orleans.  Lieff Cabraser attorneys Don Arbitblit and Jennifer Gross participated in the trial, working closely with attorneys Mark Robinson and Andy Birchfield. The jury reached a verdict in favor of Mr. Barnett, finding that Vioxx caused his heart attack, and that Merck's conduct justified an award of punitive damages.  In November 2007, Merck announced it had entered into an agreement with the executive committee of the Plaintiffs' Steering Committee as well as representatives of plaintiffs' counsel in state coordinated proceedings.  Merck paid $4.85 billion into a settlement fund for qualifying claims.

3.  ***In re Silicone Gel Breast Implants Products Liability Litigation***, MDL No. 926 (N.D. Ala.).  Lieff Cabraser served on the Plaintiffs' Steering Committee and was one of five members of the negotiating committee which achieved a $4.25 billion global settlement with certain defendants of the action.  This was renegotiated in 1995, and is referred to as the Revised Settlement Program ("RSP").  Over 100,000 recipients have received initial payments, reimbursement for the explanation expenses and/or long term benefits.

4.  ***Sulzer Hip and Knee Prosthesis Liability Litigation***.  In December 2000, Sulzer Orthopedics, Inc., announced the recall of approximately 30,000 units of its Inter-Op Acetabular Shell Hip Implant, followed in May 2001 with a notification of failures of its Natural Knee II Tibial Baseplate Knee Implant.  In coordinated litigation in California state court, ***In re Hip Replacement Cases***, JCCP 4165, Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Co-Lead Counsel.  In the federal litigation, ***In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litigation***, MDL No. 1410, Lieff Cabraser played a significant role in negotiating a revised global settlement of the litigation valued at more than $1 billion.  The revised settlement, approved by the Court in May 2002, provided patients with defective implants almost twice the cash payment as under an initial settlement.  On behalf of our clients, Lieff Cabraser objected to the initial settlement.

5.  ***In re Bextra/Celebrex Marketing Sales Practices and Products Liability Litigation***, MDL No. 1699 (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Liaison Counsel and Elizabeth J. Cabraser chaired the Plaintiffs' Steering Committee (PSC) charged with overseeing all personal injury and consumer litigation in federal courts nationwide arising out of the sale and marketing of the COX-2 inhibitors Bextra and Celebrex,

manufactured by Pfizer, Inc. and its predecessor companies Pharmacia Corporation and G.D. Searle, Inc.

Under the global resolution of the multidistrict tort and consumer litigation announced in October 2008, Pfizer paid over $800 million to claimants, including over $750 million to resolve death and injury claims.

In a report adopted by the Court on common benefit work performed by the PSC, the Special Master stated:

> [L]eading counsel from both sides, and the attorneys from the PSC who actively participated in this litigation, demonstrated the utmost skill and professionalism in dealing with numerous complex legal and factual issues.  The briefing presented to the Special Master, and also to the Court, and the development of evidence by both sides was exemplary.  The Special Master particularly wishes to recognize that leading counsel for both sides worked extremely hard to minimize disputes, and when they arose, to make sure that they were raised with a minimum of rancor and a maximum of candor before the Special Master and Court.

6.   ***In re Guidant Implantable Defibrillators Products Liability Litigation***, MDL No. **1708.**  Lieff Cabraser serves on the Plaintiffs' Lead Counsel Committee in litigation in federal court arising out of the recall of Guidant cardiac defibrillators implanted in patients because of potential malfunctions in the devices.  At the time of the recall, Guidant admitted it was aware of 43 reports of device failures, and two patient deaths.  Guidant subsequently acknowledged that the actual rate of failure may be higher than the reported rate and that the number of associated deaths may be underreported since implantable cardio-defibrillators are not routinely evaluated after death.  In January 2008, the parties reached a **global settlement of the action.  Guidant's settlements of defibrillator-**related claims will total $240 million.

7.   ***In re Copley Pharmaceutical, Inc., "Albuterol" Products Liability Litigation***, MDL No. 1013 (D. Wyo.).  Lieff Cabraser served **on the Plaintiffs' Steering Committee in a class action lawsuit against** Copley Pharmaceutical, which manufactured Albuterol, a bronchodilator prescription pharmaceutical.  Albuterol was the subject of a nationwide recall in January 1994 after a microorganism was found to have contaminated the solution, allegedly causing numerous injuries including bronchial infections, pneumonia, respiratory distress and, in some cases, death.  In October 1994, the District Court certified a nationwide class on liability issues.  ***In re Copley Pharmaceutical***, 161 F.R.D. 456 (D. Wyo.

1995).  In November 1995, the District Court approved a $150 million settlement of the litigation.

8. ***In re Telectronics Pacing Systems Inc., Accufix Atrial "J" Leads Products Liability Litigation***, MDL No. 1057 (S.D. Ohio). Lieff Cabraser served on the Court-**appointed Plaintiffs' Steering** Committee in a nationwide products liability action alleging that defendants placed into the stream of commerce defective pacemaker leads.  In April 1997, the District Court re-certified a nationwide class of **"J" Lead im**plantees with subclasses for the claims of medical monitoring, negligence and strict product liability.  A summary jury trial, utilizing jury instructions and interrogatories designed by Lieff Cabraser, occurred in February 1998.  A partial settlement was approved thereafter by the District Court but reversed by the Court of Appeals.  In March 2001, the District Court approved a renewed settlement that included a $58 million fund to satisfy all past, present and future claims by patients for their medical care, injuries, or damages arising from the lead.

9. ***Mraz v. DaimlerChrysler***, No. BC 332487 (Cal. Supr. Ct.).  In March 2007, the jury returned a $54.4 million verdict, including $50 million in punitive damages, against DaimlerChrysler for intentionally failing to cure a known defect in millions of its vehicles that led to the death of Richard Mraz, a young father.  Mr. Mraz suffered fatal head injuries when the 1992 Dodge Dakota pickup truck he had been driving at his work site ran him over after he exited the vehicle believing it was in park.  The jury **found that a defect in the Dodge Dakota's automatic transmission, called** a park-to-reverse defect, played a substantial factor in Mr. **Mraz's death** and that DaimlerChrysler was negligent in the design of the vehicle for failing to warn of the defect and then for failing to adequately recall or retrofit the vehicle.

For their outstanding service to their clients in Mraz and advancing the rights of all persons injured by defective products, Lieff Cabraser partners Robert J. Nelson, the lead trial counsel, received the 2008 California Lawyer of the Year (CLAY) Award in the field of personal injury law, and were also selected as finalists for attorney of the year by the Consumer Attorneys of California and the San Francisco Trial Lawyers Association.

In March 2008, a Louisiana-state jury found DaimlerChrysler liable for the death of infant Collin Guillot and injuries to his parents Juli and August Guillot and their then 3-year-old daughter, Madison.  The jury returned a unanimous verdict of $5,080,000 in compensatory damages. **The jury found that a defect in the Jeep Grand Cherokee's transmission,** called a park-to-reverse defect, played a substantial factor in Collin **Guillot's death and the severe injuries suffered by Mr.** and Mrs. Guillot and their daughter.  Lieff Cabraser served as co-counsel in the trial.

10.    ***Craft v. Vanderbilt University***, Civ. No. 3-94-0090 (M.D. Tenn.). Lieff Cabraser served as Lead Counsel of a certified class of over 800 pregnant women and their children who were intentionally fed radioactive iron isotopes without consent while receiving prenatal care at the Vanderbilt University hospital as part of a study on iron absorption during pregnancy. The women were not informed of the nature and risks of the study. Instead, they were told that the solution they were fed was a "vitamin cocktail." In the 1960's, Vanderbilt conducted a follow-up study to determine the health effects of the plaintiffs' prior radiation exposure. Throughout the follow-up study, Vanderbilt concealed from plaintiffs the fact that they had been involuntarily exposed to radiation, and that the purpose of the follow-up study was to determine whether there had been an increased rate of childhood cancers among those exposed ***in utero***. Vanderbilt also did not inform plaintiffs of the results of the follow-up study, which revealed a disproportionately high incidence of cancers among the children born to the women fed the radioactive iron.

The facts surrounding the administration of radioactive iron to the pregnant women and their children in utero only came to light as a result of U.S. Energy Secretary Hazel O'Leary's 1993 disclosures of government-sponsored human radiation experimentation during the Cold War. Defendants' attempts to dismiss the claims and decertify the class were unsuccessful. 18 F. Supp.2d 786 (M.D. Tenn. 1998). The case was settled in July 1998 for a total of $10.3 million and a formal apology from Vanderbilt.

11.    ***Simply Thick Litigation***.  Lieff Cabraser represented parents whose infants died or suffered gave injuries linked to Simply Thick, a thickening agent for adults that was promoted to parents, caregivers, and health professional for use by infants to assist with swallowing.  The individual lawsuits alleged that Simply Thick when fed to infants caused necrotizing enterocolitis (NEC), a life-threatening condition characterized by the inflammation and death of intestinal tissue.  In 2014, the litigation was resolved on confidential terms.

12.    ***Medtronic Infuse Litigation***.  Lieff Cabraser represented patients who suffered serious injuries from the off-label use of the Infuse bone graft, manufactured by Medtronic Inc.  The FDA approved Infuse for only one type of spine surgery, the anterior lumbar fusion.  Many patients, however, received an off-label use of Infuse and were never informed of the off-label nature of the surgery.  Serious complications associated with Infuse included uncontrolled bone growth and chronic pain from nerve injuries.  In 2014, the litigation was settled on confidential terms.

13.    ***Wright Medical Hip Litigation***.  The Profemur-Z system manufactured by Wright Medical Technology consisted of three separate

components:  a femoral head, a modular neck, and a femoral stem.  Prior to 2009, Profemur-Z hip system included a titanium modular neck adapter and stem which was implanted in 10,000 patients.  Lieff Cabraser represented patients whose Profemur-Z hip implant fractured, requiring a revision surgery.  In 2013 and 2014, the litigation was resolved on confidential terms.

14.  ***In re Zimmer Durom Cup Product Liability Litigation***, MDL No. 2158.  Lieff Cabraser served as Co-Liaison Counsel for patients nationwide injured by the defective Durom Cup manufactured by Zimmer Holdings.  First sold in the U.S. in 2006, Zimmer marketed its 'metal-on-metal' Durom Cup implant as providing a greater range of motion and less wear than traditional hip replacement components.  In July 2008, Zimmer announced the suspension of Durom sales.  The complaints charged that the Durom cup was defective and led to the premature failure of the implant.  In 2011 and 2012, the patients represented by Lieff Cabraser settled their cases with Zimmer on favorable, confidential terms.

15.  ***Luisi v. Medtronic***, No. 07 CV 4250 (D. Minn.).  Lieff Cabraser represented over seven hundred heart patients nationwide who were implanted with recalled Sprint Fidelis defibrillator leads manufactured by Medtronic Inc.  Plaintiffs charge that Medtronic has misrepresented the safety of the Sprint Fidelis leads and a defect in the device triggered their receiving massive, unnecessary electrical shocks.  A settlement of the litigation was announced in October 2010.

16.  ***Blood Factor VIII And Factor IX Litigation***.  Working with counsel in Asia, Europe, Central and South America and the Middle East, Lieff Cabraser represented over 1,500 hemophiliacs worldwide, or their survivors and estates, who contracted HIV and/or Hepatitis C (HCV), and Americans with hemophilia who contracted HCV, from contaminated and defective blood factor products produced by American pharmaceutical companies.  In 2004, Lieff Cabraser was appointed Plaintiffs' Lead Counsel of the "second generation" Blood Factor MDL litigation presided over by Judge Grady in the Northern District of Illinois.  The case was resolved through a global settlement signed in 2009.

17.  ***In Re Yamaha Motor Corp. Rhino ATV Products Liability Litigation***, MDL No. 2016 (W.D. Ky.)  Lieff Cabraser served as Plaintiffs' Lead Counsel in the litigation in federal court and Co-Lead Counsel in coordinated California state court litigation arising out of serious injuries and deaths in rollover accidents involving the Yamaha Rhino.  The complaints charged that the Yamaha Rhino contained numerous design flaws, including the failure to equip the vehicles with side doors, which resulted in repeated broken or crushed legs, ankles or feet for riders.  Plaintiffs alleged also that the Yamaha Rhino was unstable due to a

narrow track width and high center of gravity leading to rollover accidents that killed and/or injured scores of persons across the nation.  On behalf of victims and families of victims and along with the Center for Auto Safety, and the San Francisco Trauma Foundation, Lieff Cabraser advocated for numerous safety changes  to the Rhino in reports submitted to the U.S. Consumer Product Safety Commission (CPSC).  On March 31, 2009, the CPSC, in cooperation with Yamaha Motor Corp. U.S.A., announced a free repair program for all Rhino 450, 660, and 700 models to improve safety, including  the addition of spacers and removal of a rear only anti-sway bar.

18.   ***Advanced Medical Optics Complete MoisturePlus Litigation***.  Lieff Cabraser represented consumers nationwide in personal injury lawsuits filed against Advanced Medical Optics arising out of the May **2007 recall of AMO's Complete MoisturePlus Multi-**Purpose Contact Lens Solution.  The product was recalled due to reports of a link between a rare, but serious eye infection, ***Acanthamoeba keratitis***, caused by a **parasite and use of AMO's** contact lens solution.  Though AMO promoted Complete MoisturePlus Multi-**Purpose as "effective against the introduction of common ocular microorganisms," the complaints charged that AMO's lens solution was ineffective and vastly inferior to other** multipurpose solutions on the market.  In many cases, patients were forced to undergo painful corneal transplant surgery to save their vision and some have lost all or part of their vision permanently.  The patients represented by Lieff Cabraser resolved their cases with AMO on favorable, confidential terms.

19.   ***Gol Airlines Flight 1907 Amazon Crash***.  Lieff Cabraser served as Plaintiffs' Liaison Counsel and represents over twenty families whose loved ones died in the Gol Airlines Flight 1907 crash.  On September 29, 2006, a brand-new Boeing 737-800 operated by Brazilian air carrier Gol plunged into the Amazon jungle after colliding with a smaller plane owned by the American company ExcelAire Service, Inc.  None of the 149 passengers and six crew members on board the Gol flight survived the accident.

The complaint charged that the pilots of the ExcelAire jet were flying at an incorrect altitude at the time of the collision, failed to operate the jet's transponder and radio equipment properly, and failed to maintain communication with Brazilian air traffic control in violation of international civil aviation standards.  If the pilots of the ExcelAire aircraft had followed these standards, the complaint charged that the collision would not have occurred.

At the time of the collision, the ExcelAire aircraft's transponder, manufactured by Honeywell, was not functioning.  A transponder

transmits a plane's altitude and operates its automatic anti-collision system.  The complaint charged that Honeywell shares responsibility for the tragedy because it defectively designed the transponder on the ExcelAire jet, and failed to warn of dangers resulting from foreseeable uses of the transponder.  The cases settled after they were sent to Brazil for prosecution.

20. ***Comair CRJ-100 Commuter Flight Crash in Lexington, Kentucky***.  A Bombardier CRJ-100 commuter plane operated by Comair, Inc., a subsidiary of Delta Air Lines, crashed on August 27, 2006 shortly after takeoff at Blue Grass Airport in Lexington, Kentucky, killing 47 passengers and two crew members. The aircraft attempted to take off from the wrong runway.  The families represented by Lieff Cabraser obtained substantial economic recoveries in a settlement of the case.

21. ***In re ReNu With MoistureLoc Contact Lens Solution Products Liability Litigation***, MDL No. 1785 (D. S.C.).  Lieff Cabraser served on the Plaintiffs' Executive Committee in federal court litigation arising out of Bausch & Lomb's 2006 recall of its ReNu with MoistureLoc contact lens solution.  Consumers who developed *Fusarium keratitis*, a rare and dangerous fungal eye infection, as well as other serious eye infections, alleged the lens solution was defective.  Some consumers were forced to undergo painful corneal transplant surgery to save their vision; others lost all or part of their vision permanently.  The litigation was resolved under favorable, confidential settlements with Bausch & Lomb.

22. ***Helios Airways Flight 522 Athens, Greece Crash***. On August 14, 2005, a Boeing 737 operating as Helios Airways flight 522 crashed north of Athens, Greece, resulting in the deaths of all passengers and crew. The aircraft was heading from Larnaca, Cyprus to Athens International Airport when ground controllers lost contact with the pilots, who had radioed in to report problems with the air conditioning system. Press reports about the official investigation indicate that a single switch for the pressurization system on the plane was not properly set by the pilots, and eventually both were rendered unconscious, along with most of the passengers and cabin crew.

Lieff Cabraser represented the families of several victims, and filed complaints alleging that a series of design defects in the Boeing 737-300 contributed to the pilots' failure to understand the nature of the problems they were facing. Foremost among those defects was a confusing pressurization warning "horn" which uses the same sound that alerts pilots to improper takeoff and landing configurations. The families represented by Lieff Cabraser obtained substantial economic recoveries in a settlement of the case.

23.     ***Legend Single Engine "Turbine Legend" Kit Plane Crash***.  On
November 19, 2005, a single engine "Turbine Legend" kit plane operated
by its owner crashed shortly after takeoff from a private airstrip in
Tucson, Arizona, killing both the owner/pilot and a passenger. Witnesses
report that the aircraft left the narrow runway during the takeoff roll and
although the pilot managed to get the plane airborne, it rolled to the left
and crashed.

Lieff Cabraser investigated the liability of the pilot and others, including
the manufacturer of the kit and the operator of the airport from which the
plane took off. The runway was 16 feet narrower than the minimum width
recommended by the Federal Aviation Administration.  Lieff Cabraser
represented the widow of the passenger, and the case was settled on
favorable, confidential terms.

24.     ***Manhattan Tourist Helicopter Crash***. On June 14, 2005, a Bell 206
helicopter operated by Helicopter Flight Services, Inc. fell into the East
River shortly after taking off for a tourist flight over New York City. The
pilot and six passengers were immersed upside-down in the water as the
helicopter overturned. Lieff Cabraser represented a passenger on the
helicopter and the case was settled on favorable, confidential terms.

25.     ***U.S. Army Blackhawk Helicopter Tower Collision***. Lieff Cabraser
represented the family of a pilot who died in the November 29, 2004
crash of a U.S. Army Black Hawk Helicopter.  The Black Hawk was flying
during the early morning hours at an altitude of approximately 500 feet
when it hit cables supporting a 1,700 foot-tall television tower, and
subsequently crashed 30 miles south of Waco, Texas, killing both pilots
and five passengers, all in active Army service.  The tower warning lights
required by government regulations were inoperative.  The case was
resolved through a successful, confidential settlement.

26.     ***Air Algerie Boeing 737 Crash***. Together with French co-counsel, Lieff
Cabraser represented the families of several passengers who died in the
March 6, 2003 crash of a Boeing 737 airplane operated by Air Algerie. The
aircraft crashed soon after takeoff from the Algerian city of Tamanrasset,
after one of the engines failed. All but one of the 97 passengers were
killed, along with six crew members. The families represented by Lieff
Cabraser obtained economic recoveries in a settlement of the case.

27.     ***In re Baycol Products Litigation***, MDL No. 1431 (D. Minn.).  Baycol
was one of a group of drugs called statins, intended to reduce cholesterol.
In August 2001, Bayer A.G. and Bayer Corporation, the manufacturers of
Baycol, withdrew the drug from the worldwide market based upon reports
that Baycol was associated with serious side effects and linked to the
deaths of over 100 patients worldwide.  In the federal multidistrict
litigation, **Lieff Cabraser served as a member of the Plaintiffs' Steering**

Committee (PSC) and the Executive Committee of the PSC.  In addition, Lieff Cabraser represented approximately 200 Baycol patients who have suffered injuries or family members of patients who died allegedly as a result of ingesting Baycol.  In these cases, our clients reached confidential favorable settlements with Bayer.

28.  ***United Airlines Boeing 747 Disaster***. Lieff Cabraser served as Plaintiffs' Liaison Counsel on behalf of the passengers and families of passengers injured and killed in the United Airlines Boeing 747 cargo door catastrophe near Honolulu, Hawaii on February 24, 1989. Lieff Cabraser organized the litigation of the case, which included claims brought against United Airlines and The Boeing Company.

Among our work, we developed a statistical system for settling the passengers' and families' damages claims with certain defendants, and coordinated the prosecution of successful individual damages trials for wrongful death against the non-settling defendants.

29.  ***Aeroflot-Russian International Airlines Airbus Disaster***. Lieff Cabraser represented the families of passengers who were on Aeroflot-Russian International Airlines Flight SU593 that crashed in Siberia on March 23, 1994. The plane was en route from Moscow to Hong Kong. All passengers on board died.

According to a transcript of the cockpit voice recorder, the pilot's two children entered the cockpit during the flight and took turns flying the plane. The autopilot apparently was inadvertently turned off during this time, and the pilot was unable to remove his son from the captain's seat in time to avert the plane's fatal dive.

Lieff Cabraser, alongside French co-counsel, filed suit in France, where Airbus, the plane's manufacturer, was headquartered.  The families Lieff Cabraser represented obtained substantial economic recoveries in settlement of the action.

30.  ***Lockheed F-104 Fighter Crashes***.  In the late 1960s and extending into the early 1970s, the United States sold F-104 Star Fighter jets to the German Air Force that were manufactured by Lockheed Aircraft Corporation in California. Although the F-104 Star Fighter was designed for high-altitude fighter combat, it was used in Germany and other European countries for low-level bombing and attack training missions.

Consequently, the aircraft had an extremely high crash rate, with over 300 pilots killed. Commencing in 1971, the law firm of Belli Ashe Ellison Choulos & Lieff filed hundreds of lawsuits for wrongful death and other claims on behalf of the widows and surviving children of the pilots.

Robert Lieff continued to prosecute the cases after the formation of our firm.  In 1974, the lawsuits were settled with Lockheed on terms favorable to the plaintiffs.  This litigation helped establish the principle that citizens of foreign countries could assert claims in United States courts and obtain substantial recoveries against an American manufacturer, based upon airplane accidents or crashes occurring outside the United States.

## II.    Securities and Financial Fraud

### A.    Current Cases

1. ***The Charles Schwab Corp. v. BNP Paribas Sec. Corp.***, No. CGC-10-501610 (Cal. Super. Ct.); ***The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.***, No. CGC-10-503206 (Cal. Super. Ct.); ***The Charles Schwab Corp. v. J.P. Morgan Sec., Inc.***, No. CGC-10-503207 (Cal. Super. Ct.); and ***The Charles Schwab Corp. v. Banc of America Sec. LLC***, No. CGC-10-501151 (Cal. Super. Ct.).  Lieff Cabraser, along with co-counsel, represents Charles Schwab in four separate individual securities actions against certain issuers and sellers of mortgage-backed securities for materially misrepresenting the quality of the loans underlying the securities in violation of California state law.  Charles Schwab Bank, N.A., a subsidiary of Charles Schwab, suffered significant damages by purchasing the securities in reliance on defendants' misstatements.  The Court largely overruled defendants' demurrers in January 2012.  Narrowed discovery regarding the defendants' loan files and documents from Charles Schwab pertaining to a potential statute of limitations defense commenced thereafter.  A trial is scheduled for February 2016.

2. ***Honeywell International Inc. Defined Contribution Plans Master Savings Trust. v. Merck & Co.***, No. 14-cv 2523-SRC-CLW (S.D.N.Y.); ***Janus Balanced Fund v. Merck & Co.***, No. 14-cv-3019-SRC-CLW (S.D.N.Y.); ***Lord Abbett Affiliated Fund v. Merck & Co.***, No. 14-cv-2027-SRC-CLW (S.D.N.Y.); ***Nuveen Dividend Value Fund (f/k/a Nuveen Equity Income Fund), on its own behalf and as successor in interest to Nuveen Large Cap Value Fund (f/k/a First American Large Cap Value Fund) v. Merck & Co.***, No. 14-cv-1709-SRC-CLW (S.D.N.Y.).  Lieff Cabraser represents Lord Abbett, Janus, and Nuveen funds and Honeywell trusts in separate, individual actions against Merck and certain of its officers for allegedly misrepresenting and omitting material information about the adverse cardiovascular effects of Merck's pharmaceutical drug Vioxx.  The complaints charge defendants with violations of the Exchange Act.  Fact discovery in the cases has been completed and the parties are preparing for trial in 2016.

3.  ***The Regents of the University of California v. American International Group***, No. 1:14-cv-01270-LTS-DCF (S.D.N.Y.).  Lieff Cabraser represents The Regents of the University of California in an individual action against American International Group, Inc. ("AIG") and certain of its officers and directors for misrepresenting and omitting material information about AIG's financial condition and the extent of its exposure to the subprime mortgage market. The complaint charges defendants with violations of the Exchange Act, as well as common law fraud and unjust enrichment.

4.  ***Arkansas Teacher Retirement System v. State Street Corp.***, No. 11cv10230 (MLW) (D. Mass.).  Lieff Cabraser is co-counsel for a proposed nationwide class of institutional custodial customers of State Street, including public pension funds and ERISA plans, who allege that defendants deceptively charged class members on FX trades done in connection with the purchase and sale of foreign securities.

    Similar to the action against BNY Mellon described above, the complaint charges that between 1999 and 2009, State Street consistently incorporated hidden and excessive mark-ups or mark-downs relative to the actual FX rates applicable at the times of the trades conducted for State Street's custodial FX clients. State Street allegedly kept for itself, as an unlawful profit, the "spread" between the prices for foreign currency available to it in the FX marketplace and the rates it charged to its customers.

    Plaintiffs seek recovery under Massachusetts' Consumer Protection Law and common law tort and contract theories. In May 2012, the Court denied State Street's motion to dismiss in all substantive respects. Since that time, the parties have been engaged in mediation and discovery. Lieff Cabraser is also actively involved in counseling other state pension and ERISA funds with respect to their potential exposure to FX manipulation by custodial service providers.

5.  ***In re Facebook, Inc. IPO Securities And Derivative Litigation***, MDL No. 12-2389 (RWS) (S.D.N.Y.).  Lieff Cabraser is counsel for proposed class representatives in the securities class litigation arising under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") concerning Facebook's initial public offering in May 2012.  In December 2013, the court denied defendants' motions to dismiss plaintiffs' consolidated class action complaint.  The parties are currently engaged in discovery and briefing plaintiffs' motion for class certification.

## B.   Successes

1.  ***In re First Capital Holdings Corp. Financial Products Securities Litigation***, MDL No. 901 (C.D. Cal.).  Lieff Cabraser served

as Co-Lead Counsel in a class action brought to recover damages sustained by policyholders of First Capital Life Insurance Company and Fidelity Bankers Life Insurance Company policyholders resulting from the insurance companies' allegedly fraudulent or reckless investment and financial practices, and the manipulation of the companies' financial statements.  This policyholder settlement generated over $1 billion in restored life insurance policies. The  settlement was approved by both federal and state courts in parallel proceedings and then affirmed by the Ninth Circuit on appeal.

2.    ***In re Bank of New York Mellon Corp. Foreign Exchange Transactions Litigation***, Case No.  MD-12-2335-LAK (S.D.N.Y.). Lieff Cabraser served as co-lead class counsel for a proposed nationwide class of institutional custodial customers of The Bank of New York Mellon Corporation ("BNY Mellon").  The litigation stemmed from alleged deceptive overcharges imposed by BNY Mellon on foreign currency exchanges (FX) that were done in connection with custodial customers' purchases or sales of foreign securities. Plaintiffs alleged that for more than a decade, BNY Mellon consistently charged its custodial customers hidden and excessive mark-ups on exchange rates for FX trades done pursuant to "standing instructions," using "range of the day" pricing, rather than the rates readily available when the trades were actually executed.

In addition to serving as co-lead counsel for a nationwide class of affected custodial customers, which included public pension funds, ERISA funds, and other public and private institutions, Lieff Cabraser was one of three firms on Plaintiffs' Executive Committee tasked with managing all activities on the plaintiffs' side in the multidistrict consolidated litigation. Prior to the cases being transferred and consolidated in the Southern District of New York, Lieff Cabraser defeated, in its entirety, BNY Mellon's motion to dismiss claims brought on behalf of ERISA and other funds under California's and New York's consumer protection laws.

The firm's clients and class representatives in the consolidated litigation included the Ohio Police & Fire Pension Fund, the School Employees Retirement System of Ohio, and the International Union of Operating Engineers, Stationary Engineers Local 39 Pension Trust Fund.

In March 2015, a global resolution of the private and governmental enforcement actions against BNY Mellon was announced, in which $504 million will be paid back to BNY Mellon customers ($335 million of which is directly attributable to the class litigation).

On September 24, 2015, U.S. District Court Judge Lewis A. Kaplan granted final approval [link to order] to the settlement. Commenting on the work of plaintiffs' counsel, Judge Kaplan stated, "This really was an

extraordinary case in which plaintiff's counsel performed, at no small risk, an extraordinary service, and they ought to be compensated for it for all the reasons that Ms. Cabraser has said. They did a wonderful job in this case, and I've seen a lot of wonderful lawyers over the years. This was a great performance. They were fought tooth and nail at every step of the road. It undoubtedly vastly expanded the costs of the case, but it's an adversary system, and sometimes you meet adversaries who are heavily armed and well financed, and if you're going to win, you have to fight them and it costs money.... This was an outrageous wrong committed by the Bank of New York Mellon, and plaintiffs' counsel deserve a world of credit for taking it on, for running the risk, for financing it and doing a **great job.** "

3. ***In re Broadcom Corporation Derivative Litigation***, No. CV 06-3252-R (C.D. Cal.).  Lieff Cabraser served as Court-appointed Lead Counsel in a shareholders derivative action arising out of stock options backdating in Broadcom securities.  The complaint alleged that defendants intentionally manipulated their stock option grant dates between 1998 and 2003 at the expense of Broadcom and Broadcom shareholders. By making it seem as if stock option grants occurred on dates when Broadcom stock was trading at a comparatively low per share price, stock option grant recipients were able to exercise their stock option grants at exercise prices that were lower than the fair market value of Broadcom stock on the day the options were actually granted.  In December 2009, U.S. District Judge Manuel L. Real granted final approval to a partial settlement in which Broadcom Corporation's insurance carriers paid $118 million to Broadcom.  The settlement released certain individual director and officer defendants covered by Broadcom's directors' and officers' policy.

Plaintiffs' counsel continued to pursue claims against William J. Ruehle, Broadcom's former Chief Financial Officer, Henry T. Nicholas, III, Broadcom's co-founder and former Chief Executive Officer, and Henry Samueli, Broadcom's co-founder and former Chief Technology Officer.  In May 2011, the Court approved a settlement with these defendants.  The settlement provided substantial consideration to Broadcom, consisting of the receipt of cash and cancelled options from Dr. Nicholas and Dr. Samueli totaling $53 million in value, plus the release of a claim by Mr. Ruehle, which sought damages in excess of $26 million.

Coupled with the earlier $118 million partial settlement, the total recovery in the derivative action was $197 million, which constitutes the third-largest settlement ever in a derivative action involving stock options backdating.

4.    ***In re Scorpion Technologies Securities Litigation I***, No. C-93-20333-EAI (N.D. Cal.); ***Dietrich v. Bauer***, No. C-95-7051-RWS (S.D.N.Y.); ***Claghorn v. Edsaco***, No. 98-3039-SI (N.D. Cal.).  Lieff Cabraser served as Lead Counsel in class action suits arising out of an alleged fraudulent scheme by Scorpion Technologies, Inc., certain of its officers, accountants, underwriters and business affiliates to inflate the company's earnings through reporting fictitious sales.  In Scorpion I, the Court found plaintiffs had presented sufficient evidence of liability under Federal securities acts against the accounting firm Grant Thornton for the case to proceed to trial.  In re Scorpion Techs., 1996 U.S. Dist. LEXIS 22294 (N.D. Cal. Mar. 27, 1996).  In 1988, the Court approved a $5.5 million settlement with Grant Thornton.  In 2000, the Court approved a $950,000 settlement with Credit Suisse First Boston Corporation.  In April 2002, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd.  The jury found that Edsaco aided Scorpion in setting up phony European companies as part of a scheme in which Scorpion reported fictitious sales of its software to these companies, thereby inflating its earnings.  Included in the jury verdict, one of the largest verdicts in the U.S. in 2002, was $165 million in punitive damages.  Richard M. Heimann conducted the trial for plaintiffs.

On June 14, 2002, U.S. District Court Judge Susan Illston commented on Lieff Cabraser's representation:  "[C]ounsel for the plaintiffs did a very good job in a very tough situation of achieving an excellent recovery for the class here.  You were opposed by extremely capable lawyers.  It was an uphill battle.  There were some complicated questions, and then there was the tricky issue of actually collecting anything in the end.  I think based on the efforts that were made here that it was an excellent result for the class. . .  [T]he recovery that was achieved for the class in this second trial is remarkable, almost a hundred percent."

5.    ***In re Diamond Foods, Inc., Securities Litigation***, No. 11-cv-05386-WHA (N.D. Cal.).  Lieff Cabraser served as local counsel for Lead Plaintiff **Public Employees' Retirement System of** Mississippi ("MissPERS") and the class of investors it represented in this securities class action lawsuit arising under the PSLRA.  The complaint charged Diamond Foods and certain senior executives of the company with violations of the Exchange Act for knowingly understating the cost of walnuts Diamond Foods purchased in order to inflate the price of **Diamond Foods' common stock.  In January 2014, the Court granted final** approval of a settlement of the action requiring Diamond Foods to pay $11 million in cash and issue 4.45 million common shares worth $116.3 **million on the date of final approval based on the stock's closing price on** that date.

6.  ***Merrill Lynch Fundamental Growth Fund and Merrill Lynch Global Value Fund  v. McKesson HBOC***, No. 02-405792 (Cal. Supr. Ct.).  Lieff Cabraser served as counsel for two Merrill Lynch sponsored mutual funds in a private lawsuit alleging that a massive accounting fraud occurred at HBOC & Company ("HBOC") before and following its 1999 acquisition by McKesson Corporation ("McKesson").  The funds charged that defendants, including the former CFO of McKesson HBOC, the name McKesson adopted after acquiring HBOC, artificially inflated the price of securities in McKesson HBOC, through misrepresentations and omissions concerning the financial condition of HBOC, resulting in approximately $135 million in losses for plaintiffs.  In a significant discovery ruling in 2004, the California Court of Appeal held that defendants waived the attorney-client and work product privileges in regard to an audit committee report and interview memoranda prepared in anticipation of shareholder lawsuits by disclosing the information to the U.S. Attorney and SEC.  ***McKesson HBOC, Inc. v. Supr. Court***, 115 Cal. App. 4th 1229 (2004).  Lieff Cabraser's clients recovered approximately $145 million, representing nearly 104% of damages suffered by the funds.  This amount was approximately $115-120 million more than the Merrill Lynch funds would have recovered had they participated in the federal class action settlement.

7.  ***Informix/Illustra Securities Litigation***, No. C-97-1289-CRB (N.D. Cal.).  Lieff Cabraser represented Richard H. Williams, the former Chief Executive Officer and President of Illustra Information Technologies, Inc. ("Illustra"), and a class of Illustra shareholders in a class action suit on behalf of all former Illustra securities holders who tendered their Illustra preferred or common stock, stock warrants or stock options in exchange for securities of Informix Corporation ("Informix") in connection with Informix's 1996 purchase of Illustra.  Pursuant to that acquisition, Illustra stockholders received Informix securities representing approximately 10% of the value of the combined company.  The complaint alleged claims for common law fraud and violations of Federal securities law arising out of the acquisition.  In October 1999, U.S. District Judge Charles E. Breyer approved a global settlement of the litigation for $136 million, constituting one of the largest settlements ever involving a high technology company alleged to have committed securities fraud.  Our clients, the Illustra shareholders, received approximately 30% of the net settlement fund.

8.  ***In re Qwest Communications International Securities and "ERISA" Litigation (No. II)***, No. 06-cv-17880-REB-PAC (MDL No. 1788) (D. Colo.).  Lieff Cabraser represented the New York State Common Retirement Fund, Fire and Police Pension Association of Colorado, Denver Employees' Retirement Plan, San Francisco Employees' Retirement System, and over thirty BlackRock managed mutual funds in

individual securities fraud actions ("opt out" cases) against Qwest Communications International, Inc., Philip F. Anschutz, former co-chairman of the Qwest board of directors, and other senior executives at Qwest. In each action, the plaintiffs charged defendants with massively overstating Qwest's publicly-reported growth, revenues, earnings, and earnings per share from 1999 through 2002. The cases were filed in the wake of a $400 million settlement of a securities fraud class action against Qwest that was announced in early 2006. The cases brought by Lieff Cabraser's clients settled in October 2007 for recoveries totaling more than $85 million, or more than 13 times what the clients would have received had they remained in the class.

9.   ***In re AXA Rosenberg Investor Litigation***, No. CV 11-00536 JSW (N.D. Cal). Lieff Cabraser served as Co-Lead Counsel for a class of institutional investors, ERISA-covered plans, and other investors in quantitative funds managed by AXA Rosenberg Group, LLC and its affiliates ("AXA"). Plaintiffs alleged that AXA breached its fiduciary duties and violated ERISA by failing to discover a material computer error that existed in its system for years, and then failing to remedy it for months after its eventual discovery in 2009. By the time AXA disclosed the error in 2010, investors had suffered losses and paid substantial investment management fees to AXA. After briefing motions to dismiss and working with experts to analyze data obtained from AXA relating to the impact of the error, we reached a $65 million settlement with AXA that the Court approved in April 2012.

10.   ***In re National Century Financial Enterprises, Inc. Investment Litigation***, MDL No. 1565 (S.D. Ohio). Lieff Cabraser served as outside counsel for the New York City Employees' Retirement System, Teachers' Retirement System for the City of New York, New York City Police Pension Fund, and New York City Fire Department Pension Fund in this multidistrict litigation arising from fraud in connection with NCFE's issuance of notes backed by healthcare receivables. The New York City Pension Funds recovered more than 70% of their $89 million in losses, primarily through settlements achieved in the federal litigation and another NCFE-matter brought on their behalf by Lieff Cabraser.

11.   ***BlackRock Global Allocation Fund v. Tyco International Ltd., et al.***, No. 2:08-cv-519 (D. N.J.); ***Nuveen Balanced Municipal and Stock Fund v. Tyco International Ltd., et al.***, No. 2:08-cv-518 (D. N.J.). Lieff Cabraser represented multiple funds of the investment firms BlackRock Inc. and Nuveen Asset Management in separate, direct securities fraud actions against Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd, Covidien (U.S.), L. Dennis Kozlowski, Mark H. Swartz, and Frank E. Walsh, Jr. Plaintiffs alleged that defendants engaged in a massive criminal enterprise that combined the theft of corporate assets

with fraudulent accounting entries that concealed Tyco's financial condition from investors. As a result, plaintiffs purchased Tyco common stock and other Tyco securities at artificially inflated prices and suffered losses upon disclosures revealing Tyco's true financial condition and defendants' misconduct. In 2009, the parties settled the claims against the corporate defendants (Tyco International Ltd., Tyco Electronics Ltd., Covidien Ltd., and Covidien (U.S.). The litigation concluded in 2010. The total settlement proceeds paid by all defendants were in excess of $57 million.

12.     ***Kofuku Bank and Namihaya Bank v. Republic New York Securities Corp.***, No. 00 CIV 3298 (S.D.N.Y.): and Kita Hyogo Shinyo-Kumiai v. Republic New York Securities Corp., No. 00 CIV 4114 (S.D.N.Y.). Lieff Cabraser represented Kofuku Bank, Namihaya Bank and Kita Hyogo Shinyo-Kumiai (a credit union) in individual lawsuits against, among others, Martin A. Armstrong and HSBC, Inc., the successor-in-interest to Republic New York Corporation, Republic New York Bank and Republic New York Securities Corporation for alleged violations of federal securities and racketeering laws. Through a group of interconnected companies owned and controlled by Armstrong—the Princeton Companies—Armstrong and the Republic Companies promoted and sold promissory notes, known as the "Princeton Notes," to more than eighty of the largest companies and financial institutions in Japan. Lieff Cabraser's lawsuits, as well as the lawsuits of dozens of other Princeton Note investors, alleged that the Princeton and Republic Companies made fraudulent misrepresentations and non-disclosures in connection with the promotion and sale of Princeton Notes, and that investors' monies were commingled and misused to the benefit of Armstrong, the Princeton Companies and the Republic Companies. In December 2001, the claims of our clients and those of the other Princeton Note investors were settled. As part of the settlement, our clients recovered more than $50 million, which represented 100% of the value of their principal investments less money they received in interest or other payments.

13.     ***Alaska State Department of Revenue v. America Online***, No. 1JU-04-503 (Alaska Supr. Ct.). In December 2006, a $50 million settlement was reached in a securities fraud action brought by the Alaska State Department of Revenue, Alaska State Pension Investment Board and Alaska Permanent Fund Corporation against defendants America Online, Inc. ("AOL"), Time Warner Inc. (formerly known as AOL Time Warner ("AOLTW")), Historic TW Inc. When the action was filed, the Alaska Attorney General estimated total losses at $70 million. The recovery on behalf of Alaska was approximately 50 times what the state would have received as a member of the class in the federal securities class action settlement. The lawsuit, filed in 2004 in Alaska State Court, alleged that defendants misrepresented advertising revenues and growth

of AOL and AOLTW along with the number of AOL subscribers, which artificially inflated the stock price of AOL and AOLTW to the detriment of Alaska State funds.

The Alaska Department of Law retained Lieff Cabraser to lead the litigation efforts under its direction. "We appreciate the diligence and expertise of our counsel in achieving an outstanding resolution of the case," said Mark Morones, spokesperson for the Department of Law, following announcement of the settlement.

14. ***Allocco v. Gardner***, No. GIC 806450 (Cal. Supr. Ct.). Lieff Cabraser represented Lawrence L. Garlick, the co-founder and former Chief Executive Officer of Remedy Corporation and 24 other former senior executives and directors of Remedy Corporation in a private (non-class) securities fraud lawsuit against Stephen P. Gardner, the former Chief Executive Officer of Peregrine Systems, Inc., John J. Moores, Peregrine's former Chairman of the Board, Matthew C. Gless, Peregrine's former Chief Financial Officer, Peregrine's accounting firm Arthur Andersen and certain entities that entered into fraudulent transactions with Peregrine. The lawsuit, filed in California state court, arose out of Peregrine's August 2001 acquisition of Remedy. Plaintiffs charged that they were induced to exchange their Remedy stock for Peregrine stock on the basis of false and misleading representations made by defendants. Within months of the Remedy acquisition, Peregrine began to reveal to the public that it had grossly overstated its revenue during the years 2000-2002, and eventually restated more than $500 million in revenues.

After successfully defeating demurrers brought by defendants, including third parties who were customers of Peregrine who aided and abetted Peregrine's accounting fraud under California common law, plaintiffs reached a series of settlements. The settling defendants included Arthur Andersen, all of the director defendants, three officer defendants and the third party customer defendants KPMG, British Telecom, Fujitsu, Software Spectrum and Bindview. The total amount received in settlements was approximately $45 million.

15. ***In re Cablevision Systems Corp. Shareholder Derivative Litigation***, No. 06-cv-4130-DGT-AKT (E.D.N.Y.). Lieff Cabraser served as Co-Lead Counsel in a shareholders' derivative action against the board of directors and numerous officers of Cablevision. The suit alleged that defendants intentionally manipulated stock option grant dates to Cablevision employees between 1997 and 2002 in order to enrich certain officer and director defendants at the expense of Cablevision and Cablevision shareholders. According to the complaint, Defendants made it appear as if stock options were granted earlier than they actually were in order to maximize the value of the grants. In September 2008, the

Court granted final approval to a $34.4 million settlement of the action. Over $24 million of the settlement was contributed directly by individual defendants who either received backdated options or participated in the backdating activity.

16.   ***In re Media Vision Technology Securities Litigation***, No. CV-94-1015 (N.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit which alleged that certain Media Vision's officers, outside directors, accountants and underwriters engaged in a fraudulent scheme to inflate the company's earnings and issued false and misleading public statements about the company's finances, earnings and profits.  By 1998, the Court had approved several partial settlements with many of Media Vision's officers and directors, accountants and underwriters which totaled $31 million.  The settlement proceeds have been distributed to eligible class members.  The evidence that Lieff Cabraser developed in the civil case led prosecutors to commence an investigation and ultimately file criminal charges against Media Vision's former Chief Executive Officer and Chief Financial Officer.  The civil action against Media Vision's CEO and CFO was stayed pending the criminal proceedings against them.  In the criminal proceedings, the CEO pled guilty on several counts, and the CFO was convicted at trial.  In October 2003, the Court granted Plaintiffs' motions for summary judgment and entered a judgment in favor of the class against the two defendants in the amount of $188 million.

17.   ***In re California Micro Devices Securities Litigation***, No. C-94-2817-VRW (N.D. Cal.).  Lieff Cabraser served as Liaison Counsel for the Colorado Public Employees' Retirement Association and the California State Teachers' Retirement System, and the class they represented.  Prior to 2001, the Court approved $19 million in settlements.  In May 2001, the Court approved an additional settlement of $12 million, which, combined with the earlier settlements, provided class members an almost complete return on their losses.  The settlement with the company included multi-million dollar contributions by the former Chairman of the Board and Chief Executive Officer.

Commenting in 2001 on Lieff Cabraser's work in Cal Micro Devices, U.S. District Court Judge Vaughn R. Walker stated, "It is highly unusual for a class action in the securities area to recover anywhere close to the percentage of loss that has been recovered here, and counsel and the lead plaintiffs have done an admirable job in bringing about this most satisfactory conclusion of the litigation."  One year later, in a related proceeding and in response to the statement that the class had received nearly a 100% recovery, Judge Walker observed, "That's pretty remarkable.  In these cases, 25 cents on the dollar is considered to be a magnificent recovery, and this is [almost] a hundred percent."

18.   ***In re Network Associates, Inc. Securities Litigation***, No. C-99-1729-WHA (N.D. Cal.).  Following a competitive bidding process, the Court appointed Lieff Cabraser as Lead Counsel for the Lead Plaintiff and the class of investors.  The complaint alleged that Network Associates improperly accounted for acquisitions in order to inflate its stock price. In May 2001, the Court granted approval to a $30 million settlement.

In reviewing the ***Network Associates*** settlement, U.S. District Court Judge William H. Alsup observed, "[T]he class was well served at a good price by excellent counsel . . .  We have class counsel who's one of the foremost law firms in the country in both securities law and class actions. And they have a very excellent reputation for the conduct of these kinds of cases . . ."

19.   ***In re FPI/Agretech Securities Litigation***, MDL No. 763 (D. Haw., Real, J.).  We served as Lead Class Counsel for investors defrauded in a "Ponzi-like" limited partnership investment scheme. The Court approved $15 million in partial, pretrial settlements. At trial, the jury returned a $24 million verdict, which included $10 million in punitive damages, against non-settling defendant Arthur Young & Co. for its knowing complicity and active and substantial assistance in the marketing and sale of the worthless limited partnership offerings. The Appellate Court affirmed the compensatory damages award and remanded the case for a retrial on punitive damages. In 1994, the Court approved a $17 million settlement with Ernst & Young, the successor to Arthur Young & Co.

20.   ***Nguyen v. FundAmerica***, No. C-90-2090 MHP (N.D. Cal., Patel, J.), 1990 Fed. Sec. L. Rep. (CCH) ¶¶ 95,497, 95,498 (N.D. Cal. 1990).  Lieff Cabraser served as Plaintiffs' Class Counsel in this securities/RICO/tort action seeking an injunction against alleged unfair "pyramid" marketing practices and compensation to participants.  The District Court certified a nationwide class for injunctive relief and damages on a mandatory basis and enjoined fraudulent overseas transfers of assets.  The Bankruptcy Court permitted class proof of claims. Lieff Cabraser obtained dual District Court and Bankruptcy Court approval of settlements distributing over $13 million in FundAmerica assets to class members.

21.   ***In re Brooks Automation, Inc. Securities Litigation***, No. 06 CA 11068 (D. Mass.).  Lieff Cabraser served as Court-Appointed Lead Counsel for Lead Plaintiff the Los Angeles County Employees Retirement Association and co-plaintiff Sacramento County Employees' Retirement System in a class action lawsuit on behalf of purchasers of Brooks Automation securities.  Plaintiffs charged that Brooks Automation, its senior corporate officers and directors violated federal securities laws by backdating company stock options over a six-year period, and failed to disclose the scheme in publicly filed financial statements.  Subsequent to

Lieff Cabraser's filing of a consolidated amended complaint in this action, both the Securities and Exchange Commission and the United States Department of Justice filed complaints against the Company's former C.E.O., Robert Therrien, related to the same alleged practices. In October 2008, the Court approved a $7.75 million settlement of the action.

22.   ***In re A-Power Energy Generation Systems, Ltd. Securities Litigation***, No. 2:11-ml-2302-GW- (CWx) (C.D. Cal.). Lieff Cabraser served as Court-appointed Lead Counsel for Lead Plaintiff in this securities class action that charged defendants with materially misrepresenting A-Power Energy Generation Systems, Ltd.'s financial results and business prospects in violation of the antifraud provisions of the Securities Exchange Act of 1934. The Court approved a $3.675 million settlement in August 2013.

23.   ***Biotechnology Value Fund, L.P. v. Celera Corp.***, 3:13-cv-03248-WHA (N.D. Cal.). Lieff Cabraser represented a group of affiliated funds investing in biotechnology companies in this individual action arising from misconduct in connection with Quest Diagnostics Inc.'s 2011 acquisition of Celera Corporation. Celera, Celera's individual directors, and Credit Suisse were charged with violations of Sections 14(e) and 20(a) of the Exchange Act and breach of fiduciary duty. In February 2014, the Court denied in large part defendants' motion to dismiss the second amended complaint. In September 2014, the plaintiffs settled with Credit Suisse for a confidential amount. After the completion of fact and expert discovery, and prior to a ruling on defendants' motion for summary judgment, the plaintiffs settled with the Celera defendants in January 2015 for a confidential amount.

24.   ***Bank of America-Merrill Lynch Merger Securities Cases***. In two cases -- *DiNapoli, et al. v. Bank of America Corp.*, No. 10 CV 5563 (S.D. N.Y.) and *Schwab S&P 500 Index Fund, et al. v. Bank of America Corp., et al.*, No. 11-cv- 07779 PKC (S.D. N.Y.). -- Lieff Cabraser sought recovery on a direct, non-class basis for losses that a number of public pension funds and mutual funds incurred as a result of Bank of America's alleged misrepresentations and concealment of material facts in connection with its acquisition of Merrill Lynch & Co., Inc. Lieff Cabraser represented the New York State Common Retirement Fund, the New York State Teachers' Retirement System, the Public Employees' Retirement Association of Colorado, and fourteen mutual funds managed by Charles Schwab Investment Management. Both cases settled in 2013 on confidential terms favorable for our clients.

25.   ***Albert v. Alex. Brown Management Services; Baker v. Alex. Brown Management Services*** (Del. Ch. Ct.). In May 2004, on behalf of investors in two investment funds controlled, managed and operated by

Deutsche Bank and advised by DC Investment Partners, Lieff Cabraser filed lawsuits for alleged fraudulent conduct that resulted in an aggregate loss of hundreds of millions of dollars.  The suits named as defendants Deutsche Bank and its subsidiaries Alex. Brown Management Services and Deutsche Bank Securities, members of the funds' management committee, as well as DC Investments Partners and two of its principals.  Among the plaintiff-investors were 70 high net worth individuals.  In the fall of 2006, the cases settled by confidential agreement.

## III.   Employment Discrimination and Unfair Employment Practices

### A.   Current Cases

1.   ***Chen-Oster v. Goldman Sachs***, No. 10-6950 (S.D.N.Y.).  Lieff Cabraser serves as Co-Lead Counsel for plaintiffs in a gender discrimination class action lawsuit against Goldman Sachs.  The complaint alleges that Goldman Sachs has engaged in systemic and pervasive discrimination against its female professional employees in violation of Title VII of the Civil Rights Act of 1964 and the New York City Human Rights Law.  The complaint charges that, among other things, Goldman Sachs pays its female professionals less than similarly situated males, disproportionately promotes men over equally or more qualified women, and offers better business opportunities and professional support to its male professionals.  In 2012, the Court denied defendant's motion to strike class allegations.  On March 10, 2015, Magistrate Judge James C. Francis IV issued a recommendation against certifying the class.  Review of the Magistrate Judge's recommendation to deny plaintiffs' motion for class certification is pending before U.S. District Court Judge Analisa Torres.

2.   ***Moussouris v. Microsoft Corp.,*** No. 15-cv-01483 (W.D. Wash.).  Lieff Cabraser and co-counsel represent a former female Microsoft technical professional in a gender discrimination class action lawsuit on behalf of herself and all current and former female technical professionals employed by Microsoft in the U.S. since September 16, 2009.  The complaint alleges that Microsoft has engaged in systemic and pervasive discrimination against female employees in technical and engineering roles with respect to performance evaluations, pay, promotions, and other terms and conditions of employment. The unchecked gender bias that pervades Microsoft's corporate culture has resulted in female technical professionals receiving less compensation than similar men, the promotion of men over equally or more qualified women, and less favorable performance evaluation of female technical professionals compared to male peers.  Microsoft's continuing policy, pattern, and practice of sex discrimination against female technical employees, the complaint alleges, violates federal and state laws, including Title VII of

the Civil Rights Act of 1964 and the Washington Law Against Discrimination.

3. ***Benedict v. Hewlett-Packard Company***, No. C13-0119 (N.D. Cal.). Lieff Cabraser represents former Hewlett-Packard ("HP") technical support employees who filed a nationwide class action lawsuit charging that HP failed to pay them and other former and current technical support employees for all overtime hours worked in violation of the federal Fair Labor Standards Act **("FLSA")** and state law. The complaint charges that HP has a common practice of misclassifying its technical support workers as exempt and refusing to pay them overtime. On **February 13, 2014, the Court granted plaintiffs' motion for** conditional certification of a FSLA overtime action.

4. ***Kassman v. KPMG, LLP***, Case No. 11-03743 (S.D.N.Y.). Lieff Cabraser serves as Co-Lead Counsel for plaintiffs in a gender discrimination class and collective action lawsuit alleging that KPMG has engaged in systemic and pervasive discrimination against its female Client Service and Support Professionals in pay and promotion, discrimination based on pregnancy, and chronic failure to properly investigate and resolve complaints of discrimination and harassment. The complaint alleges violations of the Equal Pay Act, Title VII of the Civil Rights Act of 1964, the New York Executive Law § 296, and the New York City Administrative Code § 8-107. For purposes of the Equal Pay Act claim, plaintiffs represent a conditionally-certified collective of over 1,300 female Client Service and Support Professionals who have opted in to the lawsuit. In addition to bringing the Title VII and New York statutory claims on their own behalf, plaintiffs seek to represent a class of current and former exempt female Client Service and Support Professionals, including Associates, Senior Associates, Managers, Senior Managers, and Managing **Directors in KPMG's Tax and Advisory functions.**

5. ***Zaborowski v. MHN Government Services***, No. 12-CV-05109-SI (N.D. Cal.) Lieff Cabraser represents current and former Military and **Family Life Consultants ("MFLCs") in a class action lawsuit against MHN Government Services, Inc., ("MHN") and Managed Health Network, Inc.,** seeking overtime pay under the federal Fair Labor Standards Act and state laws. The complaint charges that MHN has misclassified the MFLCs **as independent contractors and as "exempt" from overtime and failed to** pay them overtime pay for hours worked over 40 per week. In April 2013, the Court denied MHN's motion to compel arbitration and granted plaintiff's motion for conditional certification of a FLSA collective action. In December 2014, the U.S. Court of Appeals for the Ninth Circuit affirmed the Court's denial of MHN's motion to compel arbitration.

6.    ***Tatum v. R.J. Reynolds Tobacco Company***, No. 1:02-cv-00373-NCT (M.D. N.C.).  Lieff Cabraser serves as Co-Lead Trial Counsel in this class action on behalf of over 3,500 employees of R.J. Reynolds Tobacco **Company ("RJR") brought under the Employment** Retirement Income Security Act.  Plaintiffs allege that RJR breached its duty of prudence in administering the employee 401(k) retirement plan when it liquidated two funds held by the plan on an arbitrary timeline without conducting a thorough investigation, thereby causing a substantial loss to the plan.  The 6-week bench trial occurred in January-February 2010 and December 2010, and post-trial briefing concluded in February 2011.

In February 2013, the District Court issued a decision in favor of RJR.  The District Court found that RJR breached its fiduciary duty of procedural prudence but concluded that a reasonable and prudent fiduciary could have made the same decision as RJR made.  Plaintiffs appealed.  In August 2014, the U.S. Court of Appeals for the Fourth Circuit affirmed the holding that RJR breached its duty of procedural prudence and therefore bore the burden of proof as to causation.  The Court of Appeals found that the District Court failed to apply the correct **legal standard in assessing RJR's** liability, reversed the judgment in favor of RJR, and remanded the case to the District Court for further proceedings.

RJR sought review by the U.S. Supreme Court of the appellate court's fiduciary duty standard. On June 29, 2015, the Court denied RJR's petition for a writ of certiorari. The case, originally filed in 2002, now returns to the District Court for a new liability verdict.

7.    ***Strauch v. Computer Sciences Corporation***, No. 2:14-cv-00956 (D. Conn.).  In 2005, Computer Sciences Corporation **("CSC") settled for $24** million a nationwide class and collective action lawsuit alleging that CSC misclassified thousands of its information technology support workers as exempt from overtime pay in violation of in violation of the federal Fair Labor Stan**dards Act ("FLSA") and state law.**  Notwithstanding that settlement, a complaint filed on behalf of current and former CSC IT worker in 2014 by Lieff Cabraser and co-counsel alleges that CSC misclassifies many information technology support workers as exempt even though they perform primarily nonexempt work.  Plaintiffs are current and former CSC System Administrators assigned the primary duty of the installation, maintenance, and/or support of computer software and/or hardware for CSC clients.  On June 9, 2015, the Court granted **plaintiffs' motion for conditional certification of a FLSA collective action.**

8.    ***Senne v. Major League Baseball***, No. 14-cv-00608 (N.D. Cal.).  Lieff Cabraser represents current and former Minor League Baseball players employed under uniform player contracts in a class and collective action

seeking unpaid overtime and minimum wages under the Fair Labor Standards Act and state laws. The complaint alleges that Major League Baseball ("MLB"), the MLB franchises, and other defendants paid minor league players a uniform monthly fixed salary that, in light of the hours worked, amounts to less than the minimum wage and an unlawful denial of overtime pay.

9.    ***Jang v. E.I. Du Pont De Nemours & Co.***, No. 15-03719-NC (N.D. Cal.). Lieff Cabraser represents certain former DuPont employees in a breach of contract action alleging that DuPont unlawfully terminated **employees' unvested stock options.** DuPont's standard stock option award contract states that unvested options will continue to vest in accordance with their vesting schedule. In practice, however, DuPont **unilaterally cancelled unvested stock options one year from employees'** termination, regardless of whether the options had vested.

The complaint was filed on August 15, 2015. DuPont filed a motion to dismiss the complaint, which will be heard by United States Magistrate Judge Nathanael Cousins on November 18, 2015.

**B.    Successes**

1.    ***Butler v. Home Depot***, No. C94-4335 SI (N.D. Cal.). Lieff Cabraser and co-counsel represented a class of approximately 25,000 female employees and applicants for employment with Home Depot's West Coast Division who alleged gender discrimination in connection with hiring, promotions, pay, job assignment, and other terms and conditions of employment. The class was certified in January 1995. In January 1998, the Court approved a $87.5 million settlement of the action that included comprehensive injunctive relief over the term of a five-year Consent Decree. Under the terms of the settlement, Home Depot modified its hiring, promotion, and compensation practices to ensure that interested and qualified women were hired for, and promoted to, sales and management positions.

On January 14, 1998, U.S. District Judge Susan Illston commented that the settlement provides "a very significant monetary payment to the class members for which I think they should be grateful to their counsel. . . . Even more significant is the injunctive relief that's provided for . . ." By 2003, the injunctive relief had created thousands of new job opportunities in sales and management positions at Home Depot, generating the equivalent of over approximately $100 million per year in wages for female employees.

In 2002, Judge Illston stated that the injunctive relief has been a "win/win . . . for everyone, because . . . the way the Decree has been

implemented has been very successful and it is good for the company as well as the company's employees."

2.   **Rosenburg v. IBM**, No. C 06-0430 PJH (N.D. Cal.).  In July 2007, the Court granted final approval to a $65 million settlement of a class action suit by current and former technical support workers for IBM seeking unpaid overtime.  The settlement constitutes a record amount in litigation seeking overtime compensation for employees in the computer industry.  Plaintiffs alleged that IBM illegally misclassified its employees who install or maintain computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

3.   **Satchell v. FedEx Express**, No. C 03-2659 SI; C 03-2878 SI (N.D. Cal.).  In 2007, the Court granted final approval to a $54.9 million settlement of the race discrimination class action lawsuit by African American and Latino employees of FedEx Express.  The settlement requires FedEx to reform its promotion, discipline, and pay practices.  Under the settlement, FedEx will implement multiple steps to promote equal employment opportunities, including making its performance evaluation process less discretionary, discarding use of the "Basic Skills Test" as a prerequisite to promotion into certain desirable positions, and changing employment policies to demonstrate that its revised practices do not continue to foster racial discrimination.  The settlement, covering 20,000 hourly employees and operations managers who have worked in the western region of FedEx Express since October 1999, was approved by the Court in August 2007.

4.   **Gonzalez v. Abercrombie & Fitch Stores**, No. C03-2817 SI (N.D. Cal.).  In April 2005, the Court approved a settlement, valued at approximately $50 million, which requires the retail clothing giant Abercrombie & Fitch to provide monetary benefits of $40 million to the class of Latino, African American, Asian American and female applicants and employees who charged the company with discrimination.  The settlement included a six-year period of injunctive relief requiring the company to institute a wide range of policies and programs to promote diversity among its workforce and to prevent discrimination based on race or gender.  Lieff Cabraser served as Lead Class Counsel and prosecuted the case with a number of co-counsel firms, including the Mexican American Legal Defense and Education Fund, the Asian Pacific American Legal Center and the NAACP Legal Defense and Educational Fund, Inc.

5.   **Giles v. Allstate**, JCCP Nos. 2984 and 2985.  Lieff Cabraser represented a class of Allstate insurance agents seeking reimbursement of out-of-pocket costs.  The action settled for approximately $40 million.

6.   **Calibuso v. Bank of America Corporation, Merrill Lynch & Co.**, No. CV10-1413 (E.D. N.Y.).  Lieff Cabraser served as Co-Lead Counsel for

female Financial Advisors who alleged that Bank of America and Merrill Lynch engaged in a pattern and practice of gender discrimination with respect to business opportunities and compensation. The complaint charged that these violations were systemic, based upon company-wide policies and practices. In December 2013, the Court approved a $39 million settlement. The settlement included three years of programmatic relief, overseen by an independent monitor, regarding teaming and partnership agreements, business generation, account distributions, manager evaluations, promotions, training, and complaint processing and procedures, among other things. An independent consultant also conducted an internal study of the bank's Financial Advisors' teaming practices.

7.     ***Frank v. United Airlines***, No. C-92-0692 MJJ (N.D. Cal.). Lieff Cabraser and co-counsel obtained a $36.5 million settlement in February 2004 for a class of female flight attendants who were required to weigh less than comparable male flight attendants. Former U.S. District Court Judge Charles B. Renfrew (ret.), who served as a mediator in the case, stated, "As a participant in the settlement negotiations, I am familiar with and know the reputation, experience and skills of lawyers involved. They are dedicated, hardworking and able counsel who have represented their clients very effectively." U.S. District Judge Martin J. Jenkins, in granting final approval to the settlement, found "that the results achieved here could be nothing less than described as exceptional," and that the settlement "was obtained through the efforts of outstanding counsel."

8.     ***Barnett v. Wal-Mart***, No. 01-2-24553-SNKT (Wash.). The Court approved in July 2009 a settlement valued at up to $35 million on behalf of workers in Washington State who alleged they were deprived of meal and rest breaks and forced to work off-the-clock at Wal-Mart stores and Sam's Clubs. In addition to monetary relief, the settlement provided injunctive relief benefiting all employees. Wal-Mart was required to undertake measures to prevent wage and hour violations at its 50 stores and clubs in Washington, measures that included the use of new technologies and compliance tools.

Plaintiffs filed their complaint in 2001. Three years later, the Court certified a class of approximately 40,000 current and former Wal-Mart employees. The eight years of litigation were intense and adversarial. Wal-Mart, currently the world's third largest corporation, vigorously denied liability and spared no expense in defending itself.

This lawsuit and similar actions filed against Wal-Mart across America served to reform the pay procedures and employment practices for Wal-Mart's 1.4 million employees nationwide. In a press release announcing the Court's approval of the settlement, Wal-Mart spokesperson Daphne

Moore stated, "This lawsuit was filed years ago and the allegations are not representative of the company we are today." Lieff Cabraser served as Court-appointed Co-Lead Class Counsel.

9.   ***Amochaev. v. Citigroup Global Markets, d/b/a Smith Barney***, No. C 05-1298 PJH (N.D. Cal.).  In August 2008, the Court approved a $33 million settlement for the 2,411 members of the Settlement Class in a gender discrimination case against Smith Barney.  Lieff Cabraser represented Female Financial Advisors who charged that Smith Barney, the retail brokerage unit of Citigroup, discriminated against them in account distributions, business leads, referral business, partnership opportunities, and other terms of employment.  In addition to the monetary compensation, the settlement included comprehensive injunctive relief for four years designed to increase business opportunities and promote equality in compensation for female brokers.

10.   ***Vedachalam v. Tata Consultancy Services***, C 06-0963 CW (N.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel for 12,700 foreign nationals sent by the Indian conglomerate Tata to work in the U.S.  After 7 years of hard-fought litigation, the District Court in July 2013 granted final approval to a $29.75 million settlement.  The complaint charged that Tata breached the contracts of its non-U.S.-citizen employees by requiring them to sign over their federal and state tax refund checks to Tata, and by failing to pay its non-U.S.-citizen employees the monies promised to those employees before they came to the United States.  In 2007 and again in **2008, the District Court denied Tata's motions to compel arbitration of Plaintiffs' claims in India.**  The Court held that no arbitration agreement existed because the documents purportedly requiring arbitration in India applied one set of rules to the Plaintiffs and another set to Tata.  In 2009, the Ninth Circuit Court of Appeals affirmed this decision.  In July 2011, **the District Court denied in part Tata's motion for summary judgment, allowing Plaintiffs' legal claims for breach of contract and certain** violations of California wage laws to go forward.  In 2012, the District Court found that the plaintiffs satisfied the legal requirements for a class action and certified two classes.

11.   ***Giannetto v. Computer Sciences Corporation***, No. 03-CV-8201 (C.D. Cal.).  In one of the largest overtime pay dispute settlements ever in the information technology industry, the Court approved a $24 million settlement with Computer Sciences Corporation in 2005.  Plaintiffs charged that the global conglomerate had a common practice of refusing to pay overtime compensation to its technical support workers involved in the installation and maintenance of computer hardware and software in violation of the Fair Labor Standards Act, California's Unfair Competition Law, and the wage and hour laws of 13 states.

12.   ***Curtis-Bauer v. Morgan Stanley & Co.***, Case No. C-06-3903 (TEH). In October 2008, the Court approved a $16 million settlement in the class action against Morgan Stanley.  The complaint charged that Morgan Stanley discriminated against African-American and Latino Financial Advisors and Registered Financial Advisor Trainees in the Global Wealth Management Group of Morgan Stanley in compensation and business opportunities.  The settlement included comprehensive injunctive relief regarding account distributions, partnership arrangements, branch manager promotions, hiring, retention, diversity training, and complaint processing, among other things. The settlement also provided for the appointment of an independent Diversity Monitor and an independent Industrial Psychologist to effectuate the terms of the agreement.

13.   ***Church v. Consolidated Freightways***, No. C90-2290 DLJ (N.D. Cal.).  Lieff Cabraser was the Lead Court-appointed Class Counsel in this class action on behalf of the exempt employees of Emery Air Freight, a freight forwarding company acquired by Consolidated Freightways in 1989.  On behalf of the employee class, Lieff Cabraser prosecuted claims for violation of the Employee Retirement Income Security Act, the securities laws, and the Age Discrimination in Employment Act.  The case settled in 1993 for $13.5 million.

14.   ***Gerlach v. Wells Fargo & Co.***, No. C 05-0585 CW (N.D. Cal.).  In January 2007, the Court granted final approval to a $12.8 million settlement of a class action suit by current and former business systems employees of Wells Fargo seeking unpaid overtime.  Plaintiffs alleged that Wells Fargo illegally misclassified those employees, who maintained and updated Wells Fargo's business tools according to others' instructions, as "exempt" from the overtime pay requirements of federal and state labor laws.

15.   ***Buccellato v. AT&T Operations***, No. C10-00463-LHK (N.D. Cal.). Lieff Cabraser represented a group of current and former AT&T technical support workers who alleged that AT&T misclassified them as exempt and failed to pay them for all overtime hours worked, in violation of federal and state overtime pay laws.  In June 2011, the Court approved a $12.5 million collective and class action settlement.

16.   ***Buttram v. UPS***, No. C-97-01590 MJJ (N.D. Cal.).  Lieff Cabraser and several co-counsel represented a class of approximately 14,000 African-American part-time hourly employees of UPS's Pacific and Northwest Regions alleging race discrimination in promotions and job advancement. In 1999, the Court approved a $12.14 million settlement of the action. Under the injunctive relief portion of the settlement, Class Counsel monitored the promotions of African-American part-time hourly employees to part-time supervisor and full-time package car drivers.

17.   ***Goddard, et al. v. Longs Drug Stores Corporation, et al.***,
No. RG04141291 (Cal. Supr. Ct.).  Store managers and assistant store
managers of Longs Drugs charged that the company misclassified them as
exempt from overtime wages.  Managers regularly worked in excess of
8 hours per day and 40 hours per week without compensation for their
overtime hours.  Following mediation, in 2005, Longs Drugs agreed to
settle the claims for a total of $11 million.  Over 1,000 current and former
Longs Drugs managers and assistant managers were eligible for
compensation under the settlement, over 98% of the class submitted
claims.

18.   ***Trotter v. Perdue Farms***, No. C 99-893-RRM (JJF) (MPT) (D. Del.).
Lieff Cabraser represented a class of chicken processing employees of
Perdue Farms, Inc., one of the nation's largest poultry processors, for
wage and hour violations.  The suit challenged Perdue's failure to
compensate its assembly line employees for putting on, taking off, and
cleaning protective and sanitary equipment in violation of the Fair Labor
Standards Act, various state wage and hour laws, and the Employee
Retirement Income Security Act.  Under a settlement approved by the
Court in 2002, Perdue paid $10 million for wages lost by its chicken
processing employees and attorneys' fees and costs.  The settlement was
in addition to a $10 million settlement of a suit brought by the
Department of Labor in the wake of Lieff Cabraser's lawsuit.

19.   ***Gottlieb v. SBC Communications***, No. CV-00-04139 AHM (MANx)
(C.D. Cal.).  With co-counsel, Lieff Cabraser represented current and
former employees of SBC and Pacific Telesis Group ("PTG") who
participated in AirTouch Stock Funds, which were at one time part of
PTG's salaried and non-salaried savings plans.  After acquiring  PTG, SBC
sold AirTouch, which PTG had owned, and caused the AirTouch Stock
Funds that were included in the PTG employees' savings plans to be
liquidated.  Plaintiffs alleged that in eliminating the AirTouch Stock
Funds, and in allegedly failing to adequately communicate with
employees about the liquidation, SBC breached its duties to 401k plan
participants under the Employee Retirement Income Security Act.  In
2002, the Court granted final approval to a $10 million settlement.

20.   ***Ellis v. Costco Wholesale Corp.***, No. 04-03341-EMC (N.D. Cal.).
Lieff Cabraser served as Co-Lead Counsel for current and former female
employees who charged that Costco discriminated against women
in promotion to management positions.  In January 2007, the Court
certified a class consisting of over 750 current and former female Costco
employees nationwide who were denied promotion to General Manager or
Assistant Manager since January 3, 2002.  Costco appealed.  In
September 2011, the U.S. Court of Appeals for the Ninth Circuit remanded
the case to the District Court to make class certification findings

consistent with the **U.S. Supreme Court's ruling in** *Wal-Mart v. Dukes*, 131 S.Ct. 2541 (2011).  In September 2012, U.S. District Court Judge **Edward M. Chen granted plaintiffs' motion for class certification and** certified two classes of over 1,250 current and former female Costco employees, one for injunctive relief and the other for monetary relief.  On May 27, 2014, the Court approved an $8 million settlement.

21.     ***In Re Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation***, MDL No. 1439 (D. Ore.).  Lieff Cabraser and co-counsel represented claims representatives of Farmers' Insurance Exchange seeking unpaid overtime.  Lieff Cabraser won a liability phase trial on a classwide basis, and then litigated damages on an individual basis before a special master.  The judgment was partially upheld on appeal.  In August 2010, the Court approved an $8 million settlement.

22.     ***Zuckman v. Allied Group***, No. 02-5800 SI (N.D. Cal.).  In September 2004, the Court approved a settlement with Allied Group and Nationwide Mutual Insurance Company of $8 million plus Allied/Nationwide's share of payroll taxes on amounts treated as wages, providing plaintiffs a 100% recovery on their claims. Plaintiffs, claims representatives of Allied / Nationwide, alleged that the company misclassified them as exempt employees and failed to pay them and other claims representatives in California overtime wages for hours they worked in excess of eight hours or forty hours per week.  In approving the settlement, U.S. District Court Judge Susan Illston commended counsel for their "really good lawyering" and stated that they did "a splendid job on this" case.

23.     ***Thomas v. California State Automobile Association***, No. CH217752 (Cal. Supr. Ct.).  With co-counsel, Lieff Cabraser represented 1,200 current and former field claims adjusters who worked for the California State Automobile Association ("CSAA").  Plaintiffs alleged that CSAA improperly classified their employees as exempt, therefore denying them overtime pay for overtime worked.  In May 2002, the Court approved an $8 million settlement of the case.

24.     ***Higazi v. Cadence Design Systems***, No. C 07-2813 JW (N.D. Cal.). In July 2008, the Court granted final approval to a $7.664 million settlement of a class action suit by current and former technical support workers for Cadence seeking unpaid overtime.  Plaintiffs alleged that Cadence illegally misclassified its employees who install, maintain, or support computer hardware or software as "exempt" from the overtime pay requirements of federal and state labor laws.

25.     ***Sandoval v. Mountain Center, Inc., et al.***,  No. 03CC00280 (Cal. Supr. Ct.).  Cable installers in California charged that defendants owed them overtime wages, as well as damages for missed meal and rest breaks and reimbursement for expenses incurred on the job.  In 2005, the Court

approved a $7.2 million settlement of the litigation, which was distributed to the cable installers who submitted claims.

26. **Lewis v. Wells Fargo**, No. 08-cv-2670 CW (N.D. Cal.).  Lieff Cabraser served as Lead Counsel on behalf of approximately 330 I/T workers who alleged that Wells Fargo had a common practice of misclassifying them as exempt and failing to pay them for all overtime hours worked in violation of federal and state overtime pay laws.  In April 2011, the Court granted collective action certification of the FLSA claims and approved a $6.72 million settlement of the action.

27. **Kahn v. Denny's**, No. BC177254 (Cal. Supr. Ct.).  Lieff Cabraser brought a lawsuit alleging that Denny's failed to pay overtime wages to its General Managers and Managers who worked at company-owned restaurants in California.  The Court approved a $4 million settlement of the case in 2000.

28. **Wynne v. McCormick & Schmick's Seafood Restaurants**, No. C 06-3153 CW (N.D. Cal.).  In August 2008, the Court granted final approval to a settlement valued at $2.1 million, including substantial injunctive relief, for a class of African American restaurant-level hourly employees.  The consent decree created hiring benchmarks to increase the number of African Americans employed in front of the house jobs (**e.g.**, server, bartender, host/hostess, waiter/waitress, and cocktail server), a registration of interest program to minimize discrimination in promotions, improved complaint procedures, and monitoring and enforcement mechanisms.

29. **Sherrill v. Premera Blue Cross**, No. 2:10-cv-00590-TSZ (W.D. Wash.). In April 2010, a technical worker at Premera Blue Cross filed a lawsuit against Premera seeking overtime pay from its misclassification of technical support workers as exempt.  In June 2011, the Court approved a collective and class action settlement of $1.45 million.

30. **Holloway v. Best Buy**, No. C05-5056 PJH (N.D. Cal.).  Lieff Cabraser, with co-counsel, represented a class of current employees of Best Buy that alleged Best Buy stores nationwide discriminated against women, African Americans, and Latinos.  The complaint charged that these employees were assigned to less desirable positions and denied promotions, and that class members who attained managerial positions were paid less than white males.  In November 2011, the Court approved a settlement of the class action in which Best Buy agreed to changes to its personnel policies and procedures that will enhance the equal employment opportunities of the tens of thousands of women, African Americans, and Latinos employed by Best Buy nationwide.

31.     **Lyon v. TMP Worldwide**, No. 993096 (Cal. Supr. Ct.).  Lieff Cabraser served as Class Counsel for a class of certain non-supervisory employees in an advertising firm.  The settlement, approved in 2000, provided almost a 100% recovery to class members.  The suit alleged that TMP failed to pay overtime wages to these employees.

32.     **Lusardi v. McHugh, Secretary of the Army**, No. 0120133395 (U.S. EEOC).  Lieff Cabraser and the Transgender Law Center represent Tamara Lusardi, a transgender civilian software specialist employed by the U.S. Army.  In a groundbreaking decision in April 2015, the Equal Employment Opportunity Commission reversed a lower agency decision and held that the employer subjected Lusardi to disparate treatment and harassment based on sex in violation of Title VII of the Civil Rights Act of 1964 when (1) the employer restricted her from using the common female restroom (consistent with her gender identity) and (2) a team leader intentionally and repeatedly referred to her by male pronouns and made hostile remarks about her transition and gender.

Lieff Cabraser attorneys have had experience representing employees in additional cases, including cases involving race, gender, sexual orientation, gender identity, and age discrimination; False Claims Act (whistleblower) claims; breach of contract claims; unpaid wages or exempt misclassification (wage/hour) claims; pension plan abuses under ERISA; and other violations of the law.  For example, as described in the Antitrust section of this resume, Lieff Cabraser serves as plaintiffs' Co-Lead Counsel in a class action charging that Adobe Systems Inc., Apple Inc., Google Inc., and Intel Corporation violated antitrust laws by conspiring to suppress the wages of certain salaried employees.

Lieff Cabraser is currently investigating charges of discrimination, wage/hour violations, and wage suppression claims against several companies.  In addition, our attorneys frequently write amicus briefs on cutting-edge legal issues involving employment law.

In 2015, **The Recorder** named Lieff Cabraser's employment group as a Litigation Department of the Year in the category of California Labor and Employment Law.  The Litigation Department of the Year awards recognize "California litigation practices that deliver standout results on their clients' most critical matters."  **The Recorder** editors consider the degree of difficulty, dollar value and importance of each matter to the client; the depth and breadth of the practice; and the use of innovative approaches.

**U.S. News** and Best Lawyers selected Lieff Cabraser as a 2013 national "Law Firm of the Year" in the category of Employment Law – Individuals.  **U.S. News** and Best Lawyers ranked firms nationally in 80 different practice areas based on extensive client feedback and evaluations from 70,000 lawyers nationwide.  Only one law firm in the U.S. in each practice area receives the "Law Firm of the Year" designation.

**Benchmark Plaintiff**, a guide to the nation's leading plaintiffs' firms, has given Lieff Cabraser's employment practice group a Tier 1 national ranking, its highest rating.  **The Legal 500** guide to the U.S. legal profession has recognized Lieff Cabraser as having one of the leading plaintiffs' employment practices in the nation for the past four years.

Kelly M. Dermody chairs the firm's employment practice group and leads the firm's employment cases.  She also serves as Managing Partner of Lieff Cabraser's San Francisco office.

In 2015, the College of Labor and Employment Lawyers named Ms. Dermody a Fellow.  Nomination to the College is by ones colleagues only, and recognizes those lawyers who have demonstrated sustained and exceptional services to their clients, bar, bench, and public, and the highest level of character, integrity, professional expertise, and leadership.

*The Daily Journal* has selected Ms. Dermody as one of the top 100 attorneys in California (2012-2015), top 75 labor and employment lawyers in California (2011-2015), and top 100 women litigators in California (2007, 2010, 2012-2015).  She has been named a Northern California "Super Lawyer" every year since 2004, including being named a "Top 10 Lawyer" in 2014.

Since 2010, Ms. Dermody has annually been recognized by her peers for inclusion in *The Best Lawyers in America* in the fields of Employment Law – Individuals and Litigation – Labor and Employment.  In 2014, she was named "Lawyer of the Year" by Best Lawyers in the category of Employment Law – Individuals in San Francisco.  In 2007, *California Lawyer* magazine awarded Ms. Dermody its prestigious California Lawyer Attorney of the Year (CLAY) Award.

## IV.    **Consumer Protection**

### A.    **Current Cases**

1.    ***Gutierrez v. Wells Fargo Bank***, No. C 07-05923 WHA (N.D. Cal.).  Following a two week bench class action trial, U.S. District Court Judge William Alsup in August 2010 issued a 90-page opinion holding that Wells Fargo violated California law by improperly and illegally assessing overdraft fees on its California customers and ordered $203 million in restitution to the certified class.  Instead of posting each transaction chronologically, the evidence presented at trial showed that Wells Fargo deducted the largest charges first, drawing down available balances more rapidly and triggering a higher volume of overdraft fees.

Wells Fargo appealed.  In December 2012, the Appellate Court issued an opinion upholding and reversing portions of Judge Alsup's order, and remanded the case to the District Court for further proceedings.  In May 2013, Judge Alsup reinstated the $203 million judgment against Wells Fargo and imposed post-judgment interest bringing the total award to nearly $250 million.  On October 29, 2014, the Appellate Court affirmed **the Judge Alsup's order reinstating the judgment.**

For his outstanding work as Lead Trial Counsel and the significance of the case, *California Lawyer* magazine recognized Richard M. Heimann with a California Lawyer Attorney of the Year (CLAY) Award.  In addition, the Consumer Attorneys of California selected Mr. Heimann and Michael W. Sobol as Finalists for the Consumer Attorney of the Year Award for their success in the case.

In reviewing counsel's request for attorneys' fees, Judge Alsup stated on May 21, 2015: "Lieff, Cabraser, on the other hand, entered as class counsel and pulled victory from the jaws of defeat. They bravely confronted several obstacles including the possibility of claim preclusion based on a class release entered in state court (by other counsel), federal preemption, hard-fought dispositive motions, and voluminous discovery. They rescued the case [counsel that originally filed] had botched and secured a full recovery of $203 million in restitution plus injunctive relief. **Notably, Attorney Richard Heimann's trial performance ranks as** one of the best this judge has seen in sixteen years on the bench. Lieff, Cabraser then twice defended the class on appeal. At oral argument on the present motion, in addition to the cash restitution, Wells Fargo acknowledged that since 2010, its posting practices changed nationwide, in part, because of the injunction. Accordingly, this order allows a multiplier of 5.5 mainly on account of the fine results achieved on behalf of the class, the risk of non-payment they accepted, the superior quality of their efforts, and the delay in payment."

2.  ***In re Checking Account Overdraft Litigation***, MDL No. 2036 (S.D. Fl.). Lieff Cabraser serves on the Plaintiffs' Executive Committee ("PEC") in Multi-District Litigation against 35 banks, including Bank of America, Chase, Citizens, PNC, Union Bank, and U.S. Bank. The complaints alleged **that the banks entered debit card transactions from the "largest to the smallest" to draw down available balances more rapidly and maximize overdraft fees. In March 2010, the Court denied defendants' motions to** dismiss the complaints. The Court has approved nearly $1 billion in settlements with the banks.

In November 2011, the Court granted final approval to a $410 million settlement of the case against Bank of America. Lieff Cabraser was the **lead plaintiffs' law firm on the PEC that prosecuted the case** against Bank of America. In approving the settlement with Bank of America, U.S. **District Court Judge James Lawrence King stated, "This is a marvelous result for the members of the class." Judge King added, "[B]ut for the** high level of dedication, ability and massive and incredible hard work by the Class attorneys . . . I do not believe the Class would have ever seen . . . **a penny."**

In September 2012, the Court granted final approval to a $35 million of the case against Union Bank. In approving the settlement, Judge King **again complimented plaintiffs' counsel for their outstanding work and** effort in resolving the case: **"The description of plaintiffs' counsel, which** is a necessary part of the settlement, is, if anything, understated. In my **observation of the diligence and professional activity, it's superb.** I know of no other class action case anywhere in the country in the last couple of

decades that's been handled as efficiently as this one has, which is a tribute to the lawyers."

3.   ***Hansell v. TracFone Wireless***, No. 13-cv-3440-EMC (N.D. Cal.); ***Blaqmoor v. TracFone Wireless***, No. 13-cv-05295-EMC (N.D. Cal.); ***Gandhi v. TracFone Wireless***, No. 13-cv-05296-EMC (N.D. Cal.).  In January 2015, **Michael W. Sobol, the chair of Lieff Cabraser's c**onsumer protection practice group, announced that consumers nationwide who **purchased service plans with "unlimited data" from TracFone Wireless,** Inc., were eligible to receive payments under a $40 million settlement of a series of class action lawsuits.  O**ne of the nation's largest wireless** carriers, TracFone uses the brands Straight Talk, Net10, Telcel America, and Simple Mobile to sell mobile phones with prepaid wireless plans at Walmart and other retail stores nationwide.  The class action alleged that TracFone falsely advertised its wireless mobile phone plans as providing **"unlimited data," while actually maintaining monthly data usage limits** that were not disclosed to customers.  It further alleged that TracFone regularly throttled (***i.e.*** significantly reduces the speed of) or terminated **customers' data plans pursuant to the secret limits.**  Approved by the Court in July 2015, the settlement permanently enjoins TracFone from making any advertisement or other representation about amount of data its cell phone plans offer without disclosing clearly and conspicuously all material restrictions on the amount and speed of the data plan.  Further, TracFone and its brands may not state in their advertisements and **marketing materials that any plan provides "unlimited data" unless there** is also clear, prominent, and adjoining disclosure of any applicable throttling caps or limits.  The litigation is notable in part because, following two years of litigation by class counsel, the Federal Trade Commission joined the litigation and filed a Consent Order with TracFone in the same federal court where the class action litigation is pending.  All compensation to consumers will be provided through the class action settlement.

4.   ***Dover v. British Airways***, Case No. 1:12-cv-05567 (E.D.N.Y.).  Lieff **Cabraser represents participants in British Airways' ("BA") frequent flyer** program, known as the Executive Club, in a breach of contract class action lawsuit.  BA imposes a very high "fuel surcharge," often in excess of $500, on Executive Club reward tickets.  Plaintiffs allege that the "fuel surcharge" is not based upon the price of fuel, and that it therefore violates the terms of the contract.

5.   ***Telephone Consumer Protection Act Litigation***.  Over the past four years, Lieff Cabraser has spearheaded a series of groundbreaking **class actions under the Telephone Consumer Protection Act ("TCPA"),** which prohibits abusive telephone practices by lenders and marketers, and places strict limits on the use of autodialers to call or send texts to cell

phones.  The settlements in these cases have put a stop to collectively millions of harassing calls by debt collectors and others and resulted in the recovery by consumers across America of over $200 million.

In the largest settlement under the TCPA ever, the Court approved a $75.4 million settlement in February 2015 in *In re Capital One Telephone Consumer Protection Act Litigation*, No. 1:12-cv-10064 (N.D. Ill.).  The same month, in *Wilkins v. HSBC Bank Nev.,* No. 14-cv-190 (N.D. Ill.), the Court approved a $39.9 million settlement.  Also, in February 2015, in *Connor v. JPMorgan Chase Bank*, No. 10 CV 1284 DMS BGS (S.D. Cal. Mar. 12, 2012), the Court approved a $11.6 million settlement.  In August 2014, the Court approved a $32 million settlement with Bank of America. Two years earlier, the Court approved a $24.15 million settlement with Sallie Mae in September 2012, which was then-largest settlement ever in a TCPA class action.  (*Rose v. Bank of America Corp.,* No. 5:11-cv-02390-EJD (N.D. Cal.), *Duke v. Bank of America*, No. 5:12-cv-04009-EJD (N.D. Cal.), and *Arthur v. Sallie Mae*, No. C10-0198 (W.D. Wash.).)

6.      *Moore v. Verizon Communications*, No. 09-cv-01823-SBA (N.D. Cal.); *Nwabueze v. AT&T*, No. 09-cv-1529 SI (N.D. Cal.); *Terry v. Pacific Bell Telephone Co.*, No. RG 09 488326 (Alameda County Sup. Ct.).  Lieff Cabraser, with co-counsel, represents nationwide classes of landline telephone customers subjected to the deceptive business practice known as "cramming."  In this practice, a telephone company bills customers for unauthorized third-party charges assessed by billing aggregators on behalf of third-party providers.  A U.S. Senate committee has estimated that Verizon, AT&T, and Qwest place 300 million such charges on customer bills each year (amounting to $2 billion in charges), many of which are unauthorized.  Various sources estimate that 90-99% of third-party charges are unauthorized.  Both Courts have granted preliminary approval of settlements that allow customers to receive 100% refunds for all unauthorized charges from 2005 to the present, plus extensive injunctive relief to prevent cramming in the future.  The Nwabueze and Terry cases are ongoing.

7.      *James v. UMG  Recordings, Inc.*, No. CV-11-1613 (N.D. Cal); *Zombie v. UMG Recordings, Inc.*, No. CV-11-2431 (N.D. Cal).  Lieff Cabraser and its co-counsel represent music recording artists in a proposed class action against Universal Music Group.  Plaintiffs allege that Universal failed to pay the recording artists full royalty income earned from customers' purchases of digitally downloaded music from vendors such as Apple iTunes.  The complaint alleges that Universal licenses plaintiffs' music to digital download providers, but in its accounting of the royalties plaintiffs have earned, treats such licenses as "records sold" because royalty rate for "records sold" is lower than the royalty rate for licenses.  Plaintiffs legal claims include breach of contract

and violation of California unfair competition laws.  In November 2011 the Court denied defendant's motion to dismiss plaintiffs' unfair competition law claims.

8.    ***White v. Experian Information Solutions***, No. 05-CV-1070 DOC (C.D. Cal.).  In 2005, plaintiffs filed nationwide class action lawsuits on **behalf of 750,000 claimants against the nation's** three largest repositories of consumer credit information, Experian Information Solutions, Inc., Trans Union, LLC, and Equifax Information Services, LLC.  The complaints charged that defendants violated the Fair Credit Reporting Act **("FCRA") by recklessly** failing to follow reasonable procedures to ensure the accurate reporting of debts discharged in bankruptcy and by refusing to adequately investigate consumer disputes regarding the status of discharged accounts.  In April 2008, the District Court approved a partial settlement of the action that established an historic injunction.  This settlement required defendants comply with detailed procedures for the **retroactive correction and updating of consumers' credit file information** concerning discharged debt (affecting one million consumers who had filed for bankruptcy dating back to 2003), as well as new procedures to ensure that debts subject to future discharge orders will be similarly treated.  **As noted by the District Court, "Prior to the injunctive relief** order entered in the instant case, however, no verdict or reported decision had ever required Defendants to implement procedures to cross-check **data between their furnishers and their public record providers."  In 2011,** the District Court approved a $45 million settlement of the class claims for monetary relief.  In April 2013, the Court of Appeals for the Ninth Circuit reversed the order approving the monetary settlement and remanded the case for further proceedings.

9.    ***Healy v. Chesapeake Appalachia***, No. 1:10cv00023 (W.D. Va.); ***Hale v. CNX Gas***, No. 1:10cv00059 (W.D. Va.); ***Estate of Holman v. Noble Energy***, No. 03 CV 9 (Dist. Ct., Co.); ***Droegemueller v. Petroleum Development Corporation***, No. 07 CV 2508 JLK (D. Co.); ***Anderson v. Merit Energy Co.***, No. 07 CV 00916 LTB (D. Co.); ***Holman v. Petro-Canada Resources (USA)***, No. 07 CV 416 (Dist. Ct., Co.).  Lieff Cabraser serves as Co-Lead Counsel in several cases pending in federal court in Virginia, in which plaintiffs allege that certain natural gas companies improperly underpaid gas royalties to the owners of the gas.  In one case that recently settled, the plaintiffs recovered approximately 95% of the damages they suffered.  Lieff Cabraser also achieved settlements on behalf of natural gas royalty owners in five other class actions outside Virginia.  Those settlements -- in which class members recovered between 70% and 100% of their damages, excluding interest -- were valued at more than $160 million.

10.     ***Adkins v. Morgan Stanley***, No. 12 CV 7667 (S.D.N.Y.).  Five African-American residents from Detroit, Michigan, joined by Michigan Legal Services, have brought a class action lawsuit against Morgan Stanley for discrimination in violation of the Fair Housing Act and other civil rights laws.  The plaintiffs charge that Morgan Stanley actively ensured the proliferation of high-cost mortgage loans with specific risk factors in order to bundle and sell mortgage-backed securities to investors.  The lawsuit is the first to seek to hold a bank in the secondary market accountable for the adverse racial impact of such policies and conduct.  Plaintiffs seek certification of the case as a class action for as many as 6,000 African-Americans homeowners in the Detroit area who may have suffered similar discrimination.  Lieff Cabraser serves as plaintiffs' counsel with the American Civil Liberties Union, the ACLU of Michigan, and the National Consumer Law Center.

11.     ***Williamson v. McAfee, Inc.***, No. 14-cv-00158-EJD (N.D.Cal.).  This nationwide class action alleges that McAfee falsely represents the prices of its computer anti-**virus software to customers enrolled in its "auto-renewal" program.  Plaintiff alleges that McAfee's fraudulent pricing** scheme operates on two levels: First, McAfee offers ***non***-auto-renewal subscriptions at stated "discounts" from a "regular" sales price; however, the stated discounts are false because McAfee does not ever sell **subscriptions at the stated "regular" price to *non*-auto-renewal customers.  Second,  plaintiffs allege that McAfee charges the auto-renewal customers the amount of the false "regular" sales price, claiming it to be the "current" regular price even though it does not sell** subscriptions at that price to any other customer.  Plaintiffs allege that McAfee's false reference price scheme violates California's and New York's unfair competition and false advertising laws.

**B.      Successes**

1.      ***Kline v. The Progressive Corporation***, Circuit No. 02-L-6 (Circuit Court of the First Judicial Circuit, Johnson County, Illinois).  Lieff Cabraser served as settlement class counsel in a nationwide consumer class action challenging Progressive Corporation's private passenger automobile insurance sales practices.  Plaintiffs alleged that the Progressive Corporation wrongfully concealed from class members the availability of lower priced insurance for which they qualified.  In 2002, the Court approved a settlement valued at approximately $450 million, which included both cash and equitable relief.  The claims program, implemented upon a nationwide mail and publication notice program, was completed in 2003.

2.      ***Catholic Healthcare West Cases***, JCCP No. 4453 (Cal. Supr. Ct.).  Plaintiff alleged that Catholic Healthcare West ("CHW") charged

uninsured patients excessive fees for treatment and services, at rates far higher than the rates charged to patients with private insurance or on Medicare. In January 2007, the Court approved a settlement that provides discounts, refunds and other benefits for CHW patients valued at $423 million. The settlement requires that CHW lower its charges and end price discrimination against all uninsured patients, maintain generous charity case policies allowing low-income and uninsured patients to receive free or heavily discounted care, and protect uninsured patients from unfair collections practices. Lieff Cabraser served as Lead Counsel in the coordinated action.

3.   ***In re Neurontin Marketing and Sales Practices Litigation***, No. 04-CV-10739-PBS (D. Mass.). Lieff Cabraser served **on the Plaintiffs' Steering Committee** in multidistrict litigation arising out of the sale and marketing of the prescription drug Neurontin, manufactured by Parke-Davis, a division of Warner-Lambert Company, which was later acquired by Pfizer, Inc. Lieff Cabraser served as co-counsel to Kaiser Foundation **Health Plan, Inc. and Kaiser Foundation Hospitals ("Kaiser") in Kaiser's** trial against Pfizer in the litigation. On March 25, 2010, a federal court jury determined that Pfizer violated a federal antiracketeering law by promoting its drug Neurontin for unapproved uses and found Pfizer must pay Kaiser damages up to $142 million. At trial, Kaiser presented evidence that Pfizer knowingly marketed Neurontin for unapproved uses without proof that it was effective. Kaiser said it was misled into believing neuropathic pain, migraines, and bipolar disorder were among the conditions that could be treated effectively with Neurontin, which was approved by the FDA as an adjunctive therapy to treat epilepsy and later for post-herpetic neuralgia, a specific type of neuropathic pain. In November 2010, the Court issued Findings of Fact and Conclusions of **Law on Kaiser's claims arising under the California Unfair Competition** Law, finding Pfizer liable and ordering that it pay restitution to Kaiser of approximately $95 million. In April 2013, the First Circuit Court of Appeals **affirmed both the jury's and the** District Court's **verdicts. In** November 2014, the Court approved a $325 million settlement on behalf of a nationwide class of third party payors.

4.   ***Sutter Health Uninsured Pricing Cases***, JCCP No. 4388 (Cal. Supr. Ct.). Plaintiffs alleged that they and a Class of uninsured patients treated at Sutter hospitals were charged substantially more than patients with private or public insurance, and many times above the cost of providing their treatment. In December 2006, the Court granted final approval to a comprehensive and groundbreaking settlement of the action. As part of the settlement, Class members were entitled to make a claim for refunds or deductions of between 25% to 45% from their prior hospital bills, at an estimated total value of $276 million. For a three year period, Sutter agreed to provide discounted pricing policies for uninsureds. In addition,

Sutter agreed to maintain more compassionate collections policies that will protect uninsureds who fall behind in their payments. Lieff Cabraser served as Lead Counsel in the coordinated action.

5. ***Citigroup Loan Cases***, JCCP No. 4197 (San Francisco Supr. Ct., Cal.). In 2003, the Court approved a settlement that provided approximately $240 million in relief to former Associates' customers across America. Prior to its acquisition in November 2000, Associates First Financial, referred to as The Associates, was one of the nation's largest "subprime" lenders. Lieff Cabraser represented former customers of The Associates charging that the company added unwanted and unnecessary insurance products onto mortgage loans and engaged in improper loan refinancing practices. Lieff Cabraser served as nationwide Plaintiffs' Co-Liaison Counsel.

6. ***Telephone Consumer Protection Act Litigation***. Lieff Cabraser has spearheaded a series of groundbreaking class actions under the **Telephone Consumer Protection Act ("TCPA"), which prohibits abusive** telephone practices by lenders and marketers, and places strict limits on the use of autodialers to call or send texts to cell phones. The settlements in these cases have put a stop to collectively millions of harassing calls by debt collectors and others and resulted in the recovery by consumers across America of over $200 million.

In the largest settlement under the TCPA ever, the Court approved a $75.4 million settlement in February 2015 in ***In re Capital One Telephone Consumer Protection Act Litigation***, No. 1:12-cv-10064 (N.D. Ill.). The same month, in ***Wilkins v. HSBC Bank Nev.***, No. 14-cv-190 (N.D. Ill.), the Court approved a $39.9 million settlement. Also, in February 2015, in ***Connor v. JPMorgan Chase Bank***, No. 10 CV 1284 DMS BGS (S.D. Cal. Mar. 12, 2012), the Court approved a $11.6 million settlement. In August 2014, the Court approved a $32 million settlement with Bank of America. Two years earlier, the Court approved a $24.15 million settlement with Sallie Mae in September 2012, which was then-largest settlement ever in a TCPA class action. (***Rose v. Bank of America Corp.***, No. 5:11-cv-02390-EJD (N.D. Cal.), ***Duke v. Bank of America***, No. 5:12-cv-04009-EJD (N.D. Cal.), and ***Arthur v. Sallie Mae***, No. C10-0198 (W.D. Wash.).)

7. ***Thompson v. WFS Financial***, No. 3-02-0570 (M.D. Tenn.); ***Pakeman v. American Honda Finance Corporation***, No. 3-02-0490 (M.D. Tenn.); ***Herra v. Toyota Motor Credit Corporation***, No. CGC 03-419 230 (San Francisco Supr. Ct.). Lieff Cabraser with co-counsel litigated against several of the largest automobile finance companies in the country to compensate victims of—and stop future instances of—racial discrimination in the setting of interest rates in automobile finance contracts. The litigation led to substantial changes in

the way Toyota Motor Credit Corporation ("TMCC"), American Honda Finance Corporation ("American Honda") and WFS Financial, Inc. sell automobile finance contracts, limiting the discrimination that can occur. In approving the settlement in *Thompson v. WFS Financial*, the Court recognized the "innovative" and "remarkable settlement" achieved on behalf of the nationwide class.  In 2006 in *Herra v. Toyota Motor Credit Corporation*, the Court granted final approval to a nationwide class action settlement on behalf of all African-American and Hispanic customers of TMCC who entered into retail installment contracts that were assigned to TMCC from 1999 to 2006.  The monetary benefit to the class was estimated to be between $159-$174 million.

8.   *In re John Muir Uninsured Healthcare Cases*, JCCP No. 4494 (Cal. Supr. Ct.).  Lieff Cabraser represented nearly 53,000 uninsured patients who received care at John Muir hospitals and outpatient centers and were charged inflated prices and then subject to overly aggressive collection practices when they failed to pay.  In November 2008, the Court approved a final settlement of the *John Muir* litigation.  John Muir agreed to provide refunds or bill adjustments of 40-50% to uninsured patients who received medical care at John Muir over a six year period, bringing their charges to the level of patients with private insurance, at a value of $115 million.  No claims were required.  Every class member received a refund or bill adjustment.  Furthermore, John Muir was required to (1) maintain charity care policies to give substantial discounts—up to 100%—to low income, uninsured patients who meet certain income requirements; (2) maintain an Uninsured Patient Discount Policy to give discounts to all uninsured patients, regardless of income, so that they pay rates no greater than those paid by patients with private insurance; (3) enhance communications to uninsured patients so they are better advised about John Muir's pricing discounts, financial assistance, and financial counseling services; and (4) limit the practices for collecting payments from uninsured patients.

9.   *Providian Credit Card Cases*, JCCP No. 4085 (San Francisco Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a certified national Settlement Class of Providian credit cardholders who alleged that Providian had engaged in widespread misconduct by charging cardholders unlawful, excessive interest and late charges, and by promoting and selling to cardholders "add-on products" promising illusory benefits and services.  In November 2001, the Court granted final approval to a $105 million settlement of the case, which also required Providian to implement substantial changes in its business practices.  The $105 million settlement, combined with an earlier settlement by Providian with Federal and state agencies, represents the largest settlement ever by a U.S. credit card company in a consumer protection case.

10. ***In re Chase Bank USA, N.A. "Check Loan" Contract Litigation***, MDL No. 2032 (N.D. Cal.). **Lieff Cabraser served as Plaintiffs' Liaison Counsel and on the Plaintiffs' Executive Committee in Multi-District Litigation ("MDL") charging that Chase Bank** violated the implied covenant of good faith and fair dealing by unilaterally modifying the terms of fixed rate loans. The MDL was established in 2009 to coordinate more than two dozen cases that were filed in the wake of the conduct at issue. The nationwide, certified class consisted of more than 1 million Chase cardholders who, in 2008 and 2009, had their monthly minimum payment requirements unilaterally increased by Chase by more than 150%. Plaintiffs alleged that Chase made this change, in part, to induce cardholders to give up their promised fixed APRs in order to avoid the unprecedented minimum payment hike. In November 2012, the Court approved a $100 million settlement of the case.

11. ***In re Synthroid Marketing Litigation***, MDL No. 1182 (N.D. Ill.). Lieff Cabraser served as Co-Lead Counsel for the purchasers of the thyroid medication Synthroid in litigation against Knoll Pharmaceutical, the manufacturer of Synthroid. The lawsuits charged that Knoll misled physicians and patients into keeping patients on Synthroid despite knowing that less costly, but equally effective drugs, were available. In 2000, the District Court gave final approval to a $87.4 million settlement with Knoll and its parent company, BASF Corporation, on behalf of a class of all consumers who purchased Synthroid at any time from 1990 to 1999. In 2001, the Court of Appeals upheld the order approving the settlement and remanded the case for further proceedings. 264 F.3d 712 (7th Cir. 2001). The settlement proceeds were distributed in 2003.

12. ***R.M. Galicia v. Franklin; Franklin v. Scripps Health***, No. IC 859468 (San Diego Supr. Ct., Cal.). Lieff Cabraser served as Lead Class Counsel in a certified class action lawsuit on behalf of 60,750 uninsured patients who alleged that the Scripps Health hospital system imposed excessive fees and charges for medical treatment. The class action originated in July 2006, when uninsured patient Phillip Franklin filed a class action cross-complaint against Scripps Health after Scripps sued Mr. Franklin through a collection agency. Mr. Franklin alleged that he, like all other uninsured patients of Scripps Health, was charged unreasonable and unconscionable rates for his medical treatment. In June 2008, the Court granted final approval to a settlement of the action which includes refunds or discounts of 35% off of medical bills, collectively worth $73 million. The settlement also required Scripps Health to modify its pricing and collections practices by (1) following an Uninsured Patient Discount Policy, which includes automatic discounts from billed charges for Hospital Services: (2) following a Charity Care Policy, which provides uninsured patients who meet certain income tests with discounts on Health Services up to 100% free care, and provides for

charity discounts under other special circumstances; (3) informing uninsured patients about the availability and terms of the above financial assistance policies; and (4) restricting certain collections practices and actively monitoring outside collection agents.

13. ***In re Lawn Mower Engine Horsepower Marketing and Sales Practices Litigation***, MDL No. 1999 (E.D. Wi.).  Lieff Cabraser served as co-counsel for consumers who alleged manufacturers of certain gasoline-powered lawn mowers misrepresented, and significantly overstated, the horsepower of the product. As the price for lawn mowers is linked to the horsepower of the engine -- the higher the horsepower, the more expensive the lawn mower -- defendants' alleged misconduct caused consumers to purchase expensive lawn mowers that provided lower horsepower than advertised. In August 2010, the Court approved a $65 million settlement of the action.

14. ***Strugano v. Nextel Communications***, No. BC 288359 (Los Angeles Supr. Ct).  In May 2006, the Los Angeles Superior Court granted final approval to a class action settlement on behalf of all California customers of Nextel from January 1, 1999 through December 31, 2002, for compensation for the harm caused by Nextel's alleged unilateral (1) addition of a $1.15 monthly service fee and/or (2) change from second-by-second billing to minute-by-minute billing, which caused "overage" charges (i.e., for exceeding their allotted cellular plan minutes).  The total benefit conferred by the Settlement directly to Class Members was between approximately $13.5 million and $55.5 million, depending on which benefit Class Members selected.

15. ***Curry v. Fairbanks Capital Corporation***, No. 03-10895-DPW (D. Mass.).  In 2004, the Court approved a $55 million settlement of a class action lawsuit against Fairbanks Capital Corporation arising out of charges against Fairbanks of misconduct in servicing its customers' mortgage loans.  The settlement also required substantial changes in Fairbanks' business practices and established a default resolution program to limit the imposition of fees and foreclosure proceedings against Fairbanks' customers.  Lieff Cabraser served as nationwide Co-Lead Counsel for the homeowners.

16. ***Payment Protection Credit Card Litigation***.  Lieff Cabraser represented consumers in litigation in federal court against some of the nation's largest credit card issuers, challenging the imposition of charges for so-called "payment protection" or "credit protection" programs.  The complaints charged that the credit card companies imposed payment protection without the consent of the consumer and/or deceptively marketed the service, and further that the credit card companies unfairly administered their payment protection programs to the detriment of

consumers.  In 2012 and 2013, the Courts approved monetary settlements with HSBC ($23.5 million), Bank of America ($20 million), and Discover ($10 million) that also required changes in the marketing and sale of payment protection to consumers.

17. ***California Title Insurance Industry Litigation***.  Lieff Cabraser, in coordination with parallel litigation brought by the Attorney General, reached settlements in 2003 and 2004 with the leading title insurance companies in California, resulting in historic industry-wide changes to the practice of providing escrow services in real estate closings.  The settlements brought a total of $50 million in restitution to California consumers, including cash payments.  In the lawsuits, plaintiffs alleged, among other things, that the title companies received interest payments on customer escrow funds that were never reimbursed to their customers. The defendant companies include Lawyers' Title, Commonwealth Land Title, Stewart Title of California, First American Title, Fidelity National Title, and Chicago Title.

18. ***Vytorin/Zetia Marketing, Sales Practices & Products Liability Litigation***, MDL No. 1938 (D. N.J.).  Lieff Cabraser served on the Executive Committee of the Plaintiffs' Steering Committee representing plaintiffs alleging that Merck/Schering-Plough Pharmaceuticals falsely marketed anti-cholesterol drugs Vytorin and Zetia as being more effective than other anti-cholesterol drugs. Plaintiffs further alleged that Merck/Schering-Plough Pharmaceuticals sold Vytorin and Zetia at higher prices than other anti-cholesterol medication when they were no more effective than other drugs. In 2010, the Court approved a $41.5 million settlement for consumers who bought Vytorin or Zetia between November 2002 and February 2010.

19. ***Morris v. AT&T Wireless Services***, No. C-04-1997-MJP (W.D. Wash.).  Lieff Cabraser served as class counsel for a nationwide settlement class of cell phone customers subjected to an end-of-billing cycle cancellation policy implemented by AT&T Wireless in 2003 and alleged to have breached customers' service agreements.  In May 2006, the New Jersey Superior Court granted final approval to a class settlement that guarantees delivery to the class of $40 million in benefits.  Class members received cash-equivalent calling cards automatically, and had the option of redeeming them for cash.  Lieff Cabraser had been prosecuting the class claims in the Western District of Washington when a settlement in New Jersey state court was announced.  Lieff Cabraser objected to that settlement as inadequate because it would have only provided $1.5 million in benefits without a cash option, and the Court agreed, declining to approve it.  Thereafter, Lieff Cabraser negotiated the new settlement providing $40 million to the class, and the settlement was approved.

20.    ***Berger v. Property I.D. Corporation***, No.  CV 05-5373-GHK (C.D. Cal.).  In January 2009, the Court granted final approval to a $39.4 million settlement with several of the nation's largest real estate brokerages, including companies doing business as Coldwell Banker, Century 21, and ERA Real Estate, and California franchisors for RE/MAX and Prudential California Realty, in an action under the Real Estate Settlement Procedures Act on behalf of California home sellers. Plaintiffs charged that the brokers and Property I.D. Corporation set up straw companies as a way to disguise kickbacks for referring their California clients' natural hazard disclosure report business to Property I.D. (the report is required to sell a home in California). Under the settlement, hundreds of thousands of California home sellers were eligible to receive a full refund of the cost of their report, typically about $100.

21.    ***In re Tri-State Crematory Litigation***, MDL No. 1467 (N.D. Ga.).  In March 2004, Lieff Cabraser delivered opening statements and began testimony in a class action by families whose loved ones were improperly cremated and desecrated by Tri-State Crematory in Noble, Georgia.  The families also asserted claims against the funeral homes that delivered the decedents to Tri-State Crematory for failing to ensure that the crematory performed cremations in the manner required under the law and by human decency.  One week into trial, settlements with the remaining funeral home defendants were reached and brought the settlement total to approximately $37 million.  Trial on the class members' claims against the operators of crematory began in August 2004.  Soon thereafter, these defendants entered into a $80 million settlement with plaintiffs.  As part of the settlement, all buildings on the Tri-State property were razed.  The property will remain in a trust so that it will be preserved in peace and dignity as a secluded memorial to those whose remains were mistreated, and to prevent crematory operations or other inappropriate activities from ever taking place there.  Earlier in the litigation, the Court granted plaintiffs' motion for class certification in a published order.  215 F.R.D. 660 (2003).

22.    ***In re American Family Enterprises***, MDL No. 1235 (D. N.J.).  Lieff Cabraser served as Co-Lead Counsel for a nationwide class of persons who received any sweepstakes materials sent under the name "American Family Publishers."  The class action lawsuit alleged that defendants deceived consumers into purchasing magazine subscriptions and merchandise in the belief that such purchases were necessary to win an American Family Publishers' sweepstakes prize or enhanced their chances of winning a sweepstakes prize.  In September 2000, the Court granted final approval of a $33 million settlement of the class action.  In April 2001, over 63,000 class members received refunds averaging over $500 each, representing 92% of their eligible purchases.  In addition,

American Family Publishers agreed to make significant changes to the way it conducts the sweepstakes.

23.   ***Walsh v. Kindred Healthcare Inc.***, No. 3:11-cv-00050 (N.D. Cal.).  Lieff Cabraser and co-counsel represented a class of 54,000 current and former residents, and families of residents, of skilled nursing care facilities in a class action against Kindred Healthcare for failing to adequately staff its nursing facilities in California.  Since January 1, 2000, skilled nursing facilities in California have been required to provide at least 3.2 hours of direct nursing hours per patient day (NHPPD), which represented the minimum staffing required for patients at skilled nursing facilities.

The complaint alleged a pervasive and intentional failure by Kindred **Healthcare to comply with California's required minimum standard for** qualified nurse staffing at its facilities. Understaffing is uniformly viewed as one of the primary causes of the inadequate care and often unsafe conditions in skilled nursing facilities. Studies have repeatedly shown a direct correlation between inadequate skilled nursing care and serious health problems, including a greater likelihood of falls, pressure sores, significant weight loss, incontinence, and premature death.  The complaint further charged that Kindred Healthcare collected millions of dollars in payments from residents and their family members, under the false pretense that it was in compliance with California staffing laws and would continue to do so.

In December 2013, the Court approved a $8.25 million settlement which included cash payments to class members and an injunction requiring Kindred Healthcare to consistently utilize staffing practices which would ensure they complied with applicable California law.  The injunction, subject to a third party monitor, was valued at between $6 to $20 million.

24.   ***Cincotta v. California Emergency Physicians Medical Group***, No. 07359096 (Cal. Supr. Ct.).  Lieff Cabraser served as class counsel for nearly 100,000 uninsured patients that alleged they were charged excessive and unfair rates for emergency room service across 55 hospitals throughout California.  The settlement, approved on October 31, 2008, provided complete debt elimination, 100% cancellation of the bill, to uninsured patients treated by California Emergency Physicians Medical Group during the 4-year class period.  These benefits were valued at $27 million.  No claims were required, so all of these bills were cancelled. In addition, the settlement required California Emergency Physicians Medical Group prospectively to (1) maintain certain discount policies for all charity care patients: (2) inform patients of the available discounts by enhanced communications; and (3) limit significantly the type of collections practices available for collecting from charity care patients.

25.     ***In re Ameriquest Mortgage Co. Mortgage Lending Practices
        Litigation***, MDL No. 1715.  Lieff Cabraser served as Co-Lead Counsel for
        borrowers who alleged that Ameriquest engaged in a predatory lending
        scheme based on the sale of loans with illegal and undisclosed fees and
        terms.  In August 2010, the Court approved a $22 million settlement.

26.     ***ING Bank Rate Renew Cases***, Case No. 11-154-LPS (D. Del.).  Lieff
        Cabraser represented borrowers in class action lawsuits charging that
        ING Direct breached its promise to allow them to refinance their
        mortgages for a flat fee.  From October 2005 through April 2009, ING
        promoted a $500 or $750 flat-rate refinancing fee called "Rate Renew" as
        a benefit of choosing ING for mortgages over competitors.  Beginning in
        May 2009, however, ING began charging a higher fee of a full monthly
        mortgage payment for refinancing using "Rate Renew," despite ING's
        earlier and lower advertised price.  As a result, the complaint alleged that
        many borrowers paid more to refinance their loans using "Rate Renew"
        than they should have, or were denied the opportunity to refinance their
        loan even though the borrowers met the terms and conditions of ING's
        original "Rate Renew" offer.  In August 2012, the Court certified a class of
        consumers in ten states who purchased or retained an ING mortgage from
        October 2005 through April 2009.  A second case on behalf of California
        consumers was filed in December 2012.  In October 2014, the Court
        approved a $20.35 million nationwide settlement of the litigation.  The
        settlement provided an average payment of $175 to the nearly 100,000
        class members, transmitted to their accounts automatically and without
        any need to file a claim form.

27.     ***Yarrington v. Solvay Pharmaceuticals***, No. 09-CV-2261 (D.
        Minn.).  In March 2010, the Court granted final approval to a
        $16.5 million settlement with Solvay Pharmaceuticals, one of the
        country's leading pharmaceutical companies.  Lieff Cabraser served as Co-
        Lead Counsel, representing a class of persons who purchased Estratest—a
        hormone replacement drug.  The class action lawsuit alleged that Solvay
        deceptively marketed and advertised Estratest as an FDA-approved drug
        when in fact Estratest was not FDA-approved for any use.  Under the
        settlement, consumers obtained partial refunds for up to 30% of the
        purchase price paid of Estratest.  In addition, $8.9 million of the
        settlement was allocated to fund programs and activities devoted to
        promoting women's health and well-being at health organizations,
        medical schools, and charities throughout the nation.

28.     ***Reverse Mortgage Cases***, JCCP No. 4061 (San Mateo County Supr.
        Ct., Cal.).  Transamerica Corporation, through its subsidiary
        Transamerica Homefirst, Inc., sold "reverse mortgages" marketed under
        the trade name "Lifetime."  The Lifetime reverse mortgages were sold
        exclusively to seniors, *i.e.*, persons 65 years or older.  Lieff Cabraser, with

co-counsel, filed suit on behalf of seniors alleging that the terms of the reverse mortgages were unfair, and that borrowers were misled as to the loan terms, including the existence and amount of certain charges and fees.  In 2003, the Court granted final approval to an $8 million settlement of the action.

29.    ***Brazil v. Dell***, No. C-07-01700 RMW (N.D. Cal.).  Lieff Cabraser served as Class Counsel representing a certified class of online consumers in California who purchased certain Dell computers based on the advertisement of an instant-off (or "slash-through") discount.  The complaint challenged Dell's pervasive use of "slash-through" reference prices in its online marketing.  Plaintiffs alleged that these "slash-through" reference prices were interpreted by consumers as representing Dell's former or regular sales prices, and that such reference prices (and corresponding representations of "savings") were false because Dell rarely, if ever, sold its products at such prices.  In October 2011, the Court approved a settlement that provided a $50 payment to each class member who submitted a timely and valid claim.  In addition, in response to the lawsuit, Dell changed its methodology for consumer online advertising, eliminating the use of "slash-through" references prices.

30.    ***Hepting v. AT&T Corp.***, Case No. C-06-0672-VRW (N.D. Cal.).  Plaintiffs alleged that AT&T collaborated with the National Security Agency in a massive warrantless surveillance program that illegally tracked the domestic and foreign communications and communications records of millions of Americans in violation of the U.S. Constitution, Electronic Communications Privacy Act, and other statutes.  The case was filed on January 2006.  The U.S. government quickly intervened and sought dismissal of the case.  By the Spring of 2006, over 50 other lawsuits were filed against various telecommunications companies, in response to a ***USA Today*** article confirming the surveillance of communications and communications records.  The cases were combined into a multi-district litigation proceeding entitled ***In re National Security Agency Telecommunications Record Litigation***, MDL No. 06-1791.  In June of 2006, the District Court rejected both the government's attempt to dismiss the case on the grounds of the state secret privilege and AT&T's arguments in favor of dismissal.  The government and AT&T appealed the decision and the U.S. Court of Appeals for the Ninth Circuit heard argument one year later.  No decision was issued.  In July 2008, Congress **granted the government and AT&T "retroactive immunity" for liability for** their wiretapping program under amendments to the Foreign Intelligence Surveillance Act that were drafted in response to this litigation.  Signed into law by President Bush in 2008, the amendments effectively terminated the litigation.  Lieff Cabraser played a leading role in the litigation working closely with co-counsel from the Electronic Frontier Foundation.

31.     ***In Re Apple and AT&T iPad Unlimited Data Plan Litigation***, No. 5:1O-cv-O2553 RMW (N.D. Ca.).  Lieff Cabraser served as class counsel in an action against Apple and AT&T charging that Apple and AT&T misrepresented that consumers purchasing an iPad with 3G capability could choose an unlimited data plan for a fixed monthly rate and switch in and out of the unlimited plan on a monthly basis as they wished.  Less than six weeks after its introduction to the U.S. market, AT&T and Apple discontinued their unlimited data plan for any iPad 3G customers not currently enrolled and prohibited current unlimited data plan customers from switching back and forth from a less expensive, limited data plan.  In March 2014, Apple agreed to compensate all class members $40 and approximately 60,000 claims were paid.  In addition, sub-class members who had not yet entered into an agreement with AT&T were offered a data plan.

## V.     Economic Injury Product Defects

### A.     Current Cases

1.     ***Front-Loading Washer Products Liability Litigation***.  Lieff Cabraser represents consumers in multiple states who have filed separate class action lawsuits against Whirlpool, Sears and LG Corporations.  The complaints charge that certain front-loading automatic washers manufactured by these companies are defectively designed and that the design defects create foul odors from mold and mildew that permeate washing machines and customers' homes.  Many class members have spent money for repairs and on other purported remedies.  As the complaints allege, none of these remedies eliminates the problem.

2.     ***In Re General Motors LLC Ignition Switch Litigation***, 14-MD-2543 (JMF); 14-MC-2434 (JMF).  On August 15, 2014, U.S. District Court Judge Jesse M. Furman appointed Elizabeth J. Cabraser as Co-Lead Plaintiffs' Counsel in the GM defective ignition switch litigation with a primary focus on economic loss claims.  The litigation seeks compensation on behalf of consumers who purchased or leased GM vehicles containing a defective ignition switch, many of which have now been recalled.  The consumer complaints allege that the ignition switches in these vehicles share a common, uniform, and defective design.  As a result, these cars are of a lesser quality than GM represented, and class members overpaid for the cars.  Further, GM's public disclosure of the ignition switch defect has caused the value of these cars to materially diminish.  The complaints seek monetary relief for the diminished value of the class members' cars.

3.     ***Honda Window Defective Window Litigation***.  Case No. 2:21-cv-01142-SVW-PLA (C.D. CA).  Lieff Cabraser represents consumers in a class action lawsuit filed against Honda Motor Company, Inc. for

manufacturing and selling vehicles with allegedly defective window regulator mechanisms. Windows in these vehicles allegedly can, without warning, drop into the door frame and break or become permanently stuck in the fully-open position.

The experience of one Honda Element owner, as set forth in the **complaint, exemplifies the problem: The driver's** side window in his vehicle slid down suddenly while he was driving on a smooth road. A few months later, the window on the passenger side of the vehicle also slid down into the door and would not move back up.  The owner incurred more than $300 in repair costs, which Honda refused to pay for. Discovery in the action is ongoing.

4.  ***In re Chinese-Manufactured Drywall Products Liability Litigation***, No. 10-30568 (E.D. La.).  Lieff Cabraser with co-counsel represents a proposed class of builders who suffered economic losses as a result of the presence of Chinese-manufactured drywall in homes and other buildings they constructed.  From 2005 to 2008, hundreds-of-millions of square feet of gypsum wallboard manufactured in China were exported to the U.S., primarily to the Gulf Coast states, and installed in newly-constructed and reconstructed properties. After installation of this drywall, owners and occupants of the properties began noticing unusual odors, blackening of silver and copper items and components, and the failure of appliances, including microwaves, refrigerators, and air-conditioning units. Some residents of the affected homes also experienced health problems, such as skin and eye irritation, respiratory issues, and headaches.

**Lieff Cabraser's client, Mit**chell Company, Inc., was the first to perfect **service on Chinese defendant Taishan Gypsum Co. Ltd. ("TG"), and** thereafter secured a default judgment against TG.  Lieff Cabraser participated in briefing that led to the District Court**'s denial of TG's** motion to dismiss the class action complaint for lack of personal jurisdiction.  On May 21, 2014, the U.S. Court of Appeals for the Fifth Court affirmed the District Court**'s default judgment against TG, finding** jurisdiction based on ties of the company and its agent with state distributors.  753 F.3d 521 (5th Cir. 2014).

5.  ***McGuire v. BMW of North America***, No. 2:13-cv-07356 (D.N.J.).  With co-counsel, Lieff Cabraser represents the plaintiff in a class action lawsuit filed on behalf of all persons in the U.S. who own or **lease a BMW vehicle equipped with BMW's Advanced Real**-Time Traffic **Information ("ARTTI")** navigation system.  BMW markets ARTTI as providing reliable, accurate, and real-time traffic information, and that ARTTI will notify drivers of traffic congestion and accidents along their routes and automatically offer a new route to avoid the traffic

incident.  The complaint alleges that ARTTI is defective in that it fails to display local real-time traffic information for the area, and fails to automatically re-route ARTTI-equipped vehicles to avoid traffic incidents **along the vehicle's intended route.**  The complaint further alleges that BMW was aware of the defects in ARTII prior to marketing and selling vehicles equipped with the navigation system, and BMW has failed to repair or remedy the defect for plaintiff and class members who brought their vehicle to authorized BMW services centers to address the ARTTI defect.

**B.      Successes**

1.      ***In re Mercedes-Benz Tele-Aid Contract Litigation***, MDL No. 1914 (D. N.J.).  Lieff Cabraser represented owners and lessees of Mercedes-Benz cars and SUVs equipped with the Tele-Aid system, an emergency response system which links subscribers to road-side assistance operators by using a combination of global positioning and cellular technology.  In 2002, the Federal Communications Commission issued a rule, effective 2008, eliminating the requirement that wireless phone carriers provide analog-based networks.  The Tele-Aid system offered by Mercedes-Benz relied on analog signals.  Plaintiffs charged that Mercedes-Benz committed fraud in promoting and selling the Tele-Aid system without disclosing to buyers of certain model years that the Tele-Aid system as installed would become obsolete in 2008.

In an April 2009 published order, the Court certified a nationwide class of all persons or entities in the U.S. who purchased or leased a Mercedes-Benz vehicle equipped with an analog-only Tele Aid system after August 8, 2002, and (1) subscribed to Tele Aid service until being informed that such service would be discontinued at the end of 2007, or (2) purchased an upgrade to digital equipment.  In September 2011, the Court approved a settlement that provided class members between a $650 check or a $750 to $1,300 certificate toward the purchase or lease of new Mercedes-Benz vehicle, depending upon whether or not they paid for an upgrade of the analog Tele Aid system and whether they still owned their vehicle.  In approving the settlement, U.S. District Court Judge Dickinson R. Debevoise stated,  "I want to thank counsel for the . . . very effective and good work . . . .  It was carried out with vigor, integrity and aggressiveness with never going beyond the maxims of the Court."

2.      ***McLennan v. LG Electronics USA***, No. 2:10-cv-03604 (D. N.J.).  Lieff Cabraser represented consumers who alleged several LG refrigerator models had a faulty design that caused the interior lights to remain on even when the refrigerator doors were closed (identified as the "light issue"), resulting in overheating and food spoilage. In March 2012, the Court granted final approval to a settlement of the nationwide class

action lawsuit.  The settlement provides that LG reimburse class members for all out-of-pocket costs (parts and labor) to repair the light issue prior to the mailing of the class notice and extends the warranty with respect to the light issue for 10 years from the date of the original retail purchase of the refrigerator.  The extended warranty covers in-home refrigerator repair performed by LG and, in some cases, the cost of a replacement refrigerator.  In approving the settlement, U.S. District Court Judge William J. Martini stated, **"The** Settlement in this case provides for both the complete reimbursement of out-of-pocket expenses for repairs fixing the Light Issue, as well as a warranty for ten years from the date of refrigerator purchase. It would be hard to imagine a better recovery for the Class had the litigation gone to trial. Because Class members will essentially receive all of the relief to which they would have been entitled after a successful trial, this factor weighs heavily in favor of settlement.**"**

3.  ***Grays Harbor Adventist Christian School v. Carrier Corporation***, No. 05-05437 (W.D. Wash.).  In April 2008, the Court approved a nationwide settlement for current and past owners of high-efficiency furnaces manufactured and sold by Carrier Corporation and equipped with polypropylene-laminated condensing heat exchangers ("CHXs").  Carrier sold the furnaces under the Carrier, Bryant, Day & Night and Payne brand-names.  Plaintiffs alleged that starting in 1989 Carrier began manufacturing and selling high efficiency condensing furnaces manufactured with a secondary CHX made of inferior materials.  Plaintiffs alleged that as a result, the CHXs, which Carrier warranted and consumers expected to last for 20 years, failed prematurely.  The settlement provides an enhanced 20-year warranty of free service and free parts for consumers whose furnaces have not yet failed.  The settlement also offers a cash reimbursement for consumers who already paid to repair or replace the CHX in their high-efficiency Carrier furnaces.

An estimated three million or more consumers in the U.S. and Canada purchased the furnaces covered under the settlement.  Plaintiffs valued the settlement to consumers at over $300 million based upon the combined value of the cash reimbursement and the estimated cost of an enhanced warranty of this nature.

4.  ***Carideo v. Dell***, No. C06-1772 JLR (W.D. Wash.).  Lieff Cabraser represented consumers who owned Dell Inspiron notebook computer model numbers 1150, 5100, or 5160.  The class action lawsuit complaint charged that the notebooks suffered premature failure of their cooling system, power supply system, and/or motherboards.  In December 2010, the Court approved a settlement which provided class members that paid Dell for certain repairs to their Inspiron notebook computer a reimbursement of all or a portion of the cost of the repairs.

5.    ***Cartwright v. Viking Industries***, No. 2:07-cv-2159 FCD (E.D. Cal.)
Lieff Cabraser represented California homeowners in a class action
lawsuit which alleged that over one million Series 3000 windows
produced and distributed by Viking between 1989 and 1999 were
defective.  The plaintiffs charged that the windows were not watertight
and allowed for water to penetrate the surrounding sheetrock, drywall,
paint or wallpaper.  Under the terms of a settlement approved by the
Court in August 2010, all class members who submitted valid claims were
entitled to receive as much as $500 per affected property.

6.    ***Pelletz v. Advanced Environmental Recycling Technologies***
(W.D. Wash.).  Lieff Cabraser served as Co-Lead Counsel in a case alleging
that ChoiceDek decking materials, manufactured by AERT, developed
persistent and untreatable mold spotting throughout their surface.  In a
published opinion in January 2009, the Court approved a settlement that
provided affected consumers with free and discounted deck treatments,
mold inhibitor applications, and product replacement and
reimbursement.

7.    ***Create-A-Card v. Intuit***, No. C07-6452 WHA (N.D. Cal.).  Lieff
Cabraser, with co-counsel, represented business users of QuickBooks Pro
for accounting that lost their QuickBooks data and other files due to faulty
software code sent by Intuit, the producer of QuickBooks.  In September
2009, the Court granted final approval to a settlement that provided all
class members who filed a valid claim with a free software upgrade and
compensation for certain data-recovery costs.  Commenting on the
settlement and the work of Lieff Cabraser on September 17, 2009, U.S.
District Court Judge William H. Alsup stated, "I want to come back to
something that I observed in this case firsthand for a long time now.  I
think you've done an excellent job in the case as class counsel and the
class has been well represented having you and your firm in the case."

8.    ***Weekend Warrior Trailer Cases***, JCCP No. 4455 (Cal. Supr. Ct.).
Lieff Cabraser, with co-counsel, represented owners of Weekend Warrior
trailers manufactured between 1998 and 2006 that were equipped with
frames manufactured, assembled, or supplied by Zieman Manufacturing
Company.  The trailers, commonly referred to as "toy haulers," were used
to transport outdoor recreational equipment such as motorcycles and all-
terrain vehicles.  Plaintiffs charged that Weekend Warrior and Zieman
knew of design and performance problems, including bent frames,
detached siding, and warped forward cargo areas, with the trailers, and
concealed the defects from consumers.  In February 2008, the Court
approved a $5.5 million settlement of the action that provided for the
repair and/or reimbursement of the trailers.  In approving the settlement,
California Superior Court Judge Thierry P. Colaw stated that class counsel

were "some of the best" and "there was an overwhelming positive reaction to the settlement" among class members.

9.  ***Lundell v. Dell***, No. C05-03970 (N.D. Cal.).  Lieff Cabraser served as Lead Class Counsel for consumers who experienced power problems with the Dell Inspiron 5150 notebook.  In December 2006, the Court granted final approval to a settlement of the class action which extended the one-year limited warranty on the notebook for a set of repairs related to the power system.  In addition, class members that paid Dell or a third party for repair of the power system of their notebook were entitled to a 100% cash refund from Dell.

10.  ***Kan v. Toshiba American Information Systems***, No. BC327273 (Los Angeles Super. Ct.).  Lieff Cabraser served as Co-Lead Counsel for a class of all end-user persons or entities who purchased or otherwise acquired in the United States, for their own use and not for resale, a new Toshiba Satellite Pro 6100 Series notebook.  Consumers alleged a series of defects were present in the notebook.  In 2006, the Court approved a settlement that extended the warranty for all Satellite Pro 6100 notebooks, provided cash compensation for certain repairs, and reimbursed class members for certain out-of-warranty repair expenses.

11.  ***Foothill/DeAnza Community College District v. Northwest Pipe Company***, No. C-00-20749 (N.D. Cal.).  In June 2004, the Court approved the creation of a settlement fund of up to $14.5 million for property owners nationwide with Poz-Lok fire sprinkler piping that fails.  Since 1990, Poz-Lok pipes and pipe fittings were sold in the U.S. as part of fire suppression systems for use in residential and commercial buildings.  After leaks in Poz-Lok pipes caused damage to its DeAnza Campus Center building, Foothill/DeAnza Community College District in California retained Lieff Cabraser to file a class action lawsuit against the manufacturers of Poz-Lok.  The college district charged that Poz-Lok pipe had manufacturing and design defects that resulted in the premature corrosion and failure of the product.  Under the settlement, owners whose Poz-Lok pipes are leaking today, or over the next 15 years, may file a claim for compensation.

12.  ***Toshiba Laptop Screen Flicker Settlement***.  Lieff Cabraser negotiated a settlement with Toshiba America Information Systems, Inc. ("TAIS") to provide relief for owners of certain Toshiba Satellite 1800 Series, Satellite Pro 4600 and Tecra 8100 personal notebook computers whose screens flickered, dimmed or went blank due to an issue with the FL Inverter Board component.  In 2004 under the terms of the Settlement, owners of affected computers who paid to have the FL Inverter issue repaired by either TAIS or an authorized TAIS service provider recovered the cost of that repair, up to $300 for the Satellite

1800 Series and the Satellite Pro 4600 personal computers, or $400 for the Tecra 8100 personal computers.  TAIS also agreed to extend the affected computers' warranties for the FL Inverter issue by 18 months.

13.  ***McManus v. Fleetwood Enterprises, Inc.***, No. SA-99-CA-464-FB (W.D. Tex.).  Lieff Cabraser served as Class Counsel on behalf of original owners of 1994-2000 model year Fleetwood Class A and Class C motor homes.  In 2003, the Court approved a settlement that resolved lawsuits pending in Texas and California about braking while towing with 1994 Fleetwood Class A and Class C motor homes.  The lawsuits alleged that Fleetwood misrepresented the towing capabilities of new motor homes it sold, and claimed that Fleetwood should have told buyers that a supplemental braking system is needed to stop safely while towing heavy items, such as a vehicle or trailer.  The settlement paid $250 to people who bought a supplemental braking system for Fleetwood motor homes that they bought new.   Earlier, the appellate court found that common **questions predominated under purchasers' breach of implied warranty of merchantability claim.** 320 F.3d 545 (5th Cir. 2003).

14.  ***Richison v. American Cemwood Corp.***, No. 005532 (San Joaquin Supr. Ct., Cal.).  Lieff Cabraser served as Co-Lead Class Counsel for an estimated nationwide class of 30,000 owners of homes and other structures on which defective Cemwood Shakes were installed.  In November 2003, the Court granted final approval to a $75 million Phase 2 settlement in the American Cemwood roofing shakes national class action litigation.  This amount was in addition to a $65 million partial settlement approved by the Court in May 2000, and brought the litigation to a conclusion.

15.  ***ABS Pipe Litigation***, JCCP No. 3126 (Contra Costa County Supr. Ct., Cal.).  Lieff Cabraser served as Lead Class Counsel on behalf of property owners whose ABS plumbing pipe was allegedly defective and caused property damage by leaking.  Six separate class actions were filed in California against five different ABS pipe manufacturers, numerous developers of homes containing the ABS pipe, as well as the resin supplier and the entity charged with ensuring the integrity of the product.  Between 1998 and 2001, we achieved 12 separate settlements in the class actions and related individual lawsuits for approximately $78 million.

Commenting on the work of Lieff Cabraser and co-counsel in the case, California Superior Court (now appellate) Judge Mark B. Simons stated on May 14, 1998: "The attorneys who were involved in the resolution of the case certainly entered the case with impressive reputations and did nothing in the course of their work on this case to diminish these reputations, but underlined, in my opinion, how well deserved those reputations are."

16.   ***Williams v. Weyerhaeuser***, No. 995787 (San Francisco Supr. Ct.).
Lieff Cabraser served as Class Counsel on behalf of a nationwide class of
hundreds of thousands or millions of owners of homes and other
structures with defective Weyerhaeuser hardboard siding.  A California-
wide class was certified for all purposes in February 1999, and withstood
writ review by both the California Court of Appeals and Supreme Court of
California.  In 2000, the Court granted final approval to a nationwide
settlement of the case which provides class members with compensation
for their damaged siding, based on the cost of replacing or, in some
instances, repairing, damaged siding.  The settlement has no cap, and
requires Weyerhaeuser to pay all timely, qualified claims over a nine year
period.  The claims program is underway and paying claims.

17.   ***Naef v. Masonite***, No. CV-94-4033 (Mobile County Circuit Ct., Ala.).
Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide
Class of an estimated 4 million homeowners with allegedly defective
hardboard siding manufactured and sold by Masonite Corporation, a
subsidiary of International Paper, installed on their homes. The Court
certified the class in November 1995, and the Alabama Supreme Court
twice denied extraordinary writs seeking to decertify the Class, including
in ***Ex Parte Masonite***, 681 So. 2d 1068 (Ala. 1996).  A month-long jury
trial in 1996 established the factual predicate that Masonite hardboard
siding was defective under the laws of most states.  The case settled on the
eve of a second class-wide trial, and in 1998, the Court approved a
settlement.  Under a claims program established by the settlement that
ran through 2008, class members with failing Masonite hardboard siding
installed and incorporated in their property between January 1, 1980 and
January 15, 1998 were entitled to make claims, have their homes
evaluated by independent inspectors, and receive cash payments for
damaged siding.  Combined with settlements involving other alleged
defective home building products sold by Masonite, the total cash paid to
homeowners exceeded $1 billion.

18.   ***In re General Motors Corp. Pick-Up Fuel Tank Products***
***Liability Litigation***, MDL No. 961 (E.D. Pa.).  Lieff Cabraser served as
Court-appointed Co-Lead Counsel representing a class of 4.7 million
plaintiffs who owned 1973-1987 GM C/K pickup trucks with allegedly
defective gas tanks.  The Consolidated Complaint asserted claims under
the Lanham Act, the Magnuson-Moss Act, state consumer protection
statutes, and common law.  In 1995, the Third Circuit vacated the District
Court settlement approval order and remanded the matter to the District
Court for further proceedings.  In July 1996, a new nationwide class
action was certified for purposes of an enhanced settlement program
valued at a minimum of $600 million, plus funding for independent fuel
system safety research projects.  The Court granted final approval of the
settlement in November 1996.

19. ***In re Louisiana-Pacific Inner-Seal Siding Litigation***, No. C-95-879-JO (D. Ore.).  Lieff Cabraser served as Co-Lead Class Counsel on behalf of a nationwide class of homeowners with defective exterior siding on their homes.  Plaintiffs asserted claims for breach of warranty, fraud, negligence, and violation of consumer protection statutes.  In 1996, U.S. District Court Judge Robert E. Jones entered an Order, Final Judgment and Decree granting final approval to a nationwide settlement requiring Louisiana-Pacific to provide funding up to $475 million to pay for inspection of homes and repair and replacement of failing siding over the next seven years.

20. ***In re Intel Pentium Processor Litigation***, No. CV 745729 (Santa Clara Supr. Ct., Cal.).  Lieff Cabraser served as one of two Court-appointed Co-Lead Class Counsel, and negotiated a settlement, approved by the Court in June 1995, involving both injunctive relief and damages having an economic value of approximately $1 billion.

21. ***Cox v. Shell***, No. 18,844 (Obion County Chancery Ct., Tenn.).  Lieff Cabraser served as Class Counsel on behalf of a nationwide class of approximately 6 million owners of property equipped with defective polybutylene plumbing systems and yard service lines.  In November 1995, the Court approved a settlement involving an initial commitment by Defendants of $950 million in compensation for past and future expenses incurred as a result of pipe leaks, and to provide replacement pipes to eligible claimants.  The deadline for filing claims expired in 2009.

22. ***Hanlon v. Chrysler Corp.***, No. C-95-2010-CAL (N.D. Cal.).  In 1995, the District Court approved a $200+ million settlement enforcing Chrysler's comprehensive minivan rear latch replacement program, and to correct alleged safety problems with Chrysler's pre-1995 designs.  As part of the settlement, Chrysler agreed to replace the rear latches with redesigned latches.  The settlement was affirmed on appeal by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (1998).

23. ***Gross v. Mobil***, No. C 95-1237-SI (N.D. Cal.).  Lieff Cabraser served as Plaintiffs' Class Counsel in this nationwide action involving an estimated 2,500 aircraft engine owners whose engines were affected by Mobil AV-1, an aircraft engine oil.  Plaintiffs alleged claims for strict liability, negligence, misrepresentation, violation of consumer protection statutes, and for injunctive relief.  Plaintiffs obtained a preliminary injunction requiring Defendant Mobil Corporation to provide notice to all potential class members of the risks associated with past use of Defendants' aircraft engine oil.  In addition, Plaintiffs negotiated a proposed Settlement, granted final approval by the Court in November 1995, valued at over $12.5 million, under which all Class Members were eligible to participate in an engine inspection and repair program, and receive compensation for

past repairs and for the loss of use of their aircraft associated with damage caused by Mobil AV-1.

## VI.    Antitrust/Trade Regulation/Intellectual Property

### A.    Current Cases

1.    ***In re High-Tech Employee Antitrust Litigation***, No. 11 CV 2509 (N.D. Cal.).  Lieff Cabraser serves as Co-Lead Class Counsel in a consolidated class action charging that Adobe Systems Inc., Apple Inc., Google Inc., Intel Corporation, Intuit Inc., Lucasfilm Ltd., and Pixar violated antitrust laws by conspiring to suppress the pay of technical, creative, and other salaried employees.  The complaint alleges that the conspiracy among defendants restricted recruiting of each other's employees.  On October 24, 2013, U.S. District Court Judge Lucy H. Koh certified a class of approximately 64,000 persons who worked in Defendants' technical, creative, and/or research and development jobs from 2005-2009.  On September 2, 2015, the Court approved a $415 million settlement with Apple, Google, Intel, and Adobe.  Earlier, on May 15, 2014, the Court approved partial settlements totaling $20 million resolving claims against Intuit, Lucasfilm, and Pixar.

2.    ***Charles Schwab Bank, N.A. v. Bank of America Corp.***, No. 11 CV 6411 (N.D. Cal.).  Lieff Cabraser serves as counsel for The Charles Schwab Corporation, its affiliates Charles Schwab Bank, N.A., and Charles Schwab & Co., Inc., which manages the investments of the Charles Schwab Bank, N.A. (collectively "Schwab"), and several series of The Charles Schwab Family of Funds, Schwab Investments, Charles Schwab Worldwide Funds plc ("Schwab Fund Series"), and the Bay Area Toll Authority ("BATA") in individual lawsuits against Bank of America Corporation, Credit Suisse Group AG, J.P. Morgan Chase & Co., Citibank, Inc., and additional banks for allegedly manipulating the London Interbank Offered Rate ("LIBOR").

The complaints allege that beginning in 2007, the defendants conspired to understate their true costs of borrowing, causing the calculation of LIBOR to be set artificially low.  As a result, Schwab, the Schwab Fund Series, and BATA received less than their rightful rates of return on their LIBOR-based investments.  The complaints assert claims under federal antitrust laws, the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the statutory and common law of California.  The actions were transferred to the Southern District of New York for consolidated or coordinated proceedings with the LIBOR multidistrict litigation pending there.  The MDL is proceeding.

3.    ***Cipro Cases I and II***, JCCP Nos. 4154 and 4220 (Cal. Supr. Ct.).  Lieff Cabraser represents California consumers and third party payors in a class action lawsuit filed in California state court charging that Bayer

Corporation, Barr Laboratories, and other generic prescription drug **manufacturers conspired to restrain competition in the sale of Bayer's** blockbuster antibiotic drug Ciprofloxacin, sold as Cipro.  Between 1997 and 2003, Bayer paid its would-be generic drug competitors nearly $400 million to refrain from selling more affordable versions of Cipro.  As a result, consumers were forced to pay inflated prices for the drug -- frequently prescribed to treat urinary tract, prostate, abdominal, and other infections.

The Trial Court **granted defendants' motion for summary judgment,** which the Appellate Court affirmed in October 2011.  Plaintiffs sought review before the California Supreme Court and were successful.  Following briefing, the case was stayed pending the U.S. **Supreme Court's decision in *FTC v. Actavis*.  After the U.S. Supreme Court in *Actavis* overturned the Appellate Court's ruling that pay-for-**delay deals in the pharmaceutical industry are generally legal, plaintiffs and Bayer entered into settlement negotiations.  In November 2013, the Trial Court approved a $74 million settlement with Bayer.

On May 7, 2015, the California Supreme Court resoundingly endorsed consumers' right to challenge pharmaceutical pay-for-delay settlements under California competition law.  The Court held that "[p]arties illegally restrain trade when they privately agree to substitute consensual monopoly in place of potential competition."

4.  ***In re Lithium-Ion Batteries Antitrust Litigation***, MDL No. 2420. Lieff Cabraser serves as Interim Co-Lead Indirect Purchaser Counsel representing consumers in a class action filed against LG, GS Yuasa, NEC, Sony, Sanyo, Panasonic, Hitachi, LG Chem, Samsung, Toshiba, and Sanyo for allegedly conspiring to fix and raise the prices of lithium-ion rechargeable batteries in violation of U.S. antitrust law from 2002 to 2011.  **The defendants are the world's leading manufacturers of lithium-**ion rechargeable batteries, which provide power for a wide variety of consumer electronic products.  As a result of the defendants' alleged anticompetitive and unlawful conduct, consumers across America paid artificially inflated prices for lithium-ion rechargeable batteries.

5.  ***In re Capacitors Antitrust Litigation,*** No. 3:14-cv-03264 (N.D. Cal.). Lieff Cabraser is a member **of the plaintiffs' steering committee** representing indirect purchases in an antitrust class action lawsuit filed against the world's largest manufacturers of capacitors. The complaint charges that the defendants conspired to unlawfully fix and raise the prices in the U.S. for electrolytic and film capacitors. The defendants include Panasonic Corp., Elna Co. Ltd., Hitachi Chemical Co., Ltd., Nistuko Electronics Corp., NEC Tokin Corp., SANYO Electric Co., Ltd., Matsuo Electric Co., Nippon Chemi-con Corp., Nichicon Corp., Rubycon

Corp., Taitsu Corp., and Toshin Kogyo Co., Ltd. The majority of motions to dismiss have been denied by the court. The case is currently in fact discovery.

6.   ***In re Disposable Contact Lens Antitrust Litigation,*** MDL No. 2626 (M.D. Fla.). Lieff Cabraser represents consumers who purchased disposable contact lenses manufactured by Alcon Laboratories, Inc., Johnson & Johnson Vision Care, Inc., Bausch + Lomb, and Cooper Vision, Inc.  The complaint challenges under federal and state antitrust laws the use by contact lens manufacturers of minimum resale price maintenance agreements with independent eye care professionals (including optometrists and ophthalmologists) and wholesalers.  These agreements, the complaint alleges, operate to raise retail prices and eliminate price **competition and discounts on contact lenses, including from "big box"** retail stores, discount buying clubs, and online retailers.  As a result, the consumers across America have paid artificially inflated prices for contact lenses.

7.   ***Jackson v. American Airlines***, No. 3:15-cv-03520 (N.D. Cal.).  Lieff Cabraser represents consumers in a class action lawsuit against the four largest U.S. airline carriers:  American Airlines Group, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc.  These airlines that collectively account for over 80 percent of all domestic airline travel. The complaint alleges that for years the airlines have colluded to restrain capacity, eliminate competition in the market, and increase the price of domestic airline airfares in violation of U.S. antitrust law.  The proposed class consists of all persons and entities who purchased domestic airline tickets directly from one or more defendants from July 2, 2011 to the present.

8.   ***Seaman v. Duke University***, No. 1:15-cv-00462 (M.D. N.C.).  Lieff Cabraser represents Danielle M. Seaman, M.D., in a class action lawsuit against Duke University ("Duke"); Duke University Health System ("DUHS"); and Dr. William L. Roper, M.D., M.P.H., in his official capacity as Dean and Vice-Chancellor of Medical Affairs for University of North **Carolina at Chapel Hill School of Medicine ("UNC"), and** Chief Executive Officer of the University of North Carolina Health Care System.  The complaint charges that the defendants entered into an express, secret agreement not to hire or attempt to hire certain medical facility faculty and staff that they each employed.  The lawsuit seeks to recover damages **and obtain injunctive relief, including treble damages, for defendants'** alleged violations of federal and North Carolina antitrust law.

9.   ***In re Municipal Derivatives Litigation***, MDL No. 1950 (S.D.N.Y.). Lieff Cabraser represents the City of Oakland, the County of Alameda, City of Fresno, Fresno County Financing Authority, and East Bay Delta

Housing and Finance Agency in a class action lawsuit brought on behalf of themselves and California entities that purchased guaranteed investment contracts, swaps, and other municipal derivatives products from Bank of America, N.A., JP Morgan Chase & Co., Piper Jaffray & Co., Societe Generale SA, UBS AG, and other banks, brokers and financial institutions. The complaint charges that defendants conspired to give cities, counties, school districts, and other governmental agencies artificially low bids for guaranteed investment contracts, swaps, and other municipal derivatives products, which are used by public entities use to earn interest on bond proceeds. The complaint charges that defendants met secretly to discuss prices, customers, and markets of municipal derivatives sold in the U.S. and elsewhere; intentionally created the false appearance of competition by engaging in sham auctions in which the results were pre-determined or agreed not to bid on contracts; and covertly shared their unjust profits with losing bidders to maintain the conspiracy. In April 2010, the Court **denied defendants' motions to dismiss.** Lieff Cabraser has settled its five municipality clients' claims with several defendants.

## B.      Successes

1.      ***Natural Gas Antitrust Cases***, JCCP Nos. 4221, 4224, 4226 & 4228 (Cal. Supr. Ct.). In 2003, the Court approved a landmark of $1.1 billion settlement in class action litigation against El Paso Natural Gas Co. for manipulating the market for natural gas pipeline transmission capacity into California. Lieff Cabrase**r served as Plaintiffs' Co**-Lead Counsel and Co-Liaison Counsel in the ***Natural Gas Antitrust Cases I-IV***.

In June 2007, the Court granted final approval to a $67.39 million settlement of a series of class action lawsuits brought by California business and residential consumers of natural gas against a group of natural gas suppliers, Reliant Energy Services, Inc., Duke Energy Trading and Marketing LLC, CMS Energy Resources Management Company, and Aquila Merchant Services, Inc.

Plaintiffs charged defendants with manipulating the price of natural gas in California during the California energy crisis of 2000-2001 by a variety of means, including falsely reporting the prices and quantities of natural gas transactions to trade publications, which compiled daily and monthly natural gas price indices; prearranged wash trading; and, in the case of **Reliant, "churning" on the Enron Online electronic trading platform,** which was facilitated by a secret netting agreement between Reliant and Enron.

The 2007 settlement followed a settlement reached in 2006 for $92 million partial settlement with Coral Energy Resources, L.P.; Dynegy Inc. and affiliates; EnCana Corporation; WD Energy Services, Inc.; and The Williams Companies, Inc. and affiliates.

2.   ***Wholesale Electricity Antitrust Cases I & II***, JCCP Nos. 4204 & 4205 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel in the private class action litigation against Duke Energy Trading & Marketing, Reliant Energy, and The Williams Companies for claims that the companies manipul**ated California's wholesale electricity markets during** the California energy crisis of 2000-2001.  Extending the landmark victories for California residential and business consumers of electricity, in September 2004, plaintiffs reached a $206 million settlement with Duke Energy Trading & Marketing, and in August 2005, plaintiffs reached a $460 million settlement with Reliant Energy, settling claims that the **companies manipulated California's wholesale electricity markets during** the California energy crisis of 2000-01.  Lieff Cabraser earlier entered into a settlement for over $400 million with The Williams Companies.

3.   ***In re Brand Name Prescription Drugs***, MDL No. 997 (N.D. Ill.).  Lieff Cabraser served as Class Counsel for a class of tens of thousands of retail pharmacies against the leading pharmaceutical manufacturers and wholesalers of brand name prescription drugs for alleged price-fixing from 1989 to 1995 in violation of the federal antitrust laws.  Plaintiffs charged that defendants engaged in price discrimination against retail pharmacies by denying them discounts provided to hospitals, health maintenance organizations, and nursing homes.  In 1996 and 1998, the Court approved settlements with certain manufacturers totaling $723 million.

4.   ***Microsoft Private Antitrust Litigation***.  Representing businesses and consumers, Lieff Cabraser prosecuted multiple private antitrust cases against Microsoft Corporation in state courts across the country, including Florida, New York, North Carolina, and Tennessee.  Plaintiffs alleged that Microsoft had engaged in anticompetitive conduct, violated state deceptive and unfair business practices statutes, and overcharged businesses and consumers for Windows operating system software and for certain software applications, including Microsoft Word and Microsoft Office.  In August 2006, the New York Supreme Court granted final approval to a settlement that made available up to $350 million in benefits for New York businesses and consumers.  In August 2004, the Court in the North Carolina action granted final approval to a settlement valued at over $89 million.  In June 2004, the Court in the Tennessee action granted final approval to a $64 million settlement.  In November 2003, in the Florida Microsoft litigation, the Court granted final approval to a $202 million settlement, one of the largest antitrust settlements in Florida history.  Lieff Cabraser served as Co-Lead Counsel in the New York, North Carolina and Tennessee cases, and held leadership roles in the Florida case.

5.      ***In re TFT-Flat Panel) Antitrust Litigation***, MDL No. 1827 (N.D. Cal.).  Lieff Cabraser served as Court-appointed Co-Lead Counsel for **direct purchasers in litigation against the world's leading manufacturers** of Thin Film Transistor Liquid Crystal Displays.  TFT-LCDs are used in flat-panel televisions as well as computer monitors, laptop computers, mobile phones, personal digital assistants, and other devices.  Plaintiffs charged that defendants conspired to raise and fix the prices of TFT-LCD panels and certain products containing those panels for over a decade, resulting in overcharges to purchasers of those panels and products.  In March 2010, the Court certified two nationwide classes of persons and entities that directly purchased TFT-LCDs from January 1, 1999 through December 31, 2006, one class of panel purchasers, and one class of buyers of laptop computers, computer monitors, and televisions that contained TFT-LCDs.  Over the course of the litigation, the classes reached settlements with all defendants except Toshiba.  The case against Toshiba proceeded to trial.  In July 2012, the jury found that Toshiba participated in the price-fixing conspiracy.  The case was subsequently settled, bringing the total settlements in the litigation to over $470 million.  For his outstanding work in the precedent-setting litigation, California Lawyer recognized Richard M. Heimann with a 2013 California Lawyer of the Year award.

6.      ***Sullivan v. DB Investments***, No. 04-02819 (D. N.J.).  Lieff Cabraser served as Class Counsel for consumers who purchased diamonds from 1994 through March 31, 2006, in a class action lawsuit against the De Beers group of companies.  Plaintiffs charged that De Beers conspired to monopolize the sale of rough diamonds in the U.S.  In May 2008, the District Court approved a $295 million settlement for purchasers of diamonds and diamond jewelry, including $130 million to consumers.  The settlement also barred De Beers from continuing its illegal business practices and required De Beers to submit to the jurisdiction of the Court to enforce the settlement.  In December 2011, the Third Circuit Court of Appeals affirmed the District Court**'s order approving the settlement.  667** F.3d 273 (3rd Cir. 2011).

For sixty years, De Beers has flouted U.S. antitrust laws.  In 1999, De **Beers' Chairman Nicholas Oppenheimer stated that De Beers "likes to think of itself as the world's . . . longest**-running monopoly.  [We seek] to manage the diamond market, to control supply, to manage prices and to act collusively with our part**ers in the business."  The hard**-fought litigation spanned several years and nations.  Despite the tremendous resources available to the U.S. Department of Justice and state attorney **generals, it was only through the determination of plaintiffs' counsel tha**t De Beers was finally brought to justice and the rights of consumers were vindicated.  Lieff Cabraser attorneys played key roles in negotiating the settlement and defending it on appeal.  Discussing the DeBeers case, The

National Law Journal noted that Lieff Cabraser was "among the plaintiffs' firms that weren't afraid to take on one of the business world's great white whales."

7.   ***In re Linerboard Antitrust Litigation***, MDL No. 1261 (E.D. Pa.). Lieff Cabraser served as Class Counsel on behalf of a class of direct purchasers of linerboard.  The Court approved a settlement totaling $202 million.

8.   ***Azizian v. Federated Department Stores***, No. 3:03 CV 03359 SBA (N.D. Cal.).  In March 2005, the Court granted final approval to a settlement that Lieff Cabraser and co-counsel reached with numerous department store cosmetics manufacturers and retailers.  The settlement was valued at $175 million and included significant injunctive relief, for the benefit of a nationwide class of consumers of department store cosmetics.  The complaint alleged the manufacturers and retailers violated antitrust law by engaging in anticompetitive practices to prevent discounting of department store cosmetics.

9.   ***Haley Paint Co. v. E.I. Dupont De Nemours and Co. et al.***, No. 10-cv-00318-RDB (D. Md.).  Lieff Cabraser served as Co-Lead Counsel for direct purchasers of titanium dioxide in a nationwide class action lawsuit against Defendants E.I. Dupont De Nemours and Co., Huntsman International LLC, Kronos Worldwide Inc., and Cristal Global (fka Millennium Inorganic Chemicals, Inc.), alleging these corporations participated in a global cartel to fix the price of titanium dioxide.  Titanium dioxide, a dry chemical powder, is the world's most widely used pigment for providing whiteness and brightness in paints, paper, plastics, and other products.  Plaintiffs charged that defendants coordinated increases in the prices for titanium dioxide despite declining demand, decreasing raw material costs, and industry overcapacity.

Unlike some antitrust class actions, Plaintiffs proceeded without the benefit of any government investigation or proceeding.  Plaintiffs overcame attacks on the pleadings, discovery obstacles, a rigorous class certification process that required two full rounds of briefing and expert analysis, and multiple summary judgment motions.  In August 2012, the Court certified the class.  Plaintiffs prepared fully for trial and achieved a settlement with the final defendant on the last business day before trial.  In December 2013, the Court approved a series of settlements with defendants totaling $163 million.

10.   ***Pharmaceutical Cases I, II, and III***, JCCP Nos. 2969, 2971 & 2972 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel and Co-Liaison Counsel representing a certified class of indirect purchasers (consumers) on claims against the major pharmaceutical manufacturers for violations of the Cartwright Act and the Unfair Competition Act.  The class alleged

that defendants unlawfully fixed discriminatory prices on prescription drugs to retail pharmacists in comparison with the prices charged to certain favored purchasers, including HMOs and mail order houses.  In April 1999, the Court approved a settlement providing $148 million in free, brand-name prescription drugs to health agencies that served **California's poor and uninsured.  In October 2001, the Court approved a** settlement with the remaining defendants in the case, which provided an additional $23 million in free, brand-name prescription drugs to these agencies.

11.     ***In re Lupron Marketing and Sales Practices Litigation***, MDL No. 1430 (D. Mass.).  In May 2005, the Court granted final approval to a settlement of a class action lawsuit by patients, insurance companies and health and welfare benefit plans that paid for Lupron, a prescription drug used to treat prostate cancer, endometriosis and precocious puberty.  The settlement requires the defendants, Abbott Laboratories, Takeda Pharmaceutical Company Limited, and TAP Pharmaceuticals, to pay $150 million, inclusive of costs and fees, to persons or entities who paid for Lupron from January 1, 1985 through March 31, 2005.  Plaintiffs **charged that the defendants conspired to overstate the drug's average wholesale price ("AWP"), which resulted in plaintiffs paying more for** Lupron than they should have paid.  Lieff Cabraser served as Co-Lead **Plaintiffs' Counsel.**

12.     ***Marchbanks Truck Service v. Comdata Network***, No. 07-cv-01078 (E.D. Pa.).  In July 2014, the Court approved a $130 million settlement of a class action brought by truck stops and other retail fueling facilities that paid percentage-based transaction fees to Comdata on proprietary card transactions using Comdata's over-the-road fleet card. The complaint challenged arrangements among Comdata, its parent company Ceridian LLC, and three national truck stop chains: defendants TravelCenters of America LLC and its wholly owned subsidiaries, Pilot Travel Centers LLC and its predecessor Pilot Corporation, and Love's Travel Stops & Country Stores, Inc.  The alleged anticompetitive conduct insulated Comdata from competition, enhanced its market power, and led to independent truck stops' paying artificially inflated transaction fees. In addition to the $130 million payment, the settlement required Comdata to change certain business practices that will promote competition among payment cards used by over-the-road fleets and truckers and lead to lower merchant fees for the independent truck stops. Lieff Cabraser served as Co-Lead Class Counsel in the litigation.

13.     ***California Vitamins Cases***, JCCP No. 4076 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel and Co-**Chairman of the Plaintiffs'** Executive Committee on behalf of a class of California indirect vitamin purchasers in every level of the chain of distribution.  In January 2002,

the Court granted final approval of a $96 million settlement with certain vitamin manufacturers in a class action alleging that these and other manufacturers engaged in price fixing of particular vitamins. In December 2006, the Court granted final approval to over $8.8 million in additional settlements.

14. ***In re Buspirone Antitrust Litigation***, MDL No. 1413 (S.D. N.Y.). In November 2003, Lieff Cabraser obtained a $90 million cash settlement for individual consumers, consumer organizations, and third party payers that purchased BuSpar, a drug prescribed to alleviate symptoms of anxiety. Plaintiffs alleged that Bristol-Myers Squibb Co. (BMS), Danbury Pharmacal, Inc., Watson Pharmaceuticals, Inc. and Watson Pharma, Inc. entered into an unlawful agreement in restraint of trade under which BMS paid a potential generic manufacturer of BuSpar to drop its challenge to BMS' patent and refrain from entering the market. Lieff Cabraser served as Plaintiffs' Co-Lead Counsel.

15. ***In re Travel Agency Commission Antitrust Litigation***, MDL No. 1058 (D. Minn.). Lieff Cabraser served as Co-Lead Counsel for a certified class of U.S. travel agents on claims against the major U.S. air carriers, who allegedly violated the federal antitrust laws by fixing the commissions paid to travel agents. In 1997, the Court approved an $82 million settlement.

16. ***In re Commercial Explosives Antitrust Litigation***, MDL No. 1093 (D. Utah). Lieff Cabraser served as Class Counsel on behalf of direct purchasers of explosives used in mining operations. In 1998, the Court approved a $77 million settlement of the litigation.

17. ***In re Toys 'R' Us Antitrust Litigation***, MDL No. 1211 (E.D. N.Y.). Lieff Cabraser served as Co-Lead Counsel representing a class of direct purchasers (consumers) who alleged that Toys 'R' Us conspired with the major toy manufacturers to boycott certain discount retailers in order to restrict competition and inflate toy prices. In February 2000, the Court approved a settlement of cash and product of over $56 million.

18. ***Meijer v. Abbott Laboratories***, Case No. C 07-5985 CW (N.D. Cal.). Lieff Cabraser served as co-counsel for the group of retailers charging that Abbott Laboratories monopolized the market for AIDS medicines used in conjunction with Abbott's prescription drug Norvir. These drugs, known as Protease Inhibitors, have enabled patients with HIV to fight off the disease and live longer. In January 2011, the Court denied Abbott's motion for summary judgment on plaintiffs' monopolization claim. Trial commenced in February 2011. After opening statements and the presentation of four witnesses and evidence to the jury, plaintiffs and Abbott Laboratories entered into a $52 million settlement. The Court granted final approval to the settlement in August 2011.

19.    ***In re Carpet Antitrust Litigation***, MDL No. 1075 (N.D. Ga.).  Lieff Cabraser served as Class Counsel and a member of the trial team for a class of direct purchasers of twenty-ounce level loop polypropylene carpet.  Plaintiffs, distributors of polypropylene carpet, alleged that Defendants, seven manufacturers of polypropylene carpet, conspired to fix the prices of polypropylene carpet by agreeing to eliminate discounts and charge inflated prices on the carpet.  In 2001, the Court approved a $50 million settlement of the case.

20.    ***In re High Pressure Laminates Antitrust Litigation***, MDL No. 1368 (S.D. N.Y.).  Lieff Cabraser served as Trial Counsel on behalf of a class of direct purchasers of high pressure laminates.  The case in 2006 was tried to a jury verdict.  The case settled for over $40 million.

21.    ***Schwartz v. National Football League***, No. 97-CV-5184 (E.D. Pa.).  **Lieff Cabraser served as counsel for individuals who purchased the "NFL Sunday Ticket" package of private satellite transmissions** in litigation against the National Football League for allegedly violating the Sherman Act by limiting the distribution of television broadcasts of NFL games by satellite transmission to one package.  In August 2001, the Court approved of a class action settlement that included: (1) the requirement that defendants provide an additional weekly satellite television package known as Single Sunday Ticket for the 2001 NFL football season, under **certain circumstances for one more season, and at the defendants'** discretion thereafter; (2) a $7.5 million settlement fund to be distributed to class members; (3) merchandise coupons entitling class members to **discounts at the NFL's Internet store which the parties value at** approximately $3 million; and (4) $2.3 million to pay for administering the settlement fund and notifying class members.

22.    ***In re Lasik/PRK Antitrust Litigation***, No. CV 772894 (Cal. Supr. **Ct.).  Lieff Cabraser served as a member of Plaintiffs' Executive** Committee in class actions brought on behalf of persons who underwent Lasik/PRK eye surgery.  Plaintiffs alleged that defendants, the manufacturers of the laser system used for the laser vision correction surgery, manipulated fees charged to ophthalmologists and others who performed the surgery, and that the overcharges were passed onto consumers who paid for laser vision correction surgery.  In December 2001, the Court approved a $12.5 million settlement of the litigation.

23.    ***In the Matter of the Arbitration between CopyTele and AU Optronics***, Case No. 50 117 T 009883 13 (Internat'l Centre for Dispute Resolution).  Lieff Cabraser successfully represented CopyTele, Inc. in a commercial dispute involving intellectual property.  In 2011, CopyTele **entered into an agreement with AU Optronics ("AUO") under which both** companies would jointly develop two groups of products incorporating

CopyTele's patented display technologies.  CopyTele charged that AUO never had any intention of jointly developing the CopyTele technologies, and instead used the agreements to fraudulently obtain and transfer **licenses of CopyTele's patented technologies.**  The case required the review of thousands of pages of documents in Chinese and in English culminating in a two week arbitration hearing.  In December 2014, after the hearing, the parties resolved the matter, with CopyTele receiving $9 million.

24.   ***Quantegy Recording Solutions, LLC, et al. v. Toda Kogyo Corp., et al.***, No. C-02-1611 (PJH).  In August 2006 and January 2009, the Court approved the final settlements in antitrust litigation against manufacturers, producers, and distributors of magnetic iron oxide **("MIO").  MIO is used in the manufacture of audiotape, videotape, and** data storage tape.  Plaintiffs alleged that defendants violated federal antitrust laws by conspiring to fix, maintain, and stabilize the prices and to allocate the worldwide markets for MIO from 1991 to October 12, 2005.  The value of all settlements reached in the litigation was $6.35 million.  **Lieff Cabraser served as Plaintiffs' Co-**Lead Counsel.

25.   ***In re Static Random Access Memory (SRAM) Antitrust Litigation***, MDL No. 1819 (N.D. Cal.).  Plaintiffs allege that from November 1, 1996 through December 31, 2006, the defendant manufacturers conspired to fix and maintain artificially high prices for SRAM, a type of memory used in many products, including smartphones and computers.  Lieff Cabraser served as one of three members of the Steering Committee for consumers and other indirect purchasers of SRAM. In February 2008, U.S. District Court Judge Claudia Wilken **denied most aspects of defendants' motions to dismiss plaintiffs'** complaints.  In November 2009, the Court certified a nationwide class seeking injunctive relief and twenty-seven state classes seeking damages.  In  2010, the Court granted final approval of a first set of settlements.  In October 2011, the Court granted final approval of settlements with the remaining defendants.

26.   ***Carbon Fiber Cases I, II, III***, JCCP Nos. 4212, 4216 & 4222 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Liaison Counsel on behalf of indirect purchasers of carbon fiber.  Plaintiffs alleged that defendants illegally conspired to raise prices of carbon fiber.  Settlements have been reached with all of the defendants.

27.   ***Methionine Cases I and II***, JCCP Nos. 4090 & 4096 (Cal. Supr. Ct.).  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of methionine, an amino acid used primarily as a poultry and swine feed additive to enhance growth and production.  Plaintiffs alleged that the

companies illegally conspired to raise methionine prices to super-competitive levels.  The case settled.

28.  ***McIntosh v. Monsanto***, No. 4:01CV65RSW (E.D. Mo.).  Lieff Cabraser served as Co-Lead Counsel in a class action lawsuit against Monsanto Company and others alleging that a conspiracy to fix prices on genetically modified Roundup Ready soybean seeds and Yieldgard corn seeds.  The case settled.

29.  ***Tortola Restaurants v. Minnesota Mining and Manufacturing***, No. 314281 (Cal. Supr. Ct).  Lieff Cabraser served as Co-Lead Counsel on behalf of indirect purchasers of Scotch-brand invisible and transparent tape.  Plaintiffs alleged that defendant 3M conspired with certain retailers to monopolize the sale of Scotch-brand tape in California.  The case was resolved as part of a nationwide settlement that Lieff Cabraser negotiated, along with co-counsel.

30.  ***In re Compact Disc Antitrust Litigation***, MDL No. 1216 (C.D. Cal.).  Lieff Cabraser served as Co-Lead Counsel for the direct purchasers of compact discs on claims that the producers fixed the price of CDs in violation of the federal antitrust laws.

31.  ***In re Electrical Carbon Products Antitrust Litigation***, MDL No. 1514 (D.N.J.).  Lieff Cabraser represented the City and County of San Francisco and a class of direct purchasers of carbon brushes and carbon collectors on claims that producers fixed the price of carbon brushes and carbon collectors in violation of the Sherman Act.

## VII.  Environmental and Toxic Exposures

### A.  Current Cases

1.  ***In Re Oil Spill  by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico***, MDL No. 2179 (E.D. La.).  Lieff Cabraser serves on the Court-appointed Plaintiffs' Steering Committee ("PSC") and with co-counsel represents fishermen, property owners, business owners, wage earners, and other harmed parties in class action litigation against BP, Transocean, Halliburton, and other defendants involved in the Deepwater Horizon oil rig blowout and resulting oil spill in the Gulf of Mexico on April 20, 2010.  The Master Complaints allege that the defendants were insouciant in addressing the operations of the well and the oil rig, ignored warning signs of the impending disaster, and failed to employ and/or follow proper safety measures, worker safety laws, and environmental protection laws in favor of cost-cutting measures.

In 2012, the Court approved two class action settlements that will fully compensate hundreds of thousands of victims of the tragedy.  The

settlements resolve the majority of private economic loss, property damage, and medical injury claims stemming from the Deepwater Horizon Oil Spill, and hold BP fully accountable to individuals and businesses harmed by the spill.  Under the settlements, there is no dollar limit on the amount BP will pay.  In 2014, the U.S. Supreme Court denied review of BP's challenge to its own class action settlement.  Approval of that settlement is now final, and has so far delivered over $5.4 billion to compensate claimants' losses.  The medical settlement is also final, and an additional $1 billion settlement has been reached with defendant Halliburton.

## B.    Successes

1.    ***In re Exxon Valdez Oil Spill Litigation***, No. 3:89-cv-0095 HRH (D. Al.).  The ***Exxon Valdez*** ran aground on March 24, 1989, spilling 11 million gallons of oil into Prince William Sound.  Lieff Cabraser served as one of the Court-appointed Plaintiffs' Class Counsel.  The class consisted of fisherman and others whose livelihoods were gravely affected by the disaster.  In addition, Lieff Cabraser served on the Class Trial Team that tried the case before a jury in federal court in 1994.  The jury returned an award of $5 billion in punitive damages.

In 2001, the Ninth Circuit Court of Appeals ruled that the original $5 billion punitive damages verdict was excessive.  In 2002, U.S. District Court Judge H. Russell Holland reinstated the award at $4 billion.  Judge Holland stated that, "Exxon officials knew that carrying huge volumes of crude oil through Prince William sound was a dangerous business, yet they knowingly permitted a relapsed alcoholic to direct the operation of the ***Exxon Valdez*** through Prince William Sound."  In 2003, the Ninth Circuit again directed Judge Holland to reconsider the punitive damages award under United States Supreme Court punitive damages guidelines.  In January 2004, Judge Holland issued his order finding that Supreme Court authority did not change the Court's earlier analysis.

In December 2006, the Ninth Circuit Court of Appeals issued its ruling, setting the punitive damages award at $2.5 billion.  Subsequently, the U.S. Supreme Court further reduced the punitive damages award to $507.5 million, an amount equal to the compensatory damages.  With interest, the total award to the plaintiff class was $1.515 billion.

2.    ***In re Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation***, MDL No. 2284 (E.D. Pa.).  Lieff Cabraser served as Co-Lead Counsel for homeowners, golf course companies and other property owners in a nationwide class action lawsuit against E.I. du Pont de Nemours & Company ("DuPont"), charging that its herbicide Imprelis caused widespread death among trees and other non-targeted vegetation across the country.  DuPont marketed Imprelis as an

environmentally friendly alternative to the commonly used 2,4-D herbicide. Just weeks after Imprelis' introduction to the market in late 2010, however, complaints of tree damage began to surface. Property owners reported curling needles, severe browning, and dieback in trees near turf that had been treated with Imprelis. In August 2011, the U.S. Environmental Protection Agency banned the sale of Imprelis.

The complaint charged that DuPont failed to disclose the risks Imprelis posed to trees, even when applied as directed, and failed to provide instructions for the safe application of Imprelis. In response to the litigation, DuPont created a process for property owners to submit claims for damages. Approximately $400 million was paid to approximately 25,000 claimants. In October 2013, the Court approved a settlement of the class action that substantially enhanced the DuPont claims process, including by adding an extended warranty, a more limited release of claims, the right to appeal the denial of claim by DuPont to an **independent arborist, and publication of DuPont's tree payment schedule.**

3.   ***In re GCC Richmond Works Cases***, JCCP No. 2906 (Cal. Supr. Ct.). Lieff Cabraser served as Co-Liaison Counsel and Lead Class Counsel in coordinated litigation arising out of the release on July 26, 1993, of a massive toxic sulfuric acid cloud which injured an estimated 50,000 residents of Richmond, California. The Coordination Trial Court granted final approval to a $180 million class settlement for exposed residents.

4.   ***In re Unocal Refinery Litigation***, No. C 94-04141 (Cal. Supr. Ct.). Lieff Cabraser served as one of two Co-Lead Class Counsel and on the Plaintiffs' Steering Committee in this action against Union Oil Company of California ("Unocal") arising from a series of toxic releases from Unocal's San Francisco refinery in Rodeo, California. The action was settled in 1997 on behalf of approximately 10,000 individuals for $80 million.

5.   ***West v. G&H Seed Co., et al.***, No. 99-C-4984-A (La. State Ct.). With co-counsel, Lieff Cabraser represented a certified class of 1,500 Louisiana crawfish farmers who charged in a lawsuit that Fipronil, an insecticide sold under the trade name ICON, damaged their pond-grown crawfish crops. In Louisiana, rice and crawfish are often farmed together, either in the same pond or in close proximity to one another.

After its introduction to the market in 1999, ICON was used extensively in Louisiana to kill water weevils that attacked rice plants. The lawsuit alleged that ICON also had a devastating effect on crawfish harvests with some farmers losing their entire crawfish crop. In 2004, the Court approved a $45 million settlement with Bayer CropScience, which during the litigation purchased Aventis CropScience, the original manufacturer of ICON. The settlement was reached after the parties had presented

nearly a month's worth of evidence at trial and were on the verge of making closing arguments to the jury.

6.  ***Kingston, Tennessee TVA Coal Ash Spill Litigation***, No. 3:09-cv-09 (E.D. Tenn.).  Lieff Cabraser represented hundreds of property owners and businesses harmed by the largest coal ash spill in U.S. history.  On December 22, 2008, more than a billion gallons of coal ash slurry spilled when a dike burst on a retention pond at the Kingston Fossil Plant operated by the Tennessee Valley Authority (TVA) in Roane County, Tennessee.  A wall of coal ash slurry traveled across the Emory River, polluting the river and nearby waterways, and covering nearly 300 acres with toxic sludge, including 12 homes and damaging hundreds of properties.  **In March 2010, the Court denied in large part TVA's motion** to dismiss the litigation.  In the Fall of 2011, the Court conducted a four week bench trial on the question of whether TVA was liable for releasing the coal ash into the river system.  The issue of damages was reserved for later proceedings.  In August 2012, the Court found in favor of plaintiffs on their claims of negligence, trespass, and private nuisance.  In August 2014, the case came to a conclusion with TVA**'s payment of** $27.8 million to settle the litigation.

7.  ***In re Sacramento River Spill Cases I and II***, JCCP Nos. 2617 & 2620 (Cal. Supr. Ct.).  On July 14, 1991, a Southern Pacific train tanker car derailed in northern California, spilling 19,000 gallons of a toxic pesticide, metam sodium, into the Sacramento River near the town of Dunsmir at a site along the rail lines known as the Cantara Loop.  The metam sodium mixed thoroughly with the river water and had a devastating effect on the river and surrounding ecosystem.  Within a week, every fish, 1.1 million in total, and all other aquatic life in a 45-mile stretch of the Sacramento River was killed.  In addition, many residents living along the river became ill with symptoms that included headaches, shortness of breath, and vomiting.  The spill considered the worst inland ecological disaster in California history.

Lieff Cabraser served as Court-appointed Plaintiffs' Liaison Counsel and Lead Class Counsel, and chaired the Plaintiffs' Litigation Committee in coordinated proceedings that included all of the lawsuits arising out of this toxic spill.  Settlement proceeds of approximately $16 million were distributed pursuant to Court approval of a plan of allocation to four certified plaintiff classes: personal injury, business loss, property damage/diminution, and evacuation.

8.  ***Kentucky Coal Sludge Litigation***, No. 00-CI-00245 (Cmmw. Ky.).  On October 11, 2000, near Inez, Kentucky, a coal waste storage facility ruptured, spilling 1.25 million tons of coal sludge (a wet mixture produced by the treatment and cleaning of coal) into waterways in the region and

contaminating hundreds of properties. This was one of the worst environmental disasters in the Southeastern United States. With co-counsel, Lieff Cabraser represented over 400 clients in property damage claims, including claims for diminution in the value of their homes and properties. In April 2003, the parties reached a confidential settlement agreement on favorable terms to the plaintiffs.

9. ***Toms River Childhood Cancer Incidents***, No. L-10445-01 MT (Sup. Ct. NJ). With co-counsel, Lieff Cabraser represented 69 families in Toms River, New Jersey, each with a child having cancer, that claimed the cancers were caused by environmental contamination in the Toms River area. Commencing in 1998, the parties—the 69 families, Ciba Specialty Chemicals, Union Carbide and United Water Resources, Inc., a water distributor in the area—participated in an unique alternative dispute resolution process, which lead to a fair and efficient consideration of the factual and scientific issues in the matter. In December 2001, under the supervision of a mediator, a confidential settlement favorable to the families was reached.

## VIII. <u>False Claims Act</u>

### A. Current Cases

Lieff Cabraser represents whistleblowers in a wide range of False Claims Act cases, including Medicare kickback and healthcare fraud, defense contractor fraud, and securities and financial fraud. We have more than a dozen whistleblower cases currently under seal and investigation in federal and state jurisdictions across the U.S. For that reason, we do not list all of our current False Claims Act and qui tam cases in our resume.

1. ***State of California ex rel. Associates Against FX Insider State Street Corp.***, No. 34-2008-00008457 (Sacramento Supr. Ct., Cal.) ("***State Street I***"). Lieff Cabraser serves as co-counsel for the whistleblowers in this action against State Street Corporation which serves as the contractual custodian for over 40% of public pension funds in the United States. As the contractual custodian, State Street is responsible for undertaking the foreign currency exchange (FX) **transactions necessary to facilitate a customer's purchases or sales of** foreign securities. The complaint charges that State Street violated the California False Claims Act by systematically manipulating the timing of its execution and reporting of FX trades in order to enrich itself, at the expense of California custodial public pension fund clients, including the **California Public Employees' Retirement System and the California State Teachers'** Retirement System. The case is in the discovery stage after the Trial Court **denied State Street's demurrer.**

2. ***United States ex rel. Matthew Cestra v. Cephalon***, No. 14-01842 (E.D. Pa.); ***United States ex rel. Bruce Boise et al. v. Cephalon***,

No. 08-287 (E.D. Pa.)  Lieff Cabraser, with co-counsel, represents four whistleblowers bringing claims on behalf of the U.S. Government and various states under the federal and state False Claims Acts against Cephalon, Inc., a pharmaceutical company.  The complaints allege that Cephalon has engaged in unlawful off-label marketing of certain of its drugs, largely through misrepresentations, kickbacks, and other unlawful or fraudulent means, causing the submission of hundreds of thousands of false claims for reimbursement to federal and state health care programs. The Boise case involves Provigil and its successor drug Nuvigil, limited-indication wakefulness drugs that are unsafe and/or not efficacious for the wide array of off-label psychiatric and neurological conditions for which Cephalon has marketed them, according to the allegations.  The Cestra case involves an expensive oncological drug called Treanda, which is approved only for second-line treatment of indolent non-**Hodgkin's** Lymphoma despite what the relators allege t**o be the company's off**-label marketing of the drug for first-line treatment. Various motions are pending.

## B.     Successes

1.     ***United States ex rel. Mary Hendow and Julie Albertson v. University of Phoenix***, No. 2:03-cv-00457-GEB-DAD (E.D. Cal.). Lieff Cabraser obtained a record whistleblower settlement against the University of Phoenix that charged the university had violated the incentive compensation ban of the Higher Education Act (HEA) by providing improper incentive pay to its recruiters.  The HEA prohibits colleges and universities whose students receive federal financial aid from paying their recruiters based on the number of students enrolled, which creates a risk of encouraging recruitment of unqualified students who, Congress has determined, are more likely to default on their loans.  High student loan default rates not only result in wasted federal funds, but the students who receive these loans and default are burdened for years with tremendous debt without the benefit of a college degree.

The complaint alleged that the University of Phoenix defrauded the U.S. Department of Education by obtaining federal student loan and Pell Grant monies from the federal government based on false statements of compliance with HEA.  In December 2009, the parties announced a $78.5 million settlement.  The settlement constitutes the second-largest settlement ever in a False Claims Act case in which the federal government declined to intervene in the action and largest settlement ever involving the Department of Education.  The University of Phoenix case led to the Obama Administration passing new regulations that took away the so-called "safe harbor" provisions that for-profit universities relied on to justify their alleged recruitment misconduct.  For his outstanding work as Lead Counsel and the significance of the case,

*California Lawyer* magazine recognized Lieff Cabraser attorney Robert J. Nelson with a California Lawyer of the Year (CLAY) Award.

2. ***State of California ex rel. Sherwin v. Office Depot***, No. BC410135 (Cal. Supr. Ct.).   In February 2015, the Court approved a $77.5 million settlement with Office Depot to settle a whistleblower lawsuit brought under the California False Claims Act.  The whistleblower was a former Office Depot account manager.  The City of Los Angeles, County of Santa Clara, Stockton Unified School District, and 16 additional California cities, counties, and school districts intervened in the action to assert their claims (including common-law fraud and breach of contract) against Office Depot directly.  The governmental entities purchased office supplies from Office Depot under a nationwide supply contract known as the U.S. Communities contract. Office Depot promised in the U.S. Communities contract to sell office supplies at its best governmental pricing nationwide.  The complaint alleged that Office Depot repeatedly failed to give most of its California governmental customers the lowest price it was offering other governmental customers.  Other pricing misconduct was also alleged.

***State of California ex rel. Rockville Recovery Associates v. Multiplan***, No. 34-2010-00079432 (Sacramento Supr. Ct., Cal.).  In a case that received widespread media coverage, Lieff Cabraser represented whistleblower Rockville Recovery Associates in a qui tam suit for civil penalties under the California Insurance Frauds Prevention Act ("IFPA"), Cal. Insurance Code § 1871.7, against Sutter Health, one of California's largest healthcare providers, and obtained the largest penalty ever imposed under the statute.  The parties reached a $46 million settlement that was announced in November 2013, shortly before trial was scheduled to commence.

The complaint alleged that the 26 Sutter hospitals throughout California submitted false, fraudulent, or misleading charges for anesthesia services (separate from the anesthesiologist's fees) during operating room procedures that were already covered in the operating room bill.

After Lieff Cabraser defeated Sutter Health's demurrer and motion to compel arbitration, California Insurance Commissioner Dave Jones intervened in the litigation in May 2011.  Lieff Cabraser attorneys continued to serve as lead counsel, and litigated the case for over two more years.   In all, plaintiffs defeated no less than 10 dispositive motions, as well as three writ petitions to the Court of Appeals.

In addition to the monetary recovery, Sutter Health agreed to a comprehensive series of billing and transparency reforms, which California Insurance Commissioner Dave Jones called "a groundbreaking step in opening up hospital billing to public scrutiny." On the date the

settlement was announced, the California Hospital Association recognized its significance by issuing a press release stating that the settlement "compels industry-wide review of anesthesia billing." Defendant Multiplan, Inc., a large leased network Preferred Provider Organization, separately paid a $925,000 civil penalty for its role in enabling Sutter's alleged false billing scheme.

3.   ***United States ex rel. Dye v. ATK Launch Systems***, No. 1:06-CV-39-TS (D. Utah).  Lieff Cabraser served as co-counsel for a whistleblower who alleged that ATK Launch Systems knowingly sold defective and potentially dangerous illumination flares to the United States military in violation of the federal False Claims Act.  The specialized flares were used in nighttime combat, covert missions, and search and rescue operations.  A key design specification set by the Defense Department was that these highly flammable and dangerous items ignite only under certain conditions.  The complaint alleged that the ATK flares at issue could ignite when dropped from a height of less than 10 feet – and, according to ATK's own analysis, from as little as 11.6 inches – notwithstanding contractual specifications that they be capable of withstanding such a drop.  In April 2012, the parties reached a settlement valued at $37 million.

4.   ***United States ex rel. Mauro Vosilla and Steven Rossow v. Avaya, Inc.***, No. CV04-8763 PA JTLx (C.D. Cal.).  Lieff Cabraser represented whistleblower in litigation alleging that defendants Avaya, Lucent Technologies, and AT&T violated the Federal False Claims Act and state false claims statutes.  The complaint alleged that defendants charged governmental agencies for the lease, rental, and post-warranty maintenance of telephone communications systems and services that the governmental agencies no longer possessed and/or were no longer maintained by defendants.  In November 2010, the parties entered into a $21.75 million settlement of the litigation.

## IX.   Digital Privacy and Data Security

### A.   Current Cases

1.   ***In re Google Inc. Street View Electronic Communications Litigation***, No. 3:10-md-021784-CRB (N.D. Cal.).  Lieff Cabraser represents persons whose right to privacy was violated when Google **intentionally equipped its Google Maps "Street View" vehicles with Wi-Fi** antennas and software tha**t collected data transmitted by those persons'** Wi-Fi networks located in their nearby homes.  Google collected not only **basic identifying information about individuals' Wi**-Fi networks, but also personal, private data being transmitted over their Wi-Fi networks such as emails, usernames, passwords, videos, and documents.  Plaintiffs allege **that Google's actions violated the federal Wiretap Act, as amended by the** Electronic Communications Privacy Act.  On September 10, 2013, the

Ninth Circuit Court of Appeals **held that Google's actions are not exempt** from the Act.

2. **_Perkins v. LinkedIn_**, No. 13-CV-04303-LHK (N.D. Cal.).  Lieff Cabraser represents individuals who joined LinkedIn's network and, without their consent or authorization, had their names and likenesses used by LinkedIn to endorse LinkedIn's services and send repeated emails to their contacts asking that they join LinkedIn.  On September 15, 2015, the Court granted preliminary approval to $13 million settlement, one of the largest per-class member settlements ever in a digital privacy class action.  In addition to the monetary relief, LinkedIn has agreed to make significant changes to Add Connections disclosures and functionality. Specifically, LinkedIn has revised disclosures to real-time permission screens presented to members using Add Connections, and has agreed to implement new functionality allowing LinkedIn members to manage their contacts, including viewing and deleting contacts and sending invitations, and to stop reminder emails from being sent if users have sent connection invitations inadvertently.

3. **_Campbell v. Facebook_**, No. 4:13-cv-05996 (N.D. Cal.). Lieff Cabraser serves as Co-Lead Counsel in a nationwide class action lawsuit alleging that Facebook intercepts certain private data in users' personal and private messages on the social network and profits by sharing that information with third parties. When a user composes a private Facebook message and includes a link (a "URL") to a third party website, Facebook allegedly scans the content of the message, follows the URL, and searches for information to profile the message-sender's web activity. This enables Facebook to datamine aspects of user data and profit from that data by sharing it with advertisers, marketers, and other data aggregators. In **December 2014, the Court in large part denied Facebook's motion to dismiss. In rejecting one of Facebook's core arguments, U.S. District** Court Judge Phyllis Hamilton stated: "An electronic communications service provider cannot simply adopt any revenue-generating practice and deem it 'ordinary' by its own subjective standard.

4. **_In re Carrier IQ Privacy Litigation_**, MDL No. 2330 (N.D. Cal.). Lieff Cabraser represents a plaintiff in Multi-District Litigation against Samsung, LG, Motorola, HTC, and Carrier IQ alleging that smartphone manufacturers violated privacy laws by installing tracking software, called IQ Agent, on millions of cell phones and other mobile devices that use the Android operating system. Without notifying users or obtaining consent, IQ Agent tracks users' keystrokes, passwords, apps, text messages, photos, videos, and other personal information and transmits this data to cellular carriers.  In a 96-page order issued in January 2015, U.S. District Court Judge Edward Chen granted in part, and de**nied in part, defendants' motion to dismiss.  Importantly, the Court permitted the core Wiretap Act**

claim to proceed as well as the claims for violations of the Magnuson-Moss Warranty Act and the California Unfair Competition Law and breach of the common law duty of implied warranty.

5.    ***Corona v. Sony Pictures Entertainment***, No.  2:14-CV-09660-RGK (C.D. Cal.).  Lieff Cabraser serves as Plaintiffs' Co-Lead Counsel in class action litigation against Sony for failing to take reasonable measures to secure the data of its employees from hacking and other attacks.  As a result, personally identifiable information of thousands of current and former Sony employees and their families was obtained and published on websites across the Internet.  Among the staggering array of personally identifiable information compromised were  medical records, Social Security Numbers, birth dates, personal emails, home addresses, salaries, tax information, employee evaluations, disciplinary actions, criminal background checks, severance packages, and family medical histories.  The complaint charges that Sony owed a duty to take reasonable steps to secure the data of its employees from hacking.  Sony allegedly breached this duty by failing to properly invest in adequate IT security, despite having already succumbed to one of the largest data breaches in history only three years ago.

6.    ***Diaz v. Intuit***, No. 5:15-CV-01778-PSG (N.D. Cal.).  Lieff Cabraser represents identity theft victims in a nationwide class action lawsuit against Intuit for alle**gedly failing to protect consumers' data from** foreseeable and preventable breaches, and by facilitating the filing of fraudulent tax returns through its TurboTax software program.  The complaint alleges that Intuit failed to protect data provided by consumers who purchased TurboTax, used to file an estimated 30 million tax returns for American taxpayers every year, from easy access by hackers and other cybercriminals.  The complaint further alleges that Intuit was aware of the widespread use of TurboTax exclusively for the filing of fraudulent tax returns.  Yet, Intuit failed to adopt basic cyber security policies to prevent this misuse of TurboTax.  As a result, fraudulent tax returns were filed in the names of the plaintiffs and thousands of other individuals across America, including persons who never purchased TurboTax.

7.    ***Henson v. Turn***, No. 3:15-CV-01497 (N.D. Cal.).  Lieff Cabraser represents plaintiffs in class action litigation alleging that internet marketing company Turn, Inc. violates users' digital privacy by installing software tracking beacons on smartphones, tablets, and other mobile computing devices. The complaint alleges that in an effort to thwart standard privacy settings and features, Turn deploys so-called "zombie cookies" that cannot be detected or deleted, and that track smartphone activity across various browsers and applications. Turn uses the data harvested by these cookies to build robust user profiles and sell targeted and profitable advertising, all without the user's knowledge or consent.

The complaint alleges that Turn's conduct violates consumer protection laws and amounts to trespass.

8. ***McDowell v. CGI Group***, No. 1:15-cv-01157-GK (D.D.C.). Lieff Cabraser represents individuals in class action litigation against CGI Group, Inc. and **CGI Federal, Inc. (collectively "CGI")** for allegedly facilitating a data breach affecting more than 1,000 U.S. citizens. The U.S. government contracts with CGI to manage all U.S. passport application activities. Passport applicants must provide their name, date of birth, city of birth, state of birth, country of birth, social security number, sex, height, hair color, eye color, occupation, and evidence of U.S. citizenship, such as a previously issued U.S. passport, or U.S. birth certificate. Between 2010 and May 2, 2015, CGI employees allegedly stole and sold personal information of passport applicants to cybercriminals. The mass identity theft allowed cybercriminals to use stolen information to buy cell phones and computers, and to obtain lines of credit. The complaint alleges that CGI failed to fulfill its legal duty to protect **customers' sensitive personal and financial information.**

9. ***Fowles v. Anthem***, No. 3:15-cv-2249 (N.D. Cal.). Lieff Cabraser represents individuals in a class action lawsuit against Anthem for its alleged failure to safeguard and secure the medical records and other personally identifiable information of its members. The second largest health insurer in the U.S., Anthem provides coverage for 37.5 million **Americans. Anthem's customer database was allegedly attacked by** international hackers on December 10, 2014. Anthem says it discovered the breach on January 27, 2015, and reported it about a week later on February 4, 2015. California customers were informed around March 18, 2015. The theft includes names, birth dates, social security numbers, billing information, and highly confidential health information. In addition, the complaint charges that Anthem was on notice about the weaknesses in its computer security defenses for at least a year before the breach occurred. According to a September 2013 audit, the U.S. Office of **Personnel Management's Inspector General found vulnerabilities that could provide "a gateway for malicious virus and hacking activity that could lead to data breaches."** The complaint charges that Anthem violated **its duty to safeguard and protect consumers' personal information, and** violated its duty to disclose the breach to consumers in a timely manner.

## X. **International and Human Rights Litigation**

### A. **Successes**

1. ***Holocaust Cases***. Lieff Cabraser was one of the leading firms that prosecuted claims by Holocaust survivors and the heirs of Holocaust survivors and victims against banks and private manufacturers and other corporations who enslaved and/or looted the assets of Jews and other

minority groups persecuted by the Nazi Regime during the Second World War era. We serve as Settlement Class Counsel in the case against the Swiss banks that the Court approved a U.S. $1.25 billion settlement in July 2000. Lieff Cabraser donated its attorneys' fees in the Swiss Banks case, in the amount of $1.5 million, to endow a Human Rights clinical chair at Columbia University Law School. We were also active in slave labor and property litigation against German and Austrian defendants, and Nazi-era banking litigation against French banks. In connection therewith, Lieff Cabraser participated in multi-national negotiations that led to Executive Agreements establishing an additional approximately U.S. $5 billion in funds for survivors and victims of Nazi persecution. Our website provides links to the websites of settlement and claims administrators in these cases.

Commenting on the work of Lieff Cabraser and co-counsel in the litigation against private German corporations, entitled ***In re Holocaust Era German Industry, Bank & Insurance Litigation*** (MDL No. 1337), U.S. District Court Judge William G. Bassler stated on November 13, 2002:

> Up until this litigation, as far as I can tell, perhaps with some minor exceptions, the claims of slave and forced labor fell on deaf ears. You can say what you want to say about class actions and about attorneys, but the fact of the matter is, there was no attention to this very, very large group of people by Germany, or by German industry until these cases were filed. . . . What has been accomplished here with the efforts of the plaintiffs' attorneys and defense counsel is quite incredible. . . . I want to thank counsel for the assistance in bringing us to where we are today. Cases don't get settled just by litigants. It can only be settled by competent, patient attorneys.

2.  ***Cruz v. U.S., Estados Unidos Mexicanos, Wells Fargo Bank, et al.,*** No. 01-0892-CRB (N.D. Cal.). Working with co-counsel, Lieff Cabraser succeeded in correcting an injustice that dated back 60 years. The case was brought on behalf of Mexican workers and laborers, known as Braceros ("strong arms"), who came from Mexico to the United States pursuant to bilateral agreements from 1942 through 1946 to aid American farms and industries hurt by employee shortages during World War II in the agricultural, railroad, and other industries. As part of the Braceros program, employers held back 10% of the workers' wages, which were to be transferred via United States and Mexican banks to savings accounts for each Bracero. The Braceros were never reimbursed for the portion of their wages placed in the forced savings accounts.

Despite significant obstacles including the aging and passing away of many Braceros, statutes of limitation hurdles, and strong defenses to claims under contract and international law, plaintiffs prevailed in a settlement in February 2009.  Under the settlement, the Mexican government provided a payment to Braceros, or their surviving spouses or children, in the amount of approximately $3,500 (USD).  In approving the settlement on February 23, 2009, U.S. District Court Judge Charles Breyer stated:

> I've never seen such litigation in eleven years on the bench that was more difficult than this one.  It was enormously challenging. . . .  It had all sorts of issues . . . that complicated it:  foreign law, constitutional law, contract law, [and] statute of limitations. . . .  Notwithstanding all of these issues that kept surfacing . . . over the years, the plaintiffs persisted.  I actually expected, to tell you the truth, at some point that the plaintiffs would just give up because it was so hard, but they never did.  They never did.  And, in fact, they achieved a settlement of the case, which I find remarkable under all of these circumstances.

## FIRM BIOGRAPHY:

### PARTNERS

**ELIZABETH J. CABRASER**, Admitted to practice in California, 1978: U.S. Supreme Court, 1996; U.S. Tax Court, 1979; California Supreme Court, 1978; U.S. District Court, Northern District of California, 1978; U.S. District Court, Eastern District of California, 1979; U.S. District Court, Central District of California and Southern District of California, 1992; U.S. District Court, Eastern District of Michigan, 2005; U.S. Court of Appeals, First Circuit, 2011; U.S. Court of Appeals, Second Circuit, 2009; U.S. Court of Appeals, Third Circuit, 1994; U.S. Court of Appeals, Fifth Circuit, 1992; U.S. Court of Appeals, Sixth Circuit, 1992; U.S. Court of Appeals, Seventh Circuit, 2001; U.S. Court of Appeals, Ninth Circuit, 1979; U.S. Court of Appeals, Tenth Circuit, 1992; U.S. Court of Appeals, Eleventh Circuit, 1992; U.S. District Court, District of Hawaii, 1986; Fourth Circuit Court of Appeals, 2013.  *Education*:  Boalt Hall School of Law, University of California (J.D., 1978); University of California at Berkeley (A.B., 1975).  *Awards and Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell; "Lawyer of the Year," *Best Lawyers*, recognized in the category of Mass Tort Litigation/Class Actions - Plaintiffs and Product Liability Litigation - Plaintiffs for San Francisco, 2014, 2016; Selected for inclusion by peers in *The Best Lawyers in America* in the fields of "Mass Tort Litigation/Class Actions – Plaintiffs" and "Personal Injury Litigation – Plaintiffs, Product Liability Litigation – Plaintiffs," 2005-2016; "California Litigation Star," *Benchmark Litigation*, 2012-2015; "Top 100 Trial Lawyers in America," *Benchmark Litigation*, 2015; "Top 100 Attorneys in California," *Daily Journal*, 2002-2007, 2010-2015; "Top California Women Litigators," *Daily Journal*, 2007-2015; "Lawdragon 500 Leading Lawyers in America," *Lawdragon*, 2005-2015; "Outstanding Women Lawyer," *National Law Journal*, 2015; "Top 10 Northern California Super

Lawyer," *Super Lawyers*, 2011-2015; "Top 50 Female Northern California Super Lawyers," *Super Lawyers*, 2005-2015**;** "Top 100 Northern California Super Lawyers," *Super Lawyers*, 2005-2015; "Northern California Super Lawyer," *Super Lawyers*, 2004-2015; "Recommended Lawyer," *The Legal 500* (U.S. edition, 2000-2014); "**100 Most Influential Lawyers in America,**" *The National Law Journal*, 1997, 2000, 2006, & 2013; "Outstanding Achievement Award," Chambers USA, 2012; "Margaret Brent Women Lawyers of Achievement Award," American Bar Association Commission on Women in the Profession, 2010; "Edward Pollock Award," Consumer Attorneys of California, 2008; "Lawdragon 500 Leading Plaintiffs' Lawyers," *Lawdragon*, Winter 2007; "50 Most Influential Women Lawyers in America," *The National Law Journal*, 1998 & 2007; "Award For Public Interest Excellence," University of San Francisco School of Law Public Interest Law Foundation, 2007; "Top 75 Women Litigators," *Daily Journal*, 2005-2006; "Lawdragon 500 Leading Litigators in America," *Lawdragon*, 2006; "Distinguished Leadership Award," Legal Community Against Violence, 2006; "Women of Achievement Award," Legal Momentum (formerly the NOW Legal Defense & Education Fund), 2006; "Top 30 Securities Litigator," *Daily Journal*, 2005; "Top 50 Women Litigators," *Daily Journal*, 2004; "Citation Award," University of California, Berkeley Boalt Hall, 2003; "Distinguished Jurisprudence Award," Anti-Defamation League, 2002; "Top 30 Women Litigators," *California Daily Journal*, 2002; "Top Ten Women Litigators," *The National Law Journal*, 2001; "Matthew O. Tobriner Public Service Award," Legal Aid Society, 2000; "California Law Business Top 100 Lawyers," *California Daily Journal*, 2000; "California Lawyer of the Year (CLAY)," *California Lawyer*, 1998; "Presidential Award of Merit," Consumer Attorneys of California, 1998; "Public Justice Achievement Award," Public Justice, 1997. *Publications & Presentations*: Editor-in-Chief, *California Class Actions Practice and Procedure*, LexisNexis (updated annually); "**Punitive Damages,**" Proving and Defending Damage Claims, Chapter 8, Aspen Publishers (updated annually); "Symposium: Enforcing the Social Contract through Representative Litigation," 33 Connecticut Law Review 1239 (Summer 2011); "Apportioning Due Process:  Preserving The Right to Affordable Justice," 87 Denver U. L.Rev. 437 (2010); "Due Process Pre-Empted: Stealth Preemption As a Consequence of Agency Capture" (2010); "**Whe**n Worlds Collide: The Supreme Court Confronts Federal Agencies with Federalism in *Wyeth v. Levine*," 84 Tulane L. Rev. 1275 (2010); "Just Choose: The Jurisprudential Necessity to Select a Single Governing Law for Mass Claims Arising from Nationally Marketed Consumer Goods and Services," *Roger Williams University Law Review* (Winter 2009); "California Class Action Classics," Consumer Attorneys of California (January/February Forum 2009); Executive Editor, ABA Section of Litigation, *Survey of State Class Action Law*, 2008-2010; Coordinating Editor, ABA Section of Litigation, Survey of State Class Action Law, 2006-2007; "The Manageable Nationwide Class: A Choice-of-Law Legacy of Phillips Petroleum Co. v. Shutts," *University of Missouri- Kansas City Law Review*, Volume 74, Number 3, Spring 2006; Co-Author with Fabrice N. Vincent, "Class Actions Fairness Act of 2005," *California Litigation*, Vol. 18, No. 3 (2005); Co-Author with Joy A. Kruse, Bruce Leppla, "Selective Waiver: Recent Developments in the Ninth Circuit and California," (pts. 1 & 2), *Securities Litigation Report* (West Legalworks May & June 2005); Editor-in-Chief, *California Class Actions Practice and Procedures* (2003); "A Plaintiffs' Perspective On The Effect of State Farm v. Campbell On Punitive Damages in Mass Torts" (May 2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law*, updated and re-published in *5 Newberg on Class Actions* (ABA 2001-2004); Co-Author, "Mass But Not (Necessarily) Class: Emerging Aggregation Alternatives Under the Federal Rules," *ABA*

*8th Annual National Institute on Class Actions*, New York (Oct. 15, 2004), New Orleans (Oct. 29, 2004); Co-Author, "2004 ABA Toxicology Monograph-California State Law," (January 2004); **"Mass Tort Class Actions," ATLA's Litigating Tort Cases**, Vol. 1, Chapter 9 (June 2003); "Human Rights Violations as Mass Torts: Compensation as a Proxy for Justice in the United States Civil Litigation System"; Co-Author with Fabrice N. Vincent, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-Author with Fabrice N. Vincent, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002); Coordinating Editor and Co-Author of California section of the *ABA State Class Action Survey* (2001-2002); "Unfinished Business: Reaching the Due Process Limits of Punitive Damages in Tobacco Litigation Through Unitary Classwide Adjudication," *36 Wake Forest Law Review 979* (Winter 2001); "Symposium: Enforcing the Social Contract through Representative Litigation," *33 Connecticut Law Review 1239* (Summer 2001); "Equity for the Victims, Equity for the Transgressor: The Classwide Treatment of Punitive Damages Claims," *74 Tulane Law Review 2005* (June 2000); "Class Action Trends and Developments After Amchem and Ortiz," in *Civil Practice and Litigation Techniques in Federal and State Courts* (ALI-ABA Course of Study 1999); Contributor/Editor, *Moore's Federal Practice* (1999); Co-Author, "Preliminary Issues Regarding Forum Selection, Jurisdiction, and Choice of Law in Class Actions," (December 1999); "Life After Amchem: The Class Struggle Continues," *31 Loyola Law Review 373* (1998); "Recent Developments in Nationwide Products Liability Litigation: The Phenomenon of Non-Injury Products Cases, the Impact of Amchem and the Trend Toward State Court Adjudication," *Products Liability* (ABA February 1998); Contributor/Editor, *California Causes of Action* (1998); "Beyond Bifurcation: Multi-Phase Structure in Mass Tort Class Actions," *Class Actions & Derivative Suits* (Spring 1997); "The Road Not Taken: Thoughts on the Fifth Circuit's Decertification of the Castano Class," *SB24 ALI-ABA 433* (1996); "Getting the Word Out: Pre-Certification Notice to Class Members Under Rule 23(d)(2)," *Class Actions & Derivative Suits Newsletter* (October 1995); "Mass Tort Class Action Settlements**,** *24 CTLA Forum 11* (January-February 1994); "Do You Know the Way from San Jose? The Evolution of Environmental and Toxic Nuisance Class Actions," *Class Actions & Derivative Suits* (Spring 1994); "An Oracle of Change? Realizing the Potential of Emerging Fee Award Methodologies for Enhancing The Role and Control of Investors in Derivative and Class Action Suits," *Principles of Corporate Governance* (ALI October 1994); "How To Streamline Complex Litigation: Tailor a Case Management Order to Your Controversy," *21 The Brief 12* (ABA/TIPS Summer 1992); "The Applicability of the Fraud-On-The-Market Theory to Undeveloped Markets: When Fraud Creates the Market," *12 Class Action Reports 402* (1989); "Mandatory Certification of Settlement Classes," *10 Class Action Reports 151* (1987).  **Member**:  American Academy of Arts and Sciences (Fellow); American Association for Justice (Fight for Justice Campaign; Women Trial Lawyers Caucus; California State Liaison); American Bar Association (Committee on Mass Torts, Past Co-Chair; Committee on Class Actions and Derivative Suits; Tort and Insurance Practice Section; Rules & Procedures Committee, Past Vice-Chair; Civil Procedure & Evidence News Letter, Contributor; Business Law Section); American Law Institute (1993 - present; Council, 1999 - present; Adviser, the Restatement Third, Consumer Contracts project and the Restatement Third, Torts: Liability for Economic Harm; Members Consultative Group, the Restatement Third, Torts: Liability for Physical Harm; past Adviser, the Recognition & Enforcement of Foreign Judgments project and

the Principles of the Law of Aggregate Litigation project); Association of Business Trial Lawyers; Bar Association of the Fifth Federal Circuit; Bar Association of San Francisco (Past President, Securities Litigation Section; Board of Directors, 1997 - 1998; Judiciary Committee); Bay Area Lawyers for Individual Freedom; California Constitution Revision Commission (1993 -1996); California Women Lawyers; Consumer Attorneys of California; Federal Bar Association; Federal Bar Association (Northern District of California Chapter); Federal Civil Rules Advisory Committee (Appointed by Supreme Court, 2011); Lawyers Club of San Francisco; National Center for State Courts (Board Member; Mass Tort Conference Planning Committee); National Judicial College (Board of Trustees); Ninth Circuit Judicial Conference (Lawyer Delegate, 1992 - 1995); Northern District of California Civil Justice Reform Act (Advisory Committee; Advisory Committee on Professional Conduct); Northern District of California Civil Justice Reform Act (CJRA) Advisory Committee; Public Justice Foundation; Queen's Bench; State Bar of California.

**RICHARD M. HEIMANN**, Admitted to practice in Pennsylvania, 1972; District of Columbia, 1974; California, 1975; U.S. District Court, Northern District of California, 1975; U.S. Court of Appeals, Ninth Circuit, 1975; U.S. Supreme Court, 1980; U.S. Court of Appeals, Second Circuit, 1980; U.S. District Court, District of Hawaii, 1986; New York, 2000; District of Colorado. *Education*: Georgetown University (J.D., 1972); *Georgetown Law Journal*, 1971-72; University of Florida (B.S.B.A., with honors, 1969). *Prior Employment*: Mr. Heimann served as Deputy District Attorney and Acting Assistant District Attorney for Tulare County, California, 1974-75, and as an Assistant Public Defender in Philadelphia, Pennsylvania, 1972-74. As a private civil law attorney, Mr. Heimann has tried over 30 civil jury cases, including complex cases such as the successful *FPI/Agretech* and *Edsaco* securities class action trials. In April 2002 in the *Edsaco* case, a federal jury in San Francisco, California returned a $170.7 million verdict against Edsaco Ltd., which included $165 million in punitive damages. *Awards & Honors*: AV Preeminent Peer Review Rated, Martindale-Hubbell; "Trial Ace," *Law360* (one of 50 attorneys in the U.S. recognized by *Law360* in September 2015 as the foremost trial lawyers in America); "Lawyer of the Year," *Best Lawyers*, recognized in the category of Litigation – Securities for San Francisco, 2016; Selected for inclusion by peers in *The Best Lawyers in America* in fields of "Bet the Company Litigation," "Litigation – Antitrust," "Litigation – Securities," and "Mass Tort Litigation/Class Actions – Plaintiffs," 2007-2016; "California Litigation Star," *Benchmark Litigation*, 2013-2015; Legal 500 recommended lawyer, *LegalEase*, 2013; "Top 100 Northern California Super Lawyers," *Super Lawyers,* 2013; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2011; California Lawyer of the Year (CLAY) Award, California Lawyer, 2011, 2013; "Lawdragon Finalist," Lawdragon, 2009-2011; "Top 100 Attorneys in California," Daily Journal, 2010-2011; "Top Attorneys In Securities Law," Super Lawyers Corporate Counsel Edition, 2010, 2012; "Northern California Super Lawyer," Super Lawyers, 2004-2013. *Publications & Presentations:* Securities Law Roundtable, *California Lawyer* (March 2013); Securities Law Roundtable, *California Lawyer* (September 2010); Securities Law Roundtable**,** *California Lawyer* (March 2009); Securities Law Roundtable, *California Lawyer* (April 2008); Securities Law Roundtable, *California Lawyer* (April 2007); Co-Author, "Preliminary Issues Regarding Forum Selection, Jurisdiction, and Choice of Law in Class Actions" (December 1999). *Member*: State Bar of California; Bar Association of San Francisco.

**WILLIAM BERNSTEIN**, Admitted to practice in California, 1975; U.S. Court of Appeals, Ninth Circuit, 1987; U.S. District Court, Northern District of California, 1975; New York and U.S. Supreme Court, 1985; U.S. District Court, Central and Eastern Districts of California, 1991; U.S. District Court, Southern District of California, 1992; U.S. Court of Appeals, Third Circuit, 2008. **Education**:  University of San Francisco (J.D., 1975); **San Francisco Law Review**, 1974-75; University of Pennsylvania (B.A., general honors, 1972). **Community Service**:  Adjunct Professor of Law, University of San Francisco, Settlement Law, 2006-present; Judge Pro Tem for San Francisco Superior Court, 2000-present; Marin Municipal Court, 1984; Discovery Referee for the Marin Superior Court, 1984-89; Arbitrator for the Superior Court of Marin, 1984-1990. **Awards & Honors**: AV Preeminent Peer Review Rated, Martindale-Hubbell; "California Litigation Star," **Benchmark Plaintiff** (ranked as one of California's leading litigators in antitrust law); Selected for inclusion by peers in **The Best Lawyers in America** in field of "**Litigation** - Antitrust**,**" **2013**-2016; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2014; "Lawdragon Finalist," **Lawdragon**, 2009-2011; "Northern California Super Lawyer," **Super Lawyers**, 2004-2014; "Top Attorneys In Antitrust Law," **Super Lawyers Corporate Counsel Edition**, 2010, 2012; Princeton Premier Registry, Business Leaders and Professionals, 2008-2009; "Top 100 Trial Lawyers in California," American Trial Lawyers Association, 2008; **Who's Who Legal**, 2007; Unsung Hero Award, Appleseed, 2006. **Publications & Presentations**:  "The Rise and Fall of Enron's One-To-Many Trading Platform," American Bar Association Antitrust Law Section, Annual Spring Meeting (2005); Co-Author with Donald C. Arbitblit, "Effective Use of Class Action Procedures in California Toxic Tort Litigation," **Hastings West-Northwest Journal of Environmental and Toxic Torts Law and Policy**, No. 3 (Spring 1996). **Member**:  Board of Governors, Association of Business Trial Lawyers; Bar Association of San Francisco; Marin County Bar Association (Admin. of Justice Committee, 1988); State Bar of California.

**DONALD C. ARBITBLIT**, Admitted to practice in Vermont, 1979; California and U.S. District Court, Northern District of California, 1986. **Education**:  Boalt Hall School of Law, University of California (J.D., 1979); Order of the Coif; Tufts University (B.S., **magna cum laude**, 1974). **Awards and Honors:**  AV Preeminent Peer Review Rated, Martindale-Hubbell; Selected for inclusion by peers in **The Best Lawyers in America** in fields of "Mass Tort Litigation/Class Actions - Plaintiffs" and "Personal Injury Litigation – Plaintiffs," 2012-2016; Northern California Super Lawyers," **Super Lawyers**, 2004, 2006-2008, 2014; Legal 500 recommended lawyer, **LegalEase**, 2013; "Lawdragon Finalist," **Lawdragon**, 2009-2011. **Publications & Presentations**:  Co-Author with Wendy Fleishman, "The Risky Business of Off-Label Use," **Trial** (March 2005); "Comment on Joiner: Decision on the Daubert Test of Admissibility of Expert Testimony," **6 Mealey's Emerging Toxic Torts**, No. 18 (December 1997); Co-author with William Bernstein, "Effective Use of Class Action Procedures in California Toxic Tort Litigation," **3 Hastings West-Northwest Journal of Environmental Law and Policy**, No. 3 (Spring 1996); "The Plight of American Citizens Injured by Transboundary River Pollution," **8 Ecology Law Quarterly**, No. 2 (1979). **Appointments**:  Co-Chair, California JCCP Yaz Science Committee, 2010-Present; Member of the Federal Court-appointed Science Executive Committee, and Chair of the Epidemiology/Clinical Trials Subcommittee, **In re Vioxx Products Liability Litigation**, MDL No. 1657 (E.D. La.); Member of the Federal Court-appointed Science and Expert Witness Committees in **In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation**, MDL No. 1203

(E.D. Pa.), *In re Baycol Products Litigation,* MDL No. 1431 (D. Minn.) and *Rezulin Products Liability Litigation*, MDL No. 1348 (S.D.N.Y.).  *Member*: State Bar of California; Bar Association of San Francisco.

**STEVEN E. FINEMAN,** Managing Partner.  Admitted to practice in California, 1989; U.S. District Court, Northern, Eastern and Central Districts of California and U.S. Court of Appeals, Ninth Circuit, 1995; U.S. Court of Appeals, Fifth Circuit, 1996; New York, U.S. District Court, Eastern and Southern Districts of New York, U.S. District Court, District of Colorado, 2006; U.S. Court of Appeals, Second Circuit and U.S. Supreme Court, 1997; U.S. District Court for the District of Columbia, 1997. *Education*:  University of California, Hastings College of the Law (J.D., 1988); University of California, San Diego (B.A., 1985); Stirling University, Scotland (English Literature and Political Science, 1983-84).  *Awards & Honors*: "Lawyer of the Year," *Best Lawyers*, recognized in the category of Mass Tort Litigation/Class Actions – Plaintiffs for New York City, 2016; Selected for inclusion by peers in *The Best Lawyers in America* in the fields of "Mass Tort Litigation/Class Actions – Plaintiffs," 2006-2016; "New York Litigation Star," *Benchmark Litigation*, 2013-2015; Member, *Best Lawyers* Advisory Board, a select group of U.S. and international law firm leaders and general counsel, 2011-2012; "Lawdragon Finalist," *Lawdragon*, 2009-present; "Super Lawyer for New York Metro," *Super Lawyers*, 2006-2014; "Top Attorneys In Securities Law," *Super Lawyers Business Edition*, 2008-present; Consultant to the Office of Attorney General, State of New York, in connection with an industry-wide investigation and settlement concerning health insurers' use of the "Ingenix database" to determine usual and customary rates for out-of-network services, April 2008-February 2009; "100 Managing Partners You Need to Know," *Lawdragon*, 2008; "40 under 40," selected as one of the country's most successful litigators under the age of 40, *The National Law Journal*, 2002. *Publications & Presentations*: Global Justice Forum, Presented by Robert L. Lieff – Moderator of Financial Fraud Litigation Panel and Participant on Financing of Litigation Panel (October 4, 2011, Columbia Law School, New York, New York); The Canadian Institute, The 12th Annual Forum on Class Actions – Panel Member, *Key U.S. and Cross-Border Trends: Northbound Impacts and Must-Have Requirements* (September 21, 2011, Toronto, Ontario, Canada); Co-Author with Michael J. Miarmi, "The *Basic*s of Obtaining Class Certification in Securities Fraud Cases: U.S. Supreme Court Clarifies Standard, Rejecting Fifth Circuit's 'Loss Causation' Requirement," *Bloomberg Law Reports* (July 5, 2011); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Representing Plaintiffs in Large-Scale Litigation (March 2, 2011, Stanford, California); Stanford University Law School — Panel Member, Symposium on the Future of the Legal Profession, (March 1, 2011, Stanford, California); Stanford University Law School, Member, Advisory Forum, Center of the Legal Profession (2011-Present); 4th International Conference on the Globalization of Collective Litigation — Panel Member, Funding Issues: Public versus Private Financing (December 10, 2010, Florida International University College of Law, Miami, Florida); "Bill of Particulars, A Review of Developments in New York State Trial Law," Column, *The Supreme Court's Decisions in Iqbol and Twombly Threaten Access to Federal Courts* (Winter 2010); American Constitution Society for Law and Policy, Access to Justice in Federal Courts — Panel Member, The Iqbal and Twombly Cases (January 21, 2010, New York, New York); American Bar Association, Section of Litigation, The 13th Annual National Institute on Class Actions — Panel Member, Hydrogen Peroxide Will Clear It Up Right Away: Developments in the Law of Class Certification (November 20, 2009, Washington, D.C.); Global Justice Forum, Presented by

Robert L. Lieff and Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Co-Host and Moderator of Mediation/Arbitration Panel (October 16, 2009, Columbia Law School, New York, New York); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts/U.S. Lawyers in Foreign Courts (April 6, 2009, Stanford, California); Consultant to the Office of Attorney General, State of New York, in connection with an industry-wide investigation and settlement concerning health insurers' use of the "Ingenix database" to determine usual and customary rates for out-of-network services, April 2008-February 2009; Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts/U.S. Lawyers in Foreign Courts (April 16, 2008, Stanford, California); Benjamin N. Cardozo Law School, The American Constitution Society for Law & Policy, and Public Justice, Co-Organizer of conference and Master of Ceremonies for conference, Justice and the Role of Class Actions (March 28, 2008, New York, New York); Stanford University Law School and The Centre for Socio-Legal Studies, Oxford University, Conference on The Globalization of Class Actions, Panel Member, Resolution of Class and Mass Actions (December 13 and 14, 2007, Oxford, England); Editorial Board and Columnist, "Federal Practice for the State Court Practitioner," New York State Trial Lawyers Association's "Bill of Particulars," (2005-present); "Bill of Particulars, A Review of Developments in New York State Trial Law," *Federal Multidistrict Litigation Practice* (Fall 2007); "Bill of Particulars, A Review of Developments in New York State Trial Law," *Pleading a Federal Court Complaint* (Summer 2007); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Courts (April 17, 2007, Palo Alto, California); "Bill of Particulars, A Review of Developments in New York State Law," *Initiating Litigation and Electronic Filing in Federal Court* (Spring 2007); "Bill of Particulars, A Review of Developments in New York State Trial Law," Column, *Federal Court Jurisdiction: Getting to Federal Court By Choice or Removal* (Winter 2007); American Constitution Society for Law and Policy, 2006 National Convention, Panel Member, Finding the Balance: Federal Preemption of State Law (June 16, 2006, Washington, D.C.); Global Justice Forum, Presented by Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Moderator and Panel Member on Securities Litigation (May 19, 2006, Paris, France); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's course on Complex Litigation, Foreign Claimants in U.S. Court (April 25, 2006, Stanford, California); Global Justice Forum, Presented by Lieff, Cabraser, Heimann & Bernstein, LLP — Conference Moderator and Speaker and Papers, The Basics of Federal Multidistrict Litigation: How Disbursed Claims are Centralized in U.S. Practice and Basic Principles of Securities Actions for Institutional Investors (May 20, 2005, London, England); New York State Trial Lawyers Institute, Federal Practice for State Practitioners, Speaker and Paper, *Federal Multidistrict Litigation Practice*, (March 30, 2005, New York, New York), published in "Bill of Particulars, A Review of Developments in New York State Trial Law" (Spring 2005); Stanford University Law School, The Stanford Center on Conflict and Negotiation, Interdisciplinary Seminar on Conflict and Dispute Resolution, Guest Lecturer, In Search of "Global Settlements": Resolving Class Actions and Mass Torts with Finality (March 16, 2004, Stanford, California); Lexis/Nexis, Mealey's Publications and Conferences Group, Wall Street Forum: Mass Tort Litigation, Co-Chair of Event (July 15, 2003, New York, New York); Northstar Conferences, The Class Action Litigation Summit, Panel Member on Class Actions in the Securities Industry, and Paper, Practical Considerations for Investors' Counsel - Getting the Case (June 27, 2003, Washington, D.C.); The Manhattan Institute, Center for Legal Policy,

Forum Commentator on Presentation by John H. Beisner, Magnet Courts: If You Build Them, Claims Will Come (April 22, 2003, New York, New York); Stanford University Law School, Guest Lecturer for Professor Deborah Hensler's Courses on Complex Litigation, Selecting The Forum For a Complex Case — Strategic Choices Between Federal And State Jurisdictions, and Alternative Dispute Resolution ADR In Mass Tort Litigation, (March 4, 2003, Stanford, California); American Bar Association, Tort and Insurance Practice Section, Emerging Issues Committee, Member of Focus Group on Emerging Issues in Tort and Insurance Practice (coordinated event with New York University Law School and University of Connecticut Law School, August 27, 2002, New York, New York); Duke University and University of Geneva, "Debates Over Group Litigation in Comparative Perspective," Panel Member on Mass Torts and Products Liability (July 21-22, 2000, Geneva, Switzerland): *New York Law Journal*, Article, Consumer Protection Class Actions Have Important Position, Applying New York's Statutory Scheme (November 23, 1998): Leader Publications, Litigation Strategist, "Fen-Phen," Articles, *The Admissibility of Scientific Evidence in Fen-Phen Litigation and Daubert Developments: Something For Plaintiffs*, Defense Counsel (June 1998, New York, New York); "Consumer Protection Class Actions Have Important Position, Applying New York's Statutory Scheme," New York Law Journal (November 23, 1998); The Defense Research Institute and Trial Lawyer Association, Toxic Torts and Environmental Law Seminar, Article and Lecture, A Plaintiffs' Counsels' Perspective: What's the Next Horizon? (April 30, 1998, New York, New York); Lexis/Nexis, Mealey's Publications and Conference Group, Mealey's Tobacco Conference: Settlement and Beyond 1998, Article and Lecture, The Expanding Litigation (February 21, 1998, Washington, D.C.); New York State Bar Association, Expert Testimony in Federal Court After Daubert and New Federal Rule 26, Article and Lecture, Breast Implant Litigation: Plaintiffs' Perspective on the Daubert Principles (May 21, 1997, New York, New York); Plaintiff Toxic Tort Advisory Council, Lexis/Nexis, Mealey's Publications and Conferences Group (January 2002-2005). *Member*: American Association for Justice; American Bar Association; American Constitution Society; Association of the Bar of the City of New York; Bar Association of the District of Columbia; Civil Justice Foundation (Board of Trustees, 2004-present); Fight for Justice Campaign; Human Rights First; National Association of Shareholder and Consumer Attorneys (Executive Committee, 2009-present); New York State Bar Association; New York State Trial Lawyers Association (Board of Directors, 2001-2004); New York State Trial Lawyers Association's "Bill of Particulars" (Editorial Board and Columnist, "Federal Practice for the State Court Practitioner," 2005-present); Plaintiff Toxic Tort Advisory Council (Lexis/Nexis, Mealey's Publications and Conferences Group, 2002-2005); Public Justice Foundation (President, 2011-2012; Executive Committee, July 2006-present; Board of Directors, July 2002-present; Co-Chair, Major Donors/Special Gifts Committee, July 2009-present; Class Action Preservation Project Committee, July 2005-present); State Bar of California; Supreme Court Historical Society.

**ROBERT J. NELSON**, Admitted to practice in California, 1987; U.S. District Court, Central District of California, 1987; U.S. District Court, Northern District of California, 1988; U.S. Court of Appeals, Ninth Circuit, 1988; U.S. Court of Appeals, Sixth Circuit, 1995; District of Columbia, 1998; New York, 1999; U.S. District Court, Eastern District of New York, Southern District of New York, 2001; U.S. District Court, Eastern District of California, 2006; U.S. District Court, Northern District of Ohio; U.S. District Court, Southern District of Ohio; U.S. District Court, Middle District of Tennessee. *Education*: New York University School of Law (J.D.,

1987): Order of the Coif, Articles Editor, *New York University Law Review*; Root-Tilden-Kern Scholarship Program. Cornell University (A.B., *cum laude* 1982): Member, Phi Beta Kappa; College Scholar Honors Program. London School of Economics (General Course, 1980-81): Graded First. *Prior Employment:* Judicial Clerk to Judge Stephen Reinhardt, U.S. Court of Appeals, Ninth Circuit, 1987-88; Assistant Federal Public Defender, Northern District of California, 1988-93; Legal Research and Writing Instructor, University of California-Hastings College of the Law, 1989-91 (Part-time position). *Awards & Honors*: Selected for inclusion by peers in *The Best Lawyers in America* in fields of "Personal Injury Litigation – Plaintiffs" and "Product Liability Litigation – Plaintiffs," 2012-2016; "**California Litigation Star**," *Benchmark Litigation*, 2013-2015; "**Consumer Attorney of the Year Finalist**," Consumer Attorneys of California, 2007, 2010, 2014; Legal 500 recommended lawyer, *LegalEase*, 2013-Present; "Lawdragon Finalist," *Lawdragon*, 2009-2011; "California Lawyer Attorney of the Year (CLAY)" Award, *California Lawyer*, 2008, 2010; "Northern California Super Lawyer," *Super Lawyers*, 2004-2013; "San Francisco Trial Lawyer of the Year Finalist," San Francisco Trial Lawyers' Association, 2007. *Publications:* False Claims Roundtable, California Lawyer (January 2013); False Claims Roundtable, California Lawyer (April 2012); False Claims Roundtable, California Lawyer (June 2011); False Claims Roundtable, *California Lawyer* (June 2010); Product Liability Roundtable, *California Lawyer* (March 2010); Product Liability Roundtable, *California Lawyer* (July 2009); "Class Action Treatment of Punitive Damages Issues after *Philip Morris v. Williams*: We Can Get There from Here," 2 Charleston Law Review 2 (Spring 2008) (with Elizabeth J. Cabraser); Product Liability Roundtable, California Lawyer (December 2007); Contributing Author, California Class Actions Practice and Procedures (Elizabeth J. Cabraser editor in chief, 2003); "The Importance of Privilege Logs," The Practical Litigator, Vol. II, No. 2 (March 2000) (ALI-ABA Publication); "To Infer or Not to Infer a Discriminatory Purpose: Rethinking Equal Protection Doctrine," 61 New York University Law Review 334 (1986). *Member*: American Association for Justice, Fight for Justice Campaign; American Bar Association; American Civil Liberties Union of Northern California; Bar Association of San Francisco; Bar of the District of Columbia; Consumer Attorneys of California; Human Rights Watch California Committee North; New York State Bar Association; RE-volv, Board Member; San Francisco Trial Lawyers Association; State Bar of California

   **KELLY M. DERMODY**, Admitted to practice in California (1994); U.S. Supreme Court (2013); U.S. Court of Appeals for the First Circuit (2012); U.S. Court of Appeals for the Second Circuit (2010); U.S. Court of Appeals for the Third Circuit (2001); U.S. Court of Appeals for the Fourth Circuit (2008); U.S. Court of Appeals for the Sixth Circuit (2008); U.S. Court of Appeals for the Seventh Circuit (2006); U.S. Court of Appeals for the Ninth Circuit (2007); U.S. District Court, Northern District of California (1995); U.S. District Court, Central District of California; U.S. District Court, Eastern District of California (2012); U.S. District Court of Colorado (2007). *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 1993); Moot Court Executive Board (1992-1993); Articles Editor, *Industrial Relations Law Journal/Berkeley Journal of Employment and Labor Law* (1991-1992); Harvard University (A.B. *magna cum laude*, 1990), Senior Class Ames Memorial Public Service Award. *Prior Employment*: Law Clerk to Chief Judge John T. Nixon, U.S. District Court, Middle District of Tennessee, 1993-1994; Adjunct Professor of Law, Golden Gate University School of Law, Employment Law (Spring 2001). *Awards & Honors:* AV Preeminent Peer Review Rated, Martindale-Hubbell; Selected for inclusion by peers in *The Best Lawyers in America* in fields of "Employment Law –

Individuals" and "Litigation – Labor and Employment," 2010-2016; "California Litigation Star," *Benchmark Litigation*, 2013-2015; "Top 100 Attorneys in California, *Daily Journal*, 2012-2015; "Top 75 Labor and Employment Attorneys in California," *Daily Journal*, 2011-2015; "Top California Women Litigators," *Daily Journal*, 2007, 2010, 2012-2015; "500 Leading Lawyers in America," *Lawdragon*, 2010-2015; "Northern California Super Lawyer," *Super Lawyers*, 2004-2015; "Top 50 Women Northern California Super Lawyers," *Super Lawyers*, 2007-2015; "Top 100 Northern California Super Lawyers," *Super Lawyers*, 2007, 2009-2015; Distinguished Jurisprudence Award, Anti-Defamation League, 2014; "Lawyer of the Year," *Best Lawyers*, recognized in the category of Employment Law – Individuals for **San Francisco, 2014;** "Top 10 Northern California Super Lawyers, *Super Lawyers*, 2014; "Dolores Huerta Adelita Award," California Rural Assistance, 2013; "Recommended Lawyer," *The Legal 500* (U.S. edition, 2013); "Women of Achievement Award," Legal Momentum (formerly the NOW Legal Defense & Education Fund), 2011; "Irish Legal 100" Finalist, *The Irish Voice*, 2010; "Florence K. Murray Award," National Association of Women Judges, 2010 (for influencing women to pursue legal careers, opening doors for women attorneys, and advancing opportunities for women within the legal profession); "Lawdragon Finalist," *Lawdragon*, 2007-2009; "Community Service Award," Bay Area Lawyers for Individual Freedom, 2008; "Community Justice Award," Centro Legal de la Raza, 2008; "Award of Merit," Bar Association of San Francisco, 2007; "California Lawyer Attorney of the Year (CLAY) Award," *California Lawyer*, 2007; "500 Leading Plaintiffs' Lawyers in America," *Lawdragon*, Winter 2007; "Trial Lawyer of the Year Finalist," Public Justice Foundation, 2007; "Consumer Attorney of the Year" Finalist, Consumer Attorneys of California, 2006; "California's Top 20 Lawyers Under 40," *Daily Journal*, 2006; "Living the Dream Partner," Lawyers' Committee for Civil Rights of the San Francisco Bay Area, 2005; "Top Bay Area Employment Attorney*," The Recorder*, 2004. *Member*: American Bar Association, Labor and Employment Law Section (Governing Council, 2009-present; Co-Chair, Section Conference, 2008-2009; Vice-Chair, Section Conference, 2007-2008; Co-Chair, Committee on Equal Opportunity in the Legal Profession, 2006-2007); Bar Association of San Francisco (Board of Directors, 2005-2012; President, 2011-2012; President-Elect, 2010-2011; Treasurer, 2009-2010; Secretary, 2008-2009; Litigation Section; Executive Committee, 2002-2005); Bay Area Lawyers for Individual Freedom; Lawyers' Committee for Civil Rights of the San Francisco Bay Area (Board of Directors, 1998-2005; Secretary, 1999-2003; Co-Chair, 2003-2005; Member, 1997-Present); Carver Healthy Environments and Response to Trauma in Schools (Steering Committee, 2007); College of Labor and Employment Lawyers (Fellow, 2015); Consumer Attorneys of California; Equal Rights Advocates (Litigation Committee, 2000-2002); National Association of Women Judges (Independence of the Judiciary Co-Chair, 2011-2014; Resource Board, Co-Chair, 2009-2011, Member, 2005-2014); National Center for Lesbian Rights (Board of Directors, 2002-2008; Co-Chair, 2005-2006); National Employment Lawyers' Association; Northern District of California Historical Society (Board of Directors, 2015- Present); Northern District of California Lawyer Representative to the Ninth Circuit Judicial Conference (2007-2010); Pride Law Fund (Board of Directors, 1995-2002; Secretary, 1995-1997; Chairperson, 1997-2002); Public Justice Foundation; State Bar of California.

**JONATHAN D. SELBIN**, Admitted to practice in California; District of Columbia; New York; U.S. Court of Appeals, Third Circuit; U.S. Court of Appeals, Fifth Circuit; U.S. Court of Appeals, Sixth Circuit; U.S. Court of Appeals, Seventh Circuit; U.S. Court of Appeals, Ninth Circuit; U.S. Court of Appeals, Eleventh Circuit; U.S. District Court, Northern District of

California; U.S. District Court, Central District of California; U.S. District Court, Northern District of Illinois; U.S. District Court, Southern District of New York; U.S. District Court, Eastern District of New York; U.S. District Court, Eastern District of Michigan; U.S. District Court, Northern District of Florida; U.S. Supreme Court; U.S. District Court, Eastern District of Wisconsin. U.S. Court of Appeals, Tenth Circuit, 2014. **Education**: Harvard Law School (J.D., *magna cum laude*, 1993); University of Michigan (B.A., *summa cum laude*, 1989). **Prior Employment**: Law Clerk to Judge Marilyn Hall Patel, U.S. District Court, Northern District of California, 1993-95. **Awards & Honors**: Selected for inclusion by peers in *The Best Lawyers in America* in field of " Product Liability Litigation – Plaintiffs," 2013-2016; "New York Litigation Star," *Benchmark Litigation*, 2013-2015; "New York Super Lawyers," *Super Lawyers*, 2006-2013; "*Lawdragon* Finalist," *Lawdragon*, 2009. **Publications & Presentations**: On Class Actions (2009); Contributing Author, "Ninth Circuit Reshapes California Consumer-Protection Law," American Bar Association (July 2012); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor-in-chief, 2003); "Bashers Beware:  The Continuing Constitutionality of Hate Crimes Statutes After R.A.V.," 72 *Oregon Law Review* 157 (Spring, 1993). **Member**: American Association for Justice; American Bar Association; District of Columbia Bar Association; New York Advisory Board, Alliance for Justice; New York State Bar Association; New York State Trial Lawyers Association; State Bar of California.

**MICHAEL W. SOBOL**, Admitted to practice in Massachusetts, 1989; California, 1998; United States District Court, District of Massachusetts, 1990; U.S. District Court, Northern District of California, 2001; U.S. District Court, Central District of California, 2005; U.S. Court of Appeals for the Ninth Circuit (2009); U.S. Court of Appeals for the Eleventh Circuit (2012). **Education**: Boston University (J.D., 1989); Hobart College (B.A., *cum laude*, 1983). **Prior Employment**: Lecturer in Law, Boston University School of Law, 1995-1997. **Awards & Honors:** Selected for inclusion by peers in *The Best Lawyers in America* in fields of "Mass Tort Litigation/Class Actions – Plaintiffs" and "Product Liability Litigation – Plaintiffs," 2013-2016; "California Litigation Star," *Benchmark Litigation*, 2013-2015; "Top 100 Northern California Super Lawyers," *Super Lawyers*, 2013; "Top 100 Attorneys in California," *Daily Journal*, 2012-2013; "Trial Lawyer of the Year Finalist," Public Justice, 2012; "Northern California Super Lawyer," *Super Lawyers*, 2012-2013; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2011; "*Lawdragon* Finalist," *Lawdragon*, 2009. **Publications & Presentations**: Panelist, National Consumer Law Center's 15th Annual Consumer Rights Litigation Conference, Class Action Symposium; Panelist, Continuing Education of the Bar (C.E.B.) Seminar on Unfair Business Practices—California's Business and Professions Code Section 17200 and Beyond; Columnist, *On Class Actions*, Association of Business Trial Lawyers, 2005 to present; *The Fall of Class Action Waivers* (2005); *The Rise of Issue Class Certification* (2006); *Proposition 64's Unintended Consequences* (2007); *The Reach of Statutory Damages* (2008). **Member**:  State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California, Board of Governors, (2007-2008, 2009-2010); National Association of Consumer Advocates.

**FABRICE N. VINCENT**, Admitted to practice in California, 1992; U.S. District Court, Northern District of California, Central District of California, Eastern District of California, Ninth Circuit Court of Appeals, 1992. **Education**: Cornell Law School (J.D., *cum laude*, 1992); University of California at Berkeley (B.A., 1989). **Awards & Honors:** Selected for inclusion by

peers in *The Best Lawyers in America* in fields of "Mass Tort Litigation/Class Actions – Plaintiffs," "Product Liability Litigation – Plaintiffs," and "Personal Injury Litigation – Plaintiffs," 2012-2016; "Super Lawyer for Northern California," *Super Lawyers*, 2006–2014; "Outstanding Subcommittee Chair for the Class Actions & Derivative Suits," *ABA Section of Litigation*, 2013. **Publications & Presentations**: Lead Author, *Citizen Report on Utility Terrain Vehicle (UTV) Hazards and Urgent Need to Improve Safety and Performance Standards; and Request for Urgent Efforts To Increase Yamaha Rhino Safety and Avoid Needless New Catastrophic Injuries, Amputations and Deaths*, Lieff Cabraser Heimann & Bernstein, LLP (2009); Co-Author with Elizabeth J. Cabraser, "Class Actions Fairness Act of 2005," *California Litigation*, Vol. 18, No. 3 (2005); Co-Editor, *California Class Actions Practice and Procedures* (2003-06); Co-Author, "Ethics and Admissibility: Failure to Disclose Conflicts of Interest in and/or Funding of Scientific Studies and/or Data May Warrant Evidentiary Exclusions," *Mealey's December Emerging Drugs Reporter* (December 2002); Co-author, "The Shareholder Strikes Back: Varied Approaches to Civil Litigation Claims Are Available to Help Make Shareholders Whole," *Mealey's Emerging Securities Litigation Reporter* (September 2002); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," *Survey of State Class Action Law* (ABA 2000-09), updated and re-published in 5 *Newberg on Class Actions* (2001-09); Coordinating Editor and Co-Author of California section of the ABA State Class Action Survey (2001-06); Co-Editor-In-Chief, *Fen-Phen Litigation Strategist* (Leader Publications 1998-2000); Author of "Off-Label Drug Promotion Permitted" (Oct. 1999); Co-Author, "The Future of Prescription Drug Products Liability Litigation in a Changing Marketplace," and "Six Courts Certify Medical Monitoring Claims for Class Treatment," 29 *Forum* 4 (Consumer Attorneys of California 1999); Co-Author, *Class Certification of Medical Monitoring Claims in Mass Tort Product Liability Litigation* (ALI-ABA Course of Study 1999); Co-Author, "How Class Proofs of Claim in Bankruptcy Can Help in Medical Monitoring Cases," (Leader Publications 1999); Author, "AHP Loses Key California Motion In Limine," (February 2000); Co-Author, Introduction, "Sanctioning Discovery Abuses in the Federal Court," (LRP Publications 2000); "With Final Approval, Diet Drug Class Action Settlement Avoids Problems That Doomed Asbestos Pact," (Leader Publications 2000); Author, "Special Master Rules Against SmithKline Beecham Privilege Log," (November 1999). **Member**: American Association for Justice; Association of Business Trial Lawyers; State Bar of California; Bar Association of San Francisco; American Bar Association; Fight for Justice Campaign; Association of Business Trial Lawyers; Society of Automotive Engineers.

**DAVID S. STELLINGS**, Admitted to practice in New York, 1994; New Jersey; 1994; U.S. District Court, Southern District of New York, 1994. **Education**: New York University School of Law (J.D., 1993); Editor, *Journal of International Law and Politics;* Cornell University (B.A., *cum laude*, 1990). **Awards & Honors**: "Super Lawyer for New York Metro," *Super Lawyers*, 2012-2014; "Trial Lawyer of the Year Finalist," Public Justice, 2012; "*Lawdragon* Finalist, *Lawdragon*, 2009. **Member**: New York State Bar Association; New Jersey State Association; Bar Association of the City of New York; American Bar Association.

**ERIC B. FASTIFF,** Admitted to practice in California, 1996; District of Columbia, 1997; U.S. Courts of Appeals for the Third, Ninth and Federal Circuit; U.S. District Courts for the Northern, Southern, Eastern, and Central Districts of California, District of Columbia; U.S. District Court, Eastern District of Wisconsin; U.S. Court of Federal Claims. **Education**: Cornell

Law School (J.D., 1995); Editor-in-Chief, *Cornell International Law Journal;* London School of Economics (M.Sc.(Econ.), 1991); Tufts University (B.A., *cum laude, magno cum honore in thesi*, 1990). *Prior Employment*: Law Clerk to Hon. James T. Turner, U.S. Court of Federal Claims, 1995-1996; International Trade Specialist, Eastern Europe Business Information Center, U.S. Department of Commerce, 1992. *Awards & Honors*: Selected for inclusion by peers in *The Best Lawyers in America* in the field of "Litigation - Antitrust," 2013-2016; "California Litigation Star," *Benchmark Litigation*, 2013-2015; Legal 500 recommended lawyer, *LegalEase*, 2013; "Northern California Super Lawyer," *Super Lawyers*, 2010-2013;"Top 100 Layers in California," *Daily Journal*, 2013; "Top Attorneys in Business Law," *Super Lawyers* Corporate Counsel Edition, 2012; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Publications & Presentations*: General Editor, *California Class Actions Practice and Procedures*, (2003-2009); Coordinating Editor and Co-Author of California section of the *ABA State Class Action Survey* (2003-2008); Author, "US Generic Drug Litigation Update," 1 *Journal of Generic Medicines* 212 (2004); Author, "The Proposed Hague Convention on the Recognition and Enforcement of Civil and Commercial Judgments:  A Solution to Butch Reynolds's Jurisdiction and Enforcement Problems," 28 *Cornell International Law Journal* 469 (1995). *Member*: American Antitrust Institute (Advisory Board, 2012-Present); Bar Association of San Francisco; **Children's Day** School (Board of Trustees); District of Columbia Bar Association; *Journal of Generic Medicines* (Editorial Board Member, 2003-Present); State Bar of California; U.S. Court of Federal Claims Bar Association.

**WENDY R. FLEISHMAN**, Admitted to practice in New York, 1992; Pennsylvania, 1977; U.S. Supreme Court, 2000; U.S. Court of Appeals 2nd Circuit, 1998; U.S. Court of Appeals 3rd Circuit, 2010; U.S. Court of Appeals 8th Circuit, 2009; U.S. Court of Appeals 9th Circuit, 2010; U.S. District Court, District of Arizona, 2013; U.S. District Court, Northern District of California; U.S. District Court, Western District of New York, 2012; U.S. District Court Eastern District of New York, 1999; U.S. District Court Northern District of New York, 1999; U.S. District Court Southern District of New York, 1995; U.S. District Court, Eastern District of Wisconsin, 2013; U.S. District Court, Eastern District of Pennsylvania, 1984; U.S. District Court, Western District of Pennsylvania, 2001; U.S. Court of Appeals 5th Circuit, March 5, 2014. *Education*: University of Pennsylvania (Post-Baccalaureate Pre-Med, 1982); Temple University (J.D., 1977); Sarah Lawrence College (B.A., 1974). *Prior Employment*:  Skadden, Arps, Slate, Meagher & Flom LLP in New York (Counsel in the Mass Torts and Complex Litigation Department), 1993-2001; Fox, Rothschild O'Brien & Frankel (partner), 1988-93 (tried more than thirty civil, criminal, employment and jury trials, and AAA arbitrations, including toxic tort, medical malpractice and serious injury and wrongful death cases); Ballard Spahr Andrews & Ingersoll (associate), 1984-88 (tried more than thirty jury trials on behalf of the defense and the plaintiffs in civil personal injury and tort actions as well as employment—and construction—related matters); Assistant District Attorney in Philadelphia, PA, 1977-84 (in charge of and tried major homicide and sex crime cases). *Awards and Honors*: "New York Litigation Star," *Benchmark Litigation*, 2013-2015; "New York Super Lawyers," *Super Lawyers*, 2006-2014; Legal 500 recommended lawyer, *LegalEase*, 2013; AV Preeminent Peer Review Rated, Martindale-Hubbell; Officer of New York State Trial Lawyers Association, 2010-present; New York State Academy of Trial Lawyers, 2011; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Publications & Presentations*: "Where Do You Want To Be? Don't Get Left Behind, Creating a Vision for Your Practice," Minority Caucus and Women Trial Lawyers Caucus (July 22, 2013);

Editor, Brown & Fleishman, "Proving and Defending Damage Claims: A Fifty-State Guide" (2007-2010); Co-Author with Donald Arbitblit, "The Risky Business of Off-Label Use," *Trial* (March 2005); Co-Author, "From the Defense Perspective," *Scientific Evidence, Chapter 6, Aspen Law Pub* (1999); Editor, *Trial Techniques Newsletter,* Tort and Insurance Practices Section, American Bar Association (1995-1996; 1993-1994); "How to Find, Understand, and Litigate Mass Torts," NYSTLA Mass Torts Seminar (April 2009); "Ethics of Fee Agreements in Mass Torts," AAJ Education Programs (July 2009). *Appointments:* Lead Counsel, Joint Coordinated California Litigation, *Amo Lens Solution Litigation*; Co-Liaison, *In re Zimmer Durom Cup Hip Implant Litigation*; Plaintiffs' Steering Committee, DePuy ASR Hip Implant Litigation; Liaison, NJ Ortho Evra Patch Product Liability Litigation; Co-Liaison, NJ Reglan Mass Tort Litigation; Co-Chair, Mealey's Drug & Medical Device Litigation Conference (2007); Executive Committee, *In re ReNu MoistureLoc Product Liability Litigation*, MDL; Discovery Chair, *In re Guidant Products Liability Litigation*; Co-Chair Science Committee, *In re Baycol MDL Litigation*; Pricing Committee, *In re Vioxx MDL Litigation*. *Member*: New York State Trial Lawyers Association (Treasurer, 2010-present; Board of Directors, 2004-Present); Association of the Bar of the City of New York (Product Liability Committee, 2007-present; Judiciary Committee, 2004-Present); American Bar Association (Annual Meeting, Torts & Insurance Practices Section, NYC, Affair Chair, 1997; Trial Techniques Committee, Torts and Insurance Practices, Chair-Elect, 1996); American Association for Justice (Board of Governors); Pennsylvania Bar Association (Committee on Legal Ethics and Professionalism, 1993-Present; Committee on Attorney Advertising, 1993-Present; Vice-Chair, Task Force on Attorney Advertising, 1991-92); State Bar of New York; Federal Bar Association; Member, Gender and Race Bias Task Force of the Second Circuit, 1994-present; Deputy Counsel, Governor Cuomo's Screening Committee for New York State Judicial Candidates, 1993-94; New York Women's Bar Association; New York County Lawyers; Fight for Justice Campaign; PATLA; Philadelphia Bar Association (Member of Committee on Professionalism 1991-92).

**JOY A. KRUSE**, Admitted to practice in Washington, D.C., 1984; California; U.S. Supreme Court; U.S. Courts of Appeals for the Ninth and Federal Circuits; U.S. District Courts for the Northern, and Eastern Districts of California; U.S. District Court for the Central District of California, 2006; U.S. District Court, District of Colorado, 2006; U.S. District Court, Eastern District of Wisconsin, 2001. *Education*: Harvard Law School (J.D., 1984); Wellesley College (B.A., 1977). *Prior Employment*: Assistant Federal Public Defender, Northern District of California, 1992-96; Public Defender Service, Washington D.C., 1984-89. *Awards & Honors:* AV Preeminent Peer Review Rated, Martindale-Hubbell; Selected for inclusion by peers in *The Best Lawyers in America* in fields of "Litigation – Securities," 2013-2016; "*Lawdragon* Finalist," *Lawdragon*, 2009. *Presentations & Publications*: Panelist, "Corporate Governance Litigation," PLI Securities Litigation & Enforcement Institute, San Francisco (October 15, 2009); Co-Author with Richard M. Heimann and Sharon M. Lee, "Post-*Tellabs* Treatment of Confidential Witnesses in Federal Securities Litigation," *Journal of Securities Law, Regulation, & Compliance* (Vol. 2, No. 3 June 2009); "*California Lawyer* Securities Law Roundtable" (October 2008); Co-Author with Elizabeth J. Cabraser, Bruce Leppla, "Selective Waiver: Recent Developments in the Ninth Circuit and California," (pts. 1 & 2), *Securities Litigation Report* (West Legalworks May and June 2005). *Member*: Phi Beta Kappa; State Bar of California; Bar Association of San Francisco; Equal Rights Advocate (Member; Board of Directors); Northern District of California Practice Program Committee (Member; Board of Directors).

**RACHEL GEMAN,** Admitted to practice in New York, 1998; Southern and Eastern Districts of New York, 1999; U.S. District Court, Eastern District of Michigan, 2005; U.S. District Court of Colorado, 2007; U.S. Supreme Court. *Education*:  Columbia University School of Law (J.D. 1997); Stone Scholar; Equal Justice America Fellow; Human Rights Fellow; Editor, *Columbia Journal of Law and Social Problems*; Harvard University (A.B. *cum laude* 1993). *Prior Employment*: Adjunct Professor, New York Law School; Special Advisor, United States Mission to the United Nations, 2000; Law Clerk to Judge Constance Baker Motley, U.S. District Court, Southern District of New York, 1997-98. *Awards & Honors*: Selected for inclusion by peers in *The Best Lawyers in America* in field of "Employment Law – Individuals," 2012-2016; "Lawyer of the Year," *Best Lawyers*, recognized in the category of Employment Law – Individuals for San Francisco, 2014; "Super Lawyer for New York Metro," *Super Lawyers*, 2013-2014; Legal 500 recommended lawyer, *LegalEase*, 2013; AV Preeminent Peer Review Rated, Martindale-Hubbell; "Rising Stars for New York Metro," *Super Lawyers*, a publication of Thomson Reuters , 2011; Distinguished Honor Award, United States Department of State, 2001. *Publications & Presentations*: Speaker and Moderator, "Statistics for Lawyers - Even Those Who Hate Math," National Employment Lawyers Association Annual Convention (2015); Speaker, "Gender Pay Disparities:  Enforcement, Litigation, and Remedies," New York City Conference on Representing Employees (2015); Speaker, "Protecting Pay: Representing Workers With Wage and Hour Claims," National Employment Lawyers Association (2015); Speaker and Author, "What Employment Lawyers Need to Know About Non-Employment Class Actions," ABA Section of Labor and Employment Law Conference (2014); Moderator, "Dodd-Frank and Sarbanes-Oxley Whistleblower Issues," National Employment Lawyers Association/New York (2014); Author, "Whistleblower Under Pressure," *Trial Magazine* (April 2013); Panelist, "Class Certification Strategies: Dukes in the Rear View Mirror," Impact Fund Class Action Conference (2013); Author & Panelist, "Who is an Employer Under the FLSA?" National Employment Lawyers Association Conference (2013); Panelist, "Fraud and Consumer Protection: Plaintiff and Defense Strategies," Current Issues in Pharmaceutical and Medical Device Litigation, ABA Section of Litigation (2012); Participant and Moderator, "Ask the EEOC:  Current Insights on Enforcement and Litigation," ABA Section of Labor and Employment Law (2011); Panelist, "Drafting Class Action Complaints," New York State Bar Association (2011); Participant and Moderator, "Ask the EEOC: Current Insights on Enforcement and Litigation," ABA Section of Labor and Employment Law (2011); *The New York Employee Advocate*, Co-Editor (2005-2009), Regular Contributor (2008-present); Moderator, "Hot Topics in Wage and Hour Class and Collective Actions," American Association for Justice Tele-Seminar (2010); Author & Panelist, "Class Action Considerations: Certification, Settlement, and More," American Conference Institute Advanced Forum (2009); Panelist, "Rights Without Remedies," American Constitutional Society National Convention, Revitalizing Our Democracy: Progress and Possibilities (2008); Panelist, Fair Measure: Toward Effective Attorney Evaluations, American Bar Association Annual Meeting (2008); Panelist, "Getting to Know You: Use and Misuse of Selection Devices for Hiring and Promotion," ABA Labor & Employment Section Annual Meeting (2008); Author, "'Don't I Think I Know You Already?': Excessive Subjective Decision-Making as an Improper Tool for Hiring and Promotion," ABA Labor & Employment Section Annual Meeting (2008); Author & Panelist, "Ethical Issues in Representing Workers in Wage & Hour Actions," Representing Workers in Individuals & Collective Actions under the FLSA (2007); Author & Panelist, "Evidence and Jury Instructions in FLSA Actions," Georgetown Law Center/ACL-ABA (2007); Author & Panelist, "Crucial Events in the 'Life' of an FLSA Collective

Action: Filing Considerations and the Two-step 'Similarly-Situated' Analysis," National Employment Lawyers Association, Annual Convention (2006); Author & Panelist, "Time is Money, Except When It's Not: Compensable Time and the FLSA,"  National Employment Lawyers Association, Impact Litigation Conference (2005); Panelist, "Electronic Discovery," Federal Judicial Center & Institute of Judicial Administration, Workshop on Employment Law for Federal Judges (2005); "Image-Based Discrimination and the BFOQ Defense," *EEO Today: The Newsletter of the EEO Committee of the ABA's Section of Labor and Employment Law*, Vol. 9, Issue 1 (2004); "Fair Labor Standards Act Overtime Exemptions: Proposed Regulatory Changes," *New York State Bar Association Labor and Employment Newsletter* (2004); Chair & Panelist, "Current Topics in Fair Labor Standards Act Litigation," Conference, Association of the Bar of the City of New York (2003); Moderator, "Workforce Without Borders," ABA Section of Labor & Employment Law, EEOC Midwinter Meeting (2003). *Member*: American Bar Association [Labor and Employment Law Section, Standing Committee on Equal Employment Opportunity (Member, Past Employee Co-Chair, 2009-2011)]; Association of the Bar of the City of New York; National Employment Lawyers' Association - New York Chapter (Board Member, 2005-2011); **National Employment Lawyers' Association –** National; Public Justice Foundation; Taxpayers Against Fraud Education Fund.

**BRENDAN P. GLACKIN**, Admitted to practice in California, 1998; New York, 2000; U.S. District Court, Northern, Central, Eastern and Southern Districts of California, 2001; U.S. Court of Appeals for the Ninth Circuit, 2004; U.S. District Court, Southern District of New York, 2001; U.S. District Court, District of Colorado, 2001; U.S. Court of Appeals for the Second Circuit, 2013; U.S. Court of Appeals for the Ninth Circuit. *Education*: Harvard Law School (J.D., *cum laude*, 1998); University of Chicago (A.B., Phi Beta Kappa, 1995). *Prior Employment*: Contra Costa Public Defender, 2005-2007; Boies, Schiller & Flexner, 2000-2005; Willkie Farr & Gallagher, 1999-2000; Law Clerk to Honorable William B. Shubb, U.S. District Court, Eastern District of California, 1998-1999. *Awards & Honors:* "Northern California Super Lawyer," *Super Lawyers,* 2013-2014. *Member*: State Bar of California; BASF Antitrust Section, Executive Committee. *Seminars:* Ramifications of *American Needle, Inc. v. National Football League,* 2010; Antitrust Institute 2011: Developments & Hot Topics, 2011; Antitrust Trials: The View From the Trenches, 2013; Applying Settlement Offsets to Antitrust Judgments, ABA Spring Meetings, 2013; California Trial Advocacy, PLI, 2013; Building Trial Skills, NITA, 2013.

**MARK P. CHALOS**, Admitted to practice in Tennessee, 1998; U.S. Court of Appeals, Sixth Circuit, 1998; U.S. District Court, Middle District of Tennessee, 2000; U.S. District Court, Western District of Tennessee, 2002; U.S. District Court, Eastern District of Tennessee, 2006; U.S. District Court, Northern District of Florida, 2006; U.S. District Court, Northern District of California, 2007; U.S. Supreme Court, 2012. *Education*:  Emory University School of Law (J.D., **1998); Dean's List; Award for Highest Grade, Admiralty Law**: Research Editor, *Emory International Law Review*; Phi Delta Phi Legal Fraternity; Vanderbilt University (B.A., 1995). *Honors & Awards*: Selected for inclusion by peers in *The Best Lawyers in America* in the field of **"Mass Tort Litigation/Class Actions – Plaintiffs," 2012**-2016; "Tennessee Litigation Star," *Benchmark Litigation,* 2013-2015; "Mid-South Super Lawyers**," *Super Lawyers*,** 2011-2014; AV Peer Review Rated, Martindale-Hubbell; "Best of the Bar," *Nashville Business Journal*, 2008-**2010; "Top 40 Under 40,"** *The Tennessean*, **2004; "Mid-South Rising Stars,"** *Super Lawyers*, 2008-2010. *Publications & Presentations*: "Supreme Court Limits The Reach Of Alien Tort

Statute In Kiobel," Legal Solutions Blog, April 2013; "The Rise of Bellwether Trials," Legal Solutions Blog, March 2013; "Amgen: The Supreme Court Refuses to Erect New Class Action Bar," Legal Solutions Blog, March 2013; "Are International Wrongdoers Above the Law?," The Trial Lawyer Magazine, January 2013; "Kiobel v. Royal Dutch Petroleum: Supreme Court to Decide Role of US Courts Abroad," ABA Journal, January 2013. "Legislation Protects the Guilty [in Deadly Meningitis Outbreak]," Tennessean, December 2012; Litigating International Torts in United States Courts, 2012 ed., Thomson Reuters/West (2012); "Successfully Suing Foreign Manufacturers," TRIAL Magazine, November 2008; "Washington Regulators Versus American Juries: The United States Supreme Court Shifts the Balance in Riegel v. Medtronic," *Nashville Bar Journal*, 2008; "Washington Bureaucrats Taking Over American Justice System," *Tennessean.com* (December 2007); "The End of Meaningful Punitive Damages," *Nashville Bar Journal*, November 2001; "Is Civility Dead?" *Nashville Bar Journal*, October 2003; "The FCC: The Constitution, Censorship, and a Celebrity Breast," Nashville Bar Journal, April 2005. *Member*:  American Association for Justice (Chair, Public Education Committee, 2015); American Bar Association (Past-Chair, YLD Criminal & Juvenile Justice Committee; Tort Trial and Insurance Practice Section Professionalism Committee); First Center for the Visual Arts (Founding Member, Young Professionals Program); Harry Phillips American Inn of Court; Kappa Chapter of Kappa Sigma Fraternity Alumni Association (President); Metropolitan Nashville Arts Commission (Grant Review Panelist); Nashville Bar Association (YLD Board of Directors; Nashville Bar Association YLD Continuing Legal Education and Professional Development Director); Nashville Bar Journal (Editorial Board); Tennessee Association for Justice (Board of Directors, 2008-2011; Legislative Committee); Tennessee Bar Association (Continuing Legal Education Committee); Tennessee Trial Lawyers Association (Board of Directors); Historic Belcourt Theatre (Past Board Chair; Board of Directors); Nashville Cares (Board of Directors).

**PAULINA do AMARAL**, Admitted to practice in New York, 1997; California, 1998; U.S. Court of Appeals, Ninth Circuit, 1999; U.S. District Court, Southern District of New York, 2004; U.S. District Court, Western District of Michigan, 2004; U.S. District Court, Eastern District of Michigan, 2007. *Education*:  University of California Hastings College of Law (J.D., 1996); Executive Editor, *Hastings Constitutional Law Quarterly*; National Moot Court Competition Team, 1995; Moot Court Executive Board; University of Rochester (B.A., 1988). *Employment*: Law Clerk to Chief Judge Richard Alan Enslen, U.S. District Court, Western District of Michigan, 1996-98. *Awards & Honors:* Legal 500 recommended lawyer, *LegalEase*, 2013. *Member*: Association of the Bar of the City of New York, (2007-2010, Committee on the Judiciary); American Bar Association; State Bar of New York; State Bar of California; Bar Association of San Francisco; American Trial Lawyers Association; New York State Trial Lawyers Association.

**KENNETH S. BYRD**, Admitted to practice in Tennessee, 2004; U.S. District Court of Appeals, 6th Circuit, 2009; U.S. District Court, Western District of Tennessee, 2007; U.S. District Court, Eastern District of Tennessee, 2006; U.S. District Court, Middle District of Tennessee, 2005. *Education:* Boston College Law School (J.D., *cum laude*, 2004), Law Student Association (President, 2003-2004), National Moot Court Team (Regional Champion, 2003-2004), American Constitution Society (Secretary, 2002-2003), Judicial Process Clinic (2003), Criminal Justice Clinic (2003-2004); Samford University (B.S., *cum laude*, in Mathematics with

Honors, minor in Journalism, 1995). *Prior Employment:* Harwell Howard Hyne Gabbert & Manner, P.C., 2004-2010; Summer Associate, Harwell Howard Hyne Gabbert & Manner, P.C., 2003; Summer Associate, Edward, Angell, Palmer, Dodger, LLP, 2003. *Awards:* "Paladin Award," Tennessee Association for Justice, 2015; "Rising Star for Mid-South," Super Lawyers, 2014. *Member:* American Bar Association; American Constitution Society, Nashville Chapter (Member & Chair of 2008 Supreme Court Preview Event); Camp Ridgecrest Alumni & Friends (Board Member); Harry Phillips American Inn of Court, Nashville Chapter (Associate Member, 2008-2010; Barrister, 2010-2014); Historic Edgefield, Inc. (President, 2009-2011); Nashville Bar Association; Tennessee Bar Association.

**STEPHEN H. CASSIDY**, Admitted to practice in California, 1989; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1997. *Education*: Hastings College of the Law (J.D., *magna cum laude*, 1989); Associate Managing Editor, *Hastings International and Comparative Law Review*, 1988-1989; Order of the Coif; Member, Thurston Society; Recipient, American Jurisprudence Awards for Real Property, Evidence and American Legal History; Georgetown University (B.S.F.S., 1986). *Prior Employment*: Law Clerk to Magistrate-Judge Joan S. Brennan, U.S. District, Northern District of California, 1989-90; Alameda County Public Defender's Office (1990-1991); Marin County Public Defender's Office (1991-1992); Motions Attorney, U.S. Court of Appeals, Ninth Circuit, 1992-94, 1996-97. *Awards & Honors:* AV Preeminent Peer Review Rated, Martindale-Hubbell. *Publications & Presentations*: TVA + Coal Ash, American Association for Justice, July 2013; "Magnetix Toy Injuries: A Failure to Inform Safety Regulators," OpEd News (2009); "Restoring Patient Rights and Promoting Safer Medical Device," OpEd News (2009); "Internet Marketing for Plaintiffs' Firms," CAOC Conference (May 2004); "Enhancing the Role of Law Firm Marketing Departments," LexisNexis Law Firm Marketers' Roundtable (November 2003); Contributing Author, *California Class Actions Practice and Procedures (*Elizabeth J. Cabraser editor in chief, 2003); Co-Author, "Decisions Interpreting California's Rules of Class Action Procedure," in *Survey of State Class Action Law* (ABA 2001); "The Newest Member of the Nuclear Club: Pakistan's Drive for a Nuclear Weapon's Capability," 12 *Hastings Int'l & Comp. L. Rev.* 679 (1989). *Member*: State Bar of California; Bar Association of San Francisco; American Bar Association (Litigation Section); Public Justice; Fight for Justice Campaign; Consumer Attorneys of California; San Francisco Trial Lawyers Association; Alameda Contra Costa Trial Lawyers' Association; American Association for Justice

**DANIEL P. CHIPLOCK**, Admitted to practice in New York, 2001; U.S. District Court, Southern District of New York, 2001; U.S. District Court, Eastern District of New York, 2001; U.S. District Court, District of Colorado, 2006; U.S. Court of Appeals for the Second Circuit, 2009; U.S. Court of Appeals for the Sixth Circuit, 2011; U.S. Supreme Court. *Education*: Stanford Law School (J.D., 2000); Article Review Board, *Stanford Environmental Law Journal*; Recipient, Keck Award for Public Service; Columbia University (B.A., *summa cum laude*, 1994); Phi Beta Kappa. *Member*: State Bar of New York; American Association for Justice; Fight for Justice Campaign; Public Justice; National Association of Shareholder and Consumer Attorneys (Executive Committee/Secretary); American Constitution Society for Law and Policy (Advocate's Circle). *Classes/Seminars:* "Fraud on the Market," Federal Bar Council, Feb. 25, 2014 (CLE panel participant).

**NIMISH R. DESAI,** Admitted to practice in California, 2006; US District Court, Northern District of California, 2007; US District Court, Central District of California, 2008; US District Court, Northern District of Florida, 2009; U.S. Court of Appeals, Ninth Circuit, 2009. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D., 2006), Finalist and Best Brief, McBaine Moot Court Competition (2006), Moot Court Best Brief Award (2004); University of Texas, Austin, (B.S. & B.A., High Honors, 2002). *Prior Employment*: Extern, Sierra Club Environmental Law Program, 2004; Researcher, Public Citizen, 2003; Center for Energy and Environmental Resources, 2001-2002. *Awards & Honors:* Selected for inclusion by peers in *The Best Lawyers in America* in field of "Qui Tam Law," 2016; "Consumer Attorney of the Year Finalist," Consumer Attorneys of California, 2014; "Northern California Super Lawyer," *Super Lawyers,* 2013-2014; "Rising Star for Northern California," *Super Lawyers*, 2012. *Publications & Presentations*: "BP, Exxon Valdez, and Class-Wide Punitive Damages," 21 Class Action and Derivative Suit Committee Newsletter (Fall 2010); "American Chemistry Council v. Johnson: Community Right to Know, But About What? D.C. Circuit Takes Restrictive View of EPCRA," 33 *Ecology L.Q.* 583 (Winter 2006); "Lessons Learned and Unlearned: A Case Study of Medical Malpractice Award Caps in Texas," *The Subcontinental*, (Winter 2004, Vol. 1, Issue 4, pp. 81-87); "Separation of Fine Particulate Matter Emitted from Gasoline and Diesel Vehicles Using Chemical Mass Balancing Techniques," *Environmental Science Technology*, (2003; 37(17) pp. 3904-3909); "Analysis of Motor Vehicle Emissions in a Houston Tunnel during Texas Air Quality Study 2000," *Atmospheric Environment*, 38, 3363-3372 (2004). *Member*: State Bar of California; Bar Association of San Francisco; Consumer Attorneys of California; American Bar Association; American Constitution Society; East Bay Community Law Center (Board Member, 2010-present); South Asian Bar Association (Board Member, 2010-present). *Languages*: Gujarati (conversational).

**NICHOLAS DIAMAND**, Admitted to practice in New York, 2003; England; Wales; U.S. District Court, Southern, Eastern, and Western Districts of New York; US. Court of Appeals, Seventh Circuit; U.S. Supreme Court. *Education*: Columbia University School of Law (LL.M., Stone Scholar, 2002); College of Law, London, England (C.P.E.; L.P.C.; Commendation, 1997); Columbia University (B.A., *magna cum laude,* 1992). *Awards & Honors:* "Super Lawyer for New York Metro," *Super Lawyers*, 2013-2014; "Rising Star for New York Metro," *Super Lawyers*, 2012. *Prior Employment*: Solicitor, Herbert Smith, London (1999-2001); Law Clerk to the Honorable Edward R. Korman, Chief Judge, U.S. District Court, Eastern District of New York (2002-03). *Publications & Presentations*: Author, "U.S. Securities Litigation & Enforcement Action," *Corporate Disputes* magazine, April-June 2015; Speaker, Strafford CLE webinar "Ethical Risks in Class Litigation," 2015; Speaker, International Corporate Governance Network Conference, 2014; "Fraud on the Market in a Post-*Amgen* World"  (with M. Miarmi), Trial Magazine, November 2013; Contributing Author, *California Class Actions Practice and Procedure* (Elizabeth J. Cabraser, Editor-in-Chief), 2006; Panelist, "Obstacles to Access to Justice in Pharmaceutical Cases," *Pharmaceutical Regulation and Product Liability*, British Institute of International and Comparative Law, April 21, 2006; Panelist, "Pre-Trial Discovery in the United States," Union Internationale des Avocats, Winter Seminar, February 2006. *Member*:  New York City Bar Association; New York State Bar Association; Public Justice Foundation; International Corporate Governance Network; Peer Articles Reviewer, American Association for Justice, *Trial* magazine.

**DEAN M. HARVEY**, Admitted to practice in California, 2007; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. District Court, Eastern District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals for the Ninth Circuit; U.S. District Court, Eastern District of Wisconsin, 2013. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 2006); Articles Editor, *California Law Review* (2005-2006); Assistant Editor, *Berkeley Journal of International Law* (2004); University of Minnesota, Twin Cities (B.A. *summa cum laude*, 2002). *Prior Employment*: Partner, Lieff Cabraser Heimann & Bernstein, LLP (2013-Present); Associate, Lieff Cabraser Heimann & Bernstein, LLP (2009-2013); Associate, Boies, Schiller & Flexner LLP (2007-2008); Law Clerk, The Honorable James V. Selna, U.S. District Court for the Central District of California (2006-2007); Law Clerk, U.S. Department of Justice, Antitrust Division, San Francisco Field Office (2006); Summer Law Intern, U.S. Department of Justice (2005); Summer Associate, Boies, Schiller & Flexner LLP (2005). *Awards & Honors*: "Super Lawyer for Northern California," *Super Lawyers*, 2013-2015; "Lawyers on the Fast Track," The Recorder, 2013; "Rising Star for Northern California," *Super* Lawyers, 2010-**2012**; "William E. Swope Antitrust Writing Prize," 2006. *Publications*: Co-Author, "Play Ball: Potential Private Rights of Action Emerging From the FIFA Corruption Scandal," 11 Business Torts & RICO News 1 (Summer 2015); Contributing Author, *The Class Action Fairness Act: Law and Strategy*, American Bar Association, 2013; Contributing Author, *Concurrent Antitrust Criminal and Civil Proceedings: Identifying Problems and Planning for Success*, American Bar Association (2013); Co-Editor, *California Class Actions Practice and Procedures* (2010-2013); Articles Editor, *Competition* (the Journal of the Antitrust and Unfair Competition Law Section of the State Bar of California) (2012); Contributing Author, *ABA Annual Review of Antitrust Law Developments* (2011); *New Guidance for Standard Setting Organizations: Broadcom Corp. v. Qualcomm Inc. and In the Matter of Rambus, Inc., 5 ABA Sherman Act Section 1 Newsl. 35* (2008); *Anticompetitive Social Norms as Antitrust Violations,* 94 Calif. L. Rev. 769 (2006). *Member*: American Bar Association (Antitrust Section); Bar Association of San Francisco; San Francisco Trial Lawyers Association.

**LEXI J. HAZAM**, Admitted to practice in California, 2003; U.S. District Court, Northern District of California, 2003; U.S. Court of Appeals for the Seventh Circuit, 2006; US District Court, Southern District of CA, 2013; U.S. Court of Appeals for the Second Circuit, 2008; U.S. Court of Appeals for the Eighth Circuit, 2008. *Education*: Stanford University (B.A., 1995, M.A., 1996), Phi Beta Kappa. Boalt Hall School of Law, University of California, Berkeley (J.D., 2001); *California Law Review* and *La Raza Law Journal* (Articles Editor); Berkeley Law Foundation Summer Grant for Public Service; Federal Practice Clinic; Hopi Appellate Clichnic). *Prior Employment*:  Law Clerk, Mexican American Legal Defense and Education Fund, 1999; Law Clerk, Judge Henry H. Kennedy, Jr., U.S. District Court for the District of Columbia, 2001-2002; Associate, Lieff Cabraser Heimann & Bernstein, LLP, 2002-2006; Partner, Lieff Global LLP, 2006-2008. *Honors & Awards*: Selected for inclusion by peers in *The Best Lawyers in America* in the field of "Mass Tort Litigation/Class Actions – Plaintiffs" and "Qui Tam Law," 2015-2016; "California Future Star," *Benchmark Litigation*, 2015; Legal 500 recommended lawyer, *LegalEase*, 2013; "Northern California Rising Stars," *Super Lawyers*, 2009-2011, 2013. *Member*: American Association for Justice (Vice Chair, Section on Toxic, Environmental, and Pharmaceutical Torts, 2015); Consumer Attorneys of California; Bar Association of San Francisco; San Francisco Trial Lawyers Association; State Bar of California.

**ROGER N. HELLER,** Admitted to practice in California, 2001; U.S. District Court, Northern District of California, 2001, U.S. Court of Appeals for the Ninth Circuit, 2001. *Education*: Columbia University School of Law (J.D., 2001); Columbia Law Review, Senior Editor. Emory University (B.A., 1997). *Prior Employment*: Extern, Honorable Michael Dolinger, U.S. District Court, Southern District of New York, 1999; Associate, O'Melveny & Myers LLP, 2001-2005; Senior Staff Attorney, Disability Rights Advocates, 2005-2008. *Honors & Awards*: "Rising Star," *Law 360*, 2014; "Northern California Super Lawyer," *Super Lawyers*, 2013-2014; "Trial Lawyer of the Year Finalist," Public Justice, 2012; "Northern California Rising Stars," *Super Lawyers*, 2011-2012; Harlan Fiske Stone Scholar, 1998-2001. *Publications & Presentations*: Co-author, Fighting For Troops on the Homefront, Trial Magazine (September 2006). *Member*: American Bar Association; Bar Association of San Francisco; Consumer Attorneys of California; State Bar of California; Advisory Committee Member, Santa Venetia Community Plan.

**DANIEL M. HUTCHINSON**, Admitted to practice in California, 2005; U.S. District Court, Central District of California; U.S. District Court, Southern District of California; U.S. Court of Appeals for the First Circuit, 2012; U.S. Court of Appeals for the Ninth Circuit, 2005; U.S. District Court, Northern District of California, 2005; U.S. Court of Appeals for the Fourth Circuit, 2008; U.S. District, Northern District of Illinois, March 25, 2014. *Education:* Boalt Hall School of Law, University of California, Berkeley (J.D., 2005), Senior Articles Editor, *African-American Law & Policy Report*, Prosser Prizes in Constitutional Law and Employment Law; Boalt Hall Teaching & Curriculum Committee (2003-2004); University of California, Berkeley Extension (Multiple Subject Teaching Credential, 2002); Brown University (B.A., 1999), Mellon Mays Fellowship (1997-1999). *Prior Employment*: Judicial Extern to the Hon. Martin J. Jenkins, U.S. District Court, Northern District of California, 2004; Law Clerk, Lewis & Feinberg, P.C., 2003-2004; Teacher, Oakland Unified School District, 1999-2002. *Honors & Awards*: "Rising Star," Law360, 2014; "Northern California Super Lawyer," *Super Lawyers*, 2013-2014; Legal 500 recommended lawyer, *LegalEase*, 2013; "50 Lawyers on the Fast Track," *The Recorder*, 2012; "Northern California Rising Stars," *Super Lawyers*, 2009-2012. *Publications & Presentations:* Panelist, "Employment Discrimination Class Actions Post-*Dukes*," Consumer Attorneys of California 50th Annual Convention (2011); "Ten Points from *Dukes v. Wal-Mart Stores, Inc.*," 20(3) *CADS Report 1* (Spring 2010); Panelist, "Rethinking Pro Bono: Private Lawyers and Public Service in the 21st Century," UCLA School of Law (2008); Author and Panelist, "Pleading an Employment Discrimination Class Action" and "EEO Litigation: From Complaint to the Courthouse Steps," ABA Section of Labor and Employment Law Second Annual CLE Conference (2008); Co-Presenter, "Rule 23 Basics in Employment Cases," Strategic Conference on Employment Discrimination Class Actions (2008). *Member*: American Bar Association (Section of Labor & Employment Law Leadership Development Program, 2009 - 2010); Association of Business Trial Lawyers (Leadership Development Committee, 2008 - 2010); Bar Association of San Francisco (Vice Chair, Cybersecurity and Privacy Law Section); Consumer Attorneys of California; Lawyer's Committee for Civil Rights of the San Francisco Bay Area (Board Chair, 2015; Chair-Elect, 2014; Board Secretary, 2011 - 2013; Board of Directors, 2009 - Present); National Bar Association; National Employment Lawyers Association; State Bar of California.

**SHARON M. LEE**, Admitted to practice in New York 2002; U.S. District Court, Southern District of New York, 2003; U.S. District Court, Eastern District of New York, 2003; Washington State, 2005; U.S. District Court, Western District of Washington, 2015. *Education*: St. John's University School of Law (J.D. 2001); *New York International Law Review*, Notes & Comments Editor, 2000-2001; St. John's University (M.A. 1998); St. John's University (B.A. 1997). *Prior Employment*: Milberg Weiss & Bershad, LLP, 2003-2007. *Member*: American Bar Association; Asian Bar Association of Washington; Washington State Bar Association; Washington State Joint Asian Judicial Evaluation Committee. *Publications & Presentations*: Author, *The Development of China's Securities Regulatory Framework and the Insider Trading Provisions of the New Securities Law*, 14 N.Y. Int'l L.Rev. 1 (2001); Co-author, *Post-Tellabs Treatment of Confidential Witnesses in Federal Securities Litigation*, 2 J. Sec. Law, Reg. and Compliance 205 (3d ed. 2009).

**BRUCE W. LEPPLA**, Admitted to practice in California, New York, Ninth Circuit Court of Appeals, California District Courts (Northern, Central, Eastern), New York District Courts (Southern, Eastern), District of Colorado. *Education*: University of California (J.D., Boalt Hall School of Law, M.G. Reade Scholarship Award); University of California at Berkeley (M.S., Law and Economics, Quantitative Economics); Yale University (B.A., *magna cum laude*, Highest Honors in Economics). *Prior Employment*: California-licensed Real Estate Broker (2009-present); FINRA and California-licensed Registered Investment Adviser (2008-present); Chairman, Leppla Capital Management LLC (2008-present); Chairman, Susquehanna Corporation (2006-present); Partner, Lieff Cabraser Heimann & Bernstein, LLP (2004-2008), Counsel (2002-2003); CEO and President, California Bankers Insurance Services Inc., 1999-2001; CEO and President, Redwood Bank (1985-1998), CFO and General Counsel (1981-1984); Brobeck, Phleger & Harrison (1980); Davis Polk & Wardwell (1976-80). *Publications*: Author or co-author of 11 different U.S. and International patents in electronic commerce and commercial product design, including "A Method for Storing and Retrieving Digital Data Transmissions," United States Patent No. 5,659,746, issued August 19, 1997; "*Stay in the Class or Opt-Out? Institutional Investors Are Increasingly Opting-Out of Securities Class Litigation*," Securities Litigation Report, Vol. 3, No. 8, September 2006, West LegalWorks; reprinted by permission of the author in Wall Street Lawyer, October 2006, Vol. 10, No. 10, West LegalWorks; "*Selected Waiver: Recent Developments in the Ninth Circuit and California, Part 1;*" Elizabeth J. Cabraser, Joy A. Kruse and Bruce W. Leppla; Securities Litigation Report, May 2005, Vol. I, No. 9, pp. 1, 3-7; "*Selected Waiver: Recent Developments in the Ninth Circuit and California, Part 2;*" Elizabeth J. Cabraser, Joy A. Kruse and Bruce W. Leppla; Securities Litigation Report, June 2005, Vol. I, No. 10, pp. 1, 3-9; Author, "*Securities Powers for Community Banks,*" California Bankers Association Legislative Journal (Nov. 1987). *Teaching Positions*: Lecturer, University of California at Berkeley, Haas School of Business, Real Estate Law and Finance (1993-96); Lecturer, California Bankers Association General Counsel Seminars, Lending Documentation, Financial Institutions Litigation and similar topics (1993-96). *Panel Presentations*: Union Internationale des Avocats, Spring Meeting 2010, Frankfurt, Germany, "*Recent Developments in Cross-Border Litigation;*" Union Internationale des Avocats, Winter Meeting 2010, Park City, Utah, "*Legal and Economic Aspects of Securities Class and Opt-out Litigation;*" EPI European Pension Fund Summit, Montreux, Switzerland, "*Legal and Global Economic Implications of the U.S. Subprime Lending Crisis,*" May 2, 2008; Bar Association of San Francisco, "*Impact of Spitzer's Litigation and Attempted Reforms on the Investment*

*Banking and Insurance Industries*," May 19, 2005: Opal Financial Conference, National Public Fund System Legal Conference, Phoenix, AZ, "*Basic Principles of Securities Litigation*," January 14, 2005; American Enterprise Institute, "*Betting on the Horse After the Race is Over—In Defense of Mutual Fund Litigation Related to Undisclosed After Hours Order Submission*," September 30, 2004. **Member**: American Association for Justice; Bar Association of San Francisco, Barrister's Club, California Bankers Association, Director, 1993 – 1999, California State Small Business Development Board, 1989 – 1997, Community Reinvestment Institute, Founding Director, 1989 – 1990, National Association of Public Pension Attorneys, New York State Bar Association, San Francisco Chamber of Commerce, Leadership Council, 1990 – 1992, State Bar of California, Union Internationale des Avocats, Winter Corporate Governance Seminar, Seminar Chairman, 2012; University of California at Berkeley, Boalt Hall Alumni, Board of Directors, 1993 – 1996, *Wall Street Lawyer*, Member, Editorial Board, Yale University Alumni Board of Directors, Director, 2001 - 2005.

**JASON L. LICHTMAN**, Admitted to practice in Illinois; New Jersey; New York; U.S. Supreme Court; District of Columbia; U.S. Court of Appeals, Third Circuit; U.S. Court of Appeals, Sixth Circuit; U.S. Court of Appeals, Seventh Circuit; U.S. Court of Appeals, Ninth Circuit; U.S. District Court, Northern District of Illinois; U.S. District Court, New Jersey; U.S. District Court, Northern District of Ohio; U.S. District Court, Eastern District of New York, U.S. District Court, Southern District of New York; U.S. Court of Appeals, Eleventh Circuit, 2013; U.S. Court of Appeals, Tenth Circuit, 2014; U.S. Court of Appeals Federal Circuit; U.S. District Court, Eastern District of Wisconsin, March 5, 2014. *Education*: University of Michigan Law School (J.D., *cum laude*, 2006), Campbell Moot Court Executive Board; Clarence T. Darrow Scholar; Northwestern University (B.A. in Economics, 2000). *Prior Employment*: Judicial Law Clerk to Honorable Kathleen M. O'Malley, United States District Court, Northern District of Ohio, 2008-2010; Litigation Associate, Howrey LLP, 2006-2008; Summer Associate, Howrey LLP, 2005; Summer Associate, Reed Smith LLP, 2004. *Awards & Honors*: "New York Rising Star," Super Lawyers, 2013-2015. *Member*: American Association for Justice, Public Justice, Sedona Conference. *Publications and Presentations:* Contributing Author, "Ninth Circuit Reshapes California Consumer Protection Law," American Bar Association (July 2012).

**SARAH R. LONDON**, Admitted to practice in California, 2009; U.S. District Court, Northern District of California, 2009; U.S. Court of Appeals for the Ninth Circuit, 2009; U.S. District Court, Central District of California, 2010; U.S. Court of Appeals for the Eleventh Circuit, 2012. *Education*: National Institute for Trial Advocacy, Building Trial Skills: Boston (Winter 2013); Boalt Hall School of Law, University of California (J.D., 2009), Order of the Coif, National Runner-Up Constance Baker Motley Moot Court Competition; Northwestern University (B.A., *cum laude*, 2002). *Prior Employment*: Public Policy Manager, Planned Parenthood of Kansas and Mid-Missouri (2004-2006). *Publications & Presentations*: "Reproductive Justice: Developing a Lawyering Model," *Berkeley Journal of African-American Law & Policy* (Volume 13, Numbers 1 & 2, 2011); "Building the Case for Closing Argument: Mass Torts," Presentation at Consumer Attorneys of California Annual Conference (Fall 2014). *Awards & Honors*: "Rising Star for Northern California," Super Lawyers, 2012-2014; Coro Fellow in Public Affairs (St. Louis, 2002-2003). *Member*: American Association for Justice; The Bar Association of San Francisco; Consumer Attorneys of California (Board of Governors 2012-2013); San Francisco Trial Lawyers Association; State Bar of California; Bar

Association San Francisco; American Association for Justice; YWCA San Francisco and Marin County (Board of Directors 2014-2016).

**ANNIKA K. MARTIN**, Admitted to practice in New York, 2005; U.S. District Court, Southern District of New York, 2005; U.S. District Court Eastern District of New York. *Education:* Law Center, University of Southern California (J.D., 2004); Review of Law & Women's Studies; Jessup Moot Court; Medill School of Journalism, Northwestern University (B.S.J., 2001); Stockholm University (Political Science, 1999). *Publications & Presentations*: "Stick a Toothbrush Down Your Throat:  An Analysis of the Potential Liability of Pro-Eating Disorder Websites," *Texas Journal of Women & the Law* (Volume 14 Issue 2, Spring 2005); "Welcome to Law School," monthly column on www.vault.com (2001-2004). *Awards and Honors*: "New York Rising Star," Super Lawyers, 2013-2014; Wiley W. Manuel Award for Pro Bono Legal Services awarded by the State Bar of California for voluntary provision of legal services to the poor, 2005. *Member*: New York State Bar Association; Swedish American Bar Association; American Association for Justice; New York State Trial Lawyers Association; New York County Lawyer's Association; New York City Bar Association. *Languages*: Swedish (fluent); French (DFA1-certified in Business French); Spanish (conversational).

**MICHAEL J. MIARMI**, Admitted to practice New York, 2006; U.S. District Court, Eastern District of New York; U.S. District Court, Southern District of New York; U.S. Court of Appeals for the Second Circuit; U.S. Court of Appeals for the Third Circuit, 2007; U.S. Court of Appeals for the Sixth Circuit; U.S. Court of Appeals for the Eighth Circuit, 2007; U.S. Supreme Court. *Education*: Fordham Law School (J.D., 2005); Yale University (B.A., *cum laude*, 2000). *Awards & Honors:* "New York Rising Star," *Super Lawyers*, 2013-2014. *Publications & Presentations*: Co-Author with Steven E. Fineman, "The *Basic*s of Obtaining Class Certification in Securities Fraud Cases: U.S. Supreme Court Clarifies Standard, Rejecting Fifth Circuit's 'Loss Causation' Requirement," *Bloomberg Law Reports* (July 5, 2011). *Prior Employment*: Milberg Weiss LLP, Associate, 2005-2007. *Member:* State Bar of New York; New York State Trial Lawyers Association; Public Justice Foundation; American Bar Association; New York State Bar Association.

**DANIEL E. SELTZ**, Admitted to practice in New York, 2004; U.S. District Court, Southern District of New York; U.S. District Court, Eastern District of New York; U.S. Court of Appeals for the First Circuit; U.S. Court of Appeals for the Ninth Circuit. *Education*: New York University School of Law (J.D., 2003); *Review of Law and Social* Change, Managing Editor; Hiroshima University (Fulbright Fellow, 1997-98); Brown University (B.A., *magna cum laude*, Phi Beta Kappa, 1997). *Prior Employment*: Law Clerk to Honorable John T. Nixon, U.S. District Court, Middle District of Tennessee, 2003-04. *Publications & Presentations*:  Co-Author with Jordan Elias, "The Limited Scope of the Ascertainability Requirement," American Bar Association, Section of Litigation, March 2013; Panelist, "Taking and Defending Depositions," New York City Bar, May 20, 2009; Contributing Author, *California Class Actions Practice & Procedures* (Elizabeth J. Cabraser, Editor-in-Chief, 2008); "Remembering the War and the Atomic Bombs: New Museums, New Approaches," in *Memory and the Impact of Political Transformation in Public Space* (Duke University Press, 2004), originally published in *Radical History Review*, Vol. 75 (1998); "Issue Advocacy in the 1998 Congressional Elections," with Jonathan S. Krasno (Urban Institute, 2001); *Buying Time: Television Advertising in the 1998*

*Congressional Elections*, with Jonathan S. Krasno (Brennan Center for Justice, 2000); "Going Negative," in *Playing Hardball*, with Kenneth Goldstein, Jonathan S. Krasno and Lee Bradford (Prentice-Hall, 2000). *Member*: American Association for Justice; State Bar of New York.

**ANNE B. SHAVER**, Admitted to practice in California, 2008; Colorado, 2008; U.S. District Court, Northern District of California, 2009; U.S. Court of Appeals for the Second Circuit, 2012; U.S. Supreme Court; U.S. Court of Appeals of the Ninth Circuit. *Education*: Boalt Hall School of Law, University of California (J.D., 2007), Order of the Coif; University of California, Santa Cruz (B.A. *cum laude*, 2003), Phi Beta Kappa. *Awards & Honors:* "Rising Star for Northern California," *Super Lawyers*, 2012-2014. *Prior Employment:* Law Clerk to Honorable Betty Fletcher, U.S. Court of Appeals for the Ninth Circuit, 2008-2009; Davis, Graham & Stubbs, LLP, Litigation Associate, 2008; Public Defender's Office of Contra Costa County, 2007; Davis, Cowell & Bowe, LLP, Summer Law Clerk, 2006; Centro Legal de la Raza, Student Director, Workers' Rights Clinic, 2005-2006; Human Rights Watch, Legal Intern, 2005. *Publications*: "Winning Your Class Certification Motion Post-Brinker," Consumer Attorneys of California, November 2013 (panelist); "Counseling HR on National Origin & Language Issues in the Workplace," ABA Labor & Employment Section, November 2012 (moderator); "*U.S. v. Fort* and the Future of Work-**Product in Criminal Discovery,"** 44 Cal. W. L. Rev. 127, 12293 (Fall 2007); "Rule 23 Basics," Impact Fund Class Action Training Institue, May 2011; "A Place At The Table? Recent Developments in LBGT Rights," ABA Labor & Employment Section Conference, April 2012 (moderator); "Transgender Workplace Issues After the EEOC's Landmark Macy Ruling," Bar Association of San Francisco, September 2012 (moderator); CAOC, "Latest Developments in Employment and Wage and Hour Law," February 25, 2014 (speaker). *Member*: Bar Association of San Francisco; Consumer Attorneys of California; National Employment Lawyers Association; American Bar Association's Equal Employment Opportunity Committee (Programs Committee).

**NICOLE D. SUGNET**, Admitted to practice in California; U.S. Court of Appeals for the Ninth Circuit; U.S. District Court, Central District of California; U.S. District Court, Eastern District of California; U.S. District Court, Northern District of California, U.S. District Court, Eastern District of Wisconsin; U.S. District Court, Northern District of Illinois, April 1, 2014. *Education*: University of California, Hastings College of the Law (J.D., 2006); Moot Court Best Oral Advocate; Senior Articles Editor, *Hastings Law Journal*; Lewis & Clark College (B.A., *magna cum laude*, 2000). *Prior Employment*: Associate, Green Welling, P.C., 2006-2012; Law Clerk, Family Violence Law Center, 2005; Law Clerk, Law Offices of Waukeen Q. McCoy, 2004. *Publications & Presentations*: Co-author with Kirsten Gibney Scott, "Consumer Protection and Employment Cases after Concepcion," *ABA Section of Litigation, Class Action & Derivative Suits Committee Newsletter* (Summer 2011); Co-Author of the California Section of the ABA State Class Action Survey (2012). *Awards & Honors*: "Rising Star for Northern California," Super Lawyers, 2013-2014. *Member*: Antitrust and Unfair Competition Law Section of the California State Bar; Labor and Employment Law Section of the California State Bar; Consumer Attorneys of California; National Association of Consumer Advocates.

**TODD A. WALBURG**, Admitted to practice in California, 2001; U.S. District Court, Northern District of California, 2001; U.S. District Court, Eastern, Central and Southern Districts of California, 2006; U.S. Court of Appeals for the Ninth Circuit, 2001. *Education*:

University of San Francisco School of Law (J.D. 1999); Founder and President, USF Student Chapter, Association of Trial Lawyers of America (1997-1999); Investigation Intern, San Francisco Public Defender's Office; Mediation Intern, San Francisco Small Claims Court; Mediation Intern, U.S. Equal Employment Opportunity Commission; University of California at Los Angeles (B.A., 1995). **Community Service**: Pro Bono Trial Attorney, Eviction Defense Project, Volunteer Legal Services Program of the Bar Association of San Francisco (2012-present). **Honors & Awards**: Selected for the inclusion by peers in **The Best Lawyers in America** in the field of "Product Liability Litigation – Plaintiffs," 2016; Elected to the Board of Directors of the San Francisco Trial Lawyers Association, 2013-present; Appointed to the Board of Governors of the Alameda-Contra Costa Trial Lawyers Association, 2012-present; **"Super Lawyer for Northern California,"** **Super Lawyers**, 2014; "Rising Star for Northern California," **Super Lawyers**, 2010-2013; Leesfield / Association of Trial Lawyers of America Scholarship, National Winner, 1998. **Prior Employment**:  Partner, Emison Hullverson Bonagofsky, LLP (2007-2008); Associate, Lieff Cabraser Heimann & Bernstein, LLP, 2005-2007); Associate, Bennett, Johnson & Galler (2001-2005). **Publications and Presentations**: "Cutting Edge Damages," SFTLA/CAOC Webinar with NJP Litigation Consulting (February 2013); "Burn Injury Cases," SFTLA/CAOC Webinar (December 2012); "Toyota Unintended Acceleration Litigation," CAOC Annual Convention (November 2011); "Product Liability Strategies Before Trial," SFTLA Roundtable (October, 2008); "Powerful Mediation Briefs," in The Verdict (ACCTLA 2006). **Member**: Alameda-Contra Costa Trial Lawyers Association (Board of Governors 2012 - Present, 2003 - 2005); American Association for Justice (Attorneys Information Exchange Group; Motor Vehicle Collision, Highway and Premises Liability Section; Products Liability Section; Section on Toxic, Environmental, and Pharmaceutical Torts); Bar Association of San Francisco (Pro Bono Trial Attorney; Eviction Defense Project; Volunteer Legal Services); Consumer Attorneys Association of Los Angeles; Consumer Attorneys of California; The Melvin M. Belli Society; San Francisco Trial Lawyers Association (Co-Chair, Membership Committee; Board of Directors, 2013 - Present; Experts Committee, 2012; Education Committee, 2005 - 2007, 2012; Carlene Caldwell Scholarship Committee, 2005 - 2007); State Bar of California; Western Trial Lawyers Association.

### OF COUNSEL

**ROBERT L. LIEFF**, Admitted to practice in California, 1966; U.S. District Court, Northern District of California and U.S. Court of Appeals, Ninth Circuit, 1969; U.S. Supreme Court, 1969; U.S. Court of Appeals, Seventh Circuit, 1972; U.S. Tax Court, 1974; U.S. District Court, District of Hawaii, 1986. **Education**:  Columbia University (M.B.A., 1962; J.D., 1962); Cornell University; University of Bridgeport (B.A., 1958). Member, Columbia Law School Dean's Council; Member, Columbia Law School Board of Visitors (1992-2006); Member, Columbia Law School Center on Corporate Governance Advisory Board (2004). **Awards & Honors**:  AV Preeminent Peer Review Rated, Martindale-Hubbell; Selected for inclusion by peers in **The Best Lawyers in America** in fields of "Mass Tort Litigation/Class Actions – Plaintiffs," 2015-2016; "Northern California Super Lawyers," **Super Lawyers**, 2005-2009, "**Lawdragon** Finalist," **Lawdragon**, 2005. **Member**: Bar Association of San Francisco; State Bar of California (Member: Committee on Rules of Court, 1971-74; Special Committee on Multiple Litigation and Class Actions, 1972-73); American Bar Association (Section on Corporation, Banking and Business Law); Lawyers Club of San Francisco; San Francisco Trial Lawyers

Association; California Trial Lawyers Association; Consumer Attorneys of California; Fight for Justice Campaign.

**LYDIA LEE**, Admitted to practice in Oklahoma 1983; U.S. District Court, Western and Eastern Districts of Oklahoma; U.S. Court of Appeals, 10th Circuit. *Education*: Oklahoma City University, School of Law (J.D., 1983); University of Central Oklahoma (B.A., 1980). *Prior Employment*: Partner, Law Office of Lydia Lee (2005-2008); Partner, Oklahoma Public Employees Retirement System (1985-2005); Associate, law firm of Howell & Webber (1983-1985). *Publications & Presentations*: "QDROs for Oklahoma's Public Pension Plans," *Oklahoma Family Law Journal*, Vol. 13, September, 1998; Co-Author, "Special Problems in Dividing Retirement for Employees of the State of Oklahoma," *OBA/FLS Practice Manual*, Chapter 27.3, 2002; Featured Guest Speaker, *Saturday Night Law*, KTOK Radio; Contributor and Editor, INFRE Course Books for CRA program. *Member*: Central Edmond Urban Development Board (2006-present); Oklahoma Bar Association (1983–present), Member OBA Women in Law Committee (2007-present); National Association of Public Pension Attorneys (1988-present), President (2002-2004), Vice-President (2001-2002), Executive Board member (1998-2004), Chair of Benefits Section, Emeritus Board member, (2004-present); Edmond Neighborhood Alliance Board of Directors (2005-present), President (2006-2007), Past President and Director (2007-present); Central Edmond Urban Development Board (2006-present); Midwest City Regional Hospital, Board of Governors (1992-1996), Served on Physician/Hospital Organization Board, Pension and Insurance Trust Committees, and Chairman of Woman's Health Committee; City of Midwest City, Planning Commission (1984-1998), Chairman (1990-1995), Vice-Chairman (1987– 1990), Served on Capital Improvement Committee, Airport Zoning Commission (Tinker AFB), and Parkland Review Board, served on Midwest City Legislative Reapportionment Committee (1991).

**DAVID RUDOLPH**, Admitted to practice in California, 2004; U.S. District Court, Northern District of California, 2008; U.S. District Court, Southern District of California, 2008; U.S. Court of Appeals for the Ninth Circuit, 2009; U.S. Court of Appeals for the Federal Circuit, 2012. *Education*: Boalt Hall School of Law, University of California, Berkeley (J.D. 2004); Moot Court Board; Appellate Advocacy Student Advisor; *Berkeley Technology Law Journal; Berkeley Journal of International Law*; Rutgers University (Ph.D. Program, 1999-2001); University of California, Berkeley (B.A. 1998). *Prior Employment*: Associate, Quinn Emanuel Urquhart & Sullivan, LLP, 2008-2012; Law Clerk to the Honorable Saundra Brown Armstrong, U.S. District Court for the Northern District of California, 2007-2008.

## ASSOCIATES

**KATHERINE LUBIN BENSON,** Admitted to practice in California, 2008; Ninth Circuit Court of Appeals; Northern District of California. **Education:** University of California, Berkeley, Boalt Hall School of Law (J.D., 2008); Boalt Hall Mock Trial Team, 2006-2008; *First Place,* San Francisco Lawyer's Mock Trial Competition. University of California Los Angeles (B.A., Political Science, minor in Spanish, *cum laude*); Phi Beta Kappa; UCLA Honors Program; Political Science Departmental Honors; GPA 3.8. Universidad de Sevilla (2003). *Prior Employment:* Associate, Orrick, Herrington & Sutcliff, LLP, 2008-2013; Summer Associate, Orrick, Herrington & Sutcliff, LLP, 2007; Judicial Extern to Honorable Dean D. Pregerson,

2006. *Member*: American Bar Association; State Bar of California; Board of Directors, East Bay Community Law Center.

  *KEVIN R. BUDNER,* Admitted to practice in California; Northern District of California, 2014; Central District of California, 2014; U.S. District Court of Colorado, February 25, 2014. *Education:* University of California, Berkeley, Boalt Hall School of Law (J.D., 2012); American Jurisprudence Award in Advanced Legal Research (first in class); Prosser Prize in Negotiation (second in class); Edwin A. Heafey, Jr. Trial Fellowship Recipient; Board of Advocates Trial Team Member; American Association of Justice Trial Competition, 2012 National Semi-finalist, 2011 Regional Finalist; *Berkeley Journal of International Law,* Senior Editor. University of California Hastings College of the Law (2009-2010); Class Rank 13/461 (top 3%); Legal Writing and Research (A+); CALI and Witkins Awards (first in class); Wesleyan University (B.A., Political Science, 2005). *Prior Employment:* Judicial Clerk to U.S. District Judge Barbara M.G. Lynn, 2012-2013; Certified Student Counsel, East Bay Community Law Center, 2011-2012; Research Assistant, Duckworth Peters Lebowitz Olivier, LLP, 2011-2012; Summer Associate, Lieff Cabraser Heimann & Bernstein, LLP , 2011-2012; Judicial Extern to U.S. District Judge Phyllis J. Hamilton, 2010; Homeless Policy Assistant, Office of Mayor Gavin Newsom, 2009; Project Manager, Augustyn & Co. 2007-2009; Visiting Professor, University of Liberal Arts Bangladesh, 2006-2007; Researcher, Rockridge Institute, 2005, 2006. *Languages:* Spanish (proficient), Portuguese (proficient), Bengali (basic). *Publications*: Co-Author, "Play Ball: Potential Private Rights of Action Emerging From the FIFA Corruption Scandal," 11 Business Torts & RICO News 1 (Summer 2015). *Member*: American Association for Justice, Bar Association of San Francisco, Consumer Attorneys of California, State Bar of California, San Francisco Trial Lawyers Association.

*LIN Y. CHAN*, Admitted to practice in California; U.S. District Court, Northern District of California; U.S. District Court, Central District of California; U.S. Court of Appeals for the Fifth Circuit; U.S. Court of Appeals for the Ninth Circuit; U.S. Court of Appeals for the Tenth Circuit. *Education:* Wellesley College (B.A., *summa cum laude*, 2001); Stanford Law School (J.D., 2007); Editor-in-Chief, *Stanford Journal of Civil Rights and Civil Liberties;* Fundraising Chair, *Shaking the Foundations Progressive Lawyering Conference.  Prior Employment:* Associate, Goldstein, Borgen, Dardarian & Ho (formerly Goldstein, Demchak Baller Borgen & Dardarian), 2008-2013; Law Clerk to Judge Damon J. Keith, Sixth Circuit Court of Appeals, 2007-2008; Clinic Student, Stanford Immigrants' Rights Clinic, 2006-2007; Union Organizer, SEIU and SEIU Local 250, 2002-2004; Wellesley-Yenching Teaching Fellow, Chinese University of Hong Kong, 2001-2002. *Presentations & Publications*: Author, "Do Federal *Associated General Contractors* Standing Requirements Apply to State *Illinois Brick* Repealer Statutes?," Business Torts & Rico News, Winter 2015; Panelist, "Federal and State Whistleblower Laws: What You Need to Know," Asian American Bar Association (November 2014); Author, "California Supreme Court Clarifies State Class Certification Standards in *Brinker*," American Bar Association Labor & Employment Law Newsletter (April 2013); Presenter, "Rule 23 Basics in Employment Cases," Impact Fund's 11th Annual Employment Discrimination Class Action Conference (February 2013); Chapter Author, The Class Action Fairness Act: Law and Strategies; Co-Author, "Clash of the Titans: Iqbal and Wage and Hour Class/Collective Actions," BNA, Daily Labor Report, 80 DLR L-1 (April 2010); Chapter Co-Chair, Lindemann & Grossman, Employment Discrimination Law Treatise, Fifth Edition; Chapter Monitor, Lindemann & Grossman, Employment Discrimination Law Treatise 2010 Cumulative Supplement. *Member:* Asian Americans Advancing Justice - Asian Law Caucus, Board Member, 2013 – Present, Annual Dinner Committee Co-Chair, 2015; Asian American Bar Association, Civil Rights Committee Co-Chair,

2011 - Present; American Bar Association, Fair and Impartial Courts Committee Vice-Chair, 2014 – Present; Bar Association of San Francisco; Public Justice; State Bar of California.

**DOUGLAS CUTHBERTSON**, Admitted to practice in New York, 2008; U.S. District Court, Eastern District of New York (2008); U.S. District Court, Southern District of New York (2008); U.S. District Court, District of Colorado (2013); U.S. District Court, Northern District of Illinois (2014). *Education*: Fordham University School of Law (J.D. *cum laude* 2007); President, Fordham Law School Chapter of Just Democracy; Senior Articles Editor, *Fordham Urban Law Journal*; Fordham University School of Law Legal Writing Award, 2004-2005; Legal Writing Teaching Assistant, 2005-2006; Dean's List, 2004-2007; *Alpha Sigma Nu Jesuit Honor Society*. Bowdoin College (B.A. *summa cum laude*, 1999), Sarah and James Bowdoin Scholar for Academic Excellence (1995-1999). *Prior Employment*: Associate, Debevoise & Plimpton, LLP, 2009-2012; Law Clerk to Honorable Magistrate Judge Andrew J. Peck, U.S. District Court, Southern District of New York, 2007-2009. *Awards & Honors:* "Rising Star for New York Metro,*" Super Lawyers*, 2013-2014. *Member:* Federal Bar Council; New York Civil Liberties Union, Board of Directors; New York State Bar Association.

**MELISSA GARDNER**, Admitted to practice in California, 2013; New York, 2013; U.S. District Court, Northern District of California, 3/28/2013. *Education*: Harvard Law School (J.D. 2011); Student Attorney, Harvard Prison Legal Assistance Project and South Brooklyn Legal Services; Semi-Finalist, Harvard Ames Moot Court Competition; *Harvard International Law Journal*. Western Washington University (B.A. *magna cum laude,* 2005). *Prior Employment*: Associate, Emery Celli Brinckherhoff & Abady (2012); Law Clerk, South Brooklyn Legal Services (2011-2012); Peace Corps Volunteer, China (2005-2008). *Publications*: Co-Author, "Play Ball: Potential Private Rights of Action Emerging From the FIFA Corruption Scandal," 11 Business Torts & RICO News 1 (Summer 2015). *Member*: American Association for Justice; American Bar Association; Bar Association of San Francisco; Consumer Attorneys of California; New York State Bar Association; State Bar of California.

**KELLY MCNABB,** Admitted to practice in Minnesota; New York, 2015; U.S. District Court, District of Minnesota. *Education:* University of Minnesota Law School (J.D., *cum laude*, 2012); Managing/Research Editor, *Minnesota Law Review*, 2010 – 2012; University of Minnesota Twin Cities College of Liberal Arts (B.A. 2008). *Publications*: What "Being a Watchdog" Really Means: Removing the Attorney General from the Supervision of Charitable Trusts, *Minnesota Law Review*, 2012. *Prior Employment*: Pritzker Olsen, P.A., Attorney, 2012 – 2014. *Member:* American Association for Justice, Minnesota Association for Justice, Minnesota Women Lawyers.

**ROSEMARIE MALIEKEL,** Admitted to practice in California, 2011. *Education:* Northwestern University School of Law (J.D., 2010); Co-Captain, Regional Champion, and National Champion, Bartlit National Trial Team, 2008 – 2010. The University of Illinois at Chicago (Pre-Medicine, BS in Biology, 2006); GPPA Scholar; graduated with distinction from the Honors College. *Prior Employment:* Trial Lawyer, Federal Defenders of San Diego, Inc., 2010-2014; Criminal Defense Legal Assistant and International Extern, International Criminal Court, 2009; Summer Associate, Kaye Scholer, LLP, 2009.

**PHONG-CHAU G. NGUYEN**, Admitted to practice in California, 2012; U.S. District Court, Northern District of California, 2013; U.S. District Court, Central District of California, 2013; U.S. Court of Appeals for the Ninth Circuit, 2013. *Education:* University of San Francisco School of Law (J.D., 2012); Development Director, USF Moot Court Board; Merit Scholar; Zief Scholarship Recipient; University of California, Berkeley (B.A., Highest Honors; Distinction in General Scholarship, 2008). *Prior Employment:* Attorney, Minami Tamaki, 2013; Post-Bar Law Clerk, Velton Zegelman PC, 2012; Law Clerk, Minami Tamaki, 2011-2012; Housing and Economic Rights Advocates, 2011; Greenlining Institute, 2008-2009, 2012. *Member:* State Bar of California; Asian American Bar Association for the Greater Bay Area; San Francisco Trial Lawyers Association.

**MARTIN D. QUIÑONES**, Admitted to practice in California. *Education:* University of California, Berkeley, School of Law (J.D., 2013); First Year High Distinction (Top 10% of Class); First Prize: Mercer University 2011 Adam A. Milani Disability Law Writing Competition; Jurisprudence Award (Highest Grade in Course): Complex Civil Litigation, Spring 2012; Best Brief Award: Written and Oral Advocacy, Spring 2011; *California Law review* (Supervising Editor, Volume 101); *Berkeley Journal of Gender, Law, and Justice* (Marketing Editor, 2011-2012); Boalt Hall Queer Caucus (Treasurer, 2011-2012); Law Students for Reproductive Justice (Chapter Board Member, 2010-2013); Brown University (B.A., 2008). *Prior Employment:* Summer Associate, Lieff Cabraser Heimann & Bernstein, 2012; Spring Semester Law Clerk, Gender Equity and LGBT Rights Program, Legal Aid Society – Employment Law Center, 2012; Judicial Extern for the Honorable William Dorsey, U.S. Dept. of Labor, Office of Administrative Law Judges, 2011; Clinic Director (2011-2012), Volunteer Counselor (2010-2011), East Bay Workers' Rights Clinic, 2010-2012; Development Associate, Planned Parenthood League of Massachusetts, 2008-2010. *Member*: Pride Law Fund, Board of Directors; State Bar of California

**JOHN T. SPRAGENS,** Admitted to Practice in Tennessee, 2012; U.S. District Court, Middle District of Tennessee, 2014. *Education:* Vanderbilt University Law School, Nashville, Tennessee (J.D., 2012); Executive Editor, Environmental Law and Policy Annual Review.  Kenyon College (B.A., *magna cum laude*, International Studies, 2004); Phi Beta Kappa. *Prior Employment:* Associate, Bass, Berry & Sims, 2013-14; Law Clerk, United States District Judge Kevin H. Sharp, 2012-**13; Legal Intern, Metropolitan Nashville Public Defender's** Office, 2011; Summer Associate, Lieff Cabraser Heimann & Bernstein, 2011; Legal Clerk, New Orleans Workers' Center for Racial Justice, **2010; Strategic Advisor, Center for Charter School** Excellence, 2010; Communications Director and Legislative Assistant to U.S. Congressman Jim Cooper, 2006-09; Staff Writer, *Nashville Scene*, 2004-06. *Member:* Tennessee Bar Association; Tennessee Association for Justice.

**JEREMY TROXEL**, Admitted to practice in New York; New Jersey. *Education:* Harvard Law School (J.D., 2012); Harvard Civil Rights-Civil Liberties Law Review, Member; Prison Legal Action Program, Student Attorney; Problem Solving Workshop Case Study: *Early Stages of the Vioxx Injuries and MDL Litigation*. University of Hong Kong (Fall 2011); Visiting Scholar. New York University (B.A., Politics, minors in Writing and History, 2009); Martin Luther King Jr. Social Justice Scholar; Sir Harold Acton Fellow; Catherine Reynolds Social Entrepreneurship Grant. New York University in Ghana (Fall 2007). New York

University in Prague (Fall 2006). ***Prior Employment:*** Associate, Morelli Ratner, P.C. (later known as Morelli Alters Ratner, P.C.), 2012-2013; Summer Associate, Lanier Law Firm, P.C., 2011; Student Attorney, Harvard Law Predatory Lending-Consumer Protection Clinic, 2010; Summer Associate, Beasley, Allen, Crow, Methvin, Protis & Miles, P.C., 2010; Animal Caregiver, Comunidad Inti Wara Yassi, Parque Ambue Ai Animal Refuge, 2009; Tutor & Assistant Teacher, America Reads, 2007; Assistant to Campaign Manager, Mark Green for Attorney General, 2006.

<u>Notice on the Firm's AV Rating</u>:  AV is a registered certification mark of Reed Elsevier Properties, Inc., used in accordance with the Martindale-Hubbell certification procedures, standards and policies.  Martindale-Hubbell is the facilitator of a peer review process that rates lawyers.  Ratings reflect the confidential opinions of members of the Bar and the Judiciary. Martindale-Hubbell Ratings fall into two categories—legal ability and general ethical standards.

# EXHIBIT C

**CARNEY ▼ BATES ▼ PULLIAM**

Carney Bates & Pulliam PLLC

www.CBPLaw.com

11311 Arcade Drive, Suite 200, Little Rock, AR 72212

p. 501-312-8500  f. 501-312-8505  tf. 888-551-9944

# Table of Contents

**The Firm's Practice and Achievements** ........................................................................1

**The Firm's Attorneys** ...................................................................................................2

    Allen Carney ....................................................................................................................2

    Hank Bates ........................................................................................................................3

    Randall K. Pulliam ..........................................................................................................4

    Curtis L. Bowman ............................................................................................................5

    Tiffany Wyatt Oldham .....................................................................................................6

    John Charles Williams ......................................................................................................7

    David Slade .......................................................................................................................7

**Leadership Positions** ...................................................................................................8

# The Firm's Practice and Achievements

Carney Bates & Pulliam is recognized as one of the country's premiere firms in the areas of consumer protection class actions, data privacy/security, securities fraud, environmental law and employment discrimination.

The attorneys at Carney Bates & Pulliam are uniquely qualified to prosecute consumer protection claims. For example, the firm has represented the State of New Mexico in numerous lawsuits against some of the largest financial service companies in connection with their practice of deceptively marketing and implementing Payment Protection Plans.  Recently, the firm recovered over $100 million for credit card holders in various actions against Bank of America, Capital One, Chase, Discover and HSBC.

Additionally, our attorneys possess expertise in issues related to complex accounting and financial fraud cases.  The firm's attorneys include a CPA and a former investment banker with one of the nation's largest investment firms. The firm's reputation for excellence in accounting fraud and other complex class actions has been recognized on repeated occasions by federal and state court judges who have appointed the firm to serve as lead or co-lead counsel in numerous cases throughout the country. In this regard, the firm has successfully represented certain states throughout the country in matters involving securities litigation such as in *Mississippi Public Employees Retirement System v. Semtech* and *In re Sterling Financial Corporation Securities Class Action,* representing Public Employees Retirement Association of New Mexico and the New Mexico Educational Retirement Board.

The firm has been successful at protecting shareholders in "change-of-control" transactions seeking to maximize shareholder value.  For example, the firm represented shareholders of Nationwide Financial in a going private transaction, and was able to negotiate more than $200 million for the public shareholders in the form of an increased share price.  In a similar matter, attorneys at the firm represented shareholders of 7-Eleven and brokered an additional $140 million in the sales price.

The firm has positioned itself at the forefront of data security and data privacy litigation.  Our attorneys were appointed by the court as co-lead counsel in *Matthew Campbell, et al. v. Facebook, Inc.*, 4:13-cv-05996-PJH (N.D. Cal.), a putative class action involving allegations of email interception and violations of federal anti-wiretapping laws.  In addition, we are counsel for the lead plaintiff in *In re: Target Corporation Customer Data Security Breach Litigation*, 0:14-cmd-02522-PAM-JJK (D. Minn.), where we represent Umpqua Bank and a putative class of financial institution plaintiffs over injuries suffered from one of the largest data breaches in history.  We also were appointed to the Plaintiffs' Steering Committee in *In re: The Home Depot, Inc., Customer Data Security Breach Litigation*, 1:14-md-02583-TWT (N.D. Ga.), which is also a putative class action brought on behalf of injured financial institutions in the wake of a massive retailer data breach.  We are co-lead counsel in *Toyer Grear, et al. v Comcast Corporation*, 4:14-cv-05333-JSW (N.D. Cal.), a putative class action alleging violations of the federal Computer Fraud and Abuse Act, arising from the defendant's practice of providing its residential customers with wireless routers that secretly emit secondary, public Wi-Fi networks over which the individual consumer had no control.  We are also co-counsel in *Michael Levine, et al. v. Sony Pictures Entertainment, Inc.*, 2:14-cv-09687-RGK-SH (C.D. Cal.), a putative class action brought on behalf of current and former Sony employees whose personal information, along with that of their families, was compromised in a data breach.

Additionally, our attorneys handling environmental litigation possess expert knowledge in issues related to groundwater and air pollution, toxic exposures, leaking pipelines and underground storage tanks, oil field contamination, and pesticides. The firm pursues claims against corporate polluters and governmental agencies on the state, local and federal level. For example, Carney Bates & Pulliam served as co-lead counsel on behalf of the Quapaw Tribe in a case that involved natural resources damages to tribe-related lands from lead and zinc mining, which resulted in an $11.5 million settlement against Asarco, LLC, in addition to confidential settlements with four other mining companies.

In the employment context, Carney Bates & Pulliam served as co-lead counsel in *Nelson v. Wal-Mart Stores, Inc.,* 04-00171 (E.D. Ark.), a nationwide race discrimination class action on behalf of African-American truck drivers against Wal-Mart that provided $17.5 million in recovery, as well as significant changes to Wal-Mart's hiring policies and four years of court supervision of the settlement terms.

In addition to its strong personnel, Carney Bates & Pulliam is well-capitalized, allowing it to dedicate considerable resources and to advance expenses on a contingency fee basis to the fullest extent necessary to achieve the best possible result for class members.  As a result of its successful track record and strong capitalization, the firm enjoys a high level of respect and credibility with the defense bar and insurance carriers that often defend and insure corporations and their officers and directors.

As a firm, Carney Bates & Pulliam values practicing in a small environment where professional and personal interaction among the partners, associates, paralegals, accounting staff and other personnel allow for a true "team approach" to litigation strategy that fosters an energetic exchange of ideas.  The firm believes its size allows for a greater degree of independence, flexibility and satisfaction than a large firm environment, without sacrificing the quality of representation necessary to achieve successful results for its clients.

# The Firm's Attorneys

### ALLEN CARNEY

Mr. Carney is a graduate of the University of Arkansas, earning a degree in Finance. Subsequently, Mr. Carney graduated from the University of Arkansas at Little Rock School of Law.

Allen Carney concentrates his practice on prosecuting complex litigation on behalf of investors, consumers and employees. He has extensive experience in nationwide cases, including appointment as lead counsel in dozens of securities and consumer class actions. He has successfully represented investors and consumers in cases that achieved cumulative recoveries in the hundreds of millions of dollars for plaintiffs.

Mr. Carney played a key role in litigating the various Payment Protection actions against the largest credit card issuers. These actions resulted in significant recoveries for injured consumers. See *Kardonick v. JPMorgan Chase*, S.D. Florida, $20 million; *Esslinger v. HSBC Bank Nevada*, E.D. Pennsylvania, $23.5 million; *In re Discover Credit Card Payment Protection*, N.D. Illinois, $10.5 million; *In re Bank of America*, N.D. California, $20 million; *Spinelli v. Capital One*; M.D. Florida; more than $100 million.

Mr. Carney was lead counsel in Semtech Securities Litigation, a federal securities fraud class action that settled prior to trial achieving a significant recovery for investors. Additionally, he has served as lead counsel in numerous other federal securities fraud class actions, including *In re Lernout & Hauspie Securities Litigation*, No. 00-11589-PBS (D. Mass.) ($115 million settlement); *In re NewPower Securities Litigation*, No. 2-CV-1550 (S.D.N.Y.) ($41 million settlement); *In re DQE, Inc. Securities Litigation*, No. 01-1851 (W.D. Pa.); *In re Ashanti Goldfields Securities Litigation*, No. CV-00-9717 (DGT) (RML) (E.D.N.Y.); *In re Central Parking Corporation Securities Litigation*, No. 03-CV-0546 M.D. Tenn.); *In re Keyspan Securities Litigation*, No. CV-01-5852 (ARR) (MDG) (E.D.N.Y.); *Paul Ruble, et. al. v. Rural Metro Corp., et. al.*, No. CV-99-822-PHX-RGS (D. Ariz.).

Prior to joining the firm, Mr. Carney was a partner with Jack, Lyon & Jones, P.A. in the Little Rock, Arkansas office, where he practiced extensively in the areas of complex commercial litigation, labor and employment litigation, and business transactions. Allen was involved in a number of high-profile cases, including the successful defense of Capital Cities/ABC News in an action brought by Tyson Foods regarding the secret videotaping of chicken processing plants. He was also a Contributing Author to "Arkansas Employment Law Letter," published by M. Lee Smith, 1995.

Mr. Carney is licensed to practice law in Arkansas state courts, the United States District Courts for the Eastern and Western Districts of Arkansas, and the United States Court of Appeals for the Third and Eighth Circuits. Mr. Carney has argued before the Arkansas Supreme Court. Additionally, Mr. Carney has appeared in numerous federal and state courts across the nation via admission *pro hac vice*.

## HANK BATES

Mr. Bates graduated from Harvard College, where he was a National Merit Scholar. After college, Mr. Bates attended the University of Manchester, Manchester, Great Britain on a Rotary International Fellowship and then earned his juris doctorate from Vanderbilt University School of Law, where he was awarded the Andrew Ewing Scholarship and Order of the Coif and served as Articles Editor of Vanderbilt Law Review. Following law school, Mr. Bates clerked for the Honorable Danny J. Boggs, U.S. Court of Appeals, Sixth Circuit.

Mr. Bates focuses his practice on representing consumers, farmers, shareholders, small businesses and governmental entities in class actions and complex litigation involving environmental law, consumer fraud, securities fraud, employment issues, computer privacy, and corporate governance.

In the environmental context, Mr. Bates has represented numerous individuals and entire communities in Arkansas, California, Colorado, Kansas and Oklahoma involving air pollution, groundwater pollution and toxic exposures resulting in multi-million dollar recoveries and agreements and court orders requiring remediation of contamination and compliance with applicable environmental laws and regulations in the future. For example, Mr. Bates, as co-lead counsel for the Quapaw Tribe of Oklahoma, secured an $11.5 million settlement in a case against Asarco, LLC involving damage to the Tribe's land from lead and zinc mining, in addition to confidential settlements from four other mining companies. Mr. Bates has also represented successfully numerous farmers in cases involving crop damage by defective pesticides. In addition, he has represented numerous conservation groups in actions to protect water quality, free-flowing streams from dams, critical habitat for endangered species and to remediate pollution at decommissioned military sites.

In the consumer fraud context, Mr. Bates was co-lead counsel in *Spinelli v. Capital One*, M.D. Florida, which resolved for more than $100 million. Mr. Bates is currently serving as court-appointed lead counsel in two MDLs involving predatory tax refund loans – In re Liberty Refund Anticipation Loan Litigation, MDL No. 2334 (N.D. Ill) and In re H&R Block Refund Anticipation Loan Litigation, MDL No. 2373 (N.D. Ill). Mr. Bates is also lead counsel in several cases against airlines that have violated international regulations regarding flight delays and cancellations.

Mr. Bates' employment litigation includes acting as co-lead counsel in a nationwide race discrimination class action on behalf of African-American truck drivers against Wal-Mart that provided $17.5 million in recovery, significant changes to Wal-Mart's hiring policies and four years of court supervision of the settlement terms.

Mr. Bates is listed in *The Best Lawyers in America* in the category of Environmental Law and has been named a "Super Lawyer" (among the top 5 percent of lawyers in Arkansas, Mississippi and Tennessee) by *Mid-South Super Lawyers* Magazine in the area of Environmental Litigation.

Mr. Bates is active in the bar, currently serving as Arkansas State Coordinator for Public Justice. In the past he has served as the Chairman of the Environmental Law Section of the Arkansas Bar Association and as Vice-Chairman of the American Bar Association's Committee on Pesticides, Chemical Regulation, and Right-to-Know. In his community, he currently serves on the Board of Directors for Arkansas Advocates for Children and Families.

Mr. Bates is licensed to practice in the State of Arkansas, the State of California, the U.S. Court of Federal Claims, the U.S. Circuit Court of Appeals for the Eighth and Ninth Circuits, the U.S. District Courts for the Eastern and Western Districts of Arkansas, and the U.S. District Courts for the Northern and Southern Districts of California.

**RANDALL K. PULLIAM**

Mr. Pulliam graduated from the University of Central Arkansas with a Bachelor of Business Administration degree, where he was nominated for Outstanding Management Student in the university's School of Business.  Mr. Pulliam later earned his Master of Business Administration degree from the University of Arkansas, with an emphasis in Finance.  Mr. Pulliam earned his juris doctorate from the University of Arkansas at Little Rock (UALR) School of Law where he received multiple American Jurisprudence Awards.

Mr. Pulliam has substantial experience in many areas of the securities industry, holding his Series 7 General Securities Representative license.  Mr. Pulliam worked for Stephens, Inc. as an Equity Trader for four years, where he executed in excess of $2 billion in securities transactions each year and participated in the firm's underwriting and Initial Public Offering allocation decisions.  Prior to working at Stephens, Mr. Pulliam worked as an investment banker for Crews and Associates, Inc., where he was responsible for buying municipal bonds for both individual and institutional investors.

Mr. Pulliam has been appointed lead counsel in dozens of successful class actions relating to consumer and shareholder protection.  Currently, Mr. Pulliam represents the State of New Mexico in a series of lawsuits asserting causes of actions for violations of the Dodd-Frank Act and state law against seven of the largest financial institutions in the world.  Recently, Mr. Pulliam was co-lead counsel in a series of consumer class actions related to the practice of credit card companies selling payment protection, which resulted in significant recoveries for class members.  *See Kardonick v. JPMorgan Chase & Co.*, S.D. Florida, $20 million; *Esslinger v. HSBC Bank Nevada*, E.D. Pennsylvania, $23.5 million; *In re Discover Credit Card Payment Protection*, N.D. Illinois, $10.5 million; *In re Bank of America Credit Protection Marketing & Sales Practices Litig.*, N.D. California, $20 million; *Spinelli v. Capital One*; M.D. Florida; more than $100 million.

Mr. Pulliam has also represented investors seeking financial recovery for losses suffered as a result of securities fraud, as well as in "change-of-control" transactions seeking to maximize shareholder value.  Mr. Pulliam represented shareholders of Nationwide Financial in a going private transaction, and was able to achieve more than $200 million to the public shareholders.  In a similar matter, Mr. Pulliam represented shareholders of 7-Eleven and helped negotiate an additional $140 million in the sales price.

Prior to joining the firm, Mr. Pulliam had a successful law practice in a variety of legal areas, including commercial litigation, where he gained extensive courtroom experience, successfully trying several jury trials.

On the issues of securities fraud and fiduciary duty, Mr. Pulliam has been quoted in numerous publications, including the *New York Times* and the *Dallas Morning News*.  Mr. Pulliam has also provided presentations about issues affecting institutional investors at conferences and to the boards of numerous public and union pension funds, including being a panelist on the 2005 Institutional Shareholder Services Annual Conference, *The Fiduciary Responsibility to Claim Securities Class Action Settlements*.  Mr. Pulliam is past chair of the Arkansas Bar Association Securities Law Section.

### CURTIS L. BOWMAN

Mr. Bowman began his legal career in 1986, with the Department of Justice Honors Program, a program created by Attorney General Robert Kennedy.  Mr. Bowman worked for the Tax Division of the Department of Justice, in Washington, D.C. until October 1990. During his tenure with the DOJ, Mr. Bowman tried dozens of cases involving diverse and complex issues including tax fraud, amortization of core deposit intangibles, "Bivens" actions and judicial review ability of governmental action.  While at the Justice Department, Mr. Bowman litigated a matter making it clear that certain action or inaction on the part of the Internal Revenue Service Commissioner is not subject to judicial review.  See *Horton Homes, Inc. v. United States of America*, 727 F. Supp. 1450 (1990), affirmed by the Eleventh Circuit Court of Appeals and subsequently overturned prospectively by Congress.  During his tenure at the Justice Department, Mr. Bowman was recognized as the "Outstanding Attorney" of the Tax Division (nationwide).

In 1990, Mr. Bowman returned to Little Rock, Arkansas, where he began his private practice of law with the firm of Jack, Lyon & Jones, P.A.  In 1993, Mr. Bowman became a partner of Jack, Lyon & Jones and was head of the firm's complex commercial and white collar defense litigation sections.  Mr. Bowman has been involved in a number of high profile cases, including the criminal defense of a complex "Whitewater" matter wherein the former governor of Arkansas and his attorney were indicted by the Whitewater prosecutor, Kenneth Starr.  In that case, *United States of America v. John H. Haley*, 898 F. Supp. 654 (1995), Haley and Tucker successfully argued to the District Court that Kenneth Starr had exceeded his jurisdiction in prosecuting citizens of the State of Arkansas as opposed to officers of the Executive Branch with whom Attorney General Reno had a conflict of interest.  That case was subsequently reversed by the Eighth Circuit Court of Appeals.

Mr. Bowman's litigation experience is broad and includes both the prosecution and defense of cases on behalf of individuals and classes involving death penalty matters; common law civil fraud; securities fraud; RTC savings and loan litigation; general commercial litigation; white collar crime; and tax matters.  Mr. Bowman's class action experience includes the successful defense of a string of related class actions brought against Rapid Acceptance Corporation alleging that Rapid had charged consumers an amount of interest in excess of the amount allowed by law.

Mr. Bowman was also actively involved in many of the firm's securities class actions, particularly those involving accounting fraud, and took the lead role for the firm in such cases as *Rosa E. Garza v. J.D. Edwards & Co.*, U.S.D.C. District of Colorado, No. 99-1744, ( $15 million settlement); *Betty M. Lynch v. JDN Realty Corp., et al.*, U.S.D.C. Northern District of Georgia, Atlanta Division, No. 1:00-CV-2539 ( settled for more than $40 million in cash and stock with 11% of the total settlement allocated to Mr. Bowman's clients); *In re Phycor Shareholder Litigation*, U.S.D.C., Middle District of Tennessee, Nashville Division, No. 3-99-0807 ($11.2 million cash settlement); and *In re Vision America Securities Litigation*, U.S.D.C., Middle District of Tennessee, Nashville Division, No. 3-00-0279 ($5.9 million settlement).

***TIFFANY WYATT OLDHAM***

Ms. Oldham graduated *cum laude* from the University of Arkansas at Fayetteville School of Law in 2001. She served as a member of the Board of Advocates and the W.B. Putman Inns of Court. In addition, Ms. Oldham served as President of Phi Delta Phi honors fraternity. During her law school career, Ms. Oldham participated in various trial competitions and moot court, where she was selected as a semi-finalist in the spring rounds. Ms. Oldham has a Bachelor's of Arts in English from the University of Arkansas at Fayetteville.

Ms. Oldham began her legal career with Carney Bates & Pulliam in 2002, and for over a decade now, she has focused her practice on securities and consumer fraud class actions.

Ms. Oldham has had a significant role in several of the firm's prominent cases, including: *Spinelli v. Capital One Bank,* No. 08-CV-132-T-33EAJ (M.D. Fla.); *In re Semtech Corp. Securities Litigation,* No. 07-cv-7114 (FMOx) (C.D. Cal.); *In re Fleming Companies, Inc. Securities and Derivative Litigation,* 5-030MD-1530 (TJW) (E.D. Tex.); *In re Keyspan Securities Litigation,* No. CV-01-5852 (ARR) (MDG) (E.D.N.Y.); *Freidman v. Rayovac Corporation,* No. 02-CV-0308 (W.D. WI); *In re IXL Enterprises, Inc. Securities Litigation,* No. 1:00-CV-2347-CC (N.D. Ga.); *Asher v. Baxter International, Inc.,* et. al., No. 02-CV-5608 (N.D. Il). Having prosecuted numerous class actions through all stages of the litigation process, Ms. Oldham has experience with the full range of litigation issues confronting investors and consumers in complex litigation.

Working together with her colleagues at Carney Bates & Pulliam, Ms. Oldham's work has contributed to hundreds of millions in recoveries for investors and consumers.

Immediately prior to joining Carney Bates & Pulliam, Ms. Oldham spent time overseas working for the Japanese municipal government in Okinawa, Japan. In addition, Ms. Oldham worked as an intern for the United States Bankruptcy Court, Western Division of Arkansas, where she assisted in researching bankruptcy issues and administrating bankruptcy proceedings.

Ms. Oldham is licensed to practice in the Arkansas state courts and the United States District Courts for the Eastern and Western Districts of Arkansas, and the United States Courts of Appeals for the Third Circuit. She is currently a member of the American, Arkansas and Pulaski County Bar Associations. Ms. Oldham has experience in a multitude of legal fields including securities law, corporate law, business litigation, real estate transactions, and insurance regulation.

***JOHN CHARLES WILLIAMS***

Mr. Williams graduated from Vanderbilt Law School in 2012.  During law school at Vanderbilt, he interned at the United States Attorney's Office for the District of New Mexico and at the Tennessee Justice Center, a public-interest firm focused on health care litigation.  Additionally, Mr. Williams served on Vanderbilt Law Review and Moot Court Board.

Following graduation from law school, Mr. Williams clerked for Judge Gilbert S. Merritt on the United States Court of Appeals for the Sixth Circuit.

Mr. Williams joined Carney, Bates & Pulliam in 2013, where he focuses his practice on consumer protection class actions.  Mr. Williams is licensed to practice in the States of Tennessee and Arkansas, the U.S. Court of Appeals for the Sixth and Seventh Circuits, and the U.S. District Courts for the Eastern and Western Districts of Arkansas.

***DAVID SLADE***

Mr. Slade's path to the law was a nontraditional one.  After graduating from college at Yale, he moved to New York City, working at various jobs in the music industry, forming a band, and spending several years touring the country and recording albums.  Throughout this period, his interest in the law was nurtured by a side job as a trial assistant in the hormone therapy litigation, *In re: Prempro Products Liability Litigation*, Case No. MDL 1507.

Following his work with the *Prempro* MDL, Mr. Slade attended the University of Arkansas at Little Rock William H. Bowen School of Law.  While there, he co-founded the Arkansas Journal of Social Change and Public Service, an online, interdisciplinary publication for which he served as Editor-in-Chief.  He oversaw the Journal's inaugural symposium, as well as a variety of community engagement efforts.  In its first year, the Journal published submissions from authors throughout the world.  Mr. Slade graduated from the University of Arkansas at Little Rock William H. Bowen School of Law in 2013 with high honors.

At Carney Bates & Pulliam, Mr. Slade's principal focus is on consumer protection, with an emphasis on data privacy and data security.  Extending his advocacy beyond litigation, Mr. Slade organized a cyber safety training summit for Arkansas law enforcement and victim assistance professionals, in conjunction with the National Organization of Victim Assistance (NOVA).  In addition to his work in the class action context, Mr. Slade is a member of the Volunteers Organization, Center for Arkansas Legal Services (VOCALS), an organization committed to pro bono advocacy.

Mr. Slade is licensed to practice law in the State of Arkansas and the U.S. District Courts for the Eastern and Western Districts of Arkansas.

# Leadership Positions

Class Action, MLD and Complex Litigation Cases where the attorneys of Carney Bates & Pulliam have held a leadership position of Lead or Co-Lead Plaintiffs' Counsel or as a member of the Executive Committee of Counsels:

*In re AFC Enterprises, Inc. Securities Litigation*, United States District Court for the Northern District of Georgia, Case No. 1:03-cv-0817-TWT ($15 million settlement).

*Anderson, et al. v. Farmland Industries, Inc*., United State District Court for the District of Kansas, Case No. 98-cv-2499-JWL (multi-party consolidated environmental litigation, Co-Lead Counsel; confidential settlement).

*In re Ashanti Goldfields Securities Litigation*, United States District Court for the Eastern District of New York, Case No. CV-00-0717 (DGT) (RML) (Co-Lead Counsel; $15 million settlement).

*Brian Asher v. Baxter International, Inc., et al.*, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 02 C 5608 (Co-Lead Counsel).

*In re Bank of America Credit Protection Marketing & Sales Practices Litig.*, United States District Court for the Northern District of California, Case No. 11-md-2269-THE ($20 million settlement; member of Plaintiffs' Executive Committee).

*Bland, et al. v. Petromark, Inc., et al.*, Circuit Court of Boone County, Arkansas, Case No. CV-2003-3-2 (multi-party consolidated environmental litigation, Co-Lead Counsel).

*In re Central Parking Corporation Securities Litigation*, United States District Court for the Middle District of Tennessee), Case No. 3:03-0546 ($4.85 million settlement).

*Desert Orchid Partners, LLC v. Transaction Systems Architects, Inc.*, United States District Court for the District of Nebraska, Case No. 02-cv-553 ($24.5 million settlement; Co-Lead Counsel).

*In re Discover Credit Card Payment Protection Plan Marketing and Sales Practices Litig*., United States District Court for the Northern District of Illinois, Case No. MDL No. 2217 ($10.5 million; Co-Lead Counsel).

*In re DQE, Inc. Securities Litigation*, United States District Court, Western District of Pennsylvania, Case No. 01-1851 (Co-Lead Counsel; $12 million settlement).

*In re Dynacq International, Inc. Securities Litigation*, United States District Court for the Southern District of Texas, Houston Division, No. H-02-0377 (Co-Lead Counsel).

*Eli Friedman v Rayovac Corporation, et al.*, United States District Court of the Western District of Wisconsin, Case No. 02-0308 ($4 million settlement).

*Esslinger v. HSBC Bank Nevada*, United States District Court for the Eastern District of Pennsylvania, Case No. 2:10-cv-03213-BMS ($23.5 million; Co-Lead Counsel).

*In re Fleming Corporation Securities Litigation,* United States District Court for the Eastern District of Texas, Texarkana Division, No. 5-02-CV-178 (Co-Lead Counsel for 33 Act Claims; $93.75 million settlement).

*Martin Gaynor v. Thorne, et al.,* Circuit Court of Cook County, Illinois County, Dept of Chancery, Case No. 07-CH-14381.

*Rosa E. Garza v. J.D. Edwards & Co.,* United States District Court for the District of Colorado, Case No. 99-1744, ($15 million settlement).

*Hardin, et al. v. BASF,* United States District Court for the Eastern District of Arkansas, Western Div., Consolidated No. 00-CV-00500 SWW (multi-party consolidated environmental litigation, Co-Lead Counsel; confidential settlement).

*In re Keyspan Corporation Securities Litigation,* United States District Court for the Eastern District of New York, Case No. 01-cv-5852 (ARR) (MDG).

*Kardonick v. JPMorganChase,* United States District Court for the Southern District of Florida, Case No. 1:10-cv-23235-WMH ($20 million settlement; Co-Lead Counsel).

*King, et al., v. Hamilton Sundstrand Corporation,* District Court of Adams County, Colorado, Case No. 02-CV-2018 (Co-lead Counsel; $2 million settlement of groundwater contamination case).

*In re Lernout & Hauspie Securities Litigation,* United States District Court for the District of Massachusetts, No. 00-CV-11589-PBS (Co-Lead Counsel; $115 million settlement).

*In re Liberty Refund Anticipation Loan Litigation,* United States District Court for the Northern District of Illinois, Case No. MDL 2334 (Interim Co-Lead Class Counsel; currently pending litigation).

*Betty M. Lynch v. JDN Realty Corp., et al.,* United States District Court for the Northern District of Georgia, Atlanta Division, Case No. 1:00-CV-2539 (settled for over $40 million in cash and stock with 11% of the total settlement allocated to Mr. Bowman's clients).

*Middlesex County Retirement System v. Semtech Corp. et al,* United States District Court for the Southern District of New York, Case No. 07-Civ-7183 (DC) (Co-Lead Counsel; $20 million settlement).

*David Montalvo v. Tripos, Inc. et al.,* United States District Court for the Eastern District of Missouri, Eastern Division, Case No. 4:03CV995SNL (Co-Lead; $3,150,000 settlement).

*In re Monterey Pasta Company Securities Litigation,* United States District Court for the Northern District of California, Case No. 3:03 CV 00632 MJJ (Co-Lead Counsel).

*Matthew Campbell, et al. v. Facebook, Inc.,* United States District Court for the Northern District of California, Case No. 4:13-cv-05996-PJH (Co-Lead Counsel)

*In re National Golf Properties, Inc. Securities Litigation,* United States District Court for the Central District of California, Western Division, Case No. 02-1383-GHK RZX; ($4.175 million settlement).

*In re Nationwide Financial Services Litigation,* United States District Court for the Southern District of Ohio, Case No. 08-CV-00249 ($5.05 per share increase in offer price; $232.8 million value).

*Nelson, et al. v. Wal-Mart Stores, Inc.,* United States District Court for the Eastern District of Arkansas, Case No. 04-CV-00171 (Co-Lead Counsel; $17.5 million).

*In re NewPower Holdings Securities Litigation*, United States District Court for the Southern District of New York, Case No. 01-cv-1550 (CLB) (Co-Lead Counsel; $41 million settlement).

*Pennsylvania Avenue Funds v. Gerard H. Brandi, et al.*, Common Wealth of Massachusetts Superior Court, Middlesex County, Case No. CV 08-1057.

*Pierce v. Ryerson Inc. et al.*, Illinois Circuit Court, Cook County, Case No. 07 CH 21060.

*City of Pontiac General Employees' Retirement System v. CBS Corp,* United States District Court for the Southern District of New York, Case No. 08-CV-10816 (LBS).

*In re Phycor Shareholder Litigation*, United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3-99-0807 ($11.2 million cash settlement).

*The Quapaw Tribe of Oklahoma v. Blue Tee Corp.,* United States District Court for the Northern District of Oklahoma, Case No.03-cv-0846-CVE-PJC ($11.5 million settlement in a case against Asarco, LLC).

*Paul Ruble, et. al. v. Rural Metro Corp., et. al.*, United States District Court for the District of Arizona, Case No. 99-cv-822-PHX-RGS.

*Sheet Metal Workers Local 28  Pension Fund  v. Office Depot, Inc. et al.*, United States District Court for the Southern District of Florida, Case No. 07-81038-CIV-Hurley/Hopkins.

*Simpson, et al., v. Koppers, et al.*, Pulaski County Circuit Court, Third Division, Case No. CV-00-1659 (multi-party consolidated environmental litigation, Co-Lead Counsel; confidential settlement).

*Richard Slatten v. Rayovac Corporation, et al.*, United States District Court for the Western District of Wisconsin, Case No. 02 C 0325 C (Co-Lead Counsel; $4 million settlement).

*David Slone, et.al. v. Fifth Third*, United States District Court for the Southern District of Ohio, Case No. 03-cv-00211 ($15 million settlement).

*Smith v. Intuit, Inc.*, United States District Court for the Northern District of California, Case No. 5:12-cv-00222 ($6.55 million cash settlement).

*Spinelli v. Capital One Bank (USA), et al.,* United States District Court for the Middle District of Florida, Case No. 8:08-cv-132-T-33EAJ (more than $100 million settlement; Co-Lead Counsel).

*State of New Mexico v. Discover Financial Services, Inc., et al.,* United States District Court for the District of New Mexico, Case No. 1:13-cv-00503 ($2.15 million cash settlement).

*State of New Mexico v. JPMorgan Chase & Co., et al.,* United States District Court for the District of New Mexico, Case No. 1:13-cv-00472 ($2,146,750.00 million cash settlement).

*In re Sterling Financial Corporation Securities Class Action*, United States District Court of the Southern District of New York, Case No. CV 07-2171(Co-Lead Counsel; $10.25 million settlement).

*In re Supervalu, Inc. Securities Litigation,* United States District Court for the District of Minnesota, Case No. 02-CV-1738 (JEL/JGL) (Co-Lead Counsel; $4 million settlement).

*Valuepoint Partners, Inc. v. ICN Pharmaceuticals, Inc. Et al.*, United States District Court for the Central District of California, Case No. 03-0989 ($3,225,000 settlement)

*In re Vision America Securities Litigation* , United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3-00-0279 ($5.9 million settlement).

*White v. Minnesota Mining & Manufacturing Co.*, United States District Court for the Eastern District of Arkansas, Western Div., Case No. LR-C-98-362 (multi-party consolidated environmental litigation, Co-Lead Counsel; confidential settlement).

*Wise, et al. v. Arkansas Aluminum Alloys, Inc., et al.*, Miller County Circuit Court; Case No. CIV-2003-14-1(multi-party consolidated environmental litigation, Co-Lead Counsel; confidential settlement).

*Yvon DuPaul v. H. Edwin Trusheim, et al.* (Rehabcare Group), Circuit Court of the County of St. Louis, Missouri, Case No. 02 CC 3039 (Lead Derivative Counsel).