UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAPOLEON EBARLE, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>LIFELOCK, INC.,<br><br>　　　　　Defendant. | Case No. 15-cv-00258-HSG<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL**<br><br>Re: Dkt. No. 49 |

Pending before the Court is Plaintiffs' Motion for Preliminary Approval of Conditional Class Certification and Class Action Settlement. Dkt. No. 43. The parties appeared before the Court for a preliminary approval hearing on December 17, 2015. After careful consideration of the settlement agreement and the parties' arguments, the Court **GRANTS** Plaintiffs' motion for preliminary approval.

## I.    BACKGROUND

### A.    Litigation History

Defendant LifeLock, Inc. provides identity theft protection services to its subscribers. This action began on January 19, 2015, when Plaintiffs Napoleon Ebarle and Jeanne Stamm filed a putative class action complaint alleging that Defendant's advertisements of identity theft protection services violated Arizona's Consumer Fraud Act. Dkt. No. 1. On March 6, 2015, Defendant filed a motion to dismiss, Dkt. No. 24, and Plaintiffs filed an amended class action complaint on March 27, 2015, Dkt. No. 31. The amended complaint added Brian Litton as a Plaintiff and alleged four causes of action: (1) violation of Arizona's Consumer Fraud Act, (2) breach of contract, (3) unjust enrichment, and (4) declaratory judgment. The causes of action were based on four categories of alleged misrepresentations: (1) Defendant's promise to provide "comprehensive" services in detecting fraud, (2) Defendant's promise to provide timely and continuous alerts of potential fraud twenty-four hours a day every day of the year, (3) Defendant's

promise to keep customers' personal data (credit card, social security, and bank account numbers) secure, and (4) Defendant's promise to provide a "$1 Million Total Service Guarantee," which purports to provide insurance up to $1,000,000 against identity theft.

The parties exchanged informal discovery requests before participating in settlement discussions with mediator Justice Howard Wiener on July 1, 2015. Dkt. No. 49-2 at 2. The parties did not reach a resolution at the first mediation; they continued to engage in informal discovery and participated in a second full-day mediation on August 18, 2015. *Id.* At the end of the second mediation, the parties still were unable to reach a resolution, so Justice Wiener made a mediator's proposal, which the parties accepted and memorialized in a non-binding memorandum of understanding. *Id.* During this time, the Court granted four stipulated requests to extend Defendant's time to answer the amended complaint pending mediation. Dkt. Nos. 35, 38, 40, 42.

On July 21, 2015, the Federal Trade Commission ("FTC") filed an enforcement action against Defendant in the United States District Court for the District of Arizona ("FTC Action"); the alleged violations overlap with the claims asserted in this case. Defendant negotiated a separate agreement with the FTC that provides for a $100,000,000 judgment in the FTC's favor for the purpose of consumer redress. On December 22, 2015, the district court in the FTC Action approved the settlement between Defendant and the FTC, entered a money judgment of $100,000,000, and directed Defendant to satisfy the judgment by depositing the money in the District of Arizona's registry within five business days, Dkt. Nos. 54, 56. Pursuant to the terms of this settlement, Defendant can use the registry funds to fund the Settlement Fund here. *Id.*

**B.  Overview of the Proposed Settlement**

The parties executed a Class Action Settlement Agreement ("Settlement Agreement") on November 3, 2015. Dkt. No. 49-1, Ex. A. The key provisions of the Settlement Agreement are described below.

<u>Settlement Funds.</u>  Defendant agrees to establish a non-reversionary Settlement Fund of $68,000,000 for the benefit of the eligible Class Members, which includes a Class and Subclass. *Id.* at ¶¶ 40, 44, 57, 58. A Subclass Fund shall be created based on the percentage of the Class that comprises the Subclass. *Id.* at ¶ 44. The Class Fund shall be the Settlement Fund less the

2

1  Subclass Fund. *Id.* at ¶ 12.

2  Class.  All members of Defendant's identity theft protection plan in the United States at any time between September 1, 2010 and the date of the preliminary approval order. *Id.* at ¶ 9.

Subclass.  All individuals who enrolled in Defendant's identity theft protection plan in the United States at any time between January 1, 2012 and April 30, 2015. *Id.* at ¶ 43.

Allocation Method.  Each Subclass Member will receive an automatic *pro rata* distribution from the Subclass Fund. *Id.* at ¶ 58.  Additionally, each Class Member (including those who are also Subclass Members) can submit a claim for $20.00 before the Claim Deadline, which will be paid from the Class Fund. *Id.*  If the number of claims submitted exceeds the Class Fund amount, then each claimant will receive a pro rata distribution from the Class Fund. *Id.* at ¶ 69.  If the claims submitted do not exhaust the Class Fund, the Settlement Administrator shall distribute the remainder of the Class Fund on a *pro rata* basis. *Id.* at ¶ 70.

If money remains from uncashed checks 120 days after payment dates, a second *pro rata* distribution shall be made to Valid Claimants who cashed their initial payment checks. *Id.* at ¶ 63.  If money remains from uncashed checks 120 days after the second distribution, the money shall be deposited into the Court Registry in the FTC Action. *Id.*

Attorneys' Fees; Costs; Incentive Payments.  Defendant has agreed not to oppose an application for $10,200,000 in attorneys' fees and expenses and $2,000 to each of the four Class Representatives.  The Settlement Agreement provides that Defendant will pay each of these costs and awards in addition to (and not out of) the Settlement Fund.

Second Amended Complaint.  As a material part of the settlement, Defendant stipulates to and does not oppose the filing of a second amended complaint ("SAC") naming Renier Jerome Ebarle as a named Plaintiff, "provided that a Preliminary Approval Order, a Final Approval Order, and Final Judgment each is entered and this Settlement Agreement becomes effective on the Final Settlement Date." *Id.* at ¶¶ 52-53.  If either the preliminary approval order or the final approval or judgment is not entered or if the Settlement Agreement fails to become effective, the Agreement provides that Plaintiffs will withdraw the SAC within five days of the denial or termination. *Id.* at ¶ 54.  If the Court does not allow withdrawal of the SAC, then Defendant

3

1  "reserves all rights to challenge the validity of the SAC." *Id*.

2  <u>Releases</u>.  The Settlement Class Members will release "any claims" that "were or reasonably could have been alleged in the Action or in any other court, tribunal, arbitration panel, commission, agency, or before any governmental and/or administrative body, or any other adjudicatory body, on the basis of, connected with, arising from, or relating to the subject matter or allegations of the Action." *Id.* at 90.

<u>Requests for Exclusion</u>.  Any Class Member may email or mail a written request for exclusion to the Settlement Administrator at the email or mailing address provided in the Class Notice no later than the postmarked deadline. *Id.* at 71.  A Class Member who does not submit a timely written exclusion request shall be bound by all subsequent proceedings, including the release. *Id.* at 72.  A Class Member who timely submits a request for exclusion shall waive and forfeit all rights the member may have to benefits of the Settlement if it is approved. *Id.* at 73.

<u>Unclaimed Settlement Funds</u>.  The Settlement Agreement is non-reversionary. *Id.* at 58.  Any residual amounts will be paid out to the members of the settlement subclasses pursuant to the allocation set forth above.

<u>Objections</u>.  Class Members who do not opt out of the settlement may file an objection to the Settlement Agreement no later than the Objection Deadline. *Id.* at ¶¶ 75-80.

## II. CONDITIONAL CLASS CERTIFICATION

Class certification under Rule 23 is a two-step process.  First, a plaintiff must demonstrate that the four requirements of Rule 23(a) are met: numerosity, commonality, typicality, and adequacy.  "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  Second, a plaintiff must establish that one of the bases for certification in Rule 23(b) is met.  Here, by invoking Rule 23(b)(3), Plaintiffs must establish that "questions of law or fact common to Class Members predominate over any questions affecting only individual members, and . . . [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The party seeking class certification bears the burden of

demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met. *See Wal-Mart*, 131 S. Ct. at 2551.

### A. Rule 23(a)(1)—Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Defendant estimates that there are over six million Class Members, over three million of whom are in the Subclass. The Court finds that numerosity is satisfied because joinder of all the estimated Class Members would be impracticable.

### B.     Rule 23(a)(2)—Commonality

A Rule 23 class is certifiable only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For the purposes of Rule 23(a)(2), even a single common question is sufficient. *Wal-Mart*, 131 S. Ct. at 2556. The common contention, however, "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted).

The Court finds that the proposed Class satisfies the commonality requirement because, at a minimum, the existence of Defendant's alleged policies and practices is an issue common to all members. This includes (1) whether Defendant's promise of "comprehensive" monitoring services was misleading and/or deceptive, (2) whether Defendant's alert notification services were subject to regular delays and/or shutdowns, (3) whether Defendant failed to maintain adequate technology and safeguards to deliver the protections as promised to related to consumers' sensitive personal data, including credit card, social security, and/or bank account numbers, which all Class Members provided to Defendant, and (4) whether Defendant misrepresented and/or misled consumers regarding the benefits of its $1 Million Total Service Guarantee.

### C.     Rule 23(a)(3)—Typicality

In certifying a class, a court must find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The purpose

of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (internal quotation marks omitted).

The Court finds that the named Plaintiffs are typical of the Class they seek to represent. Like the rest of the proposed settlement Class Members, they purchased the Defendant's products and services that were advertised, marketed, and sold as providing "comprehensive" monitoring services, timely and continuous alert detection and notification services, and a $1 Million Total Service Guarantee. The named Plaintiffs, like all Class Members, provided their personal data, such as credit card, social security, and bank account numbers, to the Defendant. Moreover, Plaintiff Reiner Jerome Ebarle's claims are typical of the Subclass, in particular: he purchased Defendant's service between January 1, 2012 and April 30, 2015 when Defendant was advertising and selling its products and/or services as providing "continuous, uninterrupted" alerts of potential credit or identity fraud to customers 24 hours a day, every day of the year. Therefore, the named Plaintiffs' claims arise from Defendant's common practices and alleged misrepresentations and thus are typical of the Class Members.

### D.     Rule 23(a)(4)—Adequacy of Representation

"The adequacy of representation requirement . . . requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). The requirement "'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)). Among other purposes, these requirements determine whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13. Adequacy of representation requires two legal determinations: "(1) do the named

plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

No evidence in the record suggests that Plaintiffs or proposed class counsel have a conflict of interest with other Class Members. The named Plaintiffs, Class Members, and Subclass Members are equally interested in demonstrating Defendant's misrepresentations. Moreover, proposed class counsel has substantial experience prosecuting class actions. *See* Dkt. No. 49-1, Exs. B, C. The Court finds that proposed class counsel and Plaintiffs have prosecuted this action vigorously on behalf of the Class, and will continue to do so. The adequacy requirement is therefore satisfied.

### E. Rule 23(b)(3)—Predominance and Superiority

To certify a Rule 23 damages class, the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (citation omitted).

Here, the Court finds that—for purposes of settlement—the common questions raised by Plaintiffs' claims predominate over questions affecting only individual members of the proposed Class. Whether these allegations have a basis in fact is a common question that would largely resolve the claims of all Class Members. The predominance requirement is therefore satisfied.

Next, "[t]he superiority inquiry under Rule 23(b)(3) requires the Court to determine whether the objectives of the particular class action procedure will be achieved in the particular case." *Id.* at 1023. Here, because common legal and factual questions predominate over individual ones, and taking into account the size of the proposed class, the Court finds that the

1  judicial economy achieved through common adjudication makes a class action a superior method
2  for adjudicating the claims of the proposed class.

3  Finally, while not enumerated in Rule 23, "courts have recognized that 'in order to
4  maintain a class action, the class sought to be represented must be adequately defined and clearly
5  ascertainable.'" *Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 211 (N.D. Cal. 2012)
6  (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)); *see also Berger v. Home
7  Depot USA, Inc.*, 741 F.3d 1061, 1071, n.4 (9th Cir. 2014) (referring, in dicta, to the "threshold
8  ascertainability test").  "[A] class definition is sufficient if the description of the class is definite
9  enough so that it is administratively feasible for the court to ascertain whether an individual is a
10 member." *Vietnam Veterans*, 288 F.R.D. at 211 (internal quotation marks omitted).

11 Courts have considered at least three types of "ascertainability" concerns when
12 determining whether class certification is appropriate: (1) whether the class can be ascertained by
13 reference to objective criteria; (2) whether the class includes members who are not entitled to
14 recovery; and (3) whether the putative named plaintiff can show that he will be able to locate
15 absent class members once a class is certified. *See Lilly v. Jamba Juice Co.*, 2014 WL 4652283, at
16 *3-4 (N.D. Cal. Sept. 18, 2014). The proposed Class in this case does not present any of these
17 concerns. Defendant will provide the Settlement Administrator a list of all Class Members and
18 Subclass Members, including their names, last known mailing address, and last known email
19 address. Dkt. No. 49-1, Ex. A, ¶ 65. The Settlement Administrator will update the mailing
20 addresses through the National Change of Address Database before sending the notices and will
21 perform a Single Skip Trace for any notice that is returned as undeliverable. *Id.* This information
22 will allow the settlement administrator to identify and locate class members with sufficient
23 confidence to satisfy the ascertainability requirement.

\* \* \*

25 The Court **GRANTS** conditional class certification of the Class and Subclass.

26 **III.    PRELIMINARY APPROVAL**

27 Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a
28 certified class may be settled, voluntarily dismissed, or compromised only with the court's

approval." The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Accordingly, before a court approves a settlement it must conclude that the settlement is "fundamentally fair, adequate and reasonable." *In re Heritage Bond Litig.*, 546 F.3d 667, 674-75 (9th Cir. 2008).

In general, the district court's review of a class action settlement is "extremely limited." *Hanlon*, 150 F.3d at 1026. However, where the parties reach a class action settlement prior to class certification, courts apply "a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citation and internal quotations omitted). Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

At the preliminary approval stage, the Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval. *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007); Joseph M. McLaughlin, McLaughlin on Class Actions: Law and Practice § 6.6 (7th ed. 2011) ("Preliminary approval is an initial evaluation by the court of the fairness of the proposed settlement, including a determination that there are no obvious deficiencies such as indications of a collusive negotiation, unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys . . . ."). The Court considers the settlement as a whole, rather than its components, and lacks the authority to "delete, modify or substitute certain provisions." *Officers for Justice v. Civ. Serv. Comm'n of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982). Rather, "[t]he settlement must stand or fall in its entirety." *Id.*

9

### A. Settlement Process

The first factor the Court examines is the means by which the parties arrived at the settlement. "An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Harris v. Vector Mktg. Corp.*, No. 08-cv-5198-EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (citation omitted).

Here, class counsel conducted an extended investigation into Defendant's advertising practices, its terms of service, contracts between LifeLock and its vendors, account histories for the individual plaintiffs, alert histories, identity theft protection plan cancellations, and insurance policies before filing this lawsuit. Dkt. No. 49-2 at 4-5. Before engaging in mediation, class counsel reviewed thousands of documents Defendant informally produced and deposed two employees, the Vice President of Enterprise Risk & Strategic Operations and the Senior Director of Product Management, who testified regarding Defendant's advertising and policies and practices. Dkt. No. 49-1 at 4-5, 9. Moreover, the parties reached their settlement pursuant to the proposal of mediator Justice Wiener following two full-day mediation sessions. Dkt. No. 49-2 at 2. According to Justice Wiener, the parties aggressively advocated their positions and "were fully prepared to proceed with litigation . . . rather than accept any unfair settlement terms." *Id.* at 2-3. This strongly suggests the absence of collusion or bad faith by the parties or counsel. *See* Dkt. No. 49-2 at 2; *see also Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010); *Satchell v. Fed. Express Corp.*, No. 03-cv-2659-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

### B. Obvious Deficiencies

The second factor the Court considers is whether there are obvious deficiencies in the Settlement Agreement. At the preliminary approval hearing, class counsel explained why the settlement amount of $68,000,000 was reasonable. *See* FTR 4:05-4:16. Customers paid between $10 and $30 a month to be a member of the Defendant's identity theft protection plan. Relying on similar cases, class counsel assumed a 3 to 10 percent claims rate return from Class Members. This would result in the following projected recovery: $20 a person for Class Members, between

1  $16 and $20 a person for Subclass Members who do not submit a claim, and between $36 and $39
2  a person for Subclass Members who submit a claim. Accordingly, at a minimum, Class Members
3  are projected to receive on average the amount they paid per month of service, if not slightly more
4  for Subclass Members. Moreover, in the unlikely scenario that 100 percent of the Class submits a
5  claim, then Class Members are still projected to recover a significant percentage of what they paid:
6  $5 for Class Members, $10 for Subclass Members who do not submit a claim, and $15 for
7  Subclass Members who submit a claim.

Defendant's counsel further clarified that for the FTC Action, the parties examined data showing the total number of alerts delivered and/or potentially not delivered during the Subclass time period. Defendant's counsel stated that during this time LifeLock's revenue was $504,000,000 and that 99.8 percent of all alerts were delivered. Counsel concluded that if the Court were to extrapolate, the most likely total recovery would be $10 million.

Both counsel also highlighted the difficulties in valuing the asserted potential harm for the claims. Class counsel stated that reasonable minds could differ in terms of how to calculate the value a customer received versus the harm he or she suffered. Moreover, Plaintiffs would need to show actual injury as a consequence of some non-delivery of services. According to defense counsel, any delayed alerts were very isolated instances, and that on the whole the basic impressions and expectations that consumers had of the advertising matched the delivery of services received.

Given these challenges in identifying and valuing harm, the Court concludes that the $68,000,000 settlement amount, or a likely projected recovery of a month to two months of service, is reasonable. Thus, there are no obvious deficiencies in the Agreement.

### C. Preferential Treatment

Under the third factor, the Court examines whether the Settlement Agreement provides preferential treatment to any class member. The proposed plan of allocation provides an automatic, pro rata distribution for the Subclass Members, while the Class (including the Subclass Members) can file a claim form for a $20 settlement. The proposal appears to compensate Class Members in a manner generally proportionate to the harm they suffered on account of the services

or products Subclass members in particular purchased during the January 1, 2012 and April 30, 2015 timeframe.

The Settlement Agreement authorizes each named Plaintiff to seek an incentive award of $2,000 for his or her participation as a representative. Although the Court will ultimately determine whether each Plaintiff is entitled to such an award and the reasonableness of the amount requested, the Court notes Plaintiffs, thus far, have provided no explanation for why the named Plaintiffs deserve an award 100 times greater than the settlement value of the other Class Members. Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). Plaintiffs must provide sufficient evidence to allow a district court to "evaluate [named plaintiffs'] awards individually, using relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing the litigation . . . ." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). The Court will consider the evidence presented at the final fairness hearing as to these factors so that it can evaluate the reasonableness of the incentive awards' request.

**D.    Whether the Settlement Falls Within the Range of Possible Approval**

Finally, the Court must consider whether the Settlement Agreement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1125 (E.D. Cal. 2009) (citing *Tableware*, 484 F. Supp. 2d at 1080) (internal quotations omitted). Additionally, to determine whether a settlement is fundamentally fair, adequate, and reasonable, the Court may preview the factors that ultimately inform final approval: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6)

the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement. *See Churchill Vill. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citation omitted).  Although the Court undertakes a more in-depth investigation of the foregoing factors at the final approval stage, these factors inform whether the Settlement Agreement falls within the "range of possible approval."

        The Court first considers the Class' expected recovery balanced against the value of the settlement offer, taking into account the strength of the Plaintiffs' case.  The settlement provides for the payment of $68,000,000, and, assuming the 3 to 10 percent claims rate, each Class Member will receive on average the amount they paid per month of service, if not slightly more for subclass members.  Plaintiffs argue that this is a fair compromise within the range of reasonableness given the risks of litigation, non-certification, and dismissal on the merits.  Dkt. No. 49 at 15-16.  Plaintiffs further contend that although the value of their claims may be a figure larger than the proposed settlement, the "tangible, immediate benefits of the Settlement" outweigh continued litigation and the uncertainty of a trial.  *Id.* at 15.  *See also In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Immediate receipt of money through settlement, even if lower than what could potentially be achieved through ultimate success on the merits, has value to a class, especially when compared to risky and costly continued litigation.").

        The Court agrees.  Defendant denies the allegations in the complaint, specifically contending that it did not intentionally delay alerts and that it provided comprehensive identity theft protection services during the relevant time.  Dkt. No. 49-1 at 9.  Moreover, Defendant asserts that any inadvertent delays in service affected only a small number of customers and that such delays did not result in any harm in the form of actual credit card fraud or identity theft; thus, Defendant contests that Class Members suffered actual injury.  *Id.* at 9-10.  Defendant further argues that class certification would be unlikely given "variances in the representations that Class Members saw, whether Class Members' alerts were delayed, and whether Class Members suffered any harm."  *Id*.

        Second, the settlement amount is adequate given the expense, complexity, and duration of further litigation.  To prevail in this action, Plaintiffs would be required to successfully move for

class certification under Rule 23, survive summary judgment, and receive a favorable verdict capable of withstanding a potential appeal.  There is uncertainty as to which Class Members might have actually received the benefits of the identity theft protection plan (for instance, receipt of alerts), as opposed to those Class Members who did not receive a timely alert or those who did not receive a timely alert and suffered some sort of harm (for instance, credit fraud).  Given the variables that Plaintiffs might need to grapple with if there were further litigation, the Court finds that the risks and costs associated with class action litigation weigh strongly in favor of settlement.

The third factor concerning whether class certification can be maintained through trial also weighs in favor of settlement.  For the reasons discussed, certifying a Class and Subclass encompassing, based on counsel's representation, approximately 6.8[1] and 3.4 million customers, respectively, presents complex issues that could undermine certification at many different stages of the litigation.

Fourth, the $68,000,000 settlement amount appears reasonable given the stage of the proceedings (settlement was reached before dispositive motions or trial), Defendant's intention to contest certification, and the issues with identifying and calculating actual harm.  Given that Class Members likely did not suffer harm each month that they paid for services and that they did get some value (even if not the full value of the service), a settlement amount that likely results in a recovery of one to two months of service paid appears reasonable.

Fifth, the parties have undertaken sufficient discovery to inform their view of the reasonableness of the Settlement Agreement.  Class counsel reviewed 10,000 documents, including exemplars of print advertisements and television commercials; account histories for individual Plaintiffs; transcripts of depositions, settlement agreements, and documents from a multi-district litigation and FTC Action; consumer surveys Defendant conducted on its advertisements; Defendant's call center scripts; the terms of service during the alleged Class Period; insurance policies underlying its $1 million guarantee; alert histories; identify theft

---

[1] At the hearing, class counsel clarified that since filing the preliminary approval motion, the parties have a better understanding of the number of Class Members; the class is estimated to include 6.7 million customers.

14

1    protection plan cancellations; and the responses to FTC's requests for information.  Dkt. No. 49-1
2    at 4-5.
3           The sixth factor takes into account counsel's experience and their respective views of the
4    Settlement Agreement.  The Court has previously evaluated class counsel's qualifications and
5    experience and concluded that counsel is qualified to represent the class' interests in this action.
6    *See* Dkt. No. 50; Dkt. No. 49-1, Ex. B at 100, Ex. C at 4.  Moreover, class counsel "believe[s] this
7    is an excellent recovery for the Class and endorse the Settlement as fair, reasonable, and
8    adequate."  Dkt. No. 49-1 at 2.  The Court notes that courts have taken divergent views as to the
9    weight to accord counsel's opinions.  *Compare Carter v. Anderson Merch., LP*, 2010 WL
10   1946784, at *8 (C.D. Cal. May 11, 2010) ("Counsel's opinion is accorded considerable weight."),
11   *with Chun-Hoon*, 716 F. Supp. 2d at 852 ("[T]his court is reluctant to put much stock in counsel's
12   pronouncements, as parties to class actions and their counsel often have pecuniary interests in
13   seeing the settlement approved.").  The Court finds that this factor tilts in favor of approval, even
14   though the Court affords only modest weight to the views of counsel.
15          The seventh factor examines the participation of a government entity.  Here, because the
16   judgment was entered in the FTC Action, Defendant can use up to $68,000,000 from the FTC
17   Action for the settlement fund in this case.  This coordination weighs in favor of granting
18   preliminary approval.  *See In re TracFone Unlimited Serv. Plan Litig.*, No. C-13-3440 EMC, 2015
19   WL 4051882, at *9 (N.D. Cal. July 2, 2015), reconsideration denied, No. C-13-3440 EMC, 2015
20   WL 4735521 (N.D. Cal. Aug. 10, 2015).
21          Eighth, because the Class has not yet been formally notified of the settlement, the Court
22   cannot undertake any evaluation of Class Members' reaction to the settlement, including the
23   number and substance of any objections.
24          Having weighed these eight factors, the Court finds that the Settlement Agreement falls
25   within the range appropriate for preliminary approval.
26   **IV.    PROPOSED CLASS NOTICE AND NOTIFICATION PROCEDURES**
27          The class notice in a Rule 23(b)(3) class action must comport with the requirements of due
28   process.  "The plaintiff must receive notice plus an opportunity to be heard and participate in

litigation, whether in person or through counsel." *Philips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). The notice must be "the best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (internal quotation marks omitted). "The notice should describe the action and the plaintiffs' rights in it." *Id.* Rule 23(c)(2)(B) provides, in relevant part:

> The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Additionally, "an absent plaintiff [must] be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Philips Petroleum Co.*, 472 U.S. at 812.

Because the FTC Action was approved after the Plaintiffs filed the motion for preliminary approval, the Court gave leave for the parties to submit a revised proposed notice reflecting the FTC Action settlement. On December 29, 2015, the parties filed a revised proposed summary notice and long-form notice, Dkt. No. 54, which the Court reviews here.

Plaintiffs propose Garden City Group, LLC ("Garden City Group") as the settlement administrator for the Class. Dkt. No. 49-1 at ¶ 37. The Garden City Group will send the summary class notice and long-form notice to the Class Members following the Court's preliminary approval order. The Settlement Administrator will (1) post the long-form notice to the settlement website, and (2) send the summary class notice to Class Members for whom an email address is available and via First Class U.S. Mail for those members for whom an email address is not available. Dkt. No. 49-1, ¶ 65.

The Court finds that the long form notice satisfies all of the requirements of Rule 23(c)(2)(B), Dkt. No. 54-4, but directs counsel to address the following deficiencies:

- On page 1 in the "Summary of Your Options and Legal Rights in this Settlement" section, counsel shall change "Write to the Court if you don't like the settlement" to

16

read: "Write to the Settlement Administrator if you don't like the settlement."

- On page 2, Counsel will change the number and line formatting so that the content is easy to follow.
- On page 4, under section 9, Counsel will add a sentence to the end of the first paragraph, stating that Class Members who are not Subclass Members must submit a claim form in order to receive a cash payment.
- On page 4, Counsel will clarify where Class Members can find the Claim ID.

The Court finds that the summary form notice fails to satisfy the requirements of Rule 23(c)(2)(B), Dkt. No. 54-2. Although the summary class notice describes the nature of the action, defines the class certified, and informs Class Members that they may appear at the final fairness hearing and hire their own attorney, it has several deficiencies. First, it fails to identify the four categories of misrepresentations underlying the lawsuit. Instead, the notice contains the following general statement: "This lawsuit challenges representations LifeLock made regarding its identity theft protection plans and information security program. LifeLock denies all allegations or that it did anything wrong." Dkt. No. 54-2. The Court finds that these two sentences are inadequate to apprise Class Members of the Class claims, issues, or defenses. Second, the summary class notice fails to inform Class Members of *how* they can exclude themselves. The notice does not explain where the written request must be sent and what the written request must include in order for it to be a valid exclusion. Third, the summary class notice fails to describe the binding effects of the settlement and what it means to exclude oneself. The summary notice should include the Settlement Administrator's mailing and email addresses and indicate that claim forms, exclusions, and objections should be either emailed or mailed to that address. The summary notice also should identify where the claim form is located and include either the claim ID or explain how the claimant accesses his or her ID.

An overly short summary notice that directs Class Members to go to the settlement website for more information can result in Class Members being unaware of basic rights. Moreover, the parties cannot rely on the long-form notice to satisfy the due process requirements, given that the long-form notice is only available on the settlement website and is not mailed directly to class

members.

## V.  NOTICE OF MOTION AND AWARD OF ATTORNEYS' FEES AND COSTS

The settlement notices inform class members that class counsel will ask the Court to award attorneys' fees and expenses of up to $10,200,000 and to award a $2,000 service award for each of the four class representatives in the case.  To enable Class Members to review class counsel's motion, class counsel shall include language in the settlement notices indicating the deadline for filing the attorneys' fees motion, specifically stating the deadline for any class member objections to the fees motion, and informing Class Members that the motion and supporting materials will be available for viewing on class counsel's website.  *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-94 (9th Cir. 2010) (holding that under Rule 23(h), class members must be given a full and fair opportunity to examine and object to attorneys' fees motion).  That motion shall be filed with the Court and posted on the settlement website not later than 20 days before Class Members' objections are due.

## VI.  CONCLUSION

For the reasons stated, the Court grants Plaintiff's motion for preliminary approval of class action settlement, and conditionally certifies the Class and Subclass for settlement purposes.  The Court grants leave for Plaintiffs to file a second amended complaint.  The Court also approves the proposed Settlement Administrator Garden City Group, as well as the proposed class representatives.  Pursuant to Docket No. 50, Lieff Cabraser Heimann & Bernstein, LLP and Carney Bates & Pulliam, PLLC, are class counsel.

Within five days of the date of this Order, Plaintiffs shall submit revised summary and long-form notices that address the Court's concerns.  The revised notices shall include redlined or highlighted copies clearly identifying the modifications to the proposed notices.

In addition, the parties are directed to meet and confer and stipulate to a schedule of dates for each event listed below, which shall be submitted to the Court along with a proposed order within ten days of the date of this Order.

| Event | Date |
| --- | --- |
| Deadline to send notice to Class Members | |

| | |
|---|---|
| Filing deadline for attorneys' fees and costs motion | |
| Filing deadline for incentive payment motion | |
| Last date to file objections | |
| Last date to submit claims | |
| Filing deadline for final approval motion | |
| Final fairness hearing and hearing on motions | |

**IT IS SO ORDERED.**

Dated: 1/20/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge