1  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   Michael W. Sobol (CA #194857)
2  msobol@lchb.com
   Nicole D. Sugnet (CA #246255)
3  nsugnet@lchb.com
   275 Battery Street, 29th Floor
4  San Francisco, CA  94111-3339
   Telephone:  (415) 956-1000
5  Facsimile:  (415) 956-1008

6  CARNEY BATES & PULLIAM, PLLC
   Joseph Henry ("Hank") Bates (CA #167688)
7  hbates@cbplaw.com
   Randall K. Pulliam (admitted *pro hac vice*)
8  rpulliam@cbplaw.com
   One Cantrell Building
9  2800 Cantrell, Suite 510
   Little Rock, AR  72212
10 Telephone:  (501) 312-8500
   Facsimile:  (501) 312-8505

11
   Class Counsel and Attorneys for Plaintiffs Napoleon Ebarle,
12 Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle

13

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16

17

18 NAPOLEON EBARLE, JEANNE          Case No.  3:15-cv-00258
   STAMM, BRIAN LITTON, and REINER
19 JEROME EBARLE on behalf of       **PLAINTIFFS' NOTICE OF MOTION AND**
   themselves and all other similarly **MOTION FOR ATTORNEYS' FEES AND**
20 situated,                        **EXPENSES AND FOR SERVICE**
                                    **AWARDS FOR PLAINTIFFS**
21              Plaintiffs,
                                    Date:        June 23, 2016
22 v.                              Time:        2:00 PM
                                    Courtroom:   15, 18th Floor
23 LIFELOCK, INC.,                  Judge:       Hon. Haywood S. Gilliam Jr.
   Defendant.
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ...................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

I.      INTRODUCTION ................................................................................... 1

II.     BACKGROUND ..................................................................................... 2

    A.    Class Counsel Negotiated an Exceptional Result for the Class ................. 2

    B.    Class Counsel Negotiated a Robust Notice Program ................................. 4

    C.    Class Counsel Expended Considerable Time and Resources in Achieving the Settlement .................................................................... 5

III.    ARGUMENT ........................................................................................... 7

    A.    The Requested Fee is Fair, Reasonable, and Justified ............................... 7

        1.    The Fee Should Be Calculated Using the Percentage-of-the-Fund Method .................................................................................. 7

        2.    The Requested Fee Falls Below the Ninth Circuit's "Benchmark" and Below the Average Fee Courts Typically Award in Common Fund Cases ...................................................... 9

        3.    The Requested Fee is Reasonable Considering all Relevant Factors ................................................................................. 10

            a.    Class Counsel Achieved a Strong Monetary Result for the Class ...................................................................... 10

            b.    Class Counsel Achieved Valuable Additional Benefits Beyond the Settlement Fund ............................. 12

            c.    Class Counsel Assumed Significant Risk in Litigating on a Purely Contingent Basis ......................... 13

            d.    Successfully Prosecuting This Matter Required Significant Skill and Effort on the Part of Class Counsel ............................................................................ 15

        4.    A Lodestar-Multiplier "Cross-Check" Confirms the Reasonableness of the Fee Requested ...................................... 16

            a.    Class Counsel's Hourly Rates are Reasonable and Do Not Reflect Their Contingency Fee Risk .................... 17

            b.    The Number of Hours That Class Counsel Worked is Reasonable ....................................................................... 17

            c.    The Fee Requested Represents an Appropriate Multiplier on Class Counsel's Lodestar ........................... 18

    B.    Class Counsel Are Not Seeking Reimbursement of their Costs on Top of the Fee Award, Although Such Reimbursement Would be Justified ...................................................................................... 21

    C.    The Requested Service Awards for Plaintiffs Are Reasonable and Justified ...................................................................................... 21

IV.    CONCLUSION ..................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aichele v. City of Los Angeles*,
No. CV 12-10863, 2015 WL 5286028 (C.D. Cal. Sept. 9, 2015) ......................................... 16

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) ....................................................................................... 20

*Blum v. Stenson*,
465 U.S. 886 (1984) ........................................................................................................... 17

*Buccellato v. AT&T Operations, Inc.*,
No. C10-00463-LHK, 2011 WL 3348055 (N.D. Cal. June 30, 2011) .................................. 20

*Caudle v. Bristow Optical Co.*,
224 F.3d 1014 (9th Cir. 2000).......................................................................................... 18

*Charles I. Friedman, P.C. v. Microsoft Corp.*,
141 P.3d 824 (Ariz. Ct. App. 2006) .................................................................................. 7

*Craft v. County of San Bernardino*,
624 F. Supp. 2d 1113 (C.D. Cal. 2008) ..................................................................... 16, 20

*Davis v. J.P. Morgan Chase & Co.*,
827 F. Supp. 2d 172 (W.D.N.Y. 2011) ............................................................................. 20

*Dyer v. Wells Fargo Bank, N.A.*,
303 F.R.D. 326 (N.D. Cal. 2014) ..................................................................................... 22

*Faigman v. AT & T Mobility LLC*,
No. C-06-04622-MHP, 2011 WL 672648 (N.D. Cal. Feb. 16, 2011) .................................. 22

*Federal Trade Commission v. LifeLock, Inc.*,
Case No. CV-10-00530-PHX-JJT (D. Az.) .............................................................. 2, 5, 13

*Garner v. State Farm*,
No. CV 08 1365 CW, 2010 U.S. Dist. LEXIS 49482
(N.D. Cal. Apr. 22, 2010) ................................................................................................. 9

*Glass v. UBS Fin. Servs., Inc.*,
No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007) aff'd, 331
F. App'x 452 (9th Cir. 2009) ............................................................................................ 16

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)................................................................................... 7, 8, 16

*Harman v. Lyphomed, Inc.*,
945 F.2d 969 (7th Cir. 1991)............................................................................................ 14

*Hartless v. Clorox Co.*,
273 F.R.D. 630 (S.D. Cal. 2011)........................................................................................ 9

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)................................................................................................... 11, 18

*In Re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011)............................................................................... 7, 9, 19, 21

*In Re Lifelock, Inc. Marketing and Sales Practices Litigation*,
MDL Dkt. No. 08-1977................................................................................................... 5

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Linkedin User Privacy Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015)................................................................. 22

*In re Media Vision Tech. Sec. Litig.*,
913 F.Supp. 1362 (N.D. Cal. 1996) ............................................................ 21

*In re Omnivision*,
559 F. Supp. 2d 1036 (N.D. Cal. 2007) ............................................... passim

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015)....................................................................... 22

*In re Portal Software, Inc. Sec. Litig.*,
No. C-03-5138 VRW, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ................... 14

*In re Rite Aid Corp. Sec. Litig.*,
146 F. Supp. 2d 706 (E.D. Pa. 2001) .......................................................... 20

*In re Rite Aid Corp. Secs. Litig.*,
362 F. Supp. 2d 587 (E.D. Pa. 2005) .......................................................... 20

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994).......................................................... 7, 8, 13, 17

*Kerr v. Screen Extras Guild, Inc.*,
526 F.2d 67 (9th Cir. 1975).......................................................................... 17

*Knight v. Red Door Salons, Inc.*,
No. 08-01520 SC, 2009 U.S. Dist. LEXIS 11149
(N.D. Cal. Feb. 2, 2009)................................................................................. 9

*Lopez v. Youngblood*,
No. CV-F-07-0474 DLB, 2011 U.S. Dist. LEXIS 99289
(E.D. Cal. Sept. 1, 2011) ............................................................................... 8

*McKenna v. Sears, Roebuck & Co.*,
116 F.3d 1486 (9th Cir. 1997)...................................................................... 16

*Mills v. Electric Auto–Lite Co.*,
396 U.S. 375 (1970)..................................................................................... 21

*New Eng. Carpenters Health Benefits Fund v. First Databank*,
2009 U.S. Dist. LEXIS 68419 (D. Mass. Aug. 3, 2009)....................................... 20

*Rodriguez v. West Publishing Corp.*,
563 F.3d 948 (9th Cir. 2009)........................................................................ 21

*Six Mexican Workers v. Arizona Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990)........................................................................ 7

*Stanger v. McGee*,
No. 13-56903, 2016 WL 191986 (9th Cir. Jan. 15, 2016) ............................... 17, 19

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003)............................................................ 7, 9, 21, 22

*Steiner v. Am. Broad. Co.*,
248 F. App'x 780 (9th Cir. 2007) ................................................................. 20

*Stovall-Gusman v. W.W. Granger, Inc.*,
No. 13-CV-02540, 2015 WL 3776765 (N.D. Cal. June 17, 2015) .......................... 9

**TABLE OF AUTHORITIES**
(continued)

Page

*Swedish Hosp. Corp. v. Shalala*,
   1 F.3d 1261 (D.C. Cir. 1993) ............................................................................ 7, 8

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ......................................................................... passim

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96, 122 (2d Cir. 2005) ............................................................................ 8

**RULES**

Fed. R. Civ. P. 23(e) ................................................................................................... 7

Rule 30(b)(6) ............................................................................................................... 6

**OTHER AUTHORITIES**

Brian T. Fitzpatrick,
   *An Empirical Study of Class Action Settlements and Their Fee Awards*,
   7 J. EMPIRICAL LEGAL STUDIES 811 (2010) ......................................................... 10

Federal Judicial Center, Manual for Complex Litigation,
   § 27.71, p.336 (4th ed. 2004) ............................................................................. 11

Myriam Gilles & Gary Friedman,
   *Exploding the Class Action Agency Costs Myth: The Social Utility of
   Entrepreneurial Lawyers*, 155 U. PA. L. REV. 103, 140-45 (2006) ....................... 19

Theodore Eisenberg & Geoffrey P. Miller,
   *Attorney Fees in Class Action Settlements: 1993–2008*,
   7 J. EMPIRICAL LEGAL STUDIES 248 (2010) .......................................................... 10

1

## NOTICE OF MOTION

2  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3      **PLEASE TAKE NOTICE** that on June 23, 2016, at 2:00 PM, in the Courtroom of the

4  Honorable Haywood S. Gilliam Jr., United States District Judge for the Northern District of

5  California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs and Class Counsel[1] in

6  the above-captioned matter will and hereby do move the Court for an Order: (a) awarding Class

7  Counsel attorneys' fees and expenses in the amount of $10,200,000; and (b) awarding Plaintiffs

8  service awards in the amount of $2,000 each for their commitment and efforts on behalf of the

9  Class, with all such attorneys' fees, expenses, and service awards to be paid separately by

10  Defendant LifeLock, Inc., in addition to (and not out of) the $68 million non-reversionary

11  Settlement Fund in this action.

12      As discussed in the accompanying memorandum, the amounts requested are fair,

13  reasonable and appropriate under applicable law, and are well-justified under the circumstances

14  of this matter.

15      This motion is based upon this notice of motion and motion; the accompanying

16  memorandum of points and authorities; the declarations filed in support hereof; the proposed

17  Class Settlement Agreement (the "Settlement") previously filed with the Court[2] and all papers

18  filed in support thereof; the argument of counsel; all papers and records on file in this matter; and

19  such other matters as the Court may consider.

20

21  Dated:  March 18, 2016                    By:    /s/ Michael W. Sobol

22                                            LIEFF CABRASER HEIMANN
                                              & BERNSTEIN, LLP
23                                            Michael W. Sobol (CA #194857)
                                              msobol@lchb.com
24                                            Nicole D. Sugnet (CA #246255)
                                              nsugnet@lchb.com

25

26  [1] "Class Counsel" are the firms appointed as Class Counsel pursuant to the Preliminary Approval
    Order (Docket No. 57): Lieff Cabraser Heimann & Bernstein LLP and Carney Bates & Pulliam,
27  PLLC.
    [2] The Settlement Agreement is on file at Docket No. 49-1, Ex. A.
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

CARNEY BATES & PULLIAM, PLLC
Joseph Henry ("Hank") Bates (CA #167688)
Randall K. Pulliam (admitted *pro hac vice*)
11311 Arcade Drive, Suite 200
Little Rock, AR 72212
Telephone:  (501) 312-8500
Fax:  (501) 312-8505

*Class Counsel and Attorneys for Plaintiffs*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Class Counsel's efforts created a $68 million non-reversionary common fund (the "Settlement Fund"), the entire amount of which will go to Class Members as cash payments estimated to be between $16 and $36 per Class Member.  LifeLock has agreed that the costs of administering the Settlement, as well as any attorneys' fees, costs, and service awards to the Plaintiffs, will be paid by LifeLock *on top of* the Settlement Fund.  Class Counsel, having vigorously and effectively represented the Class, respectfully move the Court for an award of reasonable attorneys' fees and expenses totaling $10,200,000 and service awards of $2,000 to each Plaintiff.

The requested fee is fair, reasonable, and appropriate under applicable law.  Class Counsel's fee request is inclusive of, and not in addition to, their reasonable expenses incurred in this litigation.  If granted, the fee would represent approximately 12.6 percent of the total monetary payout by LifeLock, which is well below the 25 percent "benchmark" that Ninth Circuit courts apply in common fund cases like this one and is therefore exceedingly reasonable. Moreover, the requested fee is well-justified under the circumstances of this litigation, given the substantial monetary benefits that Class Counsel's efforts generated for Class Members, the challenges and risks that Class Counsel assumed in pursuing this matter on a contingency basis, and the time and resources that Class Counsel expended prior to reaching a Settlement and overseeing Settlement administration.

Notably, the reaction from the Class has been very positive thus far.  As of March 17, 2016—five weeks prior to the claims deadline of April 20, 2016—119,218 Class Members have submitted claims.[1]  Given the fact that each of the 3.4 million Subclass Members will receive an *automatic* payment under the Settlement—regardless of whether they submit a claim—it is expected that at least 52 percent (and likely more) of Class Members will receive payments.

For the foregoing reasons and the others detailed below, Class Counsel respectfully

---

[1] Declaration of Michael W. Sobol in Support of Motion for Attorneys' Fees ("Sobol Decl.") ¶ 47.

1   request that the Court grant their motion for attorneys' fees and expenses and grant service

2   awards in the amount of $2,000 each for the Plaintiffs to compensate them for their commitment

3   and efforts on behalf of the Class.

4   **II.**     **BACKGROUND**

5          **A.**     **Class Counsel Negotiated an Exceptional Result for the Class**

6          The $68,000,000 Settlement Fund represents an exceptional result for the Class.  Class

7   Counsel vigorously advocated that individual settlement payments be meaningful to Class

8   Members, which could only be achieved through a sizable Settlement Fund given the size of the

9   Class.  Indeed, LifeLock agreed to the Settlement Fund only after two contentious full-day

10  mediation sessions and a mediator's proposal set forth by Justice Howard Wiener.

11         The parties refrained from commencing any negotiation regarding attorneys' fees until

12  after reaching agreement as to the amount of the $68 million Settlement Fund and the other

13  material terms of the Settlement.[2]  Although Class Counsel's efforts warranted a fee in the

14  amount of 25 percent of the Settlement Fund—25 percent of a common fund being the

15  "benchmark" indicator of a reasonable fee in the Ninth Circuit—Class Counsel instead stated it

16  would agree to a substantially lower fee of just 15 percent of the Settlement Fund.[3]  Accordingly,

17  Class Counsel executed a memorandum of understanding providing that they would apply for a

18  15 percent fee to be paid from the Settlement Fund, which the parties contemplated would be

19  memorialized in a final written agreement.[4]

20         Subsequent to signing the memorandum of understanding, but before a final settlement

21  agreement was completed, the parties entered into further negotiations, at LifeLock's request, to

22  discuss the coordination of this class action settlement with the potential resolution of a pending

23  enforcement action brought by the Federal Trade Commission, *Federal Trade Commission v.*

24  *LifeLock, Inc.*, Case No. CV-10-00530-PHX-JJT (D. Az.) ("FTC Action").[5]  After those

25

26  _____

[2] *Id.* ¶ 48.

27  [3] *Id.*

[4] *Id.*

28  [5] *Id.* ¶ 49.

negotiations, LifeLock and the FTC reached an agreement whereby LifeLock was required to pay $100 million into the Court's registry in the FTC action, of which $68 million would be available to fund the Settlement Fund in this Action.[6]  As this funding arrangement required the agreement of the Class, Class Counsel insisted on revised terms to protect the pending class settlement. First, and foremost, Class Counsel obtained LifeLock's agreement that it would guarantee timely funding of $68 million to the Settlement Fund, regardless whether or not LifeLock timely effectuated a distribution of those funds from the Court's registry in the FTC Action.[7]  Second, LifeLock agreed that Class Counsel's attorneys' fees, the Plaintiffs' service awards, and settlement administration costs would be paid *separately and in addition to* the $68 million Settlement Fund, thereby making the entirety of the $68 million Settlement Fund available for payment directly to Class Members.[8]  By agreeing to a (possible) indirect funding of the Settlement via the Court's registry in the FTC Action, Class Counsel not only protected the $68 million Settlement Fund, the value to the Class increased by approximately $12.8 million.  As a result, Class Members will receive higher individual payments under the Settlement.  Despite this increase in value to the Class, Class Counsel did not require, and does not request, any fees in addition to the amount originally agreed under the memorandum of understanding, *i.e.*, the amount equivalent to 15 percent of the $68 million Settlement Fund, or $10.2 million.[9]  In other words, the value of the Settlement increased, but Class Counsel seeks no additional fee for it.

The value of the Settlement, therefore, is potentially $80,808,000 (the $68 million Fund, plus attorneys' fees and costs of $10.2 million, plus service awards of $8,000, plus estimated settlement notice and administration costs of $2.6 million).  Class Counsel's requested fee of $10.2 million, originally negotiated as 15 percent of the $68 million fund, represents only 12.6% of the final, total $80,808,000 Settlement.

Roughly 51% ($34.6 million) of the $68 million Settlement Fund will be allocated to the

---

[6] *Id.* ¶ 50.

[7] *Id.* ¶ 51.

[8] *Id.*

[9] *Id.* ¶ 52.

- 3 -

3.4 million Subclass Members for automatic cash payments, regardless of whether they make a claim.[10]  The remaining 49% of the Settlement Fund ($33.4 million) will be made available to all Class Members, including Subclass Members, to make a claim for $20.[11]  Any residual, unclaimed funds left over from the claimant fund will be allocated to Subclass Members as part of their automatic payments.[12]  Assuming a 3 to 10 percent claims rate, Class Counsel estimate the following cash payments: $20 for Class Members who submit claims and who are not also Subclass Members; between $16 and $20 for Subclass Members who *not* submit claims; and between $36 and $39 for Subclass Members who *do* submit claims.

Any funds remaining in the Settlement Fund due to checks that remain uncashed 120 days after the payment date will be distributed *pro rata* to claimants who cashed their initial payment checks.[13]  If funds remain 120 days after that second distribution, the remainder will go to the FTC.[14]

### B. Class Counsel Negotiated a Robust Notice Program

Class Counsel negotiated a robust notice program designed to ensure that all or nearly all Class Members will receive notice of the Settlement.  The program includes direct, individual notice to Class Members via email or mail, utilizing LifeLock's internal records.[15]  The notice informs Class Members of the estimated amounts of each Class and Subclass Member's cash payments.[16]  In addition to direct notice, notice of the Settlement has been posted on the Settlement Website and published in USA Today.[17]  The Settlement Administrator has also established a toll-free telephone number where Class Members can obtain further information about the Settlement and their rights.[18]

---

[10] Dkt. No. 49-1, Ex. A at ¶¶ 44, 58.

[11] *Id.* ¶ 68.

[12] *Id.* ¶ 70.

[13] *Id.* ¶ 63.

[14] *Id.*

[15] Dkt. No. 49-1, Ex. A ¶ 65(A).

[16] Dkt. No. 59.

[17] Dkt. No. 49-1, Ex. A ¶ 65(C).

[18] *Id.* ¶¶ 65(E) & 65(F).

- 4 -

The Settlement also involves an easy claims process. Class Members need only to fill out a one-page form, and have the option of submitting their claims electronically via the Settlement Website, or by email or mail to the Settlement Administrator.[19]

**C.      Class Counsel Expended Considerable Time and Resources in Achieving the Settlement**

This Settlement was reached only after a thorough investigation into the legal and factual issues in the case. Before filing suit, Class Counsel conducted an extensive investigation into LifeLock's marketing and advertising materials, its terms of service, and its Master Insurance Policy, as well as industry facts and the applicable law.

During the pendency of the action, Class Counsel reviewed and analyzed thousands of documents (totaling over 10,500 pages) informally produced by LifeLock relating to the key issues, including, among other things, LifeLock's advertising, its policies and practices in sending alerts, any issues that resulted in delays in sending alerts, and the scope of its identity and credit fraud monitoring network. These documents included, for example: (i) exemplars of 416 print advertisements; (ii) exemplars of 75 aired television commercials; (iii) account histories for the individual Plaintiffs; (iv) the Settlement Agreement in the Multi District Litigation entitled *In Re LifeLock, Inc. Marketing and Sales Practices Litigation*, MDL Dkt. No. 08-1977 in the United States District Court for the District of Arizona; (iv) certain documents filed in the matter entitled *Federal Trade Commission v. LifeLock*, No. 10-CV-00530; (vi) transcripts of depositions taken in other litigation involving LifeLock; (vii) an affidavit signed by Stephen Burke, a former LifeLock employee; (viii) consumer surveys LifeLock conducted concerning certain of its advertisements; (ix) a "white paper" that LifeLock provided to the FTC in connection with its 18-month investigation; (x) contracts between LifeLock and its vendors; (xi) LifeLock call-center scripts; (xii) LifeLock's terms of service during the alleged Class Period; (xiii) insurance policies underlying LifeLock's $1 million guarantee; (xiv) information regarding LifeLock subscribers; (xv) alert histories including times when alerts may not have been delivered immediately; (xvi) product pricing; (xvii) identity theft protection plan cancellations; (xviii) financial institutions

---

[19] *Id.* ¶¶ 65(d)(5) & (E); *see also* Dkt. No. 59.

within LifeLock's monitoring network; and (xix) LifeLock's responses to numerous of the FTC's requests for more information.[20]

Class Counsel also took Rule 30(b)(6) depositions of two key LifeLock employees: (1) Gregory Lim, Vice President Enterprise Risk and Strategic Operations; and (2) Sharma Upadhyayula, Senior Director, Product Management.  These depositions covered various topics, including LifeLock's policies and practices in delivering alerts to customers and how those policies and practices changed over time.[21]

Class Counsel prepared two confidential mediation briefs in advance of the two mediation sessions with Justice Wiener.[22]  The mediation was adversarial and contentious; the parties were able to come to an agreement only with the assistance of Justice Wiener through a mediator's proposal.[23]

Following the second mediation session, Class Counsel worked hard on negotiating and finalizing the settlement, including by engaging in several meetings regarding coordination of the Settlement with LifeLock's settlement with the FTC.[24]  Class Counsel also drafted the written settlement agreement, the forms of notice and the revised forms of notice, the claim form, and the other exhibits to the settlement.[25]  Class Counsel have also worked closely with the Settlement Administrator on the design and implementation of the notice program and claims process.[26]  In addition, Class Counsel have spoken with and continue to speak with hundreds Class Members about the Settlement.[27]

---

[20] Joint Declaration of Hank Bates and Michael W. Sobol in Support of Plaintiffs' Motion for Preliminary Approval ("Joint Decl."), filed at Dkt. No. 49-1, ¶ 11.
[21] *Id.* ¶ 13.
[22] *Id.* ¶¶ 9 & 11.
[23] *Id.* ¶ 12.  *See also* Declaration of Howard B. Wiener in Support of Plaintiffs' Motion for Preliminary Approval, filed at Dkt. No. 49-2, ¶¶ 8 & 10.
[24] Sobol Decl. ¶ 41; Declaration of Hank Bates in Support of Plaintiffs' Motion for Attorneys' Fees ("Bates Decl.") ¶ 39.
[25] *Id.*
[26] Sobol Decl. ¶ 42; Bates Decl. ¶ 40.
[27] Sobol Decl. ¶ 42.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    ARGUMENT

#### A.    The Requested Fee is Fair, Reasonable, and Justified

In deciding whether the requested fee amount is appropriate, the Court's role is to determine whether such amount is "fundamentally 'fair, adequate, and reasonable.'" *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)).  *See also In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1294-95 n.2 (9th Cir. 1994) (overriding principle is that the fee award be "reasonable under the circumstances").  Because Arizona law governed the claims in the case, it also governs the award of fees.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  However, Arizona courts cite federal law in determining the appropriate fees to award in common fund cases, *see, e.g.*, *Charles I. Friedman, P.C. v. Microsoft Corp.*, 141 P.3d 824, 831 (Ariz. Ct. App. 2006), and Plaintiffs therefore cite federal law in this motion.  Ninth Circuit law makes clear that Class Counsel's fee request is reasonable, appropriate, and justified.

#### 1.    The Fee Should Be Calculated Using the Percentage-of-the-Fund Method

Courts have discretion to use either the percentage-of-the-fund method or the lodestar-plus-multiplier method to determine a reasonable fee.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011); *Burke v. Ariz. State Ret. Sys.*, 77 P.3d 444, 447 (Ariz. Ct. App. 2003).  Regardless of which approach is used, the ultimate objective is to ensure that the fee awarded to class counsel is "reasonable under the circumstances." *Wash. Pub. Power*, 19 F.3d at 1295.

Class Counsel respectfully submit that where, as here, contingency fee litigation has produced a common fund for the class, the fairest and most efficient way to calculate a reasonable fee would be to apply the percentage-of-the-fund method.  This method comports with the legal marketplace where counsel's success is frequently measured in terms of the results counsel has achieved.  *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.C. Cir. 1993) (explaining that in common fund cases "the monetary amount of the victory is often the true measure of [counsel's] success").  By assessing the amount of the fee in terms of the amount of the benefit

1    conferred on the class, the percentage method "more accurately reflects the economics of

2    litigation practice" which, "given the uncertainties and hazards of litigation, must necessarily be

3    result-oriented." *Id.* Further, the percentage method most effectively aligns the incentives of the

4    class members and their counsel, encouraging counsel to focus on maximizing the relief available

5    to the class, rather than their own lodestar hours. *See Vizcaino*, 290 F.3d at 1050 n.5; *In re*

6    *Activision Sec. Litig.*, 723 F. Supp. 1373, 1375 (N.D. Cal. 1989); 141 P.3d 824; *Wal-Mart Stores,*

7    *Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 122 (2d Cir. 2005) (citation omitted). Finally, the

8    percentage method comports with the established practice in the private legal market to reward

9    attorneys for taking the risk of nonpayment by paying them a premium for successfully resolving

10   contingency fee cases. *See Wash. Pub. Power*, 19 F.3d at 1299. If this method did not exist,

11   "very few lawyers could take on the representation of a class client given the investment of

12   substantial time, effort, and money, especially in light of the risks of recovering nothing." *Id.* at

13   1300 (citation omitted).

14          For these and other reasons, the percentage-of-the-fund method is applied more frequently

15   than the lodestar-plus-multiplier method in common fund cases in the Ninth Circuit. *See, e.g., In*

16   *re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2007) ("[U]se of the percentage

17   method in common fund cases appears to be dominant."); *Vizcaino*, 290 F.3d at 1050 ("[T]he

18   primary basis of the fee award remains the percentage method."); *Lopez v. Youngblood*, No. CV-

19   F-07-0474 DLB, 2011 WL 10483569, at *11 (E.D. Cal. Sept. 2, 2011) ("[W]hile the Court has

20   discretion to use either a percentage of the fund or a lodestar approach in compensating class

21   counsel . . . the percentage of the fund is the typical method of calculating class fund fees."); *In re*

22   *Activision Sec. Litig.*, 723 F. Supp. 1373, 1374-78 (N.D. Cal. 1989) (discussing advantages of

23   percentage of recovery method in common fund cases). By contrast, courts tend to rely on the

24   lodestar method under circumstances not applicable here; *i.e.*, where a common fund is not

25   created or "there is no way to gauge the net value of the settlement or of any percentage thereof."

26   *Hanlon*, 150 F.3d at 1029.

27          Class Counsel accordingly proffer that the Court should use the percentage-of-the-fund

28   approach to determining the award of attorneys' fees in this action with its substantial, non-

1    reversionary Settlement Fund.

2    **2.    The Requested Fee Falls Below the Ninth Circuit's "Benchmark" and Below the Average Fee Courts Typically Award in Common Fund Cases**

3

4        In the Ninth Circuit, the "benchmark" for a fee award in a common fund case is 25

5    percent of the fund achieved.  *Vizcaino*, 290 F.3d at 1048-1050; *Stovall-Gusman v. W.W.*

6    *Granger, Inc.*, No. 13-CV-02540, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015).  Courts

7    may stray from the benchmark only if "special circumstances" so warrant.  *In re Bluetooth*, 654

8    F.3d at 942.  Courts in this District often find that circumstances warrant awarding a percentage

9    of the fund that is *higher* than the 25 percent benchmark.  *Omnivision*, 559 F. Supp. 2d at 1047

10   ("[I]n most common fund cases, the award exceeds th[e] benchmark."); *see also Vizcaino*, 290

11   F.3d at 1048-1050 (awarding 28%); *Garner v. State Farm*, No. CV 08 1365 CW, 2010 U.S. Dist.

12   LEXIS 49482, at *5-6 (N.D. Cal. Apr. 22, 2010) (awarding 30%); *Knight v. Red Door Salons,*

13   *Inc.*, No. 08-01520 SC, 2009 U.S. Dist. LEXIS 11149, at *17 (N.D. Cal. Feb. 2, 2009) (same).

14       Here, LifeLock has agreed to establish a $68 million fund, and to pay Court-awarded

15   attorneys' fees and expenses and services awards, as well as settlement notice and administration

16   costs, on top of the fund amount.  When such amounts are included—as they must be for the

17   purposes of determining a fee award—the total monetary payout by LifeLock is approximately

18   $80,808,000.  *See Staton*, 327 F.3d at 974-75 (9th Cir. 2003) (explaining that it is appropriate to

19   include all amounts paid by defendant, including notice costs, in defining the "fund" used for

20   applying percentage-of-the-fund method); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 645 (S.D. Cal.

21   2011) ("In cases such as this one, where attorneys' fees are paid separately from the claim fund,

22   courts base the fee award on the entire settlement fund as that package is the benefit to the class.

23   This amount includes notice and administration costs and separately paid attorneys' fees and

24   costs.").  The $10,200,000 fee that Class Counsel requests represents 12.6 percent of that total

25   payout—which is far less than the Ninth Circuit's 25 percent benchmark.

26       Empirical studies of class action settlements show that Class Counsel's fee request not

27   only falls far below the benchmark in the Ninth Circuit, but also falls far below the average

28   percentage fee awarded in other federal courts.  In 2010, law professors Theodore Eisenberg and

1   Geoffrey Miller published a study analyzing class action settlements throughout the federal courts

2   from 1993 to 2008.  Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action*

3   *Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010).[28]  The study found that the

4   average fee for consumer class actions across jurisdictions was 25 percent of the recovery, or

5   $10.04 million.  *Id.* at Tab 5.  The study further found that the average fee award from settlements

6   (regardless of case type) in the $38.3 to $69.6 million range was 20.5%, and the average award

7   from settlements in the $69.6 to $175.5 range was 19.4%.  *Id.* at Tab. 7.  Also in 2010, law

8   professor Brian Fitzpatrick published a paper analyzing every federal class action settlement in

9   2006 and 2007.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their*

10  *Fee Awards*, 7 J. EMPIRICAL LEGAL STUDIES 811 (2010).[29]  Fitzpatrick found that the average fee

11  award for settlements of between $72.5 and $100 million was 23.7%.  *Id.* at 839.  Thus, Class

12  Counsel's request of 12.6 percent of the Settlement Fund falls well below the average fee that

13  courts across all jurisdictions typically award.

14          Class Counsel's fee request is therefore presumptively reasonable.

15                  **3.      The Requested Fee is Reasonable Considering all Relevant Factors**

16          Courts in the Ninth Circuit consider the following factors to determine whether special

17  circumstances exist to stray from the benchmark 25 percent fee award: (1) the results achieved;

18  (2) whether there are benefits to the class beyond the generation of a cash fund; (3) the contingent

19  nature of the fee; and (4) the complexity of the case and skill required of class counsel.  *Vizcaino*,

20  290 F.3d at 1048-1050; *In re Omnivision*, 559 F. Supp. 2d at 1046.  Application of these factors

21  make clear that a 25 percent fee would be justified here, and that Class Counsel's request of a fee

22  of about half of the 25 percent benchmark amount is exceedingly fair and reasonable.

23                  **a.      Class Counsel Achieved a Strong Monetary Result for the Class**

24          The results obtained for the class are generally considered to be the most important factor

25

---

26  [28] Available at
    http://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=2468&context=facpub

27  [29] Available at
    http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/2012_aba_annua

28  l/12_6.authcheckdam.pdf

1    in determining the appropriate fee award in a common fund case.  *See Hensley v. Eckerhart*, 461

2    U.S. 424, 435-36 (1983); *Vizcaino*, 290 F.3d at 1049; *Omnivision*, 559 F. Supp. 2d at 1046; *see*

3    *also* Federal Judicial Center, Manual for Complex Litigation, § 27.71, p. 336 (4th ed. 2004) (the

4    "fundamental focus is on the result actually achieved for class members").

5         Here, the $68 million Fund achieved represents a strong monetary result for the Class,

6    particularly given the harm alleged and the substantial risks and delay inherent in ongoing

7    litigation.  It should be noted that the $68 million Fund is not merely a potential or hypothetical

8    value of the monetary relief achieved.  Nor is this a situation where the bulk of settlement funds

9    will go to a *cy pres* recipient instead of to the class.  Instead, the Settlement includes a multi-

10   phase payout system that ensures that as much of the Fund as possible goes to Class Members,

11   with only limited amounts going to the FTC in the event that there are any uncashed checks

12   following and initial distribution of the fund as well as a second distribution to claimants who

13   cashed their initial distribution checks.  Under no circumstance will any of the Settlement Fund

14   revert to LifeLock.

15        Assuming a 3 to 10 percent claims rate, most Class Members will receive about the

16   amount they paid for one month of enrollment in a LifeLock identity theft protection plan, if not

17   slightly more for Subclass Members.  As the Court noted in its order preliminarily approving the

18   Settlement (Dkt. No. 57), this is a fair result, particularly given LifeLock's assessment of the total

19   likely recovery, as well as the risks of ongoing litigation.  LifeLock represented to the Court at the

20   preliminary approval hearing that, during the relevant timeframe, LifeLock's revenue was

21   $504,000,000 and that 99.8 percent of all alerts were delivered.  Dkt. No. 57 at 11.  LifeLock

22   concluded from these asserted facts that the most likely recovery for the Class was approximately

23   $10 million.  *Id*.  While Class Counsel does not agree with LifeLock's estimation of the total

24   value of the case, counsel for both parties agree that valuing and calculating damages for the

25   claims here would likely be difficult.  This is particularly true given that LifeLock's identity theft

26   plans arguably provided *some* value to all or nearly all Class Members, and determining the

27   difference between the value of the services Class Members paid for and the value of the services

28   actually received (*i.e.* services that allegedly failed to deliver on various promises) would be

challenging.  The Settlement provides that *all* Class Members may make a claim for immediate cash relief, regardless of whether or not LifeLock failed to deliver or was late in delivering an alert to any particular Class Member, or whether a claimant could ultimately prove actual harm or damages resulting from LifeLock's conduct.

Moreover, LifeLock has vigorously denied Plaintiffs' allegations of wrongdoing, and, absent settlement, would likely defend this action aggressively at multiple steps prior to trial, including a motion to dismiss, motion for summary judgment, and opposition to class certification.  Specifically, LifeLock contends that it did not intentionally delay alerts and that it provided comprehensive identity theft protection services during the relevant time.[30]  LifeLock also claims that any delays did not result in any actual credit card fraud or identity theft, and so it does not even concede the Cass Members suffered injury.[31]  Finally, LifeLock preemptively argues that class certification would be unlikely.[32]  Although Plaintiffs disagree with each of LifeLock's views, there is at least some risk that, absent Settlement, the Class would have recovered nothing.

The substantial monetary relief achieved, particularly under the circumstances, militates strongly in favor of the requested fee award.

### b.   Class Counsel Achieved Valuable Additional Benefits Beyond the Settlement Fund

While the Settlement does not provide for injunctive relief in addition to the sizable monetary recovery, this should not weigh against Class Counsel's fee request because injunctive relief was not necessary under the circumstances.

First, LifeLock already has made substantial changes to its advertisements and practices, eliminating the need for injunctive relief.  Specifically, following the filing of this Action, as of April 30, 2015, LifeLock has made substantial changes to both its advertising and alert systems. LifeLock no longer promises that it will provide "continuous, uninterrupted" alerts 24 hours a

---

[30] Joint Decl. ¶ 31.

[31] *Id.*

[32] *Id.*

1   day, 7 days a week, 365 days a year.[33]  Perhaps more importantly, LifeLock made several

2   technical improvements to its systems so that it is now able to deliver alerts during planned and

3   unplanned system outages through the use of "parallel tracks" that allow maintenance of the

4   system on one track while alerts continue to be delivered to customers on another track.[34]  In

5   addition, LifeLock now has emergency backup systems through which alerts may be processed

6   and delivered in the event that all of its "parallel tracks" were to fail for some reason.[35]

7          Second, LifeLock is already subject to a permanent injunction in related litigation between

8   it and the FTC.  The injunction prohibits LifeLock from, among other things, misrepresenting its

9   identity theft protection service.  It also requires LifeLock to establish a comprehensive

10  information security program.  *FTC v. LifeLock Inc.*, No. 2:10-cv-00530 (D. Ariz), Dkt. No. 67.

11  After the principle terms in this case were agreed to, LifeLock negotiated a separate proposed

12  agreement with the FTC to settle allegations that it had violated the injunction.  *See* Dkt. 56-1.

13         Therefore, although this Settlement does not include equitable relief, this factor does not

14  weigh against awarding Class Counsel their reasonable fee request of 12.6 percent of the

15  Settlement Fund.

16                        **c.    Class Counsel Assumed Significant Risk in Litigating on a
                                  Purely Contingent Basis**

17

18         Courts have long recognized that the public interest is served by rewarding attorneys who

19  assume representation on a contingent basis with an enhanced fee to compensate them for the risk

20  that they might be paid nothing at all for their work.  *See Wash. Pub. Power*, 19 F.3d at 1299

21  ("Contingent fees that may far exceed the market value of the services if rendered on a non-

22  contingent basis are accepted in the legal profession as a legitimate way of assuring competent

23  representation for plaintiffs who could not afford to pay on an hourly basis regardless whether

24  they win or lose."); *Vizcaino*, 290 F.3d at 1051 (courts reward successful class counsel in

25  contingency case "by paying them a premium over their normal hourly rates").

26         Class Counsel prosecuted this matter on a purely contingent basis, agreeing to advance all

27  [33] *Id.* ¶ 20.
    [34] *Id.*
28  [35] *Id.*

1    necessary expenses and agreeing to receive a fee only if there was a recovery.  Additionally,

2    Class Counsel had to turn down opportunities to work on other cases in order to devote the

3    appropriate amount of time and resources necessary to handle this matter.[36]

4          While Class Counsel were able to settle this case prior to significant motions practice,

5    their outlay of resources has nevertheless been significant.  Class Counsel conducted a thorough

6    review of over 10,000 pages of documents, and also conducted two depositions, to ensure that the

7    result reached would be fair to Class Members.[37]  Class Counsel also engaged in arms-length and

8    difficult negotiations.[38]  The fact that Class Counsel were able to secure a fairly speedy result for

9    Class Members should not be counted against them, particularly given (1) the size of the Fund

10   that they were able to achieve for Class Members; (2) the fact that they are requesting a fee well

11   below the Ninth Circuit's 25 percent benchmark; and (3) any award of attorneys' fees will be paid

12   on top of, and not out of, the Settlement Fund.  Awarding a lower fee than that requested, based

13   on Class Counsel's efficiency in resolving this case, would create a perverse incentive on the part

14   of counsel for other class actions to "expend more hours than may be necessary on litigating a

15   case so as to recover a reasonable fee."  *Vizcaino*, 290 F.3d at 1050 n.5.

16         Furthermore, the risk that Class Counsel undertook must be measured at the outset of the

17   case, without considering *ex post* how or when the case was ultimately resolved.  *See In re Portal*

18   *Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *14 (N.D. Cal. Nov. 26,

19   2007) ("*ex ante* risk of nonrecovery in the litigation" is one factor in determining the

20   reasonableness of a multiplier).  *See also Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir.

21   1991) ("[T]he judge should view the multiplier from an ex ante perspective; that is, what size risk

22   the attorney assumed at the outset by taking this type of case.").  Class Counsel undertook this

23   litigation despite the very real risk that they may never be compensated at all.  Indeed, the risk

24   was magnified in this case, given the formidable defenses and challenges that they faced in

25   prosecuting this action.  Specifically, LifeLock aggressively argued that there existed little to no

26

27   [36] Sobol Decl. ¶¶ 15-17; Bates Decl. ¶¶ 16-18.

     [37] Joint Decl. ¶¶ 11, 13, 29; Sobol Decl. ¶ 38; Bates Decl. ¶ 36.

28   [38] Joint Decl. ¶¶ 10 & 12, ; Sobol Decl. ¶ 41; Bates Decl. ¶ 39.

1    evidence showing that Class Members were harmed by the alleged practices of, for example,

2    delayed or undelivered alerts.  While Plaintiffs continue to disagree with LifeLock's view of the

3    case, Plaintiffs acknowledge that proving which Class Members were impacted by LifeLock's

4    practices—to the extent such proof was required—would be difficult and would also raise class

5    certification issues.  Further, Class Counsel acknowledge that determining the value Class

6    Members placed on the alleged misrepresentations, and comparing that value to the benefits Class

7    Members received from LifeLock's services for the purpose of calculating restitution or damages,

8    could be difficult.

9          Accordingly, this factor weighs in favor of granting Class Counsel's fee request.

10
          **d.**      **<u>Successfully Prosecuting This Matter Required Significant Skill</u>**
11                   **<u>and Effort on the Part of Class Counsel</u>**

12          The "prosecution and management of a complex national class action requires unique

13    legal skills and abilities" that are to be considered when determining a reasonable fee.  *In re*

14    *Omnivision*, 559 F. Supp. 2d at 1047 (citation omitted); *see also Vizcaino*, 290 F.3d at 1048 (the

15    complexity of the issues involved and skill and effort displayed by class counsel are additional

16    factors used in determining the proper fee under the percentage-of-the-fund approach).

17          Class Counsel in this matter are experienced litigators who have successfully prosecuted

18    and resolved numerous large consumer class actions and other complex matters, including cases

19    regarding false advertising and unfair business practice claims.[39]  Class Counsel's skill and

20    relevant experience were critical in achieving an exceptional result for the Class in an expeditious

21    manner, despite LifeLock's formidable opposition and aggressive positions during negotiations.

22          Moreover, prosecuting and settling this action required commitments of time and

23    resources by Class Counsel.  Among other important tasks, Class Counsel have done the

24    following:

25        •   Conducted extensive factual investigation and legal research;

26        •   Deposed two senior LifeLock executives;

27        •   Reviewed and analyzed thousands of documents produced by LifeLock in informal

---

28    [39] Sobol Decl. ¶¶ 2-5, 9-10; Bates Decl. ¶¶ 2-14.

discovery;

- Prepared for and participated in multiple mediation sessions;

- Negotiated the Settlement, and drafted the settlement agreement and exhibits thereto;

- Prepared settlement approval papers;

- Oversaw (and continue to oversee) settlement implementation issues; and

- Discussed (and continue to discuss) the Settlement with Class Members.

*See supra* section II.C.  The skill and effort displayed by Class Counsel here further justifies the requested fee award.

### 4. A Lodestar-Multiplier "Cross-Check" Confirms the Reasonableness of the Fee Requested

A court applying the percentage-of-the-fund method may, but is not required to, use the lodestar-multiplier method as a "cross-check on the reasonableness of a percentage figure." *Vizcaino*, 290 F.3d at 1050 & n.5; *Craft v. County of San Bernadino*, 624 F. Supp. 2d 1113, 1122 (C.D. Cal. 2008) ("A lodestar cross-check is not required in this circuit, and in some cases is not a useful reference point."); *Aichele v. City of Los Angeles*, No. CV 12-10863, 2015 WL 5286028, at *6 (C.D. Cal. Sept. 9, 2015) (same).  A lodestar cross-check may not be useful here, where the starting point is a fee request well below the presumptively reasonable benchmark of 25 percent of a common fund.  *See, e.g., McKenna v. Sears, Roebuck & Co.,* 116 F.3d 1486 (9th Cir. 1997) (lodestar cross-check unnecessary where counsel sought fee of only about 12 percent of the fund). It is also often not useful where, like here, an "early" settlement achieved exceptional results for the class.  *See, e.g., Glass v. UBS Fin. Servs., Inc*., No. C-06-4068 MMC, 2007 WL 221862, at *16 (N.D. Cal. Jan. 26, 2007) aff'd, 331 F. App'x 452 (9th Cir. 2009) ("Under the circumstances presented here, where the early settlement resulted in a significant benefit to the class, the Court finds no need to conduct a lodestar cross-check.").  Regardless, application of a lodestar-plus-multiplier cross-check confirms that Class Counsel's requested fee is reasonable.

The first step in the lodestar-plus-multiplier method is to multiply the number of hours counsel reasonably expended by a reasonable hourly rate.  *Hanlon,* 150 F.3d at 1029.  Once this raw lodestar figure is determined, the court "*must* apply a risk multiplier to the lodestar when (1)

attorneys take a case with the expectation they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence the case was risky." *Stanger v. McGee*, No. 13-56903, 2016 WL 191986, at *4 (9th Cir. Jan. 15, 2016) (emphasis added).  *See also Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

<b>a.    Class Counsel's Hourly Rates are Reasonable and Do Not Reflect Their Contingency Fee Risk</b>

The accompanying declarations of Class Counsel set forth the billing rates used to calculate their lodestars.[40]  In assessing the reasonableness of an attorney's hourly rate, courts consider whether the claimed rate is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895-96 n.11 (1984).  Courts apply each biller's current rates for all hours of work performed, regardless of when the work was performed, as a means of compensating for the delay in payment. *Wash. Pub. Power*, 19 F.3d at 1305.

Class Counsel here are experienced, highly regarded members of the bar.  They have brought to this case extensive experience in the area of consumer class actions and complex litigation, including specific experience litigating and settling cases regarding misleading advertising and unfair business practices.[41]  Class Counsel's customary rates, which were used in calculating the lodestar here, are in line with prevailing rates in this District, have been approved by courts in this District and other courts.[42]  Moreover, Class Counsel's rates are paid by hourly-paying clients, and thus do not reflect the contingency fee risk that Class Counsel undertook in taking on this case.[43]

<b>b.    The Number of Hours That Class Counsel Worked is Reasonable</b>

Class Counsel and their staffs have devoted a total of approximately 1,988.4 hours to this litigation, and have a total unadjusted lodestar to date of approximately $1,247,754.[44]  These

---

[40] Sobol Decl. ¶ 29; Bates Decl. ¶ 27.
[41] Sobol Decl. ¶¶ 2-5, 9-10; Bates Decl. ¶¶ 2-14.
[42] Sobol Decl. ¶¶ 30, 32-33; Bates Decl. ¶¶ 28-30.
[43] Sobol Decl. ¶ 31.
[44] Sobol Decl. ¶ 18; Bates Decl. ¶ 19.

1 figures do not include any time spent on this motion, nor do they include the additional time that

2 Class Counsel will have to spend going forward in obtaining final approval of, and implementing,

3 the Settlement.[45]

4     Class Counsel billed a reasonable number of hours in this litigation.  *See Caudle v.*

5 *Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Cir. 2000) (counsel entitled to recover for all

6 hours reasonably expended).  In order to be in a position to evaluate and negotiate the Settlement,

7 Class Counsel were required to spend considerable time investigating the factual issues involved,

8 researching and analyzing applicable law and the potential legal claims, and speaking with class

9 members about their experiences.  In addition, in conjunction with the mediation, Class Counsel

10 committed time and resources in informal discovery, reviewing and analyzing thousands of

11 documents and deposing key witnesses.[46]

12     These tasks were performed for the benefit of the Class, and contributed to the success

13 Class Counsel achieved.  Class Counsel spent reasonable amounts of time on these tasks.

14 Further, Class Counsel made every reasonable effort to prevent the duplication of work or

15 inefficiencies.[47]

16         **c.**    **The Fee Requested Represents an Appropriate Multiplier on**
**Class Counsel's Lodestar**

17

18     Class Counsel request a fee of $10,200,000, which includes Class Counsel's costs.  This

19 represents a multiplier of approximately 8.17 on Class Counsel's total lodestar of $1,247,754

20 incurred in this litigation.  This lodestar figure does not include any of the time Class Counsel has

21 spent on applying for fees, or any of the time Class Counsel will spend in drafting the final

22 approval papers and presenting the Settlement at the final fairness hearing, assisting Class

23 Members with individual inquiries, overseeing aspects of the claims process, working with the

---

24 [45] Sobol Decl. ¶¶ 21-26; Bates Decl. ¶¶ 21, 23-24.

25 [46] Sobol Decl. ¶¶ 35-42; Bates Decl. ¶¶ 32-40.  It is well-established that in moving for fees, counsel are "not required to record in great detail how each minute of his time was expended."

26 *Hensley v. Eckerhart*, 461 U.S. 424, 437 n.12 (1983).  Instead, counsel need only "identify the general subject matter of his time expenditures."  *Id.*  Nevertheless, for the Court's convenience, Class Counsel categorize the hours billed by tasks.  If the Court prefers to review Class Counsel's

27 detailed time records, Class Counsel will make them available for *in camera* review.

28 [47] Sobol Decl. ¶¶ 20, 43-44; Bates Decl. ¶¶ 22, 41-42.

1  Settlement Administrator to resolve any administration issues, and/or responding to any objectors

2  or objector appeals of the Settlement.  In Class Counsel's experience, time spent on a matter from

3  the date of submitting a motion for fees to the resolution of a case is typically between 50 and 150

4  hours if no appeals are involved, and can go up to as much as 700 hours if appeals are involved.[48]

5  While the multiplier resulting from the lodestar cross-check is admittedly on the high-end

6  of approved multipliers, it is not outside of the range of reasonableness.  *See, e.g., Vizcaino*, 290

7  F.3d at 1051 and Appendix (citing cases approving multipliers in common fund cases going as

8  high as 19.6).  This is particularly true given the excellent results achieved for the class, the fact

9  that Class Counsel seek a fee far below the benchmark, and the risks Class Counsel undertook in

10  taking on this case.  *See Stanger,* 2016 WL 191986, at *4 (reversible error to decline to award a

11  multiplier where certain risk factors were present).  *See also In re Bluetooth*, 654 F.3d 935, 941-

12  42 (9th Cir. 2011) (citations omitted) (discussing relevant factors in determining reasonableness

13  of multiplier).

14  In *Vizcaino*, for example, the Ninth Circuit overruled an objector's challenge to the district

15  court's *upward* departure from the benchmark in its award of attorneys' fees of 28 percent (or

16  over $27 million), resulting in a 3.65 multiplier, noting that lodestar multipliers reflect the risk of

17  nonpayment attorneys undertake in contingency fee cases, where "compensation depends on their

18  winning the case" and must make up for "lack of compensation in the cases [attorneys] lose." *Id.*

19  at 1051 (internal citation and quotation omitted).  Notably, the *Vizcaino* court cautioned that the

20  lodestar crosscheck should not be used to award counsel a lesser percentage fee recovery simply

21  because a case settles quickly and efficiently. *Id.* at 1050 n.5.  If courts were to do so, lawyers

22  would have little economic incentive to fight for the biggest possible settlement once they reach a

23  settlement where the "benchmark" percentage exceeds their lodestar by a certain amount.

24  Myriam Gilles & Gary Friedman*, Exploding the Class Action Agency Costs Myth: The Social*

25  *Utility of Entrepreneurial Lawyers,* 155 U. PA. L. REV. 103, 140-45 (2006) (explaining how the

26  lodestar cross-check can operate to "cap[] settlements, often at grossly suboptimal levels").  The

27

28  [48] Sobol Decl. ¶¶ 21-26.

1  fact that Class Counsel were able to achieve an exceptional result for the Class in a relatively

2  speedy timeframe should weigh in favor of, and not against, granting Class Counsel's fee request.

3  *See, e.g., Steiner v. Am. Broad. Co.,* 248 F. App'x 780, 782 (9th Cir. 2007) (upholding attorney

4  fee of 25%, resulting in 6.85 multiplier, where counsel obtained a $65 million fund for the class

5  in a short timeframe and prior to motions practice); *Buccellato v. AT&T Operations, Inc.,* No.

6  C10-00463-LHK, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (approving 25% fee,

7  resulting in 4.3 multiplier, given the "excellent and quick results obtained for the Class").

8       Moreover, the multiplier reflected in the lodestar cross-check should not be divorced from

9  the fact that Class Counsel seek a fee totaling far less than the benchmark 25 percent of the Fund.

10  Ninth Circuit courts have approved of higher-end multipliers even where, unlike here, counsel

11  sought the 25 percent benchmark and the fee was to be paid out of the common fund and thus

12  would reduce the net recovery of the class members.  *See, e.g., Steiner,* 248 Fed. Appx. at 783

13  (holding that a 25% fee yielding multiplier of 6.85 "falls well within the range of multipliers that

14  courts have allowed"); *Craft v. County of San Bernardino,* 624 F. Supp. 2d 1113 (C.D. Cal. 2008)

15  (approving 25% fee award yielding a multiplier of 5.2 and stating that "there is ample authority

16  for such awards resulting in multipliers in this range or higher"); *Buccellato,* 2011 WL 3348055,

17  at * 2 (awarding 25% fee resulting in a multiplier of 4.3).  In a similar vein, numerous federal

18  courts throughout the country recognize that "[c]ourts regularly award lodestar multipliers of up

19  to eight times lodestar, and in some cases, even higher multipliers."  *Yuzary v. HSBC Bank USA,*

20  *N.A.,* 2013 U.S. Dist. LEXIS 144327 (S.D.N.Y. Oct. 2, 2013) (awarding 31.7% of $15,625,000

21  settlement, yielding a multiplier of 7.6).[49]

22

23  [49] *See also Beckman v. KeyBank, N.A.,* 293 F.R.D. 467, 481-482 (S.D.N.Y. 2013) (awarding 33% of $4.9 million settlement, yielding a multiplier of 6.3); *Davis v. J.P. Morgan Chase & Co.,* 827

24  F. Supp. 2d 172, 185 (W.D.N.Y. 2011) (awarding one third of $42 million, yielding a multiplier of 5.3); *New Eng. Carpenters Health Benefits Fund v. First Databank,* 2009 U.S. Dist. LEXIS

25  68419 (D. Mass. Aug. 3, 2009) (awarding 24% of a $350 million settlement, yielding a multiplier of 8.3); *In re Rite Aid Corp. Secs. Litig.,* 362 F. Supp. 2d 587 (E.D. Pa. 2005) (awarding 25% of

26  the $126,641,315 settlement fund, yielding a multiplier of 6.96); *Di Giacomo v. Plains All Am. Pipeline,* 2001 U.S. Dist. LEXIS 25532 (S.D. Tex. Dec. 18, 2001) (awarding 30% of $29.5

27  million global settlement, yielding a multiplier of 5.3); *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001) (awarding 25% of a $193 million settlement and stating a

28  lodestar multiplier in the range of 4.5 to 8.5 is "unquestionably reasonable.").

MOTION FOR ATTORNEYS' FEES AND EXPENSES
AND FOR SERVICE AWARDS
CASE NO. 3:15-CV-00258

Accordingly, the cross-check would not demonstrate "special circumstances justifying a departure" from the 25 percent benchmark, and it certainly does not justify a further downward adjustment of the 12.6 percent fee requested here. *See In re Bluetooth*, 654 F.3d at 942 (internal quotation marks omitted).

### B.   Class Counsel Are Not Seeking Reimbursement of their Costs on Top of the Fee Award, Although Such Reimbursement Would be Justified

Under well-settled law, Class Counsel are entitled to reimbursement of the expenses they reasonably incurred investigating and prosecuting this matter. *See Staton*, 327 F.3d at 974; *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1995) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391–92 (1970)).  Pursuant to the Settlement, however, Class Counsel's 12.6 percent fee request includes their expenses.  Nonetheless, Class Counsel note that recovery of their expenses—on top of the fee award—would be appropriate here.

To date, Class Counsel have incurred a total of $39,595.16 in out-of-pocket litigation expenses.  This amount includes costs for mediation fees, transcripts, filing fees, travel, legal research, telephone costs, and postage.[50]  These expenses were reasonably necessary for the continued prosecution and resolution of this litigation, and were incurred by Class Counsel for the benefit of the Class with no guarantee that they would be reimbursed.  *See In re Media Vision*, 913 F. Supp. at 1367-72 (costs related to retention of experts, photocopy costs, travel expenses, postage, telephone costs, computerized legal research fees, and filing fees may be reimbursed).

Accordingly, Class Counsel's agreement not to seek these expenses separately further demonstrates the reasonableness of the requested 12.6 percent fee.

### C.   The Requested Service Awards for Plaintiffs Are Reasonable and Justified

As the Ninth Circuit has recognized, "named plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977; *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (service awards "are fairly typical in class action cases").  Such awards are "intended to compensate class representatives for work done on behalf of the class [and] make up for financial or reputational

---

[50] Sobol Decl. ¶¶ 45-46; Bates Decl. ¶¶ 43-44.

1   risk undertaken in bringing the action." *Id.*; *see also Van Vranken*, 901 F. Supp. at 299-300.

2   　　　The modest service awards that Plaintiffs request are reasonable and justified.  In this

3   District, service awards in the amount of $5,000 per class representative are "presumptively

4   reasonable."  *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 592 (N.D. Cal. 2015) (citation

5   omitted); *Dyer v. Wells Fargo Bank, N.A.,* 303 F.R.D. 326, 335 (N.D. Cal. 2014) (citation

6   omitted); *Faigman v. AT & T Mobility LLC*, No. C-06-04622-MHP, 2011 WL 672648, at *5

7   (N.D. Cal. Feb. 16, 2011) (citation omitted).  Here, Plaintiffs seek only $2,000 each as service

8   awards.  Thus, Plaintiffs seek service awards in an amount that is less than half of the

9   presumptively reasonable amount in this District.

10   　　　Moreover, the requested service awards are reasonable in proportion to what the Class

11   will receive.  In *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015), the Ninth

12   Circuit approved of nine incentive awards of $5,000 each, totaling $45,000.  The Ninth Circuit

13   explained that while the incentive awards were "roughly 417 times larger than the $12 individual

14   award" that class members would receive, this issue was not the focus of its opinion in *Staton*,

15   and that the more important factors were "the number of class representatives, the average

16   incentive award amount, and the proportion of the total settlement that is spent on incentive

17   awards."  *Id.* at 947.  Because there were only nine class representatives, the incentive award

18   amounts were modest, and the total amount of incentive awards only made up "a mere .17%" of

19   the settlement fund, the Ninth Circuit held that the incentive awards were reasonable.  *Id.* at 948.

20   Here, there are only four Plaintiffs, seeking a total of $8,000 in service awards, which makes up

21   only 0.01 percent of the $68,000,000 Settlement Fund.  Thus, the incentive awards that Plaintiffs

22   seek are not disproportionate to the monetary recovery they secured for the Class.

23   　　　Moreover, the requested service awards are reasonable in light of the commitment and

24   work undertaken by the Plaintiffs for the benefit of the Class.  In addition to lending their names

25   to these cases, and thus subjecting themselves to public attention, the Plaintiffs were actively

26   engaged in the litigation.  Among other things, they provided information to Class Counsel,

27   gathered documents, reviewed pleadings, stayed updated about and monitored the litigation, and

28

1   reviewed and approved the proposed Settlement.[51]  Their commitment is notable given the

2   relatively modest size of their personal financial stakes in this matter.  *See Van Vranken*, 901 F.

3   Supp. at 299 ("In exchange for his participation, Van Vranken will not receive great personal

4   benefit.  He owns a moderately sized truck stop and his claim makes up only a tiny fraction of the

5   common fund.").

6        Thus, the requested service awards of $2,000 to each Named Plaintiff are reasonable and

7   justified.

8   **IV.    CONCLUSION**

9        For the foregoing reasons, Plaintiffs and Class Counsel respectfully request that the Court

10  enter an Order: (a) awarding Class Counsel attorneys' fees and costs in the amount of

11  $10,200,000; and (b) awarding the Plaintiffs service awards in the amount of $2,000 each for

12  their efforts and commitment on behalf of the Class.  Class Counsel will submit a proposed order

13  for attorneys' fees and service awards as part of their upcoming Motion for Final Approval.

14  Dated: March 18, 2016          By:  ___/s/ *Michael W. Sobol*___

15                                 LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                   Michael W. Sobol (CA #194857)
16                                 msobol@lchb.com
                                   Nicole D. Sugnet (CA #246255)
17                                 nsugnet@lchb.com
                                   275 Battery Street, 29th Floor
18                                 San Francisco, CA  94111-3339
                                   Telephone:  (415) 956-1000
19                                 Facsimile:  (415) 956-1008

20                                 CARNEY BATES & PULLIAM, PLLC
                                   Joseph Henry ("Hank") Bates (CA #167688)
21                                 hbates@cbplaw.com
                                   Randall K. Pulliam (admitted *pro hac vice*)
22                                 rpulliam@cbplaw.com
                                   One Cantrell Building
23                                 2800 Cantrell, Suite 510
                                   Little Rock, AR  72212
24                                 Telephone:  (501) 312-8500
                                   Facsimile:  (501) 312-8505

25
                                   Class Counsel and Attorneys for Plaintiffs Napoleon Ebarle,
26                                 Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle

27

28  _____
[51] Napoleon Ebarle Decl. ¶ 7; Stamm Decl. ¶ 7; Litton Decl. ¶ 7; Reiner Ebarle Decl. ¶ 7.