LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Michael W. Sobol (CA #194857)
msobol@lchb.com
Nicole D. Sugnet (CA #246255)
nsugnet@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

CARNEY BATES & PULLIAM, PLLC
Joseph Henry ("Hank") Bates (CA #167688)
hbates@cbplaw.com
Randall K. Pulliam (admitted *pro hac vice*)
rpulliam@cbplaw.com
One Cantrell Building
2800 Cantrell, Suite 510
Little Rock, AR  72212
Telephone:  (501) 312-8500
Facsimile:  (501) 312-8505

Class Counsel and Attorneys for Plaintiffs Napoleon Ebarle, Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAPOLEON EBARLE, JEANNE STAMM, BRIAN LITTON, and REINER JEROME EBARLE on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LIFELOCK, INC.,<br>Defendant. | Case No.  3:15-cv-00258<br><br>**DECLARATION OF MICHAEL W. SOBOL IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES AND FOR SERVICE AWARDS FOR PLAINTIFFS**<br><br>Date:         June 23, 2016<br>Time:        2:00 PM<br>Courtroom: 15, 18th Floor<br>Judge:       Hon. Haywood S. Gilliam Jr. |

I, Michael W. Sobol, declare as follows:

1. I am a member in good standing of the California State Bar and a partner in the law firm Lieff, Cabraser, Heimann & Bernstein, LLP ("LCHB"), counsel for Plaintiffs and the Class in these consolidated proceedings. I am the LCHB attorney principally responsible for overseeing LCHB's work in these proceedings. I submit this declaration in support of Plaintiffs' Motion for Attorneys' Fees and Expenses and for Service Awards for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called to testify thereto, I could and would do so competently.

I. **Background and Experience**

2. LCHB is a national law firm with offices in San Francisco, New York, and Nashville. LCHB's practice focuses on complex and class action litigation involving consumer protection, employment, financial, securities, environmental, and personal injury matters. A copy of LCHB's firm resume, which describes the firm's experience in class action and other complex litigation, can be found at http://www.lchbdocs.com/pdf/firm-resume.pdf, and is not attached hereto given its length. This resume is not a complete listing of all cases in which LCHB has been class counsel or otherwise counsel of record.

3. Since 2002, I have chaired LCHB's Consumer Protection Practice Group. Since joining LCHB in 1997, I have almost exclusively represented plaintiffs in consumer protection class actions. I have been a partner with LCHB since 1999. I am a 1989 graduate of Boston University School of Law. I practiced law in Massachusetts from 1989 to 1997. From 1995 through 1997, I was a Lecturer in Law at Boston University School of Law. In 1997, I left my position as partner in the Boston firm of Shafner, Gilleran & Mortensen, P.C. to move to San Francisco, where I joined LCHB.

4. During my time at LCHB, I have overseen a wide range of consumer protection litigation and have served as plaintiffs' class counsel in numerous nationwide consumer class action cases. The following cases are representative examples of class actions in which I have played or am currently playing a leadership role:

a. I was appointed to the Plaintiffs' Steering Committee in *In re Anthem, Inc. Data Breach Litigation*, No. 15-md-02617-LHK (NC) (N.D. Cal.), a multidistrict litigation alleging that Anthem failed to maintain adequate security measures, resulting in a massive data breach compromising highly sensitive personal identifying information of more than 80 million persons. The Plaintiffs were recently successful in opposing Anthem's motion to dismiss, and the parties are currently engaging in discovery.

b. I serve as Co-Lead Counsel and Plaintiffs' Liaison Counsel in *Campbell v. Facebook*, No. 4-13-cv-5996 (N.D. Cal.), a nationwide class action lawsuit alleging that Facebook intercepts private data in users' personal and private e-mail messages on the social network and profits by sharing that information with third parties. The Plaintiffs were successful in opposing Facebook's motion to dismiss and are currently moving for class certification.

c. I serve as Interim Co-Lead Class Counsel in *Corona v. Sony Pictures Entertainment, Inc.*, No. CV 14-09600-RGK (Ex) (C.D. Cal.), a nationwide class action alleging that Sony had inadequate security measures in place, which allowed cyberattackers to successfully steal its employees' personally identifying information. A settlement was preliminarily approved by the Court on November 24, 2015. The settlement establishes a non-reversionary cash fund of $2 million to reimburse class members for preventive measures they took to prevent identity theft as a result of the breach, and also provides up to $2.5 million for class members who experienced losses due to identity theft or misuse of their personally identifying information. The settlement further provides for identity protection services for class members for a period of two years.

d. I serve as Co-Lead Class Counsel in *Perkins v. LinkedIn Corporation*, No. 13-04303 (N.D. Cal.), alleging that individuals who joined LinkedIn's network had their names and likenesses used without consent by LinkedIn to endorse LinkedIn's services and send repeated emails to their contacts asking that they join LinkedIn. On September 15, 2015, the Court granted preliminary approval to $13 million settlement, one of the largest per-class member settlements ever in a digital privacy class action. In addition to the monetary relief, LinkedIn has agreed to make significant changes to Add Connections disclosures and functionality.

1   Specifically, LinkedIn has revised disclosures to real-time permission screens presented to
2   members using Add Connections, and has agreed to implement new functionality allowing
3   LinkedIn members to manage their contacts, including viewing and deleting contacts and sending
4   invitations, and to stop reminder emails from being sent if users have sent connection invitations
5   inadvertently.

6         e.    I serve as Chair of Plaintiffs' Executive Committee and interim Class
7   Counsel in *In re Intuit Data Litigation*, No. 15-1778 (N.D. Cal.), representing identity theft
8   victims in a nationwide class action lawsuit against Intuit for facilitating the filing of fraudulent
9   tax returns through its TurboTax software program. The parties are currently briefing Intuit's
10  motion to dismiss.

11        f.    I served as Co-Lead Class Counsel in *Gutierrez v. Wells Fargo Bank, N.A.*,
12  No. C 07-05923 WHA (N.D. Cal.), a class action alleging unfair practices and false
13  representations by Wells Fargo in connection with its imposition of overdraft charges. In 2013,
14  the court reinstated a $203 million class judgment that had been entered in 2010 following a
15  bench trial, and in 2014 the reinstated judgment was affirmed by the Ninth Circuit. Judge Alsup
16  noted that LCHB "performed at a superior level as class trial counsel" and that LCHB's trial
17  performance "ranks as one of the best this judge has seen in sixteen years on the bench."
18  *Gutierrez v. Wells Fargo Bank, N.A*., No. C 07-05923 WHA, 2015 WL 2438274, at *1, 7 (N.D.
19  Cal. May 21, 2015). In 2011, I was named a finalist of Consumer Attorneys of California's
20  ("CAOC") Consumer Attorney of the Year award for my work in this case.

21        g.    I served on the Plaintiffs' Executive Committee in *In re Checking Account*
22  *Overdraft Litigation*, MDL 2036 (S.D. Fla.), a multidistrict litigation involving more than two
23  dozen banks and allegations of unfair practices and false representations in connection with the
24  banks' imposition of overdraft charges. Class settlements totaling over a billion dollars have been
25  approved by the court to date. In 2012, I was named as a finalist for Trial Lawyer of the Year by
26  Public Justice for my work in this litigation. The same year, I was named a finalist by CAOC for
27  the Consumer Attorney of the Year award for my work in the *Yourke v. Bank of America*, a case
28  that was a part of the MDL which resulted in a settlement of $410 million.

h. I served as Plaintiffs' Liaison Counsel and on the Plaintiffs' Executive Committee in *In re Chase Bank USA, N.A. "Check Loan" Contract Litigation*, MDL No. 2032 (N.D. Cal.), a nationwide multidistrict class action alleging that Chase breached its good faith obligation to credit card holders by modifying the terms of their long-term fixed rate loans. In November 2012, the court granted final approval to a $100 million nationwide settlement that provides direct payments to approximately one million cardholders and important injunctive relief. In 2013, I was named a finalist for CAOC's Consumer Attorney of the Year award for my efforts in this litigation

i. I served as co-class counsel in *In re TracFone Unlimited Service Plan Litigation*, Case No. 13-cv-03440-EMC (N.D. Cal.), a class action alleging that *TracFone* falsely advertised its cell phone plans as providing "unlimited" data when it imposed secret data caps on the plans, pursuant to which it would throttle (*i.e.* severely slow down) or suspend consumers' data. On July 2, 2015, Judge Chen granted final approval to a $40 million settlement which included industry-leading business practice changes.

j. I served as Class Counsel in *Brazil v. Dell Inc.*, No. C-07-01700 RMW (N.D. Cal.), a class action alleging false reference price advertising in connection with defendant's online sale of computers. This was the first class action of its kind to receive certification, and resulted in a settlement which allowed class members to submit claims for $50 payments, and included important practice changes.

k. I served as Lead Plaintiffs' Counsel in *In re Apple and AT&T iPad Unlimited Data Plan Litigation*, No. 10-cv-02553 RMW (N.D. Cal.), a class action alleging that defendants falsely advertised access to an unlimited data plan for the iPad device. In 2014, the court granted final approval of a settlement which allowed class members to submit claims for $40 payments and provided other benefits to class members.

l. I served as Co-Class Counsel in *Pakeman, et al. v. American Honda Finance Corporation* (M.D. Tenn.), a case raising race discrimination claims under the Equal Credit Opportunity Act. On April 18, 2005, court granted final approval of a class settlement requiring defendant to establish a refinance program applicable to $1 billion of its existing loan

1  portfolio under which African Americans and Hispanic Americans are eligible for a reduction on
2  their auto loan interest rate.  The settlement also imposed a limit to the amount of "mark-up"
3  lenders can impose on interest rates, increased the transparency of consumer disclosures, and
4  funded consumer education programs.  The monetary benefit to the class is estimated to be
5  between about $47 million to $72 million.

6         m.      I was Co-Lead Plaintiffs' Counsel in *Morris v. AT&T Wireless Services,*
7  *Inc.*, No. C-04-1997-MJP (W.D. Wash.), a case alleging that a nationwide class of cell phone
8  customers was subjected to an end-of-billing cycle cancellation policy implemented by AT&T
9  Wireless, thereby breaching customers' service agreements.  On May 19, 2006, the New Jersey
10 Superior Court granted final approval to a class settlement that guaranteed delivery to the class of
11 $40 million in benefits.

12        n.      I served as Co-Lead Counsel in *Yarrington v. Solvay Pharmaceuticals,*
13 *Inc.*, No. 09-CV-2261 (D. Minn.), a class action alleging that Solvay deceptively marketed and
14 advertised Estratest as an FDA-approved drug when in fact Estratest was not FDA-approved for
15 any use.  In March 2010, the court granted final approval to a $16.5 million settlement, pursuant
16 to which consumers obtained partial refunds of up to 30% of the purchase price paid for Estratest.

17        o.      I served as Co-Lead Plaintiffs' Counsel in *Reverse Mortgage Cases*,
18 J.C.C.P. No. 4061 (San Mateo Sup. Ct.), an action brought against Transamerica alleging that it
19 targeted senior citizens to market and sell "reverse mortgages" which were misleading as to loan
20 terms and contained unfair charges and fees.  A nationwide settlement provided relief to
21 approximately 1600 members of the class averaging about $5,000 per class member, with some
22 class members receiving many times that amount.

23   5.   In addition to the above, LCHB has litigated several prominent consumer class
24 actions throughout the nation.  Such cases include the following:

25        a.      LCHB served as co-lead counsel in *In Re Providian Financial Corp. Credit*
26 *Card Terms Litigation*, MDL No. 1301 (E.D. Pa.), and related JCCP proceedings, representing
27 credit card holders who were charged excessive interest and late charges and sold "add on"
28 products and services with promised benefits that were illusory.  In November 2001, the court

1  granted final approval to a $105 million settlement of the case, which also required Providian to
2  implement substantial changes to its business practices.

3     b.  LCHB served as Settlement Class Counsel in *Kline v. The Progressive
4  Corporation*, No. 02-L-6 (Ill. Cir. Ct., Johnson County), a nationwide class action challenging
5  Progressive Corporation's private passenger automobile insurance sales practices.  In 2002, the
6  court approved a settlement valued at approximately $450 million, which included both cash and
7  equitable relief.

8     c.  LCHB served as Lead Counsel in *Catholic Healthcare West Cases*,
9  J.C.C.P. No. 4453 (San Francisco Sup. Ct.), a coordinated action alleging that CHW charged
10 uninsured patients excessive fees for treatment and services, at rates far higher than the rates
11 charged to patients with private insurance or on Medicare.  In 2007, the court approved a
12 settlement that provides discounts, refunds and other benefits for CHW patients valued at $423
13 million, and injunctive relief.

14    d.  LCHB served as co-lead counsel in *Strugano v. Nextell Communications,
15 Inc.*, No. BC 288359 (L.A. Sup. Ct.), a case alleging defendant's unilateral (1) addition of a $1.15
16 monthly service fee and/or (2) change from second-by-second billing to minute-by-minute
17 billing, which caused "overage" charges.  On May 10, 2006, the Los Angeles Superior Court
18 granted final approval to a class settlement on behalf of all California Nextel customers.  The total
19 benefit conferred by the settlement directly to class members is between approximately $13.5
20 million and $55.5 million.

21    e.  LCHB represented a class of consumers in *Citigroup Loan Cases*, J.C.C.P.
22 No. 4197 (San Francisco Sup. Ct.) against a "sub-prime" lender for cramming unwanted and
23 unnecessary insurance products onto mortgage loans and engaging in improper loan refinancing
24 practices.  A court-approved settlement of the case provided $240 million in relief to the
25 nationwide class.

## II. Qualifications and Duties of LCHB Attorneys and Staff

6. The primary LCHB attorneys who have worked on this matter are myself, LCHB partner Nicole D. Sugnet, and former LCHB associate RoseMarie Maliekel, with assistance from other LCHB attorneys, paralegals, and staff.

7. My background is set forth above. My primary duties in this litigation included, developing and overseeing case strategy and discovery strategy, reviewing and editing pleadings, conducting factual analysis including damages analysis, preparing for settlement negotiations and mediations including by reviewing and editing the mediation briefs, negotiating the settlement and settlement papers, and overseeing Class Counsel's settlement approval and implementation efforts.

8. The backgrounds and primary duties of the other attorneys and of staff who assisted with this case are set forth below.

### A. LCHB Attorneys

9. <u>Nicole D. Sugnet</u> joined LCHB as an associate in 2012 and became a partner in 2015. She graduated from the University of California, Hastings College of the Law in 2006. Since graduating from law school, Ms. Sugnet has focused her practice exclusively on consumer class action litigation. Ms. Sugnet is on the Board of Governors for California Women Lawyers. Every year from 2013 through 2016, she has been recognized by Super Lawyers as a Northern California Rising Star. She is the co-author of "Consumer Protection and Employment Cases after Concepcion," published in the ABA Section of Litigation, Class Action & Derivative Suits Committee Newsletter (Summer 2011). Ms. Sugnet's primary duties in this litigation included drafting Plaintiffs' second mediation brief, taking 30(b)(6) depositions of two key LifeLock employees, attending the second mediation, reviewing and revising the Settlement Agreement, drafting the Settlement Agreement's exhibits including the class notices and claim form, soliciting settlement administrator bids, and overseeing class notice and settlement administration.

10. <u>RoseMarie Maliekel</u> graduated from Northwestern University School of Law in 2010, where she was Captain of the Bartlit National Trial Team. Prior to joining LCHB, she was

a trial lawyer with Federal Defenders of San Diego, Inc., where she first-chaired multiple jury trials. During her time at LCHB, until her departure in 2015, Ms. Maliekel's practice was focused primarily on prosecuting consumer protection and privacy class actions. Ms. Maliekel's duties in this litigation included drafting Plaintiffs' first mediation brief, attending the mediations, reviewing and analyzing discovery, and drafting Class Counsel's Rule 23(g) motion.

### B. LCHB Paralegals and Litigation Support Staff

11. LCHB has a team of paralegals that assist in the litigation of its cases, with the level of staffing depending on the size and needs of the particular case. In this case, Miriam Gordon was the primary LCHB paralegal assigned to this matter. Ms. Gordon is a 1998 graduate of William Smith College. Ms. Gordon's tasks in this litigation have included the following: conducting factual investigation; assisting with filings; maintaining LCHB's case file; preparing materials for depositions and mediations; and communicating with Class Members.

12. Other paralegals who worked on this matter include Rami Bata and Jennifer Rudnick, who assisted with Class Member calls, and well as Nikki Belushko Barrows and Christian Chan, who assisted with factual research.

13. LCHB litigation support specialists worked on this matter as well. LCHB's Litigation Support group consists of an experienced team of litigation support specialists responsible primarily for: (a) preparing and conducting trial presentations and similar in-court technical productions; (b) creating, managing, and searching case-specific document and information databases (*e.g.*, Relativity); and (c) performing certain case-specific data analyses (*e.g.*, for use in evaluating damages). Because the personnel who make up LCHB's Litigation Support group have extensive training and experience performing these specific and technical tasks, it is more efficient and cost-effective, and in my judgment ultimately results in better work product, for this sort of work to be assigned to these personnel as opposed to paralegals with other areas of specialization who normally perform less technical work. Other firms might contract this work out to third parties, or assign a more general paralegal to perform these sorts of tasks, and that would be perfectly reasonable. However, in my judgment, the fact that LCHB has in-house

1  personnel who specifically focus on these tasks represents a significant benefit and value to the
2  clients and class members that LCHB represents.
3         14.    The primary LCHB litigation support specialists who worked on this case were
4  <u>Margie Calangian</u>, <u>Anthony Grant</u>, and <u>Erwin Ocampo</u>.  Their tasks included creating and
5  managing the document database dedicated to this case; searching and helping LCHB's attorneys
6  and co-counsel access and search the database for materials for use in the mediation briefs,
7  depositions, and for other purposes; and providing guidance and assistance regarding technical
8  aspects of document production and resolving issues concerning the format of materials produced
9  by LifeLock.

10  **III.    Overview of LCHB's Efforts in this Litigation**
11         **A.    Contingent Nature of Action**
12         15.    This matter has required LCHB to spend time on this litigation that could have
13  been spent on other matters.  In addition to a substantial percentage of my time, this litigation has
14  also required considerable work by other lawyers, paralegals, and staff at LCHB that could have
15  otherwise been spent on other fee-generating work.
16         16.    The time that LCHB has spent on this litigation has been completely contingent on
17  the outcome.  LCHB has not been paid for any of its time spent on this litigation, nor has it been
18  reimbursed for any of its expenses incurred in this litigation.
19         17.    Because LCHB undertook representation of this matter on a contingency-fee basis,
20  LCHB shouldered the risk of expending substantial costs and time in litigating the action without
21  any monetary gain in the event of an adverse judgment.
22         **B.    LCHB's Lodestar**
23         18.    LCHB has maintained contemporaneous time records since the commencement of
24  this action.  As of March 14, 2016, LCHB has worked a total of **508.80** hours, with a total
25  lodestar of $**279,491.50**.
26         19.    All attorneys and staff at LCHB are instructed to maintain contemporaneous time
27  records reflecting the time spent on this and other matters.  The regular practice at LCHB is for all
28  attorneys and staff to keep contemporaneous time records, maintained on a daily basis, and

1  describing tasks performed in 0.1 hour increments. Firm policy requires all staff to enter their
2  time into an electronic timekeeping system on a daily basis. I review and audit the time on a
3  regular basis.

4  20. At my direction and with my oversight, LCHB attorney Nicole D. Sugnet carefully
5  reviewed LCHB's time entries in this matter and removed duplicative entries or other erroneous
6  entries, and also exercised billing discretion to remove time billed to administrative tasks. None
7  of this excluded time is included in the above numbers.

8  21. I did not include any time spent working on Plaintiffs' Motion for Attorneys' Fees
9  and Expenses and for Service Awards for Plaintiffs within the lodestar reported in paragraph 18
10 above. However, such time was necessarily spent since, without compensation, attorneys would
11 not take on such cases. Moreover, such time required LCHB attorneys and staff to continue to
12 focus on this litigation rather than focusing on other matters. As of March 14, 2016, LCHB
13 attorneys and staff spent 38.9 hours on matters relating to Class Counsel's request for fees and
14 incentive awards.

15 22. LCHB's lodestar will grow as we continue to finalize the settlement process and
16 close the litigation. The claims period will last for several months, and LCHB's commitment of
17 time and labor to this case will continue until (and likely beyond) that date. LCHB will draft the
18 final approval papers, respond to any objectors, and present the Settlement at the final fairness
19 hearing. LCHB will also continue to assist Class Members with individual inquiries, will oversee
20 aspects of the claims resolution process, and will help resolve Class Member challenges to their
21 claims submissions. Further, LCHB will continue to assist the Settlement Administrator in
22 resolving any administration issues. Finally, if there are appeals of the Settlement, LCHB will
23 work on responding to such appeals.

24 23. Judging by previous experiences, these responsibilities will potentially require
25 hundreds of hours of work by Class Counsel over the coming months. I have reviewed LCHB's
26 post-fee brief time in other matters that recently settled, and depending upon the complexity of
27 issues that might arise with settlement administration, as well as whether there are any objector
28 appeals of the settlement, the time spent post-fee brief can be quite substantial. For example, in a

1  case where LCHB's fee motion was submitted in September 2012, an objector who failed to opt-
2  out but wanted to instigate his own action against the defendant appealed the settlement. This
3  resulted in a lengthy, multi-year process in which LCHB responded to the objector's multiple
4  appeals, continued to respond to class member inquiries regarding their on-hold settlement
5  payments, worked on settlement payment calculations, and oversaw initial and subsequent
6  distributions of settlement payments. The final distribution of settlement payments did not occur
7  until December 2015. Between the time that LCHB submitted the fee brief and the date of final
8  settlement distributions, LCHB spent over 700 hours on the matter.

9  24.  In another case involving appeals of a settlement made by so-called "professional"
10 objectors, who eventually voluntarily withdrew their appeals, LCHB expended 252.8 hours from
11 the time the fee brief was submitted until the time of final settlement distributions and closure of
12 the matter.

13 25.  In cases that don't involve settlement appeals, LCHB typically spends between 50
14 and 150 hours from the time of submitting a fee brief and finally closing the matter.

15 26.  Based upon my experience with other class actions and complex matters, I believe
16 that the time expended by LCHB in connection with this litigation was reasonable in amount and
17 contributed to the ultimate result achieved for the class, and that LCHB's final lodestar is more
18 likely to be at least around $320,000 before the case is closed, assuming an average billing rate of
19 about $400.

20 **C.  LCHB Billing Rates**

21 27.  LCHB sets its rates for attorneys and staff members based on a variety of factors,
22 including the following: the experience, skill, and sophistication required for the types of legal
23 services typically performed; the rates customarily charged in similar matters; and the experience,
24 reputation, and abilities of the attorneys and staff members.

25 28.  For any individuals who have left the employ of LCHB, the hourly rate at the time
26 when their employment concluded is used. For all others who are still employed by LCHB, their
27 current hourly rate is used.

28

1    29.    The following chart details the billing rates for each attorney and staff member
2  who worked on this matter:

| Attorney/Staff | Title | Bar Admission Year | Billing Rate |
|---|---|---|---|
| Michael W. Sobol | Partner | 1989 (MA) 1998 (CA) | $875 |
| Nicole D. Sugnet | Partner | 2006 (CA) | $485 |
| RoseMarie Maliekel | Associate | 2011 (CA) | $395 |
| Margie Calangian | Litigation Support Specialist | N/A | $360 |
| Anthony Grant | Litigation Support Specialist | N/A | $360 |
| Erwin Campo | Litigation Support Specialist | N/A | $360 |
| Nikki Belushko Barrows | Research Assistant | 2013 (CA) | $345 |
| Jennifer Rudnick | Senior Paralegal | N/A | $345 |
| Christian Chan | Paralegal | N/A | $335 |
| Rami Bata | Paralegal | N/A | $300 |
| Miriam Gordon | Paralegal | N/A | $290 |

30.    These rates are my firm's current commercial billing rates and are supported by our extensive and specialized experience in these types of cases and recognized expertise. LCHB's rates reflect the market rates in the markets within which LCHB's primary office is located and from which this matter has been handled: San Francisco.

31.    LCHB primarily represents clients on a contingent fee basis, both in class and individual cases.  However, LCHB also represents plaintiffs on an hourly basis and is paid according to its then current hourly rates.  For example, LCHB's hourly rates were negotiated with and are paid on an hourly basis by sophisticated commercial entities, BlackRock (f/k/a Merrill Lynch Mutual Funds) and Charles Schwab & Co., Inc.  LCHB does not bill at different rates for different clients or different types of cases.

32.    Courts in this District that have approved LCHB's standard billing rates and reimbursement of costs as reasonable include the following:

a.    *In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1009 (N.D. Cal. 2015) (granting requested attorneys' fees);

1      b.  *Nwabueze v. AT&T Inc.*, No. C 09-01529 SI, 2014 WL 324262, at *2 (N.D. Cal. Jan. 29, 2014) ("[T]he Court also finds that the rates requested are within the range of reasonable hourly rates for contingency litigation approved in this District.");

       c.  *Ross v. Trex Co., Inc.*, No. 09-cv-00670-JSW, Dkt. No. 341 (N.D. Cal. Dec. 16, 2013) (awarding requested attorneys' fees);

       d.  *Walsh v. Kindred Healthcare*, No. C 11-00050 JSW, 2013 WL 6623224, at *2 (N.D. Cal. Dec. 16, 2013) ("The Court concludes Plaintiffs have shown that the requested rates are reasonable");

       e.  *Moore v. Verizon Communs., Inc.*, No. 09-1823 SBA (JSC), 2013 U.S. Dist. LEXIS 170027, at *28 (N.D. Cal. Nov. 27, 2013) ("The Court concludes that the hourly rates for the attorneys who billed time on this case are reasonable given the geographic location and experience of counsel.");

       f.  *Vedachalam v. Tata Consultancy Servs.*, Ltd, No. C 06-0963 CW, 2013 WL 3941319, at *3 (N.D. Cal. July 18, 2013) ("Class Counsel's hourly rates are reasonable in light of their experience (as reflected in their declarations and the declarations of their peers in the field of class action litigation), and the rates charged are comparable to other attorneys in this field.");

       g.  *Brazil v. Dell Inc.*, No. C-07-01700 RMW, 2012 WL 1144303, at *1 (N.D. Cal. Apr. 4, 2012) ("The billing rates used by Class Counsel to calculate their lodestar are reasonable and in line with prevailing rates in this District for personnel of comparable experience, skill, and reputation.");

       h.  *In re AXA Rosenberg Investor Litigation,* No. 11-00536-JSW, Dkt. No. 73 (N.D. Cal. April 2, 2012) ("The Court has also reviewed Lead Counsel's hourly rates and concludes that these rates are appropriate for attorneys in this locality of Lead Counsel's skills and experience.");

       i.  *Wehlage v. Evergreen at Arvin LLC*, No. 4:10-CV-05839-CW, 2012 WL 4755371, at *2 (N.D. Cal. Oct. 4, 2012) ("[T]he billing rates used by Class Counsel to calculate

1  their lodestar are reasonable and in line with prevailing rates in this District for personnel of
2  comparable experience.");

3        j.   *Holloway v. Best Buy Co., Inc.*, No. C-05-5056 PJH (MEJ), Dkt. No. 382
4  (N.D. Cal. Nov. 9, 2011) ("The rates used by Class Counsel are reasonable.");

5        k.   *Fulford v. Logitech, Inc.*, No. 08-CV-02041 MMC, 2010 WL 807448, at *4
6  (N.D. Cal. Mar. 5, 2010) ("The Court further finds that Plaintiff's Counsels' hourly rates are
7  reasonable for their skill and the work they performed.");

8     33.   Federal and state courts throughout the country have likewise approved LCHB's
9  standard billing rates and reimbursement of costs as reasonable. *See, e.g., Lonardo v. Travelers
10 Indem. Co.*, No. 06-cv-962, 2010 WL 1416698, at *22-23 (N.D. Ohio Mar. 31, 2010); *Electrical
11 Carbon Products Cases*, J.C.C.P. No. 4294 (San Francisco County Super. Ct. Feb. 4, 2009);
12 *Pelletz v. Weyerhaeuser Co.*, 592 F. Supp. 2d 1322, 1326-27 (W.D. Wash. 2009); *In re John Muir
13 Uninsured Healthcare Cases*, J.C.C.P. No. 4494 (Contra Costa County Super. Ct. Nov. 19, 2008);
14 *Grays Harbor Adventist Church Sch. v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, at
15 *3 (W.D. Wash. Apr. 24, 2008); *Pelletz Weekend Warrior Trailer Cases*, J.C.C.P. No. 4455
16 (Orange County Super. Ct. Feb. 22, 2008); *Cox v. Microsoft Corp.*, No. 105193/2000 (N.Y. Sup.
17 Ct. Feb. 2, 2007); *Dancer v. Catholic Healthcare West*, No. CGC 05 445624 (San Francisco
18 County Super. Ct. Jan. 11, 2007); *Sutter Health Uninsured Pricing Cases,* No. JC4388
19 (Sacramento County Super. Ct. Dec. 12, 2006); *In re Diet Drugs (Phentermine, Fenfluramine,
20 Dexfenfluramine) Prods. Liab. Litig.*, No. Civ.A. 99-20593, MDL No. 1203, 2003 WL 21641958,
21 at *9 (E.D. Pa. May 15, 2003); *In re Prudential-Bache Energy Income P'ships Sec. Litig.*, No.
22 888, 1994 WL 202394, at *1-2 (E.D. La. May 18, 1994).

23    **D.**   **Overview of Work Performed**

24    34.   To provide the Court with an overview of the work done by LCHB in this
25 litigation, without requiring the review of our voluminous time records themselves, I divide my
26 firm's work into specific tasks.

35. *Complaints*. LCHB first appeared in this case after the initial Complaint had been filed. LCHB reviewed the case file and the Amended Complaint prior to its filing. LCHB spent 3 hours on these tasks.

36. *Factual Investigation*. LCHB spent 6.6 hours on initial case investigation. Such investigation included the following: Conducting factual research into the merits of the claims; interviewing and collecting information from affected class members and potential class representatives; and conducting research on LifeLock.

37. *Motions and Pleadings.* LCHB spent 52.9 hours on motions and pleadings, including drafting the Motion for Appointment of Interim Co-Lead Class Counsel and Entry of Case Management Order, and drafting and arguing the Motion for Preliminary Approval of the Settlement.

38. *Discovery, Document Review, and Data Analysis*. LCHB spent 154.35 hours of discovery, document review, and data analysis. This included preparing for and taking the 30(b)(6) depositions of two key LifeLock witnesses; drafting informal discovery requests; creating and maintaining the document production database; reviewing and analyzing thousands of pages of LifeLock documents; and analyzing LifeLock's data regarding the timing of and/or gaps in alerts it sent to customers regarding potential identity fraud.

39. *Litigation Strategy*. LCHB spent 4.75 hours discussing litigation strategy, analyzing factual and legal matters that might impact litigation strategy, and determining appropriate litigation strategy plans.

40. *Case Administration*. LCHB spent 8.9 hours on case management and administration tasks.

41. *Mediation and Settlement*. LCHB spent 212.9 hours negotiating and drafting the settlement. Such time included engaging in settlement discussions with LifeLock; drafting two mediation briefs; reviewing and analyzing LifeLock's mediation briefs; preparing for and attending two full-day mediation sessions before Justice Howard Wiener; discussing the Plaintiffs' mediation strategy with co-counsel; analyzing UMG's settlement proposals; crafting, along with co-counsel, Plaintiffs' settlement proposals; drafting and revising the Memorandum of

1  Understanding.  Following the mediation sessions, LCHB has worked hard in drafting and
2  revising the Settlement Agreement; drafting and revising the exhibits to the Settlement
3  Agreement, including the class notice and the claim form; reviewing and discussing with
4  LifeLock the terms of the FTC settlement to ensure consistency with the Class Settlement in this
5  Action; and revising the class notice pursuant to the Court's Preliminary Approval Order.

6    42. *Class Member Correspondence and Settlement Administration.* LCHB spent 65.4
7  hours corresponding with Class Members and overseeing Settlement Administration.  Such time
8  included obtaining bids from settlement administrators; working with the Settlement
9  Administrator on various notice and settlement administration issues; reviewing the draft IVR
10  script for the telephone line; and corresponding with hundreds of Class Members about the
11  litigation and the settlement.

12    **E.** **Careful Assignment of Work**

13    43. Tasks were delegated appropriately among partners, associate attorneys,
14  paralegals, and other staff according to their complexity.  The work performed by associate
15  attorneys and paralegals was work that required sufficient knowledge of legal concepts and that I
16  or another partner would have had to perform absent such assistance.  The paralegals identified
17  were all qualified to perform substantive legal work based on their training and past experience
18  working for attorneys, including attorneys outside of LCHB's offices.  I and other Class Counsel
19  therefore made every effort to litigate this efficiently by reducing duplication of effort and
20  assigning work to the lowest billing timekeepers where feasible.

21    44. I worked closely with co-counsel to divide tasks, ensure efficient case
22  management, and prevent duplication of efforts.  By assigning specific tasks among firms, we
23  were able to avoid replicating work.  Only where it was necessary to have involvement from all
24  of the firms, such as during the mediations, did such involvement occur.  For example, LCHB
25  took the lead on the depositions, drafting the mediation briefs, and managing the production of
26  LifeLock's documents, while Carney Bates & Pulliam took the lead on working up the case,
27  drafting the complaints, overseeing the production of Plaintiffs' documents, and drafting the
28

1  motion for preliminary approval of settlement. Both firms reviewed LifeLock's documents and
2  worked equally in negotiating the Settlement in the matter.

3  **F.     LCHB's Costs**

4  45.   LCHB maintains all books and records regarding costs expended on each case in
5  the ordinary course of business, which books and records are prepared from expense vouchers
6  and check records. I have reviewed the records of costs expended in this matter.

7  46.   LCHB has incurred $**18,080.94** in expenses. Such costs include LCHB's
8  proportional contributions to mediation fees ($7,500.00); filing fees ($86.04); travel costs
9  including airfare, hotels, parking, taxis, and meals associated with the Phoenix, Arizona
10 mediation session and meetings among counsel ($4,914.16); deposition transcripts ($2,392.50);
11 other hard costs such as research on LEXIS, Westlaw, Courthouse News Service, and First Legal
12 Network court research ($407.04); Federal Express, messenger, or process server charges
13 ($56.17); and internal costs such as printing ($1,784.20), copying ($74.60), and telephone charges
14 ($866.23).

15 **IV.    Class Member Response to the Settlement**

16 47.   According to the report I received from the Settlement Administrator, as of March
17 17, 2016, 119,218 Class Members have submitted claims, with 57,029 of the claims coming from
18 Subclass Members and 54,796 from Class Members who are not a part of the Subclass (7,393 of
19 the claims have not yet been processed).

20 **V.     Negotiation of Attorneys' Fees**

21 48.   The parties negotiated attorneys' fees only after reaching agreement as to the
22 amount of the Settlement Fund and all other key terms of the Settlement Agreement. Although
23 Class Counsel's efforts warranted a fee in the amount of 25 percent of the Settlement Fund—25
24 percent of a common fund being the "benchmark" indicator of a reasonable fee in the Ninth
25 Circuit—Class Counsel instead stated it would agree to a substantially lower fee of just 15
26 percent of the Settlement Fund. Accordingly, Class Counsel executed a memorandum of
27 understanding providing that they would apply for a 15 percent fee to be paid from the Settlement
28 Fund, which the parties contemplated would be memorialized in a final written agreement.

1  49. Subsequent to signing the memorandum of understanding, but before a final settlement agreement was completed, the parties entered into further negotiations, at Lifelock's request, to discuss the coordination of the pending class action settlement of this case with the potential resolution of a pending enforcement action brought by the Federal Trade Commission, *Federal Trade Commission v. LifeLock, Inc*., Case No. CV-10-00530-PHX-JJT (D. Az.) ("FTC Action").

50. After those negotiations, Lifelock and the FTC reached an agreement whereby Lifelock is to pay the FTC $100 million, of which $68 million would be made available to fund to the Settlement of this case.

51. As this required the agreement of the Class, Class Counsel insisted on revised terms to protect the pending class settlement.  First, Class Counsel obtained Lifelock's agreement that whether or not the FTC timely effectuated funding of the $68 million to the Settlement Fund, Lifelock would nonetheless guaranty timely funding of the Settlement Fund, in full.  Second, LifeLock and Class Counsel agreed that costs of the class action settlement administration, incentive awards, and Class Counsel's attorneys' fees would be paid *separately and in addition to* the $68 million Settlement Fund, thereby making the entirety of the $68 Settlement Fund available to class members for distribution.

52. As a result, Class Members will receive higher individual payments under the Settlement.  Despite this increase in value to the Class, Class Counsel did not require, and does not request, any fees in addition to the amount originally agreed under the memorandum of understanding, *i.e.*, the amount equivalent to 15 percent of the $68 million Settlement Fund, or $10.2 million.

I hereby declare under penalty of perjury of the laws of the United States and California that the foregoing is true and correct.

Executed this 18th day of March, 2016 at San Francisco, California.

*/s/ Michael W. Sobol*
Michael W. Sobol