1  Michael W. Sobol (CA #194857)
   msobol@lchb.com
2  Nicole D. Sugnet (CA #246255)
   nsugnet@lchb.com
3  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
4  San Francisco, CA 94111-3339
   Telephone: (415) 956-1000
5  Facsimile: (415) 956-1008

6  Joseph Henry ("Hank") Bates (CA #167688)
   hbates@cbplaw.com
7  Randall K. Pulliam (admitted *pro hac vice*)
   rpulliam@cbplaw.com
8  CARNEY BATES & PULLIAM, PLLC
   One Cantrell Building
9  2800 Cantrell, Suite 510
   Little Rock, AR 72212
10 Telephone: (501) 312-8500
   Facsimile: (501) 312-8505

11
   Class Counsel and Attorneys for Plaintiffs Napoleon Ebarle,
12 Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15

16 NAPOLEON EBARLE, JEANNE                  Case No. 3:15-cv-00258-HSG
   STAMM, BRIAN LITTON, and REINER
17 JEROME EBARLE on behalf of              **PLAINTIFFS' NOTICE OF MOTION AND**
   themselves and all other similarly situated,   **MOTION FOR FINAL APPROVAL OF**
18                                          **CLASS ACTION SETTLEMENT, AWARD**
                  Plaintiffs,              **OF ATTORNEYS' FEES AND COSTS,**
19                                          **AND AWARD OF CLASS**
   v.                                       **REPRESENTATIVE SERVICE**
20                                          **PAYMENTS**
   LIFELOCK, INC.,
21                                          Date:       June 23, 2016
                  Defendant.               Time:       2:00 p.m.
22                                          Courtroom: 15, 18th Floor
                                           Judge:      Hon. Haywood S. Gilliam Jr.
23

24

25

26

27

28

MOTION FOR FINAL APPROVAL OF
                                                                 CLASS ACTION SETTLEMENT
                                                                 CASE NO. 3:15-CV-00258-HSG

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION ........................................................................................................ 1

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................. 2

    A. Plaintiffs' Claims ................................................................................... 2

    B. The Settlement Process .......................................................................... 2

    C. Coordination With the FTC Action ....................................................... 3

III. THE SETTLEMENT TERMS AND THEIR PROPOSED
IMPLEMENTATION ......................................................................................... 5

    A. $68,000,000 in Cash Payments to Class Members ............................... 5

    B. Administration Costs .............................................................................. 6

    C. Attorneys' Fees and Expenses and Service Awards .............................. 6

    D. Release ................................................................................................... 6

IV. IMPLEMENTATION OF THE NOTICE PLAN RESULTED IN A
DIRECT NOTICE BY MAIL OR EMAIL TO OVER 99.5% OF CLASS
MEMBERS ......................................................................................................... 6

V. THE COURT SHOULD GRANT FINAL APPROVAL OF THE
SETTLEMENT, AS FAIR, REASONABLE AND ADEQUATE ....................... 7

    A. The Strength of Plaintiffs' Case Balanced Against the Risk,
Expense, Complexity, and Likely Duration of Further Litigation .......... 8

    B. The Risk of Maintaining Class Action Status Throughout Trial ........... 8

    C. The Benefits Offered in Settlement and the Reaction of the Class ........ 9

        1. The Settlement is an Excellent Result for the Class ...................... 9

        2. The Settlement Enjoys the Overall Support of the Class ............... 9

        3. Extent of Discovery and Stage of Proceedings ........................... 10

        4. The Experience and View of Counsel .......................................... 10

        5. The Presence of a Governmental Participant ............................... 11

        6. Lack of Collusion Between the Parties ........................................ 11

VI. THE REQUESTED ATTORNEYS' FEE IS FAIR AND REASONABLE ........ 12

    A. The Requested Fee of 12.6% of the Total Monetary Benefits
Provided to the Class is Presumptively Fair, Reasonable, and
Justified, and is Lower than the Average Fee Awarded in
Settlements of Similar Size ................................................................... 12

    B. The Coordination of the Settlement with the FTC Settlement
Supports, Rather than Undermines, the Requested Fee ......................... 15

    C. The *Ex Ante* Risk Undertaken by Class Counsel Supports the
Requested Fee ....................................................................................... 21

    D. The Number of Hours Worked and Hourly Rates are Reasonable .......... 21

- i -

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

VII.    THE REMAINING OBJECTIONS PROVIDE NO BASIS TO DENY
FINAL APPROVAL ............................................................................................ 23

4

VIII.   CONCLUSION .................................................................................................... 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT
CASE NO. 3:15-CV-00258-HSG

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Alexander v. Fedex Ground Package Sys., Inc.,*
No. 05-cv-00038-EMC, 2016 WL 1427358 (N.D. Cal. Apr. 12, 2016) ................................... 19

*Barnes v. Fleetboston Fin. Corp.,*
No. CA 01-10395-NG, 2006 WL 6916834 (D. Mass. Aug. 22, 2006) ..................................... 19

*Blum v. Stenson,*
465 U.S. 886 (1994) ................................................................................................................... 22

*Chaid v. Glickman,*
No. C98-1004 WHO JCS, 1999 WL 33292940 (N.D. Cal. Nov. 17, 1999) ............................. 22

*Chavez v. Netflix, Inc.,*
162 Cal. App. 4th 43 (2008) ...................................................................................................... 19

*Churchill Vill., L.L.C. v. Gen. Elec.,*
361 F.3d 566 (9th Cir. 2004) ............................................................................................ 7, 9, 10

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992) ................................................................................................... 11

*CLRB Hanson Indus., LLC v. Weiss & Associates, PC,*
465 F. App'x 617 (9th Cir. 2012) ............................................................................................. 20

*Craft v. County of San Bernardino,*
624 F. Supp. 2d 1113 (C.D. Cal. 2008) ..................................................................................... 12

*Dennis v. Kellogg Co.,*
697 F.3d 858 (9th Cir. 2012) ..................................................................................................... 17

*Dennis v. Kellogg Co.,* No. 09-cv-1786-L (WMc),
2013 U.S. Dist. LEXIS 163118 (S.D. Cal. Nov. 14, 2013) ....................................................... 20

*Faught v. Am. Home Shield Corp.,*
444 F. App'x 445 (11th Cir. 2011) ........................................................................................... 18

*Gaskill v. Gordon,*
942 F. Supp. 382 (N.D. Ill. 1996), aff'd, 160 F.3d 361 (7th Cir. 1998) ................................... 22

*Glass v. UBS Fin. Servs., Inc.,*
No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007), aff'd, 331 F. App'x 452
(9th Cir. 2009) ........................................................................................................................... 24

*Glasser v. Volkswagen Of Am., Inc.,*
645 F.3d 1084 (9th Cir. 2011) ................................................................................................... 17

*Gucci Am., Inc. v. Pieta,*
No. CV 04–9626 ABC (Mcx), 2006 WL 4725707 (C.D. Cal. July 17, 2006) ......................... 21

- iii -

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998).................................................................................................. 17

4

*Harman v. Lyphomed, Inc.*,
    945 F.2d 969 (7th Cir. 1991)................................................................................................... 20

5

6

*In re Activision Sec. Litig.*,
    723 F. Supp. 1373 (N.D. Cal. 1989) ................................................................................. 12, 14

7

*In re Bluetooth Headset Products Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011)............................................................................................. 16, 17

8

9

*In re Cathode Ray Tube Antitrust Litig.*,
    281 F.R.D. 531 (N.D. Cal. 2012) ............................................................................................ 18

10

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    No. MDL 1361, 2003 WL 22417252 (D. Me. Oct. 7, 2003) .................................................. 19

11

12

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014).................................................................................................. 20

13

*In re Groupon, Inc.*,
    No. 11-md-2238, 2012 U.S. Dist. LEXIS 185750 (S.D. Cal. Sept. 28, 2012) ........................ 19

14

15

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
    No. 09CV1088 BTM KSC, 2013 WL 5275618 (S.D. Cal. Sept. 17, 2013) ............................ 18

16

*In re Immune Response Sec. Litig.*,
    497 F. Supp. 2d 1166 (S.D. Cal. 2007) ................................................................................... 11

17

18

*In re LifeLock, Inc. Mktg. & Sales Practices Litig.*,
    No. MDL 08-1977-MHM, 2010 WL 3715138 (D. Ariz. Aug. 31, 2010)................................ 19

19

*In re LifeLock, Inc., Marketing and Sales Practices Litig.*,
    No. 10-17177, Dkt. No. 13 (9th Cir. Jan. 3, 2011) ................................................................. 19

20

21

*In re Linkedin User Privacy Litig.*,
    309 F.R.D. 573 (N.D. Cal. 2015)......................................................................................... 9, 23

22

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    205 F.R.D. 369 (D.D.C. 2002)................................................................................................ 16

23

24

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000), as amended (June 19, 2000)....................................................... 9

25

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    MDL No. 1532, 2011 U.S. Dist. LEXIS 40843 (D. Me. Apr. 13, 2011)................................. 19

26

27

*In re Omnivision Techs.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2007) ............................................................................. 12, 24

28

1

**TABLE OF AUTHORITIES**
**(continued)**

2

Page

3

*In re Pacific Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995)....................................................................................... 10

4

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) ............................................................................... 10

5

6

*In re Portal Software, Inc. Sec. Litig.*,
   No. C-03-5138 VRW, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ...................... 20

7

*In re Royal Ahod N.V. Securities and ERISA Litig.*,
   No. 1:03-md-01539-CCB, Dkt. No. 771 at 68:9-21 (D. Md. July 12, 2006)............ 19

8

9

*In re TracFone Unlimited Service Plan Litig.*,
   112 F. Supp. 3d 993 (N.D. Cal. July 2, 2015).................................................... 10, 16

10

*In re UnitedHealth Grp. Inc. PSLRA Litig.*,
   643 F. Supp. 2d 1107 (D. Minn. 2009) ..................................................................... 20

11

12

*In re Wal-Mart Wage & Hour Emp't Practices Litig.*,
   No. 06-cv-00225, 2010 U.S. Dist. LEXIS 21466 (D. Nev. Mar. 8, 2010) ............... 18

13

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02 CIV 3288(DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004)................... 19

14

15

*Linney v. Cellular Alaska P'ship*,
   No. C 96-3008 DLJ, 1997 U.S. Dist. LEXIS 24300 (N.D. Cal. July 18, 1997), aff'd, 151 F.3d
   1234 (9th Cir. 1998)................................................................................................... 10

16

17

*Lobatz v. U.S. West Cellular of California*,
   222 F.3d 1142 (9th Cir. 2000).................................................................................... 17

18

*Lopez v. Youngblood*,
   No. CV-F-07-0474 DLB, 2011 U.S. Dist. LEXIS 99289 (E.D. Cal. Sep. 1, 2011) ........... 11, 12

19

20

*Moreno v. City of Sacramento*,
   534 F.3d 1106 (9th Cir. 2008)..................................................................................... 22

21

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) .......................................................................... 7, 10

22

23

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982).......................................................................................... 7

24

*Parkinson v. Hyundai Motor Am.*,
   258 F.R.D. 580 (C.D. Cal. 2008) ............................................................................... 25

25

26

*Roberts v. Electrolux Home Products, Inc.*,
   No. CV13-2339-CAS VBKX, 2014 WL 4568632 (C.D. Cal. Sept. 11, 2014) ........ 18

27

*Rodriguez v. West Publishing Corp.*,
   563 F.3d 948 (9th Cir. 2009)................................................................................. 7, 23

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Satchell v. Federal Express Corp.*,
  No. C 03-2659 SI, 2007 U.S. Dist. LEXIS 99066 (N.D. Cal. Apr. 13, 2007) ........................ 11

*Spark v. MBNA Corp.*,
  289 F. Supp. 2d 510 (D. Del. 2003) .......................................................................... 18

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ............................................................................. 11, 23

*Sullivan v. Oracle Corp.*,
  547 F.3d 1177 (9th Cir. 2008) ................................................................................. 25

*Swedish Hosp. Corp. v. Shalala*,
  1 F.3d 1261 (D.C. Cir. 1993) .................................................................................. 13

*Taubenfeld v. Aon Corp.*,
  415 F.3d 597 (7th Cir. 2005) ................................................................................... 19

*Tenuto v. Transworld Sys., Inc.*,
  No. CIV. A. 99-4228, 2002 WL 188569 (E.D. Pa. Jan. 31, 2002) ........................... 19

*United States v. Google Inc.*,
  No. CV 12-04177 SI, 2012 U.S. Dist. LEXIS 164401 (N.D. Cal. Nov. 16, 2012) ................. 16

*United States v. Oregon*,
  913 F.2d 576 (9th Cir. Or. 1990) ............................................................................. 16

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) .......................................................................... 12, 13, 14

*Wilkins v. HSBC Bank Nevada, N.A.*,
  No. 14 C 190, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015) ................................... 18, 19

### Statutes

Ariz. Rev. Stat. § 44-1528 ........................................................................................ 13

Ariz. Rev. Stat. § 44-1522(A) ..................................................................................... 2

### Treatises

4 Alba Conte & Herbert B. Newberg on Class Actions §11.50 (4th ed. 2002) ............................ 7

4 Alba Conte & Herbert B. Newberg on Class Actions § 11.41 (4th ed. 2002) ........................... 11

### Other Authorities

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
  7 J. EMPIRICAL LEGAL STUDIES 811 at Table 11 (2010) ............................................ 14

Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*,
  158 U. Pa. L. Rev. 2043, 2051 (2010) ..................................................................... 14

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3   Theodore Eisenberg & Geoffrey P. Miller,
       *Attorney Fees in Class Action Settlements: 1993–2008,*

4       7 J. EMPIRICAL LEGAL STUDIES 248 (2010) ............................................................. 14

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that on June 23, 2016, at 2:00 PM, in the Courtroom of the Honorable Haywood S. Gilliam Jr., United States District Judge for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs and Class Counsel[1] in the above-captioned matter will and hereby do move the Court for an Order granting final approval of the Class Action Settlement Agreement ("Settlement"), awarding attorneys' fees and costs, awarding class representative service payments, and entry of a corresponding Judgment.

Plaintiffs' motion is based on this notice, the accompanying memorandum of points and authorities, the Declaration of Lori L. Castaneda Regarding Notice and Settlement Administration ("Castaneda Decl.") filed herewith, the papers filed in support Plaintiffs' motion for preliminary settlement approval, the record in this case, and any additional argument and evidence the Court may consider.

Dated: May 13, 2016

By: ___*/s/ Hank Bates*_____

CARNEY BATES & PULLIAM, PLLC
Joseph Henry ("Hank") Bates (CA #167688)
Randall K. Pulliam (admitted *pro hac vice*)
One Cantrell Building
2800 Cantrell, Suite 510
Little Rock, AR 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Michael W. Sobol (CA #194857)
msobol@lchb.com
Nicole D. Sugnet (CA #246255)
nsugnet@lchb.com

*Class Counsel and Attorneys for Plaintiffs*

---

[1] "Class Counsel" are the firms appointed as Class Counsel pursuant to the Preliminary Approval Order (Docket No. 57): Lieff Cabraser Heimann & Bernstein LLP and Carney Bates & Pulliam, PLLC.

- 1 -

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      <u>INTRODUCTION</u>**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("FRCP") and the Court's order preliminarily approving the proposed Settlement [Dkt. No. 57] (the "Preliminary Approval Order"), Plaintiffs respectfully request that the Court grant final approval of the Settlement, award attorneys' fees and costs, award class representative service awards, and enter judgment accordingly.

The Settlement establishes a $68,000,000 non-reversionary settlement fund (the "Settlement Fund") for the sole benefit of the Class—100% of the funds will be distributed to Class members. In addition to the Settlement Fund, LifeLock will separately pay court-ordered attorneys' fees (up to $10,200,000 or 12.6%), service awards (up to $8,000), and the costs of notice and administration (currently estimated at $2,836,000). Thus, the total monetary benefit provided by the Settlement is approximately $81,044,000.

The Settlement's multi-faceted notice program was extraordinarily effective, directly reaching over 99.5% of Class Members.[1] There are 3,321,261 Subclass Members who will receive an automatic payment without the need of filing a claim.[2] In addition, the Settlement Administrator received 164,424 Claim Forms from Class members (78,830 of whom are also Subclass Members) who availed themselves of the user-friendly claims process. Thus, approximately 3,406,855 Class Members will share from the payout of the entire Settlement Fund, resulting in an overall delivery rate of approximately 52%.[3] By contrast, only 3,919 persons timely requested exclusion from the Class and only 57 objections were timely submitted, collectively representing 0.0006% of the Class.[4]

The Settlement is the product of arms'-length negotiations led by experienced and informed counsel, and facilitated by a highly-respected former California Court of Appeals

---

[1] Declaration of Lori L. Castaneda Regarding Notice and Settlement Administration ("Castaneda Decl."), ¶ 18.
[2] *Id.* ¶ 7.
[3] *Id.* ¶¶ 7 and 28.
[4] *Id.* ¶¶ 30 and 32.

1   Justice serving as a mediator. Plaintiffs and Class Counsel exerted significant litigation pressure

2   on LifeLock to expeditiously achieve significant results for the Class. After the parties agreed to

3   the size of the Settlement Fund, LifeLock and the Federal Trade Commission ("FTC") entered

4   into a Consent Decree, and Plaintiffs thereafter agreed to coordinate the Settlement with the

5   Consent Decree. The Settlement of this class action provides the only certain avenue for class

6   members to obtain restitution, and the FTC, by coordinating efforts here, has implicitly accepted

7   the consumer redress provided by the Settlement.

8       The Settlement is fair, reasonable and adequate, and Class Counsel respectfully submits

9   that the Court should approve it.

10  **II.      BACKGROUND**

11      **A.      Plaintiffs' Claims**

12      This Action commenced on January 19, 2015. Plaintiffs Napoleon Ebarle, Jeanne Stamm,

13  Brian Litton, and Reiner Jerome Ebarle allege in the Second Amended Complaint ("SAC") that

14  LifeLock's advertisements regarding its identity theft protection services violated Arizona's

15  Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A) ("ACFA"). The alleged misrepresentations

16  concern LifeLock's promises to provide (1) "comprehensive" services in detecting fraud; (2)

17  timely and continuous alerts of potential fraud twenty-four hours a day, seven days a week, three-

18  hundred-sixty-five days a year; (3) security for customers' sensitive personal data; and (4)

19  insurance in an amount up to $1,000,000 against identity theft. Plaintiffs seek declaratory

20  judgment, compensatory damages, equitable relief, attorneys' fees, and costs.

21      **B.      The Settlement Process[5]**

22      In early April 2015, counsel for the respective parties participated in a meet and confer

23  regarding the possibility of mediation. Thereafter, on April 22, 2015, the parties participated in an

24  in-person meeting regarding possible mediation and exchanging informal discovery prior thereto.

25  Following that meeting, the parties exchanged informal discovery requests, which led to the

26  ───────────────

27  [5] The facts set forth in Sections II.B and II.C of this Motion are also set forth in detail in the Joint
    Declaration of Hank Bates and Michael W. Sobol in Support of Motion for Preliminary Approval
    [Dkt. No. 49-1] ("Joint Decl."), ¶¶ 7-14 and the Declaration of Michael W. Sobol in Support of

28  Plaintiffs' Motion for Attorneys' Fees [Dkt. No. 60-1] ("Sobol Decl."), ¶¶ 48-52.

1   production and review of thousands of pages of documents. The parties also exchanged

2   confidential mediation statements addressing Plaintiffs' allegations and LifeLock's potential

3   defenses thereto.

4          On July 1, 2015, the parties participated in mediation before the highly-respected

5   mediator, Justice Howard Wiener. While the parties made good progress, they were unable to

6   reach a mutually agreeable resolution to the Action. However, at the behest of Justice Wiener, the

7   parties agreed to schedule a second mediation session. Leading up to that second mediation

8   session, the parties continued to engage in extensive, informal discovery. Ultimately, LifeLock

9   produced, and Class Counsel reviewed, over 10,000 pages of critical documents produced in

10   response to targeted requests.

11          On August 18, 2015, the parties participated in a second all-day mediation session before

12   Justice Wiener. At the conclusion of this session, all parties accepted the mediator's proposal to

13   settle this matter for $68,000,000 (the "Settlement Amount"). Only after agreement on the

14   Settlement Amount did the parties negotiate attorneys' fees. Notwithstanding the well-established

15   25% benchmark for attorneys' fees in common fund cases in the Ninth Circuit, Class Counsel

16   agreed to a lower fee of just 15% of the Settlement Amount. The parties contemplated that any

17   awarded attorneys' fees would be paid out of the Settlement Amount. The parties memorialized

18   the principal terms of their agreement in a Memorandum of Understanding ("MOU") that day.

19          Thereafter, the parties engaged in further negotiations regarding the final terms of the

20   Settlement and negotiated the coordination of the Settlement with the settlement in the FTC

21   Action (*see* Section II.C below). The parties also negotiated and drafted the proposed Notices, the

22   Claim Form, and the proposed orders. In addition, Class Counsel took 30(b)(6) depositions on

23   various topics, including LifeLock's policies and practices in delivering alerts to customers and

24   how those policies and practices changed over time.

25          The Settlement was executed by all parties on November 3, 2015, a copy of which was

26   filed with the Court on November 4, 2016. *See* Dkt. No. 49-1, Exhibit A.

27          **C.      Coordination With the FTC Action**

28          On July 21, 2015, approximately six months after this Action commenced, the FTC filed

1    an enforcement action in *Federal Trade Commission v. LifeLock, Inc*., Case No. CV-10-00530-

2    PHX-JJT, pending in the United States District Court for the District of Arizona ("FTC Action").

3    The FTC Action involved underlying alleged violations that overlap with the claims previously

4    asserted on behalf of the Class in this Action.

5            Following execution of the MOU in this Action, LifeLock reached a separate settlement in

6    the FTC Action. At that point, LifeLock requested, and all parties agreed to, the coordination of

7    the Settlement in this Action with the settlement in the FTC Action. As a result of the coordinated

8    approach, the settlement in the FTC Action authorizes LifeLock to fund the Settlement Amount

9    reached in this Action, *i.e.,* $68,000,000, with funds LifeLock deposits in the registry of the

10   United States District Court for the District of Arizona in connection with its settlement in the

11   FTC Action.[6] However, to guarantee adequate and timely payments to Class members in this

12   Action, Class Counsel insisted on a provision in the Settlement Agreement which requires

13   LifeLock to pay, within three business days following entry of this Court's Final Approval Order,

14   sufficient amounts to fully fund the $68,000,000 Settlement Fund in this Action, regardless of

15   what occurs in the FTC Action. In other words, in the event that LifeLock was unable to obtain

16   the funds from the Arizona Court's Registry, it nevertheless would have been required to pay

17   another $68,000,000 to the Settlement Administrator to make payments to Class members.[7] The

18   parties' negotiations regarding coordination of the settlements also resulted in LifeLock's

19   agreement to separately pay attorneys' fees (up to $10.2 million), service awards (up to $8,000),

20   and notice and administration costs and fees (estimated at $2.836 million), such that Class

21   members will now be receiving the full $68,000,000. By subsequently negotiating the payment of

22   these costs and fees to occur on top of, rather than from, the Settlement Fund, Class Counsel

23   added an estimated value of approximately $13,000,000 to the previously negotiated

24   $68,000,000, resulting in a Settlement that provides a total of about $81,044,000 in monetary

25

26   [6] Notably, because the FTC Action was not subject to the procedural requirements applicable to class actions under FRCP 23, it was anticipated that funding of the FTC Action would be able to

27   occur prior to funding in this Action.
     [7] Settlement Agreement, ¶ 57. LifeLock in fact obtained an order disbursing funds from the

28   Arizona Court's Registry, in accordance with the Settlement Agreement.

- 4 -

1  benefits to the Class.

2  **III.    THE SETTLEMENT TERMS AND THEIR PROPOSED IMPLEMENTATION**

3      **A.    $68,000,000 in Cash Payments to Class Members**

4      The entire $68 million Settlement Fund will be paid to Class Members. A review of

5  LifeLock's customer records identified 6,499,241 unique Class Members, of whom 3,323,108 are

6  also members of the Settlement Subclass.[8] The Subclass members will receive payments from the

7  Settlement Fund without the need to file a claim. In addition, 164,424 Class Members filed valid

8  claims ("Valid Claimants").[9] Accordingly, Class Members will receive payments in a manner

9  designed to exhaust the Settlement Fund, as follows:

10      (a) the **85,594** Valid Claimants who are not Settlement Subclass Members will
    receive **$20** each pursuant to Paragraph 68 of the Settlement Agreement, for an
11      aggregate total of $1,711,880;

12      (b) the **78,830** Settlement Subclass Members who are also Valid Claimants will
    receive **$39.48** each pursuant to Paragraphs 58, 68, and 70 of the Settlement
13      Agreement, for an aggregate total of $3,112,208.40;

14      (c) the **3,242,431** Settlement Subclass Members who did not make Claims will
    receive **$19.48** each pursuant to Paragraphs 58 and 70 of the Settlement
15      Agreement, for an aggregate total of $63,162,555.88.[10]

16  In total, $63,162,555.88 will be paid to Class Members in this initial distribution.[11] Pursuant to

17  Paragraph 63 of the Settlement Agreement, there will be a second *pro rata* distribution –

18  consisting of the money remaining from uncashed checks 120 days after the first payments – to

19  Valid Claimants who cashed their initial payment checks. The residual $4,837,444.20 will roll

20  over into that fund to be included in the second distribution, thus ensuring that the full $68

21  million is made payable to Class members.[12]

22  [8] Castaneda Decl., ¶ 7.

23  [9] *Id.* ¶ 28.

[10] *Id.* These payments are consistent with the estimates provided in the Notice to the Class: "The
24  parties estimate that Subclass Members (persons who enrolled in a LifeLock plan between
January 1, 2012 and April 30, 2015) will likely receive between about $34 and $39 if they do
25  make a claim and between about $14 and $19 if they do not make a claim. All other Class
Members (persons who were members of a LifeLock plan between September 1, 2010 and
26  December 31, 2011 or between May 1, 2015 and January 20, 2016) will likely receive $20 if they
do make a claim and nothing if they do not make a claim." *Id.*, Exs. A, B, & C.

27  [11] Precisely $68,000,000.00 cannot be distributed in the initial distribution because each
additional penny in pro rata distribution to the Subclass members adds $33,212.61.

28  [12] Pursuant to Paragraph 63 of the Settlement Agreement, any residual funds due to uncashed

*Footnote continued on next page*

### B.     Administration Costs

LifeLock will pay the costs associated with the court-approved notice program and the other costs of settlement administration separate from the Settlement Fund established for the benefit of the Class.[13] Those costs are $1,181,000 up to April 30, 2016, with estimated costs (consisting primarily of postage) through completion of $1,655,000, yielding total administration costs at $2,836,000.[14]

### C.     Attorneys' Fees and Expenses and Service Awards

LifeLock will pay, in addition to and separate from the Settlement Fund, Court-ordered attorneys' fees and expenses up to $10.2 million. *See* Dkt. No. 60. Therefore, the award of attorneys' fees and expenses will not reduce the relief available to the Class. LifeLock has also agreed to separately pay the service awards in the amount of $2,000 for each of the four Plaintiffs to compensate them for their efforts in pursuing this litigation. *See id*.

### D.     Release

The Action will be dismissed with prejudice upon final approval of the Settlement, and the Settlement Class Members will thereby release all claims as set forth in Paragraph 90 of the Settlement Agreement and disclosed to the Class in Sections 15 and 20 of the Class Notice.

### IV.     IMPLEMENTATION OF THE NOTICE PLAN RESULTED IN A DIRECT NOTICE BY MAIL OR EMAIL TO OVER 99.5% OF CLASS MEMBERS

Pursuant to the Court's Preliminary Approval Order, direct notice was accomplished through: (a) email notices delivered to 5,977,723 emails, and (b) individual postcard notices mailed to 1,288,501 mailing addresses.[15] Over 99.5% of the 6,499,241 Class Members received Summary Notice via email or mail (*i.e.,* the notice was not returned undeliverable), which is an exceptionally high direct notice deliverability rate.[16] In addition, publication notice was provided

---

*Footnote continued from previous page*
checks from this second distribution will be deposited in the Court Registry in the FTC Action.
[13] Settlement Agreement [Dkt. No. 49-1, Ex. A], ¶ 64.
[14] Castaneda Decl., ¶¶ 34-35.
[15] Castaneda Decl., ¶¶ 11, 14.
[16] *Id.* ¶ 18.

1    in *USA Today*.[17]

2          The Settlement Administrator maintained a website that is designed to address the

3    Settlement and established a call center with a toll-free number and Interactive Voice Response

4    (IVR) system.[18] More particularly, the Settlement website provides an explanation of the

5    litigation, the Settlement, and important dates; allows for on-line Claim Form submissions; and

6    posts copies of: (i) the Long Form Class Notice; (ii) the Second Amended Complaint; (iii) the

7    Settlement Agreement; (iv) the Motion for Preliminary Approval; (v) the Preliminary Approval

8    Order; (vi) the Order Regarding Revised Notices and Schedule of Settlement Dates; and (vii)

9    Plaintiffs' application for attorneys' fees and costs.[19] Class Members are able to obtain copies of

10   these documents through the Settlement website, 24 hours a day. Through May 12, 2016, the

11   Settlement website statistics show 239,115 visits to the website.[20] Similarly, for this same time

12   period, the call center has logged a total of 37,071 calls.[21]

13   **V.     THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT,
             AS FAIR, REASONABLE AND ADEQUATE**

14

15         The "settlement is fundamentally fair, adequate and reasonable," and should therefore be

16   approved. *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco,* 688 F.2d

17   615, 625 (9th Cir. 1982). In evaluating the Settlement, the Court balances several factors,

18   including: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely

19   duration of further litigation; (3) the risk of maintaining class action status throughout the trial;

20   (4) the benefits offered in the settlement; (5) the extent of discovery completed and the stage of

21   the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental

22   participant; and (8) the reaction of the class members to the proposed settlement. *Churchill Vill.,*

23   *L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

24

25   _____

26   [17] *Id. ¶* 19.
     [18] *Id. ¶¶* 20, 24.

27   [19] *Id*. ¶¶ 21-22.
     [20] *Id*. at ¶ 23.

28   [21] *Id*. at ¶ 25.

**A.      The Strength of Plaintiffs' Case Balanced Against the Risk, Expense, Complexity, and Likely Duration of Further Litigation**

While Plaintiffs and Class Counsel believe that their claims and allegations are meritorious, they also recognize the possibility that their claims might not succeed. Indeed, this Action called for resolution of numerous complex issues at considerable time and expense to the parties and the Court. The Settlement, by contrast, provides prompt relief for Class Members. *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) ("The Court shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.") (citation omitted); 4 Alba Conte & Herbert B. Newberg on Class Actions §11.50 (4th ed. 2002) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.")

LifeLock has vigorously denied Plaintiffs' allegations of wrongdoing, and would defend this Action aggressively at multiple procedural steps prior to trial, including through a motion to dismiss, a motion for summary judgment, and in opposition to class certification. LifeLock denies that it engaged in any intentional "throttling" (*i.e.,* systemic delays) of alerts, and also maintains that it provides the most comprehensive identity theft protection services available on the market. LifeLock additionally asserts that any inadvertent delays in sending alerts to customers affected only a small number of its customers, and that such delays in any event likely did not result in any harm in the form of actual credit fraud or identity theft. While Plaintiffs disagree with LifeLock's view, there is at least some risk that, absent a settlement, Class Members might recover nothing. In reaching the Settlement prior to dispositive motions or trial, Plaintiffs have ensured a favorable recovery for the Class and avoided significant expense, delay and uncertainty.

**B.      The Risk of Maintaining Class Action Status Throughout Trial**

LifeLock argues that class certification is unlikely because of variances in the representations that Class Members saw, delays in Class Members' alerts, and the presence (or absence) of Class Members' actual harm. While Plaintiffs believe that they have a strong

1    argument for certifying the Class, obtaining and maintaining class action status throughout trial is

2    always a challenge and is far from guaranteed in a complex case like this one.

3        **C.    The Benefits Offered in Settlement and the Reaction of the Class**

4            **1.    The Settlement is an Excellent Result for the Class**

5            The $68 million Settlement Fund offers an excellent monetary result for the Class. The

6    entire $68 million will be distributed to members of the Class. All Subclass Members will receive

7    automatic payments, and other Class Members who filled out a simple one-page claim form will

8    also receive payments. Together, this will ensure that 52% of the Class will receive payments

9    under the Settlement. The amount of the payments to Class Members will range between $19.48

10   and $39.48.[22] Putting the Settlement Amount in perspective, the average cost for one of

11   LifeLock's service plans is between $10 and $30 a month. Thus, Subclass Members (whether or

12   not they submit a claim) and all Class Members who submit timely and valid claims will recover

13   about the cost of a month of what they paid for LifeLock's service plans. As the Court noted in its

14   order preliminarily approving the Settlement (Dkt. No. 57), this is a fair result. While the

15   maximum value of Plaintiffs' claim is calculated to be a figure larger than the aggregate value of

16   the Settlement, when this amount is discounted by the identifiable risks, experience dictates that

17   the interests of the Class are better served by the proposed Settlement. *See In re LinkedIn User

18   Privacy Litig.,* 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Immediate receipt of money through

19   settlement, even if lower than what could potentially be achieved through ultimate success on the

20   merits, has value to a class, especially when compared to risky and costly continued litigation.").

21           In addition to the $68 million Settlement Fund, the Settlement requires LifeLock to make

22   separate payments of court-awarded attorneys' fees (up to $10.2 million), service awards (up to

23   $8,000), and notice and administration costs and fees (estimated at $2.836 million). Thus, viewed

24   in the aggregate, the value of the Settlement is potentially $81,044,000. This represents a

25   significant and immediate benefit to the Class.

26           **2.    The Settlement Enjoys the Overall Support of the Class**

27           The reaction of the Class has been very positive. As of May 12, 2016, 164,424 claims

28   [22] Castaneda Decl., ¶ 28.

1   have been submitted.[23] A total of 3,406,855 Class Members (*i.e.*, 52% of the Class) will receive

2   payments. In contrast, 3,919 persons have requested exclusion from the Class and only 57

3   objections have been timely submitted.[24] These numbers represent 0.0006 of the total Class. *See,*

4   *e.g., Churchill Vill.*, 361 F.3d at 577 (upholding district court's approval of class settlement with

5   45 objections and 500 opt-outs out of 90,000 notified class members; *i.e.* 0.6% of the class).

### 3.   Extent of Discovery and Stage of Proceedings

7        Class Counsel has "sufficient information to make an informed decision about the

8   settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), as amended

9   (June 19, 2000). Class Counsel negotiated the Settlement on a fully informed basis and with a

10  thorough understanding of the merits and value of the parties' claims and defenses. When the

11  parties executed the Settlement Agreement, Plaintiffs and Class Counsel had extensively

12  researched the facts and law applicable to both Plaintiffs' claims and LifeLock's defenses;

13  deposed key personnel at LifeLock on various pertinent issues; reviewed and analyzed over

14  10,000 pages of core documents responsive to targeted requests; exchanged confidential

15  mediation submissions; and participated in multiple mediation sessions with a reputable and

16  knowledgeable mediator. Accordingly, the extent of discovery completed and the stage of the

17  proceedings weigh strongly in favor of final approval of the Settlement.

### 4.   The Experience and View of Counsel

19       "The involvement of experienced class action counsel and the fact that the settlement

20  agreement was reached in arm's length negotiations, after relevant discovery had taken place

21  create a presumption that the agreement is fair." *Linney v. Cellular Alaska P'ship*, No. C 96-3008

22  DLJ, 1997 U.S. Dist. LEXIS 24300, at *16 (N.D. Cal. July 18, 1997), aff'd, 151 F.3d 1234 (9th

23  Cir. 1998). Based on their analyses of the risks, burdens, and expense of continued litigation as

24  well as their experience litigating other complex class actions, Class Counsel firmly believe the

25  Settlement is fundamentally fair, adequate and reasonable, and in the best interest of the Class. *In*

26  *re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent

27  ――――――――――――――
    [23] Castaneda Decl., ¶ 28.

28  [24] *Id.* ¶¶ 30, 32.

1  counsel are better positioned than courts to produce a settlement that fairly reflects each party's

2  expected outcome in litigation."); *see also Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("'Great

3  weight' is accorded to the recommendation of counsel, who are most closely acquainted with the

4  facts of the underlying litigation.") (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D.

5  104, 125 (S.D.N.Y. 1997)).

6  ### 5.   The Presence of a Governmental Participant

7  After its material terms were agreed to by the parties, the Settlement was coordinated with

8  the settlement of the FTC Action, further demonstrating its reasonableness and adequacy. *See*,

9  *e.g.*, *In re TracFone Unlimited Service Plan Litig.*, 112 F. Supp. 3d 993 (N.D. Cal. July 2, 2015)

10  (holding that coordination of a consumer settlement with an FTC settlement "weigh[ed] in favor

11  of final approval"); *Churchill Vill.*, 361 F.3d at 575 (listing "the presence of a governmental

12  participant" as one of the factors to be considered when determining whether a settlement should

13  be finally approved). Moreover, notice has been issued to the Attorney Generals in all fifty states,

14  the District of Columbia and all five permanently inhabited territories pursuant to the Class

15  Action Fairness Act,[25] and to date no governmental entity has raised objections or concerns about

16  the proposed Settlement.

17  ### 6.   Lack of Collusion Between the Parties

18  The Court "must reach a reasoned judgment that the proposed agreement is not the

19  product of fraud or overreaching by, or collusion among, the negotiating parties." *Class Plaintiffs*

20  *v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992) (citations omitted). Where, as here, a

21  settlement is the product of arm's length negotiations conducted by capable and experienced

22  counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable.

23  *See* 4 Newberg § 11.41. In addition, the participation of Justice Wiener, a highly-respected and

24  neutral mediator, underscores the fact that the proposed Settlement is not the product of collusion.

25  *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1171 (S.D. Cal. 2007) (former judge's

26  involvement as mediator was "highly indicative of fairness"); *Satchell v. Federal Express Corp.*,

27  No. C 03-2659 SI, 2007 U.S. Dist. LEXIS 99066, at *17 (N.D. Cal. Apr. 13, 2007) ("The

28  [25] Castaneda Decl., ¶ 4, Ex. A.

1  assistance of an experienced mediator in the settlement process confirms that the settlement is

2  non-collusive.").

3      In sum, all of the relevant factors weigh in favor of final Settlement approval.

4  **VI.    THE REQUESTED ATTORNEYS' FEE IS FAIR AND REASONABLE**

5      **A.    The Requested Fee of 12.6% of the Total Monetary Benefits Provided to the Class is Presumptively Fair, Reasonable, and Justified, and is Lower than the Average Fee Awarded in Settlements of Similar Size**

6

7      The Settlement guarantees that the full $68 million will be paid to Class Members and it

8  provides for up to approximately $81,044,000 in total monetary benefits to the Class.[26] Under

9  Ninth Circuit law, approval of an attorneys' fee as fair, reasonable and justified is within the

10 discretion of the district court upon consideration of all of the circumstances of the case. *Vizcaino*

11 *v. Microsoft Corp.*, 290 F.3d 1043, 1047-48 (9th Cir. 2002). Here, there are no "special

12 circumstances" that warrant departing from the fee request that is already considerably below the

13 presumptively reasonable benchmark of 25%. Instead, all of the relevant circumstances[27] strongly

14 support approval of Class Counsel's request of a 12.6% fee: Class Counsel seek a fee roughly half

15 of the benchmark in a case where they achieved extraordinary results for the Class Members

16 through concentrated effort in remarkably swift fashion. Moreover, the Settlement enjoys the

17 benefit of coordination with the FTC, and such coordination effectuated the post-MOU shifting of

18 the attorneys' fees (and administration costs) out of, and on top of, the Settlement Fund, so that

19 the Class Members receive the full benefit of the $68 million Settlement Fund, regardless the fee

20 award.

21     Some objectors argue that the Court should award fees based on Class Counsel's lodestar

22 rather than as a percentage-of-the-fund. But, courts in the Ninth Circuit typically apply the

---

23,24 [26] The total "benefit" achieved for the Class includes "costs (including class administrative costs) and fees." *Lopez v. Youngblood*, No. CV-F-07-0474 DLB, 2011 U.S. Dist. LEXIS 99289, at *32 (E.D. Cal. Sep. 1, 2011). *See also Staton v. Boeing Co.,* 327 F.3d 938, 975 (9th Cir. 2003) (holding that, where the defendant pays the costs of notice to the class on top of the settlement fund, "it is reasonable . . . to include that cost in a putative common fund benefiting the plaintiffs for all purposes, including the calculation of attorneys' fees.").

27,28 [27] A detailed analysis of the relevant circumstances is set forth in Plaintiffs' Motion for Attorney's Fees and Expenses and For Service Awards for Plaintiffs, Dkt. No. 60 at 7-18. This pleading focuses only on issues raised by objectors.

1  percentage-of-the-fund method to calculate fees in common fund cases. *In re Omnivision Techs*.,

2  559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2007) ("[U]se of the percentage method in common fund

3  cases appears to be dominant."); *Vizcaino*, 290 F.3d at 1050 ("[T]he primary basis of the fee

4  award remains the percentage method."); *Lopez v. Youngblood*, No. CV-F-07-0474 DLB, 2011

5  U.S. Dist. LEXIS 99289, at *31 (E.D. Cal. Sept. 1, 2011) ("[W]hile the Court has discretion to

6  use either a percentage of the fund or a lodestar approach in compensating class counsel . . . the

7  percentage of the fund is the typical method of calculating class fund fees."); *In re Activision Sec.*

8  *Litig.*, 723 F. Supp. 1373, 1374-78 (N.D. Cal. 1989) (discussing the advantages of percentage of

9  recovery method in common fund cases). The reason courts prefer the percentage-of-the-fund

10  approach is that it "aligns the interests of counsel and the class by allowing class counsel to

11  directly benefit from increasing the size of the class fund." *Craft v. County of San Bernardino*,

12  624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) (citations omitted). By directly linking counsel's fee

13  to the benefit conferred on the class, the percentage method "more accurately reflects the

14  economics of litigation practice," which, "given the uncertainties and hazards of litigation, must

15  necessarily be result-oriented." *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1269 (D.C. Cir.

16  1993). In contrast, as the Ninth Circuit has recognized, the lodestar approach "creates incentives

17  for counsel to expend more hours than may be necessary on litigating a case so as to recover a

18  reasonable fee." *Vizcaino*, 290 F.3d at 1050.[28]

19          Other objectors assert that the fee should be lowered based on the lodestar crosscheck.

20  But, if the Court were to use the lodestar crosscheck to decline to award a fee that is *already*

21  much lower than the presumptively reasonable 25% benchmark, the same perverse incentives the

22  Ninth Circuit warned of in *Vizcaino* would inure as a result. To illustrate, suppose that Class

23  Counsel continued litigating this action for four years and racked up about $5 million in lodestar

24  (based on the current lodestar of about $1.2 million multiplied by four), ultimately obtaining a

---

[28] Presumably aware of this preference, a few objectors erroneously construe Class Counsel's fee request as one being made pursuant to a "fee shifting statute" and argue that the Court should accordingly apply the lodestar method to calculate a fee. *See* Niemeyer Obj., Dkt. No. 67, at 3-4; Robinson Obj., Dkt. No. 66, at 7-8. None of the Class claims are made under a statute with a fee-shifting provision. Plaintiffs' only statutory claim arises under Arizona's Consumer Fraud Act, which does not provide for attorneys' fees to the prevailing party. *See* Ariz. Rev. Stat. § 44-1528.

settlement of $40,800,000. Under objectors' reasoning, they would not oppose a requested fee of

25% (or $10.2 million) of that hypothetical $40,800,000 fund because the lodestar cross-check

would yield a multiplier of only about 2. And yet, the Class undoubtedly would be worse off

under that scenario. Although the hypothetical fund might still constitute a fair, reasonable, and

adequate settlement,[29] Class Members would receive significantly less than they are receiving

under this Settlement, and would have to wait several more years for payment.

Adopting objectors' view would penalize Class Counsel for obtaining an excellent result

in a relatively short timeframe, when the opposite should occur. Research shows that in class

action settlements between the years 1993 and 2008, with recovery sizes ranging from $69.6 to

$175.5 million, the average fee was 19.4%—*i.e.*, between $13,502,400 and $33,950,000.

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993–*

*2008*, 7 J. EMPIRICAL LEGAL STUDIES 248 at Table 7 (2010).[30] In a study of class action settlement

between the years 2006 to 2007, with recovery sizes ranging from $72.5 to $100 million, the

average fee was 23.7%—*i.e.*, between $18,125,000 and $23,700,000. Brian T. Fitzpatrick, *An*

*Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL

STUDIES 811 at Table 11 (2010).[31] This same study found that, in consumer class actions,

settlements took about two and a half years to reach on average. *Id.* at Table 2.[32] If the Court were

to award a fee lower than the already lower-than-average requested fee of 12.6% of the fund (or

$10.2 million) simply because Class Counsel reached the Settlement within a quicker-than-

average timeframe, the message to class action lawyers would be clear: Prolong the litigation

until you reach a lodestar roughly equivalent to the benchmark percentage of the fund, even if the

[29] Particularly if the Court were to accept LifeLock's view that the total maximum recovery the
Class could obtain is $10 million. *See* Dkt. No. 57 at 11.

[30] Available at
http://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=2468&context=facpub

[31] Available at
http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/2012_aba_annua
l/12_6.authcheckdam.pdf

[32] Similarly, the Appendix to *Vizcaino* "surveys fee awards from 34 common fund settlements of
$50-200 million from 1996-2001, with fees awarded under the percentage method. Awards here
range from 3-40%, with most (27 of 34, or 79%) awards around 10-30% and a bare majority (19
of 34, or 56%) clustered in the 20-30% range." *Vizcaino*, 290 F.3d at 1050, n. 5.

1    amount being offered to settle the litigation is imminently fair, reasonable, and in the best

2    interests of the class. For this reason, the *Vizcaino* court cautioned that the lodestar crosscheck

3    should not be used to award counsel a lesser percentage fee recovery simply because a case

4    settles quickly and efficiently. 290 F.3d at 1050 n.5. *See also In re Activision Sec. Litig.,* 723 F.

5    Supp. at 1375 ("Where attorneys must depend on a lodestar approach there is little incentive to

6    arrive at an early settlement."); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*,

7    158 U. Pa. L. Rev. 2043, 2051 (2010) (criticizing the lodestar crosscheck because it "caps the

8    amount of compensation class counsel can receive from a settlement, thereby misaligning their

9    incentives from those of class members, and blunting their incentive to achieve the largest

10   possible award for the class").

11          The multiplier resulting from the lodestar crosscheck simply cannot be viewed in a

12   vacuum, separate and apart from the already low percentage requested and the high recovery

13   obtained for the Class in swift fashion. Indeed, as detailed in Plaintiffs' Fee Motion, Ninth Circuit

14   courts have approved fee requests with similar crosscheck multipliers even where, unlike here,

15   counsel sought the 25% benchmark and the fee was to be paid out of the common fund and thus

16   would reduce the net recovery of the class members.[33]

17          **B.      The Coordination of the Settlement with the FTC Settlement Supports,
                     Rather than Undermines, the Requested Fee**

18

19          Eight objectors wrongly assert that the $68 million fund was secured by the FTC and not

20   Class Counsel.[34] These objectors ignore or wholly misstate the facts: The FTC Action was filed

21   six months after this Action, and the FTC settlement was entered into only *after* LifeLock agreed

22   to a $68 million settlement to resolve this Action and signed a MOU to that effect. That LifeLock

23   *later* agreed to a $100 million settlement with the FTC, pursuant to which the $68 million paid to

24   consumers in *this* Settlement will operate as a set-off for LifeLock, does not in any way negate or

25   otherwise diminish the results achieved by Class Counsel's efforts. The fact of the matter is that

---

[33] Dkt. No. 60 at 20.

[34] *See* Ellingwood Obj., Dkt. No. 61, at 1-6; Pentz Obj., Dkt. No. 62, at 1-2; Robinson Obj., Dkt. No. 66, at 7; Niemeyer Obj., Dkt. No. 67, at 4-6; Carrasco Obj., Dkt. No. 68, at 3-4; Hinojosa & Piazza Objs., attached as Ex. G to the Castaneda Decl.

1   neither LifeLock nor the FTC would be under *any* obligation to distribute the funds to the Class if

2   it weren't for the Settlement that Class Counsel negotiated.[35]

3          Contrastingly, the Settlement here requires LifeLock to fund the $68 million *regardless* of

4   what happens in the FTC Action. Specifically, if for any reason LifeLock were unable to obtain

5   the $68 million from the court's registry in the FTC Action, it would nevertheless be required to

6   hand over *another* $68 million to fund this Settlement.[36] This provision of the Settlement

7   Agreement was inserted at Class Counsel's insistence to protect Class Members and to ensure

8   that they get paid pursuant to this Settlement, irrespective of what might occur in the FTC Action.

9          If anything, joint coordination with the subsequent FTC settlement supports Class

10   Counsel's request for fees. First, it shows the FTC's recognition that $68 million is a reasonable

11   amount to provide for consumer redress in this Action. Because the FTC is the government

12   agency charged with protecting consumers' rights, courts give deference to its views on what

13   constitutes adequate consumer redress.[37] Second, as detailed previously, coordination of the two

14   settlements ultimately resulted in higher individual payment amounts to Class Members, now that

15   the costs of settlement notice and administration, attorneys' fees and costs, and service awards to

16   the Plaintiffs—collectively equating to about $13 million—will be paid *on top* of the $68 million

17   Settlement Fund.[38]

18          Ironically, Objectors Carrasco and Ellingwood take issue with the fact that fees will now

19   be paid on top of, and not out of, the Settlement Fund,[39] even though this later agreed-to payment

20   structure greatly benefitted the Class. Rather than being the result of some nefarious motive or

---

[35] Neither the objectors nor Class Counsel have any way of knowing whether or how much of any settlement that the FTC might have negotiated on its own, absent this Settlement, would go to Class Members as opposed to simply going to the FTC.

[36] Settlement Agreement [Dkt. No. 49-1, Ex. A], ¶ 51.

[37] *See United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (settlements with a government agency are "presumptively valid"); *United States v. Google Inc.*, No. CV 12-04177 SI, 2012 U.S. Dist. LEXIS 164401, at *5 (N.D. Cal. Nov. 16, 2012) (courts give deference to consent decrees entered with the FTC).

[38] While coordination with the FTC settlement ultimately resulted in an added value of about $13 million, certain objectors are wrong in asserting that this is the *only* value Class Counsel obtained for the Class because, as discussed, Class Counsel negotiated the $68 million recovery for the Class in the first instance, prior to, and separate from, the FTC settlement.

[39] *See* Carrasco Obj., Dkt. No. 68, at 5-6; Ellingwood Obj., Dkt. No. 61, at 7.

1    scheme on the part of Class Counsel, Class Counsel did not engage in *any* negotiations for a

2    separate fee fund prior to execution of the MOU and the FTC settlement. Instead, this payment

3    structure came about through the coordination of the Settlement with the FTC's settlement, and it

4    is common to class action settlements that are coordinated with FTC settlements.[40]

5           The Ninth Circuit warned against separate fee and settlement funds only in a starkly

6    different context where such a structure was used to seek a fee, based on counsel's lodestar, in

7    *excess* of "the 25% benchmark requirement on what is in economic reality a common fund

8    situation." *In re Bluetooth Headset Products Liab. Litig*., 654 F.3d 935, 943 (9th Cir. 2011)

9    (internal quotations and citations omitted) (class counsel sought eight times the total recovery of

10   the class in fees). Here, Class Counsel's fee request fell well below the 25% benchmark under the

11   originally contemplated fee of 15% of a total Class recovery of $68 million. Now, with attorneys'

12   fees being paid on top of the $68 million, Class Counsel's requested fee falls even further below

13   the benchmark at about 12.6% of the approximately $81,044,000 in total monetary benefits that

14   will be provided to the Class. In other words, the separate fee fund did not diminish but rather

15   *enhanced* the Class recovery, and yet Class Counsel seek no additional fee for this enhancement.

16   This is not a case like *Bluetooth* where the class was getting little or nothing in exchange for an

17   excessive fee.[41] Instead, a large $68 million fund was achieved for the Class, *all* of which will

18   now be paid out to Class Members as a *result* of coordination with the FTC Settlement and the

19   subsequent agreement to pay fees (and administration costs) separately from the Fund. Thus, the

20   separate fee payment carries no indicia of collusion. Quite the opposite, this structure greatly

21   benefits the Class to the detriment of LifeLock.

22          Objector Pentz asserts that the Court may take a portion of the requested fees and add that

23   amount to the Settlement Fund for payments to Class Members.[42] None of the case law he cites

---

[40] *See, e.g., In re TracFone,* 112 F. Supp. 3d at 1007 (approving the settlement and requested attorneys' fees notwithstanding the FTC's requirement that attorneys' fees be paid separately from class funds); *In re Lorazepam & Clorazepate Antitrust Litig*., 205 F.R.D. 369, 384-85 (D.D.C. 2002) (same).

[41] Under the proposed settlement in *Bluetooth*, the attorneys sought $800,000 in fees but the results obtained for the class consisted only of injunctive relief and a *cy pres* payment of $100,000, with *no* compensation to class members. *In re Bluetooth*, 654 F.3d at 945.

[42] *See* Objection of James E. Pentz, Dkt. No. 62, at 3.

1     supports that proposition.[43] The Class Members already have benefitted from the post-MOU

2     agreement to remove any fee award from the $68,000,000 Settlement Fund. The Court has no

3     authority to rewrite the executed Settlement Agreement by adding any unawarded fee amount to

4     the Class recovery. "It is the settlement taken as a whole, rather than the individual component

5     parts, that must be examined for overall fairness," and the court cannot "delete, modify or

6     substitute certain provisions. The settlement must stand or fall in its entirety." *Dennis v. Kellogg*

7     *Co.*, 697 F.3d 858, 868 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026

8     (9th Cir. 1998)).

9         That these objections are unfounded is unsurprising, given that all eight were made by so-

10    called "serial" or "professional" objectors who file objections to extract payments for themselves

11    from the parties or counsel by threatening years of delay associated with unmeritorious settlement

12    objections and appeals. Objector Antonia Carrasco is represented in part by Christopher Bandas,[44]

13    who has repeatedly been reprimanded by courts for filing objections not "to effectuate changes to

14    settlements, but . . . for his own personal financial gain; he has been excoriated by Courts for this

15    conduct." *In re Cathode Ray Tube Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012).[45] Ms.

16    Carrasco's other attorney, Timothy Hanigan, has a similar history of making frivolous objections,

17    appealing them when they are overruled, and then voluntarily withdrawing the appeal before it is

18

---

19    [43] *Lobatz*, for example, holds that an objector may have standing to challenge a separate fee

20    award only where class counsel "breached their fiduciary duty to the class by agreeing to an
      unfair settlement offer" such that the excessive fee award "could be considered the property of the

21    class." *Glasser v. Volkswagen Of Am., Inc.*, 645 F.3d 1084, 1088 (9th Cir. 2011) (citing *Lobatz v.*
      *U.S. West Cellular of California*, 222 F.3d 1142, 1147 (9th Cir. 2000)).

22    [44] Ms. Carrasco has been represented by Mr. Bandas in objecting to other class action settlements.
      *See, e.g., Wilkins v. HSBC Bank Nevada, N.A.,* No. 14 C 190, 2015 WL 890566, at *9 (N.D. Ill.

23    Feb. 27, 2015) (finding that "none of the objections to the total amount of the settlement or its
      administration are well-founded" and granting final approval).

24    [45] *See also In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09CV1088 BTM KSC, 2013 WL
      5275618, at *5 (S.D. Cal. Sept. 17, 2013) (striking Mr. Bandas's objections and finding that they

25    "were filed for the improper purpose of obtaining a cash settlement in exchange for withdrawing
      the objections"); *In re Wal-Mart Wage & Hour Emp't Practices Litig.,* No. 06-cv-00225, 2010

26    U.S. Dist. LEXIS 21466, at *16-17 (D. Nev. Mar. 8, 2010) (finding that Mr. Bandas had
      submitted objections that were "not supported by law or the facts and are indeed meritless" and

27    that he had "a documented history of filing notices of appeal from orders approving other class
      action settlements, and thereafter dismissing said appeals when they and their clients were

28    compensated by the settling class or counsel for the settling class").

         - 18 -         

1   ruled upon.[46]

2        The same is true with respect to Objector James Pentz's attorneys, John Pentz and Charles

3   Benjamin Nutley.[47] One court called John Pentz's objection to another settlement "frivolous" and

4   "reflect[ed] a substantial lack of knowledge of the record of this case," and also found that he had

5   "essentially highjacked [the objector's] objection for his own purposes." *In re Royal Ahod N.V.*

6   *Securities and ERISA Litig.*, No. 1:03-md-01539-CCB, Dkt. No. 771 at 68:9-21 (D. Md. July 12,

7   2006). John Pentz is the founder of what was formerly called "The Objectors Group" (now the

8   "Class Action Fairness Group"), and has used his father,[48] wife,[49] mother-in-law,[50] and apparently

9   even a deceased grandmother[51] to further his agenda as objector counsel. He has also objected on

10  behalf of James Pentz (presumably a relative) in a different settlement involving LifeLock.[52]

11        Objector Walter F. Ellingwood, III's attorney, Steven Helfand, is also a "well-known

12  serial objector." *Gay v. Tom's of Maine*, No. 0:14-cv-60604-KMM, Dkt. No. 43 (S.D. Fla.

13  March 11, 2016), appeal voluntarily dismissed at *Gay v. Tom's of Maine*, No. 16-11356 (11th Cir.

14

---

15  [46] *See, e.g., Roberts v. Electrolux Home Products, Inc.,* No. CV13-2339-CAS VBKX, 2014 WL
16  4568632, at *11 (C.D. Cal. Sept. 11, 2014) (finding that Mr. Hanigan's objections
    "misunderstand or misread the Settlement Agreement, or provide no evidence or support");
17  *Adams v. AllianceOne Receivables Mgmt., Inc.*, No. 08-CV-0248 JAH (WVG), Dkt. Nos. 167-1,
    169, 171 & 175 (S.D. Cal.) (voluntarily withdrawing objection after it was revealed that the
18  objector's signature was forged by his attorneys, and the objector had no knowledge of the
    substance of the objection).

19  [47] *See, e.g., Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 514 (D. Del. 2003) ("The objector's
    [Pentz's] 'opposition' to class counsel's fee petition appears to be nothing more than an attempt
20  to receive attorneys' fees."); *Faught v. Am. Home Shield Corp.*, 444 F. App'x 445, 446 (11th Cir.
    2011) (upholding district court's denial of attorneys' fees to Nutley, finding that his objections
21  "were based on speculation that is unsupported by the record").

22  [48] *See, e.g., Tenuto v. Transworld Sys., Inc.*, No. CIV. A. 99-4228, 2002 WL 188569, at *2-3
    (E.D. Pa. Jan. 31, 2002) (noting factual and legal errors of objections and overruling them).

23  [49] *See, e.g., Barnes v. Fleetboston Fin. Corp.*, No. CA 01-10395-NG, 2006 WL 6916834, at *2
    n.1 (D. Mass. Aug. 22, 2006) (finding that Pentz is a "professional objector[]" and ordering
24  appeal bond of $645,111.60 for frivolous appeal); *In re Compact Disc Minimum Advertised Price
    Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *2 (D. Me. Oct. 7, 2003); *Taubenfeld v.
25  Aon Corp.*, 415 F.3d 597 (7th Cir. 2005).

    [50] *See, e.g., Barnes*, 2006 WL 6916834, at *2.
26
    [51] *See* http://pslranugget.blogspot.com/2005/07/seventh-circuit-shoots-down.html.

27  [52] *See In re LifeLock, Inc. Mktg. & Sales Practices Litig.*, No. MDL 08-1977-MHM, 2010 WL
    3715138, at *6 (D. Ariz. Aug. 31, 2010) (overruling objection), appeal voluntarily dismissed prior
28  to ruling at *In re LifeLock, Inc., Marketing and Sales Practices Litig.*, No. 10-17177, Dkt. No. 13
    (9th Cir. Jan. 3, 2011).

Apr. 5, 2016).[53] Likewise, Objector Teri Niemeyer's attorneys, Steve Miller, Jonathan Fortman,

and John Kress have a history of objecting to class action settlements.[54] The same is true with

respect to Objector Marla Merhab Robinson's attorney, Steven Scow,[55] and Objectors Jennifer

Hinojosa's, Stephen Piazza's, and Jill Piazza's attorneys, Alan Sherwood and Stuart Yoes.[56]

   The Court should view these objections with particular skepticism and give them little

weight. *See Dennis v. Kellogg Co.,* No. 09-cv-1786-L (WMc), 2013 U.S. Dist. LEXIS 163118, at

*11 n.2 (S.D. Cal. Nov. 14, 2013) ("When assessing the merits of an objection to a class action

settlement, courts consider the background and intent of objectors and their counsel, particularly

when indicative of a motive other than putting the interest of the class members first.").

---

[53] *See also se Alexander v. Fedex Ground Package Sys., Inc.,* No. 05-cv-00038-EMC, 2016 WL 1427358, at *4, n.9 & *10 (N.D. Cal. Apr. 12, 2016) (noting that Helfand had represented objectors in several cases within the district and finding that his "objections lack sufficient merit to warrant a denial of final approval"); *Chavez v. Netflix, Inc.,* 162 Cal. App. 4th 43, 52 (2008) (abandoning the objections on appeal); *In re WorldCom, Inc. Sec. Litig.,* No. 02 CIV 3288(DLC), 2004 WL 2591402, at *21 (S.D.N.Y. Nov. 12, 2004) ("Helfand's objections are not persuasive.").

[54] *See, e.g., Wilkins,* 2015 WL 890566, at *9 (finding that objection regarding release "is incorrect and falls apart upon a more exacting review of the full release, rather than the abridged version [Miller, Fortman, and Kress] quoted in [their] objection"); *In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. 07-md-1827, Dkt. No. 9096 (N.D. Cal. June 10, 2014) (voluntarily dismissing appeal of court's order overruling their objection without having obtained anything for the class); *In re Pre-Filled Propone Tank Marketing & Sales Prac. Litig.,* No. 09-md-02086, Dkt. No. 311 (W.D. Mo. Nov. 20, 2012) (same); *In re Groupon, Inc.,* No. 11-md-2238, 2012 U.S. Dist. LEXIS 185750, at *26 (S.D. Cal. Sept. 28, 2012) (overruling objection as having no merit); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* MDL No. 1532, 2011 U.S. Dist. LEXIS 40843, n.22 (D. Me. Apr. 13, 2011) (rejecting Miller's "specious" argument made in connection with objection).

[55] *See, e.g., Golloher v. Todd Christopher Int'l, Inc.,* No. 12-cv-06002-RS, Dkt. No. 95 (N.D. Cal. July 4, 2014) (denying appeal bond but nevertheless finding that Scow's appeal "appear[s] to lack substantial merit or legal justification"), appeal voluntarily dismissed prior to merits determination at *Golloher v. Todd Christopher Int'l, Inc.*, No. 14-15959, Dkt. No. 16 (9th Cir. Sept. 16, 2014).

[56] *See, e.g., In re Deepwater Horizon*, 739 F.3d 790, 795 (5th Cir. 2014) (affirming final approval from appeal by Yoes (with Pentz)); *CLRB Hanson Indus., LLC v. Weiss & Associates, PC*, 465 F. App'x 617, 619 (9th Cir. 2012) (affirming final approval after previously denying Sherwood's motion to voluntarily dismiss appeal); *Perkins v. LinkedIn Corp.*, No. 13-cv-04303-LHK, Dkt. No. 134 (N.D. Cal. Feb. 16, 2016) (overruling Sherwood's objections as being "not the law in the Ninth Circuit, and, indeed, would contradict the precedent of this district"), pending appeal at *Perkins v. LinkedIn Corp.*, No. 16-15398 (9th Cir.); *Fraley v. Facebook*, No. 11-cv-01726-RS, Dkt. No. 430 (N.D. Cal. Dec. 19, 2013) (Sherwood withdrew appeal rather than showing cause for lateness in filing notice of appeal); *In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107, 1109 (D. Minn. 2009) (finding Yoes's request for attorneys' fees to be "laughable," given that "[t]hese objectors have contributed nothing").

     - 20 -

1

## C.      The *Ex Ante* Risk Undertaken by Class Counsel Supports the Requested Fee

2          Objector Pentz argues that Class Counsel undertook no risk because the Action settled

3 "just eight months" after it was filed.[57] But, how quickly Class Counsel effectuates a settlement

4 reveals *nothing* about how risky it might be to continue litigation. This is why the risk that Class

5 Counsel undertook should be measured *ex ante* at the outset of the case, and not *ex post* based on

6 how or when the case was ultimately resolved. *See In re Portal Software, Inc. Sec. Litig.,* No. C-

7 03-5138 VRW, 2007 WL 4171201, at *14 (N.D. Cal. Nov. 26, 2007); *Harman v. Lyphomed, Inc.,*

8 945 F.2d 969, 974 (7th Cir. 1991).

9          Objector Niemeyer argues that the case purportedly involved little risk because of the

10 FTC's "involvement" and because of a 2010 Stipulated Judgment and Order for Permanent

11 Injunction and Other Equitable Relief ("2010 FTC Order") agreed to between the FTC and

12 LifeLock. Both assertions are incorrect. First, the FTC has never been involved in this litigation;

13 the FTC's separate contempt action was filed six months after this Action and Class Counsel have

14 never spoken with counsel for the FTC or anyone at the FTC about either action. More

15 fundamentally, the risk Class Counsel undertook in instigating this Action was arguably *greater*

16 due to the 2010 FTC Order, given that proving at least some of Plaintiffs' claims would require a

17 showing that LifeLock was not complying with a prior court order and agreement with a

18 governmental agency.[58]

19          When Class Counsel commenced this Action in January 2015, they had no way of

20 knowing whether it would settle or when, and faced significant challenges on proving the merits

21 of their case, certifying a class, and proving classwide damages. *See*, *supra*, Section V.A and V.B.

22 Such hurdles would still exist if the Action were to continue, *notwithstanding* either of the FTC's

23 separate actions against LifeLock.

24

## D.      The Number of Hours Worked and Hourly Rates are Reasonable

25          A few of the objectors mistakenly argue that Class Counsel failed to submit evidence of

26

---

[57] *See* Pentz Obj., Dkt. No. 62 at 2.

27 [58] Objector Pentz also incorrectly asserts that the action involved little risk because "followed in the footsteps of an FTC contempt proceeding"; in fact, this action was instigated—and settled—

28 *prior* to the FTC's December 2015 contempt action. *See supra,* Section II.C.

1    the hours worked on this matter. In fact, Class Counsel submitted detailed declarations that set

2    forth the number of hours worked, their billing rates and the amount of time spent on particular

3    tasks (*e.g.*, "motions and pleadings" and "discovery, document review, and data analysis"). Dkt.

4    No. 60-1 & 60-2. These declarations were filed on the public docket on March 18, 2016 and were

5    uploaded to the Settlement website one day later.[59] To the extent objectors believe that more

6    detailed records are required—one objector argues that detailed time records should be mailed to

7    all 6.7 million Class Members—they are wrong. Even in cases where the fee is based on

8    counsel's lodestar, the fee applicant "is not required to record in great detail how each minute of

9    [his] time was expended" and a description "of the time spent on broad categories of tasks such as

10   pleadings" is sufficient. *Gucci Am., Inc. v. Pieta*, No. CV 04–9626 ABC (Mcx), 2006 WL

11   4725707, at *2 (C.D. Cal. July 17, 2006). Moreover, one of the benefits of calculating the fees

12   based on a percentage-of-the-fund approach is it saves the Court the time it would otherwise need

13   to spend reviewing detailed billing records. *Gaskill v. Gordon,* 942 F. Supp. 382, 386 (N.D. Ill.

14   1996), aff'd, 160 F.3d 361 (7th Cir. 1998).

15          Some objectors take issue with Class Counsel's hourly rates. Class Counsel's rates are

16   reasonable because they are "in line with those prevailing in the community for similar services

17   by lawyers of reasonably comparable skill, experience and reputation," *Blum v. Stenson*, 465 U.S.

18   886, 895 n.11 (1994), and have repeatedly been approved by courts in this District and across the

19   nation.[60] Others argue that the case should have been staffed differently, for example, by having

20   paralegals rather than attorneys review pertinent documents.[61] The Ninth Circuit has held,

21   however, that while courts "may permissibly look to the hourly rates charged by comparable

22   attorneys for similar work, [they] may not attempt to impose its own judgment regarding the best

23   way to operate a law firm, nor to determine if different staffing decisions might have led to

24   different fee requests." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1115 (9th Cir. 2008). But,

25   even if this were a permissible inquiry, having paralegals review documents would have made

26   _____

     [59] *See* Castaneda Decl. ¶ 22. *See also* http://www.ebarleclasssettlement.com/courtdocs.php.

27   [60] *See* Sobol Fee Decl. ¶¶ 32-33 (citing cases); Decl. of Hank Bates in Support of Mot. for
     Attorneys' Fees [Dkt. No. 60-2] ¶¶ 29-30 (citing cases).

28   [61] *See, e.g.,* Helfand Obj., Dkt. No. 61, at 9.

1  little sense under the circumstances of this litigation. LifeLock produced thousands of critical

2  documents, responsive to targeted requests, just prior to and during settlement negotiations. These

3  documents needed to be quickly and efficiently reviewed to develop Plaintiffs' negotiation

4  strategy and to ensure that any settlement reached would be fair to the Class. Assigning this task

5  to paralegals, who lack a formal legal education and rightly were not participants in the settlement

6  negotiations, would not have resulted in case efficiency and may have negatively impacted Class

7  Counsel's ultimate recovery. *See Chaid v. Glickman,* No. C98-1004 WHO JCS, 1999 WL

8  33292940, at *15 (N.D. Cal. Nov. 17, 1999) (court was reluctant "to become embroiled in

9  decisions involving staffing of individual cases or the structuring of the firms that come before it"

10  and rejected defendant's view that "the delegation of research, drafting of pleadings and

11  discovery to lower paid associates and research assistants would have been more efficient").

12      Accordingly, Class Counsel's hours and billing rates are reasonable, and these objections

13  should be overruled.

14  **VII.    THE REMAINING OBJECTIONS PROVIDE NO BASIS TO DENY FINAL**
15  **APPROVAL**

16      The remaining objections provide no basis for declining to approve the Settlement. Some

17  of the objectors appear to find offense with class actions generally, while others are satisfied with

18  LifeLock's services. Neither position is a proper basis for denying approval of the Settlement. A

19  few objectors believe that the Named Plaintiffs should not be receiving service awards, but

20  service awards are typically awarded to Named Plaintiffs to compensate them "for work done on

21  behalf of the class [and] make up for financial or reputational risk undertaken in bringing the

22  action." *Staton v. Boeing Co.,* 327 F.3d 938, 977 (9th Cir. 2003). *See also Rodriguez v. West*

23  *Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (service awards "are fairly typical in class action

24  cases"). Moreover, the amount requested for the Named Plaintiffs—$2,000 each—is well below

25  the "presumptively reasonable" amount of $5,000. *See, e.g., In re Linkedin User Privacy Litig.*,

26  309 F.R.D. at 592 (citation omitted).

27      Some objectors feel that Class Members are not receiving enough money. The majority of

28  these objectors argue that Class Members should, at a minimum, recover the total amount of

1    membership fees that they paid to LifeLock.[62] This presents an overly simplistic view of damages

2    that fails to account for any value or benefits Class Members received pursuant to their LifeLock

3    memberships. Since restitution—the relief available under Arizona's Consumer Fraud Act—

4    measures the difference between the value of the product paid for and the value of the product

5    actually received, any measure of damages here must account for any value of the services

6    LifeLock provided to Class Members. Thus, in order to receive full restitution of the amounts

7    consumers paid to LifeLock, consumers would likely need to show—on a classwide basis—that

8    LifeLock's services had *zero* benefit. LifeLock would vehemently deny this; indeed, LifeLock

9    represented to the Court that 99.8% of its alerts were delivered to Class Members (*see* Dkt. No.

10   57 at 11). These alerts at least arguably provided some value. It is therefore highly unlikely that

11   Plaintiffs would obtain a full recovery, for all Class Members, of all amounts paid for LifeLock

12   services.

13         Some objectors take issue with the fact that Subclass Members who make claims will

14   receive a slightly higher settlement payment than claimants who are not members of the Subclass.

15   As explained at length in Plaintiffs' Motion for Preliminary Approval (Dkt. No. 49 at 6), the

16   Subclass consists of persons who purchased LifeLock during a two-year timeframe during which

17   LifeLock's promises regarding its delivery of alerts and its failure to meet those promises were

18   particularly problematic. Allocating slightly more money to Subclass Members is thus

19   appropriate because they likely suffered more harm than other Class Members. *See, e.g., In re*

20   *Omnivision*, 559 F. Supp. 2d at 1045 ("It is reasonable to allocate the settlement funds to class

21   members based on the extent of their injuries or the strength of their claims on the merits.");

22   *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *8 (N.D. Cal. Jan. 26,

23   2007), aff'd, 331 F. App'x 452 (9th Cir. 2009) (rejecting objection to differential allocation to

24   class members whose "legal claims are more valuable" than the claims of other class members).

25         Relatedly, at least one Class Member believes that no Class Member should be required to

26   make a claim, but the Settlement reasonably provides for direct payments to Subclass Members

27   [62] The remainder of these objectors argue that LifeLock should be subject to some measure of
     punitive or exemplary damages; for example, one objector argues, without any analysis or
28   reasoning, that she should be individually entitled to $3,000,000 under the Settlement.

1    without requiring them to make a claim because they were more likely to have been harmed by

2    LifeLock's practices. LifeLock made technical improvements to its systems at the end of the

3    Subclass period that makes it unlikely that there were issues with delivering alerts after that

4    timeframe, and LifeLock did not make the key alleged misrepresentations prior to the start of the

5    Subclass period. Even so, persons who did not enroll in a LifeLock plan within the Subclass

6    period may still make a claim for a payment if they believe they have been harmed by LifeLock's

7    practices, without having to actually prove harm or damages. If a Class Member believes that the

8    compensation provided by the Settlement does not adequately cover their individual damages,

9    they may always opt out of the Settlement.

10   Finally, Objector Robinson asserts that California law, and not Arizona law, should

11   govern this action.[63] This argument ignores the Arizona choice-of-law provision applicable to this

12   action (SAC ¶ 7) and the fact that, regardless, Plaintiffs would have been unable to bring claims

13   under California consumer protection laws on behalf of a nationwide class against an Arizona

14   company from where all of the alleged bad conduct and misrepresentations emanated. *See, e.g.,*

15   *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (citing *Sullivan v.*

16   *Oracle Corp.*, 547 F.3d 1177, 1187 (9th Cir. 2008) (California's consumer protection statutes

17   may cover non-California residents only where the defendant is based in California; the statutes

18   may not be applied extraterritorially where the harm occurred outside of California). For the same

19   reasons, California does not have a greater interest in applying its own law as opposed to Arizona

20   law. More importantly, Objector Robinson fails to explain how the application of Arizona law

21   might have changed the outcome of the Settlement, or renders this Settlement unfair. In fact, she

22   admits that application of California law "would not impact the outcome of the litigation."[64]

23   Thus, her objection is meaningless and should be overruled.

24   **VIII.   <u>CONCLUSION</u>**

25   For the foregoing reasons, Plaintiffs and Class Counsel respectfully request that the Court

26   overrule the objections and enter an Order granting final approval of the Settlement.

27   _____
      [63] Robinson Obj., Dkt. No. 66, at 1-7.

28   [64] *Id.* at 2.

1

2

Dated: May 13, 2016                        By: _____ /s/ *Hank Bates* _____

3                                          CARNEY BATES & PULLIAM, PLLC
                                           Joseph Henry ("Hank") Bates (CA #167688)
4                                          hbates@cbplaw.com
                                           Randall K. Pulliam (admitted *pro hac vice*)
5                                          rpulliam@cbplaw.com
                                           One Cantrell Building
6                                          2800 Cantrell, Suite 510
                                           Little Rock, AR 72212
7                                          Telephone: (501) 312-8500
                                           Facsimile: (501) 312-8505

8                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                           Michael W. Sobol (CA #194857)
9                                          msobol@lchb.com
                                           Nicole D. Sugnet (CA #246255)
10                                         nsugnet@lchb.com
                                           275 Battery Street, 29th Floor
11                                         San Francisco, CA 94111-3339
                                           Telephone: (415) 956-1000
12                                         Facsimile: (415) 956-1008

13                                         Class Counsel and Attorneys for Plaintiffs Napoleon Ebarle,
                                           Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28