CARNEY BATES & PULLIAM, PLLC
Joseph Henry ("Hank") Bates (CA #167688)
hbates@cbplaw.com
Randall K. Pulliam
rpulliam@cbplaw.com
One Cantrell Building
2800 Cantrell, Suite 510
Little Rock, AR  72212
Telephone:  (501) 312-8500
Facsimile:  (501) 312-8505

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Michael W. Sobol (CA #194857)
msobol@lchb.com
RoseMarie Maliekel (CA #276036)
rmaliekel@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAPOLEON EBARLE, JEANNE STAMM, BRIAN LITTON, and REINER JEROME EBARLE on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LIFELOCK, INC.,<br><br>Defendant. | Case No.  3:15-cv-258<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>1.  VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. § 44-1522(A))<br><br>2.  BREACH OF CONTRACT<br><br>3.  DECLARATORY JUDGMENT<br><br>4.  UNJUST ENRICHMENT |

COMES NOW, Plaintiffs Napoleon Ebarle, Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle ("Plaintiffs"), who bring this Complaint against Defendant LifeLock, Inc. ("Defendant" or "LifeLock" or the "Company"), and allege as follows:

**INTRODUCTION**

1.    In today's technologically driven and connected world, the fear of identity theft preys on American consumers.  Notably, however, there is a significant divide between an average consumer's sensitivities to this fear and his or her comprehension of the practical tools necessary to combat the threat of identity theft in a realistic manner.  This chasm between phobia and comprehension has created an opportunity for unscrupulous companies to exploit concerned American consumers.

2.    Capitalizing on this disconnect between fear and knowledge, LifeLock falsely represents and/or misleads consumers into believing its subscription based services will thwart criminals from stealing their personal information.  This consumer class action is brought to redress LifeLock's false, misleading and deceptive activities.

3.    In a nutshell, LifeLock's material misrepresentations and omissions fall into two broad categories:  (a) LifeLock's promise to provide services that the Company cannot provide as either a practical or a legal matter, and (b) LifeLock's promise to provide specific services and/or results which it falls short in delivering.  Indeed, far from its claim that the Company provides services that banks and credit card companies cannot, LifeLock does an inferior job of providing redundant services that these entities provide, oftentimes for free.

4.    At its core, LifeLock represents that it is the "leading provider" of "comprehensive" and "proactive identity theft protection services for consumers and identity risk and credit worthiness assessment for enterprise."  The foundation of its purported "comprehensive" and "proactive" services, and its representations to its customers in both marketing and contractual materials, includes 6 pillars.  Yet, each of these 6 pillars is flawed:

    i.     "comprehensive" network, which is in reality miniscule in comparison to the number of banking and financial institutions;

    ii.    timely and continuous 24/7/365 "alert" services, which, in truth, were so fraught with wide-scale problems that the Company instituted a code freeze policy;

    iii.   patented alert technology that purports to "*stop thieves before they do damage*," which, in the simplest terms, overstates the benefits of and the results achieved by LifeLock;

    iv.    protection that "watches out for you in ways banks and credit card companies just

can't;" however, in truth, other banks and credit card companies provide a superior product and they provide it for free;

v.    statistical analyses on the rising trends in identity theft; however, a closer review of current data reveals that the incidence of new account fraud-the mainstay of LifeLock's services- had actually declined in 2013, meaning LifeLock's use of such data amounts to nothing more than a scare tactic;

vi.    $1 Million Total Service Guarantee; which is in actuality a clever marketing ploy that is essentially worthless.

5.    In short, LifeLock purports to provide sweeping and superior identity theft protection services, when, in fact, its services are limited in scope and effectiveness and inferior to services offered by other credit card companies for free.

6.    LifeLock's unsavory and deceptive practices are nothing new.  Indeed, as recent as 2010, the Federal Trade Commission ("FTC") and 35 Attorneys General brought an action (the "FTC Action") alleging that LifeLock made material misrepresentations and/or omissions of material fact in violation of Section 5(a) of the FTC Act by representing and/or creating the impression, among others, that (a) LifeLock stops identity theft before it happens, (b) LifeLock offers a proven solution to identity theft, and (c) LifeLock guarantees identity-theft from ever happening.  As a result of the FTC Action LifeLock was permanently enjoined from "misrepresenting, in any manner, expressly or by implication" that its product prevents misuse of personal data, the effectiveness or scope of its services, and the risk of identity theft to consumers, among other things.  In addition, LifeLock was forced to pay out approximately $12 million.  Notwithstanding, LifeLock continues, 5 years later, to engage in the same fundamental, deceptive practices in marketing to new customers and in inducing existing customers to renew the service on a monthly or annual basis.

7.    LifeLock's subscription-based services are governed by, among other things, LifeLock's Service Terms and Conditions ("Service Terms"), which specifically provides that

> The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

As such, class-wide application of Arizona law is appropriate.

8.      Generally, this class action alleges that Defendant has engaged, on an ongoing and continuous basis, in deceptive marketing and sales practices in connection with its subscription based membership plans in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 (A), as well as breached its contract with its consumers.  As customers who have paid LifeLock's periodic subscription fees ("Membership Fees") at all relevant times hereto, Plaintiffs bring this action on behalf of a national class of consumers who paid Membership Fees after January 19, 2009.

9.      More particularly, Plaintiffs allege that LifeLock has engaged in a fraudulent and/or misleading course of conduct by making material misrepresentations and/or omissions that LifeLock's services (i) are "comprehensive," (ii) provide timely and continuous "alert" services, (iii) are founded on patented alert technology that purports to "*stop thieves before they do damage*," (iv) provide protection that "watches out for you in ways banks and credit card companies just can't;" and (v) $1 Million Total Service Guarantee.  In addition, LifeLock falsely and/or misleadingly represents the risk of identity theft to consumers.  Contrary to LifeLock's representations and/or omissions, LifeLock's network covers an estimated 3% of reported banking institutions; LifeLock's "alert" services are teeming with wide-scale problems, such that the Company instituted regular code freezes; LifeLock's services cannot as a practical or legal matter fulfill and/or achieve the benefits promised; LifeLock's services provide an inferior product that, in substance, offer little to no value; the risk of new account fraud was less than 1%, meaning LifeLock's principle service is inapplicable to 99% of American consumers; and LifeLock's $1 Million Total Service Guarantee is essentially worthless.

10.      Upon information and belief, as a result of LifeLock's contractual breach and its unfair, deceptive, and unconscionable practices, Defendant has amassed, to the detriment of its customers, substantial sums of money from the monthly fees paid by consumers ("Membership Fees"), including Plaintiffs, for these Membership Plans.  Accordingly, Plaintiffs seek damages, which at a minimum include payments of monthly or annual charges for services that were not as represented and payments for a service that is either illegal or infeasible for a company such as LifeLock to perform.

## **PARTIES**

11.    Plaintiff Napoleon Ebarle is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

12.    Plaintiff Jeanne Stamm is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

13.    Plaintiff Brian Litton is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

14.    Plaintiff Reiner Jerome Ebarle is a resident of California and subscriber, during all relevant times hereto, to LifeLock.

15.    Defendant LifeLock is a Delaware corporation with its principal executive offices at 60 East Rio Salado Parkway, Suite 400, Tempe, Arizona 85281.  LifeLock conducts business throughout California and the United States.  It is currently estimated that LifeLock provides identity theft services to over 3 million subscribers.

## **JURISDICTION AND VENUE**

16.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, which, inter alia, amends 28 U.S.C. § 1332 to add subsection (d), which confers jurisdiction over class actions where, as here, "any member of a class is a citizen of a State different from any other Defendant," and the aggregated amount in controversy exceeds five million dollars.  *See* 28 U.S.C. § 1332(d)(2) and (6).

17.    This Court has jurisdiction over Defendant because it does business in California and upon information and belief Defendant's conduct that gives rise to this complaint, as further described below, occurred within and/or was implemented, authorized, or ratified in California.

18.    In accordance with 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the conduct complained of herein occurred in this District.

## COMMON FACTUAL ALLEGATIONS

**I.      LifeLock's Relationship With Its Subscribers**

19.      LifeLock markets, offers, and sells the following fee-based membership plans to consumers (collectively referred to as the "Membership Plans"):  LifeLock Standard, LifeLock Advantage, and LifeLock Ultimate Plus.

20.      LifeLock Standard purports to offer identity theft detection and alerts within its network, lost wallet protection, address change verification, black market website surveillance, reduced pre-approved credit card offers, and a $1 million total service guarantee for $9.99/mo.

21.      LifeLock Advantage purports to offer LifeLock Standard services plus fictitious identity monitoring, court records scanning, data breach notifications, credit reports and scores, financial account activity alerts, and a $1 million total service guarantee for $19.99/mo.

22.      LifeLock Ultimate Plus protection purports to provide LifeLock Advantage services plus bank account takeover alerts, enhanced credit application alerts, file-sharing network searches, sex offender registry reports, credit reports and scores, monthly credit score tracking, and a $1 million total service guarantee for $29.99.

23.      As an add-on service, a subscriber of one of these three Membership Plans can enroll in LifeLock Junior, which is marketed and sold as providing monitoring services for the member's children's personal information.  LifeLock Junior protection purportedly provides identity theft detection and alert notifications, credit file detection, black market website surveillance, file-sharing network searches, and a $1 million total service guarantee.  According to LifeLock, "LifeLock Junior – it's relentless protection for your kids and peace of mind for you."

24.      Each of LifeLock's Membership Plans is governed by LifeLock's Service Terms and Conditions, which specifically provide that

These LifeLock Service Terms and Conditions (the "Service Terms") are a legally binding agreement between LifeLock, Inc. ("LifeLock," "we" "our" or "us") and you ("you," "your" or "yours"), and describe the terms under which you agree to use the LifeLock identity programs, including any applicable Stolen Identity Insurance (the "Protection Programs""), credit monitoring service (the "Credit Monitoring Service") and any other service or product which may be made available to you by us for which you have registered or enrolled or have been

registered or enrolled by an authorized third party (collectively the 'Services" and individually a "Service").

25.     In addition, the Service Terms provide as follows:

The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

26.     In sum, LifeLock customers are charged and pay between $10 and $30 dollars a month in Membership Fees for the Company to monitor their identities, but as discussed, LifeLock falsely and misleadingly advertises and sells its services and does not provide the protections against identity theft as promised.

## II.     Defendant's Products are Marketed, Offered, and Sold to Consumers in an Unfair, Misleading, and Deceptive Manner.

### A.     LifeLock's Claim of "Comprehensive" Services Misrepresents the Scope and Effectiveness of Its Network

27.     As previously noted, in 2008, the FTC filed suit against LifeLock alleging that the Company's services did not prevent identity theft, as represented, and did not provide many of the protections claimed by LifeLock.  Indeed, commenting on the lawsuit, then FTC Chairman Jon Leibowitz had this to say:  "The protection [LifeLock] actually provided left enough holes that you could drive a truck through it."  *See* https://www.truthinadvertising.org/lifelocks-protection-leaves-much-to-be-desired/.

28.     In resolution of the claims brought by the FTC, LifeLock and the FTC entered into a Final Stipulated Judgment and Order for Permanent Injunction and Other Equitable Relief as to Defendants LifeLock and Davis (the "FTC Order"), wherein LifeLock and Davis and "their officers, agents, servants, and employees and all persons in active concert of participation with any of them . . ." were "permanently restrained and enjoined" from the following:

A.     in connection with the advertising, distributing, promoting, offering for sale, or sale of any product, service, or program designed for the purpose of preventing, mitigating, or recovering from any form of identity theft as defined in 18 U.S.C. § 1028, misrepresenting in any manner, expressly or by implication:

    1.     that such product, service, or program provides complete protection against all forms of identity theft by making customers' personal information useless to identity thieves;

2.   that such product, service, or program prevents unauthorized changes to customers' address information;

3.   that such product, service, or program constantly monitors activity on each of its customers' consumer reports;

4.   that such product, service, or program ensures that a customer will always receive a phone call from a potential creditor before a new credit account is opened in the customer's name;

5.   the means, methods, procedures, effects, effectiveness, coverage, or scope of such product, service, or program;

6.   the risk of identity theft to consumers;

7.   whether a particular consumer has become or is likely to become a victim of identity theft; and/or

8.   the opinions, beliefs, findings, or experiences of an individual or group of consumers related in any way to any such product, service, or program.

Such products, services, or programs include, but are not limited to, the placement of fraud alerts on behalf of consumers, searching the internet for consumers' personal data, monitoring commercial transactions for consumers' personal data, identity theft protection for minors, and guarantees of any such product, services, or programs.

B.   misrepresenting in any manner, expressly or by implication, the manner or extent to which they maintain and protect the privacy, confidentiality, or security of any personal information collected from or about consumers.

29.   Despite the permanent injunction, LifeLock has continued to market and sell its products using the same and/or substantially similar marketing ploys, promising customers "comprehensive" and "relentless" protection.

30.   Despite promising "comprehensive" protection, LifeLock's network only provides limited protection against only some forms of identity theft.

31.   To begin with, LifeLock makes misleading declarations, via its advertisements and website, that "[e]nrollment takes just minutes and our 24/7 identity theft protection starts immediately."  In truth, however and as buried in the fine print in LifeLock's Service Terms it can take up to four (4) weeks from the date of a customer's acceptance of the Service Terms to complete the enrollment process and for all services to be fully activated.  As such, LifeLock's claims of "immediate" protection do not adequately portray the enrollment process or the scope and effectiveness of LifeLock's services and/or operations.

32.     In addition to its false and/or misleading claims of "immediate" protection, LifeLock falsely and/or misleadingly portrays LifeLock's "comprehensive" service as trolling "a trillion data points."  In reality, LifeLock's services do not cover some of the largest credit card companies and/or businesses, or car loans.  Indeed, upon information and belief, LifeLock's network consists of approximately 250 institutions *collectively*.  By way of comparison, there were 6,891 active banking institutions reported at the end of the third quarter in 2013, meaning LifeLock's network has access to only 3% of these entities, and that is being generous because it does not account for the hundreds of thousands of retail outlets in the United States.

33.     The limitations of LifeLock's network are chronicled on various outlets.  For example, as recounted by one LifeLock customer on a January 4, 2014 post on LifeLock's Facebook page, the customer applied for a credit card at Best Buy but never received an alert that someone was using her personal information to get a credit card.  To the contrary, she received an automatic email from LifeLock stating that they had checked her information and "LifeLock found no fraudulent activity associated with your personal information within our extensive network.  LifeLock monitors over a trillion data points and is relentlessly protecting your identity . . . ."  When the customer contacted LifeLock to question the Company, she was informed that Best Buy was not in LifeLock's network.

34.     Similarly, and further demonstrative of LifeLock's misrepresentations and/or concealments, another customer complaint posted on April 1, 2014 on the Better Business Bureau's website, reveals that despite subscribing to LifeLock the previous year under the impression "that, as advertised, the company would notify me if there was activity using my personal information in order to detect possible identity fraud," LifeLock failed to send her a single alert when she moved, changed her address on her credit card accounts, purchased a vehicle, and had credit approved for a lease on a rental property.  Moreover, when she contacted LifeLock on the matter, she was told that the particular banks she used were not in LifeLock's network and car loans aren't always counted.

35.     Similarly, in a March 2013 special report, KTVU-TV in Oakland reported that LifeLock completely missed not one, but two, identity theft incidents because the two firms

1   involved, Sprint and USAA, were not part of LifeLock's network.  *See*

2   http://www.ktvu.com/news/news/special-reports/industry-leader-identity-theft-protection-

3   recently/nWf9P/.

4        36.    Thus, LifeLock's proclaimed "comprehensive" network that purportedly trolls "a

5   trillion data points" is misleading and/or fails to inform customers that LifeLock's services do not

6   cover some of the largest credit card companies and/or businesses, or car loans.

7        37.    In addition to falsely and/or misleadingly representing LifeLock's diminished

8   network, LifeLock misrepresents the value of its services, many of which are available for free.

9   For example, LifeLock's black market website monitoring is essentially worthless.  With regard

10  to this service, LifeLock has no authority or power to prevent personal information from being

11  posted or shared on these websites, and any "threat" is detected after the theft has already

12  occurred -- not "before it happens."  As such, this service provides limited to zero value to

13  LifeLock's customers, and it misleads LifeLock's customers about the quality and characteristics

14  of LifeLock's services.  Indeed, upon information and belief, even if LifeLock sends a "black

15  market" alert, it does not have the ability to inform customers about the specific information on

16  the website, how it was obtained, or who obtained it, heightening the potential for incorrect

17  and/or unreliable information from LifeLock in this context.

18       38.    LifeLock also fails to adequately inform its customers that it does not provide 3-

19  bureau credit monitoring to subscribers of its Standard package.  Most consumers understand

20  LifeLock's representations to include this service in each of its Membership Plans.  However, this

21  is not the case, and, upon and information and belief, when consumers call LifeLock to inquire

22  about the disparity between the services advertised and those actually provided by LifeLock, they

23  are told they must increase their Membership Plan and Membership Fees to be covered, despite

24  the fact that customers can obtain their own credit data for free.

25       39.    Thus, LifeLock only provides credit monitoring to subscribers of LifeLock's

26  Ultimate Plan, those paying the highest monthly premium of $30 a month.  However, credit

27  monitoring is an antiquated service that is not very effective, and not worth the heightened

28  premium.  Indeed, a 2013 Department of Justice study found that less than 1% of existing account

1    fraud was discovered from a credit monitoring service or credit report.  Similarly, *Consumer*

2    *Reports* advises that "credit monitoring is a primitive defense against ID theft that can scare you

3    with lots of alerts for day-to-day nonfraudulent changes in your credit report – only 1 in 20 alerts

4    is actual illicit activity – and that can ultimately train you to ignore the alerts."

5    http://www.consumerreports.org/cro/news/2014/02/expect-less-and-pay-more-with-target-credit-

6    monitoring/index.htm.

7         40.    Further, LifeLock fails to inform customers that it does not monitor transactions on

8    existing accounts.  Indeed, as noted below, approximately 90% of current identity theft incidents

9    consist of fraudulent transactions on existing accounts.  However, upon information and belief,

10   LifeLock does not monitor charges on a customer's existing accounts.  Thus, LifeLock provides

11   zero protection against credit card and bank fraud.

12        41.    In this same vein, LifeLock's alleged reduction of pre-approved credit card offers

13   is similarly of limited to no value.  The essence of this so-called service is simply LifeLock

14   entering its members' information at the Consumer Credit Reporting industry at

15   optoutprescreen.com, a process that takes less than five minutes and that the customer can do by

16   himself or herself for free.  Notwithstanding, LifeLock charges its customers approximately $10

17   to $30 month for this service.

18        42.    Upon further information and belief, LifeLock does not have direct access to

19   financial information.  Accordingly, it is dependent on electronic transfers of data from partners

20   and has no ability to monitor paper forms.

21        43.    In sum, LifeLock's network does not cover major financial and business

22   institutions and several of the services offered provide zero value to customers.  As such,

23   LifeLock falsely and/or misleadingly advertises its services, as well as charges customers for

24   services that they are not receiving and/or that are essentially worthless.

25        B.     LifeLock Conceals Wide-Scale Problems of Its "Alert" Services and Regular Code
                 Freezes

26

27        44.    LifeLock represents that it will keep its customers timely informed through use of

28   its patented "Identity Alert System".  According to its website, LifeLock promises the following:

**Alerts When You Need Them**

With our patented LifeLock Identity Alert system, as soon as we detect a threat to your identity, you'll be notified by text, phone, or email, to help **stop thieves before they do damage**. So while you're out there connecting to the world, we'll be here helping to keep your personal information safe. (emphasis added)

45. Defendant represents that it provides continuous "alert" services, maintaining that its team works 24 hours a-day, 7 days a week, 365 days a year. Specifically, Defendant touts:

**Need Help? We're Here all the Time.**

Our award-winning Member Services agents are on the job every minute of every day, including holidays. Call or contact us online whenever you need help or have questions. If you do become a victim, our Certified Resolution Specialists know exactly what to [do]. That's why millions trust LifeLock with their identity theft protection.

46. However, LifeLock's representations falsely and/or misleadingly conveyed the scope and effectiveness of its "alert" services. Indeed, in a complaint filed on July 8, 2013 for wrongful termination (*see Burke v. LifeLock, Inc.*, No. 13-CV-1355 (D. Ariz.)), insider Stephen P. Burke ("Burke"), a Senior Financial Analyst with LifeLock from February 1, 2010 to March 2013, revealed that during the period of his employment, LifeLock

had and continues to have widespread system problems in processing [ ] alerts and sending them out to the customers as promised in its national marketing campaigns. The problem of timely informing customers that their credit information was accessed is so widespread that Defendant instituted a code freeze. In essence, Defendant is deliberately 'stepping on the brakes' with regard to sending this critical information to customers on a timely basis, and worse, often choosing not to send these alerts out at all. This practice has been referred to as "throttling."

*See* Ex. 2: Burke Compl., ¶ 13.

47. Burke further revealed that he "first learned of an issue with LifeLock's alert notification services to customers through an e-mail chain forwarded to him in late November 2012 by John Lenstrohm ("Lenstrohm"), [LifeLock's] Director, Direct Response. *Id*. at ¶ 15.

48. Burke further recounted that he reported the problems of delayed alerts, diminished alert notification service, and "throttling" of alerts with the following LifeLock officers and employees, among others: Lenstrohm, Director, Direct Response; Erick Dickens,

Vice President of Marketing; Amanda Mellon, Senior Manager; Brent Hazel, Manager; Melinda Keels, Finance; and Gregory Lim, Burke's immediate supervisor.  According to Burke, he raised concerns to these officers and employees about the effects of not sending out alerts, specifically addressing that "throttling" might violate the FTC Order.  Burke also recommended that LifeLock "adjust its marketing messaging to reflect this diminished service."  *Id.* at ¶¶ 16, 19.

49.     In February 2014, LifeLock settled Burke's wrongful termination suit for an undisclosed amount.

50.     To further put all this into perspective, a LifeLock website reports that LifeLock "members receive over 20,000 alerts for potential identity fraud on a weekly basis."  *See* http://www.lifelockbusinesssolutions.com/why-lifelock/trust-lifelock/.  With an estimated three million members, this means that the typical LifeLock member receives one alert every 150 weeks.

C.     <u>LifeLock Falsely Touts Its Patented Technology to Mislead Customers into Believing It Will "Stop Thieves Before They Do Damage"</u>

51.     In addition to the already described misdeeds, LifeLock falsely and/or misleadingly leads customers to believe that its patented technology will "stop thieves before they do damage."  However, this is a guarantee that LifeLock cannot back, as either a legal or practical matter.

52.     Via its website, LifeLock purports to "review each attempt to misuse your identity, and proactively contact you anytime we detect an exposure or threat."  However, LifeLock's representation gives customers a false sense of security because LifeLock's technology, systems, and personnel are inadequate to provide this level of protection.

53.     First, and as previously noted, LifeLock's network is far more limited than LifeLock represents and LifeLock's "alert" services were so riddled with problems that the Company instituted a code freeze, meaning that members did not receive notification of potential exposures or threats because LifeLock routinely turned these services off.  Thus, LifeLock's technology cannot, as a practical matter, guarantee to "stop thieves before they do damage."

54.     Second, LifeLock's systems and personnel are not equipped to handle the level of administrative, technical, and physical safeguards that is necessary to provide the promised protections.

55.     More specifically, all Lifelock subscribers, including Plaintiffs and all members of the proposed Class, provide Lifelock with sensitive personal data, including credit card, social security and bank account numbers. The FTC Order, in addition to what has previously been listed, ordered LifeLock (as well as any business entity controlled by Davis that collects, maintains, or stores personal information from or about consumers) to "establish and implement, and thereafter maintain, a comprehensive information security program that is designed to protect the security, confidentiality, and integrity of personal information collected from or about consumers.  Such program, the content and implementation of which must be fully documented in writing, shall contain administrative, technical, and physical safeguards appropriate to the entity's size and complexity, the nature and scope of the entity's activities, and the sensitivity of the personal information collected from or about consumers . . . ."  In this same vein, the FTC Order required LifeLock to (1) make an initial assessment and biennial assessments for twenty years on the effectiveness of its safeguards, and (2) distribute a copy of the FTC order to all principals, officers, directors, managers, employees, agents, and representatives for a period of five years, or until February 23, 2015.

56.     Despite the obligations imposed by the FTC Order, LifeLock continued to use ineffective administrative, technical, and physical safeguards, failed to routinely assess and report the adequacy of the effectiveness of its safeguards, and failed to distribute the FTC Order to required personnel.  All the while, however, LifeLock falsely and/or misleadingly represented that it would "stop thieves before they do damage."

57.     The deficiencies in LifeLock's systems and staffing have been documented by a Company insider.  Indeed, on the heels of the Burke settlement, insider Michael D. Peters ("Peters"), LifeLock's Chief Information Security Officer from approximately May 24, 2013 through July 29, 2013, corroborated Burke's allegations of wide-scale problems and himself filed

1   a complaint against LifeLock for wrongful termination and violation of whistleblower protection

2   laws, a suit that remains ongoing.

3          58.     In his complaint against LifeLock, Peters alleges that upon commencing work at

4   LifeLock, he immediately began an initial risk assessment of the Company.  Peters states that

5   prior to his risk assessment, the Company had never conducted a bona fide risk assessment.

6   Ex. 3:  Peters Compl. ¶ 17.

7          59.     Peters further alleges that the risk assessment uncovered that LifeLock's

8   technology and security were ineffective to deliver the protections LifeLock promised.

9   Specifically, Peters determined that

10         •   LifeLock's internal capacity for governance implemented (policies, audit plan,

11             change controls, architecture review, etc.) was at 47% of the minimum to protect

12             LifeLock's customers and their sensitive information." (*Id*. at ¶ 18);

13         •   "LifeLock's technological security readiness (intrusion prevention, data leakage,

14             data encryption, access controls, physical security, etc.) was only at 27% of the

15             minimum to protect LifeLock's customers and their sensitive information." (*Id*. at

16             ¶ 19); and

17         •   "LifeLock's security vigilance (vulnerability testing, auditing, monitoring,

18             awareness education, event logging, incident management, etc.) was at 0% of the

19             minimum to protect LifeLock's customers and their sensitive information."  (*Id*. at

20             ¶ 20).

21         60.     According to Peters, these deficiencies were due, in large part, to deficient

22   staffing.  LifeLock only had two people responsible for security.  One individual lacked technical

23   skill and only had minimal security experience. While the other had technical skills, he was newly

24   out of college and lacked experience.  Peters determined that millions of consumers were at risk,

25   which led Peters to advise LifeLock Chief Financial Officer, Chris Power, and LifeLock Chief

26   Information Officer, Rich Stebbins, that LifeLock should immediately hire 12 information

27   security professionals.  Peters reports that in response, LifeLock fired Peters, resulting in Peters

28   filing suit.  (*Id*. at ¶¶ 20-25.)

61.     Peters further states that the findings of his assessment included discovery of multiple examples of LifeLock's misleading, unfair, and/or deceptive practices, including, among others, the following:

- LifeLock's director of internal audits, Tony Valentine, had collected evidence from the information security team that existed prior to Peters's arrival related to access logging, audit logging, audit log reviews, network security controls, and data leakage controls that either (1) did not truly exist because the technology was still in boxes; or (2) LifeLock lacked the staff to keep track of everything; or (3) such reviews were not actually conducted.

- LifeLock employee Dave Bridgman reported that LifeLock's current practice was to manipulate the customer alerts sent to its elderly customers.  LifeLock would turn off or reduce the services alerting elderly customers to reduce the call volume received by LifeLock's customer support center.

- LifeLock was in the process of finalizing a new product offering called PassLock.  This system was designed to allow customers to include their passwords for up to ten accounts.  PassLock would then crawl through hundreds of internet sites to check the username and password supplied by the customer and report back to the customer.  The problem was that the database was not being protected with industry-grade encryption.  The database was predicted to contain millions of customer credentials that would be devastating to consumers if a breach occurred.  Moreover, the system was going to utilize third-party cloud hosting business without that third party's knowledge or consent.  Technically, the PassLock crawling would be identified by most service providers as intrusive, illegal, illegitimate, and then blacklist the source address.

*Id.*

62.     Accordingly, company insiders have confirmed that LifeLock intentionally misled its customers concerning the scope and effectiveness of its services.

63.     Moreover, the Consumer Product Advisor reports that LifeLock's products and services are marketed in a confusing and convoluted way, masking their limitations, exclusions, and restrictions, and making it impossible for consumers to knowingly determine what these products cover and whether they provide a worthwhile benefit.

64.     LifeLock is able to perpetuate its maze-like services through use of its "affiliates." As part of its marketing campaign, LifeLock uses an affiliate program whereby people and/or businesses create websites and blogs that link to LifeLock.com.  The affiliates receive a commission on each enrollment generated from their site or review.  Thus, LifeLock's affiliates are incentivized to perpetuate LifeLock's advertising and marketing scheme and mislead consumers.

65.     Moreover, even though the FTC Order requires LifeLock to distribute a copy of the FTC Order to LifeLock's affiliates, upon information and belief, LifeLock fails to provide its affiliates a copy of the FTC Order.  Failure to do so is itself a violation of the FTC Order.

66.     In addition, upon information and belief, LifeLock fails to adequately inform its members that the Company only runs a credit report once a year and that the Sex Offender list maintained by LifeLock is not updated on a daily or weekly basis.

67.     Upon further information and belief, Defendant's customer service representatives employ an array of deceptive tactics to thwart members' ability to cancel their Membership Plans, such as putting customers on hold for lengthy amounts of time, citing misleading identity theft statistics, and telling consumers that without LifeLock's services their identity will be stolen.

68.     Indeed, various customer complaints posted on www.consumeraffairs.com/privacy/lifelock.html report that LifeLock does not timely respond to cancellation requests and/or uses scare tactics to bully or mislead customers into believing that they are unsafe without LifeLock.  Moreover, customers report that even after canceling their accounts, or at least a portion thereof, they continued to be billed by LifeLock for the canceled services.

69.     In sum, LifeLock's marketing and sales representations misrepresent that Defendant's services have many hidden, variable, and narrow restrictions; that Defendant's alert

1    notification services are substantially diminished because of the Company's practice of

2    "throttling" alerts; and that Defendant's monitoring services were not equipped to handle and

3    protect a customer's personal information as represented by LifeLock.  Consequently, LifeLock's

4    promise to "stop thieves before they do damage" is a falsehood.

5         D.    LifeLock Promises Protection That It Purports Other Banks and Credit Card
               Companies Cannot Provide
6

7         70.    In 2008, Experian Information Solutions, Inc. ("Experian"), a credit reporting

8    agency, filed suit against LifeLock alleging that LifeLock's practice of placing and renewing

9    "fraud alerts" under consumers' names violated the federal Fair Credit Reporting Act ("FCRA")

10   because the statutory language excludes corporations such as LifeLock from placing "fraud

11   alerts".  According to court documents, LifeLock called Experian's fraud hotline up to 15,000

12   times a day to request "fraud alerts."

13        71.    In an order granting partial Summary Judgment in favor of Experian, the

14   Honorable Andrew J. Guilford agreed with Experian, finding that under the language of the

15   statute and its legislative history, "the FCRA embodies an established public policy against

16   companies like LifeLock placing fraud alerts on behalf of consumers."  *See Experian Information*

17   *Solutions, Inc. v. LifeLock Inc.* (Case No. SACV08-00165 AG), Order Granting Motion for

18   Partial Summary Judgment, attached hereto as Ex. 1.  Accordingly, the very premise of

19   LifeLock's promised protections, *i.e.* the Company setting fraud alerts on behalf of its consumers,

20   was declared unlawful.

21        72.    Despite the court's ruling in *Experian*, LifeLock's business model and services

22   have remained substantially unchanged since 2005.  *See*

23   http://consumerproductadvisor.com/lifelock-review/.  Indeed, on the website

24   www.lifelockblog.com/why-lifelock/, which upon information and belief is owned by LifeLock,

25   has a 2015 copyright and was last visited by Plaintiffs' counsel on January 14, 2015, LifeLock

26   continues to represent that "LifeLock will request on your behalf that fraud alerts be placed on

27   your accounts – By doing these, creditors will use extra care to identify who you are to

28   investigate the validity of any transaction."

73.     On this same website, LifeLock further represents that "If a child has a credit report, LifeLock will request that fraud alerts be placed on the child's accounts." *See* www.lifelockblog.com/why-lifelock/.

74.     However, at no time does LifeLock inform consumers that under the statutory language of the FCRA, only an individual is allowed to place a "fraud alert," either for themselves, or acting on behalf of or as a personal representative to another individual.

75.     Likewise, LifeLock fails to inform consumers that a federal court has previously ruled that placement of fraud alerts by LifeLock with any credit reporting agency violates public policy.

76.     As set forth above in ¶27 the FTC Order enjoins LifeLock from misrepresenting, expressly or by implication, "the means, methods, procedures, effects, effectiveness, coverage, or scope" of LifeLock's services.  Thus, LifeLock had an ongoing duty throughout the Class Period to provide accurate and non-misleading information with regard to "the means, methods, procedures, effects, effectiveness, coverage, or scope" of its services. Notwithstanding this duty, throughout the Class Period, Defendant made, and continues to make, material misrepresentations and omissions.

77.     Moreover, as set forth above, LifeLock's technology and personnel were deficient and incapable of protecting the security, confidentiality, and integrity of personal information collected from or about consumers as promised.  Thus, in reality, LifeLock provides an inferior service to that offered by other banks and credit card companies for free.

78.     Notably, at around the same time Peters filed his wrongful termination suit against LifeLock in federal court, Peters filed a whistleblower complaint with the FTC.  As a result, in or about August 2013, the FTC opened an investigation into LifeLock's current policies, procedures, and practices.  Upon information and belief, the FTC investigation remains ongoing.

79.     Thus, Defendant's representations that LifeLock offers protection that other banks and credit companies can't are misleading, at best.

E.      LifeLock Uses Statistical Analyses and Testimonials to Mislead Consumers of the Risk of Identity Theft and the Benefits and Results of LifeLock's Services

80.     Upon information and belief, the foundation of LifeLock's marketing strategy is the use of misleading statistics and testimonials, as well as other scare tactics.

81.     More specifically, on its website, LifeLock proclaims that "according to the Department of Justice, approximately 16.6 million Americans were victims of identity theft in 2012, sustaining more than $24 billion of economic losses." (citing "Victims of Identity Theft, 2012," Department of Justice, 2012).

82.     At the same time, LifeLock assures that "[w]ith approximately 3 million LifeLock members, we're committed to providing our consumers peace of mind amid the growing threat of identity theft."

83.     However, LifeLock's statistics are misleading at best.  In point of fact, in a 2014 report on industry statistics, Javelin Research reported that 88% of all U.S. fraud loss was related to fraud on existing accounts and that new account fraud has fallen to "historic lows."  In this same report, Javelin found that the incidence of new account fraud was only 0.5% in 2013, down from 1.2% in 2012.  Javelin further determined that new account fraud is rapidly declining because financial institutions have made it more difficult for criminals to open fraudulent accounts.

84.     However, LifeLock makes no differentiation in its marketing.  This is undoubtedly because LifeLock does not monitor charges on customers' existing accounts, only on new accounts.  Stated another way, LifeLock does not protect against those instances where someone steals your credit-card number and begins making purchases with that information.  Thus, LifeLock's services only pertain to a fraction of a percent of current identity theft trends.

85.     Notwithstanding the small umbrella of protection actually provided by LifeLock, LifeLock's use of such statistics falsely and misleadingly conveys the message that the scope of LifeLock's network is more expansive than it actually is, as well as falsely and/or misleadingly conveying the characteristics of LifeLock's Membership Plans and its $1 Million Guarantee.  In truth, and as further discussed below, LifeLock's services and purported patented technology

1    regularly fail to notify customers of new account openings, auto loans, and/or wireless account

2    activity.  In reality, it simply does not provide the promised "comprehensive" protection that it

3    purports other banks and credit companies cannot offer.

4         86.    Moreover, LifeLock's use of such statistics fails to inform consumers that

5    LifeLock does not protect against tax and wage-related fraud, which the FTC listed as the most

6    common type of identity theft in 2012.  *See* https://www.truthinadvertising.org/lifelocks-

7    protection-leaves-much-to-be-desired/.

8         87.    LifeLock is able to further perpetuate its commercial deception and mask the true

9    scope of its network through use of false and/or misleading testimonials.  These testimonials are

10   used to aid in the appearance of legitimacy; however, they falsely and misleading present the

11   scope and effectiveness of LifeLock's services.

12        88.    For example, a testimonial from Gene Z. on LifeLock's website states that Gene Z.

13   was contacted by a company that sold large computer equipment and asked if he had purchased a

14   computer, which he had not.  Gene Z. states that while he was in the process of looking up his

15   credit card information, he received a call from LifeLock informing him that someone had tried to

16   use his social security number to open a phone account.  Gene Z. further states that he informed

17   LifeLock of the potential credit card fraud and asked LifeLock what he needed to do.  Gene Z.

18   states that LifeLock told him "Don't worry, we'll take care of everything."  First, this testimonial

19   falsely and/or misleadingly conveys the message that LifeLock protects against any and all credit

20   card fraud, which it does not.  Second, this testimonial falsely and/or misleadingly conveys the

21   message that LifeLock handles every aspect of a customer's ordeal while the customer has zero

22   responsibility to take any action.  In reality, LifeLock mandates a list of exclusions and

23   preconditions that substantially limit the applicability of LifeLock's services and its $1 Million

24   Total Service Guarantee.  Third, this testimonial falsely and/or misleadingly conveys the message

25   that LifeLock's services will prevent identity theft, a representation that LifeLock cannot

26   guarantee.

27        89.    Similarly, a second testimonial from Justin L., also on LifeLock's website,

28   recounts how Justin L. was contacted by several credit card companies to verify credit

applications, which he did not in fact apply for.  Justin L. further states that whoever was attempting to open these new accounts in his name, also got into his bank account.  Justin L. then states that he signed up for LifeLock and has had no problems since.  This testimonial falsely and/or misleadingly leads consumers to believe that the result a customer can expect after signing up with LifeLock is a complete reduction in identity theft threats, *i.e.* that LifeLock's services will prevent identity theft.  Further, this testimonial falsely and/or misleadingly conveys the message that LifeLock's services provide complete protection and/or greater protection than credit card companies provide.  Also, this testimonial falsely and/or misleadingly conveys the message that when someone tries to misuse a customer's information LifeLock automatically kicks in.

90.     Another testimonial used by LifeLock, and found at http://www.reviewsonlife.com/life-reviews/life-testimonial.html, states, "As the owner of a small business my employees are an extension of my family.  I looked into LifeLock and immediately paid to sign everyone up."  This testimonial is false and/or misleading because it conveys the message that LifeLock provides protection for all business activities, when, in fact, it does not.  *See* below.

91.     The testimonials described above are unsubstantiated and/or falsely and/or misleadingly overstate the services provided by LifeLock and the benefits and results achieved by utilizing LifeLock's services.  In truth, LifeLock's network is extremely limited and is dependent upon the exchange of electronic information, meaning it does not have the capacity to monitor paper applications.  Moreover, the scope, quality, and characteristics of its services do not provide the protections promised because LifeLock's safety protocols are not sufficient, LifeLock's suffers from lack of adequate personnel, and many of LifeLock's services are available to a consumer for free.

92.     In this same vein, celebrity endorsements from Rush Limbaugh, Rudy Guiliani, Montel Williams, and others falsely and misleadingly convey the effectiveness of LifeLock's services.  Indeed, each of these paid advertisers give LifeLock customers a false sense of security

1  because, as described herein, LifeLock's services are predicated on illusory, worthless, and/or

2  misleading promises.

3       F.      LifeLock's $1 Million Total Service Guarantee is Nothing More Than a Clever
               Marketing Ploy That Is Essentially Worthless
4

5       93.     Through its website and advertisements, LifeLock makes the blanket statement

6  "Sign up for any LifeLock membership and you're immediately backed by our $1 Million Total

7  Service Guarantee."

8       94.     LifeLock further proclaims, "If you become a victim of identity theft while a

9  LifeLock member, we'll spend up to $1 million to hire experts, lawyers, investigators, consultants

10 and whomever else it takes to help your recovery.  Benefits under the Service Guarantee are

11 provided under a zero deductible identity theft insurance policy."  Also promising, "Our U.S.

12 based recovery agents work closely with you to evaluate your specific situation and provide the

13 support you need to recover quickly.  When necessary, a Certified Resolution Specialist will

14 handle your case step by step."

15      95.     Broken down, LifeLock's $1 Million Identity Theft Guarantee has two

16 components:  (1) identity theft insurance, and (2) a service guarantee.

17      96.     The first part of LifeLock's $1 Million Guarantee, *i.e.* the identity theft insurance,

18 is described by LifeLock as follows:  "Identity theft insurance included with your LifeLock

19 membership – with zero deductible – reimburses you for certain out-of-pocket expenses."

20      97.     Notably, LifeLock is not an insurance company.  Accordingly, the insurance

21 component of the guarantee is provided by a third-party insurance company called State National

22 Insurance Company ("State National").

23      98.     However, the insurance policy provided by State National contains an exhaustive

24 list of restrictive provisions and exclusions, rendering the policy less than the premiums paid for

25 it.  More specifically, the Master Policy provides the following exclusions:

26       •   Any loss arising from dishonest acts;

27       •   Any loss arising from bodily injury;

28       •   Any loss arising from war or terrorism;

1      • Any loss arising from pollution;

2      • Any loss arising from radioactive Contamination;

3      • Any loss arising from contract frustration business;

4      • Any loss arising from failure to or delay in delivery or supply of any form of

5         property whatsoever;

6      • Any loss arising from any form of financial guarantee, surety, or credit indemnity;

7      • Any loss arising from fraudulent withdrawals by immediate family members;

8      • Any loss not reported within 90 days;

9      • Any loss arising from any  business activity;

10     • Any loss resulting from or arising out of the destruction, confiscation, or seizure

11        by order of any government of public authority; and

12     • Any loss arising from a voluntary disclosure of any code or other security

13        information.

14   In addition, the Master Policy has an exhaustive list of conditions precedent.  These limitations

15   and restrictions prevent consumers from being able to decipher what is covered and what is not

16   and/or the true value of the Master Policy.

17          99.     The second component, the service guarantee, is described by LifeLock as follows:

18   "If you become a victim of identity theft while you are a LifeLock member we will spend up to

19   $1 million to hire experts, lawyers, investigators, consultants, and whoever else it takes to help

20   your recovery."  Thus, the service guarantee is supposed to cover legal costs, remediation, service

21   costs, and case management costs in the event of an identity theft.

22          100.    However, LifeLock's service guarantee is limited by the Master Policy, which

23   provides as follows:

24          Remediation Service Cost.  The amount of reasonable and necessary expenses paid
            to investigators and other third-party business providers who are retained by
25          LifeLock and provide any services that are reasonably necessary, **viewed in the**
            **context of LifeLock's business and Membership Programs**, to restore the good
26          name and identity of the Insured, or to recover Losses of the Insured in accordance
            with any Membership Program. (emphasis added)
27

28   Consequently, because the service guarantee is given in the context of "LifeLock's business and

1   Membership Programs" and, as described herein, LifeLock's network and services are severely

2   limited and/or restricted, LifeLock's service guarantee does not cover a variety of identity theft

3   instances and/or losses incurred by LifeLock's customers.

4         101.    Thus, upon information and belief, LifeLock's $1 Million Service Guarantee is

5   illusory.  Demonstrating the illusory nature of LifeLock's guarantee, LifeLock Senior Vice

6   President Mike Prusinski reported that as of September 27, 2011, the largest payout under the

7   service guarantee was approximately $2,500 (a fraction of 1% of the $1 Million Total Service

8   Guarantee).

9   **III.    LifeLock Breached Its Contractual Obligations**

10         102.    Through its advertising, website, and Service Terms, LifeLock made analogous

11   offers to Plaintiffs and the members of the Class to protect their identity by, among other things,

12   providing "comprehensive" protection that "banks and credit card companies" cannot provide,

13   "up-to-the-minute" alerts, adequate safeguards and personnel, and a $1 Million Total Service

14   Guarantee. *See* Ex. 4 (LifeLock client agreement).

15         103.    Plaintiffs and the Class accepted LifeLock's offer and provided consideration

16   through payment of Membership Fees.

17         104.    Upon information and belief, all relevant contracts contain a clause stating:

18       …any Services provided hereunder will be governed by the laws of the State of
   Arizona, without regard to any laws that would direct the choice of another state's
19       laws and, where applicable, will be governed by the federal laws of the United
   States.
20

21   Accordingly, class-wide application of Arizona law is appropriate.

22         105.    LifeLock breached its contract with Plaintiffs and the members of the Class by

23   making material misrepresentations about the agreement and its services.

24         106.    Up to 3 million people paid on average between $10.00 and $30.00 for a service

25   LifeLock promised,  but did not – and could not – provide.  In reliance on that promise, those

26   who subscribed to LifeLock's products at worst were left unprotected and suffered further harm,

27   and at best were paying for a service that they were not receiving.

28

1         107.    LifeLock's first contractual promise to its subscribers is that it provides

2    "comprehensive" identity theft protection.  Subscribers rely on LifeLock's promise of

3    "comprehensive" monitoring to mean that LifeLock does in fact have the capability of providing

4    such a service.  As stated above, LifeLock's services do not cover some of the largest credit card

5    companies and businesses, nor does it cover car loans.  Instead, LifeLock only monitors 250

6    institutions in total, less than 3% of entities that would require monitoring.

7         108.    Failure to monitor the remaining 97% of entities which could be the source of

8    identity theft for subscribers is a clear breach of LifeLock's contractual obligation to provide

9    comprehensive monitoring.

10        109.    LifeLock's second contractual promise is that it provides timely and continuous

11   24/7/265 "alert" services.  Subscribers rely on this service to notify them of any suspicious

12   activity related to their identities.  Not only does LifeLock lack the resources and personnel to

13   follow through on this service, but also, LifeLock has actually suspended this service entirely

14   both because of system failures and as a way of deflecting customer service calls.

15        110.    This is an example not simply of failure to comply with a contractual obligation,

16   but rather a failure to perform the contractual obligation at all.  Subscribers rely on notifications

17   of suspicious activity so that they may proactively take next steps in protecting themselves.  By

18   throttling or shutting down the alert system entirely, LifeLock fails to meet its contractual

19   obligation of keeping its subscribers informed of suspicious activity.

20        111.    LifeLock's third contractual promise is that it employs a patented alert system

21   which stops identity theft before it does damage.  This was an obligation that LifeLock did not

22   meet, and could not as a practical or legal matter.  Numerous audits and recommendations were

23   presented to LifeLock regarding its products and policy that brought to light deficiencies in

24   LifeLock's ability to deliver on this particular promise.  (See ¶ 45 through 60).  Despite having

25   notice that they did not have the technology, personnel, and expertise to deliver this service,

26   LifeLock nevertheless promised to provide it to subscribers and charged them for it.  Moreover,

27   as described in ¶ 60 above, some of the technology which LifeLock intended to use to sweep the

28

web first left its subscribers' personally identifiable information entirely unencrypted and second was arguably illegal.

112.    LifeLock's fourth contractual promise is that it provides a monitoring service that banks and credit card companies cannot provide.  Subscribers rely on this promise and pay LifeLock to provide a superior service than their banks or credit card companies. As discussed above, LifeLock's lack of technology, personnel, and expertise has made it impossible for them to deliver even a substandard level of care in credit monitoring, let alone provide a service superior to that provided by banks and credit card companies for free.

113.    Finally, LifeLock's fifth contractual obligation is that it will use statistical analyses on rising trends in identity theft to better protect its subscribers.  Subscribers rely on this promise by trusting that LifeLock will stay up-to-date and adjust its monitoring accordingly.  Data over the past three years has clearly shown that the incidence of new account fraud accounts for the clear minority of fraud, and instead that the vast majority of fraud is related to existing accounts. And yet, LifeLock fails to provide for this exact type of identity theft – if someone steals your credit card number and uses it to make purchases, LifeLock won't help you.

114.    In sum, LifeLock fails to deliver on any of the above contractual obligations it promises to provide.  And in exchange, up to 3 million subscribers pay LifeLock up to $30.00 a month, believing they are protected when in fact they are getting nothing in return.

## **FACTUAL ALLEGATIONS SPECIFIC TO NAMED PLAINTIFFS**

115.    Plaintiff Napoleon Ebarle has been a member of LifeLock since at least 2012.  In addition, Plaintiff Napoleon Ebarle enrolled his wife and two minor children.  Since his enrollment and based on LifeLock's representations and promises, Plaintiff Napoleon Ebarle has paid LifeLock a fee of approximately $40 a month for LifeLock's services.

116.    Based on LifeLock's advertisements and representations, as identified herein, Plaintiff Napoleon Ebarle understood and/or had the impression that LifeLock would protect against any attempt to steal his identity or fraudulently procure credit under his name, would contact him in the event his personal data was used, and send him "up-to-the-minute" alerts.  In

1   accord with Plaintiff Ebarle's understanding, he submitted his, his wife's, and his children's
2   personal information to LifeLock.

3        117.   In or around August of 2014, Plaintiff Ebarle opened a Discover account;
4   however, Plaintiff Ebarle did not receive an alert from LifeLock in connection with this new
5   account opening.

6        118.   Similarly, in or around October 2014, Plaintiff Ebarle opened a new account with
7   US bank and Wells Fargo.  Yet again, however, Plaintiff Ebarle did not receive any notifications
8   from LifeLock in connection with these account openings.

9        119.   In comparison to LifeLock's inability and/or failure to detect and report these
10  activities, each of the three (3) instances described above was detected and reported to Plaintiff
11  Ebarle through his alternative account with Protect My ID, a LifeLock competitor.

12       120.   Consequently, it is clear that Plaintiff Ebarle did not receive the services and/or
13  support promised by LifeLock and paid for by Plaintiff Ebarle, and that LifeLock does not
14  provide the superior "comprehensive" services promised.

15       121.   Additionally, during the period from March through December 2014, while
16  Plaintiff Ebarle received approximately six alerts pertaining to his wife's personal information
17  from Protect My ID, he did not receive a single alert from LifeLock.  Upon contacting LifeLock,
18  Plaintiff Ebarle learned that despite paying for services for himself and his wife, LifeLock was
19  not servicing the account for his wife, even though Plaintiff Ebarle had been charged for and paid
20  for these services.

21       122.   Plaintiff Jeanne Stamm subscribed to LifeLock in 2008.  Since that time, Plaintiff
22  Stamm has paid LifeLock a fee of $9 per month, or $108 a year.

23       123.   Based on LifeLock's advertisements and representations, Plaintiff Stamm
24  understood and/or had the impression that LifeLock would protect against any attempt to steal her
25  identity or fraudulently procure credit under her name and send her timely alert notifications.
26  Based on her understanding, Plaintiff Stamm submitted her personal information to LifeLock.

27       124.   At no time relevant hereto was Plaintiff Stamm aware that LifeLock was not
28  permitted to submit fraud alerts on her behalf; that LifeLock's consumer alert notification

1   services were routinely disabled by the Company; or that LifeLock's technology and personnel

2   were deficient and incapable of protecting the security, confidentiality, and integrity of personal

3   information collected from or about consumers as promised.

4        125.   Plaintiff Brian Litton has been a member of LifeLock since 2007.  In addition,

5   Plaintiff Litton enrolled his wife and minor child.  Since his enrollment and based on LifeLock's

6   representations and promises, Plaintiff Litton has paid LifeLock a fee of approximately $30 a

7   month for LifeLock's services.

8        126.   Based on LifeLock's advertisements and representations, Plaintiff Litton

9   understood and/or had the impression that LifeLock would protect against any attempt to steal his

10   identity or fraudulently procure credit under his name, would contact him in the event his

11   personal data was used, and send him timely alerts.  In accord with Plaintiff Litton's

12   understanding, he submitted his, his wife's, and his child's personal information to LifeLock.

13        127.   In or around late February 2015, Mr. Litton received correspondence from a credit

14   company that someone was attempting to open a credit account in his name.  He informed the

15   company that it was not him, and the credit card company closed the account.  Mr. Litton never

16   received an alert from LifeLock.

17        128.   Shortly after this incident, someone did open a Sears account in Mr. Litton's name,

18   charging approximately $750.00.  Mr. Litton called and canceled the credit card.  Again,

19   Mr. Litton never received a notification from LifeLock.  When Mr. Litton called LifeLock to

20   inquire why the Company was not sending him notifications on these account openings, LifeLock

21   instructed him that he needed a different plan for LifeLock to monitor these activities and to assist

22   him in restoring his name.

23        129.   Based on LifeLock's representations, Mr. Litton enrolled in LifeLock's Ultimate

24   Plan and was told that a service representative would contact him within 24 to 72 hours.  In the

25   meantime, through its free service, Citibank assisted Mr. Litton in contacting the credit unions

26   and sending out affidavits to put a lock on his credit.  Mr. Litton was only contacted by LifeLock

27   after he had already handled the problems, meaning he received none of the promised protections

28   and/or assistance that LifeLock represented it would provide.

130.     Plaintiff Reiner Jerome Ebarle subscribed to LifeLock in mid-2012.  Since that time, Plaintiff Reiner Ebarle has paid LifeLock a fee of $9 per month, or $108 a year.

131.     Based on LifeLock's advertisements and representations, Plaintiff Reiner Ebarle understood and/or had the impression that LifeLock would protect against any attempt to steal his identity or fraudulently procure credit under his name and send him timely alert notifications. Based on his understanding, Plaintiff Reiner Ebarle submitted his personal information to LifeLock.

132.     At no time relevant hereto was Plaintiff Reiner Ebarle aware that LifeLock was not permitted to submit fraud alerts on her behalf; that LifeLock's consumer alert notification services were routinely disabled by the Company; or that LifeLock's technology and personnel were deficient and incapable of protecting the security, confidentiality, and integrity of personal information collected from or about consumers as promised.

133.     As such, Plaintiffs were charged and paid fees for services that were not as represented, were illegal for the Company to perform, were non-existent, and/or virtually worthless.

## FRAUDULENT CONCEALMENT AND TOLLING

134.     The applicable statutes of limitations are tolled by virtue of Defendant's knowing and active concealment of the facts alleged above.  Plaintiffs and class members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

135.     At the time this action was filed, Defendant was under a duty to disclose the true, character, quality, and nature of LifeLock's services to Plaintiffs and the Class.  Defendant is therefore estopped to rely on any statute of limitations.

136.     Defendant's fraudulent concealment is common to the Class.

## CLASS ACTION ALLEGATIONS

137.     Plaintiffs bring this action against LifeLock as a class action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3).

138.     Plaintiffs seek certification of this action on behalf of the following class (the "Class"):  all persons in the United State who are or were, during January 19, 2009, through the resolution of this matter (the "Class Period") subscribers of LifeLock's fee-based theft protection services. Excluded from the Class are Defendant, any parent, subsidiary, affiliate, or controlled person of Defendant, as well as the officers, directors, agents, servants or employees of Defendant and the immediate family members of any such person.  Also excluded is any judge who may preside over this cause of action.

139.     The exact number of the Class, as herein identified and described, is not known, but it is estimated to number in the thousands.  The Class is so numerous that joinder of individual members herein is impracticable.

140.     There are common questions of law and fact in the action that relate to and affect the rights of each member of the Class and the relief sought is common to the entire Class.  In particular, the common questions of fact and law include:

(A)     Whether Defendant's alert notification services were subject to regular delays and/or shut-downs;

(B)     Whether Defendant failed to maintain compliance with the FTC Order;

(C)     Whether Defendant's technology and safeguards were deficient to deliver the protections as promised;

(D)     Whether Arizona law applies to the putative Class; and

(E)     Whether members of the Class have sustained damages, and, if so, in what amount.

141.     The claims of the Plaintiffs, who are representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiffs, depend on a showing of the acts of Defendant giving rise to the right of Plaintiffs to the relief sought herein.  There is no conflict between the individually named Plaintiffs and other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

1       142.    The named Plaintiffs are the representative parties for the Class, and are able to,

2   and will fairly and adequately protect the interests of the Class.  The attorneys for Plaintiffs and

3   the Class are experienced and capable in complex civil litigation, consumer fraud litigation and

4   class actions.

5       143.    The class action procedure is superior to all other available methods for the fair

6   and efficient adjudication of this controversy.  This action would permit a large number of injured

7   persons to prosecute their common claims in a single forum simultaneously, efficiently, and

8   without unnecessary duplication of evidence and effort.  Class treatment also would permit the

9   adjudication of claims by class members whose claims are too small and complex to individually

10  litigate against a large corporate defendant.

### COUNT I
### VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT

13      144.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

14      145.    LifeLock's acts and omissions constitute material misrepresentations and

15  concealments in connection with the sale or advertisement of its services in violation of the

16  Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A).

17      146.    Specifically, LifeLock used false, deceptive and misleading statements, concerning

18  the scope and effectiveness of its services; LifeLock's ability to provide continuous alerts and

19  services; LifeLock's ability to place fraud alerts under the FCRA; and the limitations, exclusions,

20  and restrictions on LifeLock's services.

21      147.    Likewise, LifeLock's advertisements and website were misleading, false, and/or

22  deceptive regarding the efficacy of LifeLock's technology and safeguards.

23      148.    LifeLock further omitted and/or concealed material facts.  For example, LifeLock

24  concealed the fact that the Company was regularly engaged in the practice of throttling, that

25  LifeLock's network and safety protocols were not and/or could not function at the level promised.

26  In addition, LifeLock also failed to disclose the effects of not sending out alerts.

27      149.    LifeLock's advertisements, marketing, and customer service representatives

28  purposely used inconsistent and confusing terms and/or high pressure sales tactics so as to

confuse customers and prevent them from bringing legitimate claims and/or canceling their services.

150.     Upon information and belief, LifeLock knowingly violated the terms of the FTC Order and used false, misleading, and deceptive representations and/or omissions in the advertising, marketing, and sales of its services.

151.     As a result of LifeLock's misrepresentations and omissions, LifeLock's members paid substantial fees, were injured and sustained damages in an amount to be proven at trial. These damages include, at a minimum, payments of monthly charges for services that were not as represented and payments for a service that is illegal for a company such as LifeLock to perform.

## COUNT II
## BREACH OF CONTRACT

152.     Plaintiffs repeat and reallege all preceding paragraphs contained herein.

153.     By contract, LifeLock agreed to provide Plaintiffs and the members of the Class Membership Plans and protections as advertised.

154.     LifeLock breached its contracts with Plaintiffs and the members of the Class by failing to provide the benefits and/or protections as promised.

155.     As a direct and proximate result of Defendant's breach, Plaintiffs and the Class are entitled to all damages arising from the breach of contract.

## COUNT III
## UNJUST ENRICHMENT

156.     Plaintiffs repeat and reallege all preceding paragraphs contained herein.

157.     Plaintiffs and the Class conferred benefits upon the Defendant by paying Membership Fees for the promised identity theft protections and services.

158.     Although LifeLock received earnings and benefits from the sale of its Membership Plans and the collection of Membership Fees, LifeLock retained these revenues under conditions that would constitute an unjust enrichment of those revenues.

1      159.    As a direct and proximate result of Defendant's actions, Plaintiffs and the Class

2   are entitled to restitution on the full amount by which the Defendant has been unjustly enriched

3   and should be required to disgorge same to Plaintiffs and the Class.

### COUNT IV
### DECLARATORY JUDGMENT

6      160.    Plaintiffs hereby repeat and reallege all preceding paragraphs contained herein.

7      161.    An actual case and controversy within the meaning of the Federal Declaratory

8   Judgment Act, 28 U.S.C. §§ 2201 and 2202, which may be adjudicated by this Court exists

9   between Plaintiffs and proposed class members, and the Defendant.

10      162.    Plaintiffs and all members of the proposed class have, had, or were subscribers of

11   one of Defendant's fee-based Membership Plans.  Defendant's Terms and Conditions provide that

12   its insureds are treated consistent with the requirements of the laws and regulations of

13   Arizona.  Thus, per the governing contract, Arizona law controls how the Defendant's customers

14   must be treated by Defendant.

15      163.    At the same time, the relationship between Defendant and its customers was

16   subject to the FTC Order entered between Defendant and the FTC in 2010, which specifically

17   enjoins LifeLock from misrepresenting, expressly or by implication, "the means, methods,

18   procedures, effects, effectiveness, coverage, or scope" of LifeLock's services.

19      164.    Defendant, as a general policy and business practice, represented or created the

20   impression that LifeLock's Membership Plans provide: (a) protection from fraud or unauthorized

21   account charges or "peace of mind"; (b) a solution to financial security; (c) live member support

22   24/7/365 and up-to-the-minute "alerts" of any threat of identity theft; and (d) a $1 million total

23   service guarantee.

24      165.    Accordingly, Defendant has violated, and continues to violate, Arizona law and

25   the FTC Order and Plaintiffs are entitled to declaratory relief.

### RELIEF

27      WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

28   respectfully request that this Court:

1        a)      determine that this action may be maintained as a class action under Rule 23 of the

2              Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives,

3              and approve Plaintiffs' Counsel as counsel for the Class;

4        b)      enter an order demanding that Defendant pay monetary damages to the Plaintiffs,

5              and all proposed Class members;

6        c)      enter an order declaring that Defendant's actions are unlawful; and

7        d)      grant such other legal and equitable relief as the Court may deem appropriate,

8              including costs and attorneys' fees.

9                                  **<u>JURY DEMAND.</u>**

10      Plaintiffs and the Class members hereby request a trial by jury.

11    Dated:  May 13, 2016                Respectfully submitted,

12                         By:   */s/ Joseph H. Bates*

13                             CARNEY BATES & PULLIAM, PLLC
                                          Joseph Henry ("Hank") Bates (CA #167688)

14                                          Randall K. Pulliam
                                          11311 Arcade Drive, Suite 200

15                                          Little Rock, AR 72212
                                          Telephone:  (501) 312-8500

16                                          Fax:  (501) 312-8505

17                                      LIEFF CABRASER HEIMANN
                                            & BERNSTEIN, LLP

18                                      Michael W. Sobol (CA #194857)
                                          msobol@lchb.com

19                                      RoseMarie Maliekel (CA #276036)
                                          rmaliekel@lchb.com

20                                      275 Battery Street, 29th Floor
                                          San Francisco, CA  94111-3339

21                                      Telephone:  (415) 956-1000
                                          Facsimile:  (415) 956-1008

22                                      *Attorneys for Plaintiffs*

23

24

25

26

27

28