UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAPOLEON EBARLE, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>LIFELOCK, INC.,<br><br>    Defendant. | Case No. 15-cv-00258-HSG<br><br>**ORDER GRANTING FINAL APPROVAL OF SETTLEMENT; GRANTING ATTORNEYS' FEES**<br><br>Re: Dkt. Nos. 60, 71 |

Pending before the Court are two motions filed by Plaintiffs Napoleon Ebarle, Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle. Plaintiffs move for (1) final approval of the parties' proposed class action settlement, Dkt. No. 71; and (2) an award of attorneys' fees, costs, and named plaintiff incentive payments, Dkt. No. 60. The Court held a final fairness hearing on both motions on June 23, 2016. For the reasons stated below, the Court GRANTS both motions.

**I.  BACKGROUND**

    **A.  Litigation History**

Defendant LifeLock, Inc. provides identity theft protection services to its subscribers. This action began on January 19, 2015. Plaintiffs Napoleon Ebarle, Jeanne Stamm, Brian Litton, and Reiner Jerome Ebarle allege in the second amended complaint ("SAC") that Defendant's advertisements of identity theft protection services violated Arizona's Consumer Fraud Act. Dkt. No. 73. The allegations concerned Defendant's promises to provide: (1) "comprehensive" services in detecting fraud, (2) timely and continuous alerts of potential fraud twenty-four hours a day every day of the year, (3) security for customers' personal data (credit card, social security, and bank account numbers), and (4) insurance in an amount up to $1,000,000 against identity theft.

The parties exchanged informal discovery requests before participating in settlement

discussions with mediator Justice Howard Wiener on July 1, 2015. Dkt. No. 49-2 at 2. The parties did not reach a resolution at the first mediation; they continued to engage in informal discovery and participated in a second full-day mediation on August 18, 2015. *Id.* At the end of the second mediation, the parties still were unable to reach a resolution, so Justice Wiener made a mediator's proposal, which the parties accepted and memorialized in a non-binding memorandum of understanding. *Id.* The settlement was executed by all parties on November 3, 2015, Dkt. No. 49-1, Ex. A.

On July 21, 2015, the Federal Trade Commission ("FTC") filed an enforcement action against Defendant in the United States District Court for the District of Arizona ("FTC Action"); the alleged violations overlap with the claims asserted in this case. Defendant negotiated a separate agreement with the FTC that provides for a $100,000,000 judgment in the FTC's favor for the purpose of consumer redress. On December 22, 2015, the district court in the FTC Action approved the settlement between Defendant and the FTC, entered a money judgment of $100,000,000, and directed Defendant to satisfy the judgment by depositing the money in the District of Arizona's registry within five business days, Dkt. Nos. 54, 56. Pursuant to the terms of this settlement, Defendant can use the registry funds to fund the settlement here. *Id.*

On January 20, 2016, the Court granted Plaintiffs' motion for preliminary approval of the settlement, conditionally certifying the Class and Subclass for settlement purposes. Dkt. No. 57.

### B. Overview of the Proposed Settlement

The parties executed a Class Action Settlement Agreement ("Settlement Agreement") on November 3, 2015. Dkt. No. 49-1, Ex. A. The key provisions of the Settlement Agreement are described below.

*Settlement Funds.* Defendant agrees to establish a non-reversionary Settlement Fund of $68,000,000 for the benefit of the eligible Class Members, which includes a Class and Subclass. *Id.* at ¶¶ 40, 44, 57, 58. A Subclass Fund shall be created based on the percentage of the Class that comprises the Subclass. *Id.* at ¶ 44. The Class Fund shall be the Settlement Fund less the Subclass Fund. *Id.* at ¶ 12.

*Class.* All members of Defendant's identity theft protection plan in the United States at

2

any time between September 1, 2010 and the date of the preliminary approval order. *Id.* at ¶ 9.

*Subclass.* All individuals who enrolled in Defendant's identity theft protection plan in the United States at any time between January 1, 2012 and April 30, 2015. *Id.* at ¶ 43.

*Allocation Method.* Each Subclass Member will receive an automatic pro rata distribution from the Subclass Fund. *Id.* at ¶ 58. Additionally, each Class Member (including those who are also Subclass Members) can submit a claim for $20.00 before the Claim Deadline, which will be paid from the Class Fund. *Id.* If the number of claims submitted exceeds the Class Fund amount, then each claimant will receive a pro rata distribution from the Class Fund. *Id.* at ¶ 69. If the claims submitted do not exhaust the Class Fund, the Settlement Administrator shall distribute the remainder of the Class Fund on a pro rata basis. *Id.* at ¶ 70.

If money remains from uncashed checks 120 days after payment dates, a second pro rata distribution shall be made to Valid Claimants who cashed their initial payment checks. *Id.* at ¶ 63. If money remains from uncashed checks 120 days after the second distribution, the money shall be deposited into the Court Registry in the FTC Action. *Id.*

*Attorneys' Fees; Costs; Incentive Payments.* Defendant has agreed not to oppose an application for $10,200,000 in attorneys' fees and expenses and $2,000 to each of the four Class Representatives. The Settlement Agreement provides that Defendant will pay each of these costs and awards in addition to (and not out of) the Settlement Fund.

*Second Amended Complaint.* As a material part of the settlement, Defendant stipulated to not oppose the filing of a SAC naming Renier Jerome Ebarle as a named Plaintiff, "provided that a Preliminary Approval Order, a Final Approval Order, and Final Judgment each is entered and this Settlement Agreement becomes effective on the Final Settlement Date." *Id.* at ¶¶ 52-53.

*Releases.* The Settlement Class Members will release "any claims" that "were or reasonably could have been alleged in the Action or in any other court, tribunal, arbitration panel, commission, agency, or before any governmental and/or administrative body, or any other adjudicatory body, on the basis of, connected with, arising from, or relating to the subject matter or allegations of the Action." *Id.* at 90.

*Requests for Exclusion.* Any Class Member may email or mail a written request for

exclusion to the Settlement Administrator at the email or mailing address provided in the Class Notice no later than the postmarked deadline. *Id.* at 71. A Class Member who does not submit a timely written exclusion request shall be bound by all subsequent proceedings, including the release. *Id.* at 72. A Class Member who timely submits a request for exclusion shall waive and forfeit all rights the member may have to benefits of the Settlement if it is approved. *Id.* at 73.

*Unclaimed Settlement Funds*. The Settlement Agreement is non-reversionary. *Id.* at 58. Any residual amounts will be paid to the members of the settlement pursuant to the allocation set forth above.

*Objections*. Class Members who do not opt out of the settlement may file an objection to the Settlement Agreement no later than the Objection Deadline. *Id.* at ¶¶ 75-80.

## II. DISCUSSION

### A. Motion for Final Approval of Class Action Settlement

"The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). The Court may finally approve a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To assess whether a proposed settlement comports with Rule 23(e), a district court must "determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998). To make this determination, courts consider the following factors:

> the strength of the plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Id.* No single factor is the "most significant." *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

In addition, "[a]dequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon*, 150 F.3d at 1026. Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through

4

reasonable effort." The notice must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and class members' right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B). Additionally, before granting final approval of a proposed class settlement, a court must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Rule 23(e)(1). While Rule 23 requires that reasonable efforts be made to reach all class members, it does not require that each individual actually receive notice. *See Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010) (noting that "due process requires reasonable effort to inform affected class members through individual notice, not receipt of individual notice").

### 1. Adequacy of Notice

The Court finds that the notice and notice plan, previously approved by the Court, Dkt. Nos. 57, 59, was implemented and complies with Rule 23(c)(2)(B). Defendant's customer records identified 6,499,241 unique Class Members, of whom 3,323,108 were also Subclass members. Dkt. No. 74 at ¶ 7. In accordance with the Court's orders, the settlement administrator sent email notices to 5,977,723 emails and mailed individual postcard notices to 1,288,501 mailing addresses. Dkt. No. 74 at ¶¶ 10, 11. Of the 6,499,241 Class Members, there are only 32,073 customers who did not receive an email notice and who did not receive a mailed postcard. *Id.* at 17. Thus, over 99.5% of Class Members received summary notice via email or mail. *Id.* at ¶ 18.

Additionally, the settlement administrator published notice in *USA Today*, and launched the settlement website, which contained additional settlement information, including the long form and summary notice. *Id.* at ¶¶ 19, 20, 21. As of May 12, 2016, the settlement website had received 239,115 visits. *Id.* at ¶ 23. The settlement administrator also launched a toll-free telephone number to accommodate inquiries regarding the settlement; since May 12, the settlement administrator has received 37,071 calls. *Id.* at ¶¶ 24, 25. In light of these facts, the Court again finds that the notice and notice procedures complied with the requirements of Rule 23(e).

### 2. Fairness, Adequacy, and Reasonableness of Settlement

Having found the notice procedures adequate under Rule 23(e), the Court next considers

whether the entire settlement comports with Rule 23(e).

### a. Strength of Plaintiffs' Case

The first factor for the Court to consider is the strength of Plaintiffs' case. This action reached settlement before the Court had an opportunity to consider the merits of the claims. While Plaintiffs maintain that their claims and allegations are meritorious, they also recognize the obstacles they would face should litigation have continued. It is not clear that Plaintiffs successfully would overcome Defendant's opposition to class certification, as well as any motions to dismiss and summary judgment. Moreover, variances in whether Class Members experienced delayed alerts and the presence or absence of actual harm would pose further obstacles to Plaintiffs' case. Given these and other challenges Plaintiffs would face should the case have moved forward, this factor supports final approval of the settlement.

### b. Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court next considers the risk, expense, complexity, and likely duration associated with pursuing this case through the trial and appellate process. Without a settlement, the Class would incur significant expenses as the case proceeded through anticipated motions to dismiss and summary judgment, as well as the motion for class certification. Defendant has denied the allegations in the complaint, maintaining that it provides the most comprehensive identity theft protection services on the market. It asserts that any inadvertent delays in sending alerts affected only a small number of customers and that such delays likely did not result in actual credit card fraud or identity theft. And Defendant disputes whether Class Members suffered actual injury. Moreover, customers' individual interactions with LifeLock and the degree to which customers relied on Defendant's representations could pose an obstacle to class certification. Defendant argues that certification would be unlikely given variances in "whether Class Members' alerts were delayed, and whether Class Members suffered any harm." Dkt. No. 71 at 8.

Given Defendant's willingness to defend against this action, there would be no guarantee in a favorable result even if the parties were to proceed through protracted litigation. In reaching a settlement, Plaintiffs have ensured a favorable recovery for the class in a litigation which

otherwise could have taken years to complete. *See Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 966 (9th Cir. 2009) (recognizing that difficulties and risks in litigating weigh in favor of approving a class settlement). These factors weigh in favor of approving the settlement. *See Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014) ("Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." (internal quotations omitted)).

### c. Risk of Maintaining Class Action Status

In considering the third factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed. As noted above, Defendant has maintained a vigorous opposition to Plaintiffs' case and likely would oppose any motion to certify the class in a similar manner. Considering the difficulties in certifying and maintaining a class of this size, the Court finds that this factor weighs in favor of approving the settlement.

### d. Amount Offered in Settlement

The amount offered in the settlement is another factor that weighs in favor of approval. Several Class Members object that the settlement amount is too low and that members should be refunded the full amount they paid LifeLock, if not more. *See*, *e.g.*, Dkt. Nos. 74-10 (Donna Dalton; George Johnson; James Johnson); 74-11 (James Johnson); 74-12 (Jennifer Hinojosa; Joshua Pierre; Jill and Stephen Piazza). The Court rejects these objections and finds the settlement amount reasonable.

Following arm's-length negotiations over the course of many months and with the help of a neutral mediator, Defendant agreed to pay $68,000,000 to Class Members. The amount provides Class Members on average the amount each paid for a month of service. The average cost of Defendant's service plans is $10 to $30 a month. Subclass members will automatically receive $19.48, and if they submitted a claim form, they will receive $39.48. Dkt. No. 74 at ¶ 28. Additionally, Class Members who are not a part of the Subclass and who submitted a claim form will receive $20. Dkt. No. 74 at ¶ 28. These amounts are consistent with the projected amounts approved in the Court's preliminary approval order.

Although the maximum value of Plaintiffs' claims may have been higher, the settlement

amount is reasonable given the difficulties in valuing the potential harm and showing actual injury. *See Villanueva v. Morpho Detection, Inc.*, No. 13-cv-05390-HSG, 2016 WL 1070523 *4 (N.D. Cal. March 18,2016) ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."). Objectors have provided no basis for their argument that a fair settlement amount would have included a full refund of the amount they paid to LifeLock. The SAC does not allege that Defendant failed to provide all services, thus warranting a full refund. Rather, the SAC is limited to allegations that Defendant may not have provided 24 hour service, seven days a week. Thus, some value was afforded Class Members, which would appear to negate the argument that a full refund is warranted. More significantly, the request for a higher settlement fails to account for the risk, expense, complexity, and likely duration of further protracted litigation, including Defendant's anticipated challenges through a motion to dismiss, motion for summary judgment, and an opposition to class certification. Given the possibility of protracted litigation, potential appeals, and the risk that the case results in no payout for members because of an inability to prove actual injury or fails during pretrial motion practice, the Court finds that a full refund was not required and that the settlement amount is reasonable. *See In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Immediate receipt of money through settlement, even if lower than what could potentially be achieved through ultimate success on the merits, has value to a class, especially when compared to risky and costly continued litigation."). Thus, this factor weighs in favor of approval.

         **e.**      **Extent of Discovery Completed and the Stage of Proceedings**

The parties have undertaken sufficient discovery to inform their view of the reasonableness of the settlement. Class Counsel reviewed 10,000 documents, including exemplars of print advertisements and television commercials; account histories for individual Plaintiffs; transcripts of depositions, settlement agreements, and documents from a multi-district litigation and FTC Action; consumer surveys Defendant conducted regarding its advertisements; Defendant's call center scripts; the terms of service during the alleged Class Period; insurance policies underlying its $1 million guarantee; alert histories; identify theft protection plan cancellations; and the

8

responses to FTC's requests for information. Dkt. No. 49-1 at 4-5. Accordingly, the extent of discovery completed and the stage of the proceedings weigh in favor of final approval.

### f. Experience and Views of Counsel

The Court next considers the experience and views of counsel, and finds that the factor tilts in favor of approval. The Court has previously evaluated Class Counsels' qualifications and experience and concluded that they are experienced in this type of litigation and are in a position to offer opinions regarding the settlement's fairness, adequacy, and reasonableness. *See* Dkt. No. 50; Dkt. No. 49-1, Ex. B at 100, Ex. C at 4. Class Counsel believe "the Settlement is fundamentally fair, adequate, and reasonable." Dkt. No. 49-1 at 2. The Court notes that there are divergent views as to the weight to accord counsel's opinions. *Compare Carter v. Anderson Merch., LP*, 2010 WL 1946784, at *8 (C.D. Cal. May 11, 2010) ("Counsel's opinion is accorded considerable weight."), *with Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) ("[T]his court is reluctant to put much stock in counsel's pronouncements, as parties to class actions and their counsel often have pecuniary interests in seeing the settlement approved."). Accordingly, although the Court finds that this factor weighs in favor of approval, the Court affords only modest weight to counsels' views.

### g. Government Participation

This factor examines the participation of a government entity. After the material terms were agreed to by the parties, the settlement was coordinated with the settlement in the FTC Action. This coordination favors final approval. *See In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1006 (N.D. Cal. 2015), *reconsideration denied*, No. C-13-3440 EMC, 2015 WL 4735521 (N.D. Cal. Aug. 10, 2015). Moreover, the settlement administrator served the proposed settlement agreement on the attorney generals in all states, the District of Columbia, and territories; as of May 13, 2016, no government entity had raised any objections to the settlement. Dkt. No. 71 at 11; Dkt. No. 74 at ¶ 1.

### h. Reaction of Class Members

The reaction of the Class Members supports final approval. Defendant's records identified 6,499,241 unique Class Members of whom 3,323,108 were also a part of the Subclass. Dkt. No.

74 at ¶ 7. As of May 12, 2016, 164,424 Class Members submitted claims, of whom 78,830 were Subclass members. *Id.* at ¶ 28. The deadline for submitting objections or requests for exclusion was April 14, 2016. There were 57 timely objections, and 3 late objections, Dkt. No. 74 at ¶ 30, as well as 3,889 timely requests for exclusion and 30 late requests for exclusion, *id.* at ¶ 32. In accordance with the settlement's provisions, a total of 3,406,855 Class Members (or 52% of the class) will receive payments, *id.*

The Court finds that these numbers demonstrate a favorable response by the Class and weigh in favor of final approval. *See Churchill Village v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement where 45 of approximately 90,000 class members objected); *Rodriguez*, 563 F.3d at 967 (finding favorable class reaction where 54 of 376,301 class members objected).

### i. Objections.

"[O]bjectors to a class action settlement bear the burden of proving any assertions they raise challenging the reasonableness of a class action settlement." *In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122, 1137 (N.D. Cal. 2015).

Several objectors failed to provide any basis for their objections. The Court thus denies these objections, finding they provide no basis on which to challenge the settlement's fairness or reasonableness. The substance of the other objections fall into the following categories: (1) adequacy of settlement amount, (2) attorneys' fees, (3) services awards, (4) intra-class conflicts and adequacy of representation, (5) choice of law conflict, and (6) adequacy of notice. The Court addressed the objections related to the adequacy of the settlement amount *supra* in Section II(A)(2)(d). The Court addresses the objections related to attorneys' fees and service awards *infra* in Section II(B).

The Court denies the objection alleging intra-class conflict and inadequacy of representation. *See* Dkt. No. 68. Objector Antonia Carrasco summarily argues that "the parties have not compiled with the requirements of separate representation for intra-class conflicts." *Id.* at 7. Objector Carrasco does not point to specific facts or evidence to suggest there is a conflict in representation. Moreover, the Court has seen nothing to suggest that the named plaintiffs do not

share the same interests and suffer the same injuries as the Class or Subclass members. Moreover, the existence of a Subclass, and the correspondingly different relief, does not on its own create a conflict of interest. Accordingly, the Court rejects the objection.

With respect to the choice of law objection, Objector Marla Merhab Robinson argues that California law should apply rather than Arizona law, and that at the very least the settlement should address the differences among consumer fraud statutes across each state through the creation of subclasses. Dkt. No. 74-13. This objection lacks merit.

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001). Where the parties have entered into a contract that specifies that another jurisdiction's law will govern their disputes, California courts apply the framework set forth in *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459 (1992). *See also Washington Mutual Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 914-15 (2001). *Nedlloyd* explains that "a valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized." *Nedlloyd*, 3 Cal. 4th at 470.

Here, Defendant's subscription-based services are governed by the Service Terms and Conditions ("Service Terms"), which states:

> The Service Terms and any Services provided hereunder will be governed by the laws of the State of Arizona, without regard to any laws that would direct the choice of another state's laws and, where applicable, will be governed by the federal laws of the United States.

SAC ¶ 7. Objector Robinson does not challenge the validity or enforceability of this clause and offers no evidentiary support for the argument that the services she received from Defendant were governed by a different contract or provision. Accordingly, the Court has no reason to doubt the provision's validity, and no basis to hold that the causes of action at issue here do not fall within its scope. Accordingly, Arizona law governs the action, and the Court denies the objection.

Finally, the Court denies the objections related to the adequacy of notice. Objector Walter Ellingwood argues that the notice misleads the Class by stating that Defendant has agreed

to pay $68,000,000 to a Settlement Fund, because in reality "the FTC has allowed $68 million of the $100 million penalty to the FTC to compensate Lifelock's customers." Dkt. No. 61. The Court rejects this argument, given that the Long-Form Notice expressly notifies Class Members of the FTC Action and explains that the stipulated order "provides that $68 million of the amount LifeLock pays to resolve the FTC Action may be used to provide consumer redress in this lawsuit through proposed settlement." Dkt. No. 58, Ex. C at 3.

Objector Jonathan Gross argues that the notice was not sufficient because it did not include a breakdown of counsel's fees, thus preventing objectors from having the necessary information to present their challenges. Dkt. No. 74-12. As an initial matter, the notice expressly informed Class Members that they could access and review the motion for attorneys' fees on the settlement website. More significantly, however, the Court finds that the failure to disclose Class Counsel's fees in the notice is not fatally deficient. Rule 23(c)(2)(B) specifies the information that must be in the notice, including details regarding the nature of the action; the class definition; the class claims, issues, or defenses; the binding effect of the class judgment; information regarding appearing through an attorney; and the exclusion process. As discussed above and in the Court's preliminary approval order, the notice in this case met these requirements. Because the notice sufficiently apprised the Class Members of the essential terms of the settlement and alerted Class Members to follow up if they had concerns, the Court denies this objection. *See Churchill*, 361 F.3d at 757 ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." (internal quotation marks omitted)).

The Court also rejects Barbara Cochran's argument that Class Members should not be required to submit claim forms. Dkt. No. 70. "[T]here is nothing inherently objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims[-]made settlements." *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA WMC, 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2012). Moreover, the notice program was designed to ensure that most, if not all Class Members, received notice of the settlement by employing direct, individual notice to Class Members via email or mail based on Defendant's

12

internal records. Here, the Subclass members, who have the greatest possible damages, will automatically receive a settlement payment without the need to file a claim. Moreover, any money remaining after the first settlement distribution will be paid to Class Members on a pro rata basis. Because remaining funds do not revert to Defendant, there is little basis for an argument that Defendant benefits by using a claim-submission process. This objection is denied.

### j. Arms-Length Negotiation

Finally, the Court considers whether the parties reached this settlement as a result of good faith, arms-length negotiations rather than as a result of fraud or collusion. The parties engaged in negotiations with the participation of Justice Wiener, over the course of several months, before coming to an agreement. Considering the nature and length of the negotiation process as well as the benefit conferred on the Class Members in light of the risks of continued litigation, the Court is satisfied that this settlement is not the product of collusion or fraud, but rather is the result of a successful arms-length negotiation.

\* \* \*

## B. Attorneys' Fees & Costs

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Because Arizona law governed the claim here, it also governs the award of attorneys' fees. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). Arizona courts cite federal law in determining the appropriate fees to award in common fund cases, *see*, *e.g.*, *Charles I. Friedman, P.C. v. Microsoft Corp.*, 141 P.3d 824, 831 (Ariz. Ct. App. 2006). For this reason, the Court also relies on federal law.

"Under Ninth Circuit law, the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method." *Vizcaino*, 290 F.3d at 1047. "[T]he choice between lodestar and percentage calculation depends on the circumstances, but [ ] 'either method may . . . have its place in determining what would be reasonable compensation for creating a common fund.'" *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). To guard against an unreasonable result, the Ninth Circuit has encouraged district

13

1 courts to cross-check any calculations done using one method against those using another method. *Vizcaino*, 290 F.3d at 1050-51.

Under the percentage-of-recovery method, 25% of a common fund is the benchmark award of attorney's fees. *See*, *e.g.*, *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."); *Six Mexican Workers*, 904 F.2d at 1311.

Here, Class Counsel requests $10.2 million in attorneys' fees, $8,000 in service awards, and $2.6 million in settlement notice and administration costs. Dkt. No. 60 at 3. The total monetary payout (the $68 million fund plus attorneys' fees, service awards, and settlement notice and administration costs) is $80,808,000. *See Staton v. Boeing Co.*, 327 F.3d 938, 974-75 (9th Cir. 2003) (explaining that it is appropriate to include all amounts paid by defendant, including notice costs, in defining the "fund" used for applying percentage-of-the-fund method). The $10.2 million attorneys' fee request thus represents 12.6% of the total payout, and is far less than the Circuit's 25% benchmark.

The Court additionally considers the *Vizcaino* factors to confirm the fee request's reasonableness, examining: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases. *See Vizcaino*, 290 F.3d at 1048-50.

Here, the monetary results achieved are noteworthy in light of the risks of continued litigation. The $68 million will not revert to Defendant or a *cy pres* recipient. Rather, over the course of two distribution rounds members will receive monetary relief, totaling approximately the amount each paid for one month of enrollment in Defendant's services. If there is any remaining money, it will be returned to the fund in the FTC Action. This is a significant result given that members received some value while enrolled in Defendant's identity theft protection, and given the difficulty of proving actual harm. Additionally, as a result of the litigation, Defendant made changes to its advertisements and practices. Defendant no longer promises customers continued and uninterrupted alerts 24 hours a day, and also made technical improvements so that it can

14

deliver alerts during unplanned system outages. Dkt. No. 49-1 at ¶ 20. These improvements further support a 12.6% fee request. *See Vizcaino*, 290 F.3d at 1049 ("Incidental or nonmonetary benefits conferred by the litigation are a relevant circumstance" in determining fee awards).

Additionally, there were significant litigation risks. As discussed, Defendant denied liability, and intended to contest class certification. Counsel represented Plaintiffs on a contingency basis, advanced all necessary expenses, and turned down other work opportunities to work on this case. *See* Dkt. No. 60-1 at ¶¶ 15-17; Dkt. No. 60-2 at ¶¶ 16-18.

With respect to the quality of litigation, Class Counsel is experienced in litigating large consumer class actions, including cases concerning false advertising and unfair business practice claims. *See* Dkt. No. 60-1 at 1. The successful result involved a significant commitment of effort and skill; counsel performed substantial factual investigation and legal research, deposed executives, reviewed and analyzed thousands of documents; prepared two mediation briefs and participated in multiple mediation sessions, negotiated and drafted the settlement, and oversaw the settlement's implementation. *See* Dkt. No. 60-2 at ¶ 7 (describing duties including analyzing documents and data in the following areas: gap analysis, analysis of subscriber and network data; and overseeing counsel's settlement approval and implementation efforts); Dkt. No. 60-1 at ¶ 7 (developing case and discovery strategy, reviewing and editing pleadings, conducting factual analysis including damages analysis, preparing for settlement negotiations and mediations). The skill and quality of work further support the requested fee.

Additionally, the contingent nature of the case and the financial burden assumed justify the fee request. *See* Dkt. No. 60-1 at ¶ 16 ("LCHB has not been paid for any of its time spent on this litigation, nor has it been reimbursed for any of its expenses incurred in this litigation."). Counsel was, to an extent, precluded from taking and devoting resources to other cases or potential cases, with no guarantee that the time expended would result in any recovery or recoupment of costs. Dkt. No. 60-1 at ¶ 17 ("Because LCHB undertook representation of this matter on a contingency-fee basis, LCHB shouldered the risk of expending substantial costs and time in litigating the action without any monetary gain in the event of an adverse judgment."); *see also* Dkt. No. 60-2 at ¶¶ 16-18.

Finally, in other consumer fraud class actions, courts appear to consistently award the 25% benchmark. *See Ko v. Natura Pet Prod., Inc.*, No. C 09-02619 SBA, 2012 WL 3945541, at *14 (N.D. Cal. Sept. 10, 2012) (25% benchmark); *Nigh v. Humphreys Pharmacal, Inc.*, No. 12CV2714-MMA-DHB, 2013 WL 5995382, at *12 (S.D. Cal. Oct. 23, 2013) (same); *Gallucci v. Boiron, Inc.*, No. 11CV2039 JAH NLS, 2012 WL 5359485, at *9 (S.D. Cal. Oct. 31, 2012) (same), aff'd sub nom. *Gallucci v. Gonzales*, 603 F. App'x 533 (9th Cir. 2015); *Fraley v. Facebook, Inc.*, No. C 11-1726 RS, 2013 WL 4516806, at *3 (N.D. Cal. Aug. 26, 2013) (same), aff'd sub nom. *Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016). That Class Counsel seeks an amount significantly below the benchmark further supports the reasonableness of the request.

Several objectors argue that the requested fee amount is excessive in light of the settlement benefits conveyed and that the existence of a clear sailing provision confirms that the settlement is unfair. They argue that the FTC, not Class Counsel, negotiated the $68,000,000 fund, and that the Court's fee calculation should be based only on the $10.2 million that counsel negotiated. *See, e.g.*, Dkt. Nos. 74-8 (Antonia Carrasco); 74-9 (Billy and Danny McBride; Brenda Tracy; Cindy Cartwright; Clinton Petrey); 74-10 (Don Carroll; Dorothy Thompson; Edward Smith; Dianne and Thomas Shine; George Parker; Deborah Smith); 74-12 (Janice Giordano; Jay Richardson; Jennifer Hinojosa; Jill and Stephen Piazza).

The Ninth Circuit has held that "when the parties negotiate a 'clear sailing' arrangement providing for the payment of attorneys' fees separate and apart from class funds," the Court should "scrutinize the clear sailing attorneys' fee provision" to ensure there is no collusion. *In re Bluetooth Headset*, 654 F.3d at 947-48. *In re Bluetooth Headset* identifies two additional signs of collusion: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded," and (2) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* at 947.

Having examined these factors in the context of this case, the Court is comfortable that the settlement agreement was not collusive and that the attorneys' fee award is not unreasonably high. Unlike *In re Bluetooth Headset*, the $68 million fund is non-reversionary. Because there is no

16

"kicker" contained in the agreement, remaining money in the Settlement Fund does not revert to Defendant and instead is redistributed on a pro rata basis to the Class. If there are funds remaining after the second payment, the Settlement Administrator deposits the remaining amount in the Court Registry in the FTC Action. Dkt. No. 49-1 at ¶ 63. Thus, there are no circumstances in which Defendant keeps the $68 million.[1]

Moreover, the record confirms that the initial agreement between Class Counsel and Defendant was limited to a settlement fund of $68,000,000 and that Class Counsel would apply for a 15% attorneys' fee award to be paid from the Settlement Fund. Dkt. No. 60-1 at ¶ 48; Dkt. No. 78 at ¶ 18 ("The MOU contemplated a 'Settlement Amount' of $68 million, from which attorneys' fees, service awards, administrative costs, and settlement benefits would be paid."). After signing a memorandum of understanding to this end, but before a final settlement agreement was completed, the parties entered further negotiation at Defendant's request to discuss coordination of the instant class action settlement with the potential resolution of the FTC's pending enforcement action. Dkt. No. 60-1 at ¶ 49. Following this discussion, Defendant and the FTC settled, reaching an agreement whereby Defendant would pay the FTC $100 million, of which $68 million would be available to fund the Settlement in this action. *Id.* at ¶ 50. Thus, the Court rejects the objectors' arguments that Class Counsel unfairly "piggybacked" on the work of the FTC in securing funds from LifeLock. The sequence of events confirms that the final settlement maximized the benefit to Class Members, by requiring payment of attorneys' fees, service awards, and costs separate from the $68 million. *See also* Dkt. No. 78 at ¶¶ 19-20.

The Court declines to conduct a lodestar cross-check in this case, given that under the percentage-of-the-fund method the fee request was significantly below the 25% benchmark. *See*, *e.g.*, *McKenna v. Sears, Roebuck & Co.*, 116 F.3d 1486 (9th Cir. 1997) (unpublished) (holding that lodestar cross check was not needed when the fee award fell far below the 25% benchmark); *Glass v. UBS Financial Services, Inc.*, 2007 WL 221862, 16 (N.D. Cal. 2007) (no lodestar cross-

---

[1] The Court is further persuaded of the reasonableness of the fee request given that Counsel does not seek reimbursement of $39,595.16 in costs, relying instead on the attorneys' fee award to cover costs.

17

check required where an early settlement resulted in exceptional results for the class even though some class members and the New York attorney general objected to the 25% of the fund request as excessive); *Vizcaino*, 290 F.3d at 1050 (holding the "primary basis of the fee award remains the percentage method").

### C. Incentive Awards

"[N]amed plaintiffs . . . are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977. The Court must evaluate the incentive award using "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing the litigation . . . ." *Id.* at 977. Many courts in the Ninth Circuit have held that a $5,000 incentive award is "presumptively reasonable." *See, e.g.*, *In re Toys-R-Us Delaware, Inc. FACTA Litig.*, 295 F.R.D. 438, 470–72 (C.D. Cal. 2014); *Harris v. Vector Marketing Corp.*, No. 08-cv-5198-EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) ("Several courts in this District have indicated that incentive payments of $10,000 or $25,000 are quite high and/or that, as a general matter, $5,000 is a reasonable amount.").

Plaintiffs request a service award of $2,000 for each named representative, which is less than the presumptive $5,000 request. The total award of $8,000 makes up less than one percent of the total settlement fund. The record shows that the named plaintiffs were actively engaged in litigation. They assisted with the factual development of the action by helping their attorneys understand the Defendants' products, the representations made about the products, and the customers' reliance on those representations. Dkt. Nos. 60-3, 60-4, 60-5, 60-6 at ¶ 7. They reviewed and authorized the filing of complaints and pleadings; answered and responded to informal document requests; and supported the attorneys in mediation preparation. *Id.* Finally, they subjected themselves to public attention through their active engagement in the litigation. In light of their participation and commitment to the litigation and their service to the Class, the Court finds that the service award is fair and reasonable, and accordingly rejects the objectors' arguments that the service fee is unreasonably high.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Final Approval of Class Action Settlement and Plaintiffs' Motion for Attorneys' Fees and Costs. The Court approves the Settlement Amount of $68 million and payments of attorneys' fees in the amount of $10.2 million and service awards in the amount of $2,000 for each named plaintiff.

In its Order Granting Motion for Preliminary Approval, Dkt. No. 57, the Court appointed and designated Garden City Group, LLC to act as the Settlement Administrator. Garden City Group, LLC shall continue to act as the Settlement Administrator to perform those duties and responsibilities that remain under the Settlement and this Final Order. The Parties and Settlement Administrator are hereby directed to implement this Final Order and the Settlement in accordance with the terms and provisions thereof, including the processing and payment of Claims.

Each side shall bear its own attorneys' fees and costs, except as provided in the Settlement Agreement. The Court directs the Clerk of the Court to enter Final Judgment consistent with this order, and to close the case.

**IT IS SO ORDERED.**

Dated: 9/20/2016

HAYWOOD S. GILLIAM, JR.
United States District Judge